Cyndie M. Chang (SBN 227542)
 CMChang@duanemorris.com
Angelica Zabanal (SBN 303329)
 AAZabanal@duanemorris.com
Diane Byun (SBN 337155)
 DByun@duanemorris.com
**DUANE MORRIS** LLP
865 South Figueroa Street, Suite 3100
Los Angeles, CA  90017-5450
Telephone: +1 213 689 7400
Fax: +1 213 689 7401
Attorneys for Plaintiff
*Thai Nippon Rubber Industry Public Limited Company*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| THAI NIPPON RUBBER INDUSTRY PUBLIC LIMITED COMPANY,<br><br>                    Plaintiff,<br><br>          v.<br><br>PLAYBOY ENTERPRISES INTERNATIONAL, INC. and PRODUCTS LICENSING, LLC,<br><br>                    Defendants. | Case No.<br><br>**PLAINTIFF'S COMPLAINT FOR:**<br><br>**(1) VIOLATION OF CALIFORNIA'S FRANCHISE INVESTMENT LAW**<br><br>**(2) VIOLATION OF CALIFORNIA'S FRANCHISE RELATIONS ACT**<br><br>**(3) BREACH OF CONTRACT**<br><br>**(4) BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**<br><br>**(5) VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW**<br><br>**(6) INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS**<br><br>**(7) INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS**<br><br>**(8) NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS**<br><br>**(9) FRAUDULENT INDUCEMENT TO CONTRACT**<br><br>**(10) CONVERSION**<br><br>**<u>DEMAND FOR JURY TRIAL</u>** |

COMES NOW, Plaintiff THAI NIPPON RUBBER INDUSTRY PUBLIC LIMITED COMPANY (hereinafter referred to as **"Plaintiff"** or **"TNR"**), and for causes of action against PLAYBOY ENTERPRISES INTERNATIONAL, INC. and PRODUCTS LICENSING, LLC, (hereinafter **"Defendants"** or **"Playboy"**), allege as follows:

## NATURE OF THE ACTION

1.     TNR brings this action to recover more than $100 million in damages caused by Playboy's blatant bad-faith conduct.  TNR invested tens of millions of dollars to obtain and maintain a license with Playboy for sexual wellness products—specifically, condoms and lubricants.  But, rather than acting in good faith as required by the license, Playboy engaged in a deceitful and improper campaign to move Playboy away from its historic magazine business and to take the license back for itself out of envy of TNR's profits and success.  Among other things, Playboy surreptitiously retained TNR's agent to work for Playboy, paid off and incentivized TNR's agent for TNR's proprietary information, misappropriated TNR's funds to pay for Playboy's sexual wellness operations, duped TNR into narrowing its license, and terminated TNR through a fraudulent pre-textual audit designed only to steal TNR's business.

2.     Because of Playboy's wrongful conduct, TNR now brings this action for violation of California's Franchise Investment Law, violation of California's Franchise Relations Act, breach of contract, breach of the implied covenant of good faith and fair dealing, violation of California's Unfair Competition Law, intentional interference with contractual relations, intentional interference with prospective economic relations, negligent interference with prospective economic relations, fraudulent inducement to contract, and conversion.

## THE PARTIES

3.     Established in Thailand, TNR has been an OEM manufacturer of high-quality condoms and lubricants since 1993.  TNR is a company incorporated under

1

the laws of Thailand with its principal place of business at 1 Charoenrat Road, Thung Wat Don Subdistrict, Sathon District, Bangkok 10120.  TNR is deemed a citizen of Thailand for purposes of 28 U.S.C. § 1332(c).

4.      Playboy Enterprises International, Inc. is a corporation formed under the laws of Delaware with its principal place of business at 10960 Wilshire Blvd., Suite 2200, Los Angeles, California 90024.  Playboy Enterprises International, Inc. is deemed a citizen of Delaware and California for purposes of 28 U.S.C. § 1332(c).

5.      Upon information and belief, Products Licensing, LLC is a limited liability company formed under the laws of Delaware with its principal place of business at 10960 Wilshire Blvd., Suite 2200, Los Angeles, California 90024.  Products Licensing, LLC, has as its sole member Playboy International, Inc., a corporation formed under the laws of Delaware with its principal place of business at 10960 Wilshire Blvd., Suite 2200, Los Angeles, California 90024.  Products Licensing, LLC is therefore deemed a citizen of Delaware and California for purposes of 28 U.S.C. § 1332(c).

## JURISDICTION AND VENUE

6.      This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(2) based on diversity of citizenship between TNR and Playboy.

7.      The amount in controversy, without interests and costs, exceeds $75,000.

8.      Venue lies in the Central District of California pursuant to 28 U.S.C. § 1391(b) and (c).

## FACTUAL ALLEGATIONS

### A.      Playboy Enters Into the Product License Agreement with TNR

9.      For nearly three decades, TNR has operated a successful business as an OEM manufacturer of high-quality condoms and, more recently, lubricant products. Since November 2016, TNR has been publicly traded on the Stock Exchange of Thailand (**"SET"**), trading under the ticker "TNR."

10.     On April 1, 2010, Playboy entered into a Product License Agreement ("**PLA**") with United Medical Devices, LLC ("**UMD**"), TNR's predecessor-in-interest, with the license due to expire on June 30, 2020.  As explained more fully below, TNR became the licensee under the PLA through a novation of the Agreement on April 12, 2018.

11.     The PLA offered Playboy a way to leverage and increase its worldwide brand recognition and market resources to sell products in the sexual wellness space.

12.     Shortly after the UMD and Playboy entered the PLA in 2010, UMD approached TNR to serve as the manufacturer of the Products through its plant in Thailand, which TNR did through the entirety of UMD's term as the licensee.

13.     Upon information and belief, at some point prior to April 1, 2015, Playboy Enterprises International, Inc. assigned its rights under the Product License Agreement to an affiliate company, Products Licensing LLC.

14.     Between 2015 and 2017, the PLA underwent two significant amendments.  The Third Amendment to the PLA extended the term of the license by five (5) years to end on March 31, 2025, and it changed the operative choice of law provision and forum selection clause to reflect that California law would govern the PLA and all disputes arising out of the PLA would be heard only in the California state or federal courts in the County of Los Angeles, Central District.

15.     The Fifth Amendment further extended the Expiration Date in Schedule 9 of the PLA from March 31, 2025, to December 31, 2027—subject to the Renewal Conditions stipulated in Paragraph 1(b)(ii)—and it also expanded the definition of Products in Schedule 6 of the PLA to include certain lubricants in addition to condoms, as follows: "Condoms and non-medical personal lubricants (water, silicone or oil based to be used for personal use) only bearing and sold in connection with the Playboy Properties, as defined in the Agreement."

16.     During the entirety of UMD's term as licensee, the company's working relationship with Playboy was overseen by UMD's senior vice-president, Nicholai

3

Allen (**"Allen"**).  Allen did a variety of work that included everything from research and development to facilitating relationships with retailers and other purchasers of branded products.

**B.    TNR Replaces UMD as the Licensee Under the Product License Agreement**

17.    In or around early 2018, UMD and TNR discussed the possibility of TNR acquiring UMD's rights under the PLA.  Once the parties decided to move forward, Dr. Reena Patel[1] (**"Patel"**)—then Chief Operating Officer, Global Licensing & Joint Ventures at Playboy— issued a letter on behalf of Playboy to TNR and UMD respectively, confirming the validity of Playboy's license and its issuance to UMD.

18.    With Playboy's consent, TNR and UMD entered into the Sale and Purchase Agreement (**"SPA"**) through which UMD assigned its rights under the PLA—as well as several distributor contracts— to TNR in exchange for approximately $15 million in consideration.  TNR also invested approximately an additional $13 million for expenses to perform under the license, and paid significantly more in fees per year to Playboy than the predecessor licensee.  A copy of the SPA is attached hereto as Exhibit 1.

19.    The SPA included several terms meant to facilitate the transfer of UMD's operations to TNR and to allow TNR to establish and maintain relationships with retailers in the United States, which would be crucial to TNR's success as the new licensee.

20.    Notably, Clause 4.4 of the SPA required UMD to pay Allen for one (1) year from the execution of the agreement to assist TNR's efforts to assume the

---

[1] Patel was a central player in Playboy's relationship with UMD—and, later, with TNR.  Patel has held a number of key positions within the Playboy family of companies.  Patel is currently Playboy's Chief Operating Officer, Global Licensing & Joint Ventures, and since January 2021, she has also held the role of President, International at PLBY Group, Inc.  *See* https://www.linkedin.com/in/reenavpatel.

4

responsibilities assigned to it and ensure the smooth transition of the PLA and Sub-License agreements to TNR as the assignee.

21.     The sales relationship with Walmart, Inc. ("**Walmart**") was central to TNR's plans for its U.S.-based condom and lubricant business, one it sought to develop during TNR's term as licensee.  Thus, Clause 6.2(b) of the SPA required an appropriate representative of UMD to accompany TNR officials to the USA and connect TNR to Walmart's buyer so that TNR could negotiate an agreement for the sale and distribution of Playboy Products (*e.g.*, condoms and lubricants bearing the Playboy mark) to Walmart stores during TNR's term as Playboy's licensee.

22.     Shortly after entering the SPA—and as contemplated by that agreement—Playboy, UMD, and TNR entered into the Novation Agreement ("**Novation Agreement**"), and an Amendment thereto, under which the parties agreed to novate the PLA such that UMD's rights and obligations under the PLA were transferred to TNR, who would replace UMD as the licensee, in exchange for $750,000 in consideration paid by TNR and sent to UMD as part of the SPA's purchase price, which UMD would then pay to Playboy.  Patel executed the Novation Agreement and the Amendment on Playboy's behalf and thereby knew of the SPA's terms.  Playboy expressed no objection or concern to TNR regarding UMD's course of performance as a licensee.  A true and correct copy of the Novation Agreement and the Amendment are attached hereto as Exhibits 2 and 3 respectively.

23.     Throughout the PLA, Playboy, as licensor, granted TNR, by way of a novation from UMD, the right to design, manufacture, advertise, promote, sell, and distribute condoms bearing Playboy's mark (the "**Products**") in an area covering more than 180 countries (the "**Territory**").

24.     Playboy granted TNR an exclusive right to sell the Products in the Territory in the manner specified by the Agreement.

25.     In exchange, TNR paid to Playboy guaranteed and earned royalties in the seven-figure range and the fee under the novation as described below.

5

26.     Further, the PLA imposed terms upon TNR that placed Playboy, as licensor, in a position of significant control over the relationship.

27.     Section 2.i of the PLA conditioned TNR's ability to sell products on receiving prior approval from Playboy, and it imposed a series of strict requirements on product quality that included consequences for nonconformity.

28.     Likewise, Section 2.o(ii) required TNR to submit advertising/promotional and marketing plans for Playboy's approval on a yearly basis, in Playboy's specified format, and TNR was then required to follow the approved marketing plan in connection with sales of the product.

29.     Paragraph S.10 and Section 1.e of the PLA also required TNR to meet minimum net sales amounts each year and specified the consequences of failing to meet those targets.

30.     In accordance with California law, by way of novation in 2018, the PLA between Playboy and TNR created a franchisee/franchisor relationship.  However, upon information and belief, Playboy did not register the franchise with California's Department of Financial Protection and Innovation (**"DFPI"**), nor did it disclose certain information required by California's Franchise Investment Law ("**FIL**").  *See* Cal. Corp. Code §§ 31000 et seq.

31.     Playboy's failure to register the franchise and provide the necessary disclosures impeded TNR's full understanding of the nature of its new relationship with Playboy.

32.     Relatedly, and simultaneous with TNR's assumption of rights and liabilities under the Novation Agreement, Playboy and TNR entered the Seventh Amendment to the PLA.  In Paragraph 1 of the Seventh Amendment, Playboy promised to provide ongoing "services" to aid TNR's performance as licensee under the PLA, including "product approvals, branding guidelines, brand presentations, marketing materials, and intellectual property updates."  Thus, Paragraph 1 of the

Seventh Amendment served as an affirmative representation by Playboy to offer increased support and assistance to TNR as its new licensee.

33.     Notably, the conduct Playboy would later raise as an issue with TNR included conduct that previously presented no problem to Playboy at the time of the parties' novation and during the entirety of UMD's term as licensee.

**C.     TNR Assembles its U.S. Operations and Hires Nicholai Allen**

34.     At the time TNR became the licensee, it had no sales representatives or distribution network in the United States, and members of TNR's executive team in Thailand had little familiarity with the American market.  Thus, Allen's previous position at UMD and experience with the Playboy condoms and lubricant business placed him in a singular and essential position to guide TNR's transition efforts and left TNR heavily dependent upon Allen.  TNR engaged Allen as global sales manager for the Products through an agreement with Allen's marketing and sales company in California, Monarch Digital Media LLC (**"Monarch"**).

35.     As contemplated by Clause 4.4 of the SPA, Allen quickly assumed an integral role in TNR's operations during the transition period that would allow TNR to get up to speed in conducting and managing the Playboy business in the US under the PLA, just as UMD had done previously.  Allen also conducted business on TNR's behalf.  In pertinent part, TNR structured its nascent U.S. business in accordance with—and in reliance upon—Allen's recommendations and guidance, which TNR understood to be entirely consistent with UMD's practices when UMD was the licensee.  At no time did Playboy instruct TNR to deviate from UMD's course of performance under the PLA, nor did Playboy tell TNR that any of UMD's performance had breached the PLA or that it had ever conducted an audit of UMD.

36.     To facilitate the nuts-and-bolts of conducting its US operations, TNR entered into a pair of agreements with Allen personally and Monarch, through which TNR would remunerate funds expended by Allen and/or his company for management of the Playboy condoms business on TNR's behalf.

37.     As an extension of Allen, Monarch's operations were at the core of TNR's relationship with Allen as well as its US business efforts on behalf of Playboy.  Under the arrangement between Monarch and TNR, and to manage the Playboy condom and lubricant business, Monarch sought out, engaged, and paid the various contractors, suppliers, and service providers that TNR needed to accomplish its business objectives set out by Playboy.  For all the services provided, Monarch (through Allen) would then invoice TNR monthly for those services, which TNR reimbursed as required under the agreements.

38.     TNR also paid Monarch a monthly service fee to manage the US business for TNR and to obtain global customers.

39.     As contemplated by the SPA, the relationship with Walmart was of paramount importance to the Playboy condom and lubricant business.  Walmart imposed a series of requirements upon TNR to become an approved supplier.

40.     For example, some retailers, distributors and other relationships prefer an approved distributor use a U.S. bank.  To facilitate that element of TNR's U.S. distribution, Allen incorporated Freedom Brand Corp. (**"Freedom"**) in Las Vegas, Nevada, naming himself as Freedom's President and Director on March 19, 2019. Monarch paid for some of Freedom's start-up expenses and costs, which TNR reimbursed.

41.     Freedom was set up to distribute products in the US.

42.     TNR later entered into the Walmart General Merchandise Agreement with Walmart, which established the standard terms and conditions under which TNR would serve as a supplier to sell certain Playboy branded products in Walmart stores domestically (**"General Merchandise Agreement"**).

43.     TNR's entry into the General Merchandise Agreement was predicated upon having passed the rigorous compliance evaluation process to which Walmart subjected TNR before it would authorize sales of condoms and lubricants.

44.     Finally, to facilitate sales with Walmart under the General Merchandise Agreement, Freedom entered into the Managed Services Agreement with Coastal Solutions Group LLC (**"CSG"**), appointing CSG as its agent to promote and sell the Products in Walmart's US stores (**"Managed Services Agreement"**).

**D.     Playboy Systematically Undermines TNR as Licensee**

*a.     Playboy Induces TNR to Enter the Eighth Amendment*

45.     Upon information and belief, between June 2019 and July 2019, Patel, Jared Dougherty ("**Dougherty**") (President of Playboy), and Allison Kopcha ("**Kopcha**") (President of Playboy Licensing and Joint Ventures)[2] sought to deprive TNR of any ability to sell non-liquid or non-gel lubricants nor cannabis, cannabidiol and other related products (**"CBD products"**) related to the Playboy business—and allow Playboy to develop and sell related products directly—by manipulating Allen to obtain TNR's CEO, Amorn Dararantanaroj (**"Khun Amorn"**)'s[3] signature on the Eighth Amendment to the PLA under false pretenses and on terms that restricted TNR's sales of those products.  Playboy knew that Allen was TNR's agent.  Playboy also knew that any false information it conveyed to Allen about the Eighth Amendment would be communicated to TNR through Allen.

46.     As a material inducement to enter into the Eighth Amendment, Playboy (i) concealed or suppressed the material fact that the PLA's scope included CBD condoms and lubricants; (ii) concealed or suppressed the material fact that Playboy needed the Eighth Amendment to lawfully implement its CBD growth plan; and (iii) made a false and fraudulent representation that the PLA scope excluded CBD condoms and lubricants.

---

[2] Upon information and belief, during the time of the events surrounding Playboy's efforts to induce TNR's surrender of rights to sell CBD products and wipes, Allison Kopcha was affiliated with Playboy's brand management agency, CAA-CBG (Creative Artists Agency and Global Brands Group), later joining Playboy in January 2020.  *See* https://www.linkedin.com/in/allison-kopcha-5331785.

[3] "Khun" is a Thai honorific loosely translating to "Mister" in English.

47.     At 7:56 PM on July 8, 2019, Patel failed to inform Allen that CBD condoms and lubricants were in fact included in the scope of the PLA and instead stated: "To your own point in a previous email you, [sic] you have stated that THC/CBD and products derived from [c]annabis plants are not within the current scope of TNR's rights which is what the amendment relates to."  In doing so, Playboy intentionally concealed or suppressed the material fact that CBD condoms and lubricants were included in the scope of the PLA.

48.     At 8:26 PM on July 8, 2019, Patel re-affirmed the false narrative that CBD condoms and lubricants were not a part of the initial PLA grant when she e-mailed Allen: "Reality is that THC/CBD are not part of their [TNR's] grant (per your own note) and would be subject to our approval and grant."  In doing so, Playboy (i) intentionally concealed or suppressed the fact that Playboy needed the Eighth Amendment to lawfully implement its 2021 growth plans to develop its competing CBD sexual wellness product line—CBD by Playboy— without violating the terms of the PLA;[4] and (ii) made a false representation that CBD condoms and lubricants were excluded from the scope of the PLA.

49.     On July 22, 2019, Patel sent the final version of the Eighth Amendment, which significantly narrowed the definition of Products to include "[c]ondoms and non-medical personal lubricants (water, silicone or oil based) **in gel or liquid form only** to be used for personal use only" (emphasis added) and to expressly exclude CBD products, without any consideration on Playboy's part.

50.     Per Schedule 6 of the PLA, there is no express or implicit exclusion of CBD condoms or lubricants from the scope of the PLA.  Put simply, the final and

---

[4] Having cleared TNR from the field, Playboy now sells two CBD lubricant products directly to consumers through www.pleasureforall.com: (i) CBD Arousal Spray by Playboy (a "sensual and warming stimulating oil" meant for "the vulva and clitoris" with 250mg of Broad-Spectrum CBD); and (ii) CBD Intimacy Gel by Playboy (an "incredible blend of water-based ingredients" and 250mg Broad-Spectrum CBD "designed to heighten the pleasure of your intimate experience.").

10

agreed-upon language of the PLA, prior to the Eighth Amendment, clearly grants TNR a license to all condoms and non-medical personal lubricants bearing and sold in connection with Playboy's marks and images, including CBD condoms and lubricants.

51.    Playboy made representations to convince Allen that the Eighth Amendment needed to be signed urgently, and its terms simply affirmed the alleged 'fact' that CBD products were not in the scope of the initial PLA and limited the scope of TNR's lubricant rights in an insignificant manner that would not harm TNR's operations given TNR's focus on condoms—even though Playboy knew or believed none of those representations to be true.

52.    Upon information and belief, Allen—relying upon Playboy's fraudulent conduct regarding the initial scope of the PLA, the Eighth Amendment's effects on TNR, and Playboy's legal need for the Eighth Amendment—met with Khun Amorn while in Thailand, on August 3, 2019 to obtain Khun Amorn's assent to the Eighth Amendment on behalf of TNR.  Khun Amorn was unavailable when Allen called, but when Allen pressed that the document needed to be signed urgently, despite it being a Saturday, Khun Amorn agreed to visit Allen's hotel later that day.

53.    Khun Amorn met Allen at the hotel as planned.  Moreover, given the seemingly urgent nature of the situation, Khun Amorn was not able to seek or consult legal counsel prior to signing the document.

54.    Allen repeated the substance of the representations Playboy made to him about the urgent need to sign the document as well as the justifications for doing so, as represented by Playboy.

55.    The practical result of the Eighth Amendment was to keep TNR out of the market for products involving CBD and other cannabinoids, as well as to prevent TNR from making lubricants in a non-liquid or non-gel form—for example, in dry or aerosol form— and signing the Eighth Amendment worked to TNR's detriment because TNR intended to develop CBD lubricants.  Due to Khun Amorn's lack of

direct familiarity with the various operative agreements and their effects, Khun Amorn was at a disadvantage regarding the document Playboy needed him to sign. Thus, Khun Amorn relied upon Allen's characterization of the document and its contents, which had been influenced by Playboy's intentional concealment or suppression of material facts and strategically crafted sense of urgency.  Given the belief in and trust Khun Amorn was forced to place in Allen generally due to TNR's new status as licensee, and on the strength of Playboy's representations to Allen, Khun Amorn signed the contract without the benefit of an attorney and with no consideration from Playboy.

### b.    *Playboy Poaches Allen to Undermine TNR*

56.    From the beginning, TNR understood the relationship with Walmart to be of paramount importance to its success with the Playboy business.  Through its hard work and diligence that started with TNR's presentation to Walmart in January or February 2019, TNR later experienced a breakthrough in the relationship with Walmart for sales of Playboy products whereby the number of SKUs greatly increased and sales of the Products increased from 1,110 stores to all Walmart stores nationwide, which was not previously accomplished under the prior licensee.  In addition, TNR dramatically increased the profits on sales of Playboy products to Walmart stores.

57.    Unbeknownst to TNR, while gaining the initial traction with Walmart, Allen developed a wipes product sometime in 2019 and wanted to use TNR's relationships and credentials with retailers in addition to its shipping, storage, logistics, insurance, and other resources to sell the product under the Playboy brand outside of TNR's purview under the license, but when Allen pitched the wipes product to Playboy, the company was initially cool to the idea.

58.    Allen became aware that Playboy wanted to reacquire TNR's license so that Playboy could shift from a licensor to owner/operator of the condom and lubricant business.  Around the summer of 2019, Playboy tried to take away

exclusive rights from TNR to USA and Canada and revealed its intentions then to Allen, but Allen did not agree to release such rights for such territories, likely because he wanted to continue operating as the distributor for the US territory.

59.     Thus, Playboy developed an interest in Allen's wipes idea once it realized its leverage.  Allen and Playboy entered a deal to help both parties get what they wanted: Allen would have the ability to sell his wipes product under the Playboy brand, and Playboy would have a means to charge into the sexual wellness space using TNR's retail and distributor relationships.

60.     In accordance with the new deal between Playboy and Allen—and not long after TNR achieved the new milestones with Walmart—Playboy continued to undermine TNR and compete with its own licensee's business by boldly and unabashedly trying to pull the rug out from under TNR in offering Allen an official consulting role on or about November 2019, which TNR later learned that he accepted in exchange for a significant sum of $100,000, plus sales commissions.

61.     Notably, Playboy offered this position to Allen while he continued to serve as global sales manager for TNR through Monarch and remained a director of Freedom, TNR's US distributor.

62.     The significant geographic distance between Playboy and TNR—as a foreign entity whose US presence was in its infancy—put Playboy in a superior position to conduct its deceit without TNR's knowledge.

63.     Allen accepted Playboy's offer and took a role with the company working in its Los Angeles headquarters as Playboy's "Special Project Consultant – New FMCG Wellness Products," and Playboy planted the ever-growing seed of Allen's conflict of interest.  Allen and Playboy reached an understanding whereby Playboy threw its support behind Allen's Playboy wipes product and paid Allen a significant sum for his work.  Allen worked with both Playboy and TNR at the same time without TNR's knowledge.

64.     Despite their relationship as licensor and licensee, Playboy failed to inform TNR of Allen's new position with Playboy and the direct conflict that the role created with his position at TNR.  Playboy identified a willing mole in Allen to help satiate its corporate greed by directing Allen's work as a double agent to help Playboy infiltrate, sabotage and ultimately usurp TNR's business.

65.     Playboy lacked the requisite credentials to sell its products directly to certain retailers, so it obtained a backdoor entryway through Allen to gain unfettered access to shelf space it did not earn.

66.     Upon information and belief, chief among the FMCG products Allen promoted were Playboy's Climax Delaying Wipes product (**"Playboy wipes"**), which Allen worked in tandem with Playboy to further develop and promote and to get the Playboy wipes onto Walmart's shelves using TNR's account at Walmart.

67.     Upon information and belief, around January or February of 2020, Allen presented the Playboy wipes to Walmart with the TNR products and Walmart accepted the wipes.

68.     In or around October 2020, TNR discovered the Playboy wipes being sold on the Walmart website. TNR started wondering why the Playboy wipes were being sold under TNR's account-Playboy Condoms and started making inquiries about such to Allen.

69.     TNR did not discover Playboy had poached Allen to work for Playboy for the first year or so of Allen's double-agent position.  On or about November 2020, TNR noticed a position on Allen's Linkedin profile with the description: "Launching of new FMCG products under world famous Playboy brand."  When confronted, Allen convinced TNR that this arrangement worked to TNR's benefit so as to better develop the relationship.

70.     TNR was also informed by Allen that Playboy required TNR to pay approximately $4,000 in rent and parking fees for Allen's use of the space at Playboy's headquarters.  Playboy charged TNR for Allen's rental expenses at

Playboy's headquarters, including costs for building office walls and remodeling at Playboy's offices, although Allen was concurrently working for Playboy, and Playboy has never returned the funds TNR expended under false pretenses. Playboy later admitted to TNR that Allen and Playboy jointly agreed to pursue reimbursement of the rental and parking space from TNR, though there appears to be no written rental agreement between Allen and Playboy.

### c. *Playboy Interferes in TNR's Relationship With Retailers*

71. Upon information and belief, and at Playboy's direction, Allen secured a meeting with Walmart's buyer during which he presented samples of the Playboy wipes and misdirected Walmart on behalf of Playboy that the wipes were products under TNR's account. Playboy lacked an independent supplier account with Walmart and was therefore unable to secure the necessary approvals to sell its products to the retailer without cover from TNR. Without the consent or knowledge of TNR, Playboy sold and derived profits from the wipes using TNR's supplier account and TNR's shelf space despite knowing those wipes were not manufactured by TNR and were sold under TNR's account.

72. Selling the wipes using TNR's shelf space deprived TNR of its ability to sell agreed upon quantities of TNR's condoms and lubricants at Walmart stores and hurt TNR's bottom line. Upon information and belief, sales of Playboy wipes specifically displaced TNR's top-selling "Studded Pleasure" condom from Walmart shelves, thereby preventing sales of a crucial item in TNR's sales portfolio. Playboy in no way shared any profits from sales of the wipes with TNR.

73. Playboy's intentional act of using TNR's shelf space for sales of its wipes to the exclusion of TNR's products jeopardized TNR's performance under the General Merchandise Agreement with Walmart and diminished TNR's ability to enjoy the full benefits of sales through the retailer's stores as contemplated in the General Merchandise Agreement.

74.    In addition, Playboy deployed the wipes to Walmart's shelves in packaging that is almost identical to TNR's best-selling "Studded Pleasure" condoms.

 

75.    The reduction in TNR's sales at Walmart stores resulting from displacement of TNR's products hampered TNR's ability to meet its obligations under the PLA to satisfy minimum sales requirements, undermining TNR's ability to perform as licensee.

76.    Upon information and belief, at some point in the fall of 2020, CSG (TNR's sales broker to Walmart) learned of an issue with Freedom and Allen that made it uncomfortable to further do business for the Playboy condoms.  TNR did not learn about the end of the relationship with CSG until June 2021 due to Allen's efforts on Playboy's behalf to keep TNR from full participation in the relationship.

77.    In addition to its efforts at Walmart, upon information and belief, Playboy acted through Allen without TNR's knowledge or consent to insure Playboy's products under TNR's liability insurance policy.  TNR later discovered

16

that, in addition to unauthorized use of its insurance, Playboy acted through Allen to bill shipping, storage, advertising, marketing, CSG management fees, EDI setup fees, EDI usage fees, QuickBooks monthly fee, and other significant costs and fees to TNR's accounts to support sales of Playboy wipes and CBD products.

78.     Upon information and belief, Playboy acted through Allen to use a sales pitch to CVS for TNR's products as a cover to promote Playboy wipes by mixing the wipes in with TNR's Playboy condoms and lubricants using a presentation vendor called BLKLYST, without TNR's knowledge or consent.  TNR reimbursed Monarch for the presentation in full, without knowing that a significant portion of the presentation was for Playboy's non-TNR products.

79.     Playboy wipes are sold in CVS stores but TNR's condoms and lubricants are not.  Upon information and belief, Playboy wipes at CVS are purportedly relying on TNR's product liability insurance thereby benefitting Playboy's products and profits under the cover of, and without the consent of, TNR.

80.     Upon information and belief, Playboy acted through Allen to use a sales pitch to Walgreens for TNR's products as a cover to promote Playboy wipes and CBD products by mixing those products in with TNR's Playboy condoms and lubricants using a presentation vendor called BLKLYST, without TNR's knowledge or consent.  TNR reimbursed Monarch for the presentation in full, without knowing that a significant portion of the presentation was for Playboy's non-TNR products.

81.     Playboy used sales of its wipes products to enrich itself at TNR's expense.  For example, on November 4, 2020, and without TNR's permission or knowledge, Playboy prompted Allen to send a payment of $226,061.96 from Freedom's bank account, the first of several monthly payments, as payment for Playboy wipes' sales.

82.     At or about the time it was directing Allen to undermine TNR with major retailers, Playboy revealed during an investor presentation that it would pursue a new strategy of transitioning from licensing to direct ownership and operation of its

17

sexual wellness portfolio—with an eye toward a specific expansion in US, EU, and Asia markets.  Among other things, Playboy revealed during the presentation that it had secured agreements to sell its sexual wellness products at Walmart and CVS—the very two retailers at the heart of Playboy's unauthorized efforts to use TNR resources for its own benefit.

83.    Playboy did not reveal the underhanded means described above that Playboy used to get into Walmart and CVS through TNR's relationships without TNR's knowledge or permission. Moreover, upon information and belief, Playboy has no such direct agreement to sell its sexual wellness products with Walmart.

### d.    *Playboy Blocks TNR's Attempts to Seek New Opportunities*

84.    At around the same time, Playboy also began to unabashedly exert brute force in its efforts to block potential relationships that would expand TNR's sales of Products.

85.    Playboy directed Allen not to pursue a relationship for TNR with a vendor called Core-Mark—a major USA distributor that services convenience stores and gas stations—because Playboy wanted the relationship for itself.  Due to Playboy's instruction, Allen was asked to insert Playboy into the relationship and Allen put TNR's negotiations with Core-Mark on hold and the relationship never came to fruition.

86.    Playboy interfered with a $500,000 deal by holding back its approval for 4-6 months for TNR to sell condoms in Russia, a deal Allen attempted to secure with a distributor through a sub-publisher of Playboy magazine in the country.

87.    During Playboy's strict regime of Playboy's prior approval and quality control of sales, Playboy also misused its authority under the PLA to withhold approval of a 200-page marketing plan that TNR submitted concerning, among other things, TNR's plan to utilize digital markets, social media platforms, and other internet-based endeavors in sales of Playboy products.  Playboy's abuse of power

blocked TNR's ability to utilize Playboy's social media for advertising related to TNR's Playboy-branded Products.

88.    In fact, Playboy also unreasonably withheld and/or failed to act on no fewer than 67 product approval requests and no fewer than 18 requests for approval of marketing materials—all of which were submitted through Playboy's requisite portal and met the requirements of Paragraph 2.i(i) of the PLA to the extent reasonably possible to do so.  This violated Playboy's obligations under the PLA and the Seventh Amendment to promptly provide such approvals or an explanation for denial.

89.    Furthermore, Playboy began to pressure TNR through its license management company CAA-Global Brands Group ("**CAA**"), demanding sales reports, insisting on product and ad approvals, instituting production controls, requiring marketing plan submissions, and enforcing requirements for the placement of holograms on products.  The changes and additional controls over the license contravened the course of performance between Playboy and UMD, TNR's predecessor-in-interest, as TNR understood UMD to engage in the same conduct for many years prior to novation of the license to TNR.

90.    Meanwhile, Playboy ratcheted up the pressure on Allen to deliver TNR's business to Playboy as they had agreed.  Upon information and belief, as part of his efforts on Playboy's behalf, Allen supplied Playboy with TNR's confidential business information and financial data.

91.    Apparently unsatisfied with Allen's efforts in providing such information to that point, Patel sent an email to Allen on or around November 25, 2020 with an offer of a full-time position in the company with significant compensation, and provided a list of "expectations" Playboy had for Allen, including, among other things, that he (i) deliver condom distribution rights for major markets to Playboy; (ii) transition use and control of Playboy's marks back to the company; (iii) divulge the sensitive details of TNR's logistics and distribution

setup (e.g., Freedom's role, the identity of its importer and freight forwarder, and the source of its USA regulatory guidance); (iv) work with Playboy's communications/brand team to clean up all social/digital assets related to condoms/intimacy, e.g. Instagram, Facebook, YouTube to establish greater alignment and consistent with Playboy Hero Brand and Sexual Wellness Category; and (v) share knowledge about the sexual wellness category with respect to competition, trends, industry/sector, regulatory, and other best practices.

92.     Playboy's attempt to solicit Allen for the purposes stated in the email contravened its representations under the Novation Agreement and Seventh Amendment to the PLA that it would be a supportive licensor to TNR.

93.     Thus, contrary to its contractual obligations licensing condom rights to TNR for significant consideration, and before conducting a 2021 audit to terminate TNR's license, Playboy was already taking steps in 2020 to start transitioning the license to Playboy by offering Allen compensation with a list of expectations that would achieve Playboy's goal of getting the license back from TNR.

**Playboy Engineers an Audit as Pretext for Terminating TNR's License**

94.     Eventually, things fell apart between Playboy and Allen in or about December 2020.  Upon information and belief, Playboy began to press Allen for extremely detailed accounts regarding TNR's operations, logistics, and other intimate details of TNR's business.  Ultimately, Playboy and Allen did not renew their working relationship and Allen left the Playboy space.

95.     Declining to give into Playboy's demands any further, Allen left his position at Playboy and alerted TNR to the fact during a video conference meeting with TNR officials in January 2021. Allen then informed TNR of Playboy's efforts to use him to seize TNR's Playboy condom and lubricant business and showed TNR the e-mail Playboy sent to him on November 2020.  Upon information and belief, Playboy worked with Allen to steal TNR's business.

96.     On February 11, 2021, Playboy resumed its status as a publicly traded company through a deal with a Special-Purpose Acquisition Company (**"SPAC"**) trading on the NASDAQ exchange under the ticker "PLBY."

97.     The next day, Playboy's CEO, Ben Kohn, participated in a video interview during which he outlined Playboy's strategy for the future.  Though the company had gained prominence as the publisher of a men's lifestyle and entertainment magazine, Playboy would now move away from the publication business and focus on other markets, with an emphasis on the market for sexual wellness products.  Kohn confirmed Playboy's desire to seize direct control of the sexual wellness business it was licensing to companies like TNR, stating flatly that "[s]exual wellness is a category [Playboy wants] to own . . . on a global basis" and that Playboy had begun making that desire a reality "by terminating contracts and taking back rights to certain product categories."[5]

98.     In a later interview, Kohn explained Playboy's incentive to move from licensor to owner/operator of its sexual wellness portfolio in order to maximize the sector's value to the company:  "[L]icensing is a less efficient model for that, and we can own a lot more of the spend.  That $3 billion of consumer spend, *the challenge with licensing is you're getting pennies on the dollar for that*, $0.02, $0.03 on the dollar for that.  If we pivot and we own that, not only can I drive the lifetime value of the customer up and the average order size because I can tell [sic] you more products, but I can drive my revenue up.  When you look at that, there could be a 20x increasing revenue just if you model it out and actually an increase in EBITDA by 5 or 6 times as well."[6]

---

[5] Channelchek, *Playboy CEO Ben Kohn – Presentation from NobleCon 17*, YouTube (Feb. 12, 2021), https://youtu.be/9ULyUT2sFac

[6] Nick Sciple, *PLBY Group CEO Ben Kohn on the Future of Playboy and Other Parts of the Business*, The Motley Fool (Aug 23, 2021, 2:11PM), https://www.fool.com/investing/2021/08/23/plby-group-ceo-ben-kohn-on-the-future-of-playboy/.

99.   Shortly after Playboy went public, TNR received an email placing it on notice of an impending audit under the PLA.  Up to that point, Playboy had never conducted an audit of TNR or its predecessor licensee UMD.

100.   In the wake of Playboy's failure to use Allen to steal TNR's business, TNR suspected that the audit represented a change in Playboy's strategy to misuse its broad powers under the PLA to achieve its objective instead.  Indeed, Allen later disclosed to TNR that Playboy executive Kopcha stated that an audit could be used by Playboy to terminate the license to achieve Playboy's desired outcome.

101.   At Playboy's request, Credence Global Consulting Limited ("**Credence**") conducted the audit between April 26, 2021 to May 4, 2021 at TNR's offices in Bangkok, Thailand and, as agreed, TNR cooperated fully.  On June 7, 2021, Credence issued a report detailing the findings of its audit on TNR's books and records concerning TNR's compliance with the PLA.

102.   The audit findings alleged that TNR had committed a number of breaches under the PLA, ranging from purported late payments of royalties to TNR's alleged failure to obtain certain product approvals.  In total, Playboy's audit assessed a claim against TNR in the amount of $8,622,713 for the alleged violations detailed in the audit.

103.   The audit findings were, at best, disingenuous, and none of the purported breaches of the PLA presented in the audit were material or justified immediate termination of the agreement.  Moreover, the audit contained no notice of Playboy's intent to terminate the PLA, nor any date upon which such a termination would be effective.

104.   Accordingly, TNR responded a week later with a letter providing a detailed rejection of all findings and a specific basis for each rejection.

105.   For example, contrary to the audit's finding that TNR failed to obtain product approvals, the reality was that TNR *did* obtain approvals in the same manner that UMD had always done so.

106.   Similarly false were the audit's findings that TNR had failed to pay royalties.  In fact, TNR had paid all royalties as required under the PLA.

107.   Playboy later reduced the amount it sought in connection with TNR's alleged breaches from $8,622,713 to $1,610,078, in exchange for the return of rights to territories closely aligned to those it communicated to Allen in the list of "expectations" for Playboy's offer of full-time employment to Allen, all while signaling that its proposed offer was somehow generous to TNR.

108.   TNR attempted to discuss the audit 'findings' with Playboy, offered to pay for a new audit, and expressed a desire on multiple occasions to resolve the issues between the parties, but Playboy failed to meaningfully engage in a productive dialogue.  Instead, Playboy simply bullied TNR to forcibly terminate the PLA consistent with Playboy's real intent of taking the license back to distribute products itself.

**Playboy Unlawfully Terminates the Product License Agreement**

109.   On November 5, 2021, Playboy sent a letter to a TNR executive terminating the PLA effective immediately.

110.   In the letter, Playboy invoked its purported rights to terminate the agreement due to alleged incurable defaults under Section 7.a(iii) of the PLA and citing as justification for its act the findings of the audit conducted in July 2021.  Playboy also demanded that TNR (i) cease and desist from use of Playboy's intellectual property and stop sales of products; (ii) refrain from entering a sell-off period and provide Playboy with an inventory list within ten (10) days of the termination date; (iii) remit the termination fee of $459,461.25 to Playboy within ten (10) days of the termination date; and (iv) pay Playboy the reduced figure of $1,610,078 previously sought from TNR to resolve the matter.

111.   As TNR previously noted in its audit response, the alleged defaults in Playboy's purported termination notice were (i) acts and conduct by TNR's predecessor licensee that was agreeable and sanctioned by Playboy; (ii) acts and

23

conduct that TNR continued from its predecessor's course of performance under the PLA licensee that was agreeable and sanctioned by Playboy; (iii) minor acts that TNR rectified immediately upon notice, or (iv) acts that lacked any factual basis. In all events, none of the purported breaches of the PLA were material or justified termination of the agreement.

112.   In accordance, TNR promptly notified distributors and known retailers of the sudden and abrupt nature of Playboy's immediate and wrongful termination, thereby causing significant commotion, damage, and inconvenience to all of TNR's relationships.

113.   Playboy's refusal to allow TNR to engage in a sell-off period and eliminate remaining unsold inventory was retaliatory and has saddled TNR with approximately $13 million in inventory that will have to be unnecessarily destroyed or used as a means by Playboy to ascertain and control the inventory so it can replace TNR as the new supplier to TNR's damaged relationships.

114.   Playboy's wrongful and an unjustified termination of the PLA has caused a ripple effect through TNR's supply chain and sales channels, resulting in the inability to sell millions of dollars in inventory, harm and damage to its various commercial relationships, and tarnishment of its public reputation around the world resulting in devaluation of TNR's stock by TNR having to report the license termination to the SET.

**TNR is a De Facto Franchisee Entitled to the Protections of California Law**

115.   TNR qualifies as a franchisee under Section 31005 of the FIL. Cal. Corp. Code § 31005.

116.   The terms of the PLA required TNR to seek Playboy's approval for the sales of all its branded products as well as for marketing and advertising plans, which UMD was required to use in connection with the branded products.

117.   The PLA granted TNR the right to engage in the business of selling branded condoms and lubricants bearing Playboy's mark.

24

118.   The PLA required entitled Playboy to both guaranteed and earned royalties for the rights granted by the PLA.

119.   Through the SPA and the Novation Agreement, TNR became UMD's successor in interest.

120.   The Novation Agreement required TNR to tender consideration that went to Playboy in the amount of $750,000 as an upfront fee, which it paid.

121.   The PLA required TNR to provide an annual payment of both guaranteed and earned royalties—totaling more than $2.3 million— to Playboy, which it paid.

122.   Accordingly, TNR meets each of the requirements to be a franchisee under the FIL and is entitled to its protections. It follows that Playboy is thus a franchisor and must adhere to the legal obligations of a franchisor under California law.

123.   The FIL was enacted with specific public policy in mind:

> [I]t is the intent of this law to prohibit the sale of franchises where the sale would lead to fraud or a likelihood that the franchisor's promises would not be fulfilled, and to protect the franchisor and the franchisee by providing a better understanding of the relationship between the franchisor and franchisee with regard to their business relationship.

Cal. Corp. Code § 31001.

124.   Consistent with that policy, a franchisor—here, Playboy—must either register the franchise with California's DFPI and disclose certain information required by the Franchise Investment Law through a Franchise Disclosure Document, or otherwise qualify as a franchise exempt from such disclosures.

125.   A franchisor—here, Playboy—is also required to update its DFPI disclosures to the extent there are any material changes to the information contained in the initial registration application.

126.   Upon information and belief, Playboy has never registered with California's DFPI.  As such, Playboy has also failed to provide the requisite information for a lawful Franchise Disclosure Document.

127.   Playboy's failure to make the required disclosures and provide TNR with a Franchise Disclosure Document (**"FDD"**) left TNR unaware of many aspects of its relationship with Playboy, including the role of Playboy as franchisor and TNR as franchisee.  Had Playboy fulfilled its legal obligations as a franchisor, TNR would have received a Franchise Disclosure Document informing TNR of (i) Playboy's ability to provide assistance, advertising, training, and other benefits to TNR; and (ii) Playboy's ability and obligation to participate in the operation of TNR's franchisee business, if any.

## FIRST CLAIM FOR RELIEF

### (Violation of Statute – Wrongful Termination of Franchise)
### (California Franchise Relations Act – Corporations Code sections 20000 *et seq.*)

128.   TNR hereby incorporates each and every allegation set forth in the preceding paragraphs as though set forth fully herein.

129.   The license from Playboy is a franchise as defined by California Corporations Code section 20001, known as the California Franchise Relations Act (**"FRA"**). Cal. Corp. Code §§ 20000 et seq.

130.   Under that license, Playboy granted TNR, by way of the Novation Agreement, the right to engage in the business of selling Playboy-branded products bearing its mark.  Playboy also prescribed in substantial part the means by which TNR would sell products by requiring an advertising/promotional and marketing plan, paired with its own submission and approval process, for all sales of Playboy-branded products.

131.   Moreover, Playboy conditioned all sales of Playboy-branded products upon (i) TNR satisfying Playboy's strict standards of quality and suitability dictated by Playboy under the terms of the license, and (ii) TNR receiving approval from

Playboy based on the standards dictated by Playboy. In turn, TNR's business of selling Playboy-branded products is substantially and integrally associated with Playboy's tradename, marks, and logos.

132.   TNR paid a total of $750,000 to Playboy, through UMD, as an initial fee under the Novation Agreement, and it also paid substantial guaranteed royalties of more than $2.3 million dollars annually, plus earned royalties as calculated under the terms of the PLA.

133.   Under the terms of the PLA, as extended by the Fifth Amendment, TNR's license was due to expire, if not renewed, on December 31, 2027.

134.   On November 5, 2021, Playboy issued a defective notice of termination letter indicating TNR's license was terminated immediately on the grounds of alleged incurable defaults under the PLA, citing the findings of its pretextual audit. None of the alleged defaults were material.

135.   Playboy terminated the license without providing 60 days' notice of its intent to terminate and an opportunity to cure any alleged defects in TNR's performance.  This is a violation of FRA section 20020. Cal. Corp. Code § 20020.

136.   Playboy's notice of termination was defective because it did not provide written notice to TNR by registered, certified, or receipted mail, telegram, or personal delivery.  This is a violation of FRA section 20030. Cal. Corp. Code § 20030.

137.   At all relevant times, TNR operated in substantial compliance with the terms of the PLA and substantially performed its obligations thereunder.

138.   Playboy's purported grounds for termination were arbitrary, wrongful, and without good cause, in breach of the license.  This is a violation of FRA section 20020. Cal. Corp. Code § 20020.

139.   TNR is therefore entitled to the fair market value of the franchised business and franchise assets, any other damages that result from Playboy's wrongful termination of the PLA, and injunctive relief.

140.   As a direct and proximate result of Playboy's violations, and pursuant to FRA section 20035 (Cal. Corp. Code § 20035), TNR has suffered and continues to suffer damages in an amount to be determined at time of trial, the amount of which is in excess of $100 million including, but not limited to, the fair market value of the franchised business and the franchised assets, expected profits under the license through 2027, the $15 million purchase price of the license (including $750,000 as initial consideration under the Novation Agreement), startup costs and investments of approximately $13 million, royalties, the reimbursements and returns of monies and inventory to and from third parties due to the sudden termination, any loss of stock market valuation due to TNR having to report the license termination to the SET (Stock Exchange of Thailand), and numerous operating losses, including but not limited to having to cancel third party contracts, and operating contracts for employees and vendors for storage and related logistics, approximately $17 million in unsold and returned inventory due to Playboy's retaliatory refusal to allow a sell-off period, and all consequential damages suffered by TNR related to Playboy's illegal franchise.

## SECOND CLAIM FOR RELIEF

### (Violation of Statute)
### (Franchise Investment Law – Corporations Code sections 31000 *et seq.*)

141.   TNR hereby incorporates each and every allegation set forth in the preceding paragraphs as though set forth fully herein.

142.   Playboy violated the FIL by failing to register (or claim an exemption) and by failing to file its franchise offering circular ("FOC") (now known as the FDD) with the California Department of Corporations as required of all non-exempt sellers of franchises in California.  This omission is a violation of the FIL.  TNR first discovered the nature of its franchisor-franchisee relationship with Playboy on or about November 2021 upon Playboy's wrongful termination.  In particular, TNR learned that it had legal rights under the FIL based on (i) Playboy's failure to prepare

and file the requisite paperwork under the FIL and (ii) Playboy's failure to present TNR with a FOC (now called the FDD).

143.   Specifically, Playboy violated the FIL by failing to provide a copy of a FOC (now called the FDD) to TNR at least ten (10) business days prior to TNR entering a franchise.  This is a violation of Corporations Code section 31119.

144.   Upon information and belief, Playboy never employed a registered franchise salesperson when it instructed its employees or agents to participate in the ongoing sale of the franchise from Playboy to TNR during the execution of the Novation Agreement and any subsequent Amendments to the PLA during TNR's time as licensee.  This is a violation of section 31210 of the FIL. Cal. Corp. Code § 31210.

145.   Upon information and belief, and pursuant to section 31302 of the FIL, the officers of Playboy are jointly and severally liable for the violations set forth above because they are officers, directors, and/or control persons of Playboy. Cal. Corp. Code § 31302.

146.   Upon information and belief, Playboy's acts as described herein were willful, so TNR is entitled to rescission as an alternative to remedy to its damages claims.  The PLA is therefore an illegal franchise since it violates California civil law, California administrative regulations, California public policy, and the Code of Federal Regulations.

147.   As a direct and proximate result of Playboy's violations, and pursuant to section 31300 of the FIL (Cal. Corp. Code § 31300), Plaintiff has suffered and continues to suffer damages in an amount to be determined at time of trial,  the amount of which is in excess of $100 million including, but not limited to, the fair market value of the franchised business and the franchised assets, expected profits under the license through 2027, including, but not limited to, the $15 million purchase price of the license  (including $750,000 as initial consideration under the Novation Agreement), startup costs and investments of approximately $13 million,

royalties, the reimbursements and returns of monies and inventory to and from third parties due to the sudden termination, any loss of stock market valuation due to TNR having to report the license termination to the SET (Stock Exchange of Thailand), and numerous operating losses, including but not limited to having to cancel third party contracts, and operating contracts for employees and vendors for storage and related logistics, approximately $17 million in unsold and returned inventory due to Playboy's retaliatory refusal to allow a sell-off period, and all consequential damages suffered by TNR related to Playboy's illegal franchise.

### THIRD CLAIM FOR RELIEF
### (Breach of Contract)

148.   TNR hereby incorporates each and every allegation set forth in the preceding paragraphs as though set forth fully herein.

149.   TNR operates a business of selling Playboy-branded products pursuant to the terms of the PLA, under which it became a licensee pursuant to the SPA and the Novation Agreement (collectively, the "**Agreements**").

150.   Playboy has breached the Agreements with TNR by unfairly and intentionally taking actions contrary to the terms of those Agreements and to the longstanding course of performance between Playboy and TNR—as well as between Playboy and UMD as TNR's predecessor in interest— including, but not limited to:

*a.*   Unreasonably and without justification withholding product approvals in violation of the Agreements that prevented TNR from engaging in sales of Playboy products under the Agreements, including preventing TNR from engaging in holiday promotions to maximize sales during peak sales periods;

*b.*   Failing to provide the agreed upon "services" enumerated in the Seventh Amendment to the PLA including, among other things, timely product approvals and other assistance as necessary to effectuate TNR's assumption of obligations under the PLA;

      **c.**    Failing to cooperate with TNR as licensee in good faith as required to give effect to the Novation Agreement; and

      **d.**    Wrongfully terminating the PLA on the basis of pretextual audit findings that contravene the course of performance between the parties.

151.   TNR has performed or substantially performed its obligations under the PLA and the Novation Agreement and has paid Playboy significant royalties to date.

152.   Playboy's breaches of the PLA and the Novation Agreement are material, done in bad faith, and have resulted in Playboy unfairly and unjustly profiting from its breaches.

153.   As a direct and proximate cause of Playboy's breach of the PLA and the Novation Agreement, TNR has suffered general, special, and consequential damages, including future damages, in an amount to be determined at trial, but exceeding $75,000.

## FOURTH CLAIM FOR RELIEF

### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

154.   TNR hereby incorporates each and every allegation set forth in the preceding paragraphs as though set forth fully herein.

155.   TNR operates a business of selling Playboy-branded products pursuant to the terms of the PLA, under which it became a licensee pursuant to the SPA and the Novation Agreement.

156.   The PLA and Novation Agreement, as well as the longstanding course of performance between the parties, impose a duty of good faith and fair dealing on the part of Playboy.

157.   Playboy has breached its duty of good faith and fair dealing by intentionally taking actions to frustrate and misappropriate the benefits to which TNR is entitled under the PLA and Novation Agreement, including, but not limited to:

     *a.*     Withholding product approvals unreasonably and without justification to harm TNR's performance under the PLA and prevent TNR from obtaining the full benefit of its bargain, also in violation of the Seventh Amendment to the PLA;

     *b.*     Failing to provide the good-faith cooperation required under the Novation Agreement;

     *c.*     Directing, aiding, and abetting a Playboy agent to obtain TNR's approval of the Eighth Amendment by concealing material facts about the nature of the agreement;

     *d.*     Competing directly with TNR by selling Playboy products not manufactured by TNR on TNR's retail shelf space and using packaging copied from TNR's products;

     *e.*     Undermining and sabotaging TNR's efforts to perform and meet its obligations as a licensee;

     *f.*     Directing, aiding, and abetting a Playboy agent  to bill or charge TNR for improper and unauthorized expenses to support sales of Playboy products, including, but not limited to, shipping, logistics, insurance, advertising, and other costs and fees, injuring TNR's ability to make profits under the PLA;

     *g.*     Abusing its discretionary powers under the PLA in bad faith to conduct an audit for the purpose of raising alleged defects in TNR's performance to justify immediate termination of the PLA and seizure of TNR's exclusive license; and

     *h.*     Refusing to entertain TNR's good faith efforts to cure the alleged defects in TNR's performance identified in the audit or in any way to resolve the impasse between the parties over the PLA.

158.    As a direct and proximate cause of Playboy's breach of the implied covenant of good faith and fair dealing, TNR has suffered general, special, and

consequential damages, including future damages, in an amount to be determined at trial, but exceeding $75,000.

## FIFTH CLAIM FOR RELIEF

### (Violation of California's Unfair Competition Law
### Cal. Bus. & Prof. Code § 17200 *et seq.*)

159.   TNR hereby incorporates each and every allegation set forth in the preceding paragraphs as though set forth fully herein.

160.   The California Unfair Competition Law (**"UCL"**) prohibits any "unlawful, unfair, or fraudulent business act or practice[.]"  Cal. Bus. & Prof. Code § 17200.

161.   Playboy is a "person" as defined by the UCL.  Cal. Bus. & Prof. Code § 17201.

162.   Playboy violated the UCL by engaging in unfair, unlawful, and deceptive business practices, specifically by engaging in behavior including, but not limited to:

   *a.*   Misrepresentation of Playboy's products as TNR products to usurp TNR's goodwill and take advantage of TNR's relationships with one or more major retailers and buyers of TNR's products;

   *b.*   Deceptively infiltrating TNR's earned and designated shelf space at one or more major retailers to the exclusion of TNR's products for the benefit of Playboy's wipes product;

   *c.*   Improperly, and without authorization, obtaining purported coverage through a liability insurance policy fully funded by TNR and intended solely to cover TNR's products;

   *d.*   Deceptively obtaining payment from TNR for expenses, including but not limited to, shipping, logistics costs, social media advertising, and marketing data to be used for non-TNR Playboy products;

    *e.*    Directing, aiding, and abetting a Playboy agent to bill or charge TNR for improper expenses, including but not limited to payments of rent for commercial space used exclusively by and for the benefit of Playboy;

    *f.*    Directing, aiding, and abetting a Playboy agent to obtain TNR's approval of the Eighth Amendment by concealing material facts about the nature of the agreement; and

    *g.*    Unlawfully and wrongfully terminating the PLA in violation of California franchise law.

163. Through these practices, Playboy has deprived and continues to deprive TNR of certain protections to which it is entitled under California law and misappropriating revenue lawfully due to TNR.

164. Playboy's actions are unlawful or, at a minimum, violate the public policy set forth in the FIL because Playboy was required to register as a franchisor and file and update disclosures prior to creation of the franchise concerning: the nature of its business; the assistance, advertising, and training Playboy was required to provide TNR as a franchisee; and Playboy's obligation to participate in the operation of TNR's business, if any.

165. Playboy's failure to register or make the required disclosures deprives TNR of certain information concerning Playboy's business, such as its operational standards and the assistance Playboy is expected to provide to TNR. This created a significant likelihood that Playboy's promises under the terms of the PLA and Novation Agreement would not be fulfilled—as, indeed, is now the case.

166. Playboy abused its position by performing a predatory audit of TNR's operations based on undisclosed standards and, despite the same performance by TNR's predecessor, proceeded to (i) ignore TNR's numerous subsequent requests for information and clarity concerning the alleged defects in its performance; (ii) ignore TNR's numerous subsequent attempts to remedy those alleged defects, and (iii) use

the audit as a basis to claim there was a material breach of the PLA as a pretext to immediately terminate the Agreements.

167. In addition, Playboy's acts of undermining TNR's license by selling Playboy's products through one or more major retailers using TNR's shelf space and resources for which TNR expended funds to sell its goods to the exclusion of TNR's products threaten and harm competition.

168. As a direct and proximate cause of Playboy's unlawful, unfair, and/or fraudulent business practices, TNR has suffered damages in an amount to be determined at trial, but exceeding $75,000.

## SIXTH CLAIM FOR RELIEF

### (Intentional Interference with Contractual Relations)

169. TNR hereby incorporates each and every allegation set forth in the preceding paragraphs as though set forth fully herein.

170. TNR has contractual relationships with its distributors, suppliers, and customers within the Territory set forth in the PLA, where it has operated its condom and lubricant business since 1993.

171. Each of these contractual relationships have resulted and would continue to result in an economic benefit to TNR.

172. These contractual relationships were known to Playboy, both independently and through its relationship and dealings with Allen.

173. Playboy misrepresented its products as belonging to TNR in an attempt to secure shelf space and sales rights at one or more major retailers, including, but not limited to, Walmart.  To effectuate those sales, Playboy also deceptively used packaging on its products almost identical to those on TNR's products.  These acts disrupted the contractual relationship between TNR and the retailers by depressing TNR's sales at those retailers because Playboy's actions rendered TNR unable to sell as many packages of condoms as it could have absent Playboy's interference, thus Playboy's intentional acts of disruption made TNR's performance under the

35

agreements more difficult and decreased TNR's enjoyment of the benefits it derived from those agreements.  As a result of Playboy's intentional acts to disrupt the agreements, TNR to experience decreased profits from sales at the retailers.

174.   Playboy intended to interfere in TNR's relationship with Walgreens by inducing Allen to include Playboy's wipes and CBD products in a sales pitch to Walgreens without TNR's knowledge or consent, and later actually interfered and disrupted the contractual relationship between Walgreens and TNR by terminating the PLA.

175.   Playboy deceptively obtained payment from TNR for expenses— including but not limited to, shipping, logistics costs, social media advertising, and marketing data—by inducing Allen breach his duty of loyalty to undermine TNR and to commit TNR's resources to use for Playboy's products, disrupting TNR's contractual relationships with Monarch, Freedom, and Allen.  Playboy's intentional acts induced breach of the agreements, causing TNR to expend more funds in connection with resources diverted to Playboy's products, thereby increasing the cost and burden of TNR's performance under its contracts with Monarch, Freedom, and Allen.

176.   Playboy further interfered in TNR's contractual relationships with Monarch, Freedom, and Allen by directing, aiding and abetting a Playboy agent to bill or charge TNR for improper expenses, including the payment of rent for commercial space used exclusively by and for the benefit of Playboy.  As Playboy was aware, Freedom was an entity created for TNR products yet it was used by Playboy to receive and send funds from sales of the wipes at Walmart.  Because of Playboy's intentional acts, TNR paid monies it otherwise would not have, thus increasing the cost and burden of TNR's performance under the agreements with Monarch, Freedom, and Allen.

177.   Playboy is a stranger to the contractual relationship between TNR and the aforementioned entities with whom TNR enjoys such contractual relations.

178.   Playboy knew that its acts would interfere in those relationships or it should have known that interference was substantially certain to occur as a result of its actions.

179.   TNR was harmed in an amount to be determined at trial, but exceeding $75,000.

180.   TNR is informed and believes that Playboy's conduct was intentional, malicious, oppressive, and/or designed to damage and harm TNR's business, as well as demonstrating a reckless disregard of TNR's rights.  TNR is entitled to exemplary and punitive damages as a result.

## SEVENTH CLAIM FOR RELIEF
### (Intentional Interference with Prospective Economic Relations)

181.   TNR hereby incorporates each and every allegation set forth in the preceding paragraphs as though set forth fully herein.

182.   Over the course of TNR's term as licensee, TNR has pursued economic relationships with additional distributors, suppliers, and customers within the Territory set forth in the PLA, all of which were designed to provide TNR with an economic benefit.

183.   The pursuit of these economic relationships was known to Playboy through Allen, and Playboy took actions to disrupt and/or divert those relationships that were intentionally wrongful and exceeded the bounds of fair competition, given the relationship between TNR and Playboy.

184.   Playboy acted through Allen to compete with TNR's products and to disrupt TNR's efforts to pursue an economic relationship with retailers like CVS, which would have benefitted TNR economically by allowing it to expand sales of its products.

185.   Playboy acted through Allen to block TNR's efforts to pursue an economic relationship with vendors like Core-Mark, which would have benefitted

TNR economically by allowing it to expand sales of its products to convenience stores and gas stations.

186.   Playboy also undermined TNR's deal with distributors, like one in Russia—for which TNR received a deposit of $500,000—by unreasonably withholding approval of the deal for 4-6 months.

187.   Playboy's direction of Allen to block TNR's pursuit of an economic relationship with Core-Mark caused those relationships not to materialize, and therefore worked to the detriment of TNR's expectations of an economic benefit from those relationships.

188.   Playboy's unreasonable withholding of approval for the deal for sales in Russia caused that deal to unravel and now requires TNR to return the deposit of $500,000 received in connection with it.

189.   Playboy's actions disrupted TNR's relationships and business opportunities with CVS, Core-Mark, and the prospective Russian buyer in violation of, among other things, California Business & Professions Code section 17200.

190.   TNR had a reasonable probability of future business opportunities and economic benefit in connection with both (i) its relationship with Core-Mark and (ii) its relationship with CVS.

191.   As a proximate result of Playboy's acts, TNR was harmed in an amount to be determined at trial, but exceeding $75,000.

## EIGHTH CLAIM FOR RELIEF

### (Negligent Interference with Prospective Economic Relations)

192.   TNR hereby incorporates each and every allegation set forth in the preceding paragraphs as though set forth fully herein.

193.   TNR had a reasonable probability of future business opportunities and economic benefit in connection with parties including but not limited to (i) its relationship with Core-Mark, (ii) its relationship with CVS, and (iii) its relationship with a potential Russian buyer.

194.    Playboy had knowledge of TNR's opportunities with Core-Mark, CVS, and the potential Russian buyer, and Playboy knew or should have known that if it did not act with due care, Playboy's actions would interfere with TNR's opportunities with Core-Mark, CVS, and the Russian buyer, causing TNR to lose the economic benefit of such relationships.

195.    Playboy, as licensor, failed to uphold the contractual duty of care supplied by the implied covenant of good faith and fair dealing as TNR's licensor and the contractual "services" provision by Playboy in the Seventh Amendment of the PLA, owed to TNR as licensee based on the PLA, by blocking TNR's efforts to pursue relationships that would expand its sales of Products.

196.    Playboy's failure to exercise due care resulted in actions that disrupted and/or diverted TNR's economic relationships, exceeding the bounds of fair competition given the contractual relationship between TNR and Playboy.

197.    But for Playboy's failure to exercise due care as licensor by way of instructing Allen to insert Playboy in the relationship and to put TNR's negotiations with Core-Mark on hold to prohibit TNR from exercising its licensing rights, TNR would have economically benefited from the Core-Mark relationship.

198.    But for Playboy's failure to exercise due care as licensor by way of instructing Allen to insert Playboy into TNR's presentation to CVS and to compete with TNR's products, TNR would have economically benefited from the CVS relationship.

199.    But for Playboy's failure to exercise due care as licensor by way of withholding timely approval of the deal for sales in Russia, TNR would have economically benefitted from the relationship.

200.    Playboy's failure to exercise due care has disrupted TNR's relationships and business opportunities with Core-Mark, CVS, the prospective Russian buyer and perhaps other entities presently unknown in violation of, among others, California Business & Professions Code section 17200.

201.   As a direct and proximate result of Playboy's conduct, TNR was injured by Playboy in an amount to be determined at trial, but exceeding $75,000.

### NINTH CLAIM FOR RELIEF
### (Fraudulent Inducement to Contract)

202.   TNR hereby incorporates each and every allegation set forth in the preceding paragraphs as though set forth fully herein.  In particular, TNR specifically reiterates and incorporates by reference herein paragraphs numbered 45-55 which detail the fraudulent inducement.

203.   As a material inducement to enter into the Eighth Amendment, Playboy intentionally concealed or suppressed the material fact that CBD condoms and lubricants were included in the scope of the PLA in its communications with Allen on July 8, 2019 at 7:56 PM and 8:26 PM (*first concealment or suppression*).  In the same e-mails, Playboy also intentionally concealed or suppressed the material fact that Playboy needed the Eighth Amendment to lawfully implement its CBD sexual wellness product line without violating the terms of the PLA (*second concealment or suppression*).  Playboy had a duty to disclose the aforementioned material facts regarding the Eighth Amendment (i) as an incident of the contractual relationship between defendant and plaintiff in relation to the implied covenant of good faith and fair dealing; (ii) from the fact that Patel made representations about the PLA's scope but did not disclose facts that materially qualify the facts disclosed, or the representations rendered her disclosure likely to mislead TNR; and (iii) from the fact that Patel actively concealed discovery of the material facts from TNR via Allen (*duty to disclose*).  Playboy intended to defraud TNR by intentionally concealing or suppressing the material facts that CBD condoms and lubricants were in fact included in the scope of the PLA and that Playboy needed the Eighth Amendment to lawfully implement its CBD growth plan (*intent to defraud*).[7]  At the time of

---

[7] In other words, Playboy concealed or suppressed the fact that TNR was giving up its licensing rights to CBD condoms and lubricants.

Playboy's concealment or suppression, TNR was ignorant of the material facts concealed or suppressed by Playboy (*lack of knowledge*).  If TNR had been aware of the existence of the facts not disclosed by Playboy, Khun Amorn would not have signed the Eighth Amendment on behalf of TNR because (i) lubricants of all kinds were central to TNR's business, as evidenced by condom and lubricant pairings; and (ii) TNR sought to develop CBD, THC, and other cannabinoid products—both of which the Eighth Amendment's more restrictive terms prohibited TNR from developing (*causation/injury*).

204.  As a material inducement to enter into the Eighth Amendment, Playboy also intentionally made a false representation that CBD condoms and lubricants were excluded from the scope of the PLA.  On July 8, 2019 at 8:26 PM, Patel made a representation that it was a "[r]eality" that CBD condoms and lubricants were excluded from the scope of the PLA (*representation by Playboy*).  Playboy's representation was false, as evidenced by the express language of the PLA (*falsity*).  Playboy knew that the representation was false when it made the representation to Allen, TNR's agent (*knowledge of falsity*).  Playboy intended that TNR rely on the false representation to induce TNR into signing the Eighth Amendment, which Playboy needed to lawfully implement its CBD sexual wellness product line—CBD by Playboy—without violating the terms of the PLA (*intent to induce reliance*).  TNR reasonably relied on Playboy's false and fraudulent representation, which was communicated to Khun Amorn by Allen, due to (i) Allen's specific role as intermediary between Playboy and TNR for the Eighth Amendment negotiations and (ii) Playboy's affirmative representation that it was a "reality" that CBD products were not included in the scope of the PLA (*justifiable reliance*).  TNR's reliance on Playboy's false and fraudulent representation was a substantial factor in causing harm to TNR because TNR would not have signed the Eighth Amendment, resulting in loss of licensing rights to CBD condoms and lubricants, had it not reasonably relied on Playboy's false representation (*causation/injury*).

205.   Playboy's use of intentional fraudulent conduct was a deliberate tactic to induce TNR to sign the Eighth Amendment.  As a direct and proximate result of Playboy's fraudulent concealment or suppression and false and fraudulent representation, TNR has suffered damages.  The amount of these damages has not been precisely determined and the damages are continuing to accrue.  TNR is also entitled to rescission as an alternative to remedy to its damages claims.

206.   Playboy's acts alleged above included deceit and/or fraudulent concealment or suppression of material facts as well as false or fraudulent representation of a material fact known to Playboy with the intent of inducing TNR into signing the Eighth Amendment, depriving TNR of its property or legal rights or otherwise causing injury, and were despicable, malicious, oppressive, and/or fraudulent conduct that subjected TNR to a cruel and unjust hardship in a conscious disregard of TNR's rights, so as to justify an award of exemplary and punitive damages in an amount to be proven at trial, but exceeding $75,000.

## TENTH CLAIM FOR RELIEF
### (Conversion)

207.   TNR hereby incorporates each and every allegation set forth in the preceding paragraphs as though set forth fully herein.

208.   Playboy poached Allen from TNR in a predatory and fraudulent manner by hiring Allen to work for Playboy and simultaneously ensuring Allen remained a TNR contractor to steal TNR's financial and professional resources.

209.   Patel, on behalf of Playboy, admitted to entering into an agreement with Allen to have TNR pay approximately $4,000 a month in office rental and parking costs from approximately November 2019 to December 2020 for Allen's Playboy operations, as well as costs for building office walls and remodeling at Playboy's offices.

210.   Playboy also directed, encouraged, or solicited Allen to usurp TNR's resources for other costs relating to Playboy's employment of Allen, including, inter alia:

   *a.*   TNR's payment to Allen as Allen worked to undermine TNR's market as Playboy's consultant, and upon instruction from Playboy to engage in such fraudulent conduct;

   *b.*   $2,000 a month to Joshua Martin of 818 Talent, whom Allen placed as a board member of Freedom to ensure payments could be sent to Playboy from Freedom; and

   *c.*   Total expenses that TNR paid to Monarch from April 2018 to September 2021 that benefited Playboy, estimated to be millions of dollars in an amount to be determined at trial, relating to Playboy Wipes, such as iheart wipes advertising, BLKLYST Wipes and CBD advertising, product liability insurance for Playboy Wipes at CVS, sales commissions for Playboy Wipes, bonuses on sales growth for Playboy Wipes, and EDI fees and monthly management fee for Playboy Wipes, QuickBooks monthly fee, and other significant shipping, storage, advertising, marketing, costs and fees.

211.   TNR was the rightful owner of the funds stolen by Playboy by way of Allen's consultant arrangement with Playboy.

212.   Playboy has completely failed and/or refused to account for the use of TNR's funds for Playboy's expenses and has completely failed to pay for or return any of TNR's funds, but has nevertheless benefited from TNR's retailer account and funds, paving the way for the sales of Playboy wipes.

213.   Instead, to satisfy its own operational costs relating to Playboy's sexual wellness products, Playboy wrongfully, unlawfully, and intentionally converted TNR's funds for Playboy's personal use in their entirety.

214.   TNR in no manner consented to Playboy's misappropriation of its funds.

215.   TNR has performed all of the conditions, covenants, and promises required on its part to be performed in accordance with the terms and conditions of the PLA.

216.   As a direct and proximate result of Playboy's conversion of TNR's monies, TNR has suffered significant economic damages.

217.   TNR is entitled to restitution from Playboy's unjust enrichment because Playboy knew or had reason to know that the payment Freedom sent to Playboy actually belonged to TNR.

218.   TNR is entitled to restitution from Playboy's unjust enrichment because Playboy knew or had reason to know it was being saved from expense or loss by having TNR's resources pay for Playboy's operational costs through Allen.

219.   TNR has been damaged in an amount to be determined at trial, but exceeding $75,000.

## PRAYER FOR RELIEF

**WHEREFORE**, TNR prays for judgment against Playboy as follows:

1.   For damages and restitution in an amount in excess of $100,000,000, including but not limited to expected profits under the license through 2027, the $15 million purchase price of the license (including $750,000 as initial consideration under the Novation Agreement), startup costs and initial investments of approximately $13 million, royalties, the reimbursements and returns of monies and inventory to and from third parties due to the sudden termination, revenue loss from unreasonably withheld product approvals, interference with contractual and prospective economic relationships, loss of stock market valuation, business interruption and reputational business damage due to the wrongful termination, unsold and returned inventory of approximately $17 million due to Playboy's retaliatory refusal to allow a sell-off period under to the wrongful termination, undue payments to Playboy from TNR's funds for Playboy related expenses, restitutionary disgorgement of all monies obtained due to Playboy's unlawful business practices,

and numerous operating losses, including but not limited to having to cancel third party contracts, and operating contracts for employees and vendors for storage and related logistics;

2.     Fair market value of the franchised business and franchise assets, any other damages that result from Playboy's wrongful termination of the PLA, and injunctive relief;

3.     For an award of general, special, consequential and other damages;

4.     For exemplary and punitive damages as allowable by law;

5.     For other compensatory damages;

6.     For equitable relief, including unjust enrichment and/or rescission;

7.     For reasonable attorneys' fees;

8.     For costs of suit and expert fees incurred; and

9.     For such other relief as the Court may deem proper.

## DEMAND FOR JURY TRIAL

TNR hereby demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure and Local Rule 38-1.


Dated: December 17, 2021            **DUANE MORRIS LLP**


By: */s/ Cyndie M. Chang*
Cyndie M. Chang

Attorney for Plaintiff
*Thai Nippon Rubber Industry Public Limited Company*

THAI NIPPON RUBBER INDUSTRY PUBLIC LTD. CO.'S COMPLAINT

# EXHIBIT 1

## Table of Main Contract

This is all agreement on The Transition License from UMD to TNR in total 4 agreements;

1. Sale and Purchase Agreement – between TNR and UMD      15 pages
2. Novation Agreement – between PLAYBOY-TNR – UMD      7 pages
3. AMENDMENT TO NOVATION AGREEMENT - PLAYBOY-TNR – UMD      3 pages
4. SIXTH AMENDMENT TO PRODUCT LICENSE AGREEMENT- PLAYBOY-TNR      3 pages

All agreement prepared by Business Development Department for keeping at CFO, department

Sender-------------------------------------------------------    Received--------------------------------------------------------

(Chanin Thiencharoen)

GM- Business Development

9 / 4 / 2018

CFO

--------/-----------/-------------

*Execution Version*

## SALE AND PURCHASE AGREEMENT

**THIS SALE AND PURCHASE AGREEMENT** (this "**Agreement**") is made on 9 April 2018,

**BY AND BETWEEN:**

(1)   **THAI NIPPON RUBBER INDUSTRY PUBLIC COMPANY LIMITED**, a public company duly registered and existing under the laws of Thailand having its registered office at 1 Charoenrat Road, Thung Wat Don, Sathon Bangkok 10120 (hereinafter referred to as "**TNR**"); and

(2)   **UNITED MEDICAL DEVICES, LLC**, a private company duly registered and existing under the laws of California, having its registered office at 1901 Avenue of the Stars, Suite 470 Los Angeles, CA 90067 (hereinafter referred to as the "**UMD**"),

(each hereinafter referred to as a "**Party**", and collectively referred to as the "**Parties**").

**WHEREAS:**

(A)   UMD has entered into (i) the product license agreement between itself and Playboy Enterprises International, Inc ("**Playboy**") dated 1 April 2010, (ii) the side letter amendment to product license agreement dated 7 December 2012, (iii) the second amendment to product license agreement dated 25 June 2013, (iv) the third amendment to product license agreement dated 1 April 2015, (v) the fourth amendment to product license agreement dated 16 March 2016, and (vi) the fifth amendment to product license agreement dated 14 April 2017 (collectively hereinafter referred to as the "**Product License Agreement**").

(B)   Pursuant to the Product License Agreement, Playboy has granted to UMD a license to use the Playboy Properties (as defined in the Product License Agreement) in the design, manufacture, advertising, promotion, sale and distribution of the Products (as defined below).

(C)   UMD has also entered into sub-license agreements with local distributors in 34 countries (collectively referred to as the "**Sub-license Agreements**"), details of which set out in **Annex 1**.

(D)   UMD wishes to assign its rights under the Product License Agreement and Sub-license Agreements (the "**Assigned Rights**") to TNR or TNR's designated entity, and in consideration for UMD's due performance of its obligations hereunder TNR wishes to acquire the Assigned Rights from UMD, in accordance with the provisions of this Agreement.

**THEREFORE**, the Parties agree as follows:

1.   **DEFINITIONS AND INTERPRETATION**

1.1   <u>**Definitions**</u>

In this Agreement, the following defined terms have the following meanings:

"**Assigned Rights**" shall have the meaning as described in Recital (D).

"**Assignment**" means the assignment of the Assigned Rights by UMD to TNR or TNR's designated entity.

"**Conditions to First Payment**" shall have the meaning as described in Clause 6.1.

"**Conditions to Payment**" means Conditions to First Payment and Conditions to Second Payment.

"**Conditions to Second Payment**" shall have the meaning as described in Clause 6.2.

1013942.1 3639723-v1\BKKDMS

*Execution Version*

**"Confidential Information"** shall have the meaning as described in Clause 11.1.

**"Consideration"** means the consideration for the sale and purchase of the Assigned Rights to be paid by TNR to UMD in accordance with Clause 5.1.

**"Distribution Fee"** means the distribution fee received from the Local Distributors in good funds under the Sub-license Agreements.

**"Effective Date"** means the date of this Agreement.

**"First Payment"** shall have the meaning as described in Clause 5.3(a).

**"Gross Profit"** means all profit from sales derived from Playboy Products after deducting the cost of goods sold. From the date of the First Payment, for the first nine (9) months, such profits shall be recorded when the payment is received in TNR's account in full. For the remaining three (3) months, such profits shall be recorded provided that the deposit of such sale has been paid into TNR's account,

**"Local Distributor"** means any local distributor who is a party to the Sub-license Agreements as listed in **Annex 1**.

**"Playboy"** shall have the meaning as described in Recital (A).

**"Products"** means merchandise bearing or distributed in connection with the Playboy Properties.

**"Product License Agreement"** shall have the meaning as described in Recital (A).

**"Second Payment"** shall have the meaning as described in Clause 5.3(b).

**"Sub-license Agreements"** shall have the meaning as described in Recital (C).

**"Sub-license Due Diligence List"** means the list of sub-license agreements as listed in **Annex 2.**

**"Term"** shall have the meaning as described in Clause 2.

**"TNR Monthly Management Account"** means the monthly management account prepared by TNR.

## 1.2    Interpretation

In this Agreement, subject to any express contrary indication:

(a)    words (including the definitions in Clause 1.1) importing the singular shall include the plural and *vice versa*;

(b)    any reference to any gender shall include the other genders;

(c)    any reference to a person shall be construed as including a reference to its successors, permitted transferees and permitted assignees;

(d)    any reference to this Agreement or any other agreement or document shall be construed as a reference to that agreement or document as it exists at the time of execution of this Agreement;

(e)    any reference to a Clause shall be construed as a reference to a clause of this Agreement;

(f)    any reference to a Schedule or an Annex shall be construed as a reference to a schedule or an annex to this Agreement; and

*Execution Version*

(g)     the headings to the Clauses or other provisions of this Agreement are for ease of reference only and are not to be taken into account in the interpretation of this Agreement or its provisions.

## 2.     TERM

Unless specified otherwise in this Agreement, the term of this Agreement (the "**Term**") shall commence as of the Effective Date until the termination in accordance with Clause 10.

## 3.     SALE AND PURCHASE OF THE ASSIGNED RIGHTS

3.1     Subject to the terms and conditions under this Agreement, UMD, relying on the representations, warranties, covenants, indemnities, and undertakings given by TNR in this Agreement, shall sell the Assigned Rights to TNR, and TNR, relying on the representations, warranties, covenants, indemnities, and undertakings given by UMD in this Agreement, shall purchase the Assigned Rights from UMD.

3.2     The Parties agree that the terms and conditions of the Assignment will be set out in a separate assignment agreement as follows:

(a)     a novation agreement to be entered into among TNR or TNR's designated entity, UMD, and Playboy for the assignment of the Product License Agreement; and

(b)     assignment agreements to be entered into between UMD and the relevant Local Distributors for the assignment of the Sub-license Agreements.

3.3     The obligations of TNR to purchase the Assigned Rights and make payments of the Consideration are conditional upon the fulfillment by UMD of all of the conditions contemplated under Clause 6 of this Agreement.

## 4.     UMD OBLIGATIONS

4.1     In order to achieve the completion of the Assignment, UMD agrees that it shall assist and facilitate TNR to successfully complete the following:

(a)     entering into the novation agreement of the Product License Agreement among TNR or TNR's designated entity in replacement of UMD, UMD, and Playboy;

(b)     receiving the executed consents for the assignment of the Sub-license Agreements as listed in **Annex 1** from the Local Distributors in replacement of UMD; and

(c)     collecting the Distribution Fee during the period of 12 months from the First Payment date and Gross Profit in the total amount of not less than USD three million.

4.2     Notwithstanding Clause 4.1 above, UMD shall execute such documents and perform such acts and things as TNR may reasonably request from time to time in order to complete the Assignment and shall use its best endeavor to procure that any necessary third party which including but is not limited to the Local Distributors shall execute such documents and do such acts and things as may reasonably be required in order to complete the Assignment.

4.3     UMD shall use its best endeavor to facilitate the interests of TNR under the Product License Agreement and Sub-license Agreements. UMD shall not engage in any conduct which will give rise to a conflict of interest between UMD and TNR.

4.4     UMD shall pay Mr. Nicholai Allen and Natalia Romanowski for the period of one year following the date that the First Payment has been made, in order to provide services in assisting TNR to complete the Assignment and ensure the smooth transition of the Product License Agreement and Sub-license Agreements to TNR in substitution of UMD. In this regard, UMD shall procure that Mr. Nicholai Allen shall professionally and

1013942.1 3639723-v1\BKKDMS

*Execution Version*

diligently perform his obligations, and all of his performances shall be in accordance with the guidelines, directions and instructions reasonably provided by TNR.

4.5   UMD shall not assign and/or delegate the whole or any part of its duties and/or obligations under this Agreement to any party without obtaining a prior written consent of TNR.

## 5.   CONSIDERATION

5.1   Consideration for the sale and purchase of the Assigned Rights under this Agreement (the **"Consideration"**) and the payment terms shall be in accordance with this Clause 5.

5.2   Subject to the fulfilment of Conditions to Payment under Clause 6 and the price adjustment under Clause 6.3, the total Consideration to be paid by TNR to UMD for the sale and purchase of the Assigned Rights is USD fifteen (15) million, inclusive of all applicable taxes and fees owed by UMD as a result of the transaction contemplated under this Agreement. For avoidance of doubt, tax owed by UMD includes applicable Thai withholding tax which TNR has an obligation under Thai laws to deduct.

5.3   Subject to Clause 5.2, the Consideration will be paid by TNR to UMD in two tranches as follows:

   (a)   **USD 10 million** (**"First Payment"**) will be paid upon the completion and fulfilment of the Conditions to First Payment; and

   (b)   the amount not exceeding **USD five million**, subject to price adjustment under Clause 6.3 (**"Second Payment"**), will be paid upon the completion and fulfilment of the Conditions to Second Payment.

5.4   The Parties hereby agree that, unless agreed otherwise in writing by the Parties, the First Payment shall be allocated as follows:

| Amount | Allocation |
|---|---|
| USD 9,500,000 | consideration to be paid to UMD in accordance with Clause 5.6 below. |
| USD 500,000 | consideration to be paid to UMD for the payment of administration fee of the novation of the Product License Agreement to Playboy. |

5.5   The Parties hereby agree that, unless agreed otherwise in writing by the Parties, the Second Payment shall be allocated as follows:

| Amount | Allocation |
|---|---|
| USD 250,000 | consideration to be paid to UMD for the payment of administration fee of the novation of the Product License Agreement to Playboy. |
| Second Payment minus USD 250,000 | consideration to be paid to UMD in accordance with Clause 5.6 below. |

*Execution Version*

5.6     Within five days after the completion of the relevant Conditions to Payment, TNR shall pay the Consideration to the following bank account by wire transfer, unless notify otherwise in writing to TNR in advance not less than five days prior to the date of each payment:

**To UMD:**

| | | |
|---|---|---|
| **Bank Account Name** | : | United Medical Devices, LLC |
| **Bank Account No.** | : | 7577335990 /Routing#: 121000248 /IBAN: WFBIUS6S |
| **Bank** | : | Wells Fargo Bank |
| **Branch** | : | 1800 Ave of the Stars, Los Angeles, CA 90067 |

5.7     TNR's obligation to pay the First Payment and Second Payment shall be discharged in full on the date on which the First Payment or Second Payment (as the case may be) is made by TNR to the bank accounts in accordance with Clause 5.6.

6.      **CONDITIONS TO PAYMENT**

6.1     TNR's obligation to pay the First Payment to UMD shall be subject to the condition that UMD performs and fulfils the conditions set out in this Clause 6 (**"Conditions to First Payment"**) (any of which may be waived in whole or in part by TNR at its sole discretion), which the Conditions to First Payment shall be completed by no later than 12 April 2018:

   (a)   the signing of the novation agreement of the Product License Agreement;

   (b)   the delivery of the written consents signed by the authorized representatives of the Local Distributors consenting to the assignment of the Sub-license Agreements, provided that the Local Distributors must provide TNR legal evidence under the applicable laws to which they are subject, showing that the signatories are the authorized person of the relevant Local Distributor;

   (c)   UMD has provided the notification of the assignment of the Sub-license Agreements to all Local Distributors; and

   (d)   UMD undertakes to TNR that, within 60 days after the First Payment has been made or other date as notified in writing to UMD by TNR, an appropriate representative of UMD will accompany TNR to the following countries in order to introduce TNR to the Local Distributors to ensure a smooth transition of the business and the Assignment;

      (i)    The People's Republic of China; and

      (ii)   Africa.

6.2     Subject to the price adjustment set forth in Clause 6.3 below, TNR's obligation to pay the Second Payment to UMD shall become due following twelve (12) months from the date of the First Payment which shall be subject to the following condition (**"Conditions to Second Payment"**), unless it is waived in whole or in part by TNR in writing at its sole discretion:

   (a)   the termination letter of any sub-license agreement(s) which is listed on the Sub-license Due Diligence List in **Annex 2** but is not listed on the Sub-license Agreement as listed in **Annex 1**, or any documentation evidencing such termination satisfactory to TNR has been delivered to TNR;

   (b)   UMD undertakes to TNR that on the date as notified in writing to UMD by TNR, an appropriate representative of UMD will accompany TNR to the United States of America in order to introduce TNR to

*Execution Version*

the Buyer Department of Walmart U.S. to negotiate on the sale and distribution of Playboy Products to Walmart stores; and

(c)   it is recorded in the TNR Monthly Management Accounts and satisfactory to TNR that the total amount of the Distribution Fee during the period of 12 months from the First Payment Date plus the Gross Profit is not less than USD three million.

6.3   In the case that the Conditions to Second Payment under Clauses 6.2(a) and 6.2(b) are completed but the sum of Distribution Fee during period of 12 months from the date of the First Payment plus the Gross Profit pursuant to Clause 6.2(c) is less than USD three million, the Parties agree that the Second Payment shall be adjusted based on the below formula:

$$A = B + USD\ two\ million$$

**Where:**

"A"   means   adjusted Second Payment to be paid to UMD

"B"   means   the total amount of the actual Distribution Fee during the period of 12 months from the First Payment Date recorded in the TNR Monthly Management Account plus the Gross Profit.

## 7.   PRICE ADJUSTMENT

7.1   The Parties agree that the payment of the Second Payment shall be adjusted pursuant to Clause 6.3 prior to the payment being made to UMD.

7.2   If the Distribution Fee during the period of 12 months from the date of the First Payment and the Gross Profit is zero, TNR shall be obliged to pay the Second Payment to UMD in the total amount of USD two million and the payment obligation of TNR under this Agreement shall be discharged.

7.3   Subject to Clause 7.2, TNR's obligation to pay the adjusted Second Payment shall be discharged in full on the date on which the Second Payment is made by TNR to UMD in accordance with this Clause 7 and Clause 5.6.

## 8.   TAXES AND STAMP DUTIES

8.1   The Consideration owed under this Agreement, is inclusive of applicable Thai withholding tax which TNR is required to deduct and other taxes owed by UMD under applicable laws and the U.S. - Thailand tax treaty.

8.2   The Parties acknowledge and agree that TNR may be required under applicable laws and the U.S. - Thailand tax treaty to deduct the full amount of any withholding tax to which the payment of Consideration is subject under applicable laws and the U.S. - Thailand tax treaty (and, for the avoidance of doubt, TNR shall not be required to increase or gross up the amount of such payment to account for such deduction). TNR shall remit the amount of any such withholding tax to the relevant Revenue Department in accordance with applicable taxes law and remit the remaining consideration to UMD. In such case, TNR shall provide UMD evidence of any such payment of withholding tax and shall procure to obtain a withholding tax certificate from the relevant Revenue Department.

8.3   Each party shall be responsible to pay its own, taxes, stamp duties (including stamp duties affixed to this Agreement) or any other amounts prescribed by applicable law in relation to this Agreement.

## 9.   REPRESENTATIONS AND WARRANTIES

9.1   Each of the Parties warrants to the other Party that the statements set out below are true and accurate as of the Effective Date and during the Term:

*Execution Version*

(a)   it is validly existing and is a company duly incorporated under the law of its jurisdiction of incorporation;

(b)   it has full power and authority to sign and deliver this Agreement and to exercise all its rights and perform all its obligations under this Agreement and has taken all necessary corporate action to authorize the execution of this Agreement and the exercise of its rights and the performance of its obligations hereunder, and this Agreement constitutes its valid and legally binding obligation, enforceable in accordance with its terms;

(c)   all actions, conditions and things required to be taken, fulfilled and done (including the obtaining of any necessary consents from third parties) in order (i) to enable it lawfully to enter into, exercise its rights and perform and comply with its obligations under this Agreement, and (ii) to ensure that those obligations are valid, legally binding and enforceable, have been taken, fulfilled and done;

(d)   neither the signing and delivery of this Agreement nor compliance with the terms and provisions hereof will conflict with, or result in a breach of (i) its memorandum of association or articles of association, (ii) any applicable law or regulation of such party's home state and country, (iii) any order, writ, injunction or decree of any court or governmental authority or agency, or (iv) any agreement or instrument to which it is a party or by which it is bound; and

(e)   each Party is entering into this Agreement in its own capacity and not on behalf of any other person.

9.2   UMD warrants to TNR that the statements set out below are true and accurate as of the Effective Date and during the Term:

(a)   the Product License Agreement and the Sub-license Agreements constitute valid and binding obligations of the parties thereto and are enforceable against the parties in accordance with their terms;

(b)   to the best of UMD's knowledge and belief, the novation of the Product License Agreement with Playboy and assignment of the Sub-License Agreements are valid and binding obligations on the parties thereto and are enforceable against the parties in accordance with their terms;

(c)   the Distribution Fee during the period of 12 months from the date of the First Payment plus the Gross Profit shall not be less than USD three million;

(d)   there are no outstanding actions, disputes, claims or demands between UMD, Playboy, Local Distributors, or any third party affecting the Assignment or the operation of TNR in substitution of UMD under the Product License Agreement or Sub-license Agreements. To the best of its knowledge, UMD is not aware of any actions, claims, proceedings, or any other incidents (including amendments of local laws or regulations) that may cause any adverse effect to the Assignment or the operation of TNR in substitution of UMD under the Product License Agreement or Sub-license Agreement ; and

(e)   it fully understands that TNR relies on representation of UMD under Clause 9.2(c) in entering into this Agreement.

9.3   The Parties agree that, in the event of a breach of the warranty by UMD under Clause 9.2(c), TNR's sole remedy shall be the price adjustment set forth in Clause 6.3 above.

## 10.   TERMINATION

10.1   This Agreement may be terminated upon the occurrence of the following events:

(a)   the Parties mutually agree in writing to terminate this Agreement;

(b)     in the event either Party defaults on its obligations hereunder and fails to remedy such default to the reasonable satisfaction of the non-defaulting Party within thirty (30) days after such default has been brought to the defaulting Party's attention by written notice, the other Party, at its sole discretion, may immediately terminate this Agreement; or

(c)     TNR shall be entitled to, at its sole discretion, immediately terminate this Agreement by giving UMD a notice in writing with immediate effect if the Conditions to the First Payment have not been fulfilled within the period as specified under Clause 6.1.

10.2     If the Agreement is properly terminated by TNR due to the reason under Clause 10.1(b) or Clause 10.1(c), UMD shall not be entitled to receive any further Consideration.

10.3     The termination of this Agreement shall not affect any legal rights which the non-defaulting Party may have due to the breach of the Agreement.

## 11.     CONFIDENTIALITY

11.1     The Parties shall treat all correspondences and negotiation between the Parties, the financial terms of this Agreement, as well as any and all information, material, documents and data made available in writing, visual or machine readable form or orally or other documents derived from, containing or reflecting such information that was and will be exchanged between the Parties to comply with its responsibilities under this Agreement (**"Confidential Information"**) as strictly confidential (whether or not such Confidential Information is marked or identified as being confidential).

11.2     The Parties shall not use such Confidential Information otherwise than for the purposes set forth in this Agreement and shall not disclose the Confidential Information to any third party except in any of the following manners:

(a)     with the prior written consent of the Party who may be affected by such disclosure;

(b)     for the disclosure to any person (including any key personnel of the relevant financial institution, advisor or consultant of each Party) who needs to know the Confidential Information in order for a Party to perform under this Agreement, or so that the conditions under this Agreement can be fulfilled, provided always that the disclosing Party shall be obligated to ensure that such person be duly informed of the confidentiality of the Confidential Information and the breach by such person of this obligation shall be deemed as the breach of obligation under this Clause by such disclosing Party;

(c)     for the disclosure as required by any applicable law, court order, central bank, or any regulatory body which including but not limited to the Securities and Exchange Commission and the Stock Exchange;

(d)     such disclosure or use is required for the purpose of any judicial proceedings arising out of this Agreement; or

(e)     if the information has come into the public domain through no fault of that Party.

11.3     The Parties understand and agree that the provisions under this Clause 11 shall survive the termination of this Agreement.

## 12.     NOTICES AND OTHER COMMUNICATIONS

12.1     Any notice, communications or documents required to be given by a Party to the other Party under this Agreement shall be given in the English language and shall be deemed validly served by hand delivery, or sent by registered pre-paid post (or by registered airmail in the case of international service), or by e-mail to such address set out in this Clause or to such other address, or e-mail address as may be notified by one Party to the other Parties by a like notice hereunder.

*Execution Version*

12.2    The initial address and e-mail address of the Parties are:

(a)      to TNR:

Attention:        Chanin Thiencharoen
Address:         1 Charoenrat Road, Thung Wat Don, Sathon Bangkok, Thailand 10120
E-mail address:  chanin_t@tnrcondom.com

(b)      to UMD:

Attention:        Jimmy Esebag
Address:         1901 Avenue of the Stars, Suite 470, Los Angeles, CA 90067
E-mail address:  jimmy@umdworld.com

12.3    Any such notice or communication shall be deemed to have been served:

(a)      if delivered by hand, at the time of delivery;

(b)      if posted by pre-paid post or by registered airmail or by courier service, at the expiration of five days after the envelope containing the same shall have been put into the post or have been received by the relevant courier company (as the case may be); or

(c)      if sent by e-mail shall be deemed to have been given when received into the addressee's e-mail system.

## 13.   INDEMNITY

13.1    UMD shall indemnify and hold TNR harmless against all actions, proceedings, demands, costs, expenses, duties, liabilities and claims whatsoever caused by or arising from the act, neglect or default of UMD or its agents, representative, directors, or employees under this Agreement.

13.2    TNR shall indemnify and hold UMD harmless against all actions, proceedings, demands, costs, expenses, duties, liabilities and claims whatsoever caused by or arising from the act, neglect or default of TNR or its agents, representative, directors, or employees under this Agreement.

## 14.   GOVERNING LAW / VENUE

This Agreement shall be subject to, construed in accordance with and governed by the Laws of California. The exclusive venue for resolution of any disputes arising out of this Agreement or performance thereof shall be the federal courts located in the central district of California.

## 15.   MISCELLANEOUS

15.1    Each Party shall, in good faith, cooperate with each other and execute such instruments or documents and take such other actions as may reasonably be requested from time to time in order to carry out, evidence or confirm their rights or obligations or as may be reasonably necessary or helpful to give effect to this Agreement.

15.2    Any modification or alteration of any Clause of this Agreement will not be valid unless made in writing and duly signed by an authorized representative of both Parties.

15.3    UMD hereby provides irrevocable consent to TNR that TNR may assign any or all part of this Agreement to TNR's designated entity without having to obtain any further consent from UMD. The Parties agree that such assignment by TNR shall take full legal effect upon UMD's receipt of notice from TNR informing UMD of the assignment, whereupon UMD shall thereafter perform its responsibilities under this Agreement to the entity that takes the assignment.

1013942.1 3639723-v1\BKKDMS

15.4  The failure of either Party at any time to exercise any of its rights under this Agreement shall not be deemed a waiver of any such rights or in any way prevent either Party from subsequently asserting or exercising any such rights.

15.5  This Agreement constitutes the entire agreement between the Parties relating to the subject matter hereof, superseding all prior agreements, memorandum of understandings, letters of intent or undertakings, oral or written.

15.6  This Agreement may be executed in counterparts, each of which shall be deemed to be an original, but together shall constitute one instrument.

15.7  Each party agrees and understands that no agency relationship or partnership between TNR and UMD shall exist. Neither party shall do any acts or things which may mislead any third party to believe that TNR or UMD is the agent, partner or representative of the other.

*[The remainder of this page is intentionally left blank]*

*Execution Version*

**IN WITNESS WHEREOF,** this Agreement is made and signed in two identical copies in English. Both parties have read and understand this Agreement and affixed their signatures and company seals (if any) to this Agreement on the date first above written.

Signed for and on behalf of

**THAI NIPPON RUBBER INDUSTRY PUBLIC COMPANY LIMITED**

by _____

( AMORN DARARATTANAROJ )

**UNITED MEDICAL DEVICES, LLC**

by _____

( )

in the presence of:

_____ Witness

( NICHANE ALLEN )

_____ Witness

( Chavin Thvancharoon )

1013942.1 3639723-v1\BKKDMS

## ANNEX I

## LIST OF SUB-LICENSE AGREEMENTS

|  | Country | Company Name |
|---|---|---|
| 1 | Brazil | Alco Do Brazil Impotcao E Commercio Ltda.EPP |
| 2 | Armenia | ARGE Business LLC |
| 3 | India | Dachaa Lifestyle Holding Ltd |
| 4 | Nepal | Dachaa Lifestyle Holding Ltd |
| 5 | Chile | Distribuildora Las Palmas Ltda. |
| 6 | U.A.E. | Cubita Trading LLC |
| 7 | Georgia | Geo Latex Ltd. |
| 8 | Ghana | Ghagiria International Trading |
| 9 | Bolivia | HiperMarcas s.r.l. |
| 10 | Vietnam | I.D.I Distributing JVC / CONG TY CO PHAN HE THONG |
| 11 | Lebanon | MonPro SARL |
| 12 | Malaysia | Teik Senn(Malaysia) SDN BHD |
| 13 | Serbia | Umbrella Corporation Ltd. |
| 14 | Bosnia and Herzegovina | Umbrella Corporation Ltd. |
| 15 | Macedonia | Umbrella Corporation Ltd. |
| 16 | UK and Ireland | Three Pears Ltd. |
| 17 | Venezuela | Dimassi. C.A. |
| 18 | Mongolia | Tsakhiur Tumur LLC |
| 19 | Zambia | Sterlin Medical |
| 20 | Jordan | H2O Marketing Ltd. |
| 21 | Russia | MedCom |

| | Country | Company Name |
|---|---|---|
| 22 | Dominigan Replublic | Mel Caribbean Corp |
| 23 | Surinam | Distributor and Trade Service |
| 24 | China | Flower Rabbit Brand Management |
| 25 | Hongkong | Flower Rabbit Brand Management |
| 26 | Macau | Flower Rabbit Brand Management |
| 27 | South Korea | Medevice Korea Distribution Corp. |
| 28 | Bangladesh | MD investment Group, Dubai |
| 29 | Bhutan | MD investment Group, Dubai |
| 30 | Pakistan | MD investment Group, Dubai |
| 31 | Sri Lanka | MD investment Group, Dubai |
| 32 | Malta | Hayet Global Trade |
| 33 | Bahrain | J.H. Ruyan Company W.L.L. |
| 34 | Kenya | Hudson Fulton LLC. |

## ANNEX II

### SUB-LICENSE AGREEMENT DUE DILIGENCE LIST

|    | Country | Company Name |
|----|---------|--------------|
| 1  | Brazil | Alco Do Brazil Impotcao E Commercio Ltda.EPP |
| 2  | Armenia | ARGE Business LLC |
| 3  | India | Dachaa Lifestyle Holding Ltd |
| 4  | Nepal | Dachaa Lifestyle Holding Ltd |
| 5  | Chile | Distribuildora Las Palmas Ltda. |
| 6  | U.A.E. | Cubita Trading LLC |
| 7  | Georgia | Geo Latex Ltd. |
| 8  | Ghana | Ghagiria International Trading |
| 9  | Bolivia | HiperMarcas s.r.l. |
| 10 | Vietnam | I.D.I Distributing JVC / CONG TY CO PHAN HE THONG |
| 11 | Lebanon | MonPro SARL |
| 12 | Malaysia | Teik Senn(Malaysia) SDN BHD |
| 13 | Serbia | Umbrella Corporation Ltd. |
| 14 | Bosnia and Herzegovina | Umbrella Corporation Ltd. |
| 15 | Macedonia | Umbrella Corporation Ltd. |
| 16 | UK and Ireland | Three Pears Ltd. |
| 17 | Venezuela | Dimassi. C.A. |
| 18 | Mongolia | Tsakhiur Tumur LLC |
| 19 | Zambia | Sterlin Medical |
| 20 | Jordan | H2O Marketing Ltd. |
| 21 | Russia | MedCom |

|    | Country | Company Name |
|----|---------|--------------|
| 22 | Dominigan Replublic | Mel Caribbean Corp |
| 23 | Surinam | Distributor and Trade Service |
| 24 | China | Flower Rabbit Brand Management |
| 25 | Hongkong | Flower Rabbit Brand Management |
| 26 | Macau | Flower Rabbit Brand Management |
| 27 | South Korea | Medevice Korea Distribution Corp. |
| 28 | Bangladesh | MD investment Group, Dubai |
| 29 | Bhutan | MD investment Group, Dubai |
| 30 | Pakistan | MD investment Group, Dubai |
| 31 | Sri Lanka | MD investment Group, Dubai |
| 32 | Malta | Hayet Global Trade |
| 33 | Bahrain | J.H. Ruyan Company W.L.L. |
| 34 | Kenya | Hudson Fulton LLC. |
| 35 | United States of America | Gyde Group LLC |
| 36 | Canada | Gyde Group LLC |

# EXHIBIT 2

NOVATION AGREEMENT

THIS NOVATION AGREEMENT (hereinafter the "**Agreement**") is made on 12 April 2018,

AMONG:

(1)  **THAI NIPPON RUBBER INDUSTRY PUBLIC COMPANY LIMITED**, a public company duly registered and existing under the laws of Thailand having its registered office at  1 Charoenrat Road, Thung Wat Don, Sathon Bangkok 10120 (hereinafter referred to as "**TNR**");

(2)  **UNITED MEDICAL DEVICES, LLC**, a private company duly registered and existing under the laws of California having its registered office at [1901 Avenue of the stars, Suite 470 Los Angeles, CA 90067] (hereinafter referred to as the "**UMD**"); and

(3)  **PRODUCTS LICENSING LLC**, a private company duly registered and existing under the laws of Delaware having its registered office at 9346 Civic Center Drive, Suite 200, Beverly Hills, CA 90210 (hereinafter referred to as the "**Playboy**"),

(each hereinafter referred to as a "**Party**", and collectively referred to as the "**Parties**").

WHEREAS:

(A)  UMD has entered into the product license agreement between itself and Playboy dated 1 April 2010, as amended (collectively hereinafter referred to as the "**Product License Agreement**").

(B)  Pursuant to the Product License Agreement, Playboy has granted to UMD a license to use the Playboy Properties (as defined in the Product License Agreement) in the design, manufacture, advertising, promotion, sale and distribution of the Products (as defined below).

(C)  UMD agreed to assign its rights and obligations under the Product License Agreement to TNR or TNR's designated entity, and in consideration for UMD's due performance of its obligations hereunder TNR agreed to acquire all rights and obligations under the Product License Agreement from UMD (hereinafter referred to as the "**Transaction**"), in accordance with the provisions of the sale and purchase agreement entered into between TNR and UMD dated 30 March 2018 (hereinafter referred to as the "**Sale and Purchase Agreement**").

(D)  Playboy has acknowledged the potential Transaction and provided the letter of acknowledgement to UMD dated 22 February 2018. However, the Transaction remains subject to a prior written consent of Playboy pursuant to the Product License Agreement.

(E)  The Parties desire to effect a novation of the Product License Agreement, such that TNR is assigned and accepts all the rights and obligations of UMD under the Product License Agreement under the terms and conditions of this Agreement.

THEREFORE, the Parties agree as follows:

1.      INTERPRETATION AND DEFINITIONS

1.1     <u>Definitions</u>

In this Agreement, the following defined terms have the following meanings:

"**Confidential Information**" shall have the meaning as described in Clause 6.1.

"**Effective Date**" means the date of this Agreement.

"**Novated Rights and Obligations**" means all rights, titles and interest, and all obligations and duties, present that are still valid and outstanding and future of UMD under the Product License Agreement.

"**Products**" means merchandise bearing and distributed in connection with the Playboy Properties.

"**Product License Agreement**" shall have the meaning as described in Recital (A).

"**Sale and Purchase Agreement**" shall have the meaning as described in Recital (C).

"**Transaction**" shall have the meaning as described in Recital (C).

**1.2**     **Interpretation**

In this Agreement, subject to any express contrary indication:

(a)     words (including the definitions in Clause 1.1) importing the singular shall include the plural and *vice versa*;

(b)     any reference to any gender shall include the other genders;

(c)     any reference to a person shall be construed as including a reference to its successors, permitted transferees and permitted assignees;

(d)     any reference to this Agreement or any other agreement or document shall be construed as a reference to that agreement or document as it may have been, or may from time to time be, amended, varied, novated, replaced, restated or supplemented;

(e)     any reference to a Clause shall be construed as a reference to a clause of this Agreement;

(f)     any reference to a Schedule or an Annex shall be construed as a reference to a schedule or an annex to this Agreement; and

(g)     the headings to the Clauses or other provisions of this Agreement are for ease of reference only and are not to be taken into account in the interpretation of this Agreement or its provisions.

**2.     EFFECTIVENESS**

This Agreement shall become effective and binding on the Parties hereto on the Effective Date.

**3.     CONSIDERATION**

Consideration for the novation of the Product License Agreement shall be paid by TNR directly to Playboy to an account to be designated by Playboy as follows:

(a)     U.S.$500,000 (five percent (5%) of the First Payment as defined in the Sale and Purchase Agreement) simultaneously with payment to UMD of the remaining portion of the First Payment; and

2

       (b)    U.S.$250,000 (five percent (5%) of the Second Payment as defined in the Sale and Purchase Agreement) simultaneously with payment to UMD of the remaining portion of the Second Payment.

TNR and UMD acknowledge and agree that U.S.$15,000,000 (the sum of the First Payment and the Second Payment as such terms are defined in the Sale and Purchase Agreement) are the sole consideration and/or value that TNR is paying or providing to UMD for the Transaction and/or the Assigned Rights as defined in the Sale and Purchase Agreement.

## 4.    NOVATION

**4.1**    All terms and conditions of the Product License Agreement shall be unaffected except as expressly provided herein.

**4.2**    The Parties agree to a novation of the Product License Agreement by substitution of UMD thereunder with TNR. With effect on the Effective Date:

    (a)    TNR shall replace UMD under the Product License Agreement, whereby the Novated Rights and Obligations to TNR shall be assumed by TNR. Playboy and TNR agrees to be bound by and shall comply with the Product License Agreement, as if TNR was the party to the Product License Agreement instead of UMD.

           For the avoidance of doubt, TNR is agreeing to be bound as "Licensee" as defined in the Product License Agreement.

    (b)    Playboy releases UMD from UMD's obligations, duties and liabilities to Playboy under the Product License Agreement to the extent related to the period, and which arise, as of or after the Effective Date.

           For the avoidance of doubt, UMD continues to assume and has responsibility and liability for any compliance, liabilities, claims and demands whatsoever in respect of the Product License Agreement that occurs prior to the Effective Date;

    (c)    UMD releases Playboy from its obligations, duties and liabilities to UMD under the Product License Agreement and UMD agrees that it has no further rights under the Product License Agreement, in each case, to the extent related to the period, and which arise, as of or after the Effective Date as if TNR were named as a Party to the Product License Agreement in place of UMD;

    (d)    TNR agrees with Playboy to assume the Novated Rights and Obligations of UMD under the Product License Agreement, to the extent related to the period, and which arise, as of or after the Effective Date.

           For the avoidance of doubt, TNR shall not assume and has no responsibility or liability for any compliance, liabilities, claims and demands whatsoever in respect of the Product License Agreement that occurs prior to the Effective Date;

    (e)    Playboy consents to and accepts the acceptance of the  novation of the Novated Rights and Obligations under the Product License Agreement, to the extent related to the period, and which arise, as of or after the Effective Date as if TNR were named as a Party to the Product License Agreement in place of UMD;

3

(f)     Playboy agrees that it will not assert against TNR any claim or defence that they may have or have had against UMD under the Product License Agreement to the extent related to the period and arises prior to the Effective Date.

each of the foregoing events and agreements being conditional on, and taking effect simultaneously with, the others.

## 5.   REPRESENTATIONS AND WARRANTIES

Each of the Parties warrants to the other Parties that the statements set out below are true and accurate as of the Effective Date:

(a)     it is validly existing and is a company duly incorporated under the law of its jurisdiction of incorporation;

(b)     it has full power and authority to sign and deliver this Agreement and to exercise all its rights and perform all its obligations under this Agreement and has taken all necessary corporate action to authorize the execution of this Agreement and the exercise of its rights and the performance of its obligations hereunder, and this Agreement constitutes its valid and legally binding obligation, enforceable in accordance with its terms;

(c)     all actions, conditions and things required to be taken, fulfilled and done (including the obtaining of any necessary consents from third parties) in order (i) to enable it lawfully to enter into, exercise its rights and perform and comply with its obligations under this Agreement, and (ii) to ensure that those obligations are valid, legally binding and enforceable, have been taken, fulfilled and done;

(d)     neither the signing and delivery of this Agreement nor compliance with the terms and provisions hereof will conflict with, or result in a breach of (i) its memorandum of association or articles of association, (ii) any applicable law or regulation, (iii) any order, writ, injunction or decree of any court or governmental authority or agency, or (iv) any agreement or instrument to which it is a party or by which it is bound; and

(e)     each Party is entering into this Agreement in its own capacity and not on behalf of any other person.

## 6.   INDEMNITY

UMD hereby undertakes to indemnify TNR and Playboy fully and keep TNR and Playboy indemnified fully at all times against any loss, damage or costs suffered, sustained or incurred by TNR and/or Playboy as applicable as a result of any claim arising from the breach of the terms of the Product License Agreement by UMD that occurs prior to the Effective Date.

## 7.   CONFIDENTIALITY

7.1     The Parties shall treat all correspondences and negotiation between the Parties, provisions of this Agreement, knowledge and information in relation to the transactions contemplated under this Agreement and existence as well as any and all information, material, documents and data made available in writing, visual or machine readable form or orally or other documents derived from, containing or reflecting such information that was and will be exchanged between the Parties to comply with its responsibilities under this Agreement and with respect to the Parties and the Transaction ("**Confidential Information**") as strictly confidential (whether or not such Confidential Information is marked or identified as being confidential).

4

7.2     The Parties shall not use such Confidential Information otherwise than for the purposes set forth in this Agreement and shall not disclose the Confidential Information to any third party except in any of the following manners:

(a)     with the prior written consent of the Party who may be affected by such disclosure;

(b)     for the disclosure to any person (including any key personnel of the relevant financial institution, advisor or consultant of each Party) who needs to know the Confidential Information in order for a Party to perform under this Agreement, or so that the conditions under this Agreement can be fulfilled, provided always that the disclosing Party shall be obligated to ensure that such person be duly informed of the confidentiality of the Confidential Information and the breach by such person of this obligation shall be deemed as the breach of obligation under this Clause by such disclosing Party;

(c)     for the disclosure as required by any applicable law, court order, central bank, or any regulatory body which including but not limited to the Securities and Exchange Commission and the Stock Exchange;

(d)     such disclosure or use is required for the purpose of any judicial proceedings arising out of this Agreement; or

(e)     if the information has come into the public domain through no fault of that Party.

7.3     The Parties understand and agree that the provisions under this Clause 6 shall survive the termination of this Agreement.

## 8.     NOTICES AND OTHER COMMUNICATIONS

8.1     Any notice, communications or documents required to be given by a Party to the other Party under this Agreement shall be given in the English language and shall be deemed validly served by hand delivery, or sent by registered pre-paid post (or by registered airmail in the case of international service), or by e-mail to such address set out in this Clause or to such other address, or e-mail address as may be notified by one Party to the other Parties by a like notice hereunder.

8.2     The initial address and e-mail address of the Parties are:

(a)     to TNR:

|  |  |
|---|---|
| Attention: | Chanin Thiencharoen |
| Address: | 1 Charoenrat Road, Thung Wat Don, Sathon Bangkok, Thailand 10120 |
| E-mail address: | chanin_t@tnrcondom.com |

(b)     to UMD:

|  |  |
|---|---|
| Attention: | Jimmy Esebag |
| Address: | 1901 Avenue of the Stars, Suite 470 Los Angeles, CA 90067 |
| E-mail address: | Jimmy@umdworld.com |

(b)     to Playboy:

|  |  |
|---|---|
| Attention: | VP, Global Licensing |
| Address: | 9346 Civic Center Drive, Suite 200 Beverly Hills, CA 90210 |

5

E-mail address:   rpatel@playboy.com

**8.3** Any such notice or communication shall be deemed to have been served:

(a) if delivered by hand, at the time of delivery;

(b) if posted by pre-paid post or by registered airmail or by courier service, at the expiration of five days after the envelope containing the same shall have been put into the post or have been received by the relevant courier company (as the case may be); or

(c) if sent by e-mail shall be deemed to have been given when received into the addressee's e-mail system.

**9. COSTS AND EXPENSES**

Each party hereto shall bear its own costs and expenses incurred in connection with the negotiation, preparation and implementation of this Agreement and the matter contemplated hereunder, including the fees and disbursements or their respective legal and other advisers.

**10. GOVERNING LAW**

This Agreement shall be subject to, construed in accordance with and governed by the Laws of the State of California.

**11. MISCELLANEOUS**

**11.1** Each Party shall, in good faith, cooperate with each other and execute such instruments or documents and take such other actions as may reasonably be requested from time to time in order to carry out, evidence or confirm their rights or obligations or as may be reasonably necessary or helpful to give effect to this Agreement.

**11.2** Any modification or alteration of any Clause of this Agreement will not be valid unless made in writing and duly signed by an authorized representative of all Parties.

**11.3** This assignment provision as outlined in Paragraph 5.(b) of the Product License Agreement shall apply to this Agreement.

**11.4** The failure of either Party at any time to exercise any of its rights under this Agreement shall not be deemed a waiver of any such rights or in any way prevent either Party from subsequently asserting or exercising any such rights.

**11.5** This Agreement constitutes the entire agreement between the Parties relating to the subject matter hereof, superseding all prior agreements, memorandum of understandings, letter of intents or undertakings, oral or written.

**11.6** This Agreement may be executed in counterparts, each of which shall be deemed to be an original, but together shall constitute one instrument.

*[SIGNATURE PAGE FOLLOWS]*

**IN WITNESS WHEREOF,** this Agreement is made and signed in three identical copies in English. All Parties have read and understood this Agreement and affixed their signatures and companies seals (if any) to this Agreement on the date first above written.


Signed for and on behalf of

**THAI NIPPON RUBBER INDUSTRY PUBLIC COMPANY LIMITED**

by _____

( AMORN DARARATTANARO J. )


**UNITED MEDICAL DEVICES, LLC**

by _____


**PRODUCTS LICENSING LLC**

by _____

( REENA PATEL                            )

in the presence of:


_____ Witness

( Kathleen Brower                       )


_____ Witness

( Chaiin Treencharoen )


_____ Witness

(                                       )

# EXHIBIT 3

## AMENDMENT TO NOVATION AGREEMENT

THIS AMENDMENT TO NOVATION AGREEMENT (hereinafter the "**Amendment**") hereby amends that certain Novation Agreement made on April 12, 2018 (the "**Agreement**"),

**AMONG**:

(1)  **THAI NIPPON RUBBER INDUSTRY PUBLIC COMPANY LIMITED**, a public company duly registered and existing under the laws of Thailand having its registered office at 1 Charoenrat Road, Thung Wat Don, Sathon Bangkok 10120 (hereinafter referred to as "**TNR**");

(2)  **UNITED MEDICAL DEVICES, LLC**, a private company duly registered and existing under the laws of California having its registered office at 1901 Avenue of the stars, Suite 470 Los Angeles, CA 90067 (hereinafter referred to as the "**UMD**"); and

(3)  **PRODUCTS LICENSING LLC**, a private company duly registered and existing under the laws of Delaware having its registered office at 9346 Civic Center Drive, Suite 200, Beverly Hills, CA 90210 (hereinafter referred to as the "**Playboy**"),

(each hereinafter referred to as a "**Party**", and collectively referred to as the "**Parties**").

This Amendment is hereby incorporated into the Agreement by reference. All capitalized terms not otherwise defined shall have the meanings ascribed to them in the Agreement.

**WHEREAS**, pursuant to Clause 11.2 of the Agreement, the Parties wish to amend the Agreement as set forth herein.

**THEREFORE**, in consideration of the mutual promises and covenants herein and for other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the Parties agree as follows:

1.  The definition of "Effective Date" set out in Clause 1.1 is hereby deleted and replaced with the following:

"**Effective Date**" means the date on which Playboy confirms in writing its receipt of U.S.$500,000 (Playboy's share of the First Payment as defined in the Sale and Purchase Agreement) from UMD as described in Clause 3(a) of this Agreement.

2.  Clause 3 of the Agreement is hereby deleted in its entirety and replaced with the following:

### 3.  CONSIDERATION

Immediately upon UMD's receipt from TNR, consideration for the novation of the Product License Agreement shall be paid by UMD directly to Playboy to an account to be designated by Playboy as follows:

(a)  U.S.$500,000 (Playboy's share of the First Payment as defined in the Sale and Purchase Agreement); and

(b)  U.S.$250,000 (Playboy's share of the Second Payment as defined in the Sale and Purchase Agreement).

TNR and UMD acknowledge and agree that U.S.$15,000,000 (the sum of the First Payment and the Second Payment as such terms are defined in the Sale and Purchase Agreement) are the sole consideration and/or value that TNR is paying or providing to UMD for the Transaction and/or the Assigned Rights as defined in the Sale and Purchase Agreement.

3.    Except as expressly modified above, all of the other terms and conditions of the Agreement shall remain in full force and effect and shall be applicable to the terms hereof; provided that, to the extent a provision of this Amendment conflicts with a provision of the Agreement, the provision in this Amendment shall govern and control.

*[SIGNATURE PAGE FOLLOWS]*

2

**IN WITNESS WHEREOF,** this Agreement is made and signed in three identical copies in English. All Parties have read and understood this Agreement and affixed their signatures and companies seals (if any) to this Agreement on the date first above written.

Signed for and on behalf of

**THAI NIPPON RUBBER INDUSTRY PUBLIC COMPANY LIMITED**

by _____

( AMORN DARARATTANAROJ )

**UNITED MEDICAL DEVICES, LLC**

by _____

( )

**PRODUCTS LICENSING LLC**

by _____

( )

in the presence of:

_____ Witness

( )

_____ Witness

( Chanin Thiuncharoen. )

_____ Witness

( Nacttavee Amol )

3

**IN WITNESS WHEREOF,** this Agreement is made and signed in three identical copies in English. All Parties have read and understood this Agreement and affixed their signatures and companies seals (if any) to this Agreement on the date first above written.

Signed for and on behalf of

**THAI NIPPON RUBBER INDUSTRY PUBLIC COMPANY LIMITED**

by _____

   (                           )

**UNITED MEDICAL DEVICES, LLC**

by _____

   (                           )

**PRODUCTS LICENSING LLC**

by _____

   (                           )

in the presence of:

_____ Witness

   (                           )

_____ Witness

   (                           )

_____ Witness

   (                           )

3