1  Cyndie M. Chang (SBN 227542)
      CMChang@duanemorris.com
2  Angelica Zabanal (SBN 303329)
      AZabanal@duanemorris.com
3  Diane Byun (SBN 337155)
      DByun@duanemorris.com
4  **DUANE MORRIS** LLP
   865 South Figueroa Street, Suite 3100
5  Los Angeles, CA  90017-5450
   Telephone: +1 213 689 7400
6  Fax: +1 213 689 7401

7  Mark Holscher (SBN 139582)
   mark.holscher@kirkland.com
8  Kristin Rose (SBN 278284)
   kristin.rose@kirkland.com
9  **KIRKLAND & ELLIS LLP**
   555 South Flower Street
10 Los Angeles, CA 90071
   Telephone:   (213) 680-8400
11 Facsimile:   (213) 680-8500

12 Attorneys for Plaintiff
   *Thai Nippon Rubber Industry Public Limited Company*

13

## IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| THAI NIPPON RUBBER INDUSTRY PUBLIC LIMITED COMPANY, | Case No. 2:21-cv-09749-JFW |
| Plaintiff, | **PLAINTIFF'S FIRST AMENDED COMPLAINT FOR:** |
| v. | **(1) VIOLATION OF CALIFORNIA'S FRANCHISE RELATIONS ACT** |
| PLAYBOY ENTERPRISES INTERNATIONAL, INC., PRODUCTS LICENSING, LLC, and NICHOLAI ALLEN, | **(2) VIOLATION OF CALIFORNIA'S FRANCHISE INVESTMENT LAW** |
| Defendants. | **(3) BREACH OF CONTRACT** |
| | **(4) BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING** |
| | **(5) VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW** |
| | **(6) INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS** |
| | **(7) INTENTIONAL INTERFERENCE WITH** |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**PROSPECTIVE ECONOMIC RELATIONS**

**(8) NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS**

**(9) FRAUDULENT INDUCEMENT TO CONTRACT**

**(10) CONVERSION**

**(11) BREACH OF FIDUCIARY DUTY**

**<u>DEMAND FOR JURY TRIAL</u>**

THAI NIPPON RUBBER INDUSTRY PUBLIC LTD. CO.'S FIRST AMENDED COMPLAINT

COMES NOW, Plaintiff THAI NIPPON RUBBER INDUSTRY PUBLIC LIMITED COMPANY (hereinafter referred to as "**Plaintiff**" or "**TNR**"), and for causes of action against PLAYBOY ENTERPRISES INTERNATIONAL, INC. and PRODUCTS LICENSING, LLC ("**Playboy**"), and NICHOLAI ALLEN ("**Allen**," and, together with Playboy, "**Defendants**"), allege as follows:

## NATURE OF THE ACTION

1.     TNR brings this action to recover more than $100 million in damages caused by Playboy's blatant bad-faith conduct.  TNR invested tens of millions of dollars to obtain and maintain a license with Playboy for sexual wellness products—specifically, condoms and lubricants.  But, rather than acting in good faith as required by the license, Playboy engaged in a deceitful and improper campaign to move Playboy away from its historic magazine business and to take the license back for itself out of envy of TNR's profits and success.  Among other things, Playboy surreptitiously retained TNR's global sales consultant Allen to work for Playboy, paid off and incentivized Allen for TNR's proprietary information, misappropriated TNR's funds to pay for Playboy's sexual wellness operations, duped TNR into narrowing its license, and terminated TNR through a fraudulent pre-textual audit designed only to steal TNR's business.

2.     Because of Playboy's wrongful conduct, TNR now brings this action for violation of California's Franchise Relations Act, violation of California's Franchise Investment Law, breach of contract, breach of the implied covenant of good faith and fair dealing, violation of California's Unfair Competition Law, intentional interference with contractual relations, intentional interference with prospective economic relations, negligent interference with prospective economic relations, fraudulent inducement to contract, and conversion.

## THE PARTIES

3.     Established in Thailand, TNR has been an OEM manufacturer of high-quality condoms and lubricants since 1993.  TNR is a company incorporated under the

3

laws of Thailand with its principal place of business at 1 Charoenrat Road, Thung Wat Don Subdistrict, Sathon District, Bangkok 10120. TNR is deemed a citizen of Thailand for purposes of 28 U.S.C. § 1332(c).

4.     Playboy Enterprises International, Inc. is a corporation formed under the laws of Delaware with its principal place of business at 10960 Wilshire Blvd., Suite 2200, Los Angeles, California 90024. Playboy Enterprises International, Inc. is deemed a citizen of Delaware and California for purposes of 28 U.S.C. § 1332(c).

5.     Upon information and belief, Products Licensing, LLC is a limited liability company formed under the laws of Delaware with its principal place of business at 10960 Wilshire Blvd., Suite 2200, Los Angeles, California 90024. Products Licensing, LLC, has as its sole member Playboy International, Inc., a corporation formed under the laws of Delaware with its principal place of business at 10960 Wilshire Blvd., Suite 2200, Los Angeles, California 90024. Products Licensing, LLC is therefore deemed a citizen of Delaware and California for purposes of 28 U.S.C. § 1332(c).

6.     Nicholai Allen is a natural person and, upon information and belief, a resident of Los Angeles County, California.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(2) based on diversity of citizenship between TNR and Defendants.

8.     The amount in controversy, without interests and costs, exceeds $75,000.

9.     Venue lies in the Central District of California pursuant to 28 U.S.C. § 1391(b) and (c).

## FACTUAL ALLEGATIONS

### A.     Playboy Enters Into the Product License Agreement with TNR

10.     For nearly three decades, TNR has operated a successful business as an OEM manufacturer of high-quality condoms and, more recently, lubricant products. Since November 2016, TNR has been publicly traded on the Stock Exchange of

4

Thailand ("**SET**"), trading under the ticker "TNR."

11.   On April 1, 2010, Playboy entered into a Product License Agreement ("**PLA**") with United Medical Devices, LLC ("**UMD**"), TNR's predecessor-in-interest, with the license due to expire on June 30, 2020.  The PLA granted UMD the right to design, manufacture, advertise, promote, sell, and distribute condoms bearing Playboy's mark (the "**Products**").  As explained more fully below, TNR became the licensee[1] under the PLA through a novation of the Agreement on April 12, 2018.  A copy of the PLA is attached hereto as **Exhibit 1**.

12.   The PLA offered Playboy a way to leverage and increase its worldwide brand recognition and market resources to sell products in the sexual wellness space.

13.   Shortly after UMD and Playboy entered the PLA in 2010, UMD approached TNR to serve as the manufacturer of the Products through its plant in Thailand, which TNR did through the entirety of UMD's term as the licensee.

14.   Upon information and belief, at some point prior to April 1, 2015, Playboy Enterprises International, Inc. assigned its rights under the Product License Agreement to an affiliate company, Products Licensing LLC.

15.   Between 2015 and 2017, the PLA underwent two significant amendments.  The Third Amendment to the PLA extended the term of the license by five (5) years to end on March 31, 2025, and it changed the operative choice of law provision and forum selection clause to reflect that California law would govern the PLA and all disputes arising out of the PLA would be heard only in the California state or federal courts in the County of Los Angeles, Central District.

16.   The Fifth Amendment further extended the Expiration Date in Schedule 9 of the PLA from March 31, 2025, to December 31, 2027—subject to the Renewal

---

[1] As described more fully below, the terms of the PLA created a franchise and thus placed Playboy and TNR in a franchisor-franchisee relationship. The First Amended Complaint in certain instances refers to the parties as licensor and licensee consistent with terms used in the PLA; those references are without prejudice to TNR's claims under California's Franchise Relations Act and Franchise Investment Law.

Conditions stipulated in Paragraph 1(b)(ii)—and it also expanded the definition of Products in Schedule 6 of the PLA to include certain lubricants in addition to condoms, as follows: "Condoms and non-medical personal lubricants (water, silicone or oil based to be used for personal use) only bearing and sold in connection with the Playboy Properties, as defined in the Agreement."

17.    During the entirety of UMD's term as licensee, the company's working relationship with Playboy was overseen by UMD's senior vice-president, Allen.  Allen did a variety of work that included everything from research and development to facilitating relationships with retailers and other purchasers of Products.

**B.    TNR Replaces UMD as the Licensee Under the Product License Agreement**

18.    In or around early 2018, UMD and TNR discussed the possibility of TNR acquiring UMD's rights under the PLA.  Once the parties decided to move forward, Dr. Reena Patel[2] ("**Patel**")—then Chief Operating Officer, Global Licensing & Joint Ventures at Playboy— issued a letter on behalf of Playboy to TNR and UMD respectively, confirming the validity of Playboy's license and its issuance to UMD.

19.    With Playboy's consent, TNR and UMD entered into the Sale and Purchase Agreement ("**SPA**") through which UMD assigned its rights under the PLA—as well as several distributor contracts—to TNR in exchange for approximately $15 million in consideration (including $750,000 as initial consideration under the Novation Agreement, as explained below).  TNR also invested approximately an additional $13 million for expenses to perform under the license, and paid significantly more in fees per year to Playboy than the predecessor licensee.  A copy of the SPA is attached hereto as **Exhibit 2**.

---

[2] Patel was a central player in Playboy's relationship with UMD—and, later, with TNR.  Patel has held a number of key positions within the Playboy family of companies.  Patel is currently Playboy's Chief Operating Officer, Global Licensing & Joint Ventures, and since January 2021, she has also held the role of President, International at PLBY Group, Inc.  *See* https://www.linkedin.com/in/reenavpatel.

20.     The SPA included several terms meant to facilitate the transfer of UMD's operations to TNR and to allow TNR to establish and maintain relationships with retailers in the United States, which would be crucial to TNR's success as the new licensee.

21.     Notably, Clause 4.4 of the SPA required UMD to pay Allen for one (1) year from the execution of the agreement to assist TNR's efforts to assume the responsibilities assigned to it and ensure the smooth transition of the PLA and Sub-License agreements to TNR as the assignee.

22.     The sales relationship with Walmart, Inc. ("**Walmart**") was central to TNR's plans for its U.S.-based condom and lubricant business, one it sought to develop during TNR's term as licensee.  Thus, Clause 6.2(b) of the SPA required an appropriate representative of UMD to accompany TNR officials to the USA and connect TNR to Walmart's buyer so that TNR could negotiate an agreement for the sale and distribution of the Products (*e.g.*, condoms and lubricants bearing the Playboy mark) to Walmart stores during TNR's term as Playboy's licensee.

23.     Shortly after entering the SPA—and as contemplated by that agreement—Playboy, UMD, and TNR entered into the Novation Agreement ("**Novation Agreement**"), and an Amendment thereto, under which the parties agreed to novate the PLA such that UMD's rights and obligations under the PLA were transferred to TNR, who would replace UMD as the licensee, in exchange for $750,000 in consideration paid by TNR and sent to UMD as part of the SPA's purchase price, which UMD would then pay to Playboy.  Patel executed the Novation Agreement and the Amendment on Playboy's behalf and thereby knew of the SPA's terms.  Playboy expressed no objection or concern to TNR regarding UMD's course of performance as a licensee.  A true and correct copy of the Novation Agreement and the Amendment are attached hereto as **Exhibits 3 and 4** respectively.

24.     Section 11.1 of the Novation Agreement provided that "[e]ach Party shall, in good faith, cooperate with each other and execute such instruments or

documents and take such other actions as may reasonably be requested from time to time in order to carry out, evidence or confirm their rights or obligations or as may be reasonably necessary or helpful to give effect to this Agreement," and the purpose of the Novation Agreement was to enable TNR to perform as the licensee under the PLA.

25. Under the PLA, Playboy granted TNR, by way of a novation from UMD, the right to design, manufacture, advertise, promote, sell, and distribute condoms bearing Playboy's mark in an area covering more than 180 countries (the "**Territory**"), which includes California.

26. Playboy granted TNR an exclusive right to design, manufacture, advertise, promote, sell, distribute, and conduct research and development for the Products in the Territory in the manner specified by the PLA.

27. In exchange, TNR paid to Playboy guaranteed and earned royalties in the seven-figure range and the fee under the novation as described below.

28. Further, the PLA[3] imposed terms upon TNR that placed Playboy in a position of significant control over TNR's use of Playboy's mark to engage in business related to the Products, including but not limited to:

    **a.** Section 1.a(iv) dictated controls around authorized Playboy-branded stores in various countries around the world which included conditions on TNR's ability to sell the Products or similar products to licensees of Playboy-branded stores in certain territories.

    **b.** Section 1.d of the PLA limited TNR's exercise of its exclusive rights under the license to the Territory and gave Playboy the right to deem any sales or distributions of the Products or use of Playboy's mark outside the Territory to be an incurable default;

    **c.** Sections 2.h-i conditioned TNR's ability to sell Products on

---

[3] The PLA contains a confidentiality provision that, among other things, prohibits disclosure of the Agreement. Playboy has consented to the filing of the PLA in redacted form in connection with TNR's First Amended Complaint.

receiving prior approval from Playboy, and it imposed a series of strict requirements on product quality and the related packaging and materials used in connection with the Products, such as prototypes, photography, cartoons, containers, labels, wrappers, packaging and other inner and outer packaging materials, fixtures, displays, artwork and printing, advertising, sales, marketing and promotional materials. TNR had to seek written approval from Playboy (or its designee) of samples for each of the Products and the materials at each stage of development. There were severe consequences for nonconformity, including suspension of TNR's operations and destruction or confiscation of nonconforming Products;

        **d.**     Section 2.o(i)-(ii) required TNR to make advertising, promotion, and marketing expenditures in a given License Year (as measured by Section 1.c) related to the Products that totaled not less than 3% of either its net sales or minimum net sales, whichever was greater, and to submit its advertising/promotional and marketing plan for Playboy's approval on a yearly basis, in Playboy's specified format, and TNR was then required to follow the approved marketing plan in connection with sales of the product. Relatedly, TNR was required to seek preapproval of any public relations efforts related to the Products and to cancel any disapproved efforts;

        **e.**     Paragraph S.5 and Section 2.c restricted TNR's use of advertising, promotion, sales materials to use in the Territory and restricted its distribution of the Products to those distribution channels specified in the PLA;

        **f.**     Paragraph 2.l required TNR to affix Playboy's official holograms to the Products for certain sales of Products outside the United States and to provide reports with certain metrics about hologram usage;

        **g.**     Sections 2.f-g required to keep its books in the manner prescribed by Playboy, subjected TNR to a twice-yearly audit at Playboy's discretion, set a two-year retention policy for financial records in the event of a dispute between the parties about the agreement, and required TNR to bear the cost for any audits revealing certain deficiencies;

      **h.**     Section 2.k required TNR to seek pre-approval for the use of any subcontractor or supplier to manufacture or distribute the Products, and to engage said subcontractors or suppliers using Playboy's specified contracts; and

      **i.**     Paragraph S.10 and Section 1.e of the PLA also required TNR to meet minimum net sales amounts each year and specified the consequences of failing to meet those targets, which included Playboy declaring the license to be non-exclusive as to any region of the territory or terminating the license.

29.    In accordance with California law, by way of novation in 2018, the PLA between Playboy and TNR and the significant control Playboy exerted over TNR's use of Playboy's mark created a franchisee/franchisor relationship.  However, upon information and belief, Playboy did not register the franchise with California's Department of Financial Protection and Innovation ("**DFPI**"), nor did it disclose certain information required by California's Franchise Investment Law ("**FIL**").  *See* Cal. Corp. Code §§ 31000 et seq.

30.    Playboy's failure to register the franchise and provide the necessary disclosures impeded TNR's full understanding of the nature of its new relationship with Playboy.

31.    Relatedly, and simultaneous with TNR's assumption of rights and liabilities under the Novation Agreement, Playboy and TNR entered the Seventh Amendment to the PLA.  In Paragraph 1 of the Seventh Amendment, Playboy promised and covenanted to provide ongoing "services" to aid TNR's performance under the PLA, including "product approvals, branding guidelines, brand presentations, marketing materials, and intellectual property updates."  Thus, Paragraph 1 of the Seventh Amendment served as an affirmative representation by Playboy to offer increased support[4] and assistance to TNR.

---

[4] As related to product approvals, Paragraph 1 of the Seventh Amendment built upon Playboy's obligation in Section 2.i to ensure that such approvals were not "unreasonably denied, delayed, or conditioned."

32.     Notably, the conduct Playboy would later raise as an issue with TNR following the 2021 audit included conduct that previously presented no problem to Playboy at the time of the parties' novation and during the entirety of UMD's term.

### C.     TNR Assembles its U.S. Operations and Hires Nicholai Allen

33.     At the time TNR became the licensee, it had no sales representatives or distribution network in the United States, and members of TNR's executive team in Thailand had little familiarity with the American market.  Thus, Allen's previous position at UMD and experience with the Playboy condoms and lubricant business placed him in a singular and essential position to guide TNR's transition efforts and left TNR heavily dependent upon Allen.  TNR engaged Allen as its global sales consultant for the Products through an agreement with Allen's marketing and sales company in California, Monarch Digital Media LLC ("**Monarch**").

34.     As contemplated by Clause 4.4 of the SPA, Allen quickly assumed an integral role in TNR's operations during the transition period that would allow TNR to get up to speed in conducting and managing the Playboy business in the US under the PLA, just as UMD had done previously.  Allen also conducted business on TNR's behalf.  In pertinent part, TNR structured its nascent U.S. business in accordance with—and in reliance upon—Allen's recommendations and guidance, which TNR understood to be entirely consistent with UMD's practices when UMD was the licensee.  At no time did Playboy instruct TNR to deviate from UMD's course of performance under the PLA, nor did Playboy tell TNR that any of UMD's performance had breached the PLA or that it had ever conducted an audit of UMD.

35.     To facilitate the nuts-and-bolts of conducting its US operations, TNR entered into a pair of agreements with Allen personally and Monarch, through which TNR would remunerate funds expended by Allen and/or his company for management of the Playboy condoms business on TNR's behalf.

36.     As an extension of Allen, Monarch's operations were at the core of TNR's relationship with Allen as well as its US business efforts on behalf of Playboy.

Under the arrangement between Monarch and TNR, and to manage the Playboy condom and lubricant business, Monarch sought out, engaged, and paid the various contractors, suppliers, and service providers that TNR needed to accomplish its business objectives set out by Playboy.  For all the services provided, Monarch (through Allen) would then invoice TNR monthly for those services, which TNR reimbursed as required under the agreements.

37.    TNR also paid Monarch a monthly service fee to manage the US business for TNR and to obtain global customers for TNR.

38.    As contemplated by the SPA, the relationship with Walmart was of paramount importance to the Playboy condom and lubricant business.  Walmart imposed a series of requirements upon TNR to become an approved supplier.

39.    For example, some retailers, distributors and other relationships prefer an approved distributor use a U.S. bank.  To facilitate that element of TNR's U.S. distribution, Allen incorporated Freedom Brands Corp. ("**Freedom**") in Las Vegas, Nevada, naming himself as Freedom's President and Director on March 19, 2019. Monarch paid for some of Freedom's start-up expenses and costs, which TNR reimbursed. Other than reimbursing those expenses and costs, Freedom remained a separate entity from TNR.

40.    Freedom was set up to distribute the Products in the US on TNR's behalf.

41.    TNR later entered into the Walmart General Merchandise Agreement with Walmart, which established the standard terms and conditions under which TNR would serve as a supplier to sell certain Products in Walmart stores domestically ("**General Merchandise Agreement**").

42.    TNR's entry into the General Merchandise Agreement was predicated upon having passed the rigorous compliance evaluation process to which Walmart subjected TNR before it would authorize sales of condoms and lubricants.

43.    Finally, to facilitate sales with Walmart under the General Merchandise Agreement, Freedom entered into the Managed Services Agreement with Coastal

Solutions Group LLC ("**CSG**"), appointing CSG as its agent to promote and sell the Products in Walmart's US stores ("**Managed Services Agreement**").

**D.   Playboy Systematically Undermines TNR's Rights Under the PLA**

*a.     Playboy Induces TNR to Enter the Eighth Amendment*

44.   Upon information and belief, between June 2019 and July 2019, Patel, Jared Dougherty ("**Dougherty**") (President of Playboy), and Allison Kopcha ("**Kopcha**") (President of Playboy Licensing and Joint Ventures)[5] sought to deprive TNR of any ability to sell non-liquid or non-gel lubricants nor cannabis, cannabidiol and other related products ("**CBD products**") related to the Playboy business—and allow Playboy to develop and sell related products directly—by manipulating Allen to obtain TNR's CEO, Amorn Dararantanaroj ("**Khun Amorn**")'s[6] signature on the Eighth Amendment to the PLA under false pretenses and on terms that restricted TNR's sales of those products.  Playboy knew that Allen was TNR's global sales consultant.  Playboy also knew that any false information it conveyed or failed to disclose to Allen about the Eighth Amendment would be communicated to TNR through Allen.

45.   As a material inducement to enter into the Eighth Amendment, Playboy (i) concealed or suppressed the material fact that the PLA's scope included CBD condoms and lubricants; (ii) concealed or suppressed the material fact that Playboy needed the Eighth Amendment to lawfully implement its CBD growth plan; and (iii) made a false and fraudulent representation that the PLA scope excluded CBD condoms and lubricants.

46.   At 7:56 PM on July 8, 2019, Patel failed to inform Allen that CBD

_____

[5] Upon information and belief, during the time of the events surrounding Playboy's efforts to induce TNR's surrender of rights to sell CBD products and wipes, Allison Kopcha was affiliated with Playboy's brand management agency, CAA-CBG (Creative Artists Agency and Global Brands Group), later joining Playboy in January 2020.  *See* https://www.linkedin.com/in/allison-kopcha-5331785.

[6] "Khun" is a Thai honorific loosely translating to "Mister" in English.

condoms and lubricants were in fact included in the scope of the PLA and instead stated: "To your own point in a previous email you, [sic] you have stated that THC/CBD and products derived from [c]annabis plants are not within the current scope of TNR's rights which is what the amendment relates to."  In doing so, Playboy intentionally concealed or suppressed the material fact that CBD condoms and lubricants were included in the scope of the PLA.

47.    At 8:26 PM on July 8, 2019, Patel re-affirmed the false narrative that CBD condoms and lubricants were not a part of the initial PLA grant when she e-mailed Allen: "Reality is that THC/CBD are not part of their [TNR's] grant (per your own note) and would be subject to our approval and grant."  In doing so, Playboy (i) intentionally concealed or suppressed the fact that Playboy needed the Eighth Amendment to lawfully implement its 2021 growth plans to develop its competing CBD sexual wellness product line—CBD by Playboy— without violating the terms of the PLA;[7] and (ii) made a false representation that CBD condoms and lubricants were excluded from the scope of the PLA.

48.    On July 22, 2019, Patel sent the final version of the Eighth Amendment, which significantly narrowed the definition of Products to include "[c]ondoms and non-medical personal lubricants (water, silicone or oil based) **in gel or liquid form only** to be used for personal use only" (emphasis added) and to expressly exclude CBD products, without any consideration on Playboy's part.

49.    Per Schedule 6, as modified by the Fifth Amendment to the PLA, there is no express or implicit exclusion of CBD condoms or lubricants from the scope of the PLA.  Put simply, the final and agreed-upon language of the PLA, prior to the Eighth

---

[7] Having cleared TNR from the field, Playboy now sells two CBD lubricant products directly to consumers through www.pleasureforall.com: (i) CBD Arousal Spray by Playboy (a "sensual and warming stimulating oil" meant for "the vulva and clitoris" with 250mg of Broad-Spectrum CBD); and (ii) CBD Intimacy Gel by Playboy (an "incredible blend of water-based ingredients" and 250mg Broad-Spectrum CBD "designed to heighten the pleasure of your intimate experience.").

Amendment, clearly grants TNR a license to all condoms and non-medical personal lubricants bearing and sold in connection with Playboy's marks and images, including CBD condoms and lubricants.

50.     Playboy made representations to convince TNR, through Allen, that the Eighth Amendment needed to be signed urgently, and its terms simply affirmed the alleged 'fact' that CBD products were not in the scope of the initial PLA and limited the scope of TNR's lubricant rights in an insignificant manner that would not harm TNR's operations given TNR's focus on condoms—even though Playboy knew or believed none of those representations to be true.

51.     Upon information and belief, Allen—relying upon Playboy's fraudulent conduct regarding the initial scope of the PLA, the Eighth Amendment's effects on TNR, and Playboy's legal need for the Eighth Amendment—met with Khun Amorn while in Thailand, on August 3, 2019 to obtain Khun Amorn's assent to the Eighth Amendment on behalf of TNR.  Khun Amorn was unavailable when Allen called, but when Allen pressed that the document needed to be signed urgently, despite it being a Saturday, Khun Amorn agreed to visit Allen's hotel later that day.

52.     Khun Amorn met Allen at the hotel as planned.  Moreover, given the seemingly urgent nature of the situation, Khun Amorn was not able to seek or consult legal counsel prior to signing the document.

53.     Allen repeated the substance of the representations Playboy made to him about the urgent need to sign the document as well as the justifications for doing so, as represented by Playboy.

54.     The practical result of the Eighth Amendment was to keep TNR out of the market for products involving CBD and other cannabinoids, as well as to prevent TNR from making lubricants in a non-liquid or non-gel form—for example, in dry or aerosol form— and signing the Eighth Amendment worked to TNR's detriment because TNR intended to develop CBD lubricants.  Due to Khun Amorn's lack of direct familiarity with the various operative agreements and their effects, Khun Amorn

was at a disadvantage regarding the document Playboy needed him to sign.  Thus, Khun Amorn relied upon Allen's characterization of the document and its contents, which had been influenced by Playboy's intentional concealment or suppression of material facts and strategically crafted sense of urgency.  Given the belief and trust Khun Amorn was forced to place in Allen generally due to TNR's new status as licensee, and on the strength of Playboy's representations to Allen, Khun Amorn signed the contract without the benefit of an attorney and with no consideration from Playboy.

> **b.**     ***Playboy Poaches Allen to Undermine TNR, and Allen Violates His Duties to TNR***

55.     From the beginning, TNR understood the relationship with Walmart to be of paramount importance to its success with the Playboy business.  Through its hard work and diligence that started with TNR's presentation to Walmart in January or February 2019, TNR later experienced a breakthrough in the relationship with Walmart for sales of Playboy products whereby the number of SKUs greatly increased and sales of the Products increased from 1,110 stores to all Walmart stores nationwide, which was not previously accomplished under UMD.  In addition, TNR dramatically increased the profits on sales of Playboy products to Walmart stores.

56.     Unbeknownst to TNR, while gaining the initial traction with Walmart, Allen acted covertly to develop a wipes product sometime in 2019 with the goal of using TNR's relationships and credentials with retailers in addition to its shipping, storage, logistics, insurance, and other resources to sell the product under the Playboy brand for his own benefit rather than TNR's.  But when Allen pitched the wipes product to Playboy (without TNR's knowledge or permission), Playboy was initially cool to the idea.

57.     Allen, however, soon learned that he had leverage.  Allen became aware that Playboy wanted to reacquire TNR's license so that Playboy could shift from a licensor to owner/operator of the condom and lubricant business.  Around the summer

of 2019, Playboy tried to take away TNR's exclusive rights to sell Products in the USA and Canada and revealed its intentions to Allen, but Allen did not agree to release such rights for such territories, likely because he wanted to continue operating as the distributor for the US territory.

58.    Thus, Playboy and Allen realized that it was to their benefit to make a trade, at TNR's expense.  Allen and Playboy entered a deal to help both parties get what they wanted: Allen would have the ability to sell his wipes product under the Playboy brand, and Playboy would have a means to charge into the sexual wellness space using TNR's retail and distributor relationships.

59.    In accordance with the new deal between Playboy and Allen—and not long after TNR achieved the new milestones with Walmart—Playboy continued to undermine TNR and improperly compete with TNR's Playboy-branded product lines. To implement its improper plans, and to secure the assistance of Allen in exploiting TNR's relationships and credentials with retailers as well as its shipping, storage, logistics, and insurance resources, Playboy quietly offered Allen an official consulting role on or about November 2019, which TNR later learned that he accepted in exchange for a significant sum of $100,000, plus sales commissions.

60.    Notably, Playboy offered this position to Allen without informing TNR, and while Allen continued to serve as global sales consultant for TNR through Monarch and remained a director of Freedom, TNR's US distributor.

61.    The significant geographic distance between Playboy and TNR—as a foreign entity whose US presence was in its infancy—put Playboy in a superior position to conduct its deceit without TNR's knowledge.

62.    Allen accepted Playboy's offer and took a role with the company working in its Los Angeles headquarters as Playboy's "Special Project Consultant – New FMCG Wellness Products," and Playboy planted the ever-growing seed of Allen's conflict of interest.  Allen and Playboy reached an understanding whereby Playboy threw its support behind Allen's Playboy wipes product and paid Allen a significant

sum for his work.  Allen therefore worked with both Playboy and TNR at the same time without TNR's knowledge

63.     Playboy failed to inform TNR of Allen's new position with Playboy and the direct conflict that the role created with his position at TNR.  Playboy identified a willing mole in Allen to help satiate its corporate greed by directing Allen's work as a double agent to help Playboy infiltrate, sabotage and ultimately usurp TNR's business.

64.     Playboy lacked the requisite credentials to sell its products directly to certain retailers, so it obtained a backdoor entryway through Allen to gain unfettered access to shelf space it did not earn.

65.     Upon information and belief, chief among the FMCG products Allen promoted were Playboy's Climax Delaying Wipes product ("**Playboy wipes**"), which Allen worked in tandem with Playboy to further develop and promote and to get the Playboy wipes onto Walmart's shelves using TNR's account at Walmart.

66.     Upon information and belief, around January or February of 2020, Allen presented the Playboy wipes to Walmart with the TNR Products and Walmart accepted the wipes.

67.     In or around October 2020, TNR discovered the Playboy wipes being sold on the Walmart website. TNR started wondering why the Playboy wipes were being sold under TNR's account for Playboy condoms and started making inquiries about such to Allen.

68.     TNR did not discover Playboy had poached Allen to work for Playboy for the first year or so of Allen's double agent position.  On or about November 2020, TNR noticed a position on Allen's Linkedin profile with the description: "Launching of new FMCG products under world famous Playboy brand."  When confronted, Allen convinced TNR that this arrangement worked to TNR's benefit so as to better develop the relationship.

69.     TNR also later learned that Playboy improperly required TNR to pay approximately $4,000 per month in rent and parking fees for Allen's use of the space

at Playboy's headquarters.  Playboy charged TNR for Allen's rental expenses at Playboy's headquarters, including costs for building office walls and remodeling at Playboy's offices, although Allen was concurrently working for Playboy, and Playboy has never returned the funds TNR expended under false pretenses.  Playboy later admitted to TNR that Allen and Playboy jointly agreed to pursue reimbursement of the rental and parking space from TNR, though there appears to be no written rental agreement between Allen and Playboy.

### c.    *Playboy Interferes in TNR's Relationship With Retailers*

70.    Upon information and belief, and at Playboy's direction, Allen secured a meeting with Walmart's buyer during which he presented samples of the Playboy wipes and misdirected Walmart on behalf of Playboy that the wipes were products under TNR's account.  Playboy lacked an independent supplier account with Walmart and was therefore unable to secure the necessary approvals to sell its products to the retailer without cover from TNR.  Without the consent or knowledge of TNR, Playboy sold and derived profits from the wipes using TNR's supplier account and TNR's shelf space despite knowing those wipes were not manufactured by TNR and were sold under TNR's account.

71.    Selling the wipes using TNR's shelf space deprived TNR of its ability to sell agreed upon quantities of TNR's condoms and lubricants at Walmart stores and hurt TNR's bottom line.  Upon information and belief, sales of Playboy wipes specifically displaced TNR's top-selling "Studded Pleasure" condom from Walmart shelves, thereby preventing sales of a crucial item in TNR's sales portfolio.  Playboy in no way shared any profits from sales of the wipes with TNR.

72.    Playboy's intentional act of using TNR's shelf space for sales of its wipes to the exclusion of TNR's Products jeopardized TNR's performance under the General Merchandise Agreement with Walmart and diminished TNR's ability to enjoy the full benefits of sales through the retailer's stores as contemplated in the General Merchandise Agreement.

73.   In addition, Playboy deployed the wipes to Walmart's shelves in packaging that is almost identical to TNR's best-selling "Studded Pleasure" condoms.




The reduction in TNR's sales at Walmart stores resulting from displacement of TNR's Products hampered TNR's ability to meet its obligations under the PLA to satisfy minimum sales requirements, undermining TNR's ability to perform as licensee.

74.   Upon information and belief, at some point in the fall of 2020, CSG (TNR's sales broker to Walmart) learned of an issue with Freedom and Allen that made it uncomfortable to further do business for the Playboy condoms.  TNR did not learn about the end of the relationship with CSG until June 2021 due to Allen's efforts on Playboy's behalf to keep TNR from full participation in the relationship.

75.   In addition to its efforts at Walmart, upon information and belief, Playboy acted through Allen without TNR's knowledge or consent to insure Playboy's products under TNR's liability insurance policy.  TNR later discovered that, in addition to unauthorized use of its insurance, Playboy acted through Allen to bill shipping, storage, advertising, marketing, CSG management fees, EDI setup fees, EDI usage fees, QuickBooks monthly fee, and other significant costs and fees to TNR's

accounts to support sales of Playboy wipes and CBD products.

76.     Upon information and belief, Playboy induced Allen to use a sales pitch to CVS for TNR's Products as a cover to promote Playboy wipes by mixing the wipes in with TNR's Playboy condoms and lubricants using a presentation vendor called BLKLYST, without TNR's knowledge or consent.  TNR reimbursed Monarch for the presentation in full, without knowing that a significant portion of the presentation was for Playboy's non-TNR products.

77.     Playboy wipes are sold in CVS stores but TNR's condoms and lubricants are not.  Upon information and belief, Playboy wipes at CVS are purportedly relying on TNR's product liability insurance thereby benefitting Playboy's products and profits under the cover of, and without the consent of, TNR.

78.     Upon information and belief, Playboy induced Allen to use a sales pitch to Walgreens for TNR's Products as a cover to promote Playboy wipes and CBD products by mixing those products in with TNR's Playboy condoms and lubricants using a presentation vendor called BLKLYST, without TNR's knowledge or consent.  TNR reimbursed Monarch for the presentation in full, without knowing that a significant portion of the presentation was for Playboy's non-TNR products.

79.     Playboy used sales of its wipes products to enrich itself at TNR's expense. For example, on November 4, 2020, and without TNR's permission or knowledge, Playboy prompted Allen to send a payment of $229,016.16 from Freedom's bank account, the first of several monthly payments, as payment for Playboy wipes' sales.

80.     At or about the time it was inducing Allen to undermine TNR with major retailers, Playboy revealed during an investor presentation that it would pursue a new strategy of transitioning from licensing to direct ownership and operation of its sexual wellness portfolio—with an eye toward a specific expansion in US, EU, and Asia markets.  Among other things, Playboy revealed during the presentation that it had secured agreements to sell its sexual wellness products at Walmart and CVS—the very two retailers at the heart of Playboy's unauthorized efforts to use TNR resources for

its own benefit.

81.     Playboy did not reveal the underhanded means described above that Playboy used to get into Walmart and CVS through TNR's relationships without TNR's knowledge or permission. Moreover, upon information and belief, Playboy has no such direct agreement to sell its sexual wellness products with Walmart.

### d.     *Playboy Blocks TNR's Attempts to Seek New Opportunities*

82.     At around the same time, Playboy also began to unabashedly exert brute force in its efforts to block potential relationships that would expand TNR's sales of the Products.

83.     Upon information and belief, Playboy interfered with TNR's prospective relationship with a vendor called Core-Mark—a major USA distributor that services convenience stores and gas stations—by instructing Allen not to pursue the relationship for TNR.   Instead, Playboy asked Allen to insert Playboy into the relationship to harm TNR's economic relationships and undermine TNR's operations and business. Upon Playboy's instruction, Allen put TNR's negotiations with Core-Mark on hold and the relationship never came to fruition.

84.     Playboy interfered with a deal worth more than $6 million—secured with the deposit of $400,000—by holding back its approval for 4-6 months for TNR to sell condoms in Russia and thereby delaying TNR's ability to register with the appropriate agencies to sell the Products, a deal Allen attempted to secure with a distributor through a sub-publisher of Playboy magazine in the country.

85.     During Playboy's strict regime of Playboy's prior approval and quality control of sales, Playboy also misused its authority under the PLA to withhold approval of a 200-page marketing plan that TNR submitted concerning, among other things, TNR's plan to utilize digital markets, social media platforms, and other internet-based endeavors in sales of Playboy products.   Playboy's abuse of power blocked TNR's ability to utilize Playboy's social media for advertising related to TNR's Products.

86.     In fact, Playboy also unreasonably withheld and/or failed to act on no fewer than 67 product approval requests and no fewer than 18 requests for approval of marketing materials—all of which were submitted through Playboy's requisite portal and met the requirements of Paragraph 2.i(i) of the PLA to the extent reasonably possible to do so.  This violated Playboy's obligations under the PLA and the Seventh Amendment to promptly provide such approvals or an explanation for denial.

87.     Furthermore, Playboy began to pressure TNR through its license management company CAA-Global Brands Group ("**CAA**"), demanding sales reports, insisting on product and ad approvals, instituting production controls, requiring marketing plan submissions, and enforcing requirements for the placement of holograms on Products.  The changes and additional controls over the license contravened the course of performance between Playboy and UMD, TNR's predecessor-in-interest, as TNR understood UMD to engage in the same conduct for many years prior to novation of the license to TNR.

88.     Meanwhile, Playboy ratcheted up the pressure on Allen to deliver TNR's business to Playboy as they had agreed.  Upon information and belief, as part of his efforts on Playboy's behalf, Allen supplied Playboy with TNR's confidential business information and financial data.

89.     Apparently unsatisfied with Allen's efforts in providing such information to that point, Patel sent an email to Allen on or around November 25, 2020 with an offer of a full-time position in the company with significant compensation, and provided a list of "expectations" Playboy had for Allen, including, among other things, that he (i) deliver condom distribution rights for major markets to Playboy; (ii) transition use and control of Playboy's marks back to the company; (iii) divulge the sensitive details of TNR's logistics and distribution setup (e.g., Freedom's role, the identity of its importer and freight forwarder, and the source of its USA regulatory guidance); (iv) work with Playboy's communications/brand team to clean up all social/digital assets related to condoms/intimacy, e.g. Instagram, Facebook, YouTube

to establish greater alignment and consistent with Playboy Hero Brand and Sexual Wellness Category; and (v) share knowledge about the sexual wellness category with respect to competition, trends, industry/sector, regulatory, and other best practices.

90.   Playboy's attempt to solicit Allen for the purposes stated in the email contravened its representations under the Novation Agreement and Seventh Amendment to the PLA that it would be a supportive licensor to TNR.

91.   Thus, contrary to its contractual obligations licensing condom rights to TNR for significant consideration, and before conducting a 2021 audit to terminate TNR's license, Playboy was already taking steps in 2020 to start transitioning the license to Playboy by offering Allen compensation with a list of expectations that would achieve Playboy's goal of getting the license back from TNR.

**E.   Playboy Engineers an Audit as Pretext for Terminating TNR's License**

92.   Eventually, things fell apart between Playboy and Allen in or about December 2020.  Upon information and belief, Playboy began to press Allen for extremely detailed accounts regarding TNR's operations, logistics, and other intimate details of TNR's business.  Ultimately, Playboy and Allen did not renew their working relationship and Allen left the Playboy space.

93.   Without the promise of further financial gain from his relationship with Playboy, Allen attempted to pivot back to TNR once again.  In January 2021, Allen informed TNR of Playboy's efforts to seize TNR's Playboy condom and lubricant business and showed TNR the e-mail Playboy sent to him on November 25, 2020 offering a full time position with the company and significant compensation.

94.   On February 11, 2021, Playboy resumed its status as a publicly traded company through a deal with a Special-Purpose Acquisition Company ("**SPAC**") trading on the NASDAQ exchange under the ticker "PLBY."

95.   The next day, Playboy's CEO, Ben Kohn, participated in a video interview during which he outlined Playboy's strategy for the future.  Though the

company had gained prominence as the publisher of a men's lifestyle and entertainment magazine, Playboy would now move away from the publication business and focus on other markets, with an emphasis on the market for sexual wellness products.  Kohn confirmed Playboy's desire to seize direct control of the sexual wellness business it was licensing to companies like TNR, stating flatly that "[s]exual wellness is a category [Playboy wants] to own . . . on a global basis" and that Playboy had begun making that desire a reality "by terminating contracts and taking back rights to certain product categories."[8]

96.    In a later interview, Kohn explained Playboy's incentive to move from licensor to owner/operator of its sexual wellness portfolio in order to maximize the sector's value to the company:  "[L]icensing is a less efficient model for that, and we can own a lot more of the spend.  That $3 billion of consumer spend, *the challenge with licensing is you're getting pennies on the dollar for that*, $0.02, $0.03 on the dollar for that.  If we pivot and we own that, not only can I drive the lifetime value of the customer up and the average order size because I can tell [sic] you more products, but I can drive my revenue up.  When you look at that, there could be a 20x increasing revenue just if you model it out and actually an increase in EBITDA by 5 or 6 times as well."[9]

97.    Shortly after Playboy went public, TNR received an email placing it on notice of an impending audit under the PLA.  Up to that point, Playboy had never conducted an audit of TNR or its predecessor licensee UMD.

98.    The audit represented Playboy's latest strategy to misuse its broad powers under the PLA to achieve its objective of stealing TNR's business.  Indeed, Allen later

---

[8] Channelchek, *Playboy CEO Ben Kohn – Presentation from NobleCon 17*, YouTube (Feb. 12, 2021), https://youtu.be/9ULyUT2sFac

[9] Nick Sciple, *PLBY Group CEO Ben Kohn on the Future of Playboy and Other Parts of the Business*, The Motley Fool (Aug 23, 2021, 2:11 PM), https://www.fool.com/investing/2021/08/23/plby-group-ceo-ben-kohn-on-the-future-of-playboy/.

disclosed to TNR that Playboy executive Kopcha stated that an audit could be used by Playboy to terminate the license to achieve Playboy's desired outcome.

99.     At Playboy's request, Credence Global Consulting Limited ("**Credence**") conducted the audit between April 26, 2021 to May 4, 2021 at TNR's offices in Bangkok, Thailand and, as agreed, TNR cooperated fully.  On June 7, 2021, Credence issued a report detailing the findings of its audit on TNR's books and records concerning TNR's compliance with the PLA.

100.    The audit findings alleged that TNR had committed a number of breaches under the PLA, ranging from purported late payments of royalties to TNR's alleged failure to obtain certain product approvals.  In total, Playboy's audit assessed a claim against TNR in the amount of $8,622,713 for the alleged violations detailed in the audit.

101.    The audit findings were, at best, disingenuous, and none of the purported breaches of the PLA presented in the audit were material or justified immediate termination of the agreement.  Moreover, the audit contained no notice of Playboy's intent to terminate the PLA, nor any date upon which such a termination would be effective.

102.    Accordingly, TNR responded a week later with a letter providing a detailed rejection of all findings and a specific basis for each rejection.

103.    For example, contrary to the audit's finding that TNR failed to obtain product approvals, the reality was that TNR *did* obtain approvals in the same manner that UMD had always done.

104.    Similarly false were the audit's findings that TNR had failed to pay royalties.  In fact, TNR had paid all royalties as required under the PLA.

105.    Playboy later reduced the amount it sought in connection with TNR's alleged breaches from $8,622,713 to $1,610,078, in exchange for the return of rights to territories closely aligned to those it communicated to Allen in the list of "expectations" for Playboy's offer of full-time employment to Allen sent by email on

November 25, 2020, all while signaling that its proposed offer was somehow generous to TNR.

106.   TNR attempted to discuss the audit 'findings' with Playboy, offered to pay for a new audit, and expressed a desire on multiple occasions to resolve the issues between the parties, but Playboy failed to meaningfully engage in a productive dialogue.   Instead, Playboy simply bullied TNR to forcibly terminate the PLA consistent with Playboy's real intent of taking the license back to distribute the Products itself.

### F.   Playboy Unlawfully Terminates the Product License Agreement

107.   On November 5, 2021, Playboy sent a letter to a TNR executive terminating the PLA effective immediately.

108.   In the letter, Playboy invoked its purported rights to terminate the agreement due to alleged incurable defaults under Section 7.a(iii) of the PLA and citing as justification for its act the findings of the audit conducted in July 2021. Playboy also demanded that TNR (i) cease and desist from use of Playboy's intellectual property and stop sales of the Products; (ii) refrain from entering a sell-off period and provide Playboy with an inventory list within ten (10) days of the termination date; (iii) remit the termination fee of $459,461.25 to Playboy within ten (10) days of the termination date; and (iv) pay Playboy the reduced figure of $1,610,078 previously sought from TNR to resolve the matter.

109.   As TNR previously noted in its audit response, the alleged defaults in Playboy's purported termination notice were (i) acts and conduct by TNR's predecessor licensee that was agreeable and sanctioned by Playboy; (ii) acts and conduct that TNR continued from its predecessor's course of performance under the PLA licensee that was agreeable and sanctioned by Playboy; (iii) minor acts that TNR rectified immediately upon notice, or (iv) acts that lacked any factual basis.   In all events, none of the purported breaches of the PLA were material or justified termination of the agreement.

110.   In accordance, TNR promptly notified distributors and known retailers of the sudden and abrupt nature of Playboy's immediate and wrongful termination, thereby causing significant commotion, damage, and inconvenience to all of TNR's relationships.

111.   Playboy's refusal to allow TNR to engage in a sell-off period and eliminate remaining unsold inventory was retaliatory and has saddled TNR with approximately $13 million in inventory that will have to be unnecessarily destroyed or used as a means by Playboy to ascertain and control the inventory so it can replace TNR as the new supplier to TNR's damaged relationships.

112.   Playboy's wrongful and an unjustified termination of the PLA has caused a ripple effect through TNR's supply chain and sales channels, resulting in the inability to sell millions of dollars in inventory, harm and damage to its various commercial relationships, and tarnishment of its public reputation around the world resulting in devaluation of TNR's stock by TNR having to report the license termination to the SET.

### G.   TNR is a De Facto Franchisee Entitled to the Protections of California Law

113.   TNR qualifies as a franchisee under Section 31005 of the FIL.  Cal. Corp. Code § 31005.

114.   The FIL defines a franchise as:

> [A] contract or agreement, either expressed or implied, whether oral or written, between two or more persons by which: (1) A franchisee is granted the right to engage in the business of offering, selling or distributing goods or services under a marketing plan or system prescribed in substantial part by a franchisor; and (2) The operation of the franchisee's business pursuant to such plan or system is substantially associated with the franchisor's trademark, service mark, trade name, logotype, advertising or other commercial symbol designating the franchisor or its affiliate; and (3) The franchisee is required to pay, directly or indirectly, a franchise fee.

Cal. Corp. Code § 31005.

115.   The PLA granted TNR the exclusive rights to engage in the business of designing, manufacturing, advertising, promoting, selling, distributing, and conducting research and development for condoms bearing the Playboy mark under a marketing plan or system prescribed in substantial part by Playboy that gave Playboy significant control over the business, including, but not limited to, in the following ways:

**a.**   TNR could not use any of its exclusive rights outside the Territory;

**b.**   TNR could not sell the Products without Playboy's prior approval at each stage of development, even when selling to licensees of Playboy-branded stores, and satisfying strict quality controls;

**c.**   TNR had to seek Playboy's prior approval on a yearly basis for its advertising/promotional and marketing plans and seek prior approval for any and all public relations, packaging, marketing, and advertising efforts throughout the year;

**d.**   TNR could only advertise and promote the Products within the Territory and distribute the Products in specified channels;

**e.**   TNR could not sell certain Products outside of the United States without affixing Playboy's official hologram to its packaging and provide reports with certain metrics about hologram usage;

**f.**   TNR was subject to a twice-yearly audit—for which TNR had to pay if the audit revealed certain deficiencies—and had to manage its books according to Playboy's requirements;

**g.**   TNR could not engage a subcontractor or supplier to manufacture or distribute the Products without obtaining Playboy's prior approval and using Playboy's specified contracts; and

**h.**   TNR had to meet minimum sales requirements by region and minimum marketing advertising expenditures in a given License Year or suffer consequences ranging from the loss of exclusivity over that region up to and including

termination of the license.

116.   Playboy's use of its powers to control TNR interfered with TNR's ability to operate the business.  By way of example, Playboy required TNR to submit requests for advertising/promotional and marketing approvals through a portal called Brand Comply, and Playboy's failure to timely respond to TNR's requests in early 2021 kept TNR from going forward with various holiday promotions such as Valentine's Day and St. Patrick's Day-themed promotions that were opportunities for increased sales.

117.   Additionally, after the audit, Playboy used its powers to change the scope of TNR's hologram usage—which the course of performance previously restricted to certain countries in Asia—and required that holograms be affixed to all packages. Playboy decided to use its control powers under the license to engineer its termination of the license. That change dramatically increased the number of approvals TNR had to submit, and Playboy unreasonably withheld or delayed its approval, effectively preventing TNR from selling the Products.

118.   The PLA granted TNR the right to engage in the business of selling branded condoms and lubricants bearing Playboy's mark, which was communicated to TNR's customers via the packaging of the Products.

119.   TNR was required to pay Playboy a franchise fee for the ability to engage in the business of selling Playboy's branded condoms:

a.   Through the SPA and the Novation Agreement, TNR became UMD's successor in interest, and the Novation Agreement required TNR to tender consideration that went to Playboy in the amount of $750,000 as an upfront fee, which it paid; and

b.   The PLA entitled Playboy to both guaranteed and earned royalties for the rights granted by the PLA, and it required TNR to provide an annual payment of both guaranteed and earned royalties—totaling more than $2.3 million—to Playboy over three years, which it paid.

120.   TNR engaged in sales, leases, and business transactions directed toward

customers from within the state of California as part of the business contemplated by the PLA and the Novation Agreement.  By way of example, Allen served as TNR's global sales consultant for the Products through an agreement with Monarch (incorporated in the State of California), Allen's marketing and sales company in California, where Allen operated and conducted TNR's U.S. operations, and TNR officials routinely engaged in transactions from California directed at customers.  TNR also paid rent to Playboy under the impression that doing so would allow Allen to conduct operations on behalf of TNR from Playboy's offices in California, but unbeknownst to TNR, Playboy used the arrangement to exercise further control over Allen and, through him, over TNR's business as well.

121.   Accordingly, TNR meets each of the requirements to be a franchisee under the FIL and is entitled to its protections. It follows that Playboy is thus a franchisor and must adhere to the legal obligations of a franchisor under California law.

122.   Consistent with the FIL's public policy, a franchisor—here, Playboy—must either register the franchise with California's DFPI and disclose certain information required by the Franchise Investment Law through a Franchise Disclosure Document, or otherwise qualify as a franchise exempt from such disclosures.

123.   A franchisor—here, Playboy—is also required to update its DFPI disclosures to the extent there are any material changes to the information contained in the initial registration application.

124.   Upon information and belief, Playboy has never registered with California's DFPI.   As such, Playboy has also failed to provide the requisite information for a lawful Franchise Disclosure Document.

125.   Playboy's failure to make the required disclosures and provide TNR with a Franchise Disclosure Document ("**FDD**") left TNR unaware of many aspects of its relationship with Playboy, including the role of Playboy as franchisor and TNR as franchisee.  Had Playboy fulfilled its legal obligations as a franchisor, TNR would

have received a Franchise Disclosure Document informing TNR of (i) Playboy's ability to provide assistance, advertising, training, and other benefits to TNR; and (ii) Playboy's ability and obligation to participate in the operation of TNR's franchisee business, if any.

## FIRST CLAIM FOR RELIEF

**Violation of Statute – Wrongful Termination of Franchise)**
**(California Franchise Relations Act – Corporations Code sections 20000 *et seq*.**

**(Against Playboy)**

126.    TNR hereby incorporates each and every allegation set forth in the preceding paragraphs as though set forth fully herein.

127.    The license from Playboy is a franchise as defined by California Corporations Code section 20001, known as the California Franchise Relations Act ("**FRA**"). Cal. Corp. Code §§ 20000 et seq.

128.    Under that license, Playboy granted TNR, by way of the Novation Agreement, the right to engage in the business of selling Products bearing its mark, including an exclusive right to design, manufacture, advertise, promote, sell, distribute, and conduct research and development for the Products in the territory in the manner and distribution channels specified by the PLA.  Playboy also prescribed in substantial part the means by which TNR would sell the Products by requiring an advertising/promotional and marketing plan, paired with its own submission and approval process, for all sales of Products.

129.    Moreover, Playboy conditioned all sales of Products upon (i) TNR satisfying Playboy's strict standards of quality, suitability, advertising, marketing, packaging, and other controls dictated by Playboy under the terms of the license, as referenced above in paragraphs 24-27, and (ii) TNR receiving approval from Playboy based on the standards and controls dictated by Playboy. In turn, TNR's business of selling Products is substantially and integrally associated with Playboy's tradename, marks, and logos.

130.   TNR paid a total of $750,000 to Playboy, through UMD, as an initial fee under the Novation Agreement, and it also paid substantial guaranteed royalties of more than $2.3 million dollars annually, plus earned royalties as calculated under the terms of the PLA.

131.   Under the terms of the PLA, as extended by the Fifth Amendment, TNR's license was due to expire, if not renewed, on December 31, 2027.

132.   On November 5, 2021, Playboy issued a defective notice of termination letter indicating TNR's license was terminated immediately on the grounds of alleged incurable defaults under the PLA, citing the findings of its pretextual audit.  None of the alleged defaults were material.

133.   Playboy terminated the license without providing 60 days' notice of its intent to terminate and an opportunity to cure any alleged defects in TNR's performance.  This is a violation of FRA section 20020. Cal. Corp. Code § 20020.

134.   Playboy's notice of termination was defective because it did not provide written notice to TNR by registered, certified, or receipted mail, telegram, or personal delivery.  This is a violation of FRA section 20030. Cal. Corp. Code § 20030.

135.   At all relevant times, TNR operated in substantial compliance with the terms of the PLA and substantially performed its obligations thereunder.

136.   Playboy's purported grounds for termination were arbitrary, wrongful, and without good cause, in breach of the license.  This is a violation of FRA section 20020. Cal. Corp. Code § 20020.

137.   TNR is therefore entitled to the fair market value of the franchised business and franchise assets, any other damages that result from Playboy's wrongful termination of the PLA, and injunctive relief.

138.   As a direct and proximate result of Playboy's violations, and pursuant to FRA section 20035 (Cal. Corp. Code § 20035), TNR has suffered and continues to suffer damages in an amount to be determined at time of trial, the amount of which is in excess of $100 million including, but not limited to, the fair market value of the

franchised business and the franchised assets, expected profits under the license through 2027, the $15 million purchase price of the license (including $750,000 as initial consideration under the Novation Agreement), startup costs and investments of approximately $13 million, royalties, the reimbursements and returns of monies and inventory to and from third parties due to the sudden termination, any loss of stock market valuation due to TNR having to report the license termination to the SET (Stock Exchange of Thailand), and numerous operating losses, including but not limited to having to cancel third party contracts, and operating contracts for employees and vendors for storage and related logistics, approximately $17 million in unsold and returned goods and claims from distributors and retailers due to Playboy's retaliatory refusal to allow a sell-off period, and all consequential damages suffered by TNR related to Playboy's illegal franchise.

## SECOND CLAIM FOR RELIEF

### Violation of Statute
### Franchise Investment Law – Corporations Code sections 31000 *et seq.*

### (Against Playboy)

139.   TNR hereby incorporates each and every allegation set forth in the preceding paragraphs as though set forth fully herein.

140.   Playboy violated the FIL by failing to register (or claim an exemption) and by failing to file its franchise offering circular ("FOC") (now known as the FDD) with the California Department of Corporations as required of all non-exempt sellers of franchises in California.   This omission is a violation of the FIL.   TNR first discovered the nature of its franchisor-franchisee relationship with Playboy on or about November 2021 upon Playboy's wrongful termination.   In particular, TNR learned that it had legal rights under the FIL based on (i) Playboy's failure to prepare and file the requisite paperwork under the FIL and (ii) Playboy's failure to present TNR with a FOC (now called the FDD).

141.   Specifically, Playboy violated the FIL by failing to provide a copy of a

FOC (now called the FDD) to TNR at least ten (10) business days prior to TNR entering a franchise.  This is a violation of Corporations Code section 31119.

142.   Upon information and belief, Playboy never employed a registered franchise salesperson when it instructed its employees or agents to participate in the ongoing sale of the franchise from Playboy to TNR during the execution of the Novation Agreement and any subsequent Amendments to the PLA during TNR's time as licensee.  This is a violation of section 31210 of the FIL. Cal. Corp. Code § 31210.

143.   Upon information and belief, and pursuant to section 31302 of the FIL, the officers of Playboy are jointly and severally liable for the violations set forth above because they are officers, directors, and/or control persons of Playboy. Cal. Corp. Code § 31302.

144.   Upon information and belief, Playboy's acts as described herein were willful, so TNR is entitled to rescission as an alternative to remedy its damages claims. The PLA is therefore an illegal franchise since it violates California civil law, California administrative regulations, California public policy, and the Code of Federal Regulations.

145.   As a direct and proximate result of Playboy's violations, and pursuant to section 31300 of the FIL (Cal. Corp. Code § 31300), Plaintiff has suffered and continues to suffer damages in an amount to be determined at time of trial,  the amount of which is in excess of $100 million including, but not limited to, the fair market value of the franchised business and the franchised assets, expected profits under the license through 2027, including, but not limited to, the $15 million purchase price of the license   (including $750,000 as initial consideration under the Novation Agreement), startup costs and investments of approximately $13 million, royalties, the reimbursements and returns of monies and inventory to and from third parties due to the sudden termination, any loss of stock market valuation due to TNR having to report the license termination to the SET (Stock Exchange of Thailand), and numerous operating losses, including but not limited to having to cancel third party contracts,

and operating contracts for employees and vendors for storage and related logistics, approximately $17 million in unsold and returned inventory due to Playboy's retaliatory refusal to allow a sell-off period, and all consequential damages suffered by TNR related to Playboy's illegal franchise.

## THIRD CLAIM FOR RELIEF

### Breach of Contract
### (Against Playboy)

146.   TNR hereby incorporates each and every allegation set forth in the preceding paragraphs as though set forth fully herein.

147.   TNR operates a business of design, manufacture, advertising, promotion, selling, distributing, and conducting research and development of Products pursuant to the terms of the PLA, under which it became a licensee pursuant to the SPA and the Novation Agreement (the PLA and Novation Agreement collectively, the "**Agreements**").

148.  Playboy has breached the Agreements with TNR by unfairly and intentionally taking actions contrary to the terms of those Agreements and to the longstanding course of performance between Playboy and TNR—as well as between Playboy and UMD as TNR's predecessor in interest— including, but not limited to:

a.     Unreasonably and without justification withholding product approvals in violation of the Agreements that prevented TNR from engaging in sales of Playboy Products under the Agreements, including preventing TNR from engaging in holiday promotions to maximize sales during peak sales periods;, in violation of Section 2.i of the PLA.

b.     Failing to provide the agreed upon "services" enumerated in Paragraph 1 of the Seventh Amendment to the PLA including, among other things, timely product and marketing plan approvals and other assistance as necessary to effectuate TNR's assumption of obligations under the PLA;

**c.**     Failing to cooperate with TNR as licensee in good faith as required under Section 11.1 of the Novation Agreement; and

**d.**     Engaging in the wrongful termination of the PLA on the basis of pretextual audit findings that contravene the course of performance between the parties in violation of Section 11.1 of the Novation Agreement.

149.   TNR has performed or substantially performed its obligations under the PLA and the Novation Agreement and has paid Playboy significant royalties to date.

150.   Playboy's breaches of the PLA and the Novation Agreement are material, done in bad faith, and have resulted in Playboy unfairly and unjustly profiting from its breaches.

151.   As a direct and proximate cause of Playboy's breach of the PLA and the Novation Agreement, TNR has suffered general, special, and consequential damages, including future damages, in an amount to be determined at trial, but exceeding $75,000.

### FOURTH CLAIM FOR RELIEF

**Breach of the Implied Covenant of Good Faith and Fair Dealing**

**(Against Playboy)**

152.   TNR hereby incorporates each and every allegation set forth in the preceding paragraphs as though set forth fully herein.

153.   TNR operates a business of selling Products pursuant to the terms of the PLA, under which it became a licensee pursuant to the SPA and the Novation Agreement.

154.   The PLA and Novation Agreement, as well as the longstanding course of performance between the parties, impose a duty of good faith and fair dealing on the part of Playboy.

155.   Playboy has breached its duty of good faith and fair dealing by intentionally taking actions to frustrate and misappropriate the benefits to which TNR is entitled under the PLA and Novation Agreement, including, but not limited to:

**a.**     Withholding product approvals unreasonably and without justification to harm TNR's performance under the PLA and prevent TNR from obtaining the full benefit of its bargain, in violation of Section 2.i of the PLA and Paragraph 1 of the Seventh Amendment to the PLA;

**b.**     Failing to provide the good-faith cooperation required under Section 11.1 of the Novation Agreement;

**c.**     Directing, aiding, and abetting Allen to obtain TNR's approval of the Eighth Amendment by concealing material facts about the nature of the agreement in violation of Section 11.1 of the Novation Agreement;

**d.**     Competing directly with TNR by selling Playboy products not manufactured by TNR on TNR's retail shelf space and using packaging copied from TNR's Products in violation of Section 11.1 of the Novation Agreement;

**e.**     Undermining and sabotaging TNR's efforts to perform and meet its obligations as a licensee in violation of Paragraph 1 of the Seventh Amendment and Section 11.1 of the Novation Agreement;

**f.**     Directing, aiding, and abetting Allen to bill or charge TNR for improper and unauthorized expenses to support sales of Playboy products, including, but not limited to, shipping, logistics, insurance, advertising, and other costs and fees, injuring TNR's ability to make profits under the PLA, in violation of Section 11.1 of the Novation Agreement;

**g.**     Abusing its discretionary powers under the PLA in bad faith to conduct an audit for the purpose of raising alleged defects in TNR's performance to justify immediate termination of the PLA and seizure of TNR's exclusive license, in violation of Section 11.1 of the Novation Agreement; and

**h.**     Refusing to entertain TNR's good faith efforts to cure the alleged defects in TNR's performance identified in the audit or in any way to resolve the impasse between the parties over the PLA and refusing to allow TNR to engage in a

sell-off period after termination of the PLA, in violation of Section 11.1 of the Novation Agreement.

156.   As a direct and proximate cause of Playboy's breach of the implied covenant of good faith and fair dealing, TNR has suffered general, special, and consequential damages, including future damages, in an amount to be determined at trial, but exceeding $75,000.

### FIFTH CLAIM FOR RELIEF

**Violation of California's Unfair Competition Law**
**Cal. Bus. & Prof. Code § 17200 *et seq.***

**(Against All Defendants)**

157.   TNR hereby incorporates each and every allegation set forth in the preceding paragraphs as though set forth fully herein.

158.   The California Unfair Competition Law ("**UCL**") prohibits any "unlawful, unfair, or fraudulent business act or practice[.]"  Cal. Bus. & Prof. Code § 17200.

159.   Playboy and Allen are "persons" as defined by the UCL.  Cal. Bus. & Prof. Code § 17201.

160.   Defendants violated the UCL by engaging in unfair, unlawful, and/or deceptive business practices, specifically by engaging in behavior including, but not limited to:

      **a.**   Misrepresentation of Playboy's products as TNR Products to usurp TNR's goodwill and take advantage of TNR's relationships with one or more major retailers and buyers of TNR's Products;

      **b.**   Deceptively infiltrating TNR's earned and designated shelf space at one or more major retailers to the exclusion of TNR's Products for the benefit of Playboy's wipes product;

      **c.**   Deceptively, and without authorization, obtaining purported coverage through a liability insurance policy fully funded by TNR and intended solely

to cover TNR's Products;

      **d.**    Deceptively obtaining payment from TNR for expenses, including but not limited to, shipping, logistics costs, social media advertising, and marketing data to be used for non-TNR Playboy products;

      **e.**    Billing or charging TNR for improper and illegitimate expenses, including but not limited to payments of rent for commercial space used exclusively by and for the benefit of Playboy;

      **f.**    Obtaining TNR's approval of the Eighth Amendment by concealing material facts about the nature of the agreement, which was significantly harmful to TNR; and

      **g.**    Unlawfully and wrongfully terminating the PLA in violation of California franchise law.

161.   Through these practices, Defendants deprived and continue to deprive TNR of certain protections to which it is entitled under California law and misappropriating revenue lawfully due to TNR.

162.   Playboy's actions are unlawful or, at a minimum, violate the public policy set forth in the FIL because Playboy was required to register as a franchisor and file and update disclosures prior to creation of the franchise concerning: the nature of its business; the assistance, advertising, and training Playboy was required to provide TNR as a franchisee; and Playboy's obligation to participate in the operation of TNR's business, if any.

163.   Playboy's failure to register or make the required disclosures under the FIL deprives TNR of certain information concerning Playboy's business, such as its operational standards and the assistance Playboy is expected to provide to TNR.  This created a significant likelihood that Playboy's promises under the terms of the PLA and Novation Agreement would not be fulfilled—as, indeed, is now the case.

164.   Playboy abused its position by performing a predatory audit of TNR's operations based on undisclosed standards and, despite the same performance by

TNR's predecessor, proceeded to (i) ignore TNR's numerous subsequent requests for information and clarity concerning the alleged defects in its performance; (ii) ignore TNR's numerous subsequent attempts to remedy some of those alleged defects, and (iii) use the audit as a basis to claim there was a material breach of the PLA as a pretext to immediately terminate the Agreements.

165.   In addition, Playboy's acts of undermining TNR's license under the PLA by selling Playboy's products through one or more major retailers using TNR's shelf space and resources for which TNR invested and expended funds to sell its goods to the exclusion of TNR's Products threaten and harm competition.

166.   As a direct and proximate cause of Playboy's unlawful, unfair, and/or fraudulent business practices, TNR has suffered damages entitling it to restitutionary disgorgement of all monies Playboy obtained due to its unlawful business practices in an amount to be determined at trial, but exceeding $75,000.

## SIXTH CLAIM FOR RELIEF

### Intentional Interference with Contractual Relations

### (Against Playboy)

167.   TNR hereby incorporates each and every allegation set forth in the preceding paragraphs as though set forth fully herein.

168.   TNR has contractual relationships with its distributors, suppliers, and customers—including but not limited to Walmart, Walgreens, Monarch, Freedom, and Allen—within the Territory set forth in the PLA, where it has operated its condom and lubricant business since 1993.

169.   Each of these contractual relationships have resulted and would continue to result in an economic benefit to TNR.

170.   These contractual relationships were known to Playboy, both independently and through its relationship and dealings with Allen.

171.   TNR's contractual relationship with Walmart was at-will. Playboy was neither a party nor an agent of a party to TNR's contract with Walmart. Playboy

41

engaged in conduct independent of the actual interference by intentionally misrepresenting its products as belonging to TNR in a presentation to Walmart to disrupt TNR's Walmart agreement and improperly securing shelf space and sales rights at Walmart for Playboy's products.  To effectuate those sales, Playboy also deceptively used packaging on its products almost identical to those on TNR's Products.  These acts disrupted the contractual relationship between TNR and Walmart by depressing TNR's sales at Walmart, harming TNR's certified supplier status, brand, trust, and reputation with Walmart, making TNR's performance under its agreement with Walmart more difficult, and decreasing TNR's enjoyment of the benefits it derived from the Walmart agreement.  As a proximate result of Playboy's wrongful acts to intentionally disrupt the Walmart agreement, TNR experienced decreased profits from sales at Walmart as it was unable to sell as many packages of its Products as it could have absent Playboy's interference.

172.   TNR's contractual relationship with Walgreens was of a definite term. Playboy was neither a party nor an agent of a party to TNR's contract with Walgreens. Playboy wrongfully induced Allen to include Playboy's wipes and CBD products in a sales pitch to Walgreens without TNR's knowledge or consent to disrupt TNR's contractual relationship with Walgreens. Subsequently, Playboy further disrupted the contractual relationship between Walgreens and TNR by wrongfully and unreasonably terminating the PLA, harming TNR's status, brand, trust, and reputation with Walgreens, making TNR's performance under its agreement with Walgreens more difficult and decreasing TNR's enjoyment of the benefits it derived from the Walgreens agreement. As a proximate result of Playboy's wrongful acts to intentionally disrupt the Walgreens agreement, TNR was unable to pitch and sell its own Products to Walgreens in its TNR-exclusive sales presentation and lost profits from sales at Walgreens.

173.   TNR's contractual relationships with Monarch, Freedom, and Allen were of a definite term. Playboy was neither a party nor an agent of a party to these contracts.

Playboy wrongfully obtained benefits at the expense of TNR for expenses dedicated solely to Playboy's operations—including but not limited to, shipping, logistics costs, social media advertising, marketing data, and payment of rent for commercial space used exclusively by and for the benefit of Playboy—by inducing Allen to submit illegitimate reimbursement requests. Playboy engaged in this misconduct to induce breach of TNR's agreements with Monarch, Freedom, and Allen. As Playboy was aware, Freedom was an entity engaged by TNR for its distribution in the US yet it was used by Playboy to sell Playboy wipes at Walmart as well as receive and send funds from the sales. Playboy's wrongful conduct undermined TNR and committed TNR's resources to benefit Playboy's products, thereby disrupting TNR's contractual relationships with Monarch, Freedom, and Allen and ultimately resulting in actual breach. As a proximate result of Playboy's wrongful acts to intentionally induce disruption and breach of TNR's agreements with Monarch, Freedom, and Allen, TNR paid monies it otherwise would not have in connection with resources unlawfully diverted to Playboy's products, thereby increasing the cost and burden of TNR's performance under its contracts with Monarch, Freedom, and Allen.

174.    Playboy is a stranger to the contractual relationship between TNR and the aforementioned entities with whom TNR enjoys such contractual relations.

175.    Playboy knew that its acts would interfere in those relationships or it should have known that interference was substantially certain to occur as a result of its actions.

176.    TNR was harmed in an amount to be determined at trial, but exceeding $75,000.

177.    TNR is informed and believes that Playboy's conduct was intentional, malicious, oppressive, and/or designed to damage and harm TNR's operations and reputation, as well as demonstrating a reckless disregard of TNR's rights.    TNR is entitled to compensatory, consequential, exemplary and punitive damages as a result.

**SEVENTH CLAIM FOR RELIEF**

**Intentional Interference with Prospective Economic Relations**

**(Against Playboy)**

178.   TNR hereby incorporates each and every allegation set forth in the preceding paragraphs as though set forth fully herein.

179.   TNR hereby further incorporates each and every allegation set forth in the subsequent paragraphs as though set forth fully herein.

180.   Over the course of TNR's term as licensee, TNR has pursued economic relationships with additional distributors, suppliers, and customers within the Territory set forth in the PLA, all of which were designed to provide TNR with an economic benefit.

181.   Playboy disrupted TNR's prospective economic relationship with CVS, which would have benefitted TNR economically by allowing it to expand sales of its Products to CVS stores, by (i) stealing TNR's professional and financial resources to have Allen present Playboy's products to CVS, using materials created by a presentation vendor paid for by TNR, in a TNR-exclusive presentation; (ii) violating the UCL by wrongfully inducing Allen to present Playboy's products in the aforementioned presentation; and (iii) misrepresenting itself to CVS in or around September 2020 as being an authorized beneficiary of TNR's retailer relationship during the aforementioned presentation. Playboy knew that interference with TNR's prospective economic relationship with CVS was certain or substantially certain to occur as a result of its conversion, wrongful inducement, and intentional misrepresentation to CVS.

182.   Playboy violated the UCL and disrupted TNR's prospective economic relationship with Core-Mark, which would have benefitted TNR economically by allowing it to expand sales of its Products to Core-Mark's convenience stores and gas stations., by wrongfully inducing Allen to put a hold on TNR's negotiations with Core-Mark to force the negotiations to fail and undermine TNR's operations. Playboy knew

44

that interference with TNR's prospective economic relationship with Core-Mark was certain or substantially certain to occur as a result of its wrongful inducement.

183.   Playboy violated the UCL and disrupted TNR's prospective economic relationship with the Russian distributor, which would have benefited TNR economically by keeping a deposit of $400,000 and expanding sales of its Products to Russia, by wrongfully and unreasonably withholding approval of TNR's deal with the Russian distributor—for which TNR received a deposit of $400,000—for 4-6 months to force the negotiations to fail and undermine TNR's operations. Playboy knew that interference with TNR's prospective economic relationship with the Russian distributor was certain or substantially certain to occur as a result of its wrongful and unreasonable withholding of approval.

184.   The existence of these prospective economic relationships with CVS, Core-Mark, and the Russian distributor was known to Playboy, and Playboy took actions that were intentionally wrongful and exceeded the bounds of fair competition to disrupt and/or divert those relationships.

185.   Playboy's intentional interference with TNR's prospective economic relationships with CVS, Core-Mark, and the Russian distributor prevented those relationships from materializing into economic benefit to TNR and therefore worked to the detriment of TNR's expectations of an economic benefit from those relationships.

186.   Playboy's actions disrupted TNR's prospective economic relationships with CVS, Core-Mark, and the Russian distributor through conversion, misrepresentation, and violation of the UCL.

187.   TNR had a reasonable probability of future business opportunities and economic benefit in connection with its prospective economic relationships with CVS, Core-Mark, and the Russian distributor.

188.   As a proximate result of Playboy's wrongful acts, TNR was harmed in an amount to be determined at trial, but exceeding $75,000.

## **EIGHTH CLAIM FOR RELIEF**

### **Negligent Interference with Prospective Economic Relations**

### **(Against Playboy)**

189.   TNR hereby incorporates each and every allegation set forth in the preceding paragraphs as though set forth fully herein.

190.   TNR had a reasonable probability of future business opportunities and economic benefit in connection with, but not limited to, its prospective economic relationships with CVS, Core-Mark, and the Russian distributor.

191.   Playboy owed a duty of care to perform its obligations under the Seventh Amendment of the PLA and the Novation Agreement in a way that did not cause foreseeable harm to TNR's business.

192.   Playboy had knowledge of TNR's prospective economic relationship with CVS, Core-Mark, and the Russian distributor and Playboy knew or should have known that if it did not act with due care, Playboy's actions would interfere with TNR's opportunities with CVS, Core-Mark, and the Russian distributor, causing TNR to lose the economic benefit of such relationships.

193.   Playboy failed to uphold its duty of care, thus disrupting and/or diverting TNR's prospective economic relationships and exceeding the bounds of fair competition.

194.   But for Playboy's negligent performance of its obligations by way of inducing Allen to present Playboy's products in a TNR-exclusive presentation to CVS, TNR would have economically benefited from the CVS relationship.

195.   But for Playboy's negligent performance of its obligations by way of inducing Allen to insert Playboy in the Core-Mark relationship and to put TNR's negotiations with Core-Mark on hold, TNR would have economically benefited from the Core-Mark relationship.

196.   But for Playboy's negligent performance of its obligations by way of withholding timely approval of the deal for sales in Russia, TNR would have

economically benefitted from the Russian distributor relationship.

197.   Playboy failed to perform its obligations under the Seventh Amendment of the PLA and the Novation Agreement in a way that caused unforeseeable harm to TNR's business, thereby disrupting TNR's relationships and business opportunities with CVS, Core-Mark, the Russian distributor and perhaps other entities presently unknown.

198.   As a proximate result of Playboy's negligence, TNR was injured by Playboy in an amount to be determined at trial, but exceeding $75,000.

## NINTH CLAIM FOR RELIEF

### Fraudulent Inducement to Contract

### (Against Playboy)

199.   TNR hereby incorporates each and every allegation set forth in the preceding paragraphs as though set forth fully herein.  In particular, TNR specifically reiterates and incorporates by reference herein paragraphs numbered 43-53 which detail the fraudulent inducement.

200.   As a material inducement to enter into the Eighth Amendment, Playboy intentionally concealed or suppressed the material fact that CBD condoms and lubricants were included in the scope of the PLA in its communications with Allen on July 8, 2019 at 7:56 PM and 8:26 PM, which was underscored by the lack of any consideration tendered by Playboy for the Eighth Amendment (*first concealment or suppression*).  In the same e-mails, Playboy also intentionally concealed or suppressed the material fact that Playboy needed the Eighth Amendment to lawfully implement its CBD sexual wellness product line without violating the terms of the PLA (*second concealment or suppression*).  Playboy had a duty to disclose the aforementioned material facts regarding the Eighth Amendment (i) as an incident of the contractual relationship between Playboy and TNR due to Playboy's representations under the Novation Agreement and Seventh Amendment to the PLA that it would be a supportive licensor to TNR; (ii) because Patel made false representations about the

PLA's scope but did not disclose facts that materially qualified the facts disclosed or that the representations rendered her disclosure likely to mislead TNR; and/or (iii) because Patel actively concealed discovery of the material facts from TNR by not disclosing such facts during Playboy's discussions with Allen, whom Playboy knew TNR relied upon for its US operations (*duty to disclose*). Playboy intended to defraud TNR by intentionally concealing or suppressing the material facts that CBD condoms and lubricants were in fact included in the scope of TNR's licensing rights, and that Playboy needed TNR to sign the Eighth Amendment to lawfully implement its CBD growth plan (*intent to defraud*). At the time of Playboy's concealment or suppression, TNR was ignorant of the material facts concealed or suppressed by Playboy (*lack of knowledge*). If TNR had been aware of the existence of the material facts concealed or suppressed by Playboy, Khun Amorn would not have signed the Eighth Amendment on behalf of TNR because (i) lubricants of all kinds were central to TNR's business, as evidenced by condom and lubricant pairings; and (ii) TNR sought to develop CBD, THC, and other cannabinoid products; instead, because of Playboy's concealment or suppression of the aforementioned facts, TNR was induced into signing the Eighth Amendment and unknowingly transferred its licensing rights to CBD condoms and lubricants back to Playboy (*causation/injury*).

201.   As a material inducement to enter into the Eighth Amendment, Playboy also intentionally made a false representation that CBD condoms and lubricants were excluded from the scope of the PLA. On July 8, 2019 at 8:26 PM, Patel made a representation that it was a "[r]eality" that CBD condoms and lubricants were excluded from the scope of the PLA (*representation by Playboy*). Playboy's representation was false, as evidenced by the express language of the PLA (*falsity*). Playboy knew that the representation was false when it made the representation to Allen, TNR's global sales consultant at the time (*knowledge of falsity*). Playboy intended that TNR rely on the false representation to induce TNR into signing the Eighth Amendment, which Playboy needed to lawfully implement its CBD sexual wellness product line—CBD

by Playboy—without violating the terms of the PLA (*intent to induce reliance*).  TNR reasonably relied on Playboy's false and fraudulent representation, which was communicated to Khun Amorn by Allen, due to (i) TNR's lack of experience and expertise in the American market; (ii) Allen's specific role as TNR's primary resource for guidance on US operations given TNR's lack of experience and expertise in the American market; (iii) Playboy's affirmative misrepresentation that it was a "reality" that CBD products were not included in the scope of the PLA; and (iv) Playboy's knowledge of the fact that the misrepresentation conveyed to Allen would be communicated to TNR given Allen's role as TNR's American market advisor. Due to the foregoing reasons, Khun Amorn relied upon Playboy's intentional misrepresentation of material facts and strategically crafted sense of urgency and was induced into signing the Eighth Amendment without the benefit of an attorney and with no consideration from Playboy. (*justifiable reliance*).   TNR's reliance on Playboy's false and fraudulent representation was a substantial factor in causing harm to TNR because TNR would not have signed the Eighth Amendment, resulting in loss of licensing rights to CBD condoms and lubricants, had it not reasonably relied on Playboy's false representation (*causation/injury*).

202.   Playboy's use of intentional fraudulent conduct was a deliberate tactic to induce TNR to sign the Eighth Amendment.  As a direct and proximate result of Playboy's fraudulent concealment or suppression and false and fraudulent representation, TNR has suffered damages.  The amount of these damages has not been precisely determined and the damages are continuing to accrue.  TNR is also entitled to rescission as an alternative to remedy its damages claims.

203.  Playboy's acts alleged above included deceit and/or fraudulent concealment or suppression of material facts as well as false or fraudulent representation of a material fact known to Playboy with the intent of inducing TNR into signing the Eighth Amendment, depriving TNR of its property or legal rights or otherwise causing injury, and were despicable, malicious, oppressive, and/or

fraudulent conduct that subjected TNR to a cruel and unjust hardship in a conscious disregard of TNR's rights, so as to justify an award of exemplary and punitive damages in an amount to be proven at trial, but exceeding $75,000.

## TENTH CLAIM FOR RELIEF
### Conversion
### (Against Playboy)

204. TNR hereby incorporates each and every allegation set forth in the preceding paragraphs as though set forth fully herein.

205. Playboy has completely failed and/or refused to account for the use of TNR's funds for Playboy's expenses and has completely failed to pay for or return any of TNR's funds, but has nevertheless benefited from TNR's retailer account and funds, paving the way for the sales of Playboy's sexual wellness products.

206. Instead, to satisfy its own operational costs relating to Playboy's sexual wellness products, Playboy wrongfully, unlawfully, and intentionally converted TNR's funds for Playboy's personal use in their entirety.

207. Playboy usurped TNR's resources for costs relating to Playboy's independent sexual wellness operations, including but not limited to:

   a. All funds paid by TNR for costs relating to Playboy wipes such as payments for iheart wipes advertising, BLKLYST Wipes and CBD advertising, product liability insurance for Playboy wipes at CVS, sales commissions for Playboy wipes, bonuses on sales growth for Playboy wipes, EDI fees and monthly management fee for Playboy wipes, QuickBooks monthly fee, accounting expenses, and other significant shipping, storage, advertising, marketing, costs and fees benefiting Playboy, the sum total of which can be ascertained and confirmed by third-party invoices detailing expenses incurred and paid by TNR from November 2019 to August 31, 2021 but exceeding $497.860.75.

   b. TNR's payment of $210,000 to Allen from November 2019 to December 2020 arising from Playboy's poaching of Allen to be a double agent and

undermine TNR's operations;

       **c.**    $51,520 in office rental and parking costs from approximately November 2019 to December 2020 for Playboy's operations; and

       **d.**    $6,953.95 for construction and remodeling costs for Playboy's offices.

208.   TNR is the rightful owner of and has an immediate right to possession of the funds converted by Playboy.

209.   TNR in no manner consented to Playboy's misappropriation of its funds.

210.   TNR has performed all of the conditions, covenants, and promises required on its part to be performed in accordance with the terms and conditions of the PLA.

211.   TNR is entitled to restitution from Playboy's unjust enrichment because Playboy knew or had reason to know that the payments Freedom sent to Playboy actually belonged to TNR.

212.   TNR is entitled to restitution from Playboy's unjust enrichment because Playboy knew or had reason to know it was being saved from expense or loss by having TNR's resources pay for Playboy's operational costs.

213.   As a direct and proximate result of Playboy's conversion of TNR's monies, TNR has been damaged in a specific sum capable of identification through discovery as there are thousands of invoices TNR must analyze and additional requisite information is known only to Playboy and/or Allen, but exceeding $492,864.32.

## ELEVENTH CLAIM FOR RELIEF

### Breach of Fiduciary Duty

### (Against Allen)

214.   TNR engaged Allen as global sales consultant for the Products, and authorized him to conduct business on TNR's behalf.  Allen assumed an integral role in TNR's operations and assisted in managing TNR's Products in the US under the

PLA.

215.   TNR entrusted Allen with these responsibilities based on Allen's previous position at UMD and experience with the Playboy condoms and lubricant business, which placed him in a singular and essential position to guide TNR's transition efforts and left TNR heavily dependent upon Allen.

216.   Allen served as consultant to TNR in connection with its Products in the United States, and TNR entrusted Allen to represent its interests in conducting business on its behalf in the consultant capacity.  As a result, Allen owed TNR certain fiduciary duties including the duty of undivided loyalty.

217.   Allen breached his fiduciary duties by conducting business directly with Playboy to his benefit, and TNR's detriment.  For example, Allen acted covertly to develop a wipes product sometime in 2019 with the goal of using TNR's relationships and credentials with retailers in addition to its shipping, storage, logistics, insurance, and other resources to sell the product under the Playboy brand for his own benefit rather than TNR's.

218.   After Allen learned that Playboy wished to take away exclusive rights from TNR to sell in the USA and Canada, Allen entered into a deal with Playboy whereby Allen would have the ability to sell his wipes product under the Playboy brand, and Playboy would have a means to charge into the sexual wellness space using TNR's retail and distributor relationships.

219.   In or about November 2019 Playboy offered Allen an independent consulting role, which TNR later learned that he accepted in exchange for $100,000 plus sales commissions.  Playboy offered this position to Allen without informing TNR, and while Allen continued to serve as global sales consultant for TNR through Monarch and remained a director of Freedom, TNR's US distributor.

220.   Without the assistance of Allen, Playboy and Allen would not have been able to implement their improper scheme to use TNR's retail and distributor relationships, shelf space, insurance, shipping, and other resources to distribute the

Playboy wipes.

221.   As a result of Allen's actions, Playboy and Allen were able to distribute the Playboy wipes using TNR's business relationships, shelf space, insurance, shipping, and other resources, at the expense of TNR.  TNR has accordingly been damaged in a specific sum capable of identification through discovery, as there are invoices and other information currently known only to Playboy and/or Allen.

**PRAYER FOR RELIEF**

**WHEREFORE**, TNR prays for judgment against Playboy as follows:

1.   For damages and restitution in an amount in excess of $100,000,000, including but not limited to expected profits under the license through 2027, the $15 million purchase price of the license (including $750,000 as initial consideration under the Novation Agreement), startup costs and initial investments of approximately $13 million, royalties, the reimbursements and returns of monies and inventory to and from third parties due to the sudden termination, revenue loss from unreasonably withheld product approvals, interference with contractual and prospective economic relationships, loss of stock market valuation, business interruption and reputational business damage due to the wrongful termination, unsold and returned inventory of approximately $17 million due to Playboy's retaliatory refusal to allow a sell-off period under to the wrongful termination, undue payments to Playboy from TNR's funds for Playboy related expenses, restitutionary disgorgement of all monies obtained due to Playboy's unlawful business practices, and numerous operating losses, including but not limited to having to cancel third party contracts, and operating contracts for employees and vendors for storage and related logistics;

2.   Fair market value of the franchised business and franchise assets, any other damages that result from Playboy's wrongful termination of the PLA, and injunctive relief;

3.   For an award of general, special, consequential and other damages;

4.      For exemplary and punitive damages as allowable by law;

5.      For other compensatory damages;

6.      For equitable relief, including unjust enrichment and/or rescission;

7.      For reasonable attorneys' fees;

8.      For costs of suit and expert fees incurred; and

9.      For such other relief as the Court may deem proper.

## DEMAND FOR JURY TRIAL

TNR hereby demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure and Local Rule 38-1.

Dated: March 16, 2022                           **DUANE MORRIS LLP**

                                                By: */s/ Cyndie M. Chang*
                                                    Cyndie M. Chang

                                                Attorneys for Plaintiff
                                                *Thai Nippon Rubber Industry Public Limited Company*

# EXHIBIT 1

INDEX TO UNITED MEDICAL DEVICES, LLC
<u>PRODUCT LICENSE AGREEMENT</u>

THE SCHEDULE

<u>PARAGRAPH</u>                                                              <u>PAGE NO</u>.

**1.   GRANT OF LICENSE**
       a.      Grant                                                    8 - 9
       b.      Term                                                     9
       c.      License Year and License Quarter                        10
       d.      Territory                                                10
       e.      Minimum Net Sales                                        10

**2.   COVENANTS OF LICENSEE**
       a.      Use                                                      11 - 12
       b.      (i)      Maintaining Goodwill                            12
               (ii)     Compliance with Law                            12
       c.      Distribution Channels                                    12
       d.      Royalties
               (i)      Guaranteed Royalties                           12 - 13
               (ii)     Earned Royalties                               13
               (iii)    Interest                                       13
               (iv)     Letter of Credit                               13
       e.      Statements and Payments                                 13 - 15
       f.      Records and Audit                                        15
       g.      Expenses of Conducting Examinations                     15
       h.      Product Quality                                         15 - 16
       i.      Approval of Products and the Materials                  16 - 18
       j.      Title and Protection and Preservation
               of Playboy Properties and Copyrights                    18 - 19
       k.      Right to Subcontract, Licensee Financial Statements
               and Lists of Sources and Accounts                       19 - 20
       l.      Inventory and Holograms                                 20 - 21
       m.      Playboy Properties and Non-Competitive Brands           21 - 22
       n.      Indemnification and Product
               Liability Insurance                                     22 - 23
       o.      Advertising Expenditures, Advertising Plans and Public Relations   23 - 24

**3.   ADDITIONAL COVENANTS OF THE PARTIES**
       a.      Reservation of Rights                                    24
       b.      Certain Sales                                            24
       c.      Investment Opportunity                                   24

**4.   TITLE AND PROTECTION**
       a.      Indemnification by Licensor                             24 - 25
       b.      Enforcement                                              25

**5.   RELATIONSHIP BETWEEN THE PARTIES**
       a.      No Joint Venture                                         25
       b.      Assignment                                              25 - 26

INDEX TO UNITED MEDICAL DEVICES, LLC
<u>PRODUCT LICENSE AGREEMENT</u>

**(Continued)**

| | | | |
|---|---|---|---|
| 6. | **SUBLICENSING** | | 26 |
| | | | |
| 7. | **DEFAULTS AND RIGHTS OF TERMINATION** | | |
| | a. | Defaults and Right to Cure | 26 |
| | b. | Bankruptcy or Assignment for | |
| | | Creditors, Business Discontinuance | 26 - 27 |
| | c. | Loss of Trademark Rights | 27 |
| | | | |
| 8. | **EXPIRATION OR TERMINATION** | | |
| | a. | Effect of Expiration or Termination | 27 |
| | b. | Reserved Rights | 27 |
| | c. | Continued Sales After Expiration | |
| | | or Termination | 27 - 28 |
| | d. | Inventory After Expiration or Termination | 28 - 29 |
| | e. | Equitable Relief and Legal Fees | 29 |
| | f. | Termination Fee | 29 |
| | g. | Continuity of Sales | 29 |
| | | | |
| 9. | **NOTICES** | | |
| | a. | Effectiveness | 29 - 30 |
| | b. | Address Change | 30 |
| | | | |
| 10. | **CONFIDENTIAL INFORMATION** | | 30 |
| | | | |
| 11. | **SEVERABILITY** | | 30 |
| | | | |
| 12. | **CONSENTS AND APPROVALS** | | 31 |
| | | | |
| 13. | **APPLICABLE LAW** | | 31 |
| | | | |
| 14. | **NO BROKER** | | 31 |
| | | | |
| 15. | **CONSTRUCTION** | | 31 |
| | | | |
| 16. | **SURVIVABILITY** | | 31 |
| | | | |
| 17. | **RIGHTS CUMULATIVE** | | 31 |
| | | | |
| 18. | **LIMITATION OF LIABILITY** | | 31 |
| | | | |
| 19. | **ENTIRE AGREEMENT** | | 31 |

THE SCHEDULE referred to in the Agreement made as of April 1, 2010.

S.1.        **LICENSOR:**        **PLAYBOY ENTERPRISES INTERNATIONAL, INC.**
**680 North Lake Shore Drive**
**Chicago, IL  60611**

S.2.        **LICENSEE:**        **UNITED MEDICAL DEVICES, LLC**
**9595 Wilshire Boulevard, Suite 502**
**Beverly Hills, CA  90210**
**Contact:    Mr. Patrick Bertranou**
**Telephone:   310-498-3211**
**E-Mail:     Ppber2@pacbell.net**

S.3.        **THE TRADEMARKS:**

PLAYBOY and Rabbit Head Design (as depicted in **Exhibit A** attached hereto and made a part hereof).

**THE IMAGES:**

Certain images, patterns and graphics from Licensor's art and photo archives and Style Guides, which are approved in advance in writing by Licensor on a case-by-case basis. Although Licensee may submit to Licensor a request to use certain images, patterns and graphics, any specific images to be added to the Agreement will be granted in Licensor's reasonable discretion in writing and based on appropriateness for the Products, Licensor's current strategic or business plans and availability of rights.

S.4.        **THE TYPE OF LICENSE:**

Exclusive, except as set forth in **Paragraph 1.a.(iii)** of the Agreement.

S.5.        **THE USE OF THE PLAYBOY PROPERTIES:**

Subject to the provisions of **Paragraph 2.c.** of the Agreement, design, manufacture, advertise, promote, sell and distribute the Products (either directly itself or through distributors) to or through:  (i) Playboy-branded retail stores, and specialty stores, mass stores and convenience stores (i.e. physical stores) located in the Territory and duty-free stores (but specifically excluding in-flight and cruise ship duty-free channels of distribution or duty-free sales that take place on airplanes, cruise ships or through duty-free sales magazines) (which may or may not have their own "E-Commerce Web Site" (as such term is defined in **Paragraph 1.a.(iii)** of the Agreement)); (ii) non-Playboy branded catalogs; (iii) "E-tailers" (as such term is hereinafter defined) which will promote the availability of the Products via such E-tailers' "E-Commerce Web Sites" and which will ship orders for the Products placed through such "E-Commerce Web Sites" to, and only to, those addresses located in the Territory; and (iv) an "E-Commerce Web Site" owned or controlled by either Licensee or any distributor which will promote the availability of the Products via such "E-Commerce Web Site" and which will ship orders for the Products placed through such "E-Commerce Web Site" to, and only to, those addresses located in the Territory.  "E-tailers" shall mean any entity engaged in the promotion and sale of the Products whose primary means of promotion, sale or distribution of the Products is via an "E-Commerce Web Site."  All rights granted under the License shall be subject to the terms and conditions of the E-Commerce Guidelines attached hereto as **Exhibit B** and

made a part hereof. In the event Licensee fails to adhere to the terms and conditions of the E-Commerce Guidelines or is aware that an affiliated or third-party distributor or E-tailer of Licensee fails to adhere to the terms and conditions of the E-Commerce Guidelines and Licensee fails to take reasonable actions to address such failure by the affiliated or third-party distributor or E-tailer, Licensor may deem such failure to be an incurable default under the terms and conditions of the Agreement.

S.6.      **THE PRODUCTS:**

Condoms bearing and sold in connection with the Playboy Properties, as defined in the Agreement.

S.7.      **THE TERRITORY:**

Algeria, Angola, Benin (OAPI), Botswana, Burkina Faso (OAPI), Cameroon (ASPI), Cape Verde, Central African Republic (OAPI), Chad (OAPI), Congo (OAPI), Djibouti (OAPI), Egypt, Equatorial Guinea (OAPI), Eritrea, Ethiopia, Gambia, Ghana, Guinea (OAPI), Guinea Bissau (OAPI), Kenya, Madagascar, Malawi, Mali (OAPI), Mauritania (OAPI), Mauritius, Morocco, Mozambique, Namibia, Niger (OAPI), Nigeria, Reunion, Senegal, Seychelles, Sierre Leone, Somalia, South Africa, Swaziland, Tanzania, Togo (OAPI), Tunisia, Uganda, Zambia and Zimbabwe (sometimes collectively referred to in the Agreement as "Region 1").

Antigua and Barbuda, Aruba, Bahamas, Barbados, Belize, Bermuda, Bolivia, Brazil, Chile, Colombia, Costa Rica, Dominica, Dominican Republic, Ecuador, El Salvador, French Guyana, Grenada, Guatemala, Guyana, Haiti, Honduras, Jamaica, Netherlands Antilles, Nicaragua, Panama, Paraguay, Peru, St. Kitts and Nevis, St. Lucia, St. Vincent and the Grenadines, Suriname, Trinidad and Tobago, Uruguay and Venezuela (sometimes collectively referred to in the Agreement as "Region 2").

Afghanistan, Australia, Bahrain, Bangladesh, Bhutan, Brunei, Cambodia, China, Cook Islands, Fiji Islands, Hong Kong, India, Indonesia, Israel, Jordan, Kadavu, Kiribati, Kyrgyzstan, Laos, Lau Group, Lebanon, Lomaiviti Group, Macau, Malaysia, Maldives, Mamauca Islands, Mongolia, Nepal, New Calendonia, New Zealand, Norfolk Islands, Oman, Pakistan, Palestine, Philippines, Polynesia, Qatar, Rotuma, Singapore, South Korea, Sri Lanka, Tahiti, Taiwan, Tajikistan, Taveuni, Thailand, Timor Leste, Turkmenistan, United Arab Emirates, Uzbekistan, Vanuatu, Vietnam, Yasawa Group and Yemen. Japan will be added as of August 1, 2011 and will be non-exclusive for the period August 1, 2011 through October 31, 2011 (sometimes collectively referred to in the Agreement as "Region 3").

Albania, Andorra, Armenia, Austria, Azerbaijan, Belarus, Belgium, Bosnia, Bulgaria, Czech Republic, Croatia, Cyprus, Denmark, Estonia, Faroe Islands, Finland, France, Georgia, Germany, Gibraltar, Greece, Guernsey, Hungary, Iceland, Ireland, Italy, Jersey, Kazakhstan, Kosovo, Latvia, Liechtenstein, Lithuania, Luxembourg, Macedonia, Malta, Moldova, Monaco, Montenegro, Netherlands, Norway, Poland, Portugal, Romania, Russia, San Marino, Serbia, Slovakia, Slovenia, Spain, Sweden, Switzerland, Turkey, Turkish Republic of Northern Cyprus, Ukraine and United Kingdom (sometimes collectively referred to in the Agreement as "Region 4")

United States and Canada (sometimes collectively referred to in the Agreement as "Region 5").

Anything in this Agreement to the contrary notwithstanding, Licensor makes no warranties or representations as to its ownership or control of the Trademarks set forth below for the countries of the Territory set forth below. Licensor makes no warranties or

representations as to the validity of such Trademarks in such countries.  As a result, Licensor shall not be responsible for any claims, suits or causes of action arising out of or in connection with Licensee's use of such Trademarks in such countries.  Further, Licensee understands and accepts that Licensor may not be able to enforce any rights in and to those Trademarks in such countries, the result of which is that Licensor may not be able to prevent any third party from using such Trademarks on products identical or similar to the Products in such countries.  Licensee agrees not to hold Licensor responsible for any such third-party actions it may not be able to prevent.  In addition, Licensee shall indemnify, protect and hold Licensor harmless from and against any and all claims, suits, liabilities or other causes of action that may arise out of or in connection with Licensee's use of such Trademarks in such countries set forth below.  While Licensor is seeking trademark protection as available under local laws for such Trademarks in such countries for the Products, as a result of trademark laws in such countries, Licensee acknowledges that Licensor may not have confirmation as to the results of such protection for some time.  In the event that during this process Licensor determines that there are any third parties with earlier conflicting rights for any of the Trademarks for the Products in any such country, Licensor explicitly retains the right, in its discretion, upon written notice to Licensee, to remove any such country from the Territory for the Trademark(s) for which earlier third-party rights exist without liability to Licensee or obligation to Licensee beyond such written notice.

| Country | Trademarks |
|---|---|
| Cape Verde | PLAYBOY |
| Cape Verde | Rabbit Head Design |
| Cook Islands | PLAYBOY |
| Cook Islands | Rabbit Head Design |
| Eritrea | PLAYBOY |
| Eritrea | Rabbit Head Design |
| Ethiopia | PLAYBOY |
| Ethiopia | Rabbit Head Design |
| Gambia | Rabbit Head Design |
| Kosovo | PLAYBOY |
| Kosovo | Rabbit Head Design |
| Maldives | PLAYBOY |
| Maldives | Rabbit Head Design |
| Montenegro | PLAYBOY |
| Montenegro | Rabbit Head Design |
| Mozambique | Rabbit Head Design |
| Polynesia | PLAYBOY |
| Polynesia | Rabbit Head Design |
| Seychelles | Rabbit Head Design |
| Sierra Leone | Rabbit Head Design |
| Somalia | PLAYBOY |
| Somalia | Rabbit Head Design |
| Tahiti | PLAYBOY |
| Tahiti | Rabbit Head Design |

S.8.    THE COMMENCEMENT DATE:

April 1, 2010

S.9.    THE EXPIRATION DATE:

June 30, 2020

S.10.        **THE MINIMUM NET SALES:**

[Redacted]

[Redacted]

S.11.        GUARANTEED ROYALTIES:
                                              [Redacted]

S.12.        EARNED ROYALTIES:

                                              [Redacted]

S.13.        THE ADDRESS WHERE BOOKS KEPT:  See Paragraph S.2. above.

UNITED MEDICAL DEVICES, LLC           PLAYBOY ENTERPRISES
(LICENSEE)                            INTERNATIONAL, INC.
                                      (LICENSOR)

By:    _____       By:    _____

Title:    _C.F.O_                     Title:    _Assistant Cansel_

Date:    _AUGUST - 24. 2011 -_        Date:    _8|24| 2011_

<u>**LICENSE AGREEMENT**</u>

This Agreement is made as of April 1, 2010, by and between the corporation described in **Paragraph S.1.** of the Schedule attached hereto and made a part hereof (hereinafter referred to as "Licensor") and the corporation described in **Paragraph S.2.** of the Schedule (hereinafter referred to as "Licensee").

RECITALS

WHEREAS, Licensor has certain rights in and to the trademark PLAYBOY and the other trademarks identified in **Paragraph S.3.** of the Schedule and as depicted in **Exhibit A** (the "Trademarks") and to certain images from Licensor's art and photo archives (the "Images"). The Trademarks and Images may sometimes be collectively hereinafter referred to as the "Playboy Properties;"

WHEREAS, Licensee recognizes that Licensor is an international multimedia entertainment company that publishes editions of *Playboy magazine* around the world; operates television networks and distributes programming globally; owns Playboy.com, a leading men's lifestyle and entertainment web site; and licenses the Playboy trademarks internationally for a range of consumer products and services, including retail stores; and

WHEREAS, the parties hereto desire that Licensor grant to Licensee a license to use the Playboy Properties in the design, manufacture, advertising, promotion, sale and distribution of the "Products" (as identified in **Paragraph S.6.** of the Schedule hereof and defined in **Paragraph 1.a.(i)** below).

NOW, THEREFORE, in consideration of the mutual promises herein contained, it is mutually agreed as follows:

1.     <u>**GRANT OF LICENSE**</u>.

a.     <u>Grant</u>:

(i)     Upon and subject to the terms and conditions hereinafter set forth, Licensor hereby grants to Licensee, and Licensee hereby accepts, the right, license and privilege specified in **Paragraph S.4.** of the Schedule to use the Playboy Properties in connection with, and only with, the use specified in **Paragraph S.5.** of the Schedule on and in connection with specifically designated and approved articles of merchandise specified in **Paragraph S.6.** of the Schedule (such merchandise bearing and distributed in connection with the Playboy Properties shall be referred to as the "Products" herein) in all countries of all Regions of the territory specified in **Paragraph S.7.** of the Schedule (hereinafter collectively referred to herein as the "Territory"). Such right, license and privilege is hereinafter referred to as the "License." It is understood and agreed that while the manufacture of the Products may take place outside the Territory, none of the Products may be advertised, promoted, sold or distributed outside the Territory by Licensee. Notwithstanding the foregoing, advertisements or promotions of the Products by Licensee that can be accessed from outside the Territory but are not targeted to that area, e.g., images on the Internet, shall not constitute a violation of this provision.

(ii)     Nothing contained in this Agreement shall prevent Licensor (on behalf of itself and its subsidiaries and affiliated companies) from doing any or all of the following: (a) using or granting one or more others the right or license to use the Playboy Properties on or in connection with the Products in any area of the world other than the Territory or in the Territory through any channels of distribution not included in the provisions of **Paragraph S.5.** of the Schedule attached hereto or on or in connection with any services or goods other than the Products in any or all area(s) of the world including the Territory; and/or (b) manufacturing or having manufactured in the Territory the Products for sale outside the Territory.

(iii)     Intentionally left blank.

(iv)     Licensee acknowledges that there are a number of authorized Playboy-branded stores in various countries around the world.  In the event the licensees for any such Playboy-branded stores wish to purchase any of the Products from Licensee or its distributors for sale through the Playboy-branded stores, Licensee may fulfill such orders subject to the provisions of this **Paragraph 1.a.(iv).**  While fulfillment of such orders may consist of Licensee or its distributors shipping the Products outside of the Territory, such shipments of the Products to such authorized Playboy-branded stores outside of the Territory will not be a violation of the Territory restrictions set forth in this Agreement; provided, however, that (a) Licensee may not solicit such orders outside of the Territory; (b) Licensee must report such sales separately on the "Statements" (as defined in **Paragraph 2.e.(i)** hereof); (c) **[Redacted]**

and (d) Licensee must notify Licensor in advance in writing of any such order and must obtain Licensor's prior written approval to fulfill such orders.   Notwithstanding the foregoing, the written approval of Licensor to fulfill a Playboy-branded store order shall constitute approval to fill future orders for such Playboy-branded store unless Licensor notifies Licensee otherwise in writing. Further, in the event Playboy has opened or opens, itself or through a third party, a Playboy-branded store in the Territory, the licensee for such Playboy-branded store in the Territory must source the Products from Licensee and sell such Products or similar products through such Playboy-branded store in the Territory.

(v)     Anything in this Agreement to the contrary notwithstanding, Licensee shall have no right through the License to open or operate a free-standing retail store using the Playboy Properties or any of Licensor's other intellectual property on or in connection with such store or the signage for such store.

(vi)     Licensee shall be responsible for and shall assume and pay for all costs and expenses arising out of or in connection with Licensee's responsibilities, duties and obligations set forth in this Agreement, including, but not limited to, those costs and expenses related to Licensee's design, manufacture, advertising, promotion, sale and distribution of the Products.

b.     Term:

(i)     The term of the License and this Agreement (hereinafter referred to as the "Term") shall commence on the date specified in **Paragraph S.8.** of the Schedule (hereinafter referred to as the "Commencement Date") and shall expire at midnight, Chicago time, on the date specified in **Paragraph S.9.** of the Schedule (hereinafter referred to as the "Expiration Date"), unless sooner terminated or renewed as provided in this Agreement.

(ii)     This Agreement will automatically renew for ten (10) additional License Years on the conditions that:  (a) Licensee shall be in full compliance with all of the terms and conditions of this Agreement, including, but not limited to, the timely payment of all amounts required under this Agreement; and (b) the "Minimum Net Sales" in all Regions of the Territory have been met or exceeded for each the last two License Years of this Agreement, Licensor and Licensee will, not more than six (6) consecutive calendar months prior to the Expiration Date, commence negotiations for a renewal of the License and this Agreement.  In the event that Licensor and Licensee cannot reach agreement on the terms and conditions of such renewal, including, but not limited to, "Guaranteed Royalties" (as defined in **Paragraph 2.d.(i)** hereof), "Earned Royalties" and "Minimum Net Sales" by the Expiration Date, it will be conclusively presumed that such parties cannot reach agreement and Licensor will be free to pursue such licensing opportunities without obligation or liability to Licensee.  Any such renewal must be evidenced in a writing signed by the parties.

c.      License Year and License Quarter:

(i)     For all purposes under this Agreement, a "License Year" shall be each twelve (12) consecutive calendar month period commencing on each April 1st of the Term and ending at midnight, Chicago time, on each following March 31st of the Term, and if the expiration or termination of the License and this Agreement is effective other than at the end of any such twelve (12) month period, then the final period of less than twelve (12) months ending on the effective date of such expiration or termination shall be deemed to be a License Year.

(ii)    For all purposes under this Agreement, a "License Quarter" shall be the first three (3) consecutive calendar months of the first License Year and each succeeding three (3) month period of the first License Year and each License Year thereafter, and if the expiration or termination of the License and this Agreement is effective other than at the end of a License Year, then the final period of less than three (3) months ending on the effective date of such expiration or termination shall be deemed to be a License Quarter.

d.      Territory:  The License shall extend only to the Territory, and the use by Licensee of the Playboy Properties shall be confined to the Territory.  Licensor shall have the right, but not the obligation, to terminate this Agreement by deeming any sales or distribution of the Products or use of the Playboy Properties by Licensee outside of the Territory to be an incurable default under this Agreement.  Such sales of the Products or use of the Playboy Properties shall include any sales by Licensee of the Products in the Territory for resale outside of the Territory.

e.      Minimum Net Sales:

(i)     Notwithstanding anything in this Agreement to the contrary, if Licensee's "Net Sales" in any License Year in any Region of the Territory are less than those amounts specified in **Paragraph S.10.** of the Schedule for any such License Year and any such Region of the Territory, then Licensor shall have the right to either:  (A) declare the License to be non-exclusive as to any Region of the Territory in which such shortfall occurs, thereby giving Licensor the rights to design, manufacture, advertise, promote, sell and distribute the Products in any such Region of the Territory in competition with Licensee or otherwise grant any or all of such rights to one or more other parties; or (B) terminate the License as to any such Region, in which case, such Region will be deleted from the Territory and this Agreement.  In the event that a Region is removed from the Agreement, as set forth above, the Guaranteed Royalty for each of the remaining License Years will be reduced by the percentage of sales such Region represented as part of the overall total Net Sales for the License Year in which such Region was removed.

(ii)    In the event there is a shortfall in the Minimum Net Sales amount in any License Year for all Regions of the Territory, then Licensor will have the option to terminate the License and this Agreement by deeming the failure to attain the Minimum Net Sales in all Regions of the Territory to be an incurable default under this Agreement.  Such declaration, deletion or termination:  (A) shall be immediately effective upon the receipt by Licensee of written notice from Licensor which shall be sent no later than forty-five (45) days after Licensor's receipt of the "Statement" (as defined in **Paragraph 2.d.(i)** hereof) for the end of each License Year and which evidences any such shortfall; and (B) shall have no effect upon the amounts due and payable to Licensor for periods prior to or after such declaration or termination.  For purposes of clarification, in the event the Net Sales in a Region of the Territory in a License Year exceeds the Minimum Net Sales threshold for such Region of the Territory in such License Year, such overage may not be used as an offset against any other minimums or guarantees hereunder including any Minimum Net Sales shortfall in such License Year in any other country of the Territory.  Further, Licensee may not use any such overage to offset any Minimum Net Sales shortfall in any other License Years.

2.      **COVENANTS OF LICENSEE.**

a.    Use:

(i)    Subject to Licensor's prior approval as hereinafter required, Licensee shall commence bona fide commercial sales of the Products in each Region of the Territory as soon as practicable after the Commencement Date, but in no event later than October 1, 2011.  If Licensee fails to commence any such sales in any Region by any such dates, Licensor may elect to remove any country of any such Region or all countries of any such Region from the Territory.  In the event Licensee fails to commence any such sales in all Regions of the Territory by such dates and Licensor has removed all Regions from the Territory, then this Agreement shall, upon the date of the removal of the final Region of the Territory, automatically terminate as the result of an incurable default under this Agreement.  In the event during any License Year, Licensee has not on a regular and ongoing basis sold and distributed the Products in each country of each Region of the Territory, then Licensor shall have the right to delete, from the Schedule upon not less than thirty (30) days' prior written notice to Licensee, any country to which Licensee has not so sold and distributed.  In the event that all Regions are deleted from the Territory, then the License and this Agreement will automatically terminate due to an incurable default.  For purposes of clarification, the sales discussed in this **Paragraph 2.a.(i)** are bona fide commercial sales, which are volume sales to the distribution channels listed in **Paragraph S.5.** of the Schedule for sale or distribution to consumers and will specifically exclude sample sales to distributors or wholesalers.

(ii)    Licensee shall not cause or authorize any use of the Playboy Properties in any area of the world outside the Territory and shall not knowingly manufacture, sell or otherwise deal with or distribute any of the Products on behalf of or to any individual or entity that Licensee believes intends to sell, deal with or distribute any of the Products in any way outside the Territory.  Licensee shall ensure that all of its distributors, whether affiliated or third-party, to which Licensee sells or through which Licensee otherwise moves any Products are aware of all Territory restrictions on the use of the Playboy Properties and the distribution of the Products and shall obtain an executed "Distributor Contract" (as defined in **Paragraph 2.k.(ii)** hereof) from all of its third-party distributors as set forth in **Paragraph 2.k.(ii)** hereof.  Licensee shall immediately notify Licensor should Licensee become aware that any of its distributors, whether third-party or affiliated, have distributed or dealt with the Playboy Properties or Products in any way outside the Territory.

(iii)    Licensee warrants and represents that it has and will continue to have throughout the Term and the "Sell-Off Period" (as defined in **Paragraph 8.c.** hereof) the legal right and authority to enter into this Agreement and to assume and perform its duties and obligations hereunder and that there is or are no, and Licensee shall not enter into during the Term or the "Sell-Off Period," if any, contract, agreement or understanding with any individual or entity which would in any way restrict or prevent Licensee from the performance of its duties and obligations under this Agreement.

(iv)    Licensee shall be responsible for obtaining, at its own expense prior to the Commencement Date, and maintaining at its own expense throughout the Term, any and all licenses, permits and approvals (including governmental and all other licenses, permits and approvals) necessary for Licensee to:  (a) design, manufacture, advertise, promote, sell and distribute the Products; (b) pay "Guaranteed Royalties," "Earned Royalties," and taxes; and (c) fulfill any and all other duties and obligations and exercise the rights of Licensee under this Agreement.  In the event Licensee is unable, for any reason, to obtain prior to the manufacture, advertisement, sale or distribution, or maintain throughout the Term all of such licenses, permits or approvals, such inability shall be an incurable default under this Agreement.

(v)    Licensee will take all necessary actions to ensure that all aspects of its obligations in connection with this Agreement comply with all applicable federal and state and local laws, rules and regulations, including, without limitation, all laws, rules and

regulations governing the design, manufacture, quality and safety of the Products and the CAN-SPAM Act of 2003.   Licensee will not create, initiate, transmit or otherwise participate in the creation, initiation or transmission of any unsolicited bulk email in connection with the Products.  In addition, Licensee will comply with all applicable state and federal laws governing privacy, technology, software and trade secrets.

b. (i) Maintaining Goodwill:  Licensee recognizes that the Trademarks are associated with Licensor on a worldwide basis and, therefore, Licensee shall, throughout the Term and the "Sell-Off Period," constantly use commercially reasonable efforts in the design, manufacture, safety, quality, advertising, promoting, selling, distributing and in all other dealing with or disposal of the Products to protect the good name and goodwill associated with the Trademarks and Licensor, and to obtain the greatest "Net Sales" throughout the entire Territory and the entire Term and the "Sell-Off Period."  Should Licensee directly or indirectly take any action which negatively affects or impacts the good name, goodwill or reputation of Licensor, Licensor may deem such to be an incurable default by Licensee under this Agreement.

(ii) Compliance with Law:  Licensee shall not cause, condone or authorize in any country of the Territory any violation of any federal, state or local law or regulation, including, but not limited to, the United States Department of the Treasury's economic and trade sanctions, which include, but are not limited to, any Executive Order Blocking Property of Certain Persons for any reason in any country of the Territory set by the United States Department of the Treasury Office of Foreign Assets Control.   All distributors of Licensee must also agree in writing not to cause, condone or authorize any such violations.  Any such violation by Licensee or any of its distributors shall be an incurable default under the Agreement.  Licensee agrees to indemnify, protect and hold harmless Licensor and Licensor's parent, subsidiary and affiliated entities and its and their employees, officers and directors for, from and against any and all costs, claims, suits or causes of action arising out of or in connection with any such violation.

c. Distribution Channels:  The Products may only be sold in the Territory through and only through those channels of distribution set forth in **Paragraph S.5.** of the Schedule to this Agreement.  Licensee acknowledges and agrees that nothing in this Agreement shall prevent Licensor (i) from using the Playboy Properties on or in connection with the Products or any goods similar to the Products in any channel of distribution that is not set forth in **Paragraph S.5.** of the Schedule to this Agreement, or (ii) from licensing to any third party the right to use the Playboy Properties on or in connection with the Products or any goods similar to the Products for any channel of distribution that is not set forth in **Paragraph S.5.** of the Schedule to this Agreement. Licensor shall have the sole and absolute discretion to determine if a store, club or other distribution channel falls within the licensed channels of distribution set forth in **Paragraph S.5.** of the Schedule to this Agreement.

d. Royalties:

[Redacted]

Under no circumstances whatsoever will Licensor return to Licensee all or any part(s) of Guaranteed Royalties, except as provided in **Paragraph 8.b.** hereof. In the event that Licensee is late in making any Guaranteed Royalty installment payment in any License Year and fails to make such payment within ten (10) days of receipt of written notice of such failure, Licensor will have the right upon written notice to Licensee to accelerate the payment of the unpaid remaining Guaranteed Royalty installments due and payable for the remainder of the License Year in which such installment was late, which along with the past due amount will be due and payable to Licensor within not more five (5) business days after the date of such notice. Any such notice from Licensor is without prejudice to Licensor's default and termination rights set forth in **Paragraphs 7.a.(i)** and **7.a.(iii)**.

        (ii)    Earned Royalties: Licensee shall pay to Licensor or its designee royalties (hereinafter referred to as "Earned Royalties") in the amount equal    **[Redacted]**

Earned Royalties shall be payable in accordance with the terms and conditions of **Paragraph 2.d.(i)** hereof.

        (iii)    Interest: Each sum, including, but not limited to, Guaranteed Royalties and Earned Royalties, that shall not be paid on the due date by Licensee shall bear interest from such due date until the date on which such sum is paid in full at an amount equal to four percent (4%) over the prime rate of interest as established by JP Morgan Chase on the date such sums should have been paid.

        (iv)    Letter of Credit: If, during any License Year, Licensee fails to make any timely payment of any amounts due under this Agreement, Licensor will have the right to require Licensee to deliver to Licensor an Irrevocable Stand-By Letter of Credit (the "Letter of Credit") in favor of Licensor confirmed and advised through a U.S. bank designated by Licensor and on terms and in the form and content as directed by Licensor, which may include, but may not be limited to the following terms and conditions: (a) the Letter of Credit must contain the condition that it will be automatically extended without amendment for additional periods of one year from the current or any future expiration date unless notice is sent sixty (60) days from the expiry date to the advising bank by authenticated swift and to Licensor by courier that the Letter of Credit will not be renewed and Licensor will have the right, at any time to draw upon the Letter of Credit if Licensee fails to make any payment as provided under this Agreement; and (b) the Letter of Credit must contain the condition that if during any term of the Letter of Credit, a partial draw becomes necessary, the Letter of Credit will automatically be reinstated to the original value pursuant to the terms and conditions of **Paragraph 2.e.** of this Agreement and Licensor will give notice of its intention to draw on the Letter of Credit if Licensee fails to make any payment due as provided under this Agreement. Licensor must receive the new Letter of Credit not less than thirty (30) days before the start of each such subsequent License Year. Licensor will have the right, at any time, to draw upon such Letter of Credit if Licensee fails to make any payments as provided for under this Agreement. All costs and expenses associated with such Letter of Credit, including, but not limited to, opening, amending and drawing fees, will be borne by Licensee. Licensee's failure to provide Licensor with a Letter of Credit as herein above provided shall be an incurable default under this Agreement.

e.    Statements and Payments:

        (i)    Within not more than thirty (30) days after each License Quarter during the Term and the "Sell-Off Period," if any, or within ten (10) days of a written request by Licensor Licensee shall furnish to Licensor or its designee a complete and accurate statement in a format reasonably acceptable to Licensor and certified to be true by the Chief Financial Officer (or the equivalent of such position if there is no Chief Financial Officer) of Licensee (hereinafter referred to as the "Statement") showing for such License

Quarter and the License Year through such period or for the "Sell-Off Period": (a) a listing, broken out by Region, of Licensee's accounts and the accounts of Licensee's affiliated and third-party distributors in the Territory and the units and description of all of the Products sold and distributed to each such account or otherwise disposed of by Licensee or by Licensee's affiliated and third-party distributors; (b) the computations, broken out by Region, of "Net Sales" on all such sales; (c) the computation of Earned Royalties and the amount of Earned Royalties due and payable; and (d) the advertising and promotion expenditures made by Licensee pursuant to **Paragraph 2.o.(i)** hereof and the details of all such expenditures, supported by copies of vouchers and, if specifically requested, copies of all advertising for or relating to the period covered by such Statement. When, during any License Year, the amount of Guaranteed Royalties for such License Year has been exceeded by the amount calculated according to **Paragraph S.12.** of the Schedule for such License Year, Licensee shall commence payment of Earned Royalties. Licensee shall pay all accrued and unpaid Earned Royalties by remittance accompanying each of the Statements.

      (ii)    As used in this Agreement, the term "Net Sales" means   **[Redacted]**

      (iii)    In the event the percentage of returns of Products in any License Year exceeds twenty percent (20%) of Net Sales for such License Year, then Licensor may elect to treat such an occurrence as an incurable default by Licensee under this Agreement.

      (iv)    Licensee acknowledges that any significant reduction in the wholesale price (or the retail price where Licensee sells directly to the public) or material liquidation of the Products may cause serious and perhaps irreparable harm to Licensor and Licensor's business activities and reputation in the Territory.

      (v)    If Licensee sells any of the Products to any individual or entity that is directly or indirectly owned or controlled by Licensee or is under common ownership with Licensee, in whole or in part, the invoice price used to compute Net Sales hereunder shall be the invoice price that would have been charged to an unrelated purchaser in an arm's-length transaction for such Products.

      (vi)    (a)    Payments Licensee is required to make by the terms of this Agreement shall be made by wire transfer in United States Dollars to a bank specified by Licensor. Any and all costs associated with the wire transfer payments shall be borne by Licensee. Licensee will remit to Licensor the gross amount of the Guaranteed Royalties and Earned Royalties. In the event any withholding or similar taxes are due in respect of any royalty or other payments hereunder, the amount of such payments will be grossed up such that Licensor will receive the same amount of royalty or such other payment as if such withholding or similar tax(es) had not applied. Licensee shall pay any withholding or similar taxes in a timely manner and shall promptly provide Licensor with a receipt evidencing such payment.

      (b)    Licensor and Licensee agree that the Licensor will not be liable for any withholding tax, including any interest, penalties or other associated costs, relating to any withholding obligation imposed by the government or taxing authority of any country, state, province, municipality or any other government jurisdiction arising as a result of this Agreement. Licensee further agrees to indemnify, reimburse and otherwise hold harmless, Licensor for any such costs imposed on Licensor. Licensee's obligation to pay taxes shall survive any expiration or termination of this agreement. In the event payments in the manner provided in this **Paragraph 2.e.** shall become impossible or illegal by reason of

the action of governmental authority, then, at Licensor's option, this Agreement may be terminated; and whether or not Licensor exercises such option, while such restrictions remain in effect, all payments due Licensor shall be made to an account in the Territory, or elsewhere where permitted by law, to be designated by Licensor.

      f.    <u>Records and Audit</u>:  Licensee shall:  (i) keep accurate books of account and records (including but not limited to utilization of consecutively numbered invoices which reconcile to each Statement and Licensee's general ledger) covering all transactions relating to or arising out of the License and this Agreement (which books and records shall be maintained separately from Licensee's documentation relating to other items manufactured or sold by Licensee); and (ii) upon the prior written request of Licensor but not more than twice in any License Year, permit Licensor or its nominees, employees, agents or representatives to have full access to such books and records in order to inspect such books and records at a reasonable hour of the day, to conduct an examination of and to copy (at Licensor's expense), all such books and records.  Licensee shall maintain in good order and condition all such books and records for a period of two (2) years after the expiration or termination of the License and this Agreement or, in the event of a dispute between the parties hereto, until such dispute is resolved, whichever date is later, and such books and records shall be kept at the address stated in **Paragraph S.13.** of the Schedule, except as such address may be changed from time to time in accordance with **Paragraph 9.b.** hereof.  Receipt or acceptance by Licensor of any Statement furnished pursuant hereto or any sums paid by Licensee hereunder shall not preclude Licensor from questioning the correctness thereof at any time, and if one or more inconsistencies or mistakes are discovered by Licensor in such Statement, it or they shall be rectified in an amended Statement received by Licensor no later than ten (10) days after the date of receipt by Licensee of notice of that which should be rectified.

      g.    <u>Expenses of Conducting Examinations</u>:  If any inspection or examination referred to in **Paragraph 2.f.** hereof discloses, or Licensor or Licensee otherwise discovers, an underpayment of Earned Royalties, the amount of such underpayment shall be paid by Licensee to Licensor no later than thirty (30) days after receipt of notice or knowledge thereof by Licensee.  In the event of such an underpayment by Licensee in excess of nine percent (9%) in any License Year, then Licensor may elect to treat such occurrence as an incurable default by Licensee under this Agreement.  If such inspection or examination:  (i) discloses or Licensor or Licensee otherwise discovers an overpayment of Earned Royalties or advertising contribution or either thereof (or, pursuant to **Paragraph 8.b.** hereof, an overpayment of Guaranteed Royalties), the amount of such overpayment shall be credited against the next due payment of any or all of the Guaranteed Royalties, Earned Royalties and advertising contribution or, in the event of the expiration or termination of the License and this Agreement and there is or are no such future payments, such amount shall be paid by Licensor to Licensee not later than thirty (30) days after the discovery thereof by Licensor, subject to Licensor's rights of setoff, recoupment and counterclaim; or (ii) reveals that for the period covered by such inspection or examination there is an error of five percent (5%) or more in the Earned Royalties or the advertising and promotional expenditures previously reported on the Statement(s) as being due from Licensee, all reasonable expenses involved in the conducting of such inspection or examination shall be borne by Licensee.  Licensee shall pay to Licensor the amount of such expenses no later than ten (10) days after Licensee's receipt of Licensor's invoice therefor.  If such error is less than five percent (5%), such expenses shall be borne by Licensor.

      h.    <u>Product Quality</u>:  Licensee hereby warrants and agrees that the Products designed, manufactured, advertised, promoted, sold or distributed under this Agreement shall bear the Playboy Properties faithfully produced and shall meet the high standards of quality, workmanship, material, design, size, color and style established by Licensor from time to time and in accordance with the terms and conditions of this Agreement.  Licensee will not knowingly or negligently cause or authorize any or all of the Products not conforming to this Agreement to be sold or distributed, as doing so may adversely affect Licensor's goodwill in the Trademarks and any such non-conforming Products shall either be made to conform or shall be destroyed at Licensee's expense.   All of the Products shall conform to and comply with, in all respects, all

applicable federal, state and local laws, rules and regulations governing the design, effectiveness, quality, labeling and safety of such Products.  Licensee shall not cause, condone or authorize:  (i) the use of any substandard materials in or in connection with any of the Products; (ii) any violation of any federal, state or local law or regulation, including, but not limited to, provisions thereof imposing advertising standards or requiring trade or content description of the Products; or (iii) the use of the Playboy Properties or any other word, device or symbol associated in any way with any or all of Licensor and its subsidiaries and affiliates in connection with any product or activity that is not the subject of the License and this Agreement.

    i.    <u>Approval of Products and the Materials</u>:

    (i)    Licensee understands and agrees that each of the Products and any other items bearing the Playboy Properties or intended for use in connection with the Products (hereinafter collectively referred to as the "Materials") must be approved in advance by Licensor which shall not be unreasonably denied, delayed or conditioned.  The Materials include, but are not limited to, prototypes, photography, cartons, containers, labels, wrappers, packaging and other inner and outer packaging materials, fixtures, displays, artwork and printing, advertising, sales, marketing and promotional materials.  Licensee shall, at its own expense, submit to Licensor or its designee for written approval, samples of each of the Products and the Materials at each stage of development thereof, which shall include, but not be limited to:  (a) an initial sketch or photograph; (b) a sample prototype (pre-production sample) or equivalent acceptable to Licensor; and (c) two final production-quality samples of that which will be mass produced or manufactured.  Licensee must obtain Licensor's written approval of each stage of development before proceeding to the next stage, and in no event shall Licensee commence or permit the mass manufacture, advertising, promotion, sale or distribution of any of the Products or the Materials unless and until Licensee has received Licensor's written approval of the samples provided pursuant to (b) of this **Paragraph 2.i.(i)**.  In the event Licensor fails to provide its approval or disapproval of any or all things submitted to Licensor pursuant to this **Paragraph 2.i.(i)** within fourteen (14) days of Licensor's receipt thereof, Licensee may send written notice to Licensor advising no response was received.  If Licensor does not respond within five (5) days of Licensor's receipt thereof, then Licensor shall be deemed to have given disapproval.  In the event Licensee fails to provide the two final production-quality samples pursuant to (c) of this **Paragraph 2.i.(i)**, Licensor may either purchase the two final production-quality samples and Licensee shall immediately pay Licensor for all related costs and expenses incurred by Licensor including the purchase prices and all delivery and shipment costs or such Products or Materials shall be considered unapproved.

    (ii)    The determination as to whether Products or Materials conform to a prior submission in all respects, including without limitation, with respect to materials, colors, workmanship, dimensions, styling, detail and quality,  Licensee shall not use an approved style number/designation in connection with non-conforming Products or Materials.

    (iii)    To ensure that each of the Products and the Materials are constantly maintained in conformance with the samples previously approved pursuant to this **Paragraph 2.i.**, Licensee shall, within seven (7) days of receipt of a written request from Licensor, send or cause to be sent to Licensor at Licensee's expense:  (a) such actual samples requested by Licensor of the Products and the Materials Licensee is using, manufacturing, selling, distributing or otherwise disposing of; and (b) a listing or revised listing of each location where any of the Products and the Materials or either thereof are designed, manufactured, stored or otherwise dealt with, except to the extent such listing or revised listing duplicates currently accurate information provided pursuant to **Paragraph 2.i.(ii)** hereof.  Licensor and its nominees, employees, agents and representatives shall have the right to enter upon and inspect, at all reasonable hours of the day, any and all such location(s) and to take, without payment, such samples of any of the Products and the Materials as Licensor reasonably requires for the purposes of such inspection.

(iv)   If any of the Products or Materials sent or taken pursuant to **Paragraph 2.i.(iii)** above or that otherwise come to the attention of Licensor does or do not conform in Licensor's reasonable opinion to the previously approved samples, Licensor shall so notify Licensee, in writing, specifying in what respect such of the Products or Materials is or are unacceptable. Immediately upon receipt of such notice, Licensee shall suspend all manufacture, sale and distribution of and shall obtain back from Licensee's accounts all such Products and Materials and shall not resume the manufacture, sale or distribution thereof unless and until Licensee has made all necessary changes to the reasonable satisfaction of Licensor and has received Licensor's written reapproval of each of such Products and Materials which shall not be unreasonably denied, delayed or conditioned.

(v)   All of the Products and the Materials that are not approved by Licensor or that are determined by Licensor to be unapproved, non-conforming or unacceptable shall not be sold, distributed or otherwise dealt with by Licensee bearing or referring to any of the Playboy Properties. All such Products and Materials may be confiscated, seized and/or destroyed by Licensor or, if directed by Licensor, by Licensee at Licensee's cost and expense, with an appropriate certificate of destruction furnished by Licensee.

(vi)   Any and all sales, distribution or use by Licensee of unapproved, non-conforming or unacceptable Products or Materials shall not only constitute an incurable default under the terms of this Agreement, but such Products or Materials also shall be considered unlicensed and an infringement of Licensor's proprietary rights, and Licensor shall have the right to bring legal action against Licensee for any and all remedies available to Licensor in addition to the remedies available under this Agreement.

(a)   So that there is no misunderstanding regarding the approval process, Licensee hereby agrees that in the submission of requests for approvals of proposed Products, unless Licensor gives written approval in advance, Licensee will: [1] use an Image in its entirety; [2] not crop the Image; [3] reproduce the Image with fidelity to the original; [4] not distort or mutilate the Image; and [5] not create a reproduction of the Image which would be prejudicial to the honor or reputation of the artist. Licensee further acknowledges that there may be certain works of art which Licensor, in its sole discretion, may determine are not appropriate for use on the Products. Licensor's refusal of an approval request based on a violation of any of the foregoing shall be a legitimate reason for the refusal of an approval pursuant to this License and the Agreement.

(b)   Licensor shall have final approval with respect to the following elements of the Products:

(i)   Selection of Licensor's Images for use on the Products.

(ii)   Manipulation and adaptation of the Playboy Properties for reproduction on the Products.

(iii)   Approval of "strike offs" or other pre-production samples as the parties may agree.

(iv)   Approval of actual materials to be used for manufacture of the Products.

(c)   It is specifically agreed by Licensee that there shall be no approval by default. Products may not be manufactured unless there is a written approval by Licensor.

(vii)     Licensee agrees and acknowledges that Licensor shall own all right, title and interest to the sample prototypes, final production-quality samples, and actual samples submitted by Licensee pursuant to this paragraph (the "Samples").  Licensor may store, display, destroy, sell (including without limitation sample sales to the trade), or otherwise dispose of the Samples as determined by Licensor in its sole discretion and without any obligation or payment to Licensee.

j.     Title and Protection and Preservation of Playboy Properties and Copyrights:

(i)     Licensee hereby acknowledges each of the following:  the great value of the goodwill associated with the Trademarks; the worldwide recognition thereof; that the proprietary rights therein and goodwill associated therewith are solely owned by and belong to Licensor; that the Trademarks and other related words, devices, designs and symbols are inherently distinctive or have secondary meaning firmly associated in the mind of the general public with Licensor, its subsidiaries and affiliates and its or their activities; and that all additional goodwill associated with the Trademarks created through the use of such Trademarks by Licensee shall inure to the sole benefit of Licensor. During and after the Term, Licensee shall not:

(a)     attack or question the validity of, or assist any individual or entity in attacking or questioning, the title or any rights of or claimed by Licensor, its subsidiaries and affiliates and their respective licensees and sublicensees in and to the Playboy Properties or any other trademarks, copyrights or such other intellectual or intangible property associated or connected with any or all of Licensor, its subsidiaries and affiliates, their publications, published material, activities, licensees and sublicensees;

(b)     directly or indirectly seek for itself, or assist any third party or parties to use or acquire, any rights, proprietary or otherwise, in any patent, trademark, copyright or such other intellectual or intangible property so associated or connected (including without limitation URLs and domain names), without the prior written approval of Licensor;

(c)     in any way seek to avoid Licensee's duties or obligations under this Agreement because of the assertion or allegation by any individual(s), entity or entities that any or all of the Playboy Properties are invalid or by reason of any contest concerning the rights of or claimed by Licensor; or

(d)     file or prosecute one or more trademark applications regarding Licensee's use of the Playboy Properties, unless first requested to do so in writing by Licensor.  (Licensee will cooperate with Licensor in connection with any and all such filings.)

(ii)     Licensee shall:

(a)     use the Playboy Properties as permitted under this Agreement in each jurisdiction strictly in accordance with the legal requirements in such jurisdiction.  At Licensor's request and cost, Licensee shall cooperate fully with Licensor in preparing and causing to be recorded in every jurisdiction designated by Licensor registered user agreements and all other documents or filings which may be necessary or desirable to evidence, protect and implement the rights of or claimed by Licensor pursuant to this Agreement.   In the event of any ambiguities between any registered user agreement or other similar document or filing and this Agreement, the terms and conditions of this Agreement shall govern and control.  Upon expiration or termination of this Agreement for any reason whatsoever, Licensee shall execute and file any and all documents, as required and directed by Licensor and at Licensor's expense, terminating any and all registered user agreements or other filings.  Licensee hereby authorizes

and empowers Licensor to terminate all registered user or other filings on Licensee's behalf and in Licensee's name;

(b)     affix or imprint irremovably and legibly on each of the Products and on or within all of the Materials such Playboy Properties, trademark notices, copyright notices, legends and Licensor's Hologram as Licensor directs;

(c)     manufacture, sell, distribute or otherwise deal with the Materials solely in connection with the Products (except for any or all of the Materials which do not bear one or more of the Playboy Properties or otherwise are not associated with any or all of the Products by virtue of, but not limited to, such things as design, color or content); and

(d)     not cause or grant permission to any third party or parties to acquire any copyright or other proprietary right in connection with any word, device, design or symbol used by Licensee in connection with any of the Products or the Materials.

k.     Right to Subcontract, Licensee Financial Statements and Lists of Sources and Accounts:

(i)     Licensee may subcontract the manufacture of any or all component parts of any or all of the Products bearing the Playboy Properties pursuant to this Agreement, provided:     (x)     Licensee notifies Licensor in advance of any intended supplier/subcontractor and obtains Licensor's prior written approval of such supplier/subcontractor which shall not be unreasonably withheld or delayed or conditioned; (y) Licensee obtains from each such supplier/subcontractor an executed written agreement in the form attached hereto and made a part hereof as **Exhibit C**; and (z) furnishes a copy of each such executed agreement to Licensor.

(ii)     Licensee may subcontract with a third-party distributor for the distribution of the Products in the Territory pursuant to this Agreement, provided:  (x) Licensee notifies Licensor in advance of any intended third-party distributor which shall not be unreasonably withheld or delayed and obtains Licensor's prior written approval of any such third-party distributor; (y) Licensee obtains from each Licensor-approved third-party distributor an executed written agreement (the "Distributor Contract") attached hereto and made a part hereof as **Exhibit D**; and (z) Licensee furnishes a copy of each Distributor Contract to Licensor.  For purposes of this **Paragraph 2.k.(ii)**, third-party distributors shall not include any distribution entity which is under common ownership or is wholly-owned or controlled by Licensee.  However, nothing contained in this **Paragraph 2.k.(ii)** shall be construed to relieve Licensee of its obligation and responsibility to ensure that its distributors, whether third-party or wholly or partially owned, perform their duties in accordance with the terms and conditions of this Agreement (including, but not limited to, the E-Commerce Guidelines) and the Distributor Contract, including, but not limited to approved distribution channels and Territory restrictions.  Licensee shall be responsible to Licensor for any violations by its distributors, whether third-party or affiliated, of the terms and conditions of this Agreement (which responsibility shall be included as part of Licensee's obligations under **Paragraph 2.n.(i)** hereof) or the Distributor Contract.  In the event of any such violation, Licensor shall have the right, but not the obligation, to do any of the following:  (i) require Licensee to immediately terminate, upon receipt of written notice from Licensor, the Distributor Contract with such distributor, at which time Licensee shall immediately and permanently cease supplying any or all of the Products to such distributor; (ii) declare the License to be non-exclusive; or (iii) terminate the License and this Agreement, immediately upon receipt by Licensee of written notice, by deeming any such violation to be an incurable default by Licensee under this Agreement. In the event of two (2) violations in one (1) License Year, Licensor shall have the right to exercise any of its rights set forth in (i), (ii) and (iii) directly above in this **Paragraph 2.k.(ii)**.     In addition, Licensee shall be responsible for obtaining from each of its

distributors, whether third-party or affiliated, a complete listing of each such distributor's inventory of the Products on hand at the time of expiration or termination of this Agreement and upon the expiration or termination of the "Sell-Off Period" (if any) and supplying a copy to Licensor of such inventory listing within the time frames set forth in **Paragraph 8.d.** hereof.

(iii)    With the Statement submitted at the end of each License Year pursuant to **Paragraph 2.e.(i)** hereof and at any other time so requested by Licensor during the Term and the "Sell-Off Period," Licensee shall provide Licensor with:  (a) copies of Licensee's most recent financial statements (including without limitation footnotes) and annual reports, 10-K's, balance sheets or other similar documents that indicate Licensee's financial status; and (b) an updated list of the names and addresses of all manufacturing sources, subcontractors, distributors, suppliers, dealers, wholesalers, retailers, accounts and others which have been engaged in the design, manufacture, advertising, promotion, sale, distribution or other dealings with any or all of the Products and the Materials during the Term and the "Sell-Off Period" or either thereof.  Such list shall, if so requested by Licensor, contain the full specification of all designs, utility models, patents or trademarks that may be involved, directly or indirectly, in the manufacture, production or distribution of any or all of the Products and the Materials. Licensee shall obtain the consent of any and all relevant third parties for such disclosure.

l.       Inventory and Holograms:

(i)     Insofar as reasonable, Licensee shall at all times during the Term be able to fulfill all orders for the Products promptly and yet not have an excessive inventory on hand at the time of the expiration or termination of the License.  Within forty-five (45) days after each License Year or within ten (10) business days of receipt of a request from Licensor (which shall not be made more than once per License year), Licensee will furnish Licensor with a complete and accurate statement (the "Inventory Statement") signed by the Chief Financial Officer (or the reasonable equivalent if Licensee does not have a Chief Financial Officer) of Licensee, setting forth in detail the quantities and description of each of the Products in work in process and finished goods inventories of the Products and the locations thereof.

(ii)    Except as otherwise set forth below, all Products shall have affixed to the label, hang tag, packaging, or elsewhere on the Products, as approved by Licensor, Licensor's official hologram ("Hologram").  Licensee shall purchase Holograms from Licensor's official Hologram supplier ("Hologram Supplier") (which Licensor may change from time to time in its sole discretion) through completed purchase orders ("Purchase Orders").  Within thirty (30) days of a written request from Licensor, which will be limited to once per License Year, Licensee shall send to Licensor a report (hereinafter referred to as the "Hologram Report") identifying (a) the quantity of Holograms used on Products sold by Licensee or otherwise distributed (with an explanation of where such Products were sold or distributed) since the prior submission of a Purchase Order; (b) the quantity of Holograms on Products on hand and intended for placement on Products in process; and (c) the requested quantity of Holograms.    Licensor (itself or through the Hologram Supplier) may reject Licensee's Purchase Orders, if, in Licensor's sole and absolute reasonable discretion, the Hologram request is excessive or otherwise inconsistent with (i) the sales information in Licensee's Statements; (ii) royalty payment history; (iii) submissions for Products approvals; or (iv) Inventory Statements.  Licensee shall pay for all Hologram costs and expenses, including without limitation shipping and handling costs, required by Licensor's Hologram Supplier.  If Licensee, directly or indirectly, ships, sells or otherwise distributes Products without Licensor's approved Holograms except as provided for below, Licensee shall be in default of this Agreement.  Licensee agrees that any and all such Products may, at Licensor's reasonable discretion, be treated as unapproved and/or counterfeit merchandise and may be seized, confiscated, and/or destroyed.  Within ten (10) days of receipt of a request from Licensor, Licensee will furnish to Licensor or its designee a report in a format acceptable to Licensor identifying

(a) the quantity of Holograms used on Products sold by Licensee or otherwise distributed (with an explanation of where such Products were sold or distributed); and (b) the quantity of Holograms on Products on hand and intended for placement on Products in process.  If a significant (i.e., more than five percent (5%)) discrepancy exists between (i) the total quantity of Holograms used on Products sold, Products on hand, and Products in process; and (ii) the quantity of Holograms sent to Licensee, such discrepancy shall be an incurable default under the terms and conditions of this Agreement.

(iii)    Licensee shall at all times during the Term and the "Sell-Off Period" be responsible for the safekeeping, protecting, and tracking of the inventory of Licensor's Holograms, including any actions or inactions taken by Licensee's manufacturing sources, subcontractors, distributors, suppliers, dealers, and/or wholesalers regarding the Holograms.  If any Holograms sent to or for Licensee are misplaced, lost, stolen, or misused, in any manner whatsoever (including use on unapproved, non-conforming or unacceptable Products or Materials pursuant to **Paragraph 2.i.** hereof), Licensee shall be in default of this Agreement.  Licensee shall be responsible for and shall pay Licensor for any and all reasonable expenses incurred by Licensor to recover such Holograms, including without limitation, legal fees and costs, investigative fees and costs, and/or expenses to purchase unapproved Products bearing such Holograms to have the Products removed from commerce, or to otherwise protect Licensor's rights.

(iv)    Notwithstanding anything herein to the contrary, Licensee will not be required to use the Hologram on the Products in the United States.  Licensee must, however, ensure that each individual box for the Products will carry (i) a proprietary bar code that is registered with GS1 and that will carry the prefix "857784" which will be associated with Licensee only, and (ii) a unit Manufacturing Lot Number that is referenced on all import documents for U.S. Customs and the FDA and that also must be the same Manufacturing Lot Number that is imprinted on each individually wrapped Product.  Further, Licensee will ensure that all entry documents for all imported Products into the United States contain a proprietary FDA 510-k number associated with such imported Products, an FDA verification of the proper FDA listing for such imported Products (with the associated 510-k number) and the current establishment listing for the manufacturer and the initial importer of such imported Products.

m.    Playboy Properties and Non-Competitive Brands:

(i)    During and after the Term, Licensee shall not use, cause or authorize to be used any word, device, design, slogan or symbol confusingly similar, in whole or in part, to any or all of the Playboy Properties, or any permutation of the Playboy Properties.  During the Term and the "Sell-Off Period," any or all of the following shall not be used on or in connection with the Products or the Materials without Licensor's prior written consent:   (a) portions or permutations of any or all of the Playboy Properties; (b) secondary marks; or (c) new words, devices, designs, slogans or symbols.  Upon such authorization by Licensor and use by Licensee, any use by Licensee of a portion, permutation, secondary mark, word, device, design, slogan and/or symbol shall inure to the benefit of the Licensor, shall be the property of Licensor and shall be included as one of the Playboy Properties subject to this Agreement.  Should Licensee create or develop any advertising, promotion, packaging or trade dress unique to the Products, all such advertising, promotion, packaging or trade dress shall be the property of Licensor and shall not be used by Licensee on or in connection with any other product or merchandise during and after the Term.  No later than ten (10) days after expiration or termination of this Agreement or at any other time Licensor reasonably requests, Licensee will assign to Licensor, without charge, all of Licensee's right, title and interest (including without limitation all goodwill associated therewith and all copyrights) in and to such advertising, promotion, packaging or trade dress and shall cooperate fully with Licensor in preparing and recording whatever documentation may be necessary or desirable or requested by Licensor to effect such assignment.

(ii)     Without Licensor's prior written consent, Licensee shall not design, manufacture, advertise, promote, distribute, sell or deal with in any way in the Territory any product or material that is or are in Licensor's reasonable judgment competitive with or confusingly similar to any or all of the Products and the Materials.

(iii)     Licensee shall not use color combinations, designs, styles, logo treatments, graphics or packaging unique to any or all of the Products on or in connection with any other product, and Licensee, without charge, will assign to Licensor ownership of all right, title and interest, including, but not limited to, all rights of copyright and trademark (including goodwill associated therewith), that Licensee has acquired or may acquire in such color combinations, designs or styles no later than ten (10) days after expiration or termination of this Agreement or at any other time Licensor reasonably requests.

(iv)     Licensee hereby assigns, transfers and conveys to Licensor, to the maximum extent permitted by applicable law, all of Licensee's right, title and interest, including, but not limited to, all rights of copyright, trademark (including goodwill associated therewith), trade secret and any other rights in and to all aspects of the Products created by Licensee under or in connection with this Agreement so that Licensor shall be the sole owner of all such rights therein. Licensee shall, upon the reasonable request of Licensor, either during the Term or at any time thereafter, execute and deliver to Licensor whatever documentation Licensor may reasonably request to effect such assignment, transfer or conveyance. Licensee shall not have any rights to use any of the elements uniquely developed by Licensee for the Products itself or in connection with any third party following expiration or termination of the Agreement. In the event Licensee engages, employs or utilizes artists, designers or other third parties (collectively, the "Designers") to develop Products and/or Materials, Licensee shall obtain a written assignment, and shall supply Licensor with a copy of each such assignment, from any Designer in favor of Licensor under which all of such Designer's right, title and interest, including, but not limited to, all rights of copyright, trademark, and all rights in and to all aspects of the Products (including trade secret protection), in and to such Designer's work product is transferred and conveyed to Licensor to the maximum extent permitted by applicable law so that Licensor will be the sole owner of all rights therein. In no event will the provisions of this **Paragraph 2.m.(iv)** be deemed to transfer to Licensor any patents owned by Licensee.

(v)                                   [Redacted]

n.     Indemnification and Product Liability Insurance:

Subject to the provisions of **Paragraph 18.** hereof, Licensee shall:

(i)     Indemnify, defend and hold harmless Licensor, its subsidiaries and affiliates, their respective shareholders, licensees and franchisees and the agents, officers, directors and employees of each (hereinafter collectively referred to as "Indemnitees") from all costs, claims, suits, losses, damages and reasonable expenses (including without limitation attorneys' fees and litigation or other expenses) arising out of or in connection with:  (a) the design, manufacture, advertising, promotion, sale or distribution of or any other dealing whatsoever with the Products or Materials (including, but not limited to, any breach of Licensee's obligations under **Paragraph S.5.** of the

Schedule); (b) any alleged action or failure to act whatsoever by Licensee; (c) any alleged defect in any or all of the Products; (d) any alleged non-conformity to or non-compliance with any law pertaining to the design, quality, safety, advertising, promotion or marketing of any or all of the Products and the Materials; or (e) any breach by Licensee of any of its representations, warranties or undertakings hereunder;

(ii)     obtain and maintain, at Licensee's own expense, product liability insurance satisfactory to Licensor in the minimum amount of Twenty Million U.S. Dollars (U.S.$20,000,000) of primary and umbrella coverage from one or more insurance companies, each with a Best's rating of "A" (or better), and qualified to transact business in the Territory (each such insurance policy shall name each of the Indemnitees as additional insureds and/or loss payees as their interests may appear and by reason of the indemnity contained in **Paragraph 2.n.(i)** above and shall evidence the insurer's agreement that such insurance shall not be amended, canceled, terminated or permitted to lapse without thirty (30) days' prior written notice to Licensor), and provide Licensor with a certificate of such insurance upon execution of this Agreement by Licensee and on each anniversary date of the grant or issuance of each such policy during the Term and the "Sell-Off Period" evidencing that each such policy has not been altered with respect to the Indemnitees in any way whatsoever nor permitted to lapse for any reason, and evidencing the payment of premium of each such policy; and

(iii)     cause each such policy to be in full force and effect prior to the later of the execution of this Agreement or the commencement of any design, manufacture, advertising, promotion, sale, distribution or dealing with any or all of the Products whatsoever. Failure by Licensee to obtain the required insurance as set forth herein or failure by Licensee to adequately maintain such insurance during the Term and the "Sell-Off Period" shall be an incurable default by Licensee under this Agreement.

o.     Advertising Expenditures, Advertising Plans and Public Relations:

(i)     In addition to any other amounts or payments to be made by Licensee under this Agreement, and not to be credited to or offset against any Guaranteed Royalties or Earned Royalties payable hereunder, Licensee agrees to expend within each License Year for advertising and promoting the Products in media directed to the consumers (including without limitation point-of-sale materials, newspapers, magazines, television and radio, fixtures, displays, premium items, Products given-away as promotional items, trade shows, and trade promotions, but specifically excluding travel and expenditure costs associated with trade shows and/or trade promotions,) not less than                    **[Redacted]**

whichever is greater.  If the Statement for the last calendar month of a License Year shows that such amount has not been spent as set forth herein, then for the first such occurrence, Licensee shall expend such difference the following License Year, and for any future occurrence, the difference between the amount actually spent and the amount required to be spent must be remitted to Licensor along with such Statement for use in Licensor's advertising and promotion pool.

(ii)     Licensee must submit to Licensor, for Licensor's approval, its advertising/promotional plan and marketing plan in the format provided by Licensor for the Products for each ensuing calendar year.  Such plans must be submitted not later than September 15th of each calendar year.  In the event Licensor, in its reasonable discretion, does not approve of any such plan, Licensee must submit a revised plan or plans to Licensor, for its approval, within not more than fifteen (15) days following Licensee's receipt of Licensor's notice of disapproval and Licensee must incorporate revisions into the plan or plans that address Licensor's concerns or reasons for disapproval.

(iii)     Within ten (10) days following the end of each License Quarter during

the Term, Licensee will submit to Licensor, a list of all upcoming public relations efforts regarding the Products (the "PR"), which may include, but will not be limited to, interviews, press releases and press events. In the event Licensee wishes to sanction or schedule any PR after the submission to Licensor of such quarterly list, Licensee will immediately notify Licensor of such additional PR. Licensee must obtain Licensor's prior written approval which shall not be unreasonably withheld, delayed or conditioned, prior to any PR effort taking place. In the event any PR consists of interviews, all talking points for same must be approved in advance in writing by Licensor. In the event Licensor, in its sole discretion, wishes to participate in any PR Licensor will so notify Licensee. In the event Licensor fails to provide its approval or disapproval of any or all things submitted to Licensor pursuant to this **Paragraph 2.o.(iii)** within fourteen (14) days of Licensor's receipt thereof, Licensor shall be deemed to have disapproved of such things. In the event Licensor disapproves any PR, Licensee will cancel such disapproved PR. Failure by Licensee to cancel any disapproved PR or engaging in any PR that has not been submitted to Licensor in advance for approval shall be an incurable default by Licensee under this Agreement.

3.     **ADDITIONAL COVENANTS OF THE PARTIES.**

a.     Reservation of Rights:  All rights not expressly and specifically granted herein to Licensee are reserved by Licensor.

b.     Certain Sales:

(i)     In the event Licensor, its subsidiaries, parent, affiliates or third-party licensees wish, during the Term, to purchase any of the Products for any purpose, including but not limited to, promotional and advertising purposes, as product placement in feature films, television and related platforms, direct marketing sales, premium sales and incentive sales, Licensee, if requested to do so by Licensor, will sell to Licensor and its licensee(s) or either thereof any or all of the Products at the best prices and terms given to other customers of the Products ordering substantially the same quantities of similar merchandise from Licensee.

(ii)     In the event of any such sale of the Products by Licensee to Licensor, Licensee shall ship or deliver such Products either directly to Licensor or, as Licensor may direct, to any other individual(s), entity or entities. Any or all such sales of the Products by Licensee to Licensor shall be at the prices described in **Paragraph 3.b.(i)** above. Licensee will include such sale(s) in the computation of Net Sales. Licensee shall bill Licensor and its licensee(s) or either thereof in accordance with Licensee's normal billing procedures for all such Products shipped or delivered.

c.     Investment Opportunity:  During the Term hereof, if Licensee (or, if Licensee is owned or controlled by, or owns and controls, another entity, such Licensee affiliate) offers to sell or to issue equity or debt to any third party or enters into any transaction for such offering or sale, Licensee shall provide written notice of the same to Licensor, and Licensor will be entitled to participate in such offering, sale or issuance on terms and conditions that are at least as favorable as those granted to any other investor in such transaction. Participation in any such transaction shall be at Licensor's sole discretion, and nothing herein shall obligate Licensor to so participate.

4.     **TITLE AND PROTECTION.**

a.     Indemnification by Licensor:  Except as otherwise set forth in **Paragraph S.7.** of the Schedule hereto, Licensor represents and warrants that:  (i) it is the owner of the Trademarks; (ii) it has all necessary rights to the Images for the purposes set forth in this Agreement; (iii) the Trademarks are valid in the Territory; and (iv) the Trademarks are, to the best of Licensor's knowledge, free from any claim by any third party that would unreasonably interfere

with the rights granted to Licensee under this Agreement.   Subject to the provisions of **Paragraph 18.** hereof, Licensor shall indemnify, defend and hold harmless Licensee, its subsidiaries and affiliates, their respective shareholders and the agents, officers, directors and employees of each against and from all claims or suits (provided prompt notice of each such claim or suit which comes to the attention of Licensee is given to Licensor by Licensee) arising solely and directly out of the authorized use of the Playboy Properties or in connection with the Products by Licensee in the Territory.  Licensor shall have the option to settle or to undertake and conduct the defense of any such claim or suit, but Licensee shall, upon receipt of notice from Licensor and pursuant to Licensor's instructions, handle, undertake and conduct the defense of any such claim or suit at Licensor's expense.   If Licensor does not provide such notice to Licensee, Licensee may, through counsel of Licensee's own choice and at its own expense, participate in any such claim or suit, but in such event Licensor shall have sole and exclusive control over such defense, and Licensor's decisions with respect thereto shall govern and control.  Licensee expressly covenants that no discussions by Licensee whatsoever with claimant or litigant, no compromise or settlement by Licensee of any claim or suit and no negotiations by Licensee with respect to any compromise or settlement shall be had, made or entered into without the prior written approval of Licensor.

b.      Enforcement:  Licensee shall promptly notify Licensor in writing of each actual, suspected or apparent infringement or imitation of the Playboy Properties or the Materials that comes to the attention of Licensee.   Licensor shall take such action in regard to such infringement or imitation as Licensor, in its sole and absolute judgment, deems to be appropriate.  Licensor shall, in its sole and absolute discretion, decide whether to assert any claim or undertake or conduct any suit with respect to such infringement or imitation, but Licensee shall, upon receipt of notice from Licensor and pursuant to Licensor's instructions, on behalf of Licensor, assert any such claim or handle, undertake and conduct any such suit at Licensor's expense in the name of Licensor or Licensee or in both names as Licensor may direct.  Licensee expressly covenants that no discussions whatsoever with the infringing or imitating party or parties, no compromise or settlement of any such claim or suit and no negotiations with respect to any compromise or settlement of any such claim or suit shall be had, made or entered into without the prior written approval of Licensor.  Licensee may share in as much as fifty percent (50%) of any damage recovery or settlement obtained by Licensor or on Licensor's behalf by Licensee as a result of any such claim or suit only if Licensee notified Licensor upon the initiation of such claim or suit that Licensee desires to participate financially in such claim or suit by contributing to the payment of the costs and expenses thereof and only in an amount that shall bear the same ratio to the damage recovery or settlement as the amount of Licensee's financial participation permitted by Licensor bears to the total costs and expenses incurred in obtaining such damage recovery or settlement.  In no event shall Licensor be responsible to Licensee for consequential or incidental damages that result from any such infringement or imitation.  Under no circumstances may Licensee enforce Licensor's rights to the Playboy Properties without Licensor's prior written approval and in no event may Licensee take any action on account of any such infringements without Licensor's prior written approval.

5.      **RELATIONSHIP BETWEEN THE PARTIES.**

a.      No Joint Venture:  Nothing herein contained shall be construed to place the parties hereto in the relationship of partners or joint venturers, and Licensee shall have no power to obligate or bind Licensor or its subsidiaries or affiliates in any manner whatsoever.  Licensor will have no fiduciary duty or fiduciary obligation to Licensee under this Agreement.

b.      Assignment:

(i)      Licensor, in entering into this Agreement, is relying entirely upon Licensee's skills, reputation and personnel, including without limitation its officers, managers, directors and shareholders.   This Agreement and all rights, duties and obligations hereunder are personal to Licensee and shall not, without the prior written consent of Licensor which shall not be unreasonably withheld, delayed or denied, be assigned, delegated, sold, transferred, leased, mortgaged or otherwise encumbered by

Licensee or by operation of law.  Any attempt to do so without such consent shall be void and shall constitute an incurable default under this Agreement.  If Licensor in its reasonable discretion believes that any change in any or all of the officers, managers, directors and shareholders of Licensee has, will or could materially interfere with or materially and adversely affect Licensee's performance hereunder or the relationship between the parties hereto, Licensor may deem such change to be a default under this Agreement and shall so notify Licensee and Licensee shall take whatever steps or actions are necessary to remedy Licensor's concerns; failing which Licensor shall have the right to terminate this Agreement.  The consent of Licensor to any such assignment, delegation, sale, transfer, lease, mortgage, other encumbrance or change shall not be deemed to be consent to any subsequent assignment, delegation, sale, transfer, lease, mortgage, other encumbrance or change.

(ii)    Licensor may assign this Agreement or assign or delegate any or all of its rights, duties and obligations under this Agreement to any of its parents, subsidiaries or affiliates or to any individual or entity.

6.    **SUBLICENSING.**  Licensee may not, without the prior written approval of Licensor, which shall not be unreasonably withheld or delayed, enter into any sublicense agreement or grant any sublicense for any or all of the rights or obligations of Licensee under the License or this Agreement.  The consent of Licensor to any sublicense agreement or sublicense shall not be deemed to be a consent to any subsequent sublicense agreement or sublicense.

7.    **DEFAULTS AND RIGHTS OF TERMINATION.**

a.    Defaults and Right to Cure:

(i)    Except as otherwise provided in this Agreement, if Licensee fails to make any timely payments under the terms of this Agreement, Licensor shall have the right and option, but not the duty, to terminate the License and this Agreement upon not less than ten (10) days' prior written notice, but no neglect or failure to serve such notice shall be deemed to be a waiver of any such violation or default.  Such termination shall become effective unless such violation or default described in such notice shall be completely remedied to the satisfaction of Licensor within such ten (10) day period.  Upon such termination, Licensee shall immediately pay all amounts owed under this Agreement.

(ii)    Except as otherwise provided in this Agreement and, specifically, **Paragraph 7.a.(i)** above, if Licensee shall violate any of the terms or conditions hereof or default on any of its duties, obligations or warranties hereunder, Licensor shall have the right and option, but not the duty, to terminate the License and this Agreement upon not less than thirty (30) days' prior written notice, but no neglect or failure to serve such notice shall be deemed to be a waiver of any such violation or default.  Such termination shall become effective unless such violation or default described in such notice shall be completely remedied to the satisfaction of Licensor within such thirty (30) day period.  Upon such termination, Licensee shall immediately pay all amounts owed under this Agreement.

(iii)    Notwithstanding the provisions of **Paragraph 7.a.(i)** above, if such violation or default:  (a) is of a kind that a remedy or cure cannot effectively restore the prior circumstances; or (b) is described in this Agreement as an incurable default, then the License and this Agreement shall terminate upon receipt by Licensee of written notice thereof without any period of remedy or cure whatsoever.  The termination of the License and this Agreement shall be without prejudice to any rights that Licensor otherwise has against Licensee under this Agreement or under law.

b.    Bankruptcy or Assignment for Creditors, Business Discontinuance:  If:  (i) Licensee files a petition in bankruptcy or is adjudicated a bankrupt; (ii) a petition in bankruptcy is

filed against Licensee; (iii) Licensee shall become insolvent or shall make or agree to make an assignment for the benefit of creditors or an arrangement pursuant to any bankruptcy law; (iv) Licensee discontinues business; (v) Licensee receives a qualified opinion from its independent auditor regarding Licensee's financial statements or an opinion stating that Licensee's financial situation raises substantial doubt about Licensee's ability to continue as a going concern (or the equivalent of such an opinion); or (vi) a receiver shall be appointed for Licensee, the License and this Agreement shall automatically terminate without the necessity of any notice whatsoever.  If the License and this Agreement are so terminated, any and all of Licensee and its receivers, representatives, trustees, agents, administrators, successors and assigns shall have no right to sell or in any way deal with any of the Playboy Properties, Products or the Materials, except with the special prior written consent and under the instructions of Licensor that it or they shall be obligated to follow.

c.      Loss of Trademark Rights:  If Licensee's right to use any or all of the Trademarks is adjudged illegal, invalid or restricted and either (i) such adjudication has become final and non-appealable; (ii) Licensor in its sole discretion chooses not to appeal therefrom; or (iii) if a settlement agreement is entered into by Licensor that prohibits or restricts Licensor's or Licensee's right(s) to use the Trademarks, the License and this Agreement shall automatically terminate without the necessity of any notice whatsoever as of the date (x) such adjudication becomes final and non-appealable; (y) Licensor makes such choice; or (z) of the execution and delivery of such settlement agreement.    Notwithstanding anything to the contrary in this Agreement, Licensee shall have no claim of any nature against Licensor for the loss of any or all rights to use the Trademarks.

8.      **EXPIRATION OR TERMINATION.**

a.      Effect of Expiration or Termination:  Upon and after the expiration or termination of the License and this Agreement, all rights granted to Licensee under this Agreement shall immediately revert to Licensor.    Licensee will refrain from any further use of the Playboy Properties or any further reference to anything similar to the Playboy Properties (including, but not limited to, words, devices, designs and symbols) or in any way associated with any or all of the Products, Licensor and its subsidiaries or affiliates, except with the prior written consent of Licensor or as expressly provided in **Paragraph 8.c.** hereof.

b.      Reserved Rights:    The expiration or termination of the License and this Agreement shall not:  (i) relieve Licensor or Licensee, respectively, of any obligations incurred prior or subsequent to such expiration or termination; or (ii) impair or prejudice any of the rights of Licensor or Licensee, respectively, accruing prior or subsequent thereto as provided in this Agreement.  Upon termination of the License and this Agreement pursuant to **Paragraph 7.c.** hereof, Guaranteed Royalties for the then current License Year shall be prorated based on the ratio that the number of days in such License Year prior to termination bears to the number of days in the License Year had the License and this Agreement not been terminated.  Earned Royalties due for such License Year shall be the excess of Earned Royalties over such prorated Guaranteed Royalties.  Any overpayment or underpayment of Guaranteed Royalties or Earned Royalties based on such proration shall be immediately adjusted by the parties hereto.

c.      Continued Sales After Expiration or Termination:  Provided that Licensee is not in arrears in the payment of any amounts due to Licensor and that Licensee is in compliance with all of the terms and conditions of this Agreement, then upon the expiration of the License and this Agreement, or if this Agreement is terminated pursuant to any paragraph of this Agreement prior to the Expiration Date and then only upon Licensor's prior written approval (which may be withheld at Licensor's discretion), and except as provided in **Paragraph 8.d.** hereof, Licensee may, for a period of ninety (90) days after the Expiration Date or notice of termination together with Licensor's written consent (the "Sell-Off Period"), sell through Licensee's existing, recognized network of distributors or accounts all of the Products that have been approved by Licensor and that are in process or on hand on the Expiration Date or at the time such notice of termination together with Licensor's approval of such Sell-Off Period is received.  In such event, Licensee shall pay Earned Royalties and furnish Statements with respect to the Sell-Off Period in

accordance with the terms and conditions of this Agreement as though the License and this Agreement were still in effect.  It is expressly understood and agreed by Licensee that the Sell-Off Period shall be:  (i) non-exclusive; and (ii) considered a separate accounting period for the purpose of computing Earned Royalties due to Licensor for sales during such period.  Sales during the Sell-Off Period shall not be applied against any Guaranteed Royalties due or payable prior to the Sell-Off Period.

     d.    <u>Inventory After Expiration or Termination</u>:

     (i)    Licensee shall furnish to Licensor an Inventory Statement:

     (a)    not more than thirty (30) days after the expiration of this Agreement;

     (b)    not more than thirty (30) days after the expiration of the Sell-Off Period (if any); and

     (c)    not more than ten (10) days after:  (i) receipt by Licensee of notice of termination of this Agreement or the Sell-Off Period (if any); or (ii) the happening of any event that terminates the License and this Agreement where no such notice is required.

     (ii)    Not more than ten (10) days after the expiration or termination of this Agreement or the Sell-Off Period (if any), Licensee must supply Licensor with a certificate of destruction for all Materials, including, but not limited to, Holograms, labels, hang tags, buttons, boxes, zippers, decals, advertising material and equipment capable of recreating the Playboy Properties, including, but not limited to:  molds, tools, dies and printing screens.

     (iii)    Upon the expiration or termination (for any reason) of this Agreement during the Term or, in the event of a Sell-Off Period, then upon the expiration or termination of the Sell-Off Period (if any), Licensor reserves the right to purchase all remaining inventory at Licensee's direct variable manufacturing cost, however, if Licensor chooses not to purchase such inventory, it shall be promptly destroyed by Licensee unless otherwise agreed between Licensee and Licensor.  Licensor shall inform Licensee of its decision within fifteen (15) days after Licensor's receipt of the Inventory Statement from Licensee.

     (iv)    Should Licensor choose not to purchase Licensee's inventory as provided under **Paragraph 8.d.(iii)** above, Licensee, within ten (10) days after Licensor's notice, shall provide Licensor with a certificate of destruction for all inventory of the Product on hand or in process.

     (v)    Licensor and its agents shall have the right to conduct physical inspections of any and all locations where the Products may be designed, manufactured and/or held to ascertain Licensee's compliance with this **Paragraph 8.d.** and, in order to enable Licensor to conduct such inspections, Licensee will provide to Licensor within not more than ten (10) days of the date of Licensor's written request a listing of the places and addresses at which the Products are designed, manufactured and/or held.  Any refusal by Licensee to submit to such inspection shall forfeit Licensee's right to a Sell-Off Period, and Licensor shall retain all other legal equitable rights it has in the circumstances, which rights are hereby specifically reserved.

     (vi)    Licensee understands and acknowledges that it is essential for Licensor to have accurate, complete and timely information with regard to existing inventory of the Products and the inventory of the Products that is destroyed.  Failure to provide Licensor with timely and accurate Inventory Statements is a material default under the Agreement and, in such event, Licensor will have the right to revoke Licensee's right to the Sell-Off

Period. Further, Licensee will, prior to any destruction of the Products pursuant to the provisions of **Paragraphs 8.d.(ii)** and **8.d.(iii)** above, provide Licensor with the date, time and location of such destruction and allow Licensor or its nominee to witness such destruction if Licensor so wishes. Licensee's failure to submit to Licensor any Inventory Statement within the required time frames is a material violation of the provisions of the Agreement and Licensor hereby reserves its rights under the Agreement and under law.

e.    <u>Equitable Relief and Legal Fees</u>:

(i)    Subject to **Paragraph 8.c.** hereof, Licensee hereby acknowledges that its failure to cease the design, manufacture, advertising, promotion, sale or distribution of the Products and the Materials upon the expiration or termination of this Agreement will result in irreparable harm to Licensor and its business interests for which there is no adequate remedy at law. Accordingly, in the event of such failure or in the event of any violation or default by Licensee under this Agreement (after giving effect to the provisions of **Paragraph 7.a.(i)** hereof), Licensor shall be entitled to equitable relief without the necessity of posting bond by way of any temporary and permanent injunctions and such other relief as any court of competent jurisdiction may deem just and proper. In this regard, Licensee hereby consents to the judgment of temporary and permanent injunctions in favor of Licensor in order to give effect to this **Paragraph 8.e.(i)**.

(ii)    In the event either party hereto files any action against the other to enforce any of the provisions of this Agreement or to secure or protect such party's rights under this Agreement, such party shall be entitled to recover, in any judgment in its favor entered therein, the attorneys' fees and litigation expenses of such party, together with such court costs and damages as are provided by law.

f.    <u>Termination Fee</u>:  Notwithstanding anything to the contrary in this Agreement, if Licensor terminates this Agreement as a result of a default by Licensee or a default that is not cured by Licensee within the time frame set forth in **Paragraph 7.a.(i)** hereof, Licensee shall pay to Licensor as a termination fee no later than ten (10) days after the date of such termination all Guaranteed Royalties required to be paid during the twelve (12) calendar month period beginning with effective date of termination in addition to all Earned Royalties due through the effective date of termination, and Licensor may immediately draw down on any outstanding Letter of Credit required under **Paragraph 2.d.(iv)** hereof, which such drawing shall not preclude Licensor from seeking from Licensee any deficiency that remains after such drawing.

g.    <u>Continuity of Sales</u>:  If the License granted under this Agreement is exclusive, either in whole or in part, in order to enable Licensor to maintain continuity of sales of the Products upon expiration or termination of this Agreement, Licensor shall have the right, notwithstanding anything to the contrary contained in **Paragraph 1.a.** hereof, to authorize one or more individuals or entities to design, manufacture, advertise, promote and sell the Products in the Territory for four (4) months preceding the expiration of this Agreement or from the sooner of the time that notice is received by Licensee of termination of this Agreement or when this Agreement is terminated. Such individual(s), entity or entities shall not, however, be authorized to ship or distribute to its or their customers any or all of the Products until after this Agreement has expired or has been terminated, but may ship the Products to such customers during the Sell-Off Period, if any.

9.    **NOTICES.**

a.    <u>Effectiveness</u>:  Unless otherwise expressly indicated in this Agreement, each notice, request, approval, consent, payment and Statement (hereinafter referred to as a "Submission") specifically provided for in this Agreement shall be in writing and be considered effective or received the earliest of: (i) five (5) days after the date when such Submission is mailed by certified or registered mail with postage prepaid to the party hereto at the address set forth below; (ii) two (2) business days after the date when such Submission is sent by overnight courier service addressed to such party at such address or the date indicated as received on the overnight courier service confirmation receipt, whichever is earlier; (iii) except

for payments, when such Submission is sent by facsimile addressed to such party at such address and the sender thereof requests and receives written confirmation from such party that such Submission has been received and is legible; or (iv) when such Submission is actually received by such party at such address:

| To Licensor: | Address: | 680 North Lake Shore Drive<br>Chicago, IL  60611 |
| | Attention: | Judy Kawal |
| | Facsimile: | 312 988 9857 |
| | Telephone: | 312 373 2358 |
| With a copy to: | Address: | 2706 Media Center Drive<br>Los Angeles, CA 90065 |
| | Attention: | General Counsel |
| | Facsimile: | 323 276 4502 |
| | Telephone: | 323 276 4070 |
| To Licensee: | The address specified in **Paragraph S.2.** of the Schedule |
| | Attention: | Mr. Patrick Bertranou |
| | E-Mail: | Ppber2@pacbell.net |
| | Telephone: | 310-498-3211 |

b.     Address Change:  Notwithstanding the provisions of **Paragraph 9.a.** hereof, each party hereto may give written notice to the other party of some other address to which Submissions shall be sent, in which event such Submissions to such party subsequently shall be sent to such address.

10.     **CONFIDENTIAL INFORMATION.**  Licensor shall from time to time during the Term of this Agreement, make available to Licensee materials, including, but not limited to, Style Guides and Licensing Manuals, and other information, all of which is non-public, confidential or proprietary to Licensor.  Such materials, information and the terms and conditions of the License and this Agreement, which is confidential between Licensee and Licensor, will be collectively referred to herein as the "Proprietary Material."  Licensee shall not disclose the Proprietary Material to third-parties or use the Proprietary Material for any purpose other than in connection with its duties and obligations as set forth in this Agreement.  Licensee will ensure that the Proprietary Material will be kept confidential by Licensee and its directors, officers, employees, agents, distributors, designers and supplier/subcontractors (collectively "Representatives"), and that all such Representatives shall be made aware of the confidential nature of the Proprietary Material.  In the event Licensee is requested or required (by oral question, interrogatories, subpoena, civil investigative demand or similar process) to disclose any of the Proprietary Material, Licensee will promptly notify Licensor of such request or requirement and cooperate with Licensor so that Licensor may seek an appropriate protective order or otherwise seek appropriate protection of the Proprietary Material.  In the event that such protection is not obtained or that Licensor waives compliance, Licensee shall furnish only that portion of the Proprietary Material which Licensee is advised by written opinion of counsel is legally required to be furnished.  Immediately upon the expiration or termination of this Agreement, or within ten (10) days from the date of the Licensor's prior written request, Licensee will return to Licensor, or destroy at Licensor's request, all Proprietary Material and all copies of the Proprietary Material produced by Licensee or its Representatives or any notes, analysis or other materials prepared or produced by Licensee or its Representatives.

Anything in this Agreement to the contrary notwithstanding, unless mandated by law or a governmental agency, Licensee will keep all terms and conditions of this Agreement confidential both during and after the Term of the Agreement.

11.     **SEVERABILITY.**  Each provision of this Agreement shall be severable.  If, for any reason, any provision herein is finally determined to be invalid and contrary to, or in conflict with, any existing or future law or regulation by a court or agency having valid jurisdiction, such determination shall not impair the operation of or affect the remaining provisions of this Agreement, and such remaining provisions will continue to be given full force and effect and bind the parties hereto.  Each invalid

provision shall be curtailed only to the extent necessary to bring it within the requirements of such law or regulation.

      **12.**   **CONSENTS AND APPROVALS.**  If Licensor fails or refuses to grant to Licensee any request, consent or approval, Licensor may, but shall not be required to, give the reason therefore, but Licensor shall not be liable for any events or circumstances that arise as a result of such failure or refusal.

      **13.**   **APPLICABLE LAW.**  This Agreement shall be governed by and interpreted under the laws of the State of Illinois without regard to its conflicts of laws provisions.  Licensee hereby submits to personal jurisdiction in Cook County, Illinois.  The parties hereto agree that any and all disputes arising out of or relating in any way to this Agreement shall be litigated only in courts sitting in Cook County, Illinois.

      **14.**   **NO BROKER.**  Licensee warrants and represents that Licensee used no broker in connection with the execution and delivery of this Agreement.

      **15.**   **CONSTRUCTION.**  The headings used herein are for convenience only and shall not be deemed to define, limit or construe the contents of any provision of this Agreement.  The wording of this Agreement will be deemed to be the wording chosen by the parties hereto to express their mutual intent, and no rule of strict construction will be applied against any such party.  Time is the essence of this Agreement.  The Recitals and the Additional Terms and Conditions (contained in **Exhibit E** which is attached hereto) shall be deemed to be part of this Agreement.  This Agreement may be executed in separate counterparts, each of which is deemed to be an original, and all of which taken together constitute one and the same agreement.

      **16.**   **SURVIVABILITY.**  The expiration or termination of the License and this Agreement shall not affect those provisions hereof that are meant to survive such expiration or termination.

      **17.**   **RIGHTS CUMULATIVE.**  The respective rights and remedies of the parties hereto, whether herein specified or otherwise, shall be cumulative, and the exercise of one or more of them shall not preclude the exercise of any or all other rights and remedies each such party has hereunder or by law.

      **18.**   **LIMITATION OF LIABILITY.**  **EXCEPT FOR THE PARTIES' INDEMNIFICATION OBLIGATIONS SET FORTH IN PARAGRAPHS 2.N.(I) AND 4.A. ABOVE WITH RESPECT TO THIRD PARTIES, NEITHER PARTY SHALL BE LIABLE TO THE OTHER PARTY FOR ANY LOST PROFITS, LOST REVENUE, OR ANY INCIDENTAL, CONSEQUENTIAL, SPECIAL OR INDIRECT DAMAGES OF ANY KIND, REGARDLESS OF THE FORM OF ACTION, WHETHER IN CONTRACT, TORT (INCLUDING NEGLIGENCE OR OTHERWISE, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES IN ADVANCE.**

      **19.**   **ENTIRE AGREEMENT.**  This Agreement (with the Recitals, Schedule and **Exhibits A through E**) represents the entire understanding of the parties hereto with respect to the subject matter hereof and, as of the Commencement Date hereof, supersedes any and all prior agreements and understandings, whether written or oral, pertaining to the subject matter hereof, hereby replacing all prior and/or contemporaneous written and oral agreements between the parties in connection with the subject matter hereof including that certain Product License Agreement, dated March 1, 2010 (the "Prior US Agreement"), and that certain Product License Agreement, dated April 1, 2010 (the "Prior Global Agreement"), both of which are hereby terminated.  None of the terms of this Agreement can be waived or modified except by an express agreement in writing signed by the parties hereto.  There are no representations, promises, warranties, covenants or undertakings other than those contained in this Agreement and Licensee acknowledges that in entering into this Agreement, it has not relied upon any representations, warranties or promises, whether oral or written, not expressly contained herein.  No custom or practice of the parties hereto at variance with the terms hereof shall constitute a waiver of Licensor's right to demand exact compliance with any of the terms herein at any time.  The failure of either party hereto to enforce, or the delay by either party hereto in enforcing, any or all of its rights under this Agreement shall not be deemed as constituting a waiver or a modification thereof, and either party hereto may, within the time provided by applicable law, commence appropriate proceedings to enforce

any or all of such rights.  Except as expressly provided in this Agreement, no individual or entity other than Licensee and Licensor shall be deemed to have acquired any rights by reason of anything contained in this Agreement.

This Agreement will become null and void, and Licensor will have no further obligation to enter into this Agreement with Licensee if Licensee has not executed this Agreement and returned it to Licensor so that Licensor receives the executed Agreement by August 31, 2011.

IN WITNESS WHEREOF, the parties hereto, intending this Agreement to be effective as of the Commencement Date, have caused this Agreement to be executed by the duly authorized representative of each.

UNITED MEDICAL DEVICES, LLC
(LICENSEE)

By: _____

Title: _____C . F . O ._____

Date: ___AUGUST 24. 2011___

PLAYBOY ENTERPRISES
INTERNATIONAL, INC.
(LICENSOR)

By: _____

Title: ___Assistant Counsel___

Date: _____8|24| 2011_____

EXHIBIT A
ATTACHED TO AND MADE A PART OF
THE PRODUCT LICENSE AGREEMENT BETWEEN
PLAYBOY ENTERPRISES INTERNATIONAL, INC.
AND
UNITED MEDICAL DEVICES, LLC
DATED AS OF APRIL 1, 2010

**THE PLAYBOY PROPERTIES**\*

# PLAYBOY



\*   Any revisions to the above list and depictions will be granted only upon Licensor's receipt of

a fully-signed amendment to this Exhibit A.

**EXHIBIT B**
**ATTACHED TO AND MADE A PART OF**
**THE PRODUCT LICENSE AGREEMENT BETWEEN**
**PLAYBOY ENTERPRISES INTERNATIONAL, INC.**
**AND**
**UNITED MEDICAL DEVICES, LLC**
**DATED AS OF APRIL 1, 2010**

**E-COMMERCE GUIDELINES**

1.   Licensee's E-Commerce Web Site:  Licensee may advertise and offer the availability of the Products on its own E-Commerce Web Site and may accept orders for the Products placed through its own E-Commerce Web Site subject to the following provisions:

   a.   Licensee's E-Commerce Web Site must, include a link to www.shopthebunny.com (or any other URL as Licensor may direct from time to time) and inform visitors to such E-Commerce Web Site that the Products and other Playboy-branded Products are available for sale through such link.

   b.    Licensee may only use the Trademarks, or portions thereof, in connection with the domain name, html title, meta tags or other hidden html text for its E-Commerce Web Site only with the prior written approval of Licensor.

   c.   Licensee will ensure that the terms and conditions of its E-Commerce Web Site clearly and conspicuously inform all visitors that no orders for the Products will be accepted nor shipped outside the Territory.

   d.   Licensee will ensure that its E-Commerce Web Site continuously displays the trademark or copyright notices as directed by Licensor in connection with the display, advertisement and offer of the Products.

   e.   Licensee may not use the Playboy Properties to advertise, promote or sell non-Playboy branded Products or services.

   f.   All aspects of the display of the Playboy Properties and Products on Licensee's E-Commerce Web Site will be subject to the prior and ongoing approval of Licensor, including design, layout, content, advertising and links.  Licensee must obtain Licensor's approval prior to any change in already approved design, layout, content advertising or links of Licensee's E-Commerce Web Site.

   g.   Notwithstanding anything hereof to the contrary, Licensor shall have the right to immediately withdraw the permission set forth in this **Exhibit B** and the Agreement upon receipt of Licensor's written notice if Licensor deems, in its reasonable discretion, that any aspect of Licensee's E-Commerce Web Site, including, but not limited to, content, advertising, links or html code, violates the Standards and Practices, which Licensor may amend from time to time, set forth on Attachment 1 attached hereto and made a part hereof.  In the event of such withdrawal, Licensee must immediately remove all of the Playboy Properties and the Products from Licensee's E-Commerce Web Site.

   h.   Licensee's E-Commerce Web Site shall include Terms of Use and a Privacy Policy consistent with the terms and conditions of Playboy.com, Inc.'s privacy policy which is attached hereto by way of example as Attachment 2.

   i.   None of the advertisements contained on Licensee's E-Commerce Web Site shall include those categories set forth on Attachment 3 attached hereto and made a part hereof unless approved in advance in writing by Licensor.

2.    E-tailers' and Retailers' E-Commerce Web Sites:  Licensee may sell and distribute the Products, and allow its distributors to sell and distribute the Products, to E-tailers and retailers which may sell and distribute the Products via such E-tailers' or retailers' E-Commerce Web Sites provided that:

    a.    Licensee will use commercially reasonable efforts to ensure that such E-tailers and retailers follow the guidelines set forth in these E-Commerce Guidelines for the advertisement, promotion and offer of the Products via any E-Commerce Web Site; and

    b.    Unless authorized by Licensor in writing, Licensee will not sell or distribute the Products to an E-tailer or retailer:  (i) who is identified with or by the names of any adult male lifestyle/entertainment publications which are, in Licensor's opinion, competitive with *Playboy magazine*; (ii) who will advertise, promote or offer the Products on an E-Commerce Web Site that is identified with or by the names of any adult male lifestyle/entertainment publications which are, in Licensor's opinion competitive with *Playboy magazine*; or (iii) who will advertise, promote, or offer the Products for sale on an E-Commerce Web Site in conjunction with any products or services identified with or by the names of any adult male lifestyle/entertainment publications which are, in Licensor's opinion, competitive with *Playboy magazine*.

In the event Licensor discovers any E-Commerce Web Site which is in violation of any of the guidelines set forth in this **Exhibit B**, Licensee, upon Licensor's prior written notice, shall cease all sales and distribution of the Products to the retail or E-tailer owner or controller of any such E-Commerce Web Site.

3.    Distributors' E-Commerce Web Sites:  Licensee will ensure that its third-party distributors adhere to the terms and conditions of the E-Commerce Guidelines attached to each such distributor's Distributor Contract.  Licensee shall also ensure that its affiliated distributors adhere to the terms and conditions set forth in the Agreement and in these E-Commerce Guidelines.  In the event Licensor discovers any E-Commerce Web Site, either owned or controlled by any affiliated or third-party distributor, which is in violation of any of the E-Commerce Guidelines, Licensee shall, at Licensor's option, cease selling or distributing the Products to any such distributor.

**ATTACHMENT 1**
**ATTACHED TO AND MADE A PART OF EXHIBIT B TO**
**THE PRODUCT LICENSE AGREEMENT**
**BETWEEN**
**PLAYBOY ENTERPRISES INTERNATIONAL, INC.**
**AND**
**UNITED MEDICAL DEVICES, LLC**
**DATED AS OF APRIL 1, 2010**

**STANDARDS AND PRACTICES**

The following may not be depicted (in actual or simulated form) or explicitly described on any E-Commerce Web Sites displaying the Playboy Properties or the Products:

1.      Violence

        Violent behavior and links to sexuality or eroticism with violence, directly or indirectly.

2.      Rape

        Rape (including so-called "implicit" or "consenting" rape) is strictly forbidden.

3.      Incest

4.      Sadism and Masochism

5.      Bondage

6.      Bestiality

7.      Child Pornography

        No nude or seminude photos of anyone under 18 years old at the time such photos were taken. Even if a model visibly looks or is actually older than 18, no depictions of any model who is portrayed as younger than 18 in any sexual act.  No explicit description of or explicit references to anyone under 18 years of age.

8.      Extreme Sexual Explicitness

        No penetration, erections, ejaculations or close-up shots or descriptions of oral sex.

9.      Graphic Close-ups of Genitals

        No close-ups or descriptions of genitals, particularly in the context of actual or simulated sexual activity.

10.     Actual Sexually Explicit Conduct

        No sexual intercourse (including genital-genital, oral-genital, anal-genital or oral-anal).

11.     Necrophilia

12.     Defecation

13.     Fisting

14.     Bukkake

15.     Any content or interactivity, the presentation of which would be obscene, illegal or actionable under applicable laws.

**ATTACHMENT 2**
**ATTACHED TO AND MADE A PART OF EXHIBIT B TO**
**THE PRODUCT LICENSE AGREEMENT**
**BETWEEN**
**PLAYBOY ENTERPRISES INTERNATIONAL, INC.**
**AND**
**UNITED MEDICAL DEVICES, LLC**
**DATED AS OF APRIL 1, 2010**

**EXAMPLE PRIVACY POLICY**

This Privacy Policy (the "Policy") applies to Playboy Enterprises, Inc.'s and Playboy.com, Inc.'s (collectively, "Playboy") family of websites (the "Sites"). These include playboy.com; cyber.playboy.com; store.playboy.com; auctions.playboy.com; playboynet.playboy.com; racingusa.playboy.com; sportsbook.playboy.com; casino.playboy.com; and any other sites at which this Policy appears. It does not apply to other online or offline Playboy sites, products or services.

This Policy explains what information we collect about you and what we do with it. We reserve the right to modify this policy at any time, and we will post any new policy here. By using or navigating any of the Sites, you acknowledge that you have read, understand and agree to be bound by this Policy or any modified Policy as posted. If you do not agree to these terms, please do not use or visit any of our Sites.

**What information do we collect?**

We collect personal information that you provide to us such as your name, e-mail address, street address and telephone number. We also collect credit card information from you. We generally collect this personal information on our registration and order forms when you sign up to receive products or services from any of our Sites. We may also collect information from our online surveys such as age, gender and income level. Finally, we collect IP addresses and anonymous demographic information.

**What do we do with the information we collect?**

We use personal information and other demographic or profile information you provide to us to fulfill your order or request; to provide you with information about Playboy and some of our partners; and to contact you when necessary.

We use IP addresses and anonymous demographic information to tailor your experiences at our Sites by showing content in which we think you will be interested and displaying content according to your preferences. Anonymous demographic information is shared with advertisers and market researchers on an aggregate basis.

We use information collected to evaluate and improve our services. We may develop and use, in our sole discretion, consumer research which may be based on your use of our services.

Personal information collected on the Sites is stored and processed in the United States and by using this site, you consent to any such transfer of information outside of your country.

**Do we share the information we collect with third parties?**

In some cases, we will share information we collect (including personal information or anonymous demographic information) with third party companies who may offer products or services in which we believe you may be interested. We also share this information with third parties with whom we partner to co-promote and administer sweepstakes and contests on our Sites. You may elect not to receive promotional e-mails from us or other companies we select by choosing one of the unsubscribe options described below.

We may also share information we collect with third party service providers to manage certain aspects of the services we provide, such as maintaining our servers and processing or fulfilling orders for products and services you purchase through the Sites.

We may also disclose your information in special cases if required to do so by law, court order or other governmental authority or when we believe in good faith that disclosing this information is otherwise necessary or advisable, including, for instance, to identify, contact, or bring legal action against someone who may be causing injury to or interfering with the rights or property of Playboy, another user or anyone else that could be harmed by such activities.

**Is the information submitted in public forums confidential?**

No.  The Sites may offer chat rooms, forums, message boards and/or news groups to our users.  Please remember that any information disclosed in these areas becomes public information.  Accordingly, you should exercise caution when deciding to disclose your personal information and you do so at your own risk.

**Do we use cookies?**

Yes.  Cookies are pieces of information generated by web servers and stored in your computer for future access.  The Sites use cookie technology to enhance your online experience by making it easier for you to navigate through our Sites or make a feature work better.  Generally, cookies can be disabled.  However, you must accept cookies in order to navigate the Sites; register for our membership Sites and order products from our online stores.

**Do we use web beacons?**

Yes.  Some of our Sites may contain electronic images known as "web beacons" or single-pixel gifs that allow us to count visitors to our Sites and deliver co-branded services.  Web beacons collect limited information including cookie number, time and date of a page view and a description of the page on which the web beacon resides.

**Are the Sites secure?**

We are committed to maintaining the security of your information and have measures in place to protect against the loss, misuse and alteration of the information under our control.  All credit transactions occur in a secure area of the Site using Secure Sockets Layer ("SSL") software to process orders.  SSL encrypts the information you input on the Sites.  In addition, all information is stored in a secure location behind a firewall with limited administrative access.

**Does this Policy apply to linked sites other than the Sites?**

No.  The Sites contain links to other Internet sites, resources and sources of Playboy.  By clicking on an ad banner or other link, you will be redirected off the Sites and to third party websites.  Playboy is not responsible for the privacy policies of such sites.  You should make sure that you read and understand the privacy policies of these sites and direct any concerns regarding external links to the site administrator or webmaster of that third party website.

**How do I unsubscribe?**

All e-mails you receive from us will include specific instructions on how to unsubscribe and you may unsubscribe at any time.  Additionally, we give you the following options for removing your information from our database:

     (1)    send an email to admin@playboy.com;

     (2)    select the opt-out link at the bottom of any Playboy email and follow the instructions provided;

     (3)    send mail to the following address:  Customer Service, Playboy.com, Inc., 680 North Lake Shore Drive, Chicago, IL  60611.

**Can I update/correct my information?**

Yes.  You may correct or update your personal information by sending us an email at pb@playboy.com.

**ATTACHMENT 3**
**ATTACHED TO AND MADE A PART OF EXHIBIT B TO**
**THE PRODUCT LICENSE AGREEMENT**
**BETWEEN**
**PLAYBOY ENTERPRISES INTERNATIONAL, INC.**
**AND**
**UNITED MEDICAL DEVICES, LLC**
**DATED AS OF APRIL 1, 2010**

### UNACCEPTABLE ADVERTISEMENT CATEGORIES ON E-COMMERCE WEB SITES

SEXUAL AIDS & DEVICES (TAKEN ON A CASE-BY-CASE BASIS)
Dildos
Vibrators - if implied use is sexual
Creams and ointments - that increase pleasure or claim to extend tumescence, etc.

EXPLICIT SEXUAL MATERIAL
X-Rated videos
X-Rated audio cassettes
Sexually oriented telephone services
Explicit sex books
Suggestive T-shirts
X-Rated clothes (i.e., candypants)
Adult entertainment nightclubs and cabarets

MEDICAL
Growing new hair (including transplants) (TAKEN ON CASE-BY-CASE BASIS)
Hypnotism (i.e., stop smoking, lose weight)
Breast/Penis enlargement
Super vitamins with unsubstantiated claims
Condoms - if copy is suggestive
Aphrodisiacs
Inhalants (i.e., amylnitrate)
Weight reducers
Hemorrhoid remedies

SELF-IMPROVEMENT/BEATING THE ODDS
Betting services
Books on cheating (cards, IRS, etc.)
Lotteries
Home study courses

DRUG PARAPHERNALIA
All items including rolling papers

WEAPONS
Hand guns
Switchblade knives

SUGGESTIVE NAMES
No drug related product names unless the description of the product's use is clear.

COMPARISON ADVERTISING
Aggressive competitive ads that might create a problem with other advertisers.
Aggressively competitive claims which are not substantiated.

MISCELLANEOUS
No PLAYBOY name or logo without permission
No Nazi or anti-Semetical paraphernalia
No ads for competitive publications such as          [Redacted]
All mail-order must include a money-back guarantee

**EXHIBIT C**
**ATTACHED HERETO AND MADE A PART OF**
**THE PRODUCT LICENSE AGREEMENT BETWEEN**
**PLAYBOY ENTERPRISES INTERNATIONAL, INC.**
**AND**
**UNITED MEDICAL DEVICES, LLC**
**DATED AS OF APRIL 1, 2010**

**SUPPLIER/SUBCONTRACTOR CONTRACT**

1.   By execution of this Supplier/Subcontractor Contract ("Contract"), _____ ("Supplier")
     agrees and acknowledges that:  (i) all images and/or trademarks including, but not limited to
     PLAYBOY, (the "Playboy Properties") applied at the request of United Medical Devices, LLC
     ("Purchaser") to merchandise covered by this Contract are properties of Playboy Enterprises
     International, Inc. ("Playboy"), and when used upon merchandise means that such merchandise
     is sponsored, approved, recommended or sold by Playboy or its licensees; (ii) Supplier will not
     sell, ship or otherwise dispose of any such merchandise except upon the order of Purchaser or
     Playboy; (iii) Supplier will never make, cause others to make or assist others in making, any claim
     whatsoever to any or all of the Playboy Properties or any trademark, image, designation, name,
     phrase, design or symbol similar thereto in connection with the manufacture, advertising,
     promotion, sale or distribution of merchandise; and (iv) Supplier will defend, indemnify and hold
     harmless Purchaser and Playboy and the distributors and dealers and the officers and
     employees of each of the foregoing against all liability whatsoever which may be incurred by
     them or any of them as a result of any alleged defects in material or workmanship in the
     merchandise covered by this Contract.

2.   Supplier agrees that no production or manufacture of any merchandise covered by this Contract
     will commence until this Contract has been signed, dated and returned by Supplier to Purchaser.
     Supplier further agrees that it will not produce, cause to be produced or assist in the production
     of more units than are specified by Purchaser nor will Supplier produce, cause to be produced or
     assist in the production of any product or item not specifically requested by Purchaser using any
     or all of the Playboy Properties or any trademarks, images, designations, names, phrases,
     designs or symbols similar to any or all of the Playboy Properties during or at any time after the
     completion of merchandise requested by this Contract.

3.   Supplier will, upon request from Purchaser or Playboy, deliver to Purchaser or will destroy in the
     presence of Purchaser or its representative(s), all molds, designs or any other elements used in
     reproducing any or all of the Playboy Properties.

4.   Playboy is an intended third-party beneficiary of this Contract.

5.   This Contract, when attached to a purchase order, shall consist of the entire agreement between
     the parties and shall supersede any conflicting or contrary terms and conditions of any purchase
     order or other order form whether supplied by Purchaser or Supplier.

6.   This Contract may not be modified or terminated except in writing, and no claimed modification,
     termination or waiver shall be binding unless also signed by an authorized representative of
     Playboy.

7.    VIOLATION OF THIS AGREEMENT BY SUPPLIER MAY RESULT IN PROSECUTION FOR TRADEMARK INFRINGEMENT, UNFAIR COMPETITION AND OTHER CAUSES OF ACTION AND THE IMPOSITION OF FINES AND/OR CRIMINAL PENALTIES.

**SUPPLIER**

_____
**(Name of Company - Please Print)**

By:      _____

Title:   _____

Date:   _____


**SUPPLIER INFORMATION**

Name:        _____

Address:     _____

             _____

Contact:     _____

Telephone:  _____

Facsimile:   _____

**PURCHASER**

**UNITED MEDICAL DEVICES, LLC**

By:      _____

Title:   _____

Date:   _____


**PLAYBOY**

Name:        **PLAYBOY ENTERPRISES
             INTERNATIONAL, INC.**

Address:     680 North Lake Shore Drive

             Chicago, IL  60611

Contact:     Judy Kawal

Telephone:   312 373 2358

Facsimile:   312 988 9857

**EXHIBIT D**
**ATTACHED HERETO AND MADE A PART OF**
**THE PRODUCT LICENSE AGREEMENT BETWEEN**
**PLAYBOY ENTERPRISES INTERNATIONAL, INC.**
**AND**
**UNITED MEDICAL DEVICES, LLC**
**DATED AS OF APRIL 1, 2010**

**DISTRIBUTOR CONTRACT**

1.      By execution of this Distributor Contract ("Contract"), _____ ("Distributor") agrees and acknowledges that:  (i) all trademarks and/or images including, but not limited to, PLAYBOY (the "Playboy Properties") used on condoms (the "Products") distributed in _____ (the "Territory") at the request of United Medical Devices, LLC ("Playboy's Licensee") are trademarks of Playboy Enterprises International, Inc. ("Playboy"), and when used upon the Products means that such Products are sponsored, approved, recommended or sold by Playboy or its licensees; (ii) Distributor will not sell, ship or otherwise dispose of any Products except upon the order and within the specifications and guidelines of Playboy's Licensee or Playboy; (iii) Distributor will never make, cause others to make or assist others in making, any claim whatsoever to any or all of the Trademarks or any trademark, designation, name, phrase, design or symbol similar thereto in connection with the manufacture, advertising, promotion, sale or distribution of merchandise; and (iv) Distributor will defend, indemnify and hold harmless Playboy's Licensee and Playboy and the distributors and dealers and the officers and employees of each of the foregoing against all liability whatsoever which may be incurred by them or any of them as a result of Distributor's distribution of the Products covered by this Contract.  In no event may Distributor advertise, sell or distribute the Products outside of the Territory.

2.      Distributor agrees that no distribution of the Products covered by this Contract will commence until this Contract has been signed, dated and returned by Distributor to Playboy's Licensee. Distributor further agrees that it will not distribute, cause to be distributed or assist in the distribution of the Products outside the Territory or other than as specified by Playboy's Licensee nor will Distributor distribute, cause to be distributed or assist in the distribution of any product or item not specifically requested by Playboy's Licensee which bears any or all of the Playboy Properties or any trademarks, images, designations, names, phrases, designs or symbols similar to any or all of the Trademarks during or at any time after the distribution of the Products requested by this Contract.  Any advertisement, promotion, sale or distribution of the Products via an "E-Commerce Web Site" or the fulfillment of any orders for the Products placed via any "E-Commerce Web Site" shall be subject to the terms and conditions of the E-Commerce Guidelines attached to this Contract as Attachment 1 and made a part hereof.  In the event Distributor fails to adhere to any of the terms and conditions of the E-Commerce Guidelines, Playboy's Licensee may immediately terminate this Contract upon written notice to Distributor.  "E-Commerce Web Site" shall mean promoting, offering, providing or selling the Products using or via communications involving the TCP/IP Protocol or any TCP/IP Successor.  "TCP/IP Protocol" (which stands for Transmission Control Protocol/Internet Protocol) shall mean the two-layered program that is the basic communication language or protocol of publicly accessible computer networks such as the Internet and private computer networks such as intranets and extranets. "TCP/IP Successors" shall mean programs, languages, protocols or other technical means that are being developed or that have yet to be developed which are intended to supplement, supersede or replace TCP/IP or its use for communications on computer networks.

3.      Distributor will be responsible for ensuring all of its distributors (not retailers) for the Products adhere to and perform their duties in accordance with the terms and conditions of this Contract including adhering to the Territory restrictions.

4.      Distributor will maintain accurate records concerning the distribution of the Products and shall supply within ten (10) days of a request from Playboy or Playboy's Licensee a statement detailing Distributor's accounts for the Products.  Upon request from Playboy's Licensee and/or Playboy, Playboy's Licensee and/or Playboy shall also have the right at all reasonable hours to conduct an

examination of Distributor's books and records and shall have the right to make extracts therefrom in order to ensure Distributor's compliance with this Contract.

5.   Playboy is an intended third-party beneficiary of this Contract.

6.   This Contract, when attached to a distribution order, shall consist of the entire agreement between the parties and shall supersede any conflicting or contrary terms and conditions of any distribution order or other order form whether supplied by Distributor or Playboy's Licensee.

7.   This Contract may not be modified or terminated except in writing, and no claimed modification, termination or waiver shall be binding unless also signed by an authorized representative of Playboy.

8.   If Distributor violates any of the terms and conditions of this Contract, Playboy's Licensee and/or Playboy will have the right to immediately terminate this Contract upon written notice to Distributor. In such event, Distributor must provide Playboy's Licensee and/or Playboy within ten (10) days of the date of such notice of termination with a statement setting forth the number of Products on hand and a listing of all of Distributor's accounts for the Products.

9.   In the event the Product License Agreement between Playboy and Playboy's Licensee dated as of April 1, 2010 (the "Agreement") expires or is terminated, this Distributor Contract shall immediately terminate upon the expiration or termination of the Agreement.

10.  Playboy shall have the right to terminate this Distributor Contract upon not less than ten (10) days prior written notice.

11.  VIOLATION OF THIS AGREEMENT BY DISTRIBUTOR MAY RESULT IN PROSECUTION FOR TRADEMARK INFRINGEMENT, UNFAIR COMPETITION AND OTHER CAUSES OF ACTION AND THE IMPOSITION OF FINES AND/OR CRIMINAL PENALTIES.

**DISTRIBUTOR**

_____
**(Name of Company - Please Print)**

By:     _____

Title:  _____

Date:  _____

**PLAYBOY'S LICENSEE**

**UNITED MEDICAL DEVICES, LLC**

By:     _____

Title:  _____

Date:  _____

**DISTRIBUTOR INFORMATION**

Name:        _____

Address:     _____

             _____

Contact:     _____

Telephone: _____

Facsimile:  _____

**PLAYBOY**

Name:        **PLAYBOY ENTERPRISES INTERNATIONAL, INC.**

Address:     680 North Lake Shore Drive

             Chicago, IL  60611

Contact:     Judy Kawal

Telephone:  312 373 2358

Facsimile:  312 988 9857

**ATTACHMENT 1**
**ATTACHED TO AND MADE A PART OF**
**THE DISTRIBUTOR CONTRACT BETWEEN**
**UNITED MEDICAL DEVICES, LLC**
**AND**

_____

**DATED AS OF _____**


**E-COMMERCE GUIDELINES**

1.     Distributor's E-Commerce Web Site:  Distributor may advertise and offer the availability of the Products on its own E-Commerce Web Site and may accept orders for the Products placed through its own E-Commerce Web Site subject to the following provisions:

   a.     Distributor's E-Commerce Web Site must, in conjunction with a link to www.shopthebunny.com (or any other url as Playboy's Licensee may direct from time to time), inform visitors to such E-Commerce Web Site that the Products and other fine Playboy-branded Products are available for sale through such link.

   b.     Distributor may only use the Trademarks, or portions thereof, in connection with the domain name, html title, meta tags or other hidden html text for its E-Commerce Web Site only with prior written approval of Playboy.

   c.     Distributor will ensure that the terms and conditions of its E-Commerce Web Site clearly and conspicuously inform all visitors that no orders for the Products will be accepted and no Products will be shipped outside the Territory.

   d.     Distributor will ensure that its E-Commerce Web Site continuously displays the trademark or copyright notices as directed by Playboy's Licensee in connection with the display, advertisement and offer of the Products.

   e.     Distributor may not use the Playboy Properties to advertise, promote or sell non-Playboy branded products or services.

   f.     All aspects of the display of the Playboy Properties and Products on Distributor's E-Commerce Web Site will be subject to the prior and ongoing approval of Playboy, including design, layout, content, advertising and links.  Distributor must obtain Playboy's approval prior to any change in already approved design, layout, content advertising or links of Distributor's E-Commerce Web Site.

   g.     Notwithstanding anything hereof to the contrary, Playboy's Licensee shall have the right to immediately withdraw the permission set forth in this Attachment 1 and the Distributor Contract upon receipt of the written notice Playboy's Licensee if Playboy deems, in its sole discretion, that any aspect of Distributor's E-Commerce Web Site, including, but not limited to, content, advertising, links or html code, violates the Standards and Practices, which Playboy may amend from time to time, set forth on Attachment 1.A. attached hereto and made a part hereof.  In the event of such withdrawal, Distributor must immediately remove all of the Trademarks and the Products from Distributor's E-Commerce Web Site.

   h.     Distributor's E-Commerce Web Site shall include Terms of Use and a Privacy Policy consistent with the terms and conditions of Playboy.com, Inc.'s privacy policy which is attached hereto by way of example as Attachment 1.B.

   i.     None of the advertisements contained on Distributor's E-Commerce Web Site shall include those categories set forth on Attachment 1.C. attached hereto and made a part hereof unless approved in advance in writing by Playboy.

2.      E-tailers' and Retailers' E-Commerce Web Sites:  Distributor may sell and distribute the Products to E-tailers and retailers which may sell and distribute the Products via such E-tailers' or retailers' E-Commerce Web Sites provided that:

      a.      Distributor will use commercially reasonable efforts to ensure that such E-tailers and retailers follow the guidelines set forth in these E-Commerce Guidelines for the advertisement, promotion and offer of the Products via any E-Commerce Web Site; and

      b.      Unless authorized by Playboy in writing, Distributor will not sell or distribute the Products to an E-tailer or retailer:  (i) who is identified with or by the names of any adult male lifestyle/entertainment publications which are, in Playboy's opinion, competitive with *Playboy magazine*; (ii) who will advertise, promote or offer the Products on an E-Commerce Web Site that is identified with or by the names of any adult male lifestyle/entertainment publications which are, in Playboy's opinion competitive with *Playboy magazine*; or (iii) who will advertise, promote, or offer the Products for sale on an E-Commerce Web Site in conjunction with any products or services identified with or by the names of any adult male lifestyle/entertainment publications which are, in Playboy's opinion, competitive with *Playboy magazine*.

In the event Playboy or Playboy's Licensee discovers any E-Commerce Web Site which is in violation of any of the guidelines set forth above, Distributor, upon the prior written notice of Playboy's Licensee, shall cease all sales and distribution of the Products to the retail or E-tailer owner or controller of any such E-Commerce Web Site.

**ATTACHMENT 1.A.**
**ATTACHED TO AND MADE A PART OF ATTACHMENT 1 TO**
**THE DISTRIBUTOR CONTRACT**
**BETWEEN**
**UNITED MEDICAL DEVICES, LLC**
**AND**

**DATED AS OF _____**

**STANDARDS AND PRACTICES**

The following may not be depicted (in actual or simulated form) or explicitly described on any E-Commerce Web Sites displaying the Playboy Properties or the Products:

1.      Violence

        Violent behavior and links to sexuality or eroticism with violence, directly or indirectly.

2.      Rape

        Rape (including so-called "implicit" or "consenting" rape) is strictly forbidden.

3.      Incest

4.      Sadism and Masochism

5.      Bondage

6.      Bestiality

7.      Child Pornography

        No nude or seminude photos of anyone under 18 years old at the time such photos were taken. Even if a model visibly looks or is actually older than 18, no depictions of any model who is portrayed as younger than 18 in any sexual act.  No explicit description of or explicit references to anyone under 18 years of age.

8.      Extreme Sexual Explicitness

        No penetration, erections, ejaculations or close-up shots or descriptions of oral sex.

9.      Graphic Close-ups of Genitals

        No close-ups or descriptions of genitals, particularly in the context of actual or simulated sexual activity.

10.     Actual Sexually Explicit Conduct

        No sexual intercourse (including genital-genital, oral-genital, anal-genital or oral-anal).

11.     Necrophilia

12.     Defecation

13.     Fisting

14.     Bukkake

15.     Any content or interactivity, the presentation of which would be obscene, illegal or actionable under applicable laws.

**ATTACHMENT 1.B.**
**ATTACHED TO AND MADE A PART OF ATTACHMENT 1 TO**
**THE DISTRIBUTOR CONTRACT**
**BETWEEN**
**UNITED MEDICAL DEVICES, LLC**
**AND**

_____

DATED AS OF _____

### EXAMPLE PRIVACY POLICY

This Privacy Policy (the "Policy") applies to Playboy Enterprises, Inc.'s and Playboy.com, Inc.'s (collectively, "Playboy") family of websites (the "Sites"). These include playboy.com; cyber.playboy.com; store.playboy.com; auctions.playboy.com; playboynet.playboy.com; racingusa.playboy.com; sportsbook.playboy.com; casino.playboy.com; and any other sites at which this Policy appears. It does not apply to other online or offline Playboy sites, products or services.

This Policy explains what information we collect about you and what we do with it. We reserve the right to modify this policy at any time, and we will post any new policy here. By using or navigating any of the Sites, you acknowledge that you have read, understand and agree to be bound by this Policy or any modified Policy as posted. If you do not agree to these terms, please do not use or visit any of our Sites.

**What information do we collect?**

We collect personal information that you provide to us such as your name, e-mail address, street address and telephone number. We also collect credit card information from you. We generally collect this personal information on our registration and order forms when you sign up to receive products or services from any of our Sites. We may also collect information from our online surveys such as age, gender and income level. Finally, we collect IP addresses and anonymous demographic information.

**What do we do with the information we collect?**

We use personal information and other demographic or profile information you provide to us to fulfill your order or request; to provide you with information about Playboy and some of our partners; and to contact you when necessary.

We use IP addresses and anonymous demographic information to tailor your experiences at our Sites by showing content in which we think you will be interested and displaying content according to your preferences. Anonymous demographic information is shared with advertisers and market researchers on an aggregate basis.

We use information collected to evaluate and improve our services. We may develop and use, in our sole discretion, consumer research which may be based on your use of our services.

Personal information collected on the Sites is stored and processed in the United States and by using this site, you consent to any such transfer of information outside of your country.

**Do we share the information we collect with third parties?**

In some cases, we will share information we collect (including personal information or anonymous demographic information) with third party companies who may offer products or services in which we believe you may be interested. We also share this information with third parties with whom we partner to co-promote and administer sweepstakes and contests on our Sites. You may elect not to receive promotional e-mails from us or other companies we select by choosing one of the unsubscribe options described below.

We may also share information we collect with third party service providers to manage certain aspects of the services we provide, such as maintaining our servers and processing or fulfilling orders for products and services you purchase through the Sites.

We may also disclose your information in special cases if required to do so by law, court order or other governmental authority or when we believe in good faith that disclosing this information is otherwise necessary or advisable, including, for instance, to identify, contact, or bring legal action against someone who may be causing injury to or interfering with the rights or property of Playboy, another user or anyone else that could be harmed by such activities.

**Is the information submitted in public forums confidential?**

No.  The Sites may offer chat rooms, forums, message boards and/or news groups to our users.  Please remember that any information disclosed in these areas becomes public information.  Accordingly, you should exercise caution when deciding to disclose your personal information and you do so at your own risk.

**Do we use cookies?**

Yes.  Cookies are pieces of information generated by web servers and stored in your computer for future access.  The Sites use cookie technology to enhance your online experience by making it easier for you to navigate through our Sites or make a feature work better.   Generally, cookies can be disabled. However, you must accept cookies in order to navigate the Sites; register for our membership Sites and order products from our online stores.

**Do we use web beacons?**

Yes.  Some of our Sites may contain electronic images known as "web beacons" or single-pixel gifs that allow us to count visitors to our Sites and deliver co-branded services.  Web beacons collect limited information including cookie number, time and date of a page view and a description of the page on which the web beacon resides.

**Are the Sites secure?**

We are committed to maintaining the security of your information and have measures in place to protect against the loss, misuse and alteration of the information under our control.  All credit transactions occur in a secure area of the Site using Secure Sockets Layer ("SSL") software to process orders.  SSL encrypts the information you input on the Sites.  In addition, all information is stored in a secure location behind a firewall with limited administrative access.

**Does this Policy apply to linked sites other than the Sites?**

No.  The Sites contain links to other Internet sites, resources and sources of Playboy.  By clicking on an ad banner or other link, you will be redirected off the Sites and to third party websites.  Playboy is not responsible for the privacy policies of such sites.  You should make sure that you read and understand the privacy policies of these sites and direct any concerns regarding external links to the site administrator or webmaster of that third party website.

**How do I unsubscribe?**

All e-mails you receive from us will include specific instructions on how to unsubscribe and you may unsubscribe at any time.  Additionally, we give you the following options for removing your information from our database:

(1)    send an email to admin@playboy.com;

(2)    select the opt-out link at the bottom of any Playboy email and follow the instructions provided;

(3)    send mail to the following address:  Customer Service, Playboy.com, Inc., 680 North Lake Shore Drive, Chicago, IL  60611.

**Can I update/correct my information?**

Yes.  You may correct or update your personal information by sending us an email at pb@playboy.com.

**ATTACHMENT 1.C.**
**ATTACHED TO AND MADE A PART OF ATTACHMENT 1 TO**
**THE DISTRIBUTOR CONTRACT**
**BETWEEN**
**UNITED MEDICAL DEVICES, LLC**
**AND**

_____

**DATED AS OF _____**

## UNACCEPTABLE ADVERTISEMENT CATEGORIES ON E-COMMERCE WEB SITES

SEXUAL AIDS & DEVICES (TAKEN ON A CASE-BY-CASE BASIS)
Dildos
Vibrators - if implied use is sexual
Creams and ointments - that increase pleasure or claim to extend tumescence, etc.

EXPLICIT SEXUAL MATERIAL
X-Rated videos
X-Rated audio cassettes
Sexually oriented telephone services
Explicit sex books
Suggestive T-shirts
X-Rated clothes (i.e., candypants)
Adult entertainment nightclubs and cabarets

MEDICAL
Growing new hair (including transplants) (TAKEN ON CASE-BY-CASE BASIS)
Hypnotism (i.e., stop smoking, lose weight)
Breast/Penis enlargement
Super vitamins with unsubstantiated claims
Condoms - if copy is suggestive
Aphrodisiacs
Inhalants (i.e., amylnitrate)
Weight reducers
Hemorrhoid remedies

SELF-IMPROVEMENT/BEATING THE ODDS
Betting services
Books on cheating (cards, IRS, etc.)
Lotteries
Home study courses

DRUG PARAPHERNALIA
All items including rolling papers

WEAPONS
Hand guns
Switchblade knives

SUGGESTIVE NAMES
No drug related product names unless the description of the product's use is clear.

COMPARISON ADVERTISING
Aggressive competitive ads that might create a problem with other advertisers.
Aggressively competitive claims which are not substantiated.

MISCELLANEOUS
No PLAYBOY name or logo without permission
No Nazi or anti-Semetical paraphernalia
No ads for competitive publications such as[     [Redacted]
All mail-order must include a money-back guarantee

**EXHIBIT E**
**ATTACHED HERETO AND MADE A PART OF**
**THE PRODUCT LICENSE AGREEMENT BETWEEN**
**PLAYBOY ENTERPRISES INTERNATIONAL, INC.**
**AND**
**UNITED MEDICAL DEVICES, LLC**
**DATED AS OF APRIL 1, 2010**

**<u>ADDITIONAL TERMS AND CONDITIONS</u>**

1.    In each License Year, at Licensor's request, Licensee will provide for Licensor's promotional purposes, at no charge to Licensor, with Products that have a total wholesale value of U.S.$1,500 in such mix and in such quantities as Licensor may request.

# EXHIBIT 2

## **Table of Main Contract**

This is all agreement on The Transition License from UMD to TNR in total 4 agreements;

| | | |
|---|---|---|
| 1. | Sale and Purchase Agreement – between TNR and UMD | 15 pages |
| 2. | Novation Agreement – between PLAYBOY-TNR – UMD | 7 pages |
| 3. | AMENDMENT TO NOVATION AGREEMENT - PLAYBOY-TNR – UMD | 3 pages |
| 4. | SIXTH AMENDMENT TO PRODUCT LICENSE AGREEMENT- PLAYBOY-TNR | 3 pages |

All agreement prepared by Business Development Department for keeping  at CFO, department

Sender---------------------------------------------------------------                Received---------------------------------------------------------

(Chanin Thiencharoen)

GM- Business Development                                                                    CFO

9 / 4 / 2018                                                                                            --------/----------/-------------

*Execution Version*

## SALE AND PURCHASE AGREEMENT

**THIS SALE AND PURCHASE AGREEMENT** (this "**Agreement**") is made on 9 April 2018,

**BY AND BETWEEN:**

(1) **THAI NIPPON RUBBER INDUSTRY PUBLIC COMPANY LIMITED,** a public company duly registered and existing under the laws of Thailand having its registered office at 1 Charoenrat Road, Thung Wat Don, Sathon Bangkok 10120 (hereinafter referred to as "**TNR**"); and

(2) **UNITED MEDICAL DEVICES, LLC,** a private company duly registered and existing under the laws of California, having its registered office at 1901 Avenue of the Stars, Suite 470 Los Angeles, CA 90067 (hereinafter referred to as the "**UMD**"),

   (each hereinafter referred to as a "**Party**", and collectively referred to as the "**Parties**").

**WHEREAS:**

(A) UMD has entered into (i) the product license agreement between itself and Playboy Enterprises International, Inc ("**Playboy**") dated 1 April 2010, (ii) the side letter amendment to product license agreement dated 7 December 2012, (iii) the second amendment to product license agreement dated 25 June 2013, (iv) the third amendment to product license agreement dated 1 April 2015, (v) the fourth amendment to product license agreement dated 16 March 2016, and (vi) the fifth amendment to product license agreement dated 14 April 2017 (collectively hereinafter referred to as the "**Product License Agreement**").

(B) Pursuant to the Product License Agreement, Playboy has granted to UMD a license to use the Playboy Properties (as defined in the Product License Agreement) in the design, manufacture, advertising, promotion, sale and distribution of the Products (as defined below).

(C) UMD has also entered into sub-license agreements with local distributors in 34 countries (collectively referred to as the "**Sub-license Agreements**"), details of which set out in **Annex 1**.

(D) UMD wishes to assign its rights under the Product License Agreement and Sub-license Agreements (the "**Assigned Rights**") to TNR or TNR's designated entity, and in consideration for UMD's due performance of its obligations hereunder TNR wishes to acquire the Assigned Rights from UMD, in accordance with the provisions of this Agreement.

**THEREFORE,** the Parties agree as follows:

1. **DEFINITIONS AND INTERPRETATION**

1.1 <u>Definitions</u>

   In this Agreement, the following defined terms have the following meanings:

   "**Assigned Rights**" shall have the meaning as described in Recital (D).

   "**Assignment**" means the assignment of the Assigned Rights by UMD to TNR or TNR's designated entity.

   "**Conditions to First Payment**" shall have the meaning as described in Clause 6.1.

   "**Conditions to Payment**" means Conditions to First Payment and Conditions to Second Payment.

   "**Conditions to Second Payment**" shall have the meaning as described in Clause 6.2.

*Execution Version*

"**Confidential Information**" shall have the meaning as described in Clause 11.1.

"**Consideration**" means the consideration for the sale and purchase of the Assigned Rights to be paid by TNR to UMD in accordance with Clause 5.1.

"**Distribution Fee**" means the distribution fee received from the Local Distributors in good funds under the Sub-license Agreements.

"**Effective Date**" means the date of this Agreement.

"**First Payment**" shall have the meaning as described in Clause 5.3(a).

"**Gross Profit**" means all profit from sales derived from Playboy Products after deducting the cost of goods sold. From the date of the First Payment, for the first nine (9) months, such profits shall be recorded when the payment is received in TNR's account in full. For the remaining three (3) months, such profits shall be recorded provided that the deposit of such sale has been paid into TNR's account,

"**Local Distributor**" means any local distributor who is a party to the Sub-license Agreements as listed in **Annex 1**.

"**Playboy**" shall have the meaning as described in Recital (A).

"**Products**" means merchandise bearing or distributed in connection with the Playboy Properties.

"**Product License Agreement**" shall have the meaning as described in Recital (A).

"**Second Payment**" shall have the meaning as described in Clause 5.3(b).

"**Sub-license Agreements**" shall have the meaning as described in Recital (C).

"**Sub-license Due Diligence List**" means the list of sub-license agreements as listed in **Annex 2.**

"**Term**" shall have the meaning as described in Clause 2.

"**TNR Monthly Management Account**" means the monthly management account prepared by TNR.

1.2   **Interpretation**

In this Agreement, subject to any express contrary indication:

(a)   words (including the definitions in Clause 1.1) importing the singular shall include the plural and *vice versa*;

(b)   any reference to any gender shall include the other genders;

(c)   any reference to a person shall be construed as including a reference to its successors, permitted transferees and permitted assignees;

(d)   any reference to this Agreement or any other agreement or document shall be construed as a reference to that agreement or document as it exists at the time of execution of this Agreement;

(e)   any reference to a Clause shall be construed as a reference to a clause of this Agreement;

(f)   any reference to a Schedule or an Annex shall be construed as a reference to a schedule or an  annex to this Agreement; and

*Execution Version*

(g)    the headings to the Clauses or other provisions of this Agreement are for ease of reference only and are not to be taken into account in the interpretation of this Agreement or its provisions.

**2.    TERM**

Unless specified otherwise in this Agreement, the term of this Agreement (the "**Term**") shall commence as of the Effective Date until the termination in accordance with Clause 10.

**3.    SALE AND PURCHASE OF THE ASSIGNED RIGHTS**

3.1    Subject to the terms and conditions under this Agreement, UMD, relying on the representations, warranties, covenants, indemnities, and undertakings given by TNR in this Agreement, shall sell the Assigned Rights to TNR, and TNR, relying on the representations, warranties, covenants, indemnities, and undertakings given by UMD in this Agreement, shall purchase the Assigned Rights from UMD.

3.2    The Parties agree that the terms and conditions of the Assignment will be set out in a separate assignment agreement as follows:

(a)    a novation agreement to be entered into among TNR or TNR's designated entity, UMD, and Playboy for the assignment of the Product License Agreement; and

(b)    assignment agreements to be entered into between UMD and the relevant Local Distributors for the assignment of the Sub-license Agreements.

3.3    The obligations of TNR to purchase the Assigned Rights and make payments of the Consideration are conditional upon the fulfillment by UMD of all of the conditions contemplated under Clause 6 of this Agreement.

**4.    UMD OBLIGATIONS**

4.1    In order to achieve the completion of the Assignment, UMD agrees that it shall assist and facilitate TNR to successfully complete the following:

(a)    entering into the novation agreement of the Product License Agreement among TNR or TNR's designated entity in replacement of UMD, UMD, and Playboy;

(b)    receiving the executed consents for the assignment of the Sub-license Agreements as listed in **Annex 1** from the Local Distributors in replacement of UMD; and

(c)    collecting the Distribution Fee during the period of 12 months from the First Payment date and Gross Profit in the total amount of not less than USD three million.

4.2    Notwithstanding Clause 4.1 above, UMD shall execute such documents and perform such acts and things as TNR may reasonably request from time to time in order to complete the Assignment and shall use its best endeavor to procure that any necessary third party which including but is not limited to the Local Distributors shall execute such documents and do such acts and things as may reasonably be required in order to complete the Assignment.

4.3    UMD shall use its best endeavor to facilitate the interests of TNR under the Product License Agreement and Sub-license Agreements. UMD shall not engage in any conduct which will give rise to a conflict of interest between UMD and TNR.

4.4    UMD shall pay Mr. Nicholai Allen and Natalia Romanowski for the period of one year following the date that the First Payment has been made, in order to provide services in assisting TNR to complete the Assignment and ensure the smooth transition of the Product License Agreement and Sub-license Agreements to TNR in substitution of UMD. In this regard, UMD shall procure that Mr. Nicholai Allen shall professionally and

*Execution Version*

diligently perform his obligations, and all of his performances shall be in accordance with the guidelines, directions and instructions reasonably provided by TNR.

4.5    UMD shall not assign and/or delegate the whole or any part of its duties and/or obligations under this Agreement to any party without obtaining a prior written consent of TNR.

5.    **CONSIDERATION**

5.1    Consideration for the sale and purchase of the Assigned Rights under this Agreement (the **"Consideration"**) and the payment terms shall be in accordance with this Clause 5.

5.2    Subject to the fulfilment of Conditions to Payment under Clause 6 and the price adjustment under Clause 6.3, the total Consideration to be paid by TNR to UMD for the sale and purchase of the Assigned Rights is USD fifteen (15) million, inclusive of all applicable taxes and fees owed by UMD as a result of the transaction contemplated under this Agreement. For avoidance of doubt, tax owed by UMD includes applicable Thai withholding tax which TNR has an obligation under Thai laws to deduct.

5.3    Subject to Clause 5.2, the Consideration will be paid by TNR to UMD in two tranches as follows:

    (a)    **USD 10 million** (**"First Payment"**) will be paid upon the completion and fulfilment of the Conditions to First Payment; and

    (b)    the amount not exceeding **USD five million**, subject to price adjustment under Clause 6.3 (**"Second Payment"**), will be paid upon the completion and fulfilment of the Conditions to Second Payment.

5.4    The Parties hereby agree that, unless agreed otherwise in writing by the Parties, the First Payment shall be allocated as follows:

| Amount | Allocation |
|---|---|
| USD 9,500,000 | consideration to be paid to UMD in accordance with Clause 5.6 below. |
| USD 500,000 | consideration to be paid to UMD for the payment of administration fee of the novation of the Product License Agreement to Playboy. |

5.5    The Parties hereby agree that, unless agreed otherwise in writing by the Parties, the Second Payment shall be allocated as follows:

| Amount | Allocation |
|---|---|
| USD 250,000 | consideration to be paid to UMD for the payment of administration fee of the novation of the Product License Agreement to Playboy. |
| Second Payment minus USD 250,000 | consideration to be paid to UMD in accordance with Clause 5.6 below. |

*Execution Version*

5.6   Within five days after the completion of the relevant Conditions to Payment, TNR shall pay the Consideration to the following bank account by wire transfer, unless notify otherwise in writing to TNR in advance not less than five days prior to the date of each payment:

**To UMD:**

| | | |
|---|---|---|
| **Bank Account Name** | : | United Medical Devices, LLC |
| **Bank Account No.** | : | 7577335990 /Routing#: 121000248 /IBAN: WFBIUS6S |
| **Bank** | : | Wells Fargo Bank |
| **Branch** | : | 1800 Ave of the Stars, Los Angeles, CA 90067 |

5.7   TNR's obligation to pay the First Payment and Second Payment shall be discharged in full on the date on which the First Payment or Second Payment (as the case may be) is made by TNR to the bank accounts in accordance with Clause 5.6.

6.   **CONDITIONS TO PAYMENT**

6.1   TNR's obligation to pay the First Payment to UMD shall be subject to the condition that UMD performs and fulfils the conditions set out in this Clause 6 (**"Conditions to First Payment"**) (any of which may be waived in whole or in part by TNR in writing at its sole discretion), which the Conditions to First Payment shall be completed by no later than 12 April 2018:

    (a)   the signing of the novation agreement of the Product License Agreement;

    (b)   the delivery of the written consents signed by the authorized representatives of the Local Distributors consenting to the assignment of the Sub-license Agreements, provided that the Local Distributors must provide TNR legal evidence under the applicable laws to which they are subject, showing that the signatories are the authorized person of the relevant Local Distributor;

    (c)   UMD has provided the notification of the assignment of the Sub-license Agreements to all Local Distributors; and

    (d)   UMD undertakes to TNR that, within 60 days after the First Payment has been made or other date as notified in writing to UMD by TNR, an appropriate representative of UMD will accompany TNR to the following countries in order to introduce TNR to the Local Distributors to ensure a smooth transition of the business and the Assignment;

        (i)   The People's Republic of China; and

        (ii)   Africa.

6.2   Subject to the price adjustment set forth in Clause 6.3 below, TNR's obligation to pay the Second Payment to UMD shall become due following twelve (12) months from the date of the First Payment which shall be subject to the following condition (**"Conditions to Second Payment"**), unless it is waived in whole or in part by TNR in writing at its sole discretion:

    (a)   the termination letter of any sub-license agreement(s) which is listed on the Sub-license Due Diligence List in **Annex 2** but is not listed on the Sub-license Agreement as listed in **Annex** 1, or any documentation evidencing such termination satisfactory to TNR has been delivered to TNR;

    (b)   UMD undertakes to TNR that on the date as notified in writing to UMD by TNR, an appropriate representative of UMD will accompany TNR to the United States of America in order to introduce TNR to

the Buyer Department of Walmart U.S. to negotiate on the sale and distribution of Playboy Products to Walmart stores; and

(c)     it is recorded in the TNR Monthly Management Accounts and satisfactory to TNR that the total amount of the Distribution Fee during the period of 12 months from the First Payment Date plus the Gross Profit is not less than USD three million.

6.3     In the case that the Conditions to Second Payment under Clauses 6.2(a) and 6.2(b) are completed but the sum of Distribution Fee during period of 12 months from the date of the First Payment plus the Gross Profit pursuant to Clause 6.2(c) is less than USD three million, the Parties agree that the Second Payment shall be adjusted based on the below formula:

$$A = B + USD \text{ two million}$$

**Where:**

"**A**"     means     adjusted Second Payment to be paid to UMD

"**B**"     means     the total amount of the actual Distribution Fee during the period of 12 months from the First Payment Date recorded in the TNR Monthly Management Account plus the Gross Profit.

## 7.     PRICE ADJUSTMENT

7.1     The Parties agree that the payment of the Second Payment shall be adjusted pursuant to Clause 6.3 prior to the payment being made to UMD.

7.2     If the Distribution Fee during the period of 12 months from the date of the First Payment and the Gross Profit is zero, TNR shall be obliged to pay the Second Payment to UMD in the total amount of USD two million and the payment obligation of TNR under this Agreement shall be discharged.

7.3     Subject to Clause 7.2, TNR's obligation to pay the adjusted Second Payment shall be discharged in full on the date on which the Second Payment is made by TNR to UMD in accordance with this Clause 7 and Clause 5.6.

## 8.     TAXES AND STAMP DUTIES

8.1     The Consideration owed under this Agreement, is inclusive of applicable Thai withholding tax which TNR is required to deduct and other taxes owed by UMD under applicable laws and the U.S. - Thailand tax treaty.

8.2     The Parties acknowledge and agree that TNR may be required under applicable laws and the U.S. - Thailand tax treaty to deduct the full amount of any withholding tax to which the payment of Consideration is subject under applicable laws and the U.S. - Thailand tax treaty (and, for the avoidance of doubt, TNR shall not be required to increase or gross up the amount of such payment to account for such deduction). TNR shall remit the amount of any such withholding tax to the relevant Revenue Department in accordance with applicable taxes law and remit the remaining consideration to UMD. In such case, TNR shall provide UMD evidence of any such payment of withholding tax and shall procure to obtain a withholding tax certificate from the relevant Revenue Department.

8.3     Each party shall be responsible to pay its own, taxes, stamp duties (including stamp duties affixed to this Agreement) or any other amounts prescribed by applicable law in relation to this Agreement.

## 9.     REPRESENTATIONS AND WARRANTIES

9.1     Each of the Parties warrants to the other Party that the statements set out below are true and accurate as of the Effective Date and during the Term:

1013942.1 3639723-v1\BKKDMS

*Execution Version*

(a)   it is validly existing and is a company duly incorporated under the law of its jurisdiction of incorporation;

(b)   it has full power and authority to sign and deliver this Agreement and to exercise all its rights and perform all its obligations under this Agreement and has taken all necessary corporate action to authorize the execution of this Agreement and the exercise of its rights and the performance of its obligations hereunder, and this Agreement constitutes its valid and legally binding obligation, enforceable in accordance with its terms;

(c)   all actions, conditions and things required to be taken, fulfilled and done (including the obtaining of any necessary consents from third parties) in order (i) to enable it lawfully to enter into, exercise its rights and perform and comply with its obligations under this Agreement, and (ii) to ensure that those obligations are valid, legally binding and enforceable, have been taken, fulfilled and done;

(d)   neither the signing and delivery of this Agreement nor compliance with the terms and provisions hereof will conflict with, or result in a breach of (i) its memorandum of association or articles of association, (ii) any applicable law or regulation of such party's home state and country, (iii) any order, writ, injunction or decree of any court or governmental authority or agency, or (iv) any agreement or instrument to which it is a party or by which it is bound; and

(e)   each Party is entering into this Agreement in its own capacity and not on behalf of any other person.

9.2   UMD warrants to TNR that the statements set out below are true and accurate as of the Effective Date and during the Term:

(a)   the Product License Agreement and the Sub-license Agreements constitute valid and binding obligations of the parties thereto and are enforceable against the parties in accordance with their terms;

(b)   to the best of UMD's knowledge and belief, the novation of the Product License Agreement with Playboy and assignment of the Sub-License Agreements are valid and binding obligations on the parties thereto and are enforceable against the parties in accordance with their terms;

(c)   the Distribution Fee during the period of 12 months from the date of the First Payment plus the Gross Profit shall not be less than USD three million;

(d)   there are no outstanding actions, disputes, claims or demands between UMD, Playboy, Local Distributors, or any third party affecting the Assignment or the operation of TNR in substitution of UMD under the Product License Agreement or Sub-license Agreements. To the best of its knowledge, UMD is not aware of any actions, claims, proceedings, or any other incidents (including amendments of local laws or regulations) that may cause any adverse effect to the Assignment or the operation of TNR in substitution of UMD under the Product License Agreement or Sub-license Agreement ; and

(e)   it fully understands that TNR relies on representation of UMD under Clause 9.2(c) in entering into this Agreement.

9.3   The Parties agree that, in the event of a breach of the warranty by UMD under Clause 9.2(c), TNR's sole remedy shall be the price adjustment set forth in Clause 6.3 above.

## 10.   TERMINATION

10.1   This Agreement may be terminated upon the occurrence of the following events:

(a)   the Parties mutually agree in writing to terminate this Agreement;

*Execution Version*

(b)    in the event either Party defaults on its obligations hereunder and fails to remedy such default to the reasonable satisfaction of the non-defaulting Party within thirty (30) days after such default has been brought to the defaulting Party's attention by written notice, the other Party, at its sole discretion, may immediately terminate this Agreement; or

(c)    TNR shall be entitled to, at its sole discretion, immediately terminate this Agreement by giving UMD a notice in writing with immediate effect if the Conditions to the First Payment have not been fulfilled within the period as specified under Clause 6.1.

10.2    If the Agreement is properly terminated by TNR due to the reason under Clause 10.1(b) or Clause 10.1(c), UMD shall not be entitled to receive any further Consideration.

10.3    The termination of this Agreement shall not affect any legal rights which the non-defaulting Party may have due to the breach of the Agreement.

## 11.    CONFIDENTIALITY

11.1    The Parties shall treat all correspondences and negotiation between the Parties, the financial terms of this Agreement, as well as any and all information, material, documents and data made available in writing, visual or machine readable form or orally or other documents derived from, containing or reflecting such information that was and will be exchanged between the Parties to comply with its responsibilities under this Agreement ("**Confidential Information**") as strictly confidential (whether or not such Confidential Information is marked or identified as being confidential).

11.2    The Parties shall not use such Confidential Information otherwise than for the purposes set forth in this Agreement and shall not disclose the Confidential Information to any third party except in any of the following manners:

(a)    with the prior written consent of the Party who may be affected by such disclosure;

(b)    for the disclosure to any person (including any key personnel of the relevant financial institution, advisor or consultant of each Party) who needs to know the Confidential Information in order for a Party to perform under this Agreement, or so that the conditions under this Agreement can be fulfilled, provided always that the disclosing Party shall be obligated to ensure that such person be duly informed of the confidentiality of the Confidential Information and the breach by such person of this obligation shall be deemed as the breach of obligation under this Clause by such disclosing Party;

(c)    for the disclosure as required by any applicable law, court order, central bank, or any regulatory body which including but not limited to the Securities and Exchange Commission and the Stock Exchange;

(d)    such disclosure or use is required for the purpose of any judicial proceedings arising out of this Agreement; or

(e)    if the information has come into the public domain through no fault of that Party.

11.3    The Parties understand and agree that the provisions under this Clause 11 shall survive the termination of this Agreement.

## 12.    NOTICES AND OTHER COMMUNICATIONS

12.1    Any notice, communications or documents required to be given by a Party to the other Party under this Agreement shall be given in the English language and shall be deemed validly served by hand delivery, or sent by registered pre-paid post (or by registered airmail in the case of international service), or by e-mail to such address set out in this Clause or to such other address, or e-mail address as may be notified by one Party to the other Parties by a like notice hereunder.

*Execution Version*

12.2  The initial address and e-mail address of the Parties are:

(a)     to TNR:

        Attention:      Chanin Thiencharoen
        Address:        1 Charoenrat Road, Thung Wat Don, Sathon Bangkok, Thailand 10120
        E-mail address: chanin_t@tnrcondom.com

(b)     to UMD:

        Attention:      Jimmy Esebag
        Address:        1901 Avenue of the Stars, Suite 470, Los Angeles, CA 90067
        E-mail address: jimmy@umdworld.com

12.3  Any such notice or communication shall be deemed to have been served:

(a)     if delivered by hand, at the time of delivery;

(b)     if posted by pre-paid post or by registered airmail or by courier service, at the expiration of five days after the envelope containing the same shall have been put into the post or have been received by the relevant courier company (as the case may be); or

(c)     if sent by e-mail shall be deemed to have been given when received into the addressee's e-mail system.

## 13.   INDEMNITY

13.1  UMD shall indemnify and hold TNR harmless against all actions, proceedings, demands, costs, expenses, duties, liabilities and claims whatsoever caused by or arising from the act, neglect or default of UMD or its agents, representative, directors, or employees under this Agreement.

13.2  TNR shall indemnify and hold UMD harmless against all actions, proceedings, demands, costs, expenses, duties, liabilities and claims whatsoever caused by or arising from the act, neglect or default of TNR or its agents, representative, directors, or employees under this Agreement.

## 14.   GOVERNING LAW / VENUE

This Agreement shall be subject to, construed in accordance with and governed by the Laws of California. The exclusive venue for resolution of any disputes arising out of this Agreement or performance thereof shall be the federal courts located in the central district of California.

## 15.   MISCELLANEOUS

15.1  Each Party shall, in good faith, cooperate with each other and execute such instruments or documents and take such other actions as may reasonably be requested from time to time in order to carry out, evidence or confirm their rights or obligations or as may be reasonably necessary or helpful to give effect to this Agreement.

15.2  Any modification or alteration of any Clause of this Agreement will not be valid unless made in writing and duly signed by an authorized representative of both Parties.

15.3  UMD hereby provides irrevocable consent to TNR that TNR may assign any or all part of this Agreement to TNR's designated entity without having to obtain any further consent from UMD. The Parties agree that such assignment by TNR shall take full legal effect upon UMD's receipt of notice from TNR informing UMD of the assignment, whereupon UMD shall thereafter perform its responsibilities under this Agreement to the entity that takes the assignment.

*Execution Version*

15.4    The failure of either Party at any time to exercise any of its rights under this Agreement shall not be deemed a waiver of any such rights or in any way prevent either Party from subsequently asserting or exercising any such rights.

15.5    This Agreement constitutes the entire agreement between the Parties relating to the subject matter hereof, superseding all prior agreements, memorandum of understandings, letters of intent or undertakings, oral or written.

15.6    This Agreement may be executed in counterparts, each of which shall be deemed to be an original, but together shall constitute one instrument.

15.7    Each party agrees and understands that no agency relationship or partnership between TNR and UMD shall exist. Neither party shall do any acts or things which may mislead any third party to believe that TNR or UMD is the agent, partner or representative of the other.

*[The remainder of this page is intentionally left blank]*

*Execution Version*

**IN WITNESS WHEREOF,** this Agreement is made and signed in two identical copies in English. Both parties have read and understand this Agreement and affixed their signatures and company seals (if any) to this Agreement on the date first above written.

Signed for and on behalf of

**THAI NIPPON RUBBER INDUSTRY PUBLIC COMPANY LIMITED**

by _____

( AMORN DARARATTANAROJ )

**UNITED MEDICAL DEVICES, LLC**

by _____

( _____ )

in the presence of:

_____ Witness

( NICHANE PAUN )

_____ Witness

( Chavin Tuencharoeny.

1013942.1 3639723-v1\BKKDMS

## ANNEX I

### LIST OF SUB-LICENSE AGREEMENTS

|    | Country | Company Name |
|----|---------|--------------|
| 1  | Brazil | Alco Do Brazil Impotcao E Commercio Ltda.EPP |
| 2  | Armenia | ARGE Business LLC |
| 3  | India | Dachaa Lifestyle Holding Ltd |
| 4  | Nepal | Dachaa Lifestyle Holding Ltd |
| 5  | Chile | Distribuildora Las Palmas Ltda. |
| 6  | U.A.E. | Cubita Trading LLC |
| 7  | Georgia | Geo Latex Ltd. |
| 8  | Ghana | Ghagiria International Trading |
| 9  | Bolivia | HiperMarcas s.r.l. |
| 10 | Vietnam | I.D.I Distributing JVC / CONG TY CO PHAN HE THONG |
| 11 | Lebanon | MonPro SARL |
| 12 | Malaysia | Teik Senn(Malaysia) SDN BHD |
| 13 | Serbia | Umbrella Corporation Ltd. |
| 14 | Bosnia and Herzegovina | Umbrella Corporation Ltd. |
| 15 | Macedonia | Umbrella Corporation Ltd. |
| 16 | UK and Ireland | Three Pears Ltd. |
| 17 | Venezuela | Dimassi. C.A. |
| 18 | Mongolia | Tsakhiur Tumur LLC |
| 19 | Zambia | Sterlin Medical |
| 20 | Jordan | H2O Marketing Ltd. |
| 21 | Russia | MedCom |

|  | Country | Company Name |
|---|---|---|
| 22 | Dominigan Replublic | Mel Caribbean Corp |
| 23 | Surinam | Distributor and Trade Service |
| 24 | China | Flower Rabbit Brand Management |
| 25 | Hongkong | Flower Rabbit Brand Management |
| 26 | Macau | Flower Rabbit Brand Management |
| 27 | South Korea | Medevice Korea Distribution Corp. |
| 28 | Bangladesh | MD investment Group, Dubai |
| 29 | Bhutan | MD investment Group, Dubai |
| 30 | Pakistan | MD investment Group, Dubai |
| 31 | Sri Lanka | MD investment Group, Dubai |
| 32 | Malta | Hayet Global Trade |
| 33 | Bahrain | J.H. Ruyan Company W.L.L. |
| 34 | Kenya | Hudson Fulton LLC. |

## ANNEX II

### SUB-LICENSE AGREEMENT DUE DILIGENCE LIST

|    | Country | Company Name |
|----|---------|--------------|
| 1  | Brazil | Alco Do Brazil Impotcao E Commercio Ltda.EPP |
| 2  | Armenia | ARGE Business LLC |
| 3  | India | Dachaa Lifestyle Holding Ltd |
| 4  | Nepal | Dachaa Lifestyle Holding Ltd |
| 5  | Chile | Distribuildora Las Palmas Ltda. |
| 6  | U.A.E. | Cubita Trading LLC |
| 7  | Georgia | Geo Latex Ltd. |
| 8  | Ghana | Ghagiria International Trading |
| 9  | Bolivia | HiperMarcas s.r.l. |
| 10 | Vietnam | I.D.I Distributing JVC / CONG TY CO PHAN HE THONG |
| 11 | Lebanon | MonPro SARL |
| 12 | Malaysia | Teik Senn(Malaysia) SDN BHD |
| 13 | Serbia | Umbrella Corporation Ltd. |
| 14 | Bosnia and Herzegovina | Umbrella Corporation Ltd. |
| 15 | Macedonia | Umbrella Corporation Ltd. |
| 16 | UK and Ireland | Three Pears Ltd. |
| 17 | Venezuela | Dimassi. C.A. |
| 18 | Mongolia | Tsakhiur Tumur LLC |
| 19 | Zambia | Sterlin Medical |
| 20 | Jordan | H2O Marketing Ltd. |
| 21 | Russia | MedCom |

|    | Country | Company Name |
|----|---------|--------------|
| 22 | Dominigan Replublic | Mel Caribbean Corp |
| 23 | Surinam | Distributor and Trade Service |
| 24 | China | Flower Rabbit Brand Management |
| 25 | Hongkong | Flower Rabbit Brand Management |
| 26 | Macau | Flower Rabbit Brand Management |
| 27 | South Korea | Medevice Korea Distribution Corp. |
| 28 | Bangladesh | MD investment Group, Dubai |
| 29 | Bhutan | MD investment Group, Dubai |
| 30 | Pakistan | MD investment Group, Dubai |
| 31 | Sri Lanka | MD investment Group, Dubai |
| 32 | Malta | Hayet Global Trade |
| 33 | Bahrain | J.H. Ruyan Company W.L.L. |
| 34 | Kenya | Hudson Fulton LLC. |
| 35 | United States of America | Gyde Group LLC |
| 36 | Canada | Gyde Group LLC |

# EXHIBIT 3

NOVATION AGREEMENT

THIS NOVATION AGREEMENT (hereinafter the "**Agreement**") is made on 12 April 2018,

**AMONG**:

(1)  **THAI NIPPON RUBBER INDUSTRY PUBLIC COMPANY LIMITED**, a public company duly registered and existing under the laws of Thailand having its registered office at 1 Charoenrat Road, Thung Wat Don, Sathon Bangkok 10120 (hereinafter referred to as "**TNR**");

(2)  **UNITED MEDICAL DEVICES, LLC**, a private company duly registered and existing under the laws of California having its registered office at [1901 Avenue of the stars, Suite 470 Los Angeles, CA 90067] (hereinafter referred to as the "**UMD**"); and

(3)  **PRODUCTS LICENSING LLC**, a private company duly registered and existing under the laws of Delaware having its registered office at 9346 Civic Center Drive, Suite 200, Beverly Hills, CA 90210 (hereinafter referred to as the "**Playboy**"),

   (each hereinafter referred to as a "**Party**", and collectively referred to as the "**Parties**").

**WHEREAS:**

(A)  UMD has entered into the product license agreement between itself and Playboy dated 1 April 2010, as amended (collectively hereinafter referred to as the "**Product License Agreement**").

(B)  Pursuant to the Product License Agreement, Playboy has granted to UMD a license to use the Playboy Properties (as defined in the Product License Agreement) in the design, manufacture, advertising, promotion, sale and distribution of the Products (as defined below).

(C)  UMD agreed to assign its rights and obligations under the Product License Agreement to TNR or TNR's designated entity, and in consideration for UMD's due performance of its obligations hereunder TNR agreed to acquire all rights and obligations under the Product License Agreement from UMD (hereinafter referred to as the "**Transaction**"), in accordance with the provisions of the sale and purchase agreement entered into between TNR and UMD dated 30 March 2018 (hereinafter referred to as the "**Sale and Purchase Agreement**").

(D)  Playboy has acknowledged the potential Transaction and provided the letter of acknowledgement to UMD dated 22 February 2018. However, the Transaction remains subject to a prior written consent of Playboy pursuant to the Product License Agreement.

(E)  The Parties desire to effect a novation of the Product License Agreement, such that TNR is assigned and accepts all the rights and obligations of UMD under the Product License Agreement under the terms and conditions of this Agreement.

**THEREFORE**, the Parties agree as follows:

**1.   INTERPRETATION AND DEFINITIONS**

**1.1   <u>Definitions</u>**

   In this Agreement, the following defined terms have the following meanings:

1

**"Confidential Information"** shall have the meaning as described in Clause 6.1.

**"Effective Date"** means the date of this Agreement.

**"Novated Rights and Obligations"** means all rights, titles and interest, and all obligations and duties, present that are still valid and outstanding and future of UMD under the Product License Agreement.

**"Products"** means merchandise bearing and distributed in connection with the Playboy Properties.

**"Product License Agreement"** shall have the meaning as described in Recital (A).

**"Sale and Purchase Agreement"** shall have the meaning as described in Recital (C).

**"Transaction"** shall have the meaning as described in Recital (C).

**1.2      Interpretation**

In this Agreement, subject to any express contrary indication:

(a)      words (including the definitions in Clause 1.1) importing the singular shall include the plural and *vice versa*;

(b)      any reference to any gender shall include the other genders;

(c)      any reference to a person shall be construed as including a reference to its successors, permitted transferees and permitted assignees;

(d)      any reference to this Agreement or any other agreement or document shall be construed as a reference to that agreement or document as it may have been, or may from time to time be, amended, varied, novated, replaced, restated or supplemented;

(e)      any reference to a Clause shall be construed as a reference to a clause of this Agreement;

(f)      any reference to a Schedule or an Annex shall be construed as a reference to a schedule or an annex to this Agreement; and

(g)      the headings to the Clauses or other provisions of this Agreement are for ease of reference only and are not to be taken into account in the interpretation of this Agreement or its provisions.

**2.      EFFECTIVENESS**

This Agreement shall become effective and binding on the Parties hereto on the Effective Date.

**3.      CONSIDERATION**

Consideration for the novation of the Product License Agreement shall be paid by TNR directly to Playboy to an account to be designated by Playboy as follows:

(a)      U.S.$500,000 (five percent (5%) of the First Payment as defined in the Sale and Purchase Agreement) simultaneously with payment to UMD of the remaining portion of the First Payment; and

2

(b)    U.S.$250,000 (five percent (5%) of the Second Payment as defined in the Sale and Purchase Agreement) simultaneously with payment to UMD of the remaining portion of the Second Payment.

TNR and UMD acknowledge and agree that U.S.$15,000,000 (the sum of the First Payment and the Second Payment as such terms are defined in the Sale and Purchase Agreement) are the sole consideration and/or value that TNR is paying or providing to UMD for the Transaction and/or the Assigned Rights as defined in the Sale and Purchase Agreement.

**4.    NOVATION**

4.1    All terms and conditions of the Product License Agreement shall be unaffected except as expressly provided herein.

4.2    The Parties agree to a novation of the Product License Agreement by substitution of UMD thereunder with TNR. With effect on the Effective Date:

(a)    TNR shall replace UMD under the Product License Agreement, whereby the Novated Rights and Obligations to TNR shall be assumed by TNR. Playboy and TNR agrees to be bound by and shall comply with the Product License Agreement, as if TNR was the party to the Product License Agreement instead of UMD.

    For the avoidance of doubt, TNR is agreeing to be bound as "Licensee" as defined in the Product License Agreement.

(b)    Playboy releases UMD from UMD's obligations, duties and liabilities to Playboy under the Product License Agreement to the extent related to the period, and which arise, as of or after the Effective Date.

    For the avoidance of doubt, UMD continues to assume and has responsibility and liability for any compliance, liabilities, claims and demands whatsoever in respect of the Product License Agreement that occurs prior to the Effective Date;

(c)    UMD releases Playboy from its obligations, duties and liabilities to UMD under the Product License Agreement and UMD agrees that it has no further rights under the Product License Agreement, in each case, to the extent related to the period, and which arise, as of or after the Effective Date as if TNR were named as a Party to the Product License Agreement in place of UMD;

(d)    TNR agrees with Playboy to assume the Novated Rights and Obligations of UMD under the Product License Agreement, to the extent related to the period, and which arise, as of or after the Effective Date.

    For the avoidance of doubt, TNR shall not assume and has no responsibility or liability for any compliance, liabilities, claims and demands whatsoever in respect of the Product License Agreement that occurs prior to the Effective Date;

(e)    Playboy consents to and accepts the acceptance of the novation of the Novated Rights and Obligations under the Product License Agreement, to the extent related to the period, and which arise, as of or after the Effective Date as if TNR were named as a Party to the Product License Agreement in place of UMD;

(f)     Playboy agrees that it will not assert against TNR any claim or defence that they may have or have had against UMD under the Product License Agreement to the extent related to the period and arises prior to the Effective Date.

each of the foregoing events and agreements being conditional on, and taking effect simultaneously with, the others.

## 5.   REPRESENTATIONS AND WARRANTIES

Each of the Parties warrants to the other Parties that the statements set out below are true and accurate as of the Effective Date:

(a)     it is validly existing and is a company duly incorporated under the law of its jurisdiction of incorporation;

(b)     it has full power and authority to sign and deliver this Agreement and to exercise all its rights and perform all its obligations under this Agreement and has taken all necessary corporate action to authorize the execution of this Agreement and the exercise of its rights and the performance of its obligations hereunder, and this Agreement constitutes its valid and legally binding obligation, enforceable in accordance with its terms;

(c)     all actions, conditions and things required to be taken, fulfilled and done (including the obtaining of any necessary consents from third parties) in order (i) to enable it lawfully to enter into, exercise its rights and perform and comply with its obligations under this Agreement, and (ii) to ensure that those obligations are valid, legally binding and enforceable, have been taken, fulfilled and done;

(d)     neither the signing and delivery of this Agreement nor compliance with the terms and provisions hereof will conflict with, or result in a breach of (i) its memorandum of association or articles of association, (ii) any applicable law or regulation, (iii) any order, writ, injunction or decree of any court or governmental authority or agency, or (iv) any agreement or instrument to which it is a party or by which it is bound; and

(e)     each Party is entering into this Agreement in its own capacity and not on behalf of any other person.

## 6.   INDEMNITY

UMD hereby undertakes to indemnify TNR and Playboy fully and keep TNR and Playboy indemnified fully at all times against any loss, damage or costs suffered, sustained or incurred by TNR and/or Playboy as applicable as a result of any claim arising from the breach of the terms of the Product License Agreement by UMD that occurs prior to the Effective Date.

## 7.   CONFIDENTIALITY

7.1     The Parties shall treat all correspondences and negotiation between the Parties, provisions of this Agreement, knowledge and information in relation to the transactions contemplated under this Agreement and existence as well as any and all information, material, documents and data made available in writing, visual or machine readable form or orally or other documents derived from, containing or reflecting such information that was and will be exchanged between the Parties to comply with its responsibilities under this Agreement and with respect to the Parties and the Transaction ("**Confidential Information**") as strictly confidential (whether or not such Confidential Information is marked or identified as being confidential).

4

7.2    The Parties shall not use such Confidential Information otherwise than for the purposes set forth in this Agreement and shall not disclose the Confidential Information to any third party except in any of the following manners:

(a)    with the prior written consent of the Party who may be affected by such disclosure;

(b)    for the disclosure to any person (including any key personnel of the relevant financial institution, advisor or consultant of each Party) who needs to know the Confidential Information in order for a Party to perform under this Agreement, or so that the conditions under this Agreement can be fulfilled, provided always that the disclosing Party shall be obligated to ensure that such person be duly informed of the confidentiality of the Confidential Information and the breach by such person of this obligation shall be deemed as the breach of obligation under this Clause by such disclosing Party;

(c)    for the disclosure as required by any applicable law, court order, central bank, or any regulatory body which including but not limited to the Securities and Exchange Commission and the Stock Exchange;

(d)    such disclosure or use is required for the purpose of any judicial proceedings arising out of this Agreement; or

(e)    if the information has come into the public domain through no fault of that Party.

7.3    The Parties understand and agree that the provisions under this Clause 6 shall survive the termination of this Agreement.

## 8.    NOTICES AND OTHER COMMUNICATIONS

8.1    Any notice, communications or documents required to be given by a Party to the other Party under this Agreement shall be given in the English language and shall be deemed validly served by hand delivery, or sent by registered pre-paid post (or by registered airmail in the case of international service), or by e-mail to such address set out in this Clause or to such other address, or e-mail address as may be notified by one Party to the other Parties by a like notice hereunder.

8.2    The initial address and e-mail address of the Parties are:

(a)    to TNR:

Attention:        Chanin Thiencharoen
Address:          1 Charoenrat Road, Thung Wat Don, Sathon Bangkok, Thailand 10120
E-mail address:   chanin_t@tnrcondom.com

(b)    to UMD:

Attention:        Jimmy Esebag
Address:          1901 Avenue of the Stars, Suite 470 Los Angeles, CA 90067
E-mail address:   Jimmy@umdworld.com

(b)    to Playboy:

Attention:        VP, Global Licensing
Address:          9346 Civic Center Drive, Suite 200
                  Beverly Hills, CA 90210

5

E-mail address:   rpatel@playboy.com

8.3     Any such notice or communication shall be deemed to have been served:

(a)     if delivered by hand, at the time of delivery;

(b)     if posted by pre-paid post or by registered airmail or by courier service, at the expiration of five days after the envelope containing the same shall have been put into the post or have been received by the relevant courier company (as the case may be); or

(c)     if sent by e-mail shall be deemed to have been given when received into the addressee's e-mail system.

**9.      COSTS AND EXPENSES**

Each party hereto shall bear its own costs and expenses incurred in connection with the negotiation, preparation and implementation of this Agreement and the matter contemplated hereunder, including the fees and disbursements or their respective legal and other advisers.

**10.     GOVERNING LAW**

This Agreement shall be subject to, construed in accordance with and governed by the Laws of the State of California.

**11.     MISCELLANEOUS**

11.1    Each Party shall, in good faith, cooperate with each other and execute such instruments or documents and take such other actions as may reasonably be requested from time to time in order to carry out, evidence or confirm their rights or obligations or as may be reasonably necessary or helpful to give effect to this Agreement.

11.2    Any modification or alteration of any Clause of this Agreement will not be valid unless made in writing and duly signed by an authorized representative of all Parties.

11.3    This assignment provision as outlined in Paragraph 5.(b) of the Product License Agreement shall apply to this Agreement.

11.4    The failure of either Party at any time to exercise any of its rights under this Agreement shall not be deemed a waiver of any such rights or in any way prevent either Party from subsequently asserting or exercising any such rights.

11.5    This Agreement constitutes the entire agreement between the Parties relating to the subject matter hereof, superseding all prior agreements, memorandum of understandings, letter of intents or undertakings, oral or written.

11.6    This Agreement may be executed in counterparts, each of which shall be deemed to be an original, but together shall constitute one instrument.

*[SIGNATURE PAGE FOLLOWS]*

**IN WITNESS WHEREOF,** this Agreement is made and signed in three identical copies in English. All Parties have read and understood this Agreement and affixed their signatures and companies seals (if any) to this Agreement on the date first above written.

Signed for and on behalf of

**THAI NIPPON RUBBER INDUSTRY PUBLIC COMPANY LIMITED**

by _____

( AMORN DARARATTANARD J. )

**UNITED MEDICAL DEVICES, LLC**

by _____

**PRODUCTS LICENSING LLC**

by _____

( REENA PATEL                )

in the presence of:

_____ Witness

( Kathleen Brower          )

_____ Witness

( Chevin Treecharveen )

_____ Witness

(                                        )

# EXHIBIT 4

## AMENDMENT TO NOVATION AGREEMENT

THIS AMENDMENT TO NOVATION AGREEMENT (hereinafter the "**Amendment**") hereby amends that certain Novation Agreement made on April 12, 2018 (the "**Agreement**"),

AMONG:

(1) **THAI NIPPON RUBBER INDUSTRY PUBLIC COMPANY LIMITED**, a public company duly registered and existing under the laws of Thailand having its registered office at 1 Charoenrat Road, Thung Wat Don, Sathon Bangkok 10120 (hereinafter referred to as "**TNR**");

(2) **UNITED MEDICAL DEVICES, LLC**, a private company duly registered and existing under the laws of California having its registered office at 1901 Avenue of the stars, Suite 470 Los Angeles, CA 90067 (hereinafter referred to as the "**UMD**"); and

(3) **PRODUCTS LICENSING LLC**, a private company duly registered and existing under the laws of Delaware having its registered office at 9346 Civic Center Drive, Suite 200, Beverly Hills, CA 90210 (hereinafter referred to as the "**Playboy**"),

(each hereinafter referred to as a "**Party**", and collectively referred to as the "**Parties**").

This Amendment is hereby incorporated into the Agreement by reference. All capitalized terms not otherwise defined shall have the meanings ascribed to them in the Agreement.

**WHEREAS**, pursuant to Clause 11.2 of the Agreement, the Parties wish to amend the Agreement as set forth herein.

**THEREFORE**, in consideration of the mutual promises and covenants herein and for other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the Parties agree as follows:

1.  The definition of "Effective Date" set out in Clause 1.1 is hereby deleted and replaced with the following:

    "**Effective Date**" means the date on which Playboy confirms in writing its receipt of U.S.$500,000 (Playboy's share of the First Payment as defined in the Sale and Purchase Agreement) from UMD as described in Clause 3(a) of this Agreement.

2.  Clause 3 of the Agreement is hereby deleted in its entirety and replaced with the following:

    3.  **CONSIDERATION**

        Immediately upon UMD's receipt from TNR, consideration for the novation of the Product License Agreement shall be paid by UMD directly to Playboy to an account to be designated by Playboy as follows:

        (a) U.S.$500,000 (Playboy's share of the First Payment as defined in the Sale and Purchase Agreement); and

        (b) U.S.$250,000 (Playboy's share of the Second Payment as defined in the Sale and Purchase Agreement).

1

TNR and UMD acknowledge and agree that U.S.$15,000,000 (the sum of the First Payment and the Second Payment as such terms are defined in the Sale and Purchase Agreement) are the sole consideration and/or value that TNR is paying or providing to UMD for the Transaction and/or the Assigned Rights as defined in the Sale and Purchase Agreement.

3.    Except as expressly modified above, all of the other terms and conditions of the Agreement shall remain in full force and effect and shall be applicable to the terms hereof; provided that, to the extent a provision of this Amendment conflicts with a provision of the Agreement, the provision in this Amendment shall govern and control.

*[SIGNATURE PAGE FOLLOWS]*

2

**IN WITNESS WHEREOF,** this Agreement is made and signed in three identical copies in English. All Parties have read and understood this Agreement and affixed their signatures and companies seals (if any) to this Agreement on the date first above written.

Signed for and on behalf of

**THAI NIPPON RUBBER INDUSTRY PUBLIC COMPANY LIMITED**

by _____

( AMORN DARARATTANARO )

**UNITED MEDICAL DEVICES, LLC**

by _____

(

**PRODUCTS LICENSING LLC**

by _____

(                                    )

in the presence of:

_____ Witness

(                                    )

_____ Witness

( Chanin Thincharoen. )

_____ Witness

( Nachave Amo )

3

**IN WITNESS WHEREOF,** this Agreement is made and signed in three identical copies in English. All Parties have read and understood this Agreement and affixed their signatures and companies seals (if any) to this Agreement on the date first above written.

Signed for and on behalf of

**THAI NIPPON RUBBER INDUSTRY PUBLIC COMPANY LIMITED**

by _____

   (                      )

**UNITED MEDICAL DEVICES, LLC**

by _____

   (                      )

**PRODUCTS LICENSING LLC**

by _____

   (                      )

in the presence of:

_____ Witness

(                      )

_____ Witness

(                      )

_____ Witness

(                      )

3