Cyndie M. Chang (SBN 227542)
  CMChang@duanemorris.com
Angelica Zabanal (SBN 303329)
  AZabanal@duanemorris.com
Diane Byun (SBN 337155)
  DByun@duanemorris.com
**DUANE MORRIS LLP**
865 South Figueroa Street, Suite 3100
Los Angeles, CA  90017-5450
Telephone: +1 213 689 7400
Fax: +1 213 689 7401

Mark Holscher (SBN 139582)
mark.holscher@kirkland.com
Kristin Rose (SBN 278284)
kristin.rose@kirkland.com
**KIRKLAND & ELLIS LLP**
555 South Flower Street
Los Angeles, CA 90071
Telephone:   (213) 680-8400
Facsimile:   (213) 680-8500

Attorneys for Plaintiff
*Thai Nippon Rubber Industry Public Limited Company*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| THAI NIPPON RUBBER INDUSTRY PUBLIC LIMITED COMPANY, | Case No. 2:21-cv-09749-JFW |
| Plaintiff, | **PLAINTIFF'S FIRST AMENDED COMPLAINT FOR:** |
| v. | **(1) VIOLATION OF CALIFORNIA'S FRANCHISE RELATIONS ACT** |
| PLAYBOY ENTERPRISES INTERNATIONAL, INC., PRODUCTS LICENSING, LLC, and NICHOLAI ALLEN, | **(2) VIOLATION OF CALIFORNIA'S FRANCHISE INVESTMENT LAW** |
| Defendants. | **(3) BREACH OF CONTRACT** |
| | **(4) BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING** |
| | **(5) VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW** |
| | **(6) INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS** |
| | **(7) INTENTIONAL INTERFERENCE WITH** |

**PROSPECTIVE ECONOMIC RELATIONS**

**(8) NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS**

**(9) FRAUDULENT INDUCEMENT TO CONTRACT**

**(10) CONVERSION**

**(11) BREACH OF FIDUCIARY DUTY**

**DEMAND FOR JURY TRIAL**

2

COMES NOW, Plaintiff THAI NIPPON RUBBER INDUSTRY PUBLIC LIMITED COMPANY (hereinafter referred to as "**Plaintiff**" or "**TNR**"), and for causes of action against PLAYBOY ENTERPRISES INTERNATIONAL, INC. and PRODUCTS LICENSING, LLC ("**Playboy**"), and NICHOLAI ALLEN ("**Allen**," and, together with Playboy, "**Defendants**"), allege as follows:

## NATURE OF THE ACTION

1.     TNR brings this action to recover more than $100 million in damages caused by Playboy's blatant bad-faith conduct.  TNR invested tens of millions of dollars to obtain and maintain a license with Playboy for sexual wellness products—specifically, condoms and lubricants.  But, rather than acting in good faith as required by the license, Playboy engaged in a deceitful and improper campaign to move Playboy away from its historic magazine business and to take the license back for itself out of envy of TNR's profits and success.  Among other things, Playboy surreptitiously retained TNR's global sales consultant Allen to work for Playboy, paid off and incentivized Allen for TNR's proprietary information, misappropriated TNR's funds to pay for Playboy's sexual wellness operations, duped TNR into narrowing its license, and terminated TNR through a fraudulent pre-textual audit designed only to steal TNR's business.

2.     Because of Playboy's wrongful conduct, TNR now brings this action for violation of California's Franchise Relations Act, violation of California's Franchise Investment Law, breach of contract, breach of the implied covenant of good faith and fair dealing, violation of California's Unfair Competition Law, intentional interference with contractual relations, intentional interference with prospective economic relations, negligent interference with prospective economic relations, fraudulent inducement to contract, and conversion.

## THE PARTIES

3.     Established in Thailand, TNR has been an OEM manufacturer of high-quality condoms and lubricants since 1993.  TNR is a company incorporated under the

3

laws of Thailand with its principal place of business at 1 Charoenrat Road, Thung Wat Don Subdistrict, Sathon District, Bangkok 10120.   TNR is deemed a citizen of Thailand for purposes of 28 U.S.C. § 1332(c).

4.     Playboy Enterprises International, Inc. is a corporation formed under the laws of Delaware with its principal place of business at 10960 Wilshire Blvd., Suite 2200, Los Angeles, California 90024.   Playboy Enterprises International, Inc. is deemed a citizen of Delaware and California for purposes of 28 U.S.C. § 1332(c).

5.     Upon information and belief, Products Licensing, LLC is a limited liability company formed under the laws of Delaware with its principal place of business at 10960 Wilshire Blvd., Suite 2200, Los Angeles, California 90024. Products Licensing, LLC, has as its sole member Playboy International, Inc., a corporation formed under the laws of Delaware with its principal place of business at 10960 Wilshire Blvd., Suite 2200, Los Angeles, California 90024.   Products Licensing, LLC is therefore deemed a citizen of Delaware and California for purposes of 28 U.S.C. § 1332(c).

6.     Nicholai Allen is a natural person and, upon information and belief, a resident of Los Angeles County, California.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(2) based on diversity of citizenship between TNR and Defendants.

8.     The amount in controversy, without interests and costs, exceeds $75,000.

9.     Venue lies in the Central District of California pursuant to 28 U.S.C. § 1391(b) and (c).

## FACTUAL ALLEGATIONS

### A.     Playboy Enters Into the Product License Agreement with TNR

10.     For nearly three decades, TNR has operated a successful business as an OEM manufacturer of high-quality condoms and, more recently, lubricant products. Since November 2016, TNR has been publicly traded on the Stock Exchange of

4

Thailand ("**SET**"), trading under the ticker "TNR."

11. On April 1, 2010, Playboy entered into a Product License Agreement ("**PLA**") with United Medical Devices, LLC ("**UMD**"), TNR's predecessor-in-interest, with the license due to expire on June 30, 2020. The PLA granted UMD the right to design, manufacture, advertise, promote, sell, and distribute condoms bearing Playboy's mark (the "**Products**"). As explained more fully below, TNR became the licensee[1] under the PLA through a novation of the Agreement on April 12, 2018. A copy of the PLA is attached hereto as **Exhibit 1**.

12. The PLA offered Playboy a way to leverage and increase its worldwide brand recognition and market resources to sell products in the sexual wellness space.

13. Shortly after UMD and Playboy entered the PLA in 2010, UMD approached TNR to serve as the manufacturer of the Products through its plant in Thailand, which TNR did through the entirety of UMD's term as the licensee.

14. Upon information and belief, at some point prior to April 1, 2015, Playboy Enterprises International, Inc. assigned its rights under the Product License Agreement to an affiliate company, Products Licensing LLC.

15. Between 2015 and 2017, the PLA underwent two significant amendments. The Third Amendment to the PLA extended the term of the license by five (5) years to end on March 31, 2025, and it changed the operative choice of law provision and forum selection clause to reflect that California law would govern the PLA and all disputes arising out of the PLA would be heard only in the California state or federal courts in the County of Los Angeles, Central District.

16. The Fifth Amendment further extended the Expiration Date in Schedule 9 of the PLA from March 31, 2025, to December 31, 2027—subject to the Renewal

---

[1] As described more fully below, the terms of the PLA created a franchise and thus placed Playboy and TNR in a franchisor-franchisee relationship. The First Amended Complaint in certain instances refers to the parties as licensor and licensee consistent with terms used in the PLA; those references are without prejudice to TNR's claims under California's Franchise Relations Act and Franchise Investment Law.

Conditions stipulated in Paragraph 1(b)(ii)—and it also expanded the definition of Products in Schedule 6 of the PLA to include certain lubricants in addition to condoms, as follows: "Condoms and non-medical personal lubricants (water, silicone or oil based to be used for personal use) only bearing and sold in connection with the Playboy Properties, as defined in the Agreement."

17.     During the entirety of UMD's term as licensee, the company's working relationship with Playboy was overseen by UMD's senior vice-president, Allen.  Allen did a variety of work that included everything from research and development to facilitating relationships with retailers and other purchasers of Products.

**B.     TNR Replaces UMD as the Licensee Under the Product License Agreement**

18.     In or around early 2018, UMD and TNR discussed the possibility of TNR acquiring UMD's rights under the PLA.  Once the parties decided to move forward, Dr. Reena Patel[2] ("**Patel**")—then Chief Operating Officer, Global Licensing & Joint Ventures at Playboy— issued a letter on behalf of Playboy to TNR and UMD respectively, confirming the validity of Playboy's license and its issuance to UMD.

19.     With Playboy's consent, TNR and UMD entered into the Sale and Purchase Agreement ("**SPA**") through which UMD assigned its rights under the PLA—as well as several distributor contracts—to TNR in exchange for approximately $15 million in consideration (including $750,000 as initial consideration under the Novation Agreement, as explained below).  TNR also invested approximately an additional $13 million for expenses to perform under the license, and paid significantly more in fees per year to Playboy than the predecessor licensee.  A copy of the SPA is attached hereto as **Exhibit 2**.

_____

[2] Patel was a central player in Playboy's relationship with UMD—and, later, with TNR.  Patel has held a number of key positions within the Playboy family of companies.  Patel is currently Playboy's Chief Operating Officer, Global Licensing & Joint Ventures, and since January 2021, she has also held the role of President, International at PLBY Group, Inc.  *See* https://www.linkedin.com/in/reenavpatel.

20.     The SPA included several terms meant to facilitate the transfer of UMD's operations to TNR and to allow TNR to establish and maintain relationships with retailers in the United States, which would be crucial to TNR's success as the new licensee.

21.     Notably, Clause 4.4 of the SPA required UMD to pay Allen for one (1) year from the execution of the agreement to assist TNR's efforts to assume the responsibilities assigned to it and ensure the smooth transition of the PLA and Sub-License agreements to TNR as the assignee.

22.     The sales relationship with Walmart, Inc. ("**Walmart**") was central to TNR's plans for its U.S.-based condom and lubricant business, one it sought to develop during TNR's term as licensee.  Thus, Clause 6.2(b) of the SPA required an appropriate representative of UMD to accompany TNR officials to the USA and connect TNR to Walmart's buyer so that TNR could negotiate an agreement for the sale and distribution of the Products (*e.g.*, condoms and lubricants bearing the Playboy mark) to Walmart stores during TNR's term as Playboy's licensee.

23.     Shortly after entering the SPA—and as contemplated by that agreement—Playboy, UMD, and TNR entered into the Novation Agreement ("**Novation Agreement**"), and an Amendment thereto, under which the parties agreed to novate the PLA such that UMD's rights and obligations under the PLA were transferred to TNR, who would replace UMD as the licensee, in exchange for $750,000 in consideration paid by TNR and sent to UMD as part of the SPA's purchase price, which UMD would then pay to Playboy.  Patel executed the Novation Agreement and the Amendment on Playboy's behalf and thereby knew of the SPA's terms.  Playboy expressed no objection or concern to TNR regarding UMD's course of performance as a licensee.  A true and correct copy of the Novation Agreement and the Amendment are attached hereto as **Exhibits 3 and 4** respectively.

24.     Section 11.1 of the Novation Agreement provided that "[e]ach Party shall, in good faith, cooperate with each other and execute such instruments or

documents and take such other actions as may reasonably be requested from time to time in order to carry out, evidence or confirm their rights or obligations or as may be reasonably necessary or helpful to give effect to this Agreement," and the purpose of the Novation Agreement was to enable TNR to perform as the licensee under the PLA.

25.    Under the PLA, Playboy granted TNR, by way of a novation from UMD, the right to design, manufacture, advertise, promote, sell, and distribute condoms bearing Playboy's mark in an area covering more than 180 countries (the "**Territory**"), which includes California.

26.    Playboy granted TNR an exclusive right to design, manufacture, advertise, promote, sell, distribute, and conduct research and development for the Products in the Territory in the manner specified by the PLA.

27.    In exchange, TNR paid to Playboy guaranteed and earned royalties in the seven-figure range and the fee under the novation as described below.

28.    Further, the PLA[3] imposed terms upon TNR that placed Playboy in a position of significant control over TNR's use of Playboy's mark to engage in business related to the Products, including but not limited to:

    **a.**    Section 1.a(iv) dictated controls around authorized Playboy-branded stores in various countries around the world which included conditions on TNR's ability to sell the Products or similar products to licensees of Playboy-branded stores in certain territories.

    **b.**    Section 1.d of the PLA limited TNR's exercise of its exclusive rights under the license to the Territory and gave Playboy the right to deem any sales or distributions of the Products or use of Playboy's mark outside the Territory to be an incurable default;

    **c.**    Sections 2.h-i conditioned TNR's ability to sell Products on

---

[3] The PLA contains a confidentiality provision that, among other things, prohibits disclosure of the Agreement.  Playboy has consented to the filing of the PLA in redacted form in connection with TNR's First Amended Complaint.

receiving prior approval from Playboy, and it imposed a series of strict requirements on product quality and the related packaging and materials used in connection with the Products, such as prototypes, photography, cartoons, containers, labels, wrappers, packaging and other inner and outer packaging materials, fixtures, displays, artwork and printing, advertising, sales, marketing and promotional materials.  TNR had to seek written approval from Playboy (or its designee) of samples for each of the Products and the materials at each stage of development.  There were severe consequences for nonconformity, including suspension of TNR's operations and destruction or confiscation of nonconforming Products;

      **d.**    Section 2.o(i)-(ii) required TNR to make advertising, promotion, and marketing expenditures in a given License Year (as measured by Section 1.c) related to the Products that totaled not less than 3% of either its net sales or minimum net sales, whichever was greater, and to submit its advertising/promotional and marketing plan for Playboy's approval on a yearly basis, in Playboy's specified format, and TNR was then required to follow the approved marketing plan in connection with sales of the product.  Relatedly, TNR was required to seek preapproval of any public relations efforts related to the Products and to cancel any disapproved efforts;

      **e.**    Paragraph S.5 and Section 2.c restricted TNR's use of advertising, promotion, sales materials to use in the Territory and restricted its distribution of the Products to those distribution channels specified in the PLA;

      **f.**    Paragraph 2.l required TNR to affix Playboy's official holograms to the Products for certain sales of Products outside the United States and to provide reports with certain metrics about hologram usage;

      **g.**    Sections 2.f-g required to keep its books in the manner prescribed by Playboy, subjected TNR to a twice-yearly audit at Playboy's discretion, set a two-year retention policy for financial records in the event of a dispute between the parties about the agreement, and required TNR to bear the cost for any audits revealing certain deficiencies;

**h.**      Section 2.k required TNR to seek pre-approval for the use of any subcontractor or supplier to manufacture or distribute the Products, and to engage said subcontractors or suppliers using Playboy's specified contracts; and

**i.**      Paragraph S.10 and Section 1.e of the PLA also required TNR to meet minimum net sales amounts each year and specified the consequences of failing to meet those targets, which included Playboy declaring the license to be non-exclusive as to any region of the territory or terminating the license.

29.      In accordance with California law, by way of novation in 2018, the PLA between Playboy and TNR and the significant control Playboy exerted over TNR's use of Playboy's mark created a franchisee/franchisor relationship.  However, upon information and belief, Playboy did not register the franchise with California's Department of Financial Protection and Innovation ("**DFPI**"), nor did it disclose certain information required by California's Franchise Investment Law ("**FIL**").  *See* Cal. Corp. Code §§ 31000 et seq.

30.      Playboy's failure to register the franchise and provide the necessary disclosures impeded TNR's full understanding of the nature of its new relationship with Playboy.

31.      Relatedly, and simultaneous with TNR's assumption of rights and liabilities under the Novation Agreement, Playboy and TNR entered the Seventh Amendment to the PLA.  In Paragraph 1 of the Seventh Amendment, Playboy promised and covenanted to provide ongoing "services" to aid TNR's performance under the PLA, including "product approvals, branding guidelines, brand presentations, marketing materials, and intellectual property updates."  Thus, Paragraph 1 of the Seventh Amendment served as an affirmative representation by Playboy to offer increased support[4] and assistance to TNR.

---

[4] As related to product approvals, Paragraph 1 of the Seventh Amendment built upon Playboy's obligation in Section 2.i to ensure that such approvals were not "unreasonably denied, delayed, or conditioned."

32.   Notably, the conduct Playboy would later raise as an issue with TNR following the 2021 audit included conduct that previously presented no problem to Playboy at the time of the parties' novation and during the entirety of UMD's term.

**C.   TNR Assembles its U.S. Operations and Hires Nicholai Allen**

33.   At the time TNR became the licensee, it had no sales representatives or distribution network in the United States, and members of TNR's executive team in Thailand had little familiarity with the American market.  Thus, Allen's previous position at UMD and experience with the Playboy condoms and lubricant business placed him in a singular and essential position to guide TNR's transition efforts and left TNR heavily dependent upon Allen.  TNR engaged Allen as its global sales consultant for the Products through an agreement with Allen's marketing and sales company in California, Monarch Digital Media LLC ("**Monarch**").

34.   As contemplated by Clause 4.4 of the SPA, Allen quickly assumed an integral role in TNR's operations during the transition period that would allow TNR to get up to speed in conducting and managing the Playboy business in the US under the PLA, just as UMD had done previously.  Allen also conducted business on TNR's behalf.  In pertinent part, TNR structured its nascent U.S. business in accordance with—and in reliance upon—Allen's recommendations and guidance, which TNR understood to be entirely consistent with UMD's practices when UMD was the licensee.  At no time did Playboy instruct TNR to deviate from UMD's course of performance under the PLA, nor did Playboy tell TNR that any of UMD's performance had breached the PLA or that it had ever conducted an audit of UMD.

35.   To facilitate the nuts-and-bolts of conducting its US operations, TNR entered into a pair of agreements with Allen personally and Monarch, through which TNR would remunerate funds expended by Allen and/or his company for management of the Playboy condoms business on TNR's behalf.

36.   As an extension of Allen, Monarch's operations were at the core of TNR's relationship with Allen as well as its US business efforts on behalf of Playboy.

Under the arrangement between Monarch and TNR, and to manage the Playboy condom and lubricant business, Monarch sought out, engaged, and paid the various contractors, suppliers, and service providers that TNR needed to accomplish its business objectives set out by Playboy.  For all the services provided, Monarch (through Allen) would then invoice TNR monthly for those services, which TNR reimbursed as required under the agreements.

37.    TNR also paid Monarch a monthly service fee to manage the US business for TNR and to obtain global customers for TNR.

38.    As contemplated by the SPA, the relationship with Walmart was of paramount importance to the Playboy condom and lubricant business.  Walmart imposed a series of requirements upon TNR to become an approved supplier.

39.    For example, some retailers, distributors and other relationships prefer an approved distributor use a U.S. bank.  To facilitate that element of TNR's U.S. distribution, Allen incorporated Freedom Brands Corp. ("**Freedom**") in Las Vegas, Nevada, naming himself as Freedom's President and Director on March 19, 2019. Monarch paid for some of Freedom's start-up expenses and costs, which TNR reimbursed. Other than reimbursing those expenses and costs, Freedom remained a separate entity from TNR.

40.    Freedom was set up to distribute the Products in the US on TNR's behalf.

41.    TNR later entered into the Walmart General Merchandise Agreement with Walmart, which established the standard terms and conditions under which TNR would serve as a supplier to sell certain Products in Walmart stores domestically ("**General Merchandise Agreement**").

42.    TNR's entry into the General Merchandise Agreement was predicated upon having passed the rigorous compliance evaluation process to which Walmart subjected TNR before it would authorize sales of condoms and lubricants.

43.    Finally, to facilitate sales with Walmart under the General Merchandise Agreement, Freedom entered into the Managed Services Agreement with Coastal

Solutions Group LLC ("**CSG**"), appointing CSG as its agent to promote and sell the Products in Walmart's US stores ("**Managed Services Agreement**").

### D. Playboy Systematically Undermines TNR's Rights Under the PLA

#### a. Playboy Induces TNR to Enter the Eighth Amendment

44.     Upon information and belief, between June 2019 and July 2019, Patel, Jared Dougherty ("**Dougherty**") (President of Playboy), and Allison Kopcha ("**Kopcha**") (President of Playboy Licensing and Joint Ventures)[5] sought to deprive TNR of any ability to sell non-liquid or non-gel lubricants nor cannabis, cannabidiol and other related products ("**CBD products**") related to the Playboy business—and allow Playboy to develop and sell related products directly—by manipulating Allen to obtain TNR's CEO, Amorn Dararantanaroj ("**Khun Amorn**")'s[6] signature on the Eighth Amendment to the PLA under false pretenses and on terms that restricted TNR's sales of those products.  Playboy knew that Allen was TNR's global sales consultant.  Playboy also knew that any false information it conveyed or failed to disclose to Allen about the Eighth Amendment would be communicated to TNR through Allen.

45.     As a material inducement to enter into the Eighth Amendment, Playboy (i) concealed or suppressed the material fact that the PLA's scope included CBD condoms and lubricants; (ii) concealed or suppressed the material fact that Playboy needed the Eighth Amendment to lawfully implement its CBD growth plan; and (iii) made a false and fraudulent representation that the PLA scope excluded CBD condoms and lubricants.

46.     At 7:56 PM on July 8, 2019, Patel failed to inform Allen that CBD

---

[5] Upon information and belief, during the time of the events surrounding Playboy's efforts to induce TNR's surrender of rights to sell CBD products and wipes, Allison Kopcha was affiliated with Playboy's brand management agency, CAA-CBG (Creative Artists Agency and Global Brands Group), later joining Playboy in January 2020.  *See* https://www.linkedin.com/in/allison-kopcha-5331785.

[6] "Khun" is a Thai honorific loosely translating to "Mister" in English.

condoms and lubricants were in fact included in the scope of the PLA and instead stated: "To your own point in a previous email you, [sic] you have stated that THC/CBD and products derived from [c]annabis plants are not within the current scope of TNR's rights which is what the amendment relates to."  In doing so, Playboy intentionally concealed or suppressed the material fact that CBD condoms and lubricants were included in the scope of the PLA.

47.    At 8:26 PM on July 8, 2019, Patel re-affirmed the false narrative that CBD condoms and lubricants were not a part of the initial PLA grant when she e-mailed Allen: "Reality is that THC/CBD are not part of their [TNR's] grant (per your own note) and would be subject to our approval and grant."  In doing so, Playboy (i) intentionally concealed or suppressed the fact that Playboy needed the Eighth Amendment to lawfully implement its 2021 growth plans to develop its competing CBD sexual wellness product line—CBD by Playboy— without violating the terms of the PLA;[7] and (ii) made a false representation that CBD condoms and lubricants were excluded from the scope of the PLA.

48.    On July 22, 2019, Patel sent the final version of the Eighth Amendment, which significantly narrowed the definition of Products to include "[c]ondoms and non-medical personal lubricants (water, silicone or oil based) **in gel or liquid form only** to be used for personal use only" (emphasis added) and to expressly exclude CBD products, without any consideration on Playboy's part.

49.    Per Schedule 6, as modified by the Fifth Amendment to the PLA, there is no express or implicit exclusion of CBD condoms or lubricants from the scope of the PLA.  Put simply, the final and agreed-upon language of the PLA, prior to the Eighth

---

[7] Having cleared TNR from the field, Playboy now sells two CBD lubricant products directly to consumers through www.pleasureforall.com: (i) CBD Arousal Spray by Playboy (a "sensual and warming stimulating oil" meant for "the vulva and clitoris" with 250mg of Broad-Spectrum CBD); and (ii) CBD Intimacy Gel by Playboy (an "incredible blend of water-based ingredients" and 250mg Broad-Spectrum CBD "designed to heighten the pleasure of your intimate experience.").

Amendment, clearly grants TNR a license to all condoms and non-medical personal lubricants bearing and sold in connection with Playboy's marks and images, including CBD condoms and lubricants.

50.     Playboy made representations to convince TNR, through Allen, that the Eighth Amendment needed to be signed urgently, and its terms simply affirmed the alleged 'fact' that CBD products were not in the scope of the initial PLA and limited the scope of TNR's lubricant rights in an insignificant manner that would not harm TNR's operations given TNR's focus on condoms—even though Playboy knew or believed none of those representations to be true.

51.     Upon information and belief, Allen—relying upon Playboy's fraudulent conduct regarding the initial scope of the PLA, the Eighth Amendment's effects on TNR, and Playboy's legal need for the Eighth Amendment—met with Khun Amorn while in Thailand, on August 3, 2019 to obtain Khun Amorn's assent to the Eighth Amendment on behalf of TNR.  Khun Amorn was unavailable when Allen called, but when Allen pressed that the document needed to be signed urgently, despite it being a Saturday, Khun Amorn agreed to visit Allen's hotel later that day.

52.     Khun Amorn met Allen at the hotel as planned.  Moreover, given the seemingly urgent nature of the situation, Khun Amorn was not able to seek or consult legal counsel prior to signing the document.

53.     Allen repeated the substance of the representations Playboy made to him about the urgent need to sign the document as well as the justifications for doing so, as represented by Playboy.

54.     The practical result of the Eighth Amendment was to keep TNR out of the market for products involving CBD and other cannabinoids, as well as to prevent TNR from making lubricants in a non-liquid or non-gel form—for example, in dry or aerosol form— and signing the Eighth Amendment worked to TNR's detriment because TNR intended to develop CBD lubricants.  Due to Khun Amorn's lack of direct familiarity with the various operative agreements and their effects, Khun Amorn

was at a disadvantage regarding the document Playboy needed him to sign.  Thus, Khun Amorn relied upon Allen's characterization of the document and its contents, which had been influenced by Playboy's intentional concealment or suppression of material facts and strategically crafted sense of urgency.  Given the belief and trust Khun Amorn was forced to place in Allen generally due to TNR's new status as licensee, and on the strength of Playboy's representations to Allen, Khun Amorn signed the contract without the benefit of an attorney and with no consideration from Playboy.

> **b.**     ***Playboy Poaches Allen to Undermine TNR, and Allen Violates His Duties to TNR***

55.     From the beginning, TNR understood the relationship with Walmart to be of paramount importance to its success with the Playboy business.  Through its hard work and diligence that started with TNR's presentation to Walmart in January or February 2019, TNR later experienced a breakthrough in the relationship with Walmart for sales of Playboy products whereby the number of SKUs greatly increased and sales of the Products increased from 1,110 stores to all Walmart stores nationwide, which was not previously accomplished under UMD.  In addition, TNR dramatically increased the profits on sales of Playboy products to Walmart stores.

56.     Unbeknownst to TNR, while gaining the initial traction with Walmart, Allen acted covertly to develop a wipes product sometime in 2019 with the goal of using TNR's relationships and credentials with retailers in addition to its shipping, storage, logistics, insurance, and other resources to sell the product under the Playboy brand for his own benefit rather than TNR's.  But when Allen pitched the wipes product to Playboy (without TNR's knowledge or permission), Playboy was initially cool to the idea.

57.     Allen, however, soon learned that he had leverage.  Allen became aware that Playboy wanted to reacquire TNR's license so that Playboy could shift from a licensor to owner/operator of the condom and lubricant business.  Around the summer

16

of 2019, Playboy tried to take away TNR's exclusive rights to sell Products in the USA and Canada and revealed its intentions to Allen, but Allen did not agree to release such rights for such territories, likely because he wanted to continue operating as the distributor for the US territory.

58.    Thus, Playboy and Allen realized that it was to their benefit to make a trade, at TNR's expense.  Allen and Playboy entered a deal to help both parties get what they wanted: Allen would have the ability to sell his wipes product under the Playboy brand, and Playboy would have a means to charge into the sexual wellness space using TNR's retail and distributor relationships.

59.    In accordance with the new deal between Playboy and Allen—and not long after TNR achieved the new milestones with Walmart—Playboy continued to undermine TNR and improperly compete with TNR's Playboy-branded product lines. To implement its improper plans, and to secure the assistance of Allen in exploiting TNR's relationships and credentials with retailers as well as its shipping, storage, logistics, and insurance resources, Playboy quietly offered Allen an official consulting role on or about November 2019, which TNR later learned that he accepted in exchange for a significant sum of $100,000, plus sales commissions.

60.    Notably, Playboy offered this position to Allen without informing TNR, and while Allen continued to serve as global sales consultant for TNR through Monarch and remained a director of Freedom, TNR's US distributor.

61.    The significant geographic distance between Playboy and TNR—as a foreign entity whose US presence was in its infancy—put Playboy in a superior position to conduct its deceit without TNR's knowledge.

62.    Allen accepted Playboy's offer and took a role with the company working in its Los Angeles headquarters as Playboy's "Special Project Consultant – New FMCG Wellness Products," and Playboy planted the ever-growing seed of Allen's conflict of interest.  Allen and Playboy reached an understanding whereby Playboy threw its support behind Allen's Playboy wipes product and paid Allen a significant

sum for his work.  Allen therefore worked with both Playboy and TNR at the same time without TNR's knowledge

63.    Playboy failed to inform TNR of Allen's new position with Playboy and the direct conflict that the role created with his position at TNR.  Playboy identified a willing mole in Allen to help satiate its corporate greed by directing Allen's work as a double agent to help Playboy infiltrate, sabotage and ultimately usurp TNR's business.

64.    Playboy lacked the requisite credentials to sell its products directly to certain retailers, so it obtained a backdoor entryway through Allen to gain unfettered access to shelf space it did not earn.

65.    Upon information and belief, chief among the FMCG products Allen promoted were Playboy's Climax Delaying Wipes product ("**Playboy wipes**"), which Allen worked in tandem with Playboy to further develop and promote and to get the Playboy wipes onto Walmart's shelves using TNR's account at Walmart.

66.    Upon information and belief, around January or February of 2020, Allen presented the Playboy wipes to Walmart with the TNR Products and Walmart accepted the wipes.

67.    In or around October 2020, TNR discovered the Playboy wipes being sold on the Walmart website. TNR started wondering why the Playboy wipes were being sold under TNR's account for Playboy condoms and started making inquiries about such to Allen.

68.    TNR did not discover Playboy had poached Allen to work for Playboy for the first year or so of Allen's double agent position.  On or about November 2020, TNR noticed a position on Allen's Linkedin profile with the description: "Launching of new FMCG products under world famous Playboy brand."  When confronted, Allen convinced TNR that this arrangement worked to TNR's benefit so as to better develop the relationship.

69.    TNR also later learned that Playboy improperly required TNR to pay approximately $4,000 per month in rent and parking fees for Allen's use of the space

at Playboy's headquarters.   Playboy charged TNR for Allen's rental expenses at Playboy's headquarters, including costs for building office walls and remodeling at Playboy's offices, although Allen was concurrently working for Playboy, and Playboy has never returned the funds TNR expended under false pretenses.   Playboy later admitted to TNR that Allen and Playboy jointly agreed to pursue reimbursement of the rental and parking space from TNR, though there appears to be no written rental agreement between Allen and Playboy.

### c.    *Playboy Interferes in TNR's Relationship With Retailers*

70.    Upon information and belief, and at Playboy's direction, Allen secured a meeting with Walmart's buyer during which he presented samples of the Playboy wipes and misdirected Walmart on behalf of Playboy that the wipes were products under TNR's account.  Playboy lacked an independent supplier account with Walmart and was therefore unable to secure the necessary approvals to sell its products to the retailer without cover from TNR.  Without the consent or knowledge of TNR, Playboy sold and derived profits from the wipes using TNR's supplier account and TNR's shelf space despite knowing those wipes were not manufactured by TNR and were sold under TNR's account.

71.    Selling the wipes using TNR's shelf space deprived TNR of its ability to sell agreed upon quantities of TNR's condoms and lubricants at Walmart stores and hurt TNR's bottom line.   Upon information and belief, sales of Playboy wipes specifically displaced TNR's top-selling "Studded Pleasure" condom from Walmart shelves, thereby preventing sales of a crucial item in TNR's sales portfolio.  Playboy in no way shared any profits from sales of the wipes with TNR.

72.    Playboy's intentional act of using TNR's shelf space for sales of its wipes to the exclusion of TNR's Products jeopardized TNR's performance under the General Merchandise Agreement with Walmart and diminished TNR's ability to enjoy the full benefits of sales through the retailer's stores as contemplated in the General Merchandise Agreement.

73.    In addition, Playboy deployed the wipes to Walmart's shelves in packaging that is almost identical to TNR's best-selling "Studded Pleasure" condoms.

 

The reduction in TNR's sales at Walmart stores resulting from displacement of TNR's Products hampered TNR's ability to meet its obligations under the PLA to satisfy minimum sales requirements, undermining TNR's ability to perform as licensee.

74.    Upon information and belief, at some point in the fall of 2020, CSG (TNR's sales broker to Walmart) learned of an issue with Freedom and Allen that made it uncomfortable to further do business for the Playboy condoms.  TNR did not learn about the end of the relationship with CSG until June 2021 due to Allen's efforts on Playboy's behalf to keep TNR from full participation in the relationship.

75.    In addition to its efforts at Walmart, upon information and belief, Playboy acted through Allen without TNR's knowledge or consent to insure Playboy's products under TNR's liability insurance policy.  TNR later discovered that, in addition to unauthorized use of its insurance, Playboy acted through Allen to bill shipping, storage, advertising, marketing, CSG management fees, EDI setup fees, EDI usage fees, QuickBooks monthly fee, and other significant costs and fees to TNR's

accounts to support sales of Playboy wipes and CBD products.

76.    Upon information and belief, Playboy induced Allen to use a sales pitch to CVS for TNR's Products as a cover to promote Playboy wipes by mixing the wipes in with TNR's Playboy condoms and lubricants using a presentation vendor called BLKLYST, without TNR's knowledge or consent.  TNR reimbursed Monarch for the presentation in full, without knowing that a significant portion of the presentation was for Playboy's non-TNR products.

77.    Playboy wipes are sold in CVS stores but TNR's condoms and lubricants are not.  Upon information and belief, Playboy wipes at CVS are purportedly relying on TNR's product liability insurance thereby benefitting Playboy's products and profits under the cover of, and without the consent of, TNR.

78.    Upon information and belief, Playboy induced Allen to use a sales pitch to Walgreens for TNR's Products as a cover to promote Playboy wipes and CBD products by mixing those products in with TNR's Playboy condoms and lubricants using a presentation vendor called BLKLYST, without TNR's knowledge or consent.  TNR reimbursed Monarch for the presentation in full, without knowing that a significant portion of the presentation was for Playboy's non-TNR products.

79.    Playboy used sales of its wipes products to enrich itself at TNR's expense.  For example, on November 4, 2020, and without TNR's permission or knowledge, Playboy prompted Allen to send a payment of $229,016.16 from Freedom's bank account, the first of several monthly payments, as payment for Playboy wipes' sales.

80.    At or about the time it was inducing Allen to undermine TNR with major retailers, Playboy revealed during an investor presentation that it would pursue a new strategy of transitioning from licensing to direct ownership and operation of its sexual wellness portfolio—with an eye toward a specific expansion in US, EU, and Asia markets.  Among other things, Playboy revealed during the presentation that it had secured agreements to sell its sexual wellness products at Walmart and CVS—the very two retailers at the heart of Playboy's unauthorized efforts to use TNR resources for

its own benefit.

81.     Playboy did not reveal the underhanded means described above that Playboy used to get into Walmart and CVS through TNR's relationships without TNR's knowledge or permission. Moreover, upon information and belief, Playboy has no such direct agreement to sell its sexual wellness products with Walmart.

### d.     *Playboy Blocks TNR's Attempts to Seek New Opportunities*

82.     At around the same time, Playboy also began to unabashedly exert brute force in its efforts to block potential relationships that would expand TNR's sales of the Products.

83.     Upon information and belief, Playboy interfered with TNR's prospective relationship with a vendor called Core-Mark—a major USA distributor that services convenience stores and gas stations—by instructing Allen not to pursue the relationship for TNR.  Instead, Playboy asked Allen to insert Playboy into the relationship to harm TNR's economic relationships and undermine TNR's operations and business. Upon Playboy's instruction, Allen put TNR's negotiations with Core-Mark on hold and the relationship never came to fruition.

84.     Playboy interfered with a deal worth more than $6 million—secured with the deposit of $400,000—by holding back its approval for 4-6 months for TNR to sell condoms in Russia and thereby delaying TNR's ability to register with the appropriate agencies to sell the Products, a deal Allen attempted to secure with a distributor through a sub-publisher of Playboy magazine in the country.

85.     During Playboy's strict regime of Playboy's prior approval and quality control of sales, Playboy also misused its authority under the PLA to withhold approval of a 200-page marketing plan that TNR submitted concerning, among other things, TNR's plan to utilize digital markets, social media platforms, and other internet-based endeavors in sales of Playboy products.  Playboy's abuse of power blocked TNR's ability to utilize Playboy's social media for advertising related to TNR's Products.

86.     In fact, Playboy also unreasonably withheld and/or failed to act on no fewer than 67 product approval requests and no fewer than 18 requests for approval of marketing materials—all of which were submitted through Playboy's requisite portal and met the requirements of Paragraph 2.i(i) of the PLA to the extent reasonably possible to do so.  This violated Playboy's obligations under the PLA and the Seventh Amendment to promptly provide such approvals or an explanation for denial.

87.     Furthermore, Playboy began to pressure TNR through its license management company CAA-Global Brands Group ("**CAA**"), demanding sales reports, insisting on product and ad approvals, instituting production controls, requiring marketing plan submissions, and enforcing requirements for the placement of holograms on Products.  The changes and additional controls over the license contravened the course of performance between Playboy and UMD, TNR's predecessor-in-interest, as TNR understood UMD to engage in the same conduct for many years prior to novation of the license to TNR.

88.     Meanwhile, Playboy ratcheted up the pressure on Allen to deliver TNR's business to Playboy as they had agreed.  Upon information and belief, as part of his efforts on Playboy's behalf, Allen supplied Playboy with TNR's confidential business information and financial data.

89.     Apparently unsatisfied with Allen's efforts in providing such information to that point, Patel sent an email to Allen on or around November 25, 2020 with an offer of a full-time position in the company with significant compensation, and provided a list of "expectations" Playboy had for Allen, including, among other things, that he (i) deliver condom distribution rights for major markets to Playboy; (ii) transition use and control of Playboy's marks back to the company; (iii) divulge the sensitive details of TNR's logistics and distribution setup (e.g., Freedom's role, the identity of its importer and freight forwarder, and the source of its USA regulatory guidance); (iv) work with Playboy's communications/brand team to clean up all social/digital assets related to condoms/intimacy, e.g. Instagram, Facebook, YouTube

to establish greater alignment and consistent with Playboy Hero Brand and Sexual Wellness Category; and (v) share knowledge about the sexual wellness category with respect to competition, trends, industry/sector, regulatory, and other best practices.

90.     Playboy's attempt to solicit Allen for the purposes stated in the email contravened its representations under the Novation Agreement and Seventh Amendment to the PLA that it would be a supportive licensor to TNR.

91.     Thus, contrary to its contractual obligations licensing condom rights to TNR for significant consideration, and before conducting a 2021 audit to terminate TNR's license, Playboy was already taking steps in 2020 to start transitioning the license to Playboy by offering Allen compensation with a list of expectations that would achieve Playboy's goal of getting the license back from TNR.

**E.     Playboy Engineers an Audit as Pretext for Terminating TNR's License**

92.     Eventually, things fell apart between Playboy and Allen in or about December 2020.  Upon information and belief, Playboy began to press Allen for extremely detailed accounts regarding TNR's operations, logistics, and other intimate details of TNR's business.  Ultimately, Playboy and Allen did not renew their working relationship and Allen left the Playboy space.

93.     Without the promise of further financial gain from his relationship with Playboy, Allen attempted to pivot back to TNR once again.  In January 2021, Allen informed TNR of Playboy's efforts to seize TNR's Playboy condom and lubricant business and showed TNR the e-mail Playboy sent to him on November 25, 2020 offering a full time position with the company and significant compensation.

94.     On February 11, 2021, Playboy resumed its status as a publicly traded company through a deal with a Special-Purpose Acquisition Company ("**SPAC**") trading on the NASDAQ exchange under the ticker "PLBY."

95.     The next day, Playboy's CEO, Ben Kohn, participated in a video interview during which he outlined Playboy's strategy for the future.  Though the

company had gained prominence as the publisher of a men's lifestyle and entertainment magazine, Playboy would now move away from the publication business and focus on other markets, with an emphasis on the market for sexual wellness products. Kohn confirmed Playboy's desire to seize direct control of the sexual wellness business it was licensing to companies like TNR, stating flatly that "[s]exual wellness is a category [Playboy wants] to own . . . on a global basis" and that Playboy had begun making that desire a reality "by terminating contracts and taking back rights to certain product categories."[8]

96.    In a later interview, Kohn explained Playboy's incentive to move from licensor to owner/operator of its sexual wellness portfolio in order to maximize the sector's value to the company: "[L]icensing is a less efficient model for that, and we can own a lot more of the spend. That $3 billion of consumer spend, *the challenge with licensing is you're getting pennies on the dollar for that*, $0.02, $0.03 on the dollar for that. If we pivot and we own that, not only can I drive the lifetime value of the customer up and the average order size because I can tell [sic] you more products, but I can drive my revenue up. When you look at that, there could be a 20x increasing revenue just if you model it out and actually an increase in EBITDA by 5 or 6 times as well."[9]

97.    Shortly after Playboy went public, TNR received an email placing it on notice of an impending audit under the PLA. Up to that point, Playboy had never conducted an audit of TNR or its predecessor licensee UMD.

98.    The audit represented Playboy's latest strategy to misuse its broad powers under the PLA to achieve its objective of stealing TNR's business. Indeed, Allen later

---

[8] Channelchek, *Playboy CEO Ben Kohn – Presentation from NobleCon 17*, YouTube (Feb. 12, 2021), https://youtu.be/9ULyUT2sFac

[9] Nick Sciple, *PLBY Group CEO Ben Kohn on the Future of Playboy and Other Parts of the Business*, The Motley Fool (Aug 23, 2021, 2:11 PM), https://www.fool.com/investing/2021/08/23/plby-group-ceo-ben-kohn-on-the-future-of-playboy/.

disclosed to TNR that Playboy executive Kopcha stated that an audit could be used by Playboy to terminate the license to achieve Playboy's desired outcome.

99.   At Playboy's request, Credence Global Consulting Limited ("**Credence**") conducted the audit between April 26, 2021 to May 4, 2021 at TNR's offices in Bangkok, Thailand and, as agreed, TNR cooperated fully.  On June 7, 2021, Credence issued a report detailing the findings of its audit on TNR's books and records concerning TNR's compliance with the PLA.

100.   The audit findings alleged that TNR had committed a number of breaches under the PLA, ranging from purported late payments of royalties to TNR's alleged failure to obtain certain product approvals.  In total, Playboy's audit assessed a claim against TNR in the amount of $8,622,713 for the alleged violations detailed in the audit.

101.   The audit findings were, at best, disingenuous, and none of the purported breaches of the PLA presented in the audit were material or justified immediate termination of the agreement.  Moreover, the audit contained no notice of Playboy's intent to terminate the PLA, nor any date upon which such a termination would be effective.

102.   Accordingly, TNR responded a week later with a letter providing a detailed rejection of all findings and a specific basis for each rejection.

103.   For example, contrary to the audit's finding that TNR failed to obtain product approvals, the reality was that TNR *did* obtain approvals in the same manner that UMD had always done.

104.   Similarly false were the audit's findings that TNR had failed to pay royalties.  In fact, TNR had paid all royalties as required under the PLA.

105.   Playboy later reduced the amount it sought in connection with TNR's alleged breaches from $8,622,713 to $1,610,078, in exchange for the return of rights to territories closely aligned to those it communicated to Allen in the list of "expectations" for Playboy's offer of full-time employment to Allen sent by email on

November 25, 2020, all while signaling that its proposed offer was somehow generous to TNR.

106.   TNR attempted to discuss the audit 'findings' with Playboy, offered to pay for a new audit, and expressed a desire on multiple occasions to resolve the issues between the parties, but Playboy failed to meaningfully engage in a productive dialogue.   Instead, Playboy simply bullied TNR to forcibly terminate the PLA consistent with Playboy's real intent of taking the license back to distribute the Products itself.

**F.   Playboy Unlawfully Terminates the Product License Agreement**

107.   On November 5, 2021, Playboy sent a letter to a TNR executive terminating the PLA effective immediately.

108.   In the letter, Playboy invoked its purported rights to terminate the agreement due to alleged incurable defaults under Section 7.a(iii) of the PLA and citing as justification for its act the findings of the audit conducted in July 2021. Playboy also demanded that TNR (i) cease and desist from use of Playboy's intellectual property and stop sales of the Products; (ii) refrain from entering a sell-off period and provide Playboy with an inventory list within ten (10) days of the termination date; (iii) remit the termination fee of $459,461.25 to Playboy within ten (10) days of the termination date; and (iv) pay Playboy the reduced figure of $1,610,078 previously sought from TNR to resolve the matter.

109.   As TNR previously noted in its audit response, the alleged defaults in Playboy's purported termination notice were (i) acts and conduct by TNR's predecessor licensee that was agreeable and sanctioned by Playboy; (ii) acts and conduct that TNR continued from its predecessor's course of performance under the PLA licensee that was agreeable and sanctioned by Playboy; (iii) minor acts that TNR rectified immediately upon notice, or (iv) acts that lacked any factual basis.   In all events, none of the purported breaches of the PLA were material or justified termination of the agreement.

110.   In accordance, TNR promptly notified distributors and known retailers of the sudden and abrupt nature of Playboy's immediate and wrongful termination, thereby causing significant commotion, damage, and inconvenience to all of TNR's relationships.

111.   Playboy's refusal to allow TNR to engage in a sell-off period and eliminate remaining unsold inventory was retaliatory and has saddled TNR with approximately $13 million in inventory that will have to be unnecessarily destroyed or used as a means by Playboy to ascertain and control the inventory so it can replace TNR as the new supplier to TNR's damaged relationships.

112.   Playboy's wrongful and an unjustified termination of the PLA has caused a ripple effect through TNR's supply chain and sales channels, resulting in the inability to sell millions of dollars in inventory, harm and damage to its various commercial relationships, and tarnishment of its public reputation around the world resulting in devaluation of TNR's stock by TNR having to report the license termination to the SET.

### G.   TNR is a De Facto Franchisee Entitled to the Protections of California Law

113.   TNR qualifies as a franchisee under Section 31005 of the FIL.  Cal. Corp. Code § 31005.

114.   The FIL defines a franchise as:

> [A] contract or agreement, either expressed or implied, whether oral or written, between two or more persons by which: (1) A franchisee is granted the right to engage in the business of offering, selling or distributing goods or services under a marketing plan or system prescribed in substantial part by a franchisor; and (2) The operation of the franchisee's business pursuant to such plan or system is substantially associated with the franchisor's trademark, service mark, trade name, logotype, advertising or other commercial symbol designating the franchisor or its affiliate; and (3) The franchisee is required to pay, directly or indirectly, a franchise fee.

Cal. Corp. Code § 31005.

115.   The PLA granted TNR the exclusive rights to engage in the business of designing, manufacturing, advertising, promoting, selling, distributing, and conducting research and development for condoms bearing the Playboy mark under a marketing plan or system prescribed in substantial part by Playboy that gave Playboy significant control over the business, including, but not limited to, in the following ways:

      **a.**     TNR could not use any of its exclusive rights outside the Territory;

      **b.**     TNR could not sell the Products without Playboy's prior approval at each stage of development, even when selling to licensees of Playboy-branded stores, and satisfying strict quality controls;

      **c.**     TNR had to seek Playboy's prior approval on a yearly basis for its advertising/promotional and marketing plans and seek prior approval for any and all public relations, packaging, marketing, and advertising efforts throughout the year;

      **d.**     TNR could only advertise and promote the Products within the Territory and distribute the Products in specified channels;

      **e.**     TNR could not sell certain Products outside of the United States without affixing Playboy's official hologram to its packaging and provide reports with certain metrics about hologram usage;

      **f.**     TNR was subject to a twice-yearly audit—for which TNR had to pay if the audit revealed certain deficiencies—and had to manage its books according to Playboy's requirements;

      **g.**     TNR could not engage a subcontractor or supplier to manufacture or distribute the Products without obtaining Playboy's prior approval and using Playboy's specified contracts; and

      **h.**     TNR had to meet minimum sales requirements by region and minimum marketing advertising expenditures in a given License Year or suffer consequences ranging from the loss of exclusivity over that region up to and including

termination of the license.

116.    Playboy's use of its powers to control TNR interfered with TNR's ability to operate the business.  By way of example, Playboy required TNR to submit requests for advertising/promotional and marketing approvals through a portal called Brand Comply, and Playboy's failure to timely respond to TNR's requests in early 2021 kept TNR from going forward with various holiday promotions such as Valentine's Day and St. Patrick's Day-themed promotions that were opportunities for increased sales.

117.    Additionally, after the audit, Playboy used its powers to change the scope of TNR's hologram usage—which the course of performance previously restricted to certain countries in Asia—and required that holograms be affixed to all packages. Playboy decided to use its control powers under the license to engineer its termination of the license. That change dramatically increased the number of approvals TNR had to submit, and Playboy unreasonably withheld or delayed its approval, effectively preventing TNR from selling the Products.

118.    The PLA granted TNR the right to engage in the business of selling branded condoms and lubricants bearing Playboy's mark, which was communicated to TNR's customers via the packaging of the Products.

119.    TNR was required to pay Playboy a franchise fee for the ability to engage in the business of selling Playboy's branded condoms:

        a.    Through the SPA and the Novation Agreement, TNR became UMD's successor in interest, and the Novation Agreement required TNR to tender consideration that went to Playboy in the amount of $750,000 as an upfront fee, which it paid; and

        b.    The PLA entitled Playboy to both guaranteed and earned royalties for the rights granted by the PLA, and it required TNR to provide an annual payment of both guaranteed and earned royalties—totaling more than $2.3 million—to Playboy over three years, which it paid.

120.    TNR engaged in sales, leases, and business transactions directed toward

customers from within the state of California as part of the business contemplated by the PLA and the Novation Agreement.  By way of example, Allen served as TNR's global sales consultant for the Products through an agreement with Monarch (incorporated in the State of California), Allen's marketing and sales company in California, where Allen operated and conducted TNR's U.S. operations, and TNR officials routinely engaged in transactions from California directed at customers.  TNR also paid rent to Playboy under the impression that doing so would allow Allen to conduct operations on behalf of TNR from Playboy's offices in California, but unbeknownst to TNR, Playboy used the arrangement to exercise further control over Allen and, through him, over TNR's business as well.

121.   Accordingly, TNR meets each of the requirements to be a franchisee under the FIL and is entitled to its protections. It follows that Playboy is thus a franchisor and must adhere to the legal obligations of a franchisor under California law.

122.   Consistent with the FIL's public policy, a franchisor—here, Playboy—must either register the franchise with California's DFPI and disclose certain information required by the Franchise Investment Law through a Franchise Disclosure Document, or otherwise qualify as a franchise exempt from such disclosures.

123.   A franchisor—here, Playboy—is also required to update its DFPI disclosures to the extent there are any material changes to the information contained in the initial registration application.

124.   Upon information and belief, Playboy has never registered with California's DFPI.   As such, Playboy has also failed to provide the requisite information for a lawful Franchise Disclosure Document.

125.   Playboy's failure to make the required disclosures and provide TNR with a Franchise Disclosure Document ("**FDD**") left TNR unaware of many aspects of its relationship with Playboy, including the role of Playboy as franchisor and TNR as franchisee.  Had Playboy fulfilled its legal obligations as a franchisor, TNR would

have received a Franchise Disclosure Document informing TNR of (i) Playboy's ability to provide assistance, advertising, training, and other benefits to TNR; and (ii) Playboy's ability and obligation to participate in the operation of TNR's franchisee business, if any.

## FIRST CLAIM FOR RELIEF

**Violation of Statute – Wrongful Termination of Franchise)**
**(California Franchise Relations Act – Corporations Code sections 20000 *et seq*.**

**(Against Playboy)**

126.   TNR hereby incorporates each and every allegation set forth in the preceding paragraphs as though set forth fully herein.

127.   The license from Playboy is a franchise as defined by California Corporations Code section 20001, known as the California Franchise Relations Act ("**FRA**"). Cal. Corp. Code §§ 20000 et seq.

128.   Under that license, Playboy granted TNR, by way of the Novation Agreement, the right to engage in the business of selling Products bearing its mark, including an exclusive right to design, manufacture, advertise, promote, sell, distribute, and conduct research and development for the Products in the territory in the manner and distribution channels specified by the PLA.  Playboy also prescribed in substantial part the means by which TNR would sell the Products by requiring an advertising/promotional and marketing plan, paired with its own submission and approval process, for all sales of Products.

129.   Moreover, Playboy conditioned all sales of Products upon (i) TNR satisfying Playboy's strict standards of quality, suitability, advertising, marketing, packaging, and other controls dictated by Playboy under the terms of the license, as referenced above in paragraphs 24-27, and (ii) TNR receiving approval from Playboy based on the standards and controls dictated by Playboy. In turn, TNR's business of selling Products is substantially and integrally associated with Playboy's tradename, marks, and logos.

130.   TNR paid a total of $750,000 to Playboy, through UMD, as an initial fee under the Novation Agreement, and it also paid substantial guaranteed royalties of more than $2.3 million dollars annually, plus earned royalties as calculated under the terms of the PLA.

131.   Under the terms of the PLA, as extended by the Fifth Amendment, TNR's license was due to expire, if not renewed, on December 31, 2027.

132.   On November 5, 2021, Playboy issued a defective notice of termination letter indicating TNR's license was terminated immediately on the grounds of alleged incurable defaults under the PLA, citing the findings of its pretextual audit.  None of the alleged defaults were material.

133.   Playboy terminated the license without providing 60 days' notice of its intent to terminate and an opportunity to cure any alleged defects in TNR's performance.  This is a violation of FRA section 20020. Cal. Corp. Code § 20020.

134.   Playboy's notice of termination was defective because it did not provide written notice to TNR by registered, certified, or receipted mail, telegram, or personal delivery.  This is a violation of FRA section 20030. Cal. Corp. Code § 20030.

135.   At all relevant times, TNR operated in substantial compliance with the terms of the PLA and substantially performed its obligations thereunder.

136.   Playboy's purported grounds for termination were arbitrary, wrongful, and without good cause, in breach of the license.  This is a violation of FRA section 20020. Cal. Corp. Code § 20020.

137.   TNR is therefore entitled to the fair market value of the franchised business and franchise assets, any other damages that result from Playboy's wrongful termination of the PLA, and injunctive relief.

138.   As a direct and proximate result of Playboy's violations, and pursuant to FRA section 20035 (Cal. Corp. Code § 20035), TNR has suffered and continues to suffer damages in an amount to be determined at time of trial, the amount of which is in excess of $100 million including, but not limited to, the fair market value of the

franchised business and the franchised assets, expected profits under the license through 2027, the $15 million purchase price of the license (including $750,000 as initial consideration under the Novation Agreement), startup costs and investments of approximately $13 million, royalties, the reimbursements and returns of monies and inventory to and from third parties due to the sudden termination, any loss of stock market valuation due to TNR having to report the license termination to the SET (Stock Exchange of Thailand), and numerous operating losses, including but not limited to having to cancel third party contracts, and operating contracts for employees and vendors for storage and related logistics, approximately $17 million in unsold and returned goods and claims from distributors and retailers due to Playboy's retaliatory refusal to allow a sell-off period, and all consequential damages suffered by TNR related to Playboy's illegal franchise.

## SECOND CLAIM FOR RELIEF

### Violation of Statute
### Franchise Investment Law – Corporations Code sections 31000 *et seq.*

### (Against Playboy)

139.   TNR hereby incorporates each and every allegation set forth in the preceding paragraphs as though set forth fully herein.

140.   Playboy violated the FIL by failing to register (or claim an exemption) and by failing to file its franchise offering circular ("FOC") (now known as the FDD) with the California Department of Corporations as required of all non-exempt sellers of franchises in California.  This omission is a violation of the FIL.  TNR first discovered the nature of its franchisor-franchisee relationship with Playboy on or about November 2021 upon Playboy's wrongful termination.  In particular, TNR learned that it had legal rights under the FIL based on (i) Playboy's failure to prepare and file the requisite paperwork under the FIL and (ii) Playboy's failure to present TNR with a FOC (now called the FDD).

141.   Specifically, Playboy violated the FIL by failing to provide a copy of a

FOC (now called the FDD) to TNR at least ten (10) business days prior to TNR entering a franchise.  This is a violation of Corporations Code section 31119.

142.   Upon information and belief, Playboy never employed a registered franchise salesperson when it instructed its employees or agents to participate in the ongoing sale of the franchise from Playboy to TNR during the execution of the Novation Agreement and any subsequent Amendments to the PLA during TNR's time as licensee.  This is a violation of section 31210 of the FIL. Cal. Corp. Code § 31210.

143.   Upon information and belief, and pursuant to section 31302 of the FIL, the officers of Playboy are jointly and severally liable for the violations set forth above because they are officers, directors, and/or control persons of Playboy. Cal. Corp. Code § 31302.

144.   Upon information and belief, Playboy's acts as described herein were willful, so TNR is entitled to rescission as an alternative to remedy its damages claims. The PLA is therefore an illegal franchise since it violates California civil law, California administrative regulations, California public policy, and the Code of Federal Regulations.

145.   As a direct and proximate result of Playboy's violations, and pursuant to section 31300 of the FIL (Cal. Corp. Code § 31300), Plaintiff has suffered and continues to suffer damages in an amount to be determined at time of trial,  the amount of which is in excess of $100 million including, but not limited to, the fair market value of the franchised business and the franchised assets, expected profits under the license through 2027, including, but not limited to, the $15 million purchase price of the license    (including $750,000 as initial consideration under the Novation Agreement), startup costs and investments of approximately $13 million, royalties, the reimbursements and returns of monies and inventory to and from third parties due to the sudden termination, any loss of stock market valuation due to TNR having to report the license termination to the SET (Stock Exchange of Thailand), and numerous operating losses, including but not limited to having to cancel third party contracts,

and operating contracts for employees and vendors for storage and related logistics, approximately $17 million in unsold and returned inventory due to Playboy's retaliatory refusal to allow a sell-off period, and all consequential damages suffered by TNR related to Playboy's illegal franchise.

### THIRD CLAIM FOR RELIEF
**Breach of Contract**
**(Against Playboy)**

146.   TNR hereby incorporates each and every allegation set forth in the preceding paragraphs as though set forth fully herein.

147.   TNR operates a business of design, manufacture, advertising, promotion, selling, distributing, and conducting research and development of Products pursuant to the terms of the PLA, under which it became a licensee pursuant to the SPA and the Novation Agreement (the PLA and Novation Agreement collectively, the "**Agreements**").

148.   Playboy has breached the Agreements with TNR by unfairly and intentionally taking actions contrary to the terms of those Agreements and to the longstanding course of performance between Playboy and TNR—as well as between Playboy and UMD as TNR's predecessor in interest— including, but not limited to:

a.   Unreasonably and without justification withholding product approvals in violation of the Agreements that prevented TNR from engaging in sales of Playboy Products under the Agreements, including preventing TNR from engaging in holiday promotions to maximize sales during peak sales periods;, in violation of Section 2.i of the PLA.

b.   Failing to provide the agreed upon "services" enumerated in Paragraph 1 of the Seventh Amendment to the PLA including, among other things, timely product and marketing plan approvals and other assistance as necessary to effectuate TNR's assumption of obligations under the PLA;

**c.**     Failing to cooperate with TNR as licensee in good faith as required under Section 11.1 of the Novation Agreement; and

**d.**     Engaging in the wrongful termination of the PLA on the basis of pretextual audit findings that contravene the course of performance between the parties in violation of Section 11.1 of the Novation Agreement.

149.   TNR has performed or substantially performed its obligations under the PLA and the Novation Agreement and has paid Playboy significant royalties to date.

150.   Playboy's breaches of the PLA and the Novation Agreement are material, done in bad faith, and have resulted in Playboy unfairly and unjustly profiting from its breaches.

151.   As a direct and proximate cause of Playboy's breach of the PLA and the Novation Agreement, TNR has suffered general, special, and consequential damages, including future damages, in an amount to be determined at trial, but exceeding $75,000.

## FOURTH CLAIM FOR RELIEF

### Breach of the Implied Covenant of Good Faith and Fair Dealing

### (Against Playboy)

152.   TNR hereby incorporates each and every allegation set forth in the preceding paragraphs as though set forth fully herein.

153.   TNR operates a business of selling Products pursuant to the terms of the PLA, under which it became a licensee pursuant to the SPA and the Novation Agreement.

154.   The PLA and Novation Agreement, as well as the longstanding course of performance between the parties, impose a duty of good faith and fair dealing on the part of Playboy.

155.   Playboy has breached its duty of good faith and fair dealing by intentionally taking actions to frustrate and misappropriate the benefits to which TNR is entitled under the PLA and Novation Agreement, including, but not limited to:

**a.**     Withholding   product   approvals   unreasonably   and   without justification to harm TNR's performance under the PLA and prevent TNR from obtaining the full benefit of its bargain, in violation of Section 2.i of the PLA and Paragraph 1 of the Seventh Amendment to the PLA;

**b.**     Failing to provide the good-faith cooperation required under Section 11.1 of the Novation Agreement;

**c.**     Directing, aiding, and abetting Allen to obtain TNR's approval of the Eighth Amendment by concealing material facts about the nature of the agreement in violation of Section 11.1 of the Novation Agreement;

**d.**     Competing directly with TNR by selling Playboy products not manufactured by TNR on TNR's retail shelf space and using packaging copied from TNR's Products in violation of Section 11.1 of the Novation Agreement;

**e.**     Undermining and sabotaging TNR's efforts to perform and meet its obligations as a licensee in violation of Paragraph 1 of the Seventh Amendment and Section 11.1 of the Novation Agreement;

**f.**     Directing, aiding, and abetting Allen to bill or charge TNR for improper and unauthorized expenses to support sales of Playboy products, including, but not limited to, shipping, logistics, insurance, advertising, and other costs and fees, injuring TNR's ability to make profits under the PLA, in violation of Section 11.1 of the Novation Agreement;

**g.**     Abusing its discretionary powers under the PLA in bad faith to conduct an audit for the purpose of raising alleged defects in TNR's performance to justify immediate termination of the PLA and seizure of TNR's exclusive license, in violation of Section 11.1 of the Novation Agreement; and

**h.**     Refusing to entertain TNR's good faith efforts to cure the alleged defects in TNR's performance identified in the audit or in any way to resolve the impasse between the parties over the PLA and refusing to allow TNR to engage in a

sell-off period after termination of the PLA, in violation of Section 11.1 of the Novation Agreement.

156. As a direct and proximate cause of Playboy's breach of the implied covenant of good faith and fair dealing, TNR has suffered general, special, and consequential damages, including future damages, in an amount to be determined at trial, but exceeding $75,000.

## FIFTH CLAIM FOR RELIEF

### Violation of California's Unfair Competition Law
### Cal. Bus. & Prof. Code § 17200 *et seq.*

### (Against All Defendants)

157. TNR hereby incorporates each and every allegation set forth in the preceding paragraphs as though set forth fully herein.

158. The California Unfair Competition Law ("**UCL**") prohibits any "unlawful, unfair, or fraudulent business act or practice[.]" Cal. Bus. & Prof. Code § 17200.

159. Playboy and Allen are "persons" as defined by the UCL. Cal. Bus. & Prof. Code § 17201.

160. Defendants violated the UCL by engaging in unfair, unlawful, and/or deceptive business practices, specifically by engaging in behavior including, but not limited to:

    **a.** Misrepresentation of Playboy's products as TNR Products to usurp TNR's goodwill and take advantage of TNR's relationships with one or more major retailers and buyers of TNR's Products;

    **b.** Deceptively infiltrating TNR's earned and designated shelf space at one or more major retailers to the exclusion of TNR's Products for the benefit of Playboy's wipes product;

    **c.** Deceptively, and without authorization, obtaining purported coverage through a liability insurance policy fully funded by TNR and intended solely

to cover TNR's Products;

     **d.**    Deceptively obtaining payment from TNR for expenses, including but not limited to, shipping, logistics costs, social media advertising, and marketing data to be used for non-TNR Playboy products;

     **e.**    Billing or charging TNR for improper and illegitimate expenses, including but not limited to payments of rent for commercial space used exclusively by and for the benefit of Playboy;

     **f.**    Obtaining TNR's approval of the Eighth Amendment by concealing material facts about the nature of the agreement, which was significantly harmful to TNR; and

     **g.**    Unlawfully and wrongfully terminating the PLA in violation of California franchise law.

161. Through these practices, Defendants deprived and continue to deprive TNR of certain protections to which it is entitled under California law and misappropriating revenue lawfully due to TNR.

162. Playboy's actions are unlawful or, at a minimum, violate the public policy set forth in the FIL because Playboy was required to register as a franchisor and file and update disclosures prior to creation of the franchise concerning: the nature of its business; the assistance, advertising, and training Playboy was required to provide TNR as a franchisee; and Playboy's obligation to participate in the operation of TNR's business, if any.

163. Playboy's failure to register or make the required disclosures under the FIL deprives TNR of certain information concerning Playboy's business, such as its operational standards and the assistance Playboy is expected to provide to TNR. This created a significant likelihood that Playboy's promises under the terms of the PLA and Novation Agreement would not be fulfilled—as, indeed, is now the case.

164. Playboy abused its position by performing a predatory audit of TNR's operations based on undisclosed standards and, despite the same performance by

TNR's predecessor, proceeded to (i) ignore TNR's numerous subsequent requests for information and clarity concerning the alleged defects in its performance; (ii) ignore TNR's numerous subsequent attempts to remedy some of those alleged defects, and (iii) use the audit as a basis to claim there was a material breach of the PLA as a pretext to immediately terminate the Agreements.

165.    In addition, Playboy's acts of undermining TNR's license under the PLA by selling Playboy's products through one or more major retailers using TNR's shelf space and resources for which TNR invested and expended funds to sell its goods to the exclusion of TNR's Products threaten and harm competition.

166.    As a direct and proximate cause of Playboy's unlawful, unfair, and/or fraudulent business practices, TNR has suffered damages entitling it to restitutionary disgorgement of all monies Playboy obtained due to its unlawful business practices in an amount to be determined at trial, but exceeding $75,000.

## SIXTH CLAIM FOR RELIEF

### Intentional Interference with Contractual Relations

### (Against Playboy)

167.    TNR hereby incorporates each and every allegation set forth in the preceding paragraphs as though set forth fully herein.

168.    TNR has contractual relationships with its distributors, suppliers, and customers—including but not limited to Walmart, Walgreens, Monarch, Freedom, and Allen—within the Territory set forth in the PLA, where it has operated its condom and lubricant business since 1993.

169.    Each of these contractual relationships have resulted and would continue to result in an economic benefit to TNR.

170.    These contractual relationships were known to Playboy, both independently and through its relationship and dealings with Allen.

171.    TNR's contractual relationship with Walmart was at-will. Playboy was neither a party nor an agent of a party to TNR's contract with Walmart. Playboy

engaged in conduct independent of the actual interference by intentionally misrepresenting its products as belonging to TNR in a presentation to Walmart to disrupt TNR's Walmart agreement and improperly securing shelf space and sales rights at Walmart for Playboy's products. To effectuate those sales, Playboy also deceptively used packaging on its products almost identical to those on TNR's Products. These acts disrupted the contractual relationship between TNR and Walmart by depressing TNR's sales at Walmart, harming TNR's certified supplier status, brand, trust, and reputation with Walmart, making TNR's performance under its agreement with Walmart more difficult, and decreasing TNR's enjoyment of the benefits it derived from the Walmart agreement. As a proximate result of Playboy's wrongful acts to intentionally disrupt the Walmart agreement, TNR experienced decreased profits from sales at Walmart as it was unable to sell as many packages of its Products as it could have absent Playboy's interference.

172. TNR's contractual relationship with Walgreens was of a definite term. Playboy was neither a party nor an agent of a party to TNR's contract with Walgreens. Playboy wrongfully induced Allen to include Playboy's wipes and CBD products in a sales pitch to Walgreens without TNR's knowledge or consent to disrupt TNR's contractual relationship with Walgreens. Subsequently, Playboy further disrupted the contractual relationship between Walgreens and TNR by wrongfully and unreasonably terminating the PLA, harming TNR's status, brand, trust, and reputation with Walgreens, making TNR's performance under its agreement with Walgreens more difficult and decreasing TNR's enjoyment of the benefits it derived from the Walgreens agreement. As a proximate result of Playboy's wrongful acts to intentionally disrupt the Walgreens agreement, TNR was unable to pitch and sell its own Products to Walgreens in its TNR-exclusive sales presentation and lost profits from sales at Walgreens.

173. TNR's contractual relationships with Monarch, Freedom, and Allen were of a definite term. Playboy was neither a party nor an agent of a party to these contracts.

Playboy wrongfully obtained benefits at the expense of TNR for expenses dedicated solely to Playboy's operations—including but not limited to, shipping, logistics costs, social media advertising, marketing data, and payment of rent for commercial space used exclusively by and for the benefit of Playboy—by inducing Allen to submit illegitimate reimbursement requests. Playboy engaged in this misconduct to induce breach of TNR's agreements with Monarch, Freedom, and Allen. As Playboy was aware, Freedom was an entity engaged by TNR for its distribution in the US yet it was used by Playboy to sell Playboy wipes at Walmart as well as receive and send funds from the sales. Playboy's wrongful conduct undermined TNR and committed TNR's resources to benefit Playboy's products, thereby disrupting TNR's contractual relationships with Monarch, Freedom, and Allen and ultimately resulting in actual breach.  As a proximate result of Playboy's wrongful acts to intentionally induce disruption and breach of TNR's agreements with Monarch, Freedom, and Allen, TNR paid monies it otherwise would not have in connection with resources unlawfully diverted to Playboy's products, thereby increasing the cost and burden of TNR's performance under its contracts with Monarch, Freedom, and Allen.

174.    Playboy is a stranger to the contractual relationship between TNR and the aforementioned entities with whom TNR enjoys such contractual relations.

175.    Playboy knew that its acts would interfere in those relationships or it should have known that interference was substantially certain to occur as a result of its actions.

176.    TNR was harmed in an amount to be determined at trial, but exceeding $75,000.

177.    TNR is informed and believes that Playboy's conduct was intentional, malicious, oppressive, and/or designed to damage and harm TNR's operations and reputation, as well as demonstrating a reckless disregard of TNR's rights.  TNR is entitled to compensatory, consequential, exemplary and punitive damages as a result.

## SEVENTH CLAIM FOR RELIEF

### Intentional Interference with Prospective Economic Relations

### (Against Playboy)

178.   TNR hereby incorporates each and every allegation set forth in the preceding paragraphs as though set forth fully herein.

179.   TNR hereby further incorporates each and every allegation set forth in the subsequent paragraphs as though set forth fully herein.

180.   Over the course of TNR's term as licensee, TNR has pursued economic relationships with additional distributors, suppliers, and customers within the Territory set forth in the PLA, all of which were designed to provide TNR with an economic benefit.

181.   Playboy disrupted TNR's prospective economic relationship with CVS, which would have benefitted TNR economically by allowing it to expand sales of its Products to CVS stores, by (i) stealing TNR's professional and financial resources to have Allen present Playboy's products to CVS, using materials created by a presentation vendor paid for by TNR, in a TNR-exclusive presentation; (ii) violating the UCL by wrongfully inducing Allen to present Playboy's products in the aforementioned presentation; and (iii) misrepresenting itself to CVS in or around September 2020 as being an authorized beneficiary of TNR's retailer relationship during the aforementioned presentation. Playboy knew that interference with TNR's prospective economic relationship with CVS was certain or substantially certain to occur as a result of its conversion, wrongful inducement, and intentional misrepresentation to CVS.

182.   Playboy violated the UCL and disrupted TNR's prospective economic relationship with Core-Mark, which would have benefitted TNR economically by allowing it to expand sales of its Products to Core-Mark's convenience stores and gas stations., by wrongfully inducing Allen to put a hold on TNR's negotiations with Core-Mark to force the negotiations to fail and undermine TNR's operations. Playboy knew

that interference with TNR's prospective economic relationship with Core-Mark was certain or substantially certain to occur as a result of its wrongful inducement.

183.   Playboy violated the UCL and disrupted TNR's prospective economic relationship with the Russian distributor, which would have benefited TNR economically by keeping a deposit of $400,000 and expanding sales of its Products to Russia, by wrongfully and unreasonably withholding approval of TNR's deal with the Russian distributor—for which TNR received a deposit of $400,000—for 4-6 months to force the negotiations to fail and undermine TNR's operations. Playboy knew that interference with TNR's prospective economic relationship with the Russian distributor was certain or substantially certain to occur as a result of its wrongful and unreasonable withholding of approval.

184.   The existence of these prospective economic relationships with CVS, Core-Mark, and the Russian distributor was known to Playboy, and Playboy took actions that were intentionally wrongful and exceeded the bounds of fair competition to disrupt and/or divert those relationships.

185.   Playboy's intentional interference with TNR's prospective economic relationships with CVS, Core-Mark, and the Russian distributor prevented those relationships from materializing into economic benefit to TNR and therefore worked to the detriment of TNR's expectations of an economic benefit from those relationships.

186.   Playboy's actions disrupted TNR's prospective economic relationships with CVS, Core-Mark, and the Russian distributor through conversion, misrepresentation, and violation of the UCL.

187.   TNR had a reasonable probability of future business opportunities and economic benefit in connection with its prospective economic relationships with CVS, Core-Mark, and the Russian distributor.

188.   As a proximate result of Playboy's wrongful acts, TNR was harmed in an amount to be determined at trial, but exceeding $75,000.

## **EIGHTH CLAIM FOR RELIEF**

### **Negligent Interference with Prospective Economic Relations**

### **(Against Playboy)**

189.   TNR hereby incorporates each and every allegation set forth in the preceding paragraphs as though set forth fully herein.

190.   TNR had a reasonable probability of future business opportunities and economic benefit in connection with, but not limited to, its prospective economic relationships with CVS, Core-Mark, and the Russian distributor.

191.   Playboy owed a duty of care to perform its obligations under the Seventh Amendment of the PLA and the Novation Agreement in a way that did not cause foreseeable harm to TNR's business.

192.   Playboy had knowledge of TNR's prospective economic relationship with CVS, Core-Mark, and the Russian distributor and Playboy knew or should have known that if it did not act with due care, Playboy's actions would interfere with TNR's opportunities with CVS, Core-Mark, and the Russian distributor, causing TNR to lose the economic benefit of such relationships.

193.   Playboy failed to uphold its duty of care, thus disrupting and/or diverting TNR's prospective economic relationships and exceeding the bounds of fair competition.

194.   But for Playboy's negligent performance of its obligations by way of inducing Allen to present Playboy's products in a TNR-exclusive presentation to CVS, TNR would have economically benefited from the CVS relationship.

195.   But for Playboy's negligent performance of its obligations by way of inducing Allen to insert Playboy in the Core-Mark relationship and to put TNR's negotiations with Core-Mark on hold, TNR would have economically benefited from the Core-Mark relationship.

196.   But for Playboy's negligent performance of its obligations by way of withholding timely approval of the deal for sales in Russia, TNR would have

economically benefitted from the Russian distributor relationship.

197.   Playboy failed to perform its obligations under the Seventh Amendment of the PLA and the Novation Agreement in a way that caused unforeseeable harm to TNR's business, thereby disrupting TNR's relationships and business opportunities with CVS, Core-Mark, the Russian distributor and perhaps other entities presently unknown.

198.   As a proximate result of Playboy's negligence, TNR was injured by Playboy in an amount to be determined at trial, but exceeding $75,000.

## NINTH CLAIM FOR RELIEF

### Fraudulent Inducement to Contract

### (Against Playboy)

199.   TNR hereby incorporates each and every allegation set forth in the preceding paragraphs as though set forth fully herein.  In particular, TNR specifically reiterates and incorporates by reference herein paragraphs numbered 43-53 which detail the fraudulent inducement.

200.   As a material inducement to enter into the Eighth Amendment, Playboy intentionally concealed or suppressed the material fact that CBD condoms and lubricants were included in the scope of the PLA in its communications with Allen on July 8, 2019 at 7:56 PM and 8:26 PM, which was underscored by the lack of any consideration tendered by Playboy for the Eighth Amendment (*first concealment or suppression*).  In the same e-mails, Playboy also intentionally concealed or suppressed the material fact that Playboy needed the Eighth Amendment to lawfully implement its CBD sexual wellness product line without violating the terms of the PLA (*second concealment or suppression*).  Playboy had a duty to disclose the aforementioned material facts regarding the Eighth Amendment (i) as an incident of the contractual relationship between Playboy and TNR due to Playboy's representations under the Novation Agreement and Seventh Amendment to the PLA that it would be a supportive licensor to TNR; (ii) because Patel made false representations about the

PLA's scope but did not disclose facts that materially qualified the facts disclosed or that the representations rendered her disclosure likely to mislead TNR; and/or (iii) because Patel actively concealed discovery of the material facts from TNR by not disclosing such facts during Playboy's discussions with Allen, whom Playboy knew TNR relied upon for its US operations (*duty to disclose*).  Playboy intended to defraud TNR by intentionally concealing or suppressing the material facts that CBD condoms and lubricants were in fact included in the scope of TNR's licensing rights, and that Playboy needed TNR to sign the Eighth Amendment to lawfully implement its CBD growth plan (*intent to defraud*).  At the time of Playboy's concealment or suppression, TNR was ignorant of the material facts concealed or suppressed by Playboy (*lack of knowledge*).  If TNR had been aware of the existence of the material facts concealed or suppressed by Playboy, Khun Amorn would not have signed the Eighth Amendment on behalf of TNR because (i) lubricants of all kinds were central to TNR's business, as evidenced by condom and lubricant pairings; and (ii) TNR sought to develop CBD, THC, and other cannabinoid products; instead, because of Playboy's concealment or suppression of the aforementioned facts, TNR was induced into signing the Eighth Amendment and unknowingly transferred its licensing rights to CBD condoms and lubricants back to Playboy (*causation/injury*).

201.   As a material inducement to enter into the Eighth Amendment, Playboy also intentionally made a false representation that CBD condoms and lubricants were excluded from the scope of the PLA.  On July 8, 2019 at 8:26 PM, Patel made a representation that it was a "[r]eality" that CBD condoms and lubricants were excluded from the scope of the PLA (*representation by Playboy*).  Playboy's representation was false, as evidenced by the express language of the PLA (*falsity*).  Playboy knew that the representation was false when it made the representation to Allen, TNR's global sales consultant at the time (*knowledge of falsity*).  Playboy intended that TNR rely on the false representation to induce TNR into signing the Eighth Amendment, which Playboy needed to lawfully implement its CBD sexual wellness product line—CBD

by Playboy—without violating the terms of the PLA (*intent to induce reliance*).  TNR reasonably relied on Playboy's false and fraudulent representation, which was communicated to Khun Amorn by Allen, due to (i) TNR's lack of experience and expertise in the American market; (ii) Allen's specific role as TNR's primary resource for guidance on US operations given TNR's lack of experience and expertise in the American market; (iii) Playboy's affirmative misrepresentation that it was a "reality" that CBD products were not included in the scope of the PLA; and (iv) Playboy's knowledge of the fact that the misrepresentation conveyed to Allen would be communicated to TNR given Allen's role as TNR's American market advisor. Due to the foregoing reasons, Khun Amorn relied upon Playboy's intentional misrepresentation of material facts and strategically crafted sense of urgency and was induced into signing the Eighth Amendment without the benefit of an attorney and with no consideration from Playboy. (*justifiable reliance*).  TNR's reliance on Playboy's false and fraudulent representation was a substantial factor in causing harm to TNR because TNR would not have signed the Eighth Amendment, resulting in loss of licensing rights to CBD condoms and lubricants, had it not reasonably relied on Playboy's false representation (*causation/injury*).

202.   Playboy's use of intentional fraudulent conduct was a deliberate tactic to induce TNR to sign the Eighth Amendment.  As a direct and proximate result of Playboy's fraudulent concealment or suppression and false and fraudulent representation, TNR has suffered damages.  The amount of these damages has not been precisely determined and the damages are continuing to accrue.  TNR is also entitled to rescission as an alternative to remedy its damages claims.

203. Playboy's acts alleged above included deceit and/or fraudulent concealment or suppression of material facts as well as false or fraudulent representation of a material fact known to Playboy with the intent of inducing TNR into signing the Eighth Amendment, depriving TNR of its property or legal rights or otherwise causing injury, and were despicable, malicious, oppressive, and/or

fraudulent conduct that subjected TNR to a cruel and unjust hardship in a conscious disregard of TNR's rights, so as to justify an award of exemplary and punitive damages in an amount to be proven at trial, but exceeding $75,000.

## TENTH CLAIM FOR RELIEF
### Conversion
### (Against Playboy)

204.   TNR hereby incorporates each and every allegation set forth in the preceding paragraphs as though set forth fully herein.

205.   Playboy has completely failed and/or refused to account for the use of TNR's funds for Playboy's expenses and has completely failed to pay for or return any of TNR's funds, but has nevertheless benefited from TNR's retailer account and funds, paving the way for the sales of Playboy's sexual wellness products.

206.   Instead, to satisfy its own operational costs relating to Playboy's sexual wellness products, Playboy wrongfully, unlawfully, and intentionally converted TNR's funds for Playboy's personal use in their entirety.

207.   Playboy usurped TNR's resources for costs relating to Playboy's independent sexual wellness operations, including but not limited to:

    **a.**    All funds paid by TNR for costs relating to Playboy wipes such as payments for iheart wipes advertising, BLKLYST Wipes and CBD advertising, product liability insurance for Playboy wipes at CVS, sales commissions for Playboy wipes, bonuses on sales growth for Playboy wipes, EDI fees and monthly management fee for Playboy wipes, QuickBooks monthly fee, accounting expenses, and other significant shipping, storage, advertising, marketing, costs and fees benefiting Playboy, the sum total of which can be ascertained and confirmed by third-party invoices detailing expenses incurred and paid by TNR from November 2019 to August 31, 2021 but exceeding $497.860.75.

    **b.**    TNR's payment of $210,000 to Allen from November 2019 to December 2020 arising from Playboy's poaching of Allen to be a double agent and

undermine TNR's operations;

      **c.**    $51,520 in office rental and parking costs from approximately November 2019 to December 2020 for Playboy's operations; and

      **d.**    $6,953.95 for construction and remodeling costs for Playboy's offices.

208.   TNR is the rightful owner of and has an immediate right to possession of the funds converted by Playboy.

209.   TNR in no manner consented to Playboy's misappropriation of its funds.

210.   TNR has performed all of the conditions, covenants, and promises required on its part to be performed in accordance with the terms and conditions of the PLA.

211.   TNR is entitled to restitution from Playboy's unjust enrichment because Playboy knew or had reason to know that the payments Freedom sent to Playboy actually belonged to TNR.

212.   TNR is entitled to restitution from Playboy's unjust enrichment because Playboy knew or had reason to know it was being saved from expense or loss by having TNR's resources pay for Playboy's operational costs.

213.   As a direct and proximate result of Playboy's conversion of TNR's monies, TNR has been damaged in a specific sum capable of identification through discovery as there are thousands of invoices TNR must analyze and additional requisite information is known only to Playboy and/or Allen, but exceeding $492,864.32.

## ELEVENTH CLAIM FOR RELIEF

### Breach of Fiduciary Duty

### (Against Allen)

214.   TNR engaged Allen as global sales consultant for the Products, and authorized him to conduct business on TNR's behalf. Allen assumed an integral role in TNR's operations and assisted in managing TNR's Products in the US under the

PLA.

215.   TNR entrusted Allen with these responsibilities based on Allen's previous position at UMD and experience with the Playboy condoms and lubricant business, which placed him in a singular and essential position to guide TNR's transition efforts and left TNR heavily dependent upon Allen.

216.   Allen served as consultant to TNR in connection with its Products in the United States, and TNR entrusted Allen to represent its interests in conducting business on its behalf in the consultant capacity.  As a result, Allen owed TNR certain fiduciary duties including the duty of undivided loyalty.

217.   Allen breached his fiduciary duties by conducting business directly with Playboy to his benefit, and TNR's detriment.  For example, Allen acted covertly to develop a wipes product sometime in 2019 with the goal of using TNR's relationships and credentials with retailers in addition to its shipping, storage, logistics, insurance, and other resources to sell the product under the Playboy brand for his own benefit rather than TNR's.

218.   After Allen learned that Playboy wished to take away exclusive rights from TNR to sell in the USA and Canada, Allen entered into a deal with Playboy whereby Allen would have the ability to sell his wipes product under the Playboy brand, and Playboy would have a means to charge into the sexual wellness space using TNR's retail and distributor relationships.

219.   In or about November 2019 Playboy offered Allen an independent consulting role, which TNR later learned that he accepted in exchange for $100,000 plus sales commissions.  Playboy offered this position to Allen without informing TNR, and while Allen continued to serve as global sales consultant for TNR through Monarch and remained a director of Freedom, TNR's US distributor.

220.   Without the assistance of Allen, Playboy and Allen would not have been able to implement their improper scheme to use TNR's retail and distributor relationships, shelf space, insurance, shipping, and other resources to distribute the

Playboy wipes.

221.  As a result of Allen's actions, Playboy and Allen were able to distribute the Playboy wipes using TNR's business relationships, shelf space, insurance, shipping, and other resources, at the expense of TNR.  TNR has accordingly been damaged in a specific sum capable of identification through discovery, as there are invoices and other information currently known only to Playboy and/or Allen.

## PRAYER FOR RELIEF

**WHEREFORE**, TNR prays for judgment against Playboy as follows:

1.  For damages and restitution in an amount in excess of $100,000,000, including but not limited to expected profits under the license through 2027, the $15 million purchase price of the license (including $750,000 as initial consideration under the Novation Agreement), startup costs and initial investments of approximately $13 million, royalties, the reimbursements and returns of monies and inventory to and from third parties due to the sudden termination, revenue loss from unreasonably withheld product approvals, interference with contractual and prospective economic relationships, loss of stock market valuation, business interruption and reputational business damage due to the wrongful termination, unsold and returned inventory of approximately $17 million due to Playboy's retaliatory refusal to allow a sell-off period under to the wrongful termination, undue payments to Playboy from TNR's funds for Playboy related expenses, restitutionary disgorgement of all monies obtained due to Playboy's unlawful business practices, and numerous operating losses, including but not limited to having to cancel third party contracts, and operating contracts for employees and vendors for storage and related logistics;

2.  Fair market value of the franchised business and franchise assets, any other damages that result from Playboy's wrongful termination of the PLA, and injunctive relief;

3.  For an award of general, special, consequential and other damages;

4.      For exemplary and punitive damages as allowable by law;

5.      For other compensatory damages;

6.      For equitable relief, including unjust enrichment and/or rescission;

7.      For reasonable attorneys' fees;

8.      For costs of suit and expert fees incurred; and

9.      For such other relief as the Court may deem proper.

## DEMAND FOR JURY TRIAL

TNR hereby demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure and Local Rule 38-1.


Dated: March 16, 2022                          **DUANE MORRIS LLP**


By: */s/ Cyndie M. Chang*
Cyndie M. Chang

Attorneys for Plaintiff
*Thai Nippon Rubber Industry Public Limited Company*