# EXHIBIT 1

INDEX TO UNITED MEDICAL DEVICES, LLC
PRODUCT LICENSE AGREEMENT

THE SCHEDULE

PARAGRAPH                                                              PAGE NO.

1.   GRANT OF LICENSE
     a.   Grant                                                        8 - 9
     b.   Term                                                         9
     c.   License Year and License Quarter                             10
     d.   Territory                                                    10
     e.   Minimum Net Sales                                            10

2.   COVENANTS OF LICENSEE
     a.   Use                                                          11 - 12
     b.   (i)    Maintaining Goodwill                                  12
          (ii)   Compliance with Law                                  12
     c.   Distribution Channels                                       12
     d.   Royalties
          (i)    Guaranteed Royalties                                 12 - 13
          (ii)   Earned Royalties                                     13
          (iii)  Interest                                             13
          (iv)   Letter of Credit                                     13
     e.   Statements and Payments                                     13 - 15
     f.   Records and Audit                                           15
     g.   Expenses of Conducting Examinations                         15
     h.   Product Quality                                             15 - 16
     i.   Approval of Products and the Materials                      16 - 18
     j.   Title and Protection and Preservation
          of Playboy Properties and Copyrights                        18 - 19
     k.   Right to Subcontract, Licensee Financial Statements
          and Lists of Sources and Accounts                           19 - 20
     l.   Inventory and Holograms                                     20 - 21
     m.   Playboy Properties and Non-Competitive Brands               21 - 22
     n.   Indemnification and Product
          Liability Insurance                                         22 - 23
     o.   Advertising Expenditures, Advertising Plans and Public Relations   23 - 24

3.   ADDITIONAL COVENANTS OF THE PARTIES
     a.   Reservation of Rights                                       24
     b.   Certain Sales                                               24
     c.   Investment Opportunity                                      24

4.   TITLE AND PROTECTION
     a.   Indemnification by Licensor                                 24 - 25
     b.   Enforcement                                                 25

5.   RELATIONSHIP BETWEEN THE PARTIES
     a.   No Joint Venture                                            25
     b.   Assignment                                                  25 - 26

INDEX TO UNITED MEDICAL DEVICES, LLC
PRODUCT LICENSE AGREEMENT

(Continued)

| | | |
|---|---|---|
| 6. | **SUBLICENSING** | 26 |
| | | |
| 7. | **DEFAULTS AND RIGHTS OF TERMINATION** | |
| | a.    Defaults and Right to Cure | 26 |
| | b.    Bankruptcy or Assignment for | |
| |     Creditors, Business Discontinuance | 26 - 27 |
| | c.    Loss of Trademark Rights | 27 |
| | | |
| 8. | **EXPIRATION OR TERMINATION** | |
| | a.    Effect of Expiration or Termination | 27 |
| | b.    Reserved Rights | 27 |
| | c.    Continued Sales After Expiration | |
| |     or Termination | 27 - 28 |
| | d.    Inventory After Expiration or Termination | 28 - 29 |
| | e.    Equitable Relief and Legal Fees | 29 |
| | f.    Termination Fee | 29 |
| | g.    Continuity of Sales | 29 |
| | | |
| 9. | **NOTICES** | |
| | a.    Effectiveness | 29 - 30 |
| | b.    Address Change | 30 |
| | | |
| 10. | **CONFIDENTIAL INFORMATION** | 30 |
| | | |
| 11. | **SEVERABILITY** | 30 |
| | | |
| 12. | **CONSENTS AND APPROVALS** | 31 |
| | | |
| 13. | **APPLICABLE LAW** | 31 |
| | | |
| 14. | **NO BROKER** | 31 |
| | | |
| 15. | **CONSTRUCTION** | 31 |
| | | |
| 16. | **SURVIVABILITY** | 31 |
| | | |
| 17. | **RIGHTS CUMULATIVE** | 31 |
| | | |
| 18. | **LIMITATION OF LIABILITY** | 31 |
| | | |
| 19. | **ENTIRE AGREEMENT** | 31 |

THE SCHEDULE referred to in the Agreement made as of April 1, 2010.

S.1.         LICENSOR:              **PLAYBOY ENTERPRISES INTERNATIONAL, INC.**
                                    **680 North Lake Shore Drive**
                                    **Chicago, IL  60611**

S.2.         LICENSEE:              **UNITED MEDICAL DEVICES, LLC**
                                    **9595 Wilshire Boulevard, Suite 502**
                                    **Beverly Hills, CA  90210**
                                    **Contact:        Mr. Patrick Bertranou**
                                    **Telephone:    310-498-3211**
                                    **E-Mail:          Ppber2@pacbell.net**

S.3.         **THE TRADEMARKS:**

             PLAYBOY and Rabbit Head Design (as depicted in **Exhibit A** attached hereto and made
             a part hereof).

             **THE IMAGES:**

             Certain images, patterns and graphics from Licensor's art and photo archives and Style
             Guides, which are approved in advance in writing by Licensor on a case-by-case basis.
             Although Licensee may submit to Licensor a request to use certain images, patterns and
             graphics, any specific images to be added to the Agreement will be granted in Licensor's
             reasonable discretion in writing and based on appropriateness for the Products,
             Licensor's current strategic or business plans and availability of rights.

S.4.         **THE TYPE OF LICENSE:**

             Exclusive, except as set forth in **Paragraph 1.a.(iii)** of the Agreement.

S.5.         **THE USE OF THE PLAYBOY PROPERTIES:**

             Subject to the provisions of **Paragraph 2.c.** of the Agreement, design, manufacture,
             advertise, promote, sell and distribute the Products (either directly itself or through
             distributors) to or through:  (i) Playboy-branded retail stores, and specialty stores, mass
             stores and convenience stores (i.e. physical stores) located in the Territory and duty-free
             stores (but specifically excluding in-flight and cruise ship duty-free channels of
             distribution or duty-free sales that take place on airplanes, cruise ships or through duty-
             free sales magazines) (which may or may not have their own "E-Commerce Web Site"
             (as such term is defined in **Paragraph 1.a.(iii)** of the Agreement)); (ii) non-Playboy
             branded catalogs; (iii) "E-tailers" (as such term is hereinafter defined) which will promote
             the availability of the Products via such E-tailers' "E-Commerce Web Sites" and which will
             ship orders for the Products placed through such "E-Commerce Web Sites" to, and only
             to, those addresses located in the Territory; and (iv) an "E-Commerce Web Site" owned
             or controlled by either Licensee or any distributor which will promote the availability of the
             Products via such "E-Commerce Web Site" and which will ship orders for the Products
             placed through such "E-Commerce Web Site" to, and only to, those addresses located in
             the Territory.  "E-tailers" shall mean any entity engaged in the promotion and sale of the
             Products whose primary means of promotion, sale or distribution of the Products is via an
             "E-Commerce Web Site."  All rights granted under the License shall be subject to the
             terms and conditions of the E-Commerce Guidelines attached hereto as **Exhibit B** and

made a part hereof.  In the event Licensee fails to adhere to the terms and conditions of the E-Commerce Guidelines or is aware that an affiliated or third-party distributor or E-tailer of Licensee fails to adhere to the terms and conditions of the E-Commerce Guidelines and Licensee fails to take reasonable actions to address such failure by the affiliated or third-party distributor or E-tailer, Licensor may deem such failure to be an incurable default under the terms and conditions of the Agreement.

S.6.        **THE PRODUCTS:**

Condoms bearing and sold in connection with the Playboy Properties, as defined in the Agreement.

S.7.        **THE TERRITORY:**

Algeria, Angola, Benin (OAPI), Botswana, Burkina Faso (OAPI), Cameroon (ASPI), Cape Verde, Central African Republic (OAPI), Chad (OAPI), Congo (OAPI), Djibouti (OAPI), Egypt, Equatorial Guinea (OAPI), Eritrea, Ethiopia, Gambia, Ghana, Guinea (OAPI), Guinea Bissau (OAPI), Kenya, Madagascar, Malawi, Mali (OAPI), Mauritania (OAPI), Mauritius, Morocco, Mozambique, Namibia, Niger (OAPI), Nigeria, Reunion, Senegal, Seychelles, Sierre Leone, Somalia, South Africa, Swaziland, Tanzania, Togo (OAPI), Tunisia, Uganda, Zambia and Zimbabwe (sometimes collectively referred to in the Agreement as "Region 1").

Antigua and Barbuda, Aruba, Bahamas, Barbados, Belize, Bermuda, Bolivia, Brazil, Chile, Colombia, Costa Rica, Dominica, Dominican Republic, Ecuador, El Salvador, French Guyana, Grenada, Guatemala, Guyana, Haiti, Honduras, Jamaica, Netherlands Antilles, Nicaragua, Panama, Paraguay, Peru, St. Kitts and Nevis, St. Lucia, St. Vincent and the Grenadines, Suriname, Trinidad and Tobago, Uruguay and Venezuela (sometimes collectively referred to in the Agreement as "Region 2").

Afghanistan, Australia, Bahrain, Bangladesh, Bhutan, Brunei, Cambodia, China, Cook Islands, Fiji Islands, Hong Kong, India, Indonesia, Israel, Jordan, Kadavu, Kiribati, Kyrgyzstan, Laos, Lau Group, Lebanon, Lomaiviti Group, Macau, Malaysia, Maldives, Mamauca Islands, Mongolia, Nepal, New Calendonia, New Zealand, Norfolk Islands, Oman, Pakistan, Palestine, Philippines, Polynesia, Qatar, Rotuma, Singapore, South Korea, Sri Lanka, Tahiti, Taiwan, Tajikistan, Taveuni, Thailand, Timor Leste, Turkmenistan, United Arab Emirates, Uzbekistan, Vanuatu, Vietnam, Yasawa Group and Yemen.  Japan will be added as of August 1, 2011 and will be non-exclusive for the period August 1, 2011 through October 31, 2011 (sometimes collectively referred to in the Agreement as "Region 3").

Albania, Andorra, Armenia, Austria, Azerbaijan, Belarus, Belgium, Bosnia, Bulgaria, Czech Republic, Croatia, Cyprus, Denmark, Estonia, Faroe Islands, Finland, France, Georgia, Germany, Gibraltar, Greece, Guernsey, Hungary, Iceland, Ireland, Italy, Jersey, Kazakhstan, Kosovo, Latvia, Liechtenstein, Lithuania, Luxembourg, Macedonia, Malta, Moldova, Monaco, Montenegro, Netherlands, Norway, Poland, Portugal, Romania, Russia, San Marino, Serbia, Slovakia, Slovenia, Spain, Sweden, Switzerland, Turkey, Turkish Republic of Northern Cyprus, Ukraine and United Kingdom (sometimes collectively referred to in the Agreement as "Region 4")

United States and Canada (sometimes collectively referred to in the Agreement as "Region 5").

Anything in this Agreement to the contrary notwithstanding, Licensor makes no warranties or representations as to its ownership or control of the Trademarks set forth below for the countries of the Territory set forth below.  Licensor makes no warranties or

representations as to the validity of such Trademarks in such countries. As a result, Licensor shall not be responsible for any claims, suits or causes of action arising out of or in connection with Licensee's use of such Trademarks in such countries. Further, Licensee understands and accepts that Licensor may not be able to enforce any rights in and to those Trademarks in such countries, the result of which is that Licensor may not be able to prevent any third party from using such Trademarks on products identical or similar to the Products in such countries. Licensee agrees not to hold Licensor responsible for any such third-party actions it may not be able to prevent. In addition, Licensee shall indemnify, protect and hold Licensor harmless from and against any and all claims, suits, liabilities or other causes of action that may arise out of or in connection with Licensee's use of such Trademarks in such countries set forth below. While Licensor is seeking trademark protection as available under local laws for such Trademarks in such countries for the Products, as a result of trademark laws in such countries, Licensee acknowledges that Licensor may not have confirmation as to the results of such protection for some time. In the event that during this process Licensor determines that there are any third parties with earlier conflicting rights for any of the Trademarks for the Products in any such country, Licensor explicitly retains the right, in its discretion, upon written notice to Licensee, to remove any such country from the Territory for the Trademark(s) for which earlier third-party rights exist without liability to Licensee or obligation to Licensee beyond such written notice.

| Country | Trademarks |
| --- | --- |
| Cape Verde | PLAYBOY |
| Cape Verde | Rabbit Head Design |
| Cook Islands | PLAYBOY |
| Cook Islands | Rabbit Head Design |
| Eritrea | PLAYBOY |
| Eritrea | Rabbit Head Design |
| Ethiopia | PLAYBOY |
| Ethiopia | Rabbit Head Design |
| Gambia | Rabbit Head Design |
| Kosovo | PLAYBOY |
| Kosovo | Rabbit Head Design |
| Maldives | PLAYBOY |
| Maldives | Rabbit Head Design |
| Montenegro | PLAYBOY |
| Montenegro | Rabbit Head Design |
| Mozambique | Rabbit Head Design |
| Polynesia | PLAYBOY |
| Polynesia | Rabbit Head Design |
| Seychelles | Rabbit Head Design |
| Sierra Leone | Rabbit Head Design |
| Somalia | PLAYBOY |
| Somalia | Rabbit Head Design |
| Tahiti | PLAYBOY |
| Tahiti | Rabbit Head Design |

S.8.       **THE COMMENCEMENT DATE:**

April 1, 2010

S.9.       **THE EXPIRATION DATE:**

June 30, 2020

S.10.        **THE MINIMUM NET SALES:**

[Redacted]

[Redacted]

S.11.     GUARANTEED ROYALTIES:
                                        [Redacted]

S.12.     EARNED ROYALTIES:

                                        [Redacted]

S.13.     THE ADDRESS WHERE BOOKS KEPT:  See Paragraph S.2. above.

UNITED MEDICAL DEVICES, LLC                PLAYBOY ENTERPRISES
(LICENSEE)                                 INTERNATIONAL, INC.
                                           (LICENSOR)

By: _____               By: _____

Title: _____C.F.O_____                  Title: __Assistant Counsel__

Date: ___August 24, 2011___                Date: ____8|24|2011_____

## LICENSE AGREEMENT

This Agreement is made as of April 1, 2010, by and between the corporation described in **Paragraph S.1.** of the Schedule attached hereto and made a part hereof (hereinafter referred to as "Licensor") and the corporation described in **Paragraph S.2.** of the Schedule (hereinafter referred to as "Licensee").

RECITALS

WHEREAS, Licensor has certain rights in and to the trademark PLAYBOY and the other trademarks identified in **Paragraph S.3.** of the Schedule and as depicted in **Exhibit A** (the "Trademarks") and to certain images from Licensor's art and photo archives (the "Images"). The Trademarks and Images may sometimes be collectively hereinafter referred to as the "Playboy Properties;"

WHEREAS, Licensee recognizes that Licensor is an international multimedia entertainment company that publishes editions of *Playboy magazine* around the world; operates television networks and distributes programming globally; owns Playboy.com, a leading men's lifestyle and entertainment web site; and licenses the Playboy trademarks internationally for a range of consumer products and services, including retail stores; and

WHEREAS, the parties hereto desire that Licensor grant to Licensee a license to use the Playboy Properties in the design, manufacture, advertising, promotion, sale and distribution of the "Products" (as identified in **Paragraph S.6.** of the Schedule hereof and defined in **Paragraph 1.a.(i)** below).

NOW, THEREFORE, in consideration of the mutual promises herein contained, it is mutually agreed as follows:

1.      **GRANT OF LICENSE.**

    a.      <u>Grant</u>:

        (i)      Upon and subject to the terms and conditions hereinafter set forth, Licensor hereby grants to Licensee, and Licensee hereby accepts, the right, license and privilege specified in **Paragraph S.4.** of the Schedule to use the Playboy Properties in connection with, and only with, the use specified in **Paragraph S.5.** of the Schedule on and in connection with specifically designated and approved articles of merchandise specified in **Paragraph S.6.** of the Schedule (such merchandise bearing and distributed in connection with the Playboy Properties shall be referred to as the "Products" herein) in all countries of all Regions of the territory specified in **Paragraph S.7.** of the Schedule (hereinafter collectively referred to herein as the "Territory"). Such right, license and privilege is hereinafter referred to as the "License." It is understood and agreed that while the manufacture of the Products may take place outside the Territory, none of the Products may be advertised, promoted, sold or distributed outside the Territory by Licensee. Notwithstanding the foregoing, advertisements or promotions of the Products by Licensee that can be accessed from outside the Territory but are not targeted to that area, e.g., images on the Internet, shall not constitute a violation of this provision.

        (ii)      Nothing contained in this Agreement shall prevent Licensor (on behalf of itself and its subsidiaries and affiliated companies) from doing any or all of the following: (a) using or granting one or more others the right or license to use the Playboy Properties on or in connection with the Products in any area of the world other than the Territory or in the Territory through any channels of distribution not included in the provisions of **Paragraph S.5.** of the Schedule attached hereto or on or in connection with any services or goods other than the Products in any or all area(s) of the world including the Territory; and/or (b) manufacturing or having manufactured in the Territory the Products for sale outside the Territory.

(iii)    Intentionally left blank.

(iv)    Licensee acknowledges that there are a number of authorized Playboy-branded stores in various countries around the world. In the event the licensees for any such Playboy-branded stores wish to purchase any of the Products from Licensee or its distributors for sale through the Playboy-branded stores, Licensee may fulfill such orders subject to the provisions of this **Paragraph 1.a.(iv).** While fulfillment of such orders may consist of Licensee or its distributors shipping the Products outside of the Territory, such shipments of the Products to such authorized Playboy-branded stores outside of the Territory will not be a violation of the Territory restrictions set forth in this Agreement; provided, however, that (a) Licensee may not solicit such orders outside of the Territory; (b) Licensee must report such sales separately on the "Statements" (as defined in **Paragraph 2.e.(i)** hereof); (c)                    **[Redacted]**

and (d) Licensee must notify Licensor in advance in writing of any such order and must obtain Licensor's prior written approval to fulfill such orders. Notwithstanding the foregoing, the written approval of Licensor to fulfill a Playboy-branded store order shall constitute approval to fill future orders for such Playboy-branded store unless Licensor notifies Licensee otherwise in writing. Further, in the event Playboy has opened or opens, itself or through a third party, a Playboy-branded store in the Territory, the licensee for such Playboy-branded store in the Territory must source the Products from Licensee and sell such Products or similar products through such Playboy-branded store in the Territory.

(v)    Anything in this Agreement to the contrary notwithstanding, Licensee shall have no right through the License to open or operate a free-standing retail store using the Playboy Properties or any of Licensor's other intellectual property on or in connection with such store or the signage for such store.

(vi)    Licensee shall be responsible for and shall assume and pay for all costs and expenses arising out of or in connection with Licensee's responsibilities, duties and obligations set forth in this Agreement, including, but not limited to, those costs and expenses related to Licensee's design, manufacture, advertising, promotion, sale and distribution of the Products.

b.    Term:

(i)    The term of the License and this Agreement (hereinafter referred to as the "Term") shall commence on the date specified in **Paragraph S.8.** of the Schedule (hereinafter referred to as the "Commencement Date") and shall expire at midnight, Chicago time, on the date specified in **Paragraph S.9.** of the Schedule (hereinafter referred to as the "Expiration Date"), unless sooner terminated or renewed as provided in this Agreement.

(ii)    This Agreement will automatically renew for ten (10) additional License Years on the conditions that: (a) Licensee shall be in full compliance with all of the terms and conditions of this Agreement, including, but not limited to, the timely payment of all amounts required under this Agreement; and (b) the "Minimum Net Sales" in all Regions of the Territory have been met or exceeded for each the last two License Years of this Agreement, Licensor and Licensee will, not more than six (6) consecutive calendar months prior to the Expiration Date, commence negotiations for a renewal of the License and this Agreement. In the event that Licensor and Licensee cannot reach agreement on the terms and conditions of such renewal, including, but not limited to, "Guaranteed Royalties" (as defined in **Paragraph 2.d.(i)** hereof), "Earned Royalties" and "Minimum Net Sales" by the Expiration Date, it will be conclusively presumed that such parties cannot reach agreement and Licensor will be free to pursue such licensing opportunities without obligation or liability to Licensee. Any such renewal must be evidenced in a writing signed by the parties.

c.      License Year and License Quarter:

(i)      For all purposes under this Agreement, a "License Year" shall be each twelve (12) consecutive calendar month period commencing on each April 1st of the Term and ending at midnight, Chicago time, on each following March 31st of the Term, and if the expiration or termination of the License and this Agreement is effective other than at the end of any such twelve (12) month period, then the final period of less than twelve (12) months ending on the effective date of such expiration or termination shall be deemed to be a License Year.

(ii)      For all purposes under this Agreement, a "License Quarter" shall be the first three (3) consecutive calendar months of the first License Year and each succeeding three (3) month period of the first License Year and each License Year thereafter, and if the expiration or termination of the License and this Agreement is effective other than at the end of a License Year, then the final period of less than three (3) months ending on the effective date of such expiration or termination shall be deemed to be a License Quarter.

d.      Territory:  The License shall extend only to the Territory, and the use by Licensee of the Playboy Properties shall be confined to the Territory.  Licensor shall have the right, but not the obligation, to terminate this Agreement by deeming any sales or distribution of the Products or use of the Playboy Properties by Licensee outside of the Territory to be an incurable default under this Agreement.  Such sales of the Products or use of the Playboy Properties shall include any sales by Licensee of the Products in the Territory for resale outside of the Territory.

e.      Minimum Net Sales:

(i)      Notwithstanding anything in this Agreement to the contrary, if Licensee's "Net Sales" in any License Year in any Region of the Territory are less than those amounts specified in **Paragraph S.10.** of the Schedule for any such License Year and any such Region of the Territory, then Licensor shall have the right to either:  (A) declare the License to be non-exclusive as to any Region of the Territory in which such shortfall occurs, thereby giving Licensor the rights to design, manufacture, advertise, promote, sell and distribute the Products in any such Region of the Territory in competition with Licensee or otherwise grant any or all of such rights to one or more other parties; or (B) terminate the License as to any such Region, in which case, such Region will be deleted from the Territory and this Agreement.  In the event that a Region is removed from the Agreement, as set forth above, the Guaranteed Royalty for each of the remaining License Years will be reduced by the percentage of sales such Region represented as part of the overall total Net Sales for the License Year in which such Region was removed.

(ii)      In the event there is a shortfall in the Minimum Net Sales amount in any License Year for all Regions of the Territory, then Licensor will have the option to terminate the License and this Agreement by deeming the failure to attain the Minimum Net Sales in all Regions of the Territory to be an incurable default under this Agreement.  Such declaration, deletion or termination:  (A) shall be immediately effective upon the receipt by Licensee of written notice from Licensor which shall be sent no later than forty-five (45) days after Licensor's receipt of the "Statement" (as defined in **Paragraph 2.d.(i)** hereof) for the end of each License Year and which evidences any such shortfall; and (B) shall have no effect upon the amounts due and payable to Licensor for periods prior to or after such declaration or termination.  For purposes of clarification, in the event the Net Sales in a Region of the Territory in a License Year exceeds the Minimum Net Sales threshold for such Region of the Territory in such License Year, such overage may not be used as an offset against any other minimums or guarantees hereunder including any Minimum Net Sales shortfall in such License Year in any other country of the Territory.  Further, Licensee may not use any such overage to offset any Minimum Net Sales shortfall in any other License Years.

**2.      COVENANTS OF LICENSEE.**

a.   <u>Use</u>:

(i)   Subject to Licensor's prior approval as hereinafter required, Licensee shall commence bona fide commercial sales of the Products in each Region of the Territory as soon as practicable after the Commencement Date, but in no event later than October 1, 2011.  If Licensee fails to commence any such sales in any Region by any such dates, Licensor may elect to remove any country of any such Region or all countries of any such Region from the Territory.  In the event Licensee fails to commence any such sales in all Regions of the Territory by such dates and Licensor has removed all Regions from the Territory, then this Agreement shall, upon the date of the removal of the final Region of the Territory, automatically terminate as the result of an incurable default under this Agreement.  In the event during any License Year, Licensee has not on a regular and ongoing basis sold and distributed the Products in each country of each Region of the Territory, then Licensor shall have the right to delete, from the Schedule upon not less than thirty (30) days' prior written notice to Licensee, any country to which Licensee has not so sold and distributed.  In the event that all Regions are deleted from the Territory, then the License and this Agreement will automatically terminate due to an incurable default.  For purposes of clarification, the sales discussed in this **Paragraph 2.a.(i)** are bona fide commercial sales, which are volume sales to the distribution channels listed in **Paragraph S.5.** of the Schedule for sale or distribution to consumers and will specifically exclude sample sales to distributors or wholesalers.

(ii)   Licensee shall not cause or authorize any use of the Playboy Properties in any area of the world outside the Territory and shall not knowingly manufacture, sell or otherwise deal with or distribute any of the Products on behalf of or to any individual or entity that Licensee believes intends to sell, deal with or distribute any of the Products in any way outside the Territory.  Licensee shall ensure that all of its distributors, whether affiliated or third-party, to which Licensee sells or through which Licensee otherwise moves any Products are aware of all Territory restrictions on the use of the Playboy Properties and the distribution of the Products and shall obtain an executed "Distributor Contract" (as defined in **Paragraph 2.k.(ii)** hereof) from all of its third-party distributors as set forth in **Paragraph 2.k.(ii)** hereof.  Licensee shall immediately notify Licensor should Licensee become aware that any of its distributors, whether third-party or affiliated, have distributed or dealt with the Playboy Properties or Products in any way outside the Territory.

(iii)   Licensee warrants and represents that it has and will continue to have throughout the Term and the "Sell-Off Period" (as defined in **Paragraph 8.c.** hereof) the legal right and authority to enter into this Agreement and to assume and perform its duties and obligations hereunder and that there is or are no, and Licensee shall not enter into during the Term or the "Sell-Off Period," if any, contract, agreement or understanding with any individual or entity which would in any way restrict or prevent Licensee from the performance of its duties and obligations under this Agreement.

(iv)   Licensee shall be responsible for obtaining, at its own expense prior to the Commencement Date, and maintaining at its own expense throughout the Term, any and all licenses, permits and approvals (including governmental and all other licenses, permits and approvals) necessary for Licensee to:  (a) design, manufacture, advertise, promote, sell and distribute the Products; (b) pay "Guaranteed Royalties," "Earned Royalties," and taxes; and (c) fulfill any and all other duties and obligations and exercise the rights of Licensee under this Agreement.  In the event Licensee is unable, for any reason, to obtain prior to the manufacture, advertisement, sale or distribution, or maintain throughout the Term all of such licenses, permits or approvals, such inability shall be an incurable default under this Agreement.

(v)   Licensee will take all necessary actions to ensure that all aspects of its obligations in connection with this Agreement comply with all applicable federal and state and local laws, rules and regulations, including, without limitation, all laws, rules and

regulations governing the design, manufacture, quality and safety of the Products and the CAN-SPAM Act of 2003. Licensee will not create, initiate, transmit or otherwise participate in the creation, initiation or transmission of any unsolicited bulk email in connection with the Products. In addition, Licensee will comply with all applicable state and federal laws governing privacy, technology, software and trade secrets.

b.    (i)    Maintaining Goodwill:  Licensee recognizes that the Trademarks are associated with Licensor on a worldwide basis and, therefore, Licensee shall, throughout the Term and the "Sell-Off Period," constantly use commercially reasonable efforts in the design, manufacture, safety, quality, advertising, promoting, selling, distributing and in all other dealing with or disposal of the Products to protect the good name and goodwill associated with the Trademarks and Licensor, and to obtain the greatest "Net Sales" throughout the entire Territory and the entire Term and the "Sell-Off Period." Should Licensee directly or indirectly take any action which negatively affects or impacts the good name, goodwill or reputation of Licensor, Licensor may deem such to be an incurable default by Licensee under this Agreement.

(ii)    Compliance with Law:  Licensee shall not cause, condone or authorize in any country of the Territory any violation of any federal, state or local law or regulation, including, but not limited to, the United States Department of the Treasury's economic and trade sanctions, which include, but are not limited to, any Executive Order Blocking Property of Certain Persons for any reason in any country of the Territory set by the United States Department of the Treasury Office of Foreign Assets Control.    All distributors of Licensee must also agree in writing not to cause, condone or authorize any such violations.  Any such violation by Licensee or any of its distributors shall be an incurable default under the Agreement.  Licensee agrees to indemnify, protect and hold harmless Licensor and Licensor's parent, subsidiary and affiliated entities and its and their employees, officers and directors for, from and against any and all costs, claims, suits or causes of action arising out of or in connection with any such violation.

c.    Distribution Channels:  The Products may only be sold in the Territory through and only through those channels of distribution set forth in **Paragraph S.5.** of the Schedule to this Agreement.  Licensee acknowledges and agrees that nothing in this Agreement shall prevent Licensor (i) from using the Playboy Properties on or in connection with the Products or any goods similar to the Products in any channel of distribution that is not set forth in **Paragraph S.5.** of the Schedule to this Agreement, or (ii) from licensing to any third party the right to use the Playboy Properties on or in connection with the Products or any goods similar to the Products for any channel of distribution that is not set forth in **Paragraph S.5.** of the Schedule to this Agreement. Licensor shall have the sole and absolute discretion to determine if a store, club or other distribution channel falls within the licensed channels of distribution set forth in **Paragraph S.5.** of the Schedule to this Agreement.

d.    Royalties:

[Redacted]

Under no circumstances whatsoever will Licensor return to Licensee all or any part(s) of Guaranteed Royalties, except as provided in **Paragraph 8.b.** hereof. In the event that Licensee is late in making any Guaranteed Royalty installment payment in any License Year and fails to make such payment within ten (10) days of receipt of written notice of such failure, Licensor will have the right upon written notice to Licensee to accelerate the payment of the unpaid remaining Guaranteed Royalty installments due and payable for the remainder of the License Year in which such installment was late, which along with the past due amount will be due and payable to Licensor within not more five (5) business days after the date of such notice. Any such notice from Licensor is without prejudice to Licensor's default and termination rights set forth in **Paragraphs 7.a.(i)** and **7.a.(iii)**.

(ii)     Earned Royalties: Licensee shall pay to Licensor or its designee royalties (hereinafter referred to as "Earned Royalties") in the amount equal     **[Redacted]**

Earned Royalties shall be payable in accordance with the terms and conditions of **Paragraph 2.d.(i)** hereof.

(iii)     Interest: Each sum, including, but not limited to, Guaranteed Royalties and Earned Royalties, that shall not be paid on the due date by Licensee shall bear interest from such due date until the date on which such sum is paid in full at an amount equal to four percent (4%) over the prime rate of interest as established by JP Morgan Chase on the date such sums should have been paid.

(iv)     Letter of Credit: If, during any License Year, Licensee fails to make any timely payment of any amounts due under this Agreement, Licensor will have the right to require Licensee to deliver to Licensor an Irrevocable Stand-By Letter of Credit (the "Letter of Credit") in favor of Licensor confirmed and advised through a U.S. bank designated by Licensor and on terms and in the form and content as directed by Licensor, which may include, but may not be limited to the following terms and conditions: (a) the Letter of Credit must contain the condition that it will be automatically extended without amendment for additional periods of one year from the current or any future expiration date unless notice is sent sixty (60) days from the expiry date to the advising bank by authenticated swift and to Licensor by courier that the Letter of Credit will not be renewed and Licensor will have the right, at any time to draw upon the Letter of Credit if Licensee fails to make any payment as provided under this Agreement; and (b) the Letter of Credit must contain the condition that if during any term of the Letter of Credit, a partial draw becomes necessary, the Letter of Credit will automatically be reinstated to the original value pursuant to the terms and conditions of **Paragraph 2.e.** of this Agreement and Licensor will give notice of its intention to draw on the Letter of Credit if Licensee fails to make any payment due as provided under this Agreement. Licensor must receive the new Letter of Credit not less than thirty (30) days before the start of each such subsequent License Year. Licensor will have the right, at any time, to draw upon such Letter of Credit if Licensee fails to make any payments as provided for under this Agreement. All costs and expenses associated with such Letter of Credit, including, but not limited to, opening, amending and drawing fees, will be borne by Licensee. Licensee's failure to provide Licensor with a Letter of Credit as herein above provided shall be an incurable default under this Agreement.

e.     Statements and Payments:

(i)     Within not more than thirty (30) days after each License Quarter during the Term and the "Sell-Off Period," if any, or within ten (10) days of a written request by Licensor Licensee shall furnish to Licensor or its designee a complete and accurate statement in a format reasonably acceptable to Licensor and certified to be true by the Chief Financial Officer (or the equivalent of such position if there is no Chief Financial Officer) of Licensee (hereinafter referred to as the "Statement") showing for such License

Quarter and the License Year through such period or for the "Sell-Off Period": (a) a listing, broken out by Region, of Licensee's accounts and the accounts of Licensee's affiliated and third-party distributors in the Territory and the units and description of all of the Products sold and distributed to each such account or otherwise disposed of by Licensee or by Licensee's affiliated and third-party distributors; (b) the computations, broken out by Region, of "Net Sales" on all such sales; (c) the computation of Earned Royalties and the amount of Earned Royalties due and payable; and (d) the advertising and promotion expenditures made by Licensee pursuant to **Paragraph 2.o.(i)** hereof and the details of all such expenditures, supported by copies of vouchers and, if specifically requested, copies of all advertising for or relating to the period covered by such Statement. When, during any License Year, the amount of Guaranteed Royalties for such License Year has been exceeded by the amount calculated according to **Paragraph S.12.** of the Schedule for such License Year, Licensee shall commence payment of Earned Royalties. Licensee shall pay all accrued and unpaid Earned Royalties by remittance accompanying each of the Statements.

(ii)     As used in this Agreement, the term "Net Sales" means     **[Redacted]**

(iii)     In the event the percentage of returns of Products in any License Year exceeds twenty percent (20%) of Net Sales for such License Year, then Licensor may elect to treat such an occurrence as an incurable default by Licensee under this Agreement.

(iv)     Licensee acknowledges that any significant reduction in the wholesale price (or the retail price where Licensee sells directly to the public) or material liquidation of the Products may cause serious and perhaps irreparable harm to Licensor and Licensor's business activities and reputation in the Territory.

(v)     If Licensee sells any of the Products to any individual or entity that is directly or indirectly owned or controlled by Licensee or is under common ownership with Licensee, in whole or in part, the invoice price used to compute Net Sales hereunder shall be the invoice price that would have been charged to an unrelated purchaser in an arm's-length transaction for such Products.

(vi)     (a)     Payments Licensee is required to make by the terms of this Agreement shall be made by wire transfer in United States Dollars to a bank specified by Licensor. Any and all costs associated with the wire transfer payments shall be borne by Licensee. Licensee will remit to Licensor the gross amount of the Guaranteed Royalties and Earned Royalties. In the event any withholding or similar taxes are due in respect of any royalty or other payments hereunder, the amount of such payments will be grossed up such that Licensor will receive the same amount of royalty or such other payment as if such withholding or similar tax(es) had not applied. Licensee shall pay any withholding or similar taxes in a timely manner and shall promptly provide Licensor with a receipt evidencing such payment.

(b)     Licensor and Licensee agree that the Licensor will not be liable for any withholding tax, including any interest, penalties or other associated costs, relating to any withholding obligation imposed by the government or taxing authority of any country, state, province, municipality or any other government jurisdiction arising as a result of this Agreement. Licensee further agrees to indemnify, reimburse and otherwise hold harmless, Licensor for any such costs imposed on Licensor. Licensee's obligation to pay taxes shall survive any expiration or termination of this agreement. In the event payments in the manner provided in this **Paragraph 2.e.** shall become impossible or illegal by reason of

the action of governmental authority, then, at Licensor's option, this Agreement may be terminated; and whether or not Licensor exercises such option, while such restrictions remain in effect, all payments due Licensor shall be made to an account in the Territory, or elsewhere where permitted by law, to be designated by Licensor.

     f.    <u>Records and Audit</u>:  Licensee shall:  (i) keep accurate books of account and records (including but not limited to utilization of consecutively numbered invoices which reconcile to each Statement and Licensee's general ledger) covering all transactions relating to or arising out of the License and this Agreement (which books and records shall be maintained separately from Licensee's documentation relating to other items manufactured or sold by Licensee); and (ii) upon the prior written request of Licensor but not more than twice in any License Year, permit Licensor or its nominees, employees, agents or representatives to have full access to such books and records in order to inspect such books and records at a reasonable hour of the day, to conduct an examination of and to copy (at Licensor's expense), all such books and records.  Licensee shall maintain in good order and condition all such books and records for a period of two (2) years after the expiration or termination of the License and this Agreement or, in the event of a dispute between the parties hereto, until such dispute is resolved, whichever date is later, and such books and records shall be kept at the address stated in **Paragraph S.13.** of the Schedule, except as such address may be changed from time to time in accordance with **Paragraph 9.b.** hereof.  Receipt or acceptance by Licensor of any Statement furnished pursuant hereto or any sums paid by Licensee hereunder shall not preclude Licensor from questioning the correctness thereof at any time, and if one or more inconsistencies or mistakes are discovered by Licensor in such Statement, it or they shall be rectified in an amended Statement received by Licensor no later than ten (10) days after the date of receipt by Licensee of notice of that which should be rectified.

     g.    <u>Expenses of Conducting Examinations</u>:  If any inspection or examination referred to in **Paragraph 2.f.** hereof discloses, or Licensor or Licensee otherwise discovers, an underpayment of Earned Royalties, the amount of such underpayment shall be paid by Licensee to Licensor no later than thirty (30) days after receipt of notice or knowledge thereof by Licensee.  In the event of such an underpayment by Licensee in excess of nine percent (9%) in any License Year, then Licensor may elect to treat such occurrence as an incurable default by Licensee under this Agreement.  If such inspection or examination:  (i) discloses or Licensor or Licensee otherwise discovers an overpayment of Earned Royalties or advertising contribution or either thereof (or, pursuant to **Paragraph 8.b.** hereof, an overpayment of Guaranteed Royalties), the amount of such overpayment shall be credited against the next due payment of any or all of the Guaranteed Royalties, Earned Royalties and advertising contribution or, in the event of the expiration or termination of the License and this Agreement and there is or are no such future payments, such amount shall be paid by Licensor to Licensee not later than thirty (30) days after the discovery thereof by Licensor, subject to Licensor's rights of setoff, recoupment and counterclaim; or (ii) reveals that for the period covered by such inspection or examination there is an error of five percent (5%) or more in the Earned Royalties or the advertising and promotional expenditures previously reported on the Statement(s) as being due from Licensee, all reasonable expenses involved in the conducting of such inspection or examination shall be borne by Licensee.  Licensee shall pay to Licensor the amount of such expenses no later than ten (10) days after Licensee's receipt of Licensor's invoice therefor.  If such error is less than five percent (5%), such expenses shall be borne by Licensor.

     h.    <u>Product Quality</u>:  Licensee hereby warrants and agrees that the Products designed, manufactured, advertised, promoted, sold or distributed under this Agreement shall bear the Playboy Properties faithfully produced and shall meet the high standards of quality, workmanship, material, design, size, color and style established by Licensor from time to time and in accordance with the terms and conditions of this Agreement.  Licensee will not knowingly or negligently cause or authorize any or all of the Products not conforming to this Agreement to be sold or distributed, as doing so may adversely affect Licensor's goodwill in the Trademarks and any such non-conforming Products shall either be made to conform or shall be destroyed at Licensee's expense.   All of the Products shall conform to and comply with, in all respects, all

applicable federal, state and local laws, rules and regulations governing the design, effectiveness, quality, labeling and safety of such Products. Licensee shall not cause, condone or authorize: (i) the use of any substandard materials in or in connection with any of the Products; (ii) any violation of any federal, state or local law or regulation, including, but not limited to, provisions thereof imposing advertising standards or requiring trade or content description of the Products; or (iii) the use of the Playboy Properties or any other word, device or symbol associated in any way with any or all of Licensor and its subsidiaries and affiliates in connection with any product or activity that is not the subject of the License and this Agreement.

    i.    <u>Approval of Products and the Materials</u>:

    (i)    Licensee understands and agrees that each of the Products and any other items bearing the Playboy Properties or intended for use in connection with the Products (hereinafter collectively referred to as the "Materials") must be approved in advance by Licensor which shall not be unreasonably denied, delayed or conditioned. The Materials include, but are not limited to, prototypes, photography, cartons, containers, labels, wrappers, packaging and other inner and outer packaging materials, fixtures, displays, artwork and printing, advertising, sales, marketing and promotional materials. Licensee shall, at its own expense, submit to Licensor or its designee for written approval, samples of each of the Products and the Materials at each stage of development thereof, which shall include, but not be limited to: (a) an initial sketch or photograph; (b) a sample prototype (pre-production sample) or equivalent acceptable to Licensor; and (c) two final production-quality samples of that which will be mass produced or manufactured. Licensee must obtain Licensor's written approval of each stage of development before proceeding to the next stage, and in no event shall Licensee commence or permit the mass manufacture, advertising, promotion, sale or distribution of any of the Products or the Materials unless and until Licensee has received Licensor's written approval of the samples provided pursuant to (b) of this **Paragraph 2.i.(i)**. In the event Licensor fails to provide its approval or disapproval of any or all things submitted to Licensor pursuant to this **Paragraph 2.i.(i)** within fourteen (14) days of Licensor's receipt thereof, Licensee may send written notice to Licensor advising no response was received. If Licensor does not respond within five (5) days of Licensor's receipt thereof, then Licensor shall be deemed to have given disapproval. In the event Licensee fails to provide the two final production-quality samples pursuant to (c) of this **Paragraph 2.i.(i)**, Licensor may either purchase the two final production-quality samples and Licensee shall immediately pay Licensor for all related costs and expenses incurred by Licensor including the purchase prices and all delivery and shipment costs or such Products or Materials shall be considered unapproved.

    (ii)    The determination as to whether Products or Materials conform to a prior submission in all respects, including without limitation, with respect to materials, colors, workmanship, dimensions, styling, detail and quality, Licensee shall not use an approved style number/designation in connection with non-conforming Products or Materials.

    (iii)    To ensure that each of the Products and the Materials are constantly maintained in conformance with the samples previously approved pursuant to this **Paragraph 2.i.**, Licensee shall, within seven (7) days of receipt of a written request from Licensor, send or cause to be sent to Licensor at Licensee's expense: (a) such actual samples requested by Licensor of the Products and the Materials Licensee is using, manufacturing, selling, distributing or otherwise disposing of; and (b) a listing or revised listing of each location where any of the Products and the Materials or either thereof are designed, manufactured, stored or otherwise dealt with, except to the extent such listing or revised listing duplicates currently accurate information provided pursuant to **Paragraph 2.i.(ii)** hereof. Licensor and its nominees, employees, agents and representatives shall have the right to enter upon and inspect, at all reasonable hours of the day, any and all such location(s) and to take, without payment, such samples of any of the Products and the Materials as Licensor reasonably requires for the purposes of such inspection.

(iv)     If any of the Products or Materials sent or taken pursuant to **Paragraph 2.i.(iii)** above or that otherwise come to the attention of Licensor does or do not conform in Licensor's reasonable opinion to the previously approved samples, Licensor shall so notify Licensee, in writing, specifying in what respect such of the Products or Materials is or are unacceptable. Immediately upon receipt of such notice, Licensee shall suspend all manufacture, sale and distribution of and shall obtain back from Licensee's accounts all such Products and Materials and shall not resume the manufacture, sale or distribution thereof unless and until Licensee has made all necessary changes to the reasonable satisfaction of Licensor and has received Licensor's written reapproval of each of such Products and Materials which shall not be unreasonably denied, delayed or conditioned.

(v)     All of the Products and the Materials that are not approved by Licensor or that are determined by Licensor to be unapproved, non-conforming or unacceptable shall not be sold, distributed or otherwise dealt with by Licensee bearing or referring to any of the Playboy Properties. All such Products and Materials may be confiscated, seized and/or destroyed by Licensor or, if directed by Licensor, by Licensee at Licensee's cost and expense, with an appropriate certificate of destruction furnished by Licensee.

(vi)     Any and all sales, distribution or use by Licensee of unapproved, non-conforming or unacceptable Products or Materials shall not only constitute an incurable default under the terms of this Agreement, but such Products or Materials also shall be considered unlicensed and an infringement of Licensor's proprietary rights, and Licensor shall have the right to bring legal action against Licensee for any and all remedies available to Licensor in addition to the remedies available under this Agreement.

(a)     So that there is no misunderstanding regarding the approval process, Licensee hereby agrees that in the submission of requests for approvals of proposed Products, unless Licensor gives written approval in advance, Licensee will: [1] use an Image in its entirety; [2] not crop the Image; [3] reproduce the Image with fidelity to the original; [4] not distort or mutilate the Image; and [5] not create a reproduction of the Image which would be prejudicial to the honor or reputation of the artist. Licensee further acknowledges that there may be certain works of art which Licensor, in its sole discretion, may determine are not appropriate for use on the Products. Licensor's refusal of an approval request based on a violation of any of the foregoing shall be a legitimate reason for the refusal of an approval pursuant to this License and the Agreement.

(b)     Licensor shall have final approval with respect to the following elements of the Products:

(i)     Selection of Licensor's Images for use on the Products.

(ii)     Manipulation and adaptation of the Playboy Properties for reproduction on the Products.

(iii)     Approval of "strike offs" or other pre-production samples as the parties may agree.

(iv)     Approval of actual materials to be used for manufacture of the Products.

(c)     It is specifically agreed by Licensee that there shall be no approval by default. Products may not be manufactured unless there is a written approval by Licensor.

(vii)    Licensee agrees and acknowledges that Licensor shall own all right, title and interest to the sample prototypes, final production-quality samples, and actual samples submitted by Licensee pursuant to this paragraph (the "Samples").  Licensor may store, display, destroy, sell (including without limitation sample sales to the trade), or otherwise dispose of the Samples as determined by Licensor in its sole discretion and without any obligation or payment to Licensee.

j.    <u>Title and Protection and Preservation of Playboy Properties and Copyrights</u>:

(i)    Licensee hereby acknowledges each of the following:  the great value of the goodwill associated with the Trademarks; the worldwide recognition thereof; that the proprietary rights therein and goodwill associated therewith are solely owned by and belong to Licensor; that the Trademarks and other related words, devices, designs and symbols are inherently distinctive or have secondary meaning firmly associated in the mind of the general public with Licensor, its subsidiaries and affiliates and its or their activities; and that all additional goodwill associated with the Trademarks created through the use of such Trademarks by Licensee shall inure to the sole benefit of Licensor. During and after the Term, Licensee shall not:

(a)    attack or question the validity of, or assist any individual or entity in attacking or questioning, the title or any rights of or claimed by Licensor, its subsidiaries and affiliates and their respective licensees and sublicensees in and to the Playboy Properties or any other trademarks, copyrights or such other intellectual or intangible property associated or connected with any or all of Licensor, its subsidiaries and affiliates, their publications, published material, activities, licensees and sublicensees;

(b)    directly or indirectly seek for itself, or assist any third party or parties to use or acquire, any rights, proprietary or otherwise, in any patent, trademark, copyright or such other intellectual or intangible property so associated or connected (including without limitation URLs and domain names), without the prior written approval of Licensor;

(c)    in any way seek to avoid Licensee's duties or obligations under this Agreement because of the assertion or allegation by any individual(s), entity or entities that any or all of the Playboy Properties are invalid or by reason of any contest concerning the rights of or claimed by Licensor; or

(d)    file or prosecute one or more trademark applications regarding Licensee's use of the Playboy Properties, unless first requested to do so in writing by Licensor.  (Licensee will cooperate with Licensor in connection with any and all such filings.)

(ii)    Licensee shall:

(a)    use the Playboy Properties as permitted under this Agreement in each jurisdiction strictly in accordance with the legal requirements in such jurisdiction.  At Licensor's request and cost, Licensee shall cooperate fully with Licensor in preparing and causing to be recorded in every jurisdiction designated by Licensor registered user agreements and all other documents or filings which may be necessary or desirable to evidence, protect and implement the rights of or claimed by Licensor pursuant to this Agreement.   In the event of any ambiguities between any registered user agreement or other similar document or filing and this Agreement, the terms and conditions of this Agreement shall govern and control.  Upon expiration or termination of this Agreement for any reason whatsoever, Licensee shall execute and file any and all documents, as required and directed by Licensor and at Licensor's expense, terminating any and all registered user agreements or other filings.  Licensee hereby authorizes

and empowers Licensor to terminate all registered user or other filings on Licensee's behalf and in Licensee's name;

(b)     affix or imprint irremovably and legibly on each of the Products and on or within all of the Materials such Playboy Properties, trademark notices, copyright notices, legends and Licensor's Hologram as Licensor directs;

(c)     manufacture, sell, distribute or otherwise deal with the Materials solely in connection with the Products (except for any or all of the Materials which do not bear one or more of the Playboy Properties or otherwise are not associated with any or all of the Products by virtue of, but not limited to, such things as design, color or content); and

(d)     not cause or grant permission to any third party or parties to acquire any copyright or other proprietary right in connection with any word, device, design or symbol used by Licensee in connection with any of the Products or the Materials.

k.      Right to Subcontract, Licensee Financial Statements and Lists of Sources and Accounts:

(i)     Licensee may subcontract the manufacture of any or all component parts of any or all of the Products bearing the Playboy Properties pursuant to this Agreement, provided:     (x) Licensee notifies Licensor in advance of any intended supplier/subcontractor and obtains Licensor's prior written approval of such supplier/subcontractor which shall not be unreasonably withheld or delayed or conditioned; (y) Licensee obtains from each such supplier/subcontractor an executed written agreement in the form attached hereto and made a part hereof as **Exhibit C**; and (z) furnishes a copy of each such executed agreement to Licensor.

(ii)     Licensee may subcontract with a third-party distributor for the distribution of the Products in the Territory pursuant to this Agreement, provided:  (x) Licensee notifies Licensor in advance of any intended third-party distributor which shall not be unreasonably withheld or delayed and obtains Licensor's prior written approval of any such third-party distributor; (y) Licensee obtains from each Licensor-approved third-party distributor an executed written agreement (the "Distributor Contract") attached hereto and made a part hereof as **Exhibit D**; and (z) Licensee furnishes a copy of each Distributor Contract to Licensor.  For purposes of this **Paragraph 2.k.(ii)**, third-party distributors shall not include any distribution entity which is under common ownership or is wholly-owned or controlled by Licensee.  However, nothing contained in this **Paragraph 2.k.(ii)** shall be construed to relieve Licensee of its obligation and responsibility to ensure that its distributors, whether third-party or wholly or partially owned, perform their duties in accordance with the terms and conditions of this Agreement (including, but not limited to, the E-Commerce Guidelines) and the Distributor Contract, including, but not limited to approved distribution channels and Territory restrictions.  Licensee shall be responsible to Licensor for any violations by its distributors, whether third-party or affiliated, of the terms and conditions of this Agreement (which responsibility shall be included as part of Licensee's obligations under **Paragraph 2.n.(i)** hereof) or the Distributor Contract.  In the event of any such violation, Licensor shall have the right, but not the obligation, to do any of the following:  (i) require Licensee to immediately terminate, upon receipt of written notice from Licensor, the Distributor Contract with such distributor, at which time Licensee shall immediately and permanently cease supplying any or all of the Products to such distributor; (ii) declare the License to be non-exclusive; or (iii) terminate the License and this Agreement, immediately upon receipt by Licensee of written notice, by deeming any such violation to be an incurable default by Licensee under this Agreement.  In the event of two (2) violations in one (1) License Year, Licensor shall have the right to exercise any of its rights set forth in (i), (ii) and (iii) directly above in this **Paragraph 2.k.(ii)**.  In addition, Licensee shall be responsible for obtaining from each of its

distributors, whether third-party or affiliated, a complete listing of each such distributor's inventory of the Products on hand at the time of expiration or termination of this Agreement and upon the expiration or termination of the "Sell-Off Period" (if any) and supplying a copy to Licensor of such inventory listing within the time frames set forth in **Paragraph 8.d.** hereof.

(iii)     With the Statement submitted at the end of each License Year pursuant to **Paragraph 2.e.(i)** hereof and at any other time so requested by Licensor during the Term and the "Sell-Off Period," Licensee shall provide Licensor with:  (a) copies of Licensee's most recent financial statements (including without limitation footnotes) and annual reports, 10-K's, balance sheets or other similar documents that indicate Licensee's financial status; and (b) an updated list of the names and addresses of all manufacturing sources, subcontractors, distributors, suppliers, dealers, wholesalers, retailers, accounts and others which have been engaged in the design, manufacture, advertising, promotion, sale, distribution or other dealings with any or all of the Products and the Materials during the Term and the "Sell-Off Period" or either thereof.  Such list shall, if so requested by Licensor, contain the full specification of all designs, utility models, patents or trademarks that may be involved, directly or indirectly, in the manufacture, production or distribution of any or all of the Products and the Materials. Licensee shall obtain the consent of any and all relevant third parties for such disclosure.

l.     <u>Inventory and Holograms</u>:

(i)     Insofar as reasonable, Licensee shall at all times during the Term be able to fulfill all orders for the Products promptly and yet not have an excessive inventory on hand at the time of the expiration or termination of the License.  Within forty-five (45) days after each License Year or within ten (10) business days of receipt of a request from Licensor (which shall not be made more than once per License year), Licensee will furnish Licensor with a complete and accurate statement (the "Inventory Statement") signed by the Chief Financial Officer (or the reasonable equivalent if Licensee does not have a Chief Financial Officer) of Licensee, setting forth in detail the quantities and description of each of the Products in work in process and finished goods inventories of the Products and the locations thereof.

(ii)     Except as otherwise set forth below, all Products shall have affixed to the label, hang tag, packaging, or elsewhere on the Products, as approved by Licensor, Licensor's official hologram ("Hologram").  Licensee shall purchase Holograms from Licensor's official Hologram supplier ("Hologram Supplier") (which Licensor may change from time to time in its sole discretion) through completed purchase orders ("Purchase Orders").  Within thirty (30) days of a written request from Licensor, which will be limited to once per License Year, Licensee shall send to Licensor a report (hereinafter referred to as the "Hologram Report") identifying (a) the quantity of Holograms used on Products sold by Licensee or otherwise distributed (with an explanation of where such Products were sold or distributed) since the prior submission of a Purchase Order; (b) the quantity of Holograms on Products on hand and intended for placement on Products in process; and (c) the requested quantity of Holograms.    Licensor (itself or through the Hologram Supplier) may reject Licensee's Purchase Orders, if, in Licensor's sole and absolute reasonable discretion, the Hologram request is excessive or otherwise inconsistent with (i) the sales information in Licensee's Statements; (ii) royalty payment history; (iii) submissions for Products approvals; or (iv) Inventory Statements. Licensee shall pay for all Hologram costs and expenses, including without limitation shipping and handling costs, required by Licensor's Hologram Supplier.  If Licensee, directly or indirectly, ships, sells or otherwise distributes Products without Licensor's approved Holograms except as provided for below, Licensee shall be in default of this Agreement.  Licensee agrees that any and all such Products may, at Licensor's reasonable discretion, be treated as unapproved and/or counterfeit merchandise and may be seized, confiscated, and/or destroyed.  Within ten (10) days of receipt of a request from Licensor, Licensee will furnish to Licensor or its designee a report in a format acceptable to Licensor identifying

(a) the quantity of Holograms used on Products sold by Licensee or otherwise distributed (with an explanation of where such Products were sold or distributed); and (b) the quantity of Holograms on Products on hand and intended for placement on Products in process. If a significant (i.e., more than five percent (5%)) discrepancy exists between (i) the total quantity of Holograms used on Products sold, Products on hand, and Products in process; and (ii) the quantity of Holograms sent to Licensee, such discrepancy shall be an incurable default under the terms and conditions of this Agreement.

       (iii)    Licensee shall at all times during the Term and the "Sell-Off Period" be responsible for the safekeeping, protecting, and tracking of the inventory of Licensor's Holograms, including any actions or inactions taken by Licensee's manufacturing sources, subcontractors, distributors, suppliers, dealers, and/or wholesalers regarding the Holograms. If any Holograms sent to or for Licensee are misplaced, lost, stolen, or misused, in any manner whatsoever (including use on unapproved, non-conforming or unacceptable Products or Materials pursuant to **Paragraph 2.i.** hereof), Licensee shall be in default of this Agreement. Licensee shall be responsible for and shall pay Licensor for any and all reasonable expenses incurred by Licensor to recover such Holograms, including without limitation, legal fees and costs, investigative fees and costs, and/or expenses to purchase unapproved Products bearing such Holograms to have the Products removed from commerce, or to otherwise protect Licensor's rights.

       (iv)    Notwithstanding anything herein to the contrary, Licensee will not be required to use the Hologram on the Products in the United States. Licensee must, however, ensure that each individual box for the Products will carry (i) a proprietary bar code that is registered with GS1 and that will carry the prefix "857784" which will be associated with Licensee only, and (ii) a unit Manufacturing Lot Number that is referenced on all import documents for U.S. Customs and the FDA and that also must be the same Manufacturing Lot Number that is imprinted on each individually wrapped Product. Further, Licensee will ensure that all entry documents for all imported Products into the United States contain a proprietary FDA 510-k number associated with such imported Products, an FDA verification of the proper FDA listing for such imported Products (with the associated 510-k number) and the current establishment listing for the manufacturer and the initial importer of such imported Products.

m.    <u>Playboy Properties and Non-Competitive Brands</u>:

       (i)    During and after the Term, Licensee shall not use, cause or authorize to be used any word, device, design, slogan or symbol confusingly similar, in whole or in part, to any or all of the Playboy Properties, or any permutation of the Playboy Properties. During the Term and the "Sell-Off Period," any or all of the following shall not be used on or in connection with the Products or the Materials without Licensor's prior written consent: (a) portions or permutations of any or all of the Playboy Properties; (b) secondary marks; or (c) new words, devices, designs, slogans or symbols. Upon such authorization by Licensor and use by Licensee, any use by Licensee of a portion, permutation, secondary mark, word, device, design, slogan and/or symbol shall inure to the benefit of the Licensor, shall be the property of Licensor and shall be included as one of the Playboy Properties subject to this Agreement. Should Licensee create or develop any advertising, promotion, packaging or trade dress unique to the Products, all such advertising, promotion, packaging or trade dress shall be the property of Licensor and shall not be used by Licensee on or in connection with any other product or merchandise during and after the Term. No later than ten (10) days after expiration or termination of this Agreement or at any other time Licensor reasonably requests, Licensee will assign to Licensor, without charge, all of Licensee's right, title and interest (including without limitation all goodwill associated therewith and all copyrights) in and to such advertising, promotion, packaging or trade dress and shall cooperate fully with Licensor in preparing and recording whatever documentation may be necessary or desirable or requested by Licensor to effect such assignment.

(ii)    Without Licensor's prior written consent, Licensee shall not design, manufacture, advertise, promote, distribute, sell or deal with in any way in the Territory any product or material that is or are in Licensor's reasonable judgment competitive with or confusingly similar to any or all of the Products and the Materials.

(iii)   Licensee shall not use color combinations, designs, styles, logo treatments, graphics or packaging unique to any or all of the Products on or in connection with any other product, and Licensee, without charge, will assign to Licensor ownership of all right, title and interest, including, but not limited to, all rights of copyright and trademark (including goodwill associated therewith), that Licensee has acquired or may acquire in such color combinations, designs or styles no later than ten (10) days after expiration or termination of this Agreement or at any other time Licensor reasonably requests.

(iv)    Licensee hereby assigns, transfers and conveys to Licensor, to the maximum extent permitted by applicable law, all of Licensee's right, title and interest, including, but not limited to, all rights of copyright, trademark (including goodwill associated therewith), trade secret and any other rights in and to all aspects of the Products created by Licensee under or in connection with this Agreement so that Licensor shall be the sole owner of all such rights therein.  Licensee shall, upon the reasonable request of Licensor, either during the Term or at any time thereafter, execute and deliver to Licensor whatever documentation Licensor may reasonably request to effect such assignment, transfer or conveyance.  Licensee shall not have any rights to use any of the elements uniquely developed by Licensee for the Products itself or in connection with any third party following expiration or termination of the Agreement.  In the event Licensee engages, employs or utilizes artists, designers or other third parties (collectively, the "Designers") to develop Products and/or Materials, Licensee shall obtain a written assignment, and shall supply Licensor with a copy of each such assignment, from any Designer in favor of Licensor under which all of such Designer's right, title and interest, including, but not limited to, all rights of copyright, trademark, and all rights in and to all aspects of the Products (including trade secret protection), in and to such Designer's work product is transferred and conveyed to Licensor to the maximum extent permitted by applicable law so that Licensor will be the sole owner of all rights therein.  In no event will the provisions of this **Paragraph 2.m.(iv)** be deemed to transfer to Licensor any patents owned by Licensee.

(v)                              [Redacted]

n.      Indemnification and Product Liability Insurance:

Subject to the provisions of **Paragraph 18.** hereof, Licensee shall:

(i)     Indemnify, defend and hold harmless Licensor, its subsidiaries and affiliates, their respective shareholders, licensees and franchisees and the agents, officers, directors and employees of each (hereinafter collectively referred to as "Indemnitees") from all costs, claims, suits, losses, damages and reasonable expenses (including without limitation attorneys' fees and litigation or other expenses) arising out of or in connection with:  (a) the design, manufacture, advertising, promotion, sale or distribution of or any other dealing whatsoever with the Products or Materials (including, but not limited to, any breach of Licensee's obligations under **Paragraph S.5.** of the

Schedule); (b) any alleged action or failure to act whatsoever by Licensee; (c) any alleged defect in any or all of the Products; (d) any alleged non-conformity to or non-compliance with any law pertaining to the design, quality, safety, advertising, promotion or marketing of any or all of the Products and the Materials; or (e) any breach by Licensee of any of its representations, warranties or undertakings hereunder;

(ii) obtain and maintain, at Licensee's own expense, product liability insurance satisfactory to Licensor in the minimum amount of Twenty Million U.S. Dollars (U.S.$20,000,000) of primary and umbrella coverage from one or more insurance companies, each with a Best's rating of "A" (or better), and qualified to transact business in the Territory (each such insurance policy shall name each of the Indemnitees as additional insureds and/or loss payees as their interests may appear and by reason of the indemnity contained in **Paragraph 2.n.(i)** above and shall evidence the insurer's agreement that such insurance shall not be amended, canceled, terminated or permitted to lapse without thirty (30) days' prior written notice to Licensor), and provide Licensor with a certificate of such insurance upon execution of this Agreement by Licensee and on each anniversary date of the grant or issuance of each such policy during the Term and the "Sell-Off Period" evidencing that each such policy has not been altered with respect to the Indemnitees in any way whatsoever nor permitted to lapse for any reason, and evidencing the payment of premium of each such policy; and

(iii) cause each such policy to be in full force and effect prior to the later of the execution of this Agreement or the commencement of any design, manufacture, advertising, promotion, sale, distribution or dealing with any or all of the Products whatsoever. Failure by Licensee to obtain the required insurance as set forth herein or failure by Licensee to adequately maintain such insurance during the Term and the "Sell-Off Period" shall be an incurable default by Licensee under this Agreement.

o.     Advertising Expenditures, Advertising Plans and Public Relations:

(i) In addition to any other amounts or payments to be made by Licensee under this Agreement, and not to be credited to or offset against any Guaranteed Royalties or Earned Royalties payable hereunder, Licensee agrees to expend within each License Year for advertising and promoting the Products in media directed to the consumers (including without limitation point-of-sale materials, newspapers, magazines, television and radio, fixtures, displays, premium items, Products given-away as promotional items, trade shows, and trade promotions, but specifically excluding travel and expenditure costs associated with trade shows and/or trade promotions,) not less than                                    **[Redacted]**

whichever is greater. If the Statement for the last calendar month of a License Year shows that such amount has not been spent as set forth herein, then for the first such occurrence, Licensee shall expend such difference the following License Year, and for any future occurrence, the difference between the amount actually spent and the amount required to be spent must be remitted to Licensor along with such Statement for use in Licensor's advertising and promotion pool.

(ii) Licensee must submit to Licensor, for Licensor's approval, its advertising/promotional plan and marketing plan in the format provided by Licensor for the Products for each ensuing calendar year. Such plans must be submitted not later than September 15th of each calendar year. In the event Licensor, in its reasonable discretion, does not approve of any such plan, Licensee must submit a revised plan or plans to Licensor, for its approval, within not more than fifteen (15) days following Licensee's receipt of Licensor's notice of disapproval and Licensee must incorporate revisions into the plan or plans that address Licensor's concerns or reasons for disapproval.

(iii) Within ten (10) days following the end of each License Quarter during

the Term, Licensee will submit to Licensor, a list of all upcoming public relations efforts regarding the Products (the "PR"), which may include, but will not be limited to, interviews, press releases and press events. In the event Licensee wishes to sanction or schedule any PR after the submission to Licensor of such quarterly list, Licensee will immediately notify Licensor of such additional PR. Licensee must obtain Licensor's prior written approval which shall not be unreasonably withheld, delayed or conditioned, prior to any PR effort taking place. In the event any PR consists of interviews, all talking points for same must be approved in advance in writing by Licensor. In the event Licensor, in its sole discretion, wishes to participate in any PR Licensor will so notify Licensee. In the event Licensor fails to provide its approval or disapproval of any or all things submitted to Licensor pursuant to this **Paragraph 2.o.(iii)** within fourteen (14) days of Licensor's receipt thereof, Licensor shall be deemed to have disapproved of such things. In the event Licensor disapproves any PR, Licensee will cancel such disapproved PR. Failure by Licensee to cancel any disapproved PR or engaging in any PR that has not been submitted to Licensor in advance for approval shall be an incurable default by Licensee under this Agreement.

3.     **ADDITIONAL COVENANTS OF THE PARTIES.**

    a.     <u>Reservation of Rights</u>: All rights not expressly and specifically granted herein to Licensee are reserved by Licensor.

    b.     <u>Certain Sales</u>:

    (i)     In the event Licensor, its subsidiaries, parent, affiliates or third-party licensees wish, during the Term, to purchase any of the Products for any purpose, including but not limited to, promotional and advertising purposes, as product placement in feature films, television and related platforms, direct marketing sales, premium sales and incentive sales, Licensee, if requested to do so by Licensor, will sell to Licensor and its licensee(s) or either thereof any or all of the Products at the best prices and terms given to other customers of the Products ordering substantially the same quantities of similar merchandise from Licensee.

    (ii)     In the event of any such sale of the Products by Licensee to Licensor, Licensee shall ship or deliver such Products either directly to Licensor or, as Licensor may direct, to any other individual(s), entity or entities. Any or all such sales of the Products by Licensee to Licensor shall be at the prices described in **Paragraph 3.b.(i)** above. Licensee will include such sale(s) in the computation of Net Sales. Licensee shall bill Licensor and its licensee(s) or either thereof in accordance with Licensee's normal billing procedures for all such Products shipped or delivered.

    c.     <u>Investment Opportunity</u>: During the Term hereof, if Licensee (or, if Licensee is owned or controlled by, or owns and controls, another entity, such Licensee affiliate) offers to sell or to issue equity or debt to any third party or enters into any transaction for such offering or sale, Licensee shall provide written notice of the same to Licensor, and Licensor will be entitled to participate in such offering, sale or issuance on terms and conditions that are at least as favorable as those granted to any other investor in such transaction. Participation in any such transaction shall be at Licensor's sole discretion, and nothing herein shall obligate Licensor to so participate.

4.     **TITLE AND PROTECTION.**

    a.     <u>Indemnification by Licensor</u>: Except as otherwise set forth in **Paragraph S.7.** of the Schedule hereto, Licensor represents and warrants that: (i) it is the owner of the Trademarks; (ii) it has all necessary rights to the Images for the purposes set forth in this Agreement; (iii) the Trademarks are valid in the Territory; and (iv) the Trademarks are, to the best of Licensor's knowledge, free from any claim by any third party that would unreasonably interfere

with the rights granted to Licensee under this Agreement.  Subject to the provisions of **Paragraph 18.** hereof, Licensor shall indemnify, defend and hold harmless Licensee, its subsidiaries and affiliates, their respective shareholders and the agents, officers, directors and employees of each against and from all claims or suits (provided prompt notice of each such claim or suit which comes to the attention of Licensee is given to Licensor by Licensee) arising solely and directly out of the authorized use of the Playboy Properties or in connection with the Products by Licensee in the Territory.  Licensor shall have the option to settle or to undertake and conduct the defense of any such claim or suit, but Licensee shall, upon receipt of notice from Licensor and pursuant to Licensor's instructions, handle, undertake and conduct the defense of any such claim or suit at Licensor's expense.  If Licensor does not provide such notice to Licensee, Licensee may, through counsel of Licensee's own choice and at its own expense, participate in any such claim or suit, but in such event Licensor shall have sole and exclusive control over such defense, and Licensor's decisions with respect thereto shall govern and control. Licensee expressly covenants that no discussions by Licensee whatsoever with claimant or litigant, no compromise or settlement by Licensee of any claim or suit and no negotiations by Licensee with respect to any compromise or settlement shall be had, made or entered into without the prior written approval of Licensor.

b.      <u>Enforcement</u>:  Licensee shall promptly notify Licensor in writing of each actual, suspected or apparent infringement or imitation of the Playboy Properties or the Materials that comes to the attention of Licensee.  Licensor shall take such action in regard to such infringement or imitation as Licensor, in its sole and absolute judgment, deems to be appropriate. Licensor shall, in its sole and absolute discretion, decide whether to assert any claim or undertake or conduct any suit with respect to such infringement or imitation, but Licensee shall, upon receipt of notice from Licensor and pursuant to Licensor's instructions, on behalf of Licensor, assert any such claim or handle, undertake and conduct any such suit at Licensor's expense in the name of Licensor or Licensee or in both names as Licensor may direct.  Licensee expressly covenants that no discussions whatsoever with the infringing or imitating party or parties, no compromise or settlement of any such claim or suit and no negotiations with respect to any compromise or settlement of any such claim or suit shall be had, made or entered into without the prior written approval of Licensor.  Licensee may share in as much as fifty percent (50%) of any damage recovery or settlement obtained by Licensor or on Licensor's behalf by Licensee as a result of any such claim or suit only if Licensee notified Licensor upon the initiation of such claim or suit that Licensee desires to participate financially in such claim or suit by contributing to the payment of the costs and expenses thereof and only in an amount that shall bear the same ratio to the damage recovery or settlement as the amount of Licensee's financial participation permitted by Licensor bears to the total costs and expenses incurred in obtaining such damage recovery or settlement.  In no event shall Licensor be responsible to Licensee for consequential or incidental damages that result from any such infringement or imitation.  Under no circumstances may Licensee enforce Licensor's rights to the Playboy Properties without Licensor's prior written approval and in no event may Licensee take any action on account of any such infringements without Licensor's prior written approval.

5.      <u>**RELATIONSHIP BETWEEN THE PARTIES.**</u>

a.      <u>No Joint Venture</u>:  Nothing herein contained shall be construed to place the parties hereto in the relationship of partners or joint venturers, and Licensee shall have no power to obligate or bind Licensor or its subsidiaries or affiliates in any manner whatsoever.  Licensor will have no fiduciary duty or fiduciary obligation to Licensee under this Agreement.

b.      <u>Assignment</u>:

(i)      Licensor, in entering into this Agreement, is relying entirely upon Licensee's skills, reputation and personnel, including without limitation its officers, managers, directors and shareholders.  This Agreement and all rights, duties and obligations hereunder are personal to Licensee and shall not, without the prior written consent of Licensor which shall not be unreasonably withheld, delayed or denied, be assigned, delegated, sold, transferred, leased, mortgaged or otherwise encumbered by

Licensee or by operation of law.  Any attempt to do so without such consent shall be void and shall constitute an incurable default under this Agreement.  If Licensor in its reasonable discretion believes that any change in any or all of the officers, managers, directors and shareholders of Licensee has, will or could materially interfere with or materially and adversely affect Licensee's performance hereunder or the relationship between the parties hereto, Licensor may deem such change to be a default under this Agreement and shall so notify Licensee and Licensee shall take whatever steps or actions are necessary to remedy Licensor's concerns; failing which Licensor shall have the right to terminate this Agreement.  The consent of Licensor to any such assignment, delegation, sale, transfer, lease, mortgage, other encumbrance or change shall not be deemed to be consent to any subsequent assignment, delegation, sale, transfer, lease, mortgage, other encumbrance or change.

       (ii)     Licensor may assign this Agreement or assign or delegate any or all of its rights, duties and obligations under this Agreement to any of its parents, subsidiaries or affiliates or to any individual or entity.

     **6.**     **SUBLICENSING.**  Licensee may not, without the prior written approval of Licensor, which shall not be unreasonably withheld or delayed, enter into any sublicense agreement or grant any sublicense for any or all of the rights or obligations of Licensee under the License or this Agreement.  The consent of Licensor to any sublicense agreement or sublicense shall not be deemed to be a consent to any subsequent sublicense agreement or sublicense.

     **7.**     **DEFAULTS AND RIGHTS OF TERMINATION.**

       a.     <u>Defaults and Right to Cure</u>:

       (i)     Except as otherwise provided in this Agreement, if Licensee fails to make any timely payments under the terms of this Agreement, Licensor shall have the right and option, but not the duty, to terminate the License and this Agreement upon not less than ten (10) days' prior written notice, but no neglect or failure to serve such notice shall be deemed to be a waiver of any such violation or default.  Such termination shall become effective unless such violation or default described in such notice shall be completely remedied to the satisfaction of Licensor within such ten (10) day period.  Upon such termination, Licensee shall immediately pay all amounts owed under this Agreement.

       (ii)     Except as otherwise provided in this Agreement and, specifically, **Paragraph 7.a.(i)** above, if Licensee shall violate any of the terms or conditions hereof or default on any of its duties, obligations or warranties hereunder, Licensor shall have the right and option, but not the duty, to terminate the License and this Agreement upon not less than thirty (30) days' prior written notice, but no neglect or failure to serve such notice shall be deemed to be a waiver of any such violation or default.  Such termination shall become effective unless such violation or default described in such notice shall be completely remedied to the satisfaction of Licensor within such thirty (30) day period.  Upon such termination, Licensee shall immediately pay all amounts owed under this Agreement.

       (iii)     Notwithstanding the provisions of **Paragraph 7.a.(i)** above, if such violation or default:  (a) is of a kind that a remedy or cure cannot effectively restore the prior circumstances; or (b) is described in this Agreement as an incurable default, then the License and this Agreement shall terminate upon receipt by Licensee of written notice thereof without any period of remedy or cure whatsoever.  The termination of the License and this Agreement shall be without prejudice to any rights that Licensor otherwise has against Licensee under this Agreement or under law.

       b.     <u>Bankruptcy or Assignment for Creditors, Business Discontinuance</u>:   If:   (i) Licensee files a petition in bankruptcy or is adjudicated a bankrupt; (ii) a petition in bankruptcy is

filed against Licensee; (iii) Licensee shall become insolvent or shall make or agree to make an assignment for the benefit of creditors or an arrangement pursuant to any bankruptcy law; (iv) Licensee discontinues business; (v) Licensee receives a qualified opinion from its independent auditor regarding Licensee's financial statements or an opinion stating that Licensee's financial situation raises substantial doubt about Licensee's ability to continue as a going concern (or the equivalent of such an opinion); or (vi) a receiver shall be appointed for Licensee, the License and this Agreement shall automatically terminate without the necessity of any notice whatsoever.  If the License and this Agreement are so terminated, any and all of Licensee and its receivers, representatives, trustees, agents, administrators, successors and assigns shall have no right to sell or in any way deal with any of the Playboy Properties, Products or the Materials, except with the special prior written consent and under the instructions of Licensor that it or they shall be obligated to follow.

     c.    <u>Loss of Trademark Rights</u>:  If Licensee's right to use any or all of the Trademarks is adjudged illegal, invalid or restricted and either (i) such adjudication has become final and non-appealable; (ii) Licensor in its sole discretion chooses not to appeal therefrom; or (iii) if a settlement agreement is entered into by Licensor that prohibits or restricts Licensor's or Licensee's right(s) to use the Trademarks, the License and this Agreement shall automatically terminate without the necessity of any notice whatsoever as of the date (x) such adjudication becomes final and non-appealable; (y) Licensor makes such choice; or (z) of the execution and delivery of such settlement agreement.   Notwithstanding anything to the contrary in this Agreement, Licensee shall have no claim of any nature against Licensor for the loss of any or all rights to use the Trademarks.

## 8.   <u>EXPIRATION OR TERMINATION</u>.

     a.    <u>Effect of Expiration or Termination</u>:  Upon and after the expiration or termination of the License and this Agreement, all rights granted to Licensee under this Agreement shall immediately revert to Licensor.  Licensee will refrain from any further use of the Playboy Properties or any further reference to anything similar to the Playboy Properties (including, but not limited to, words, devices, designs and symbols) or in any way associated with any or all of the Products, Licensor and its subsidiaries or affiliates, except with the prior written consent of Licensor or as expressly provided in **Paragraph 8.c.** hereof.

     b.    <u>Reserved Rights</u>:   The expiration or termination of the License and this Agreement shall not:  (i) relieve Licensor or Licensee, respectively, of any obligations incurred prior or subsequent to such expiration or termination; or (ii) impair or prejudice any of the rights of Licensor or Licensee, respectively, accruing prior or subsequent thereto as provided in this Agreement.  Upon termination of the License and this Agreement pursuant to **Paragraph 7.c.** hereof, Guaranteed Royalties for the then current License Year shall be prorated based on the ratio that the number of days in such License Year prior to termination bears to the number of days in the License Year had the License and this Agreement not been terminated.  Earned Royalties due for such License Year shall be the excess of Earned Royalties over such prorated Guaranteed Royalties.  Any overpayment or underpayment of Guaranteed Royalties or Earned Royalties based on such proration shall be immediately adjusted by the parties hereto.

     c.    <u>Continued Sales After Expiration or Termination</u>:  Provided that Licensee is not in arrears in the payment of any amounts due to Licensor and that Licensee is in compliance with all of the terms and conditions of this Agreement, then upon the expiration of the License and this Agreement, or if this Agreement is terminated pursuant to any paragraph of this Agreement prior to the Expiration Date and then only upon Licensor's prior written approval (which may be withheld at Licensor's discretion), and except as provided in **Paragraph 8.d.** hereof, Licensee may, for a period of ninety (90) days after the Expiration Date or notice of termination together with Licensor's written consent (the "Sell-Off Period"), sell through Licensee's existing, recognized network of distributors or accounts all of the Products that have been approved by Licensor and that are in process or on hand on the Expiration Date or at the time such notice of termination together with Licensor's approval of such Sell-Off Period is received.  In such event, Licensee shall pay Earned Royalties and furnish Statements with respect to the Sell-Off Period in

accordance with the terms and conditions of this Agreement as though the License and this Agreement were still in effect.  It is expressly understood and agreed by Licensee that the Sell-Off Period shall be:  (i) non-exclusive; and (ii) considered a separate accounting period for the purpose of computing Earned Royalties due to Licensor for sales during such period.  Sales during the Sell-Off Period shall not be applied against any Guaranteed Royalties due or payable prior to the Sell-Off Period.

      d.    <u>Inventory After Expiration or Termination</u>:

      (i)    Licensee shall furnish to Licensor an Inventory Statement:

      (a)    not more than thirty (30) days after the expiration of this Agreement;

      (b)    not more than thirty (30) days after the expiration of the Sell-Off Period (if any); and

      (c)    not more than ten (10) days after:  (i) receipt by Licensee of notice of termination of this Agreement or the Sell-Off Period (if any); or (ii) the happening of any event that terminates the License and this Agreement where no such notice is required.

      (ii)    Not more than ten (10) days after the expiration or termination of this Agreement or the Sell-Off Period (if any), Licensee must supply Licensor with a certificate of destruction for all Materials, including, but not limited to, Holograms, labels, hang tags, buttons, boxes, zippers, decals, advertising material and equipment capable of recreating the Playboy Properties, including, but not limited to:  molds, tools, dies and printing screens.

      (iii)    Upon the expiration or termination (for any reason) of this Agreement during the Term or, in the event of a Sell-Off Period, then upon the expiration or termination of the Sell-Off Period (if any), Licensor reserves the right to purchase all remaining inventory at Licensee's direct variable manufacturing cost, however, if Licensor chooses not to purchase such inventory, it shall be promptly destroyed by Licensee unless otherwise agreed between Licensee and Licensor.  Licensor shall inform Licensee of its decision within fifteen (15) days after Licensor's receipt of the Inventory Statement from Licensee.

      (iv)    Should Licensor choose not to purchase Licensee's inventory as provided under **Paragraph 8.d.(iii)** above, Licensee, within ten (10) days after Licensor's notice, shall provide Licensor with a certificate of destruction for all inventory of the Product on hand or in process.

      (v)    Licensor and its agents shall have the right to conduct physical inspections of any and all locations where the Products may be designed, manufactured and/or held to ascertain Licensee's compliance with this **Paragraph 8.d.** and, in order to enable Licensor to conduct such inspections, Licensee will provide to Licensor within not more than ten (10) days of the date of Licensor's written request a listing of the places and addresses at which the Products are designed, manufactured and/or held.  Any refusal by Licensee to submit to such inspection shall forfeit Licensee's right to a Sell-Off Period, and Licensor shall retain all other legal equitable rights it has in the circumstances, which rights are hereby specifically reserved.

      (vi)    Licensee understands and acknowledges that it is essential for Licensor to have accurate, complete and timely information with regard to existing inventory of the Products and the inventory of the Products that is destroyed.  Failure to provide Licensor with timely and accurate Inventory Statements is a material default under the Agreement and, in such event, Licensor will have the right to revoke Licensee's right to the Sell-Off

Period.  Further, Licensee will, prior to any destruction of the Products pursuant to the provisions of **Paragraphs 8.d.(ii)** and **8.d.(iii)** above, provide Licensor with the date, time and location of such destruction and allow Licensor or its nominee to witness such destruction if Licensor so wishes.  Licensee's failure to submit to Licensor any Inventory Statement within the required time frames is a material violation of the provisions of the Agreement and Licensor hereby reserves its rights under the Agreement and under law.

     e.    <u>Equitable Relief and Legal Fees</u>:

     (i)    Subject to **Paragraph 8.c.** hereof, Licensee hereby acknowledges that its failure to cease the design, manufacture, advertising, promotion, sale or distribution of the Products and the Materials upon the expiration or termination of this Agreement will result in irreparable harm to Licensor and its business interests for which there is no adequate remedy at law.  Accordingly, in the event of such failure or in the event of any violation or default by Licensee under this Agreement (after giving effect to the provisions of **Paragraph 7.a.(i)** hereof), Licensor shall be entitled to equitable relief without the necessity of posting bond by way of any temporary and permanent injunctions and such other relief as any court of competent jurisdiction may deem just and proper.  In this regard, Licensee hereby consents to the judgment of temporary and permanent injunctions in favor of Licensor in order to give effect to this **Paragraph 8.e.(i)**.

     (ii)    In the event either party hereto files any action against the other to enforce any of the provisions of this Agreement or to secure or protect such party's rights under this Agreement, such party shall be entitled to recover, in any judgment in its favor entered therein, the attorneys' fees and litigation expenses of such party, together with such court costs and damages as are provided by law.

     f.    <u>Termination Fee</u>:  Notwithstanding anything to the contrary in this Agreement, if Licensor terminates this Agreement as a result of a default by Licensee or a default that is not cured by Licensee within the time frame set forth in **Paragraph 7.a.(i)** hereof, Licensee shall pay to Licensor as a termination fee no later than ten (10) days after the date of such termination all Guaranteed Royalties required to be paid during the twelve (12) calendar month period beginning with effective date of termination in addition to all Earned Royalties due through the effective date of termination, and Licensor may immediately draw down on any outstanding Letter of Credit required under **Paragraph 2.d.(iv)** hereof, which such drawing shall not preclude Licensor from seeking from Licensee any deficiency that remains after such drawing.

     g.    <u>Continuity of Sales</u>:  If the License granted under this Agreement is exclusive, either in whole or in part, in order to enable Licensor to maintain continuity of sales of the Products upon expiration or termination of this Agreement, Licensor shall have the right, notwithstanding anything to the contrary contained in **Paragraph 1.a.** hereof, to authorize one or more individuals or entities to design, manufacture, advertise, promote and sell the Products in the Territory for four (4) months preceding the expiration of this Agreement or from the sooner of the time that notice is received by Licensee of termination of this Agreement or when this Agreement is terminated.  Such individual(s), entity or entities shall not, however, be authorized to ship or distribute to its or their customers any or all of the Products until after this Agreement has expired or has been terminated, but may ship the Products to such customers during the Sell-Off Period, if any.

**9.**    **NOTICES.**

     a.    <u>Effectiveness</u>:  Unless otherwise expressly indicated in this Agreement, each notice, request, approval, consent, payment and Statement (hereinafter referred to as a "Submission") specifically provided for in this Agreement shall be in writing and be considered effective or received the earliest of:  (i) five (5) days after the date when such Submission is mailed by certified or registered mail with postage prepaid to the party hereto at the address set forth below; (ii) two (2) business days after the date when such Submission is sent by overnight courier service addressed to such party at such address or the date indicated as received on the overnight courier service confirmation receipt, whichever is earlier; (iii) except

for payments, when such Submission is sent by facsimile addressed to such party at such address and the sender thereof requests and receives written confirmation from such party that such Submission has been received and is legible; or (iv) when such Submission is actually received by such party at such address:

| | | |
|---|---|---|
| To Licensor: | Address: | 680 North Lake Shore Drive |
| | | Chicago, IL  60611 |
| | Attention: | Judy Kawal |
| | Facsimile: | 312 988 9857 |
| | Telephone: | 312 373 2358 |
| | | |
| With a copy to: | Address: | 2706 Media Center Drive |
| | | Los Angeles, CA 90065 |
| | Attention: | General Counsel |
| | Facsimile: | 323 276 4502 |
| | Telephone: | 323 276 4070 |
| | | |
| To Licensee: | The address specified in **Paragraph S.2.** of the Schedule |
| | Attention: | Mr. Patrick Bertranou |
| | E-Mail: | Ppber2@pacbell.net |
| | Telephone: | 310-498-3211 |

     b.    Address Change:  Notwithstanding the provisions of **Paragraph 9.a.** hereof, each party hereto may give written notice to the other party of some other address to which Submissions shall be sent, in which event such Submissions to such party subsequently shall be sent to such address.

     **10.**    **CONFIDENTIAL INFORMATION.**  Licensor shall from time to time during the Term of this Agreement, make available to Licensee materials, including, but not limited to, Style Guides and Licensing Manuals, and other information, all of which is non-public, confidential or proprietary to Licensor.  Such materials, information and the terms and conditions of the License and this Agreement, which is confidential between Licensee and Licensor, will be collectively referred to herein as the "Proprietary Material."  Licensee shall not disclose the Proprietary Material to third-parties or use the Proprietary Material for any purpose other than in connection with its duties and obligations as set forth in this Agreement.  Licensee will ensure that the Proprietary Material will be kept confidential by Licensee and its directors, officers, employees, agents, distributors, designers and supplier/subcontractors (collectively "Representatives"), and that all such Representatives shall be made aware of the confidential nature of the Proprietary Material.  In the event Licensee is requested or required (by oral question, interrogatories, subpoena, civil investigative demand or similar process) to disclose any of the Proprietary Material, Licensee will promptly notify Licensor of such request or requirement and cooperate with Licensor so that Licensor may seek an appropriate protective order or otherwise seek appropriate protection of the Proprietary Material.  In the event that such protection is not obtained or that Licensor waives compliance, Licensee shall furnish only that portion of the Proprietary Material which Licensee is advised by written opinion of counsel is legally required to be furnished.  Immediately upon the expiration or termination of this Agreement, or within ten (10) days from the date of the Licensor's prior written request, Licensee will return to Licensor, or destroy at Licensor's request, all Proprietary Material and all copies of the Proprietary Material produced by Licensee or its Representatives or any notes, analysis or other materials prepared or produced by Licensee or its Representatives.

     Anything in this Agreement to the contrary notwithstanding, unless mandated by law or a governmental agency, Licensee will keep all terms and conditions of this Agreement confidential both during and after the Term of the Agreement.

     **11.**    **SEVERABILITY.**  Each provision of this Agreement shall be severable.  If, for any reason, any provision herein is finally determined to be invalid and contrary to, or in conflict with, any existing or future law or regulation by a court or agency having valid jurisdiction, such determination shall not impair the operation or affect the remaining provisions of this Agreement, and such remaining provisions will continue to be given full force and effect and bind the parties hereto.  Each invalid

provision shall be curtailed only to the extent necessary to bring it within the requirements of such law or regulation.

        **12.**    **CONSENTS AND APPROVALS.**  If Licensor fails or refuses to grant to Licensee any request, consent or approval, Licensor may, but shall not be required to, give the reason therefore, but Licensor shall not be liable for any events or circumstances that arise as a result of such failure or refusal.

        **13.**    **APPLICABLE LAW.**  This Agreement shall be governed by and interpreted under the laws of the State of Illinois without regard to its conflicts of laws provisions.  Licensee hereby submits to personal jurisdiction in Cook County, Illinois.  The parties hereto agree that any and all disputes arising out of or relating in any way to this Agreement shall be litigated only in courts sitting in Cook County, Illinois.

        **14.**    **NO BROKER.**  Licensee warrants and represents that Licensee used no broker in connection with the execution and delivery of this Agreement.

        **15.**    **CONSTRUCTION.**  The headings used herein are for convenience only and shall not be deemed to define, limit or construe the contents of any provision of this Agreement.  The wording of this Agreement will be deemed to be the wording chosen by the parties hereto to express their mutual intent, and no rule of strict construction will be applied against any such party.  Time is the essence of this Agreement.  The Recitals and the Additional Terms and Conditions (contained in **Exhibit E** which is attached hereto) shall be deemed to be part of this Agreement.  This Agreement may be executed in separate counterparts, each of which is deemed to be an original, and all of which taken together constitute one and the same agreement.

        **16.**    **SURVIVABILITY.**  The expiration or termination of the License and this Agreement shall not affect those provisions hereof that are meant to survive such expiration or termination.

        **17.**    **RIGHTS CUMULATIVE.**  The respective rights and remedies of the parties hereto, whether herein specified or otherwise, shall be cumulative, and the exercise of one or more of them shall not preclude the exercise of any or all other rights and remedies each such party has hereunder or by law.

        **18.**    **LIMITATION OF LIABILITY.**  **EXCEPT FOR THE PARTIES' INDEMNIFICATION OBLIGATIONS SET FORTH IN PARAGRAPHS 2.N.(I) AND 4.A. ABOVE WITH RESPECT TO THIRD PARTIES, NEITHER PARTY SHALL BE LIABLE TO THE OTHER PARTY FOR ANY LOST PROFITS, LOST REVENUE, OR ANY INCIDENTAL, CONSEQUENTIAL, SPECIAL OR INDIRECT DAMAGES OF ANY KIND, REGARDLESS OF THE FORM OF ACTION, WHETHER IN CONTRACT, TORT (INCLUDING NEGLIGENCE OR OTHERWISE, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES IN ADVANCE.**

        **19.**    **ENTIRE AGREEMENT.**  This Agreement (with the Recitals, Schedule and **Exhibits A** through **E**) represents the entire understanding of the parties hereto with respect to the subject matter hereof and, as of the Commencement Date hereof, supersedes any and all prior agreements and understandings, whether written or oral, pertaining to the subject matter hereof, hereby replacing all prior and/or contemporaneous written and oral agreements between the parties in connection with the subject matter hereof including that certain Product License Agreement, dated March 1, 2010 (the "Prior US Agreement"), and that certain Product License Agreement, dated April 1, 2010 (the "Prior Global Agreement"), both of which are hereby terminated.  None of the terms of this Agreement can be waived or modified except by an express agreement in writing signed by the parties hereto.  There are no representations, promises, warranties, covenants or undertakings other than those contained in this Agreement and Licensee acknowledges that in entering into this Agreement, it has not relied upon any representations, warranties or promises, whether oral or written, not expressly contained herein.  No custom or practice of the parties hereto at variance with the terms hereof shall constitute a waiver of Licensor's right to demand exact compliance with any of the terms herein at any time.  The failure of either party hereto to enforce, or the delay by either party hereto in enforcing, any or all of its rights under this Agreement shall not be deemed as constituting a waiver or a modification thereof, and either party hereto may, within the time provided by applicable law, commence appropriate proceedings to enforce

any or all of such rights.  Except as expressly provided in this Agreement, no individual or entity other than Licensee and Licensor shall be deemed to have acquired any rights by reason of anything contained in this Agreement.

      This Agreement will become null and void, and Licensor will have no further obligation to enter into this Agreement with Licensee if Licensee has not executed this Agreement and returned it to Licensor so that Licensor receives the executed Agreement by August 31, 2011.

IN WITNESS WHEREOF, the parties hereto, intending this Agreement to be effective as of the Commencement Date, have caused this Agreement to be executed by the duly authorized representative of each.

**UNITED MEDICAL DEVICES, LLC**
**(LICENSEE)**

By: _____

Title: _____ C.E.O. _____

Date: _____ August 24. 2011 _____

**PLAYBOY ENTERPRISES**
**INTERNATIONAL, INC.**
**(LICENSOR)**

By: _____

Title: _____ Assistant Counsel _____

Date: _____ 8/24/2011 _____

EXHIBIT A
ATTACHED TO AND MADE A PART OF
THE PRODUCT LICENSE AGREEMENT BETWEEN
PLAYBOY ENTERPRISES INTERNATIONAL, INC.
AND
UNITED MEDICAL DEVICES, LLC
DATED AS OF APRIL 1, 2010

**THE PLAYBOY PROPERTIES**\*

# PLAYBOY



\*   Any revisions to the above list and depictions will be granted only upon Licensor's receipt of

a fully-signed amendment to this Exhibit A.

**EXHIBIT B**
**ATTACHED TO AND MADE A PART OF**
**THE PRODUCT LICENSE AGREEMENT BETWEEN**
**PLAYBOY ENTERPRISES INTERNATIONAL, INC.**
**AND**
**UNITED MEDICAL DEVICES, LLC**
**DATED AS OF APRIL 1, 2010**

**E-COMMERCE GUIDELINES**

1.    Licensee's E-Commerce Web Site:  Licensee may advertise and offer the availability of the Products on its own E-Commerce Web Site and may accept orders for the Products placed through its own E-Commerce Web Site subject to the following provisions:

   a.    Licensee's E-Commerce Web Site must, include a link to www.shopthebunny.com (or any other URL as Licensor may direct from time to time) and inform visitors to such E-Commerce Web Site that the Products and other Playboy-branded Products are available for sale through such link.

   b.    Licensee may only use the Trademarks, or portions thereof, in connection with the domain name, html title, meta tags or other hidden html text for its E-Commerce Web Site only with the prior written approval of Licensor.

   c.    Licensee will ensure that the terms and conditions of its E-Commerce Web Site clearly and conspicuously inform all visitors that no orders for the Products will be accepted nor shipped outside the Territory.

   d.    Licensee will ensure that its E-Commerce Web Site continuously displays the trademark or copyright notices as directed by Licensor in connection with the display, advertisement and offer of the Products.

   e.    Licensee may not use the Playboy Properties to advertise, promote or sell non-Playboy branded Products or services.

   f.    All aspects of the display of the Playboy Properties and Products on Licensee's E-Commerce Web Site will be subject to the prior and ongoing approval of Licensor, including design, layout, content, advertising and links.  Licensee must obtain Licensor's approval prior to any change in already approved design, layout, content advertising or links of Licensee's E-Commerce Web Site.

   g.    Notwithstanding anything hereof to the contrary, Licensor shall have the right to immediately withdraw the permission set forth in this **Exhibit B** and the Agreement upon receipt of Licensor's written notice if Licensor deems, in its reasonable discretion, that any aspect of Licensee's E-Commerce Web Site, including, but not limited to, content, advertising, links or html code, violates the Standards and Practices, which Licensor may amend from time to time, set forth on Attachment 1 attached hereto and made a part hereof.  In the event of such withdrawal, Licensee must immediately remove all of the Playboy Properties and the Products from Licensee's E-Commerce Web Site.

   h.    Licensee's E-Commerce Web Site shall include Terms of Use and a Privacy Policy consistent with the terms and conditions of Playboy.com, Inc.'s privacy policy which is attached hereto by way of example as Attachment 2.

   i.    None of the advertisements contained on Licensee's E-Commerce Web Site shall include those categories set forth on Attachment 3 attached hereto and made a part hereof unless approved in advance in writing by Licensor.

2.    E-tailers' and Retailers' E-Commerce Web Sites:  Licensee may sell and distribute the Products, and allow its distributors to sell and distribute the Products, to E-tailers and retailers which may sell and distribute the Products via such E-tailers' or retailers' E-Commerce Web Sites provided that:

    a.    Licensee will use commercially reasonable efforts to ensure that such E-tailers and retailers follow the guidelines set forth in these E-Commerce Guidelines for the advertisement, promotion and offer of the Products via any E-Commerce Web Site; and

    b.    Unless authorized by Licensor in writing, Licensee will not sell or distribute the Products to an E-tailer or retailer:  (i) who is identified with or by the names of any adult male lifestyle/entertainment publications which are, in Licensor's opinion, competitive with *Playboy magazine*; (ii) who will advertise, promote or offer the Products on an E-Commerce Web Site that is identified with or by the names of any adult male lifestyle/entertainment publications which are, in Licensor's opinion competitive with *Playboy magazine*; or (iii) who will advertise, promote, or offer the Products for sale on an E-Commerce Web Site in conjunction with any products or services identified with or by the names of any adult male lifestyle/entertainment publications which are, in Licensor's opinion, competitive with *Playboy magazine*.

In the event Licensor discovers any E-Commerce Web Site which is in violation of any of the guidelines set forth in this **Exhibit B**, Licensee, upon Licensor's prior written notice, shall cease all sales and distribution of the Products to the retail or E-tailer owner or controller of any such E-Commerce Web Site.

3.    Distributors' E-Commerce Web Sites:  Licensee will ensure that its third-party distributors adhere to the terms and conditions of the E-Commerce Guidelines attached to each such distributor's Distributor Contract.  Licensee shall also ensure that its affiliated distributors adhere to the terms and conditions set forth in the Agreement and in these E-Commerce Guidelines.  In the event Licensor discovers any E-Commerce Web Site, either owned or controlled by any affiliated or third-party distributor, which is in violation of any of the E-Commerce Guidelines, Licensee shall, at Licensor's option, cease selling or distributing the Products to any such distributor.

**ATTACHMENT 1**
**ATTACHED TO AND MADE A PART OF EXHIBIT B TO**
**THE PRODUCT LICENSE AGREEMENT**
**BETWEEN**
**PLAYBOY ENTERPRISES INTERNATIONAL, INC.**
**AND**
**UNITED MEDICAL DEVICES, LLC**
**DATED AS OF APRIL 1, 2010**

**STANDARDS AND PRACTICES**

The following may not be depicted (in actual or simulated form) or explicitly described on any E-Commerce Web Sites displaying the Playboy Properties or the Products:

1.      Violence

        Violent behavior and links to sexuality or eroticism with violence, directly or indirectly.

2.      Rape

        Rape (including so-called "implicit" or "consenting" rape) is strictly forbidden.

3.      Incest

4.      Sadism and Masochism

5.      Bondage

6.      Bestiality

7.      Child Pornography

        No nude or seminude photos of anyone under 18 years old at the time such photos were taken. Even if a model visibly looks or is actually older than 18, no depictions of any model who is portrayed as younger than 18 in any sexual act.  No explicit description of or explicit references to anyone under 18 years of age.

8.      Extreme Sexual Explicitness

        No penetration, erections, ejaculations or close-up shots or descriptions of oral sex.

9.      Graphic Close-ups of Genitals

        No close-ups or descriptions of genitals, particularly in the context of actual or simulated sexual activity.

10.     Actual Sexually Explicit Conduct

        No sexual intercourse (including genital-genital, oral-genital, anal-genital or oral-anal).

11.     Necrophilia

12.     Defecation

13.     Fisting

14.     Bukkake

15.     Any content or interactivity, the presentation of which would be obscene, illegal or actionable under applicable laws.

ATTACHMENT 2
ATTACHED TO AND MADE A PART OF EXHIBIT B TO
THE PRODUCT LICENSE AGREEMENT
BETWEEN
PLAYBOY ENTERPRISES INTERNATIONAL, INC.
AND
UNITED MEDICAL DEVICES, LLC
DATED AS OF APRIL 1, 2010

## EXAMPLE PRIVACY POLICY

This Privacy Policy (the "Policy") applies to Playboy Enterprises, Inc.'s and Playboy.com, Inc.'s (collectively, "Playboy") family of websites (the "Sites"). These include playboy.com; cyber.playboy.com; store.playboy.com; auctions.playboy.com; playboynet.playboy.com; racingusa.playboy.com; sportsbook.playboy.com; casino.playboy.com; and any other sites at which this Policy appears. It does not apply to other online or offline Playboy sites, products or services.

This Policy explains what information we collect about you and what we do with it. We reserve the right to modify this policy at any time, and we will post any new policy here. By using or navigating any of the Sites, you acknowledge that you have read, understand and agree to be bound by this Policy or any modified Policy as posted. If you do not agree to these terms, please do not use or visit any of our Sites.

**What information do we collect?**

We collect personal information that you provide to us such as your name, e-mail address, street address and telephone number. We also collect credit card information from you. We generally collect this personal information on our registration and order forms when you sign up to receive products or services from any of our Sites. We may also collect information from our online surveys such as age, gender and income level. Finally, we collect IP addresses and anonymous demographic information.

**What do we do with the information we collect?**

We use personal information and other demographic or profile information you provide to us to fulfill your order or request; to provide you with information about Playboy and some of our partners; and to contact you when necessary.

We use IP addresses and anonymous demographic information to tailor your experiences at our Sites by showing content in which we think you will be interested and displaying content according to your preferences. Anonymous demographic information is shared with advertisers and market researchers on an aggregate basis.

We use information collected to evaluate and improve our services. We may develop and use, in our sole discretion, consumer research which may be based on your use of our services.

Personal information collected on the Sites is stored and processed in the United States and by using this site, you consent to any such transfer of information outside of your country.

**Do we share the information we collect with third parties?**

In some cases, we will share information we collect (including personal information or anonymous demographic information) with third party companies who may offer products or services in which we believe you may be interested. We also share this information with third parties with whom we partner to co-promote and administer sweepstakes and contests on our Sites. You may elect not to receive promotional e-mails from us or other companies we select by choosing one of the unsubscribe options described below.

We may also share information we collect with third party service providers to manage certain aspects of the services we provide, such as maintaining our servers and processing or fulfilling orders for products and services you purchase through the Sites.

We may also disclose your information in special cases if required to do so by law, court order or other governmental authority or when we believe in good faith that disclosing this information is otherwise necessary or advisable, including, for instance, to identify, contact, or bring legal action against someone who may be causing injury to or interfering with the rights or property of Playboy, another user or anyone else that could be harmed by such activities.

**Is the information submitted in public forums confidential?**

No.  The Sites may offer chat rooms, forums, message boards and/or news groups to our users.  Please remember that any information disclosed in these areas becomes public information.  Accordingly, you should exercise caution when deciding to disclose your personal information and you do so at your own risk.

**Do we use cookies?**

Yes.  Cookies are pieces of information generated by web servers and stored in your computer for future access.  The Sites use cookie technology to enhance your online experience by making it easier for you to navigate through our Sites or make a feature work better.   Generally, cookies can be disabled.  However, you must accept cookies in order to navigate the Sites; register for our membership Sites and order products from our online stores.

**Do we use web beacons?**

Yes.  Some of our Sites may contain electronic images known as "web beacons" or single-pixel gifs that allow us to count visitors to our Sites and deliver co-branded services.  Web beacons collect limited information including cookie number, time and date of a page view and a description of the page on which the web beacon resides.

**Are the Sites secure?**

We are committed to maintaining the security of your information and have measures in place to protect against the loss, misuse and alteration of the information under our control.  All credit transactions occur in a secure area of the Site using Secure Sockets Layer ("SSL") software to process orders.   SSL encrypts the information you input on the Sites.  In addition, all information is stored in a secure location behind a firewall with limited administrative access.

**Does this Policy apply to linked sites other than the Sites?**

No.  The Sites contain links to other Internet sites, resources and sources of Playboy.  By clicking on an ad banner or other link, you will be redirected off the Sites and to third party websites.  Playboy is not responsible for the privacy policies of such sites.  You should make sure that you read and understand the privacy policies of these sites and direct any concerns regarding external links to the site administrator or webmaster of that third party website.

**How do I unsubscribe?**

All e-mails you receive from us will include specific instructions on how to unsubscribe and you may unsubscribe at any time.   Additionally, we give you the following options for removing your information from our database:

      (1)      send an email to admin@playboy.com;

      (2)      select the opt-out link at the bottom of any Playboy email and follow the instructions provided;

      (3)      send mail to the following address:  Customer Service, Playboy.com, Inc., 680 North Lake Shore Drive, Chicago, IL  60611.

**Can I update/correct my information?**

Yes.  You may correct or update your personal information by sending us an email at pb@playboy.com.

**ATTACHMENT 3**
**ATTACHED TO AND MADE A PART OF EXHIBIT B TO**
**THE PRODUCT LICENSE AGREEMENT**
**BETWEEN**
**PLAYBOY ENTERPRISES INTERNATIONAL, INC.**
**AND**
**UNITED MEDICAL DEVICES, LLC**
**DATED AS OF APRIL 1, 2010**

## UNACCEPTABLE ADVERTISEMENT CATEGORIES ON E-COMMERCE WEB SITES

SEXUAL AIDS & DEVICES (TAKEN ON A CASE-BY-CASE BASIS)
Dildos
Vibrators - if implied use is sexual
Creams and ointments - that increase pleasure or claim to extend tumescence, etc.

EXPLICIT SEXUAL MATERIAL
X-Rated videos
X-Rated audio cassettes
Sexually oriented telephone services
Explicit sex books
Suggestive T-shirts
X-Rated clothes (i.e., candypants)
Adult entertainment nightclubs and cabarets

MEDICAL
Growing new hair (including transplants) (TAKEN ON CASE-BY-CASE BASIS)
Hypnotism (i.e., stop smoking, lose weight)
Breast/Penis enlargement
Super vitamins with unsubstantiated claims
Condoms - if copy is suggestive
Aphrodisiacs
Inhalants (i.e., amylnitrate)
Weight reducers
Hemorrhoid remedies

SELF-IMPROVEMENT/BEATING THE ODDS
Betting services
Books on cheating (cards, IRS, etc.)
Lotteries
Home study courses

DRUG PARAPHERNALIA
All items including rolling papers

WEAPONS
Hand guns
Switchblade knives

SUGGESTIVE NAMES
No drug related product names unless the description of the product's use is clear.

COMPARISON ADVERTISING
Aggressive competitive ads that might create a problem with other advertisers.
Aggressively competitive claims which are not substantiated.

MISCELLANEOUS
No PLAYBOY name or logo without permission
No Nazi or anti-Semetical paraphernalia
No ads for competitive publications such as                    [Redacted]
All mail-order must include a money-back guarantee

**EXHIBIT C**
**ATTACHED HERETO AND MADE A PART OF**
**THE PRODUCT LICENSE AGREEMENT BETWEEN**
**PLAYBOY ENTERPRISES INTERNATIONAL, INC.**
**AND**
**UNITED MEDICAL DEVICES, LLC**
**DATED AS OF APRIL 1, 2010**

**SUPPLIER/SUBCONTRACTOR CONTRACT**

1.    By execution of this Supplier/Subcontractor Contract ("Contract"), _____ ("Supplier") agrees and acknowledges that:  (i) all images and/or trademarks including, but not limited to PLAYBOY, (the "Playboy Properties") applied at the request of United Medical Devices, LLC ("Purchaser") to merchandise covered by this Contract are properties of Playboy Enterprises International, Inc. ("Playboy"), and when used upon merchandise means that such merchandise is sponsored, approved, recommended or sold by Playboy or its licensees; (ii) Supplier will not sell, ship or otherwise dispose of any such merchandise except upon the order of Purchaser or Playboy; (iii) Supplier will never make, cause others to make or assist others in making, any claim whatsoever to any or all of the Playboy Properties or any trademark, image, designation, name, phrase, design or symbol similar thereto in connection with the manufacture, advertising, promotion, sale or distribution of merchandise; and (iv) Supplier will defend, indemnify and hold harmless Purchaser and Playboy and the distributors and dealers and the officers and employees of each of the foregoing against all liability whatsoever which may be incurred by them or any of them as a result of any alleged defects in material or workmanship in the merchandise covered by this Contract.

2.    Supplier agrees that no production or manufacture of any merchandise covered by this Contract will commence until this Contract has been signed, dated and returned by Supplier to Purchaser.  Supplier further agrees that it will not produce, cause to be produced or assist in the production of more units than are specified by Purchaser nor will Supplier produce, cause to be produced or assist in the production of any product or item not specifically requested by Purchaser using any or all of the Playboy Properties or any trademarks, images, designations, names, phrases, designs or symbols similar to any or all of the Playboy Properties during or at any time after the completion of merchandise requested by this Contract.

3.    Supplier will, upon request from Purchaser or Playboy, deliver to Purchaser or will destroy in the presence of Purchaser or its representative(s), all molds, designs or any other elements used in reproducing any or all of the Playboy Properties.

4.    Playboy is an intended third-party beneficiary of this Contract.

5.    This Contract, when attached to a purchase order, shall consist of the entire agreement between the parties and shall supersede any conflicting or contrary terms and conditions of any purchase order or other order form whether supplied by Purchaser or Supplier.

6.    This Contract may not be modified or terminated except in writing, and no claimed modification, termination or waiver shall be binding unless also signed by an authorized representative of Playboy.

7.    VIOLATION OF THIS AGREEMENT BY SUPPLIER MAY RESULT IN PROSECUTION FOR TRADEMARK INFRINGEMENT, UNFAIR COMPETITION AND OTHER CAUSES OF ACTION AND THE IMPOSITION OF FINES AND/OR CRIMINAL PENALTIES.

**SUPPLIER**                                                    **PURCHASER**

                                                                **UNITED MEDICAL DEVICES, LLC**

_____

**(Name of Company - Please Print)**

By: _____           By: _____

Title: _____         Title: _____

Date: _____          Date: _____


**SUPPLIER INFORMATION**                              **PLAYBOY**

Name: _____         Name:     **PLAYBOY ENTERPRISES
                                                                         INTERNATIONAL, INC.**

Address: _____       Address:   680 North Lake Shore Drive

_____                           Chicago, IL  60611

Contact: _____       Contact:   Judy Kawal

Telephone: _____     Telephone:  312 373 2358

Facsimile: _____     Facsimile:  312 988 9857

**EXHIBIT D**
**ATTACHED HERETO AND MADE A PART OF**
**THE PRODUCT LICENSE AGREEMENT BETWEEN**
**PLAYBOY ENTERPRISES INTERNATIONAL, INC.**
**AND**
**UNITED MEDICAL DEVICES, LLC**
**DATED AS OF APRIL 1, 2010**

**DISTRIBUTOR CONTRACT**

1.    By execution of this Distributor Contract ("Contract"), _____ ("Distributor") agrees and acknowledges that: (i) all trademarks and/or images including, but not limited to, PLAYBOY (the "Playboy Properties") used on condoms (the "Products") distributed in _____ (the "Territory") at the request of United Medical Devices, LLC ("Playboy's Licensee") are trademarks of Playboy Enterprises International, Inc. ("Playboy"), and when used upon the Products means that such Products are sponsored, approved, recommended or sold by Playboy or its licensees; (ii) Distributor will not sell, ship or otherwise dispose of any Products except upon the order and within the specifications and guidelines of Playboy's Licensee or Playboy; (iii) Distributor will never make, cause others to make or assist others in making, any claim whatsoever to any or all of the Trademarks or any trademark, designation, name, phrase, design or symbol similar thereto in connection with the manufacture, advertising, promotion, sale or distribution of merchandise; and (iv) Distributor will defend, indemnify and hold harmless Playboy's Licensee and Playboy and the distributors and dealers and the officers and employees of each of the foregoing against all liability whatsoever which may be incurred by them or any of them as a result of Distributor's distribution of the Products covered by this Contract.  In no event may Distributor advertise, sell or distribute the Products outside of the Territory.

2.    Distributor agrees that no distribution of the Products covered by this Contract will commence until this Contract has been signed, dated and returned by Distributor to Playboy's Licensee. Distributor further agrees that it will not distribute, cause to be distributed or assist in the distribution of the Products outside the Territory or other than as specified by Playboy's Licensee nor will Distributor distribute, cause to be distributed or assist in the distribution of any product or item not specifically requested by Playboy's Licensee which bears any or all of the Playboy Properties or any trademarks, images, designations, names, phrases, designs or symbols similar to any or all of the Trademarks during or at any time after the distribution of the Products requested by this Contract.  Any advertisement, promotion, sale or distribution of the Products via an "E-Commerce Web Site" or the fulfillment of any orders for the Products placed via any "E-Commerce Web Site" shall be subject to the terms and conditions of the E-Commerce Guidelines attached to this Contract as Attachment 1 and made a part hereof.  In the event Distributor fails to adhere to any of the terms and conditions of the E-Commerce Guidelines, Playboy's Licensee may immediately terminate this Contract upon written notice to Distributor.  "E-Commerce Web Site" shall mean promoting, offering, providing or selling the Products using or via communications involving the TCP/IP Protocol or any TCP/IP Successor.  "TCP/IP Protocol" (which stands for Transmission Control Protocol/Internet Protocol) shall mean the two-layered program that is the basic communication language or protocol of publicly accessible computer networks such as the Internet and private computer networks such as intranets and extranets. "TCP/IP Successors" shall mean programs, languages, protocols or other technical means that are being developed or that have yet to be developed which are intended to supplement, supersede or replace TCP/IP or its use for communications on computer networks.

3.    Distributor will be responsible for ensuring all of its distributors (not retailers) for the Products adhere to and perform their duties in accordance with the terms and conditions of this Contract including adhering to the Territory restrictions.

4.    Distributor will maintain accurate records concerning the distribution of the Products and shall supply within ten (10) days of a request from Playboy or Playboy's Licensee a statement detailing Distributor's accounts for the Products.  Upon request from Playboy's Licensee and/or Playboy, Playboy's Licensee and/or Playboy shall also have the right at all reasonable hours to conduct an

examination of Distributor's books and records and shall have the right to make extracts therefrom in order to ensure Distributor's compliance with this Contract.

5.   Playboy is an intended third-party beneficiary of this Contract.

6.   This Contract, when attached to a distribution order, shall consist of the entire agreement between the parties and shall supersede any conflicting or contrary terms and conditions of any distribution order or other order form whether supplied by Distributor or Playboy's Licensee.

7.   This Contract may not be modified or terminated except in writing, and no claimed modification, termination or waiver shall be binding unless also signed by an authorized representative of Playboy.

8.   If Distributor violates any of the terms and conditions of this Contract, Playboy's Licensee and/or Playboy will have the right to immediately terminate this Contract upon written notice to Distributor. In such event, Distributor must provide Playboy's Licensee and/or Playboy within ten (10) days of the date of such notice of termination with a statement setting forth the number of Products on hand and a listing of all of Distributor's accounts for the Products.

9.   In the event the Product License Agreement between Playboy and Playboy's Licensee dated as of April 1, 2010 (the "Agreement") expires or is terminated, this Distributor Contract shall immediately terminate upon the expiration or termination of the Agreement.

10.  Playboy shall have the right to terminate this Distributor Contract upon not less than ten (10) days prior written notice.

11.  VIOLATION OF THIS AGREEMENT BY DISTRIBUTOR MAY RESULT IN PROSECUTION FOR TRADEMARK INFRINGEMENT, UNFAIR COMPETITION AND OTHER CAUSES OF ACTION AND THE IMPOSITION OF FINES AND/OR CRIMINAL PENALTIES.

**DISTRIBUTOR**                                        **PLAYBOY'S LICENSEE**

                                                       **UNITED MEDICAL DEVICES, LLC**
_____
**(Name of Company - Please Print)**

By: _____                         By: _____

Title: _____                      Title: _____

Date: _____                       Date: _____


**DISTRIBUTOR INFORMATION**                            **PLAYBOY**

Name: _____                        Name:   **PLAYBOY ENTERPRISES
                                                                INTERNATIONAL, INC.**

Address: _____                     Address:  680 North Lake Shore Drive

         _____                               Chicago, IL  60611

Contact: _____                     Contact:  Judy Kawal

Telephone: _____                   Telephone:  312 373 2358

Facsimile: _____                   Facsimile:  312 988 9857

**ATTACHMENT 1**
**ATTACHED TO AND MADE A PART OF**
**THE DISTRIBUTOR CONTRACT BETWEEN**
**UNITED MEDICAL DEVICES, LLC**
**AND**

_____

**DATED AS OF** _____

**E-COMMERCE GUIDELINES**

1.   Distributor's E-Commerce Web Site:  Distributor may advertise and offer the availability of the Products on its own E-Commerce Web Site and may accept orders for the Products placed through its own E-Commerce Web Site subject to the following provisions:

    a.   Distributor's E-Commerce Web Site must, in conjunction with a link to www.shopthebunny.com (or any other url as Playboy's Licensee may direct from time to time), inform visitors to such E-Commerce Web Site that the Products and other fine Playboy-branded Products are available for sale through such link.

    b.   Distributor may only use the Trademarks, or portions thereof, in connection with the domain name, html title, meta tags or other hidden html text for its E-Commerce Web Site only with prior written approval of Playboy.

    c.   Distributor will ensure that the terms and conditions of its E-Commerce Web Site clearly and conspicuously inform all visitors that no orders for the Products will be accepted and no Products will be shipped outside the Territory.

    d.   Distributor will ensure that its E-Commerce Web Site continuously displays the trademark or copyright notices as directed by Playboy's Licensee in connection with the display, advertisement and offer of the Products.

    e.   Distributor may not use the Playboy Properties to advertise, promote or sell non-Playboy branded products or services.

    f.   All aspects of the display of the Playboy Properties and Products on Distributor's E-Commerce Web Site will be subject to the prior and ongoing approval of Playboy, including design, layout, content, advertising and links.  Distributor must obtain Playboy's approval prior to any change in already approved design, layout, content advertising or links of Distributor's E-Commerce Web Site.

    g.   Notwithstanding anything hereof to the contrary, Playboy's Licensee shall have the right to immediately withdraw the permission set forth in this Attachment 1 and the Distributor Contract upon receipt of the written notice Playboy's Licensee if Playboy deems, in its sole discretion, that any aspect of Distributor's E-Commerce Web Site, including, but not limited to, content, advertising, links or html code, violates the Standards and Practices, which Playboy may amend from time to time, set forth on Attachment 1.A. attached hereto and made a part hereof.  In the event of such withdrawal, Distributor must immediately remove all of the Trademarks and the Products from Distributor's E-Commerce Web Site.

    h.   Distributor's E-Commerce Web Site shall include Terms of Use and a Privacy Policy consistent with the terms and conditions of Playboy.com, Inc.'s privacy policy which is attached hereto by way of example as Attachment 1.B.

    i.   None of the advertisements contained on Distributor's E-Commerce Web Site shall include those categories set forth on Attachment 1.C. attached hereto and made a part hereof unless approved in advance in writing by Playboy.

2.    E-tailers' and Retailers' E-Commerce Web Sites:  Distributor may sell and distribute the Products to E-tailers and retailers which may sell and distribute the Products via such E-tailers' or retailers' E-Commerce Web Sites provided that:

   a.    Distributor will use commercially reasonable efforts to ensure that such E-tailers and retailers follow the guidelines set forth in these E-Commerce Guidelines for the advertisement, promotion and offer of the Products via any E-Commerce Web Site; and

   b.    Unless authorized by Playboy in writing, Distributor will not sell or distribute the Products to an E-tailer or retailer:  (i) who is identified with or by the names of any adult male lifestyle/entertainment publications which are, in Playboy's opinion, competitive with *Playboy magazine*; (ii) who will advertise, promote or offer the Products on an E-Commerce Web Site that is identified with or by the names of any adult male lifestyle/entertainment publications which are, in Playboy's opinion competitive with *Playboy magazine*; or (iii) who will advertise, promote, or offer the Products for sale on an E-Commerce Web Site in conjunction with any products or services identified with or by the names of any adult male lifestyle/entertainment publications which are, in Playboy's opinion, competitive with *Playboy magazine*.

In the event Playboy or Playboy's Licensee discovers any E-Commerce Web Site which is in violation of any of the guidelines set forth above, Distributor, upon the prior written notice of Playboy's Licensee, shall cease all sales and distribution of the Products to the retail or E-tailer owner or controller of any such E-Commerce Web Site.

**ATTACHMENT 1.A.**
**ATTACHED TO AND MADE A PART OF ATTACHMENT 1 TO**
**THE DISTRIBUTOR CONTRACT**
**BETWEEN**
**UNITED MEDICAL DEVICES, LLC**
**AND**

_____

**DATED AS OF _____**

**STANDARDS AND PRACTICES**

The following may not be depicted (in actual or simulated form) or explicitly described on any E-Commerce Web Sites displaying the Playboy Properties or the Products:

1.      Violence

         Violent behavior and links to sexuality or eroticism with violence, directly or indirectly.

2.      Rape

         Rape (including so-called "implicit" or "consenting" rape) is strictly forbidden.

3.      Incest

4.      Sadism and Masochism

5.      Bondage

6.      Bestiality

7.      Child Pornography

         No nude or seminude photos of anyone under 18 years old at the time such photos were taken. Even if a model visibly looks or is actually older than 18, no depictions of any model who is portrayed as younger than 18 in any sexual act.  No explicit description of or explicit references to anyone under 18 years of age.

8.      Extreme Sexual Explicitness

         No penetration, erections, ejaculations or close-up shots or descriptions of oral sex.

9.      Graphic Close-ups of Genitals

         No close-ups or descriptions of genitals, particularly in the context of actual or simulated sexual activity.

10.     Actual Sexually Explicit Conduct

         No sexual intercourse (including genital-genital, oral-genital, anal-genital or oral-anal).

11.     Necrophilia

12.     Defecation

13.     Fisting

14.     Bukkake

15.     Any content or interactivity, the presentation of which would be obscene, illegal or actionable under applicable laws.

**ATTACHMENT 1.B.**
**ATTACHED TO AND MADE A PART OF ATTACHMENT 1 TO**
**THE DISTRIBUTOR CONTRACT**
**BETWEEN**
**UNITED MEDICAL DEVICES, LLC**
**AND**

_____

DATED AS OF _____

## EXAMPLE PRIVACY POLICY

This Privacy Policy (the "Policy") applies to Playboy Enterprises, Inc.'s and Playboy.com, Inc.'s (collectively, "Playboy") family of websites (the "Sites"). These include playboy.com; cyber.playboy.com; store.playboy.com; auctions.playboy.com; playboynet.playboy.com; racingusa.playboy.com; sportsbook.playboy.com; casino.playboy.com; and any other sites at which this Policy appears. It does not apply to other online or offline Playboy sites, products or services.

This Policy explains what information we collect about you and what we do with it. We reserve the right to modify this policy at any time, and we will post any new policy here. By using or navigating any of the Sites, you acknowledge that you have read, understand and agree to be bound by this Policy or any modified Policy as posted. If you do not agree to these terms, please do not use or visit any of our Sites.

### What information do we collect?

We collect personal information that you provide to us such as your name, e-mail address, street address and telephone number. We also collect credit card information from you. We generally collect this personal information on our registration and order forms when you sign up to receive products or services from any of our Sites. We may also collect information from our online surveys such as age, gender and income level. Finally, we collect IP addresses and anonymous demographic information.

### What do we do with the information we collect?

We use personal information and other demographic or profile information you provide to us to fulfill your order or request; to provide you with information about Playboy and some of our partners; and to contact you when necessary.

We use IP addresses and anonymous demographic information to tailor your experiences at our Sites by showing content in which we think you will be interested and displaying content according to your preferences. Anonymous demographic information is shared with advertisers and market researchers on an aggregate basis.

We use information collected to evaluate and improve our services. We may develop and use, in our sole discretion, consumer research which may be based on your use of our services.

Personal information collected on the Sites is stored and processed in the United States and by using this site, you consent to any such transfer of information outside of your country.

### Do we share the information we collect with third parties?

In some cases, we will share information we collect (including personal information or anonymous demographic information) with third party companies who may offer products or services in which we believe you may be interested. We also share this information with third parties with whom we partner to co-promote and administer sweepstakes and contests on our Sites. You may elect not to receive promotional e-mails from us or other companies we select by choosing one of the unsubscribe options described below.

We may also share information we collect with third party service providers to manage certain aspects of the services we provide, such as maintaining our servers and processing or fulfilling orders for products and services you purchase through the Sites.

We may also disclose your information in special cases if required to do so by law, court order or other governmental authority or when we believe in good faith that disclosing this information is otherwise necessary or advisable, including, for instance, to identify, contact, or bring legal action against someone who may be causing injury to or interfering with the rights or property of Playboy, another user or anyone else that could be harmed by such activities.

**Is the information submitted in public forums confidential?**

No. The Sites may offer chat rooms, forums, message boards and/or news groups to our users. Please remember that any information disclosed in these areas becomes public information. Accordingly, you should exercise caution when deciding to disclose your personal information and you do so at your own risk.

**Do we use cookies?**

Yes. Cookies are pieces of information generated by web servers and stored in your computer for future access. The Sites use cookie technology to enhance your online experience by making it easier for you to navigate through our Sites or make a feature work better. Generally, cookies can be disabled. However, you must accept cookies in order to navigate the Sites; register for our membership Sites and order products from our online stores.

**Do we use web beacons?**

Yes. Some of our Sites may contain electronic images known as "web beacons" or single-pixel gifs that allow us to count visitors to our Sites and deliver co-branded services. Web beacons collect limited information including cookie number, time and date of a page view and a description of the page on which the web beacon resides.

**Are the Sites secure?**

We are committed to maintaining the security of your information and have measures in place to protect against the loss, misuse and alteration of the information under our control. All credit transactions occur in a secure area of the Site using Secure Sockets Layer ("SSL") software to process orders. SSL encrypts the information you input on the Sites. In addition, all information is stored in a secure location behind a firewall with limited administrative access.

**Does this Policy apply to linked sites other than the Sites?**

No. The Sites contain links to other Internet sites, resources and sources of Playboy. By clicking on an ad banner or other link, you will be redirected off the Sites and to third party websites. Playboy is not responsible for the privacy policies of such sites. You should make sure that you read and understand the privacy policies of these sites and direct any concerns regarding external links to the site administrator or webmaster of that third party website.

**How do I unsubscribe?**

All e-mails you receive from us will include specific instructions on how to unsubscribe and you may unsubscribe at any time. Additionally, we give you the following options for removing your information from our database:

      (1)      send an email to admin@playboy.com;

      (2)      select the opt-out link at the bottom of any Playboy email and follow the instructions provided;

      (3)      send mail to the following address: Customer Service, Playboy.com, Inc., 680 North Lake Shore Drive, Chicago, IL 60611.

**Can I update/correct my information?**

Yes. You may correct or update your personal information by sending us an email at pb@playboy.com.

en

Case 2:21-cv-09749-JFW-PD   Document 28-1   Filed 03/16/22   Page 52 of 53   Page ID #:547

**ATTACHMENT 1.C.**
**ATTACHED TO AND MADE A PART OF ATTACHMENT 1 TO**
**THE DISTRIBUTOR CONTRACT**
**BETWEEN**
**UNITED MEDICAL DEVICES, LLC**
**AND**

_____

**DATED AS OF** _____

## UNACCEPTABLE ADVERTISEMENT CATEGORIES ON E-COMMERCE WEB SITES

SEXUAL AIDS & DEVICES (TAKEN ON A CASE-BY-CASE BASIS)
Dildos
Vibrators - if implied use is sexual
Creams and ointments - that increase pleasure or claim to extend tumescence, etc.

EXPLICIT SEXUAL MATERIAL
X-Rated videos
X-Rated audio cassettes
Sexually oriented telephone services
Explicit sex books
Suggestive T-shirts
X-Rated clothes (i.e., candypants)
Adult entertainment nightclubs and cabarets

MEDICAL
Growing new hair (including transplants) (TAKEN ON CASE-BY-CASE BASIS)
Hypnotism (i.e., stop smoking, lose weight)
Breast/Penis enlargement
Super vitamins with unsubstantiated claims
Condoms - if copy is suggestive
Aphrodisiacs
Inhalants (i.e., amylnitrate)
Weight reducers
Hemorrhoid remedies

SELF-IMPROVEMENT/BEATING THE ODDS
Betting services
Books on cheating (cards, IRS, etc.)
Lotteries
Home study courses

DRUG PARAPHERNALIA
All items including rolling papers

WEAPONS
Hand guns
Switchblade knives

SUGGESTIVE NAMES
No drug related product names unless the description of the product's use is clear.

COMPARISON ADVERTISING
Aggressive competitive ads that might create a problem with other advertisers.
Aggressively competitive claims which are not substantiated.

MISCELLANEOUS
No PLAYBOY name or logo without permission
No Nazi or anti-Semetical paraphernalia
No ads for competitive publications such as[     [Redacted]
All mail-order must include a money-back guarantee

PEII\Unitedmedical_condoms_combined Agr_v8_final.doc\JRK-jvl8                          51                          08/16/11

**EXHIBIT E**
**ATTACHED HERETO AND MADE A PART OF**
**THE PRODUCT LICENSE AGREEMENT BETWEEN**
**PLAYBOY ENTERPRISES INTERNATIONAL, INC.**
**AND**
**UNITED MEDICAL DEVICES, LLC**
**DATED AS OF APRIL 1, 2010**

**ADDITIONAL TERMS AND CONDITIONS**

1.    In each License Year, at Licensor's request, Licensee will provide for Licensor's promotional purposes, at no charge to Licensor, with Products that have a total wholesale value of U.S.$1,500 in such mix and in such quantities as Licensor may request.