# EXHIBIT 2

## Table of Main Contract

This is all agreement on The Transition License from UMD to TNR in total 4 agreements;

| | | |
|---|---|---|
| 1. | Sale and Purchase Agreement – between TNR and UMD | 15 pages |
| 2. | Novation Agreement – between PLAYBOY-TNR – UMD | 7 pages |
| 3. | AMENDMENT TO NOVATION AGREEMENT - PLAYBOY-TNR – UMD | 3 pages |
| 4. | SIXTH AMENDMENT TO PRODUCT LICENSE AGREEMENT- PLAYBOY-TNR | 3 pages |

All agreement prepared by Business Development Department for keeping at CFO, department

Sender-------------------------------------------------------

(Chanin Thiencharoen)

GM- Business Development

9 / 4 / 2018

Received----------------------------------------------------------

CFO

--------/-----------/-------------

*Execution Version*

### SALE AND PURCHASE AGREEMENT

**THIS SALE AND PURCHASE AGREEMENT** (this "**Agreement**") is made on 9 April 2018,

**BY AND BETWEEN:**

(1) **THAI NIPPON RUBBER INDUSTRY PUBLIC COMPANY LIMITED**, a public company duly registered and existing under the laws of Thailand having its registered office at 1 Charoenrat Road, Thung Wat Don, Sathon Bangkok 10120 (hereinafter referred to as "**TNR**"); and

(2) **UNITED MEDICAL DEVICES, LLC**, a private company duly registered and existing under the laws of California, having its registered office at 1901 Avenue of the Stars, Suite 470 Los Angeles, CA 90067 (hereinafter referred to as the "**UMD**"),

(each hereinafter referred to as a "**Party**", and collectively referred to as the "**Parties**").

**WHEREAS:**

(A) UMD has entered into (i) the product license agreement between itself and Playboy Enterprises International, Inc ("**Playboy**") dated 1 April 2010, (ii) the side letter amendment to product license agreement dated 7 December 2012, (iii) the second amendment to product license agreement dated 25 June 2013, (iv) the third amendment to product license agreement dated 1 April 2015, (v) the fourth amendment to product license agreement dated 16 March 2016, and (vi) the fifth amendment to product license agreement dated 14 April 2017 (collectively hereinafter referred to as the "**Product License Agreement**").

(B) Pursuant to the Product License Agreement, Playboy has granted to UMD a license to use the Playboy Properties (as defined in the Product License Agreement) in the design, manufacture, advertising, promotion, sale and distribution of the Products (as defined below).

(C) UMD has also entered into sub-license agreements with local distributors in 34 countries (collectively referred to as the "**Sub-license Agreements**"), details of which set out in <u>Annex 1</u>.

(D) UMD wishes to assign its rights under the Product License Agreement and Sub-license Agreements (the "**Assigned Rights**") to TNR or TNR's designated entity, and in consideration for UMD's due performance of its obligations hereunder TNR wishes to acquire the Assigned Rights from UMD, in accordance with the provisions of this Agreement.

**THEREFORE**, the Parties agree as follows:

1. **DEFINITIONS AND INTERPRETATION**

1.1 <u>Definitions</u>

In this Agreement, the following defined terms have the following meanings:

"**Assigned Rights**" shall have the meaning as described in Recital (D).

"**Assignment**" means the assignment of the Assigned Rights by UMD to TNR or TNR's designated entity.

"**Conditions to First Payment**" shall have the meaning as described in Clause 6.1.

"**Conditions to Payment**" means Conditions to First Payment and Conditions to Second Payment.

"**Conditions to Second Payment**" shall have the meaning as described in Clause 6.2.

*Execution Version*

**"Confidential Information"** shall have the meaning as described in Clause 11.1.

**"Consideration"** means the consideration for the sale and purchase of the Assigned Rights to be paid by TNR to UMD in accordance with Clause 5.1.

**"Distribution Fee"** means the distribution fee received from the Local Distributors in good funds under the Sub-license Agreements.

**"Effective Date"** means the date of this Agreement.

**"First Payment"** shall have the meaning as described in Clause 5.3(a).

**"Gross Profit"** means all profit from sales derived from Playboy Products after deducting the cost of goods sold. From the date of the First Payment, for the first nine (9) months, such profits shall be recorded when the payment is received in TNR's account in full. For the remaining three (3) months, such profits shall be recorded provided that the deposit of such sale has been paid into TNR's account,

**"Local Distributor"** means any local distributor who is a party to the Sub-license Agreements as listed in **Annex 1**.

**"Playboy"** shall have the meaning as described in Recital (A).

**"Products"** means merchandise bearing or distributed in connection with the Playboy Properties.

**"Product License Agreement"** shall have the meaning as described in Recital (A).

**"Second Payment"** shall have the meaning as described in Clause 5.3(b).

**"Sub-license Agreements"** shall have the meaning as described in Recital (C).

**"Sub-license Due Diligence List"** means the list of sub-license agreements as listed in **Annex 2.**

**"Term"** shall have the meaning as described in Clause 2.

**"TNR Monthly Management Account"** means the monthly management account prepared by TNR.

1.2    **Interpretation**

In this Agreement, subject to any express contrary indication:

(a)    words (including the definitions in Clause 1.1) importing the singular shall include the plural and *vice versa*;

(b)    any reference to any gender shall include the other genders;

(c)    any reference to a person shall be construed as including a reference to its successors, permitted transferees and permitted assignees;

(d)    any reference to this Agreement or any other agreement or document shall be construed as a reference to that agreement or document as it exists at the time of execution of this Agreement;

(e)    any reference to a Clause shall be construed as a reference to a clause of this Agreement;

(f)    any reference to a Schedule or an Annex shall be construed as a reference to a schedule or an annex to this Agreement; and

(g)    the headings to the Clauses or other provisions of this Agreement are for ease of reference only and are not to be taken into account in the interpretation of this Agreement or its provisions.

## 2.    TERM

Unless specified otherwise in this Agreement, the term of this Agreement (the "**Term**") shall commence as of the Effective Date until the termination in accordance with Clause 10.

## 3.    SALE AND PURCHASE OF THE ASSIGNED RIGHTS

3.1    Subject to the terms and conditions under this Agreement, UMD, relying on the representations, warranties, covenants, indemnities, and undertakings given by TNR in this Agreement, shall sell the Assigned Rights to TNR, and TNR, relying on the representations, warranties, covenants, indemnities, and undertakings given by UMD in this Agreement, shall purchase the Assigned Rights from UMD.

3.2    The Parties agree that the terms and conditions of the Assignment will be set out in a separate assignment agreement as follows:

(a)    a novation agreement to be entered into among TNR or TNR's designated entity, UMD, and Playboy for the assignment of the Product License Agreement; and

(b)    assignment agreements to be entered into between UMD and the relevant Local Distributors for the assignment of the Sub-license Agreements.

3.3    The obligations of TNR to purchase the Assigned Rights and make payments of the Consideration are conditional upon the fulfillment by UMD of all of the conditions contemplated under Clause 6 of this Agreement.

## 4.    UMD OBLIGATIONS

4.1    In order to achieve the completion of the Assignment, UMD agrees that it shall assist and facilitate TNR to successfully complete the following:

(a)    entering into the novation agreement of the Product License Agreement among TNR or TNR's designated entity in replacement of UMD, UMD, and Playboy;

(b)    receiving the executed consents for the assignment of the Sub-license Agreements as listed in **Annex 1** from the Local Distributors in replacement of UMD; and

(c)    collecting the Distribution Fee during the period of 12 months from the First Payment date and Gross Profit in the total amount of not less than USD three million.

4.2    Notwithstanding Clause 4.1 above, UMD shall execute such documents and perform such acts and things as TNR may reasonably request from time to time in order to complete the Assignment and shall use its best endeavor to procure that any necessary third party which including but is not limited to the Local Distributors shall execute such documents and do such acts and things as may reasonably be required in order to complete the Assignment.

4.3    UMD shall use its best endeavor to facilitate the interests of TNR under the Product License Agreement and Sub-license Agreements. UMD shall not engage in any conduct which will give rise to a conflict of interest between UMD and TNR.

4.4    UMD shall pay Mr. Nicholai Allen and Natalia Romanowski for the period of one year following the date that the First Payment has been made, in order to provide services in assisting TNR to complete the Assignment and ensure the smooth transition of the Product License Agreement and Sub-license Agreements to TNR in substitution of UMD. In this regard, UMD shall procure that Mr. Nicholai Allen shall professionally and

*Execution Version*

diligently perform his obligations, and all of his performances shall be in accordance with the guidelines, directions and instructions reasonably provided by TNR.

4.5   UMD shall not assign and/or delegate the whole or any part of its duties and/or obligations under this Agreement to any party without obtaining a prior written consent of TNR.

5.   **CONSIDERATION**

5.1   Consideration for the sale and purchase of the Assigned Rights under this Agreement (the **"Consideration"**) and the payment terms shall be in accordance with this Clause 5.

5.2   Subject to the fulfilment of Conditions to Payment under Clause 6 and the price adjustment under Clause 6.3, the total Consideration to be paid by TNR to UMD for the sale and purchase of the Assigned Rights is USD fifteen (15) million, inclusive of all applicable taxes and fees owed by UMD as a result of the transaction contemplated under this Agreement. For avoidance of doubt, tax owed by UMD includes applicable Thai withholding tax which TNR has an obligation under Thai laws to deduct.

5.3   Subject to Clause 5.2, the Consideration will be paid by TNR to UMD in two tranches as follows:

(a)   **USD 10 million** (**"First Payment"**) will be paid upon the completion and fulfilment of the Conditions to First Payment; and

(b)   the amount not exceeding **USD five million**, subject to price adjustment under Clause 6.3 (**"Second Payment"**), will be paid upon the completion and fulfilment of the Conditions to Second Payment.

5.4   The Parties hereby agree that, unless agreed otherwise in writing by the Parties, the First Payment shall be allocated as follows:

| Amount | Allocation |
|---|---|
| USD 9,500,000 | consideration to be paid to UMD in accordance with Clause 5.6 below. |
| USD 500,000 | consideration to be paid to UMD for the payment of administration fee of the novation of the Product License Agreement to Playboy. |

5.5   The Parties hereby agree that, unless agreed otherwise in writing by the Parties, the Second Payment shall be allocated as follows:

| Amount | Allocation |
|---|---|
| USD 250,000 | consideration to be paid to UMD for the payment of administration fee of the novation of the Product License Agreement to Playboy. |
| Second Payment minus USD 250,000 | consideration to be paid to UMD in accordance with Clause 5.6 below. |

*Execution Version*

5.6 Within five days after the completion of the relevant Conditions to Payment, TNR shall pay the Consideration to the following bank account by wire transfer, unless notify otherwise in writing to TNR in advance not less than five days prior to the date of each payment:

**To UMD:**

| | | |
|---|---|---|
| **Bank Account Name** | : | United Medical Devices, LLC |
| **Bank Account No.** | : | 7577335990 /Routing#: 121000248 /IBAN: WFBIUS6S |
| **Bank** | : | Wells Fargo Bank |
| **Branch** | : | 1800 Ave of the Stars, Los Angeles, CA 90067 |

5.7 TNR's obligation to pay the First Payment and Second Payment shall be discharged in full on the date on which the First Payment or Second Payment (as the case may be) is made by TNR to the bank accounts in accordance with Clause 5.6.

6. **CONDITIONS TO PAYMENT**

6.1 TNR's obligation to pay the First Payment to UMD shall be subject to the condition that UMD performs and fulfils the conditions set out in this Clause 6 (**"Conditions to First Payment"**) (any of which may be waived in whole or in part by TNR in writing at its sole discretion), which the Conditions to First Payment shall be completed by no later than 12 April 2018:

   (a) the signing of the novation agreement of the Product License Agreement;

   (b) the delivery of the written consents signed by the authorized representatives of the Local Distributors consenting to the assignment of the Sub-license Agreements, provided that the Local Distributors must provide TNR legal evidence under the applicable laws to which they are subject, showing that the signatories are the authorized person of the relevant Local Distributor;

   (c) UMD has provided the notification of the assignment of the Sub-license Agreements to all Local Distributors; and

   (d) UMD undertakes to TNR that, within 60 days after the First Payment has been made or other date as notified in writing to UMD by TNR, an appropriate representative of UMD will accompany TNR to the following countries in order to introduce TNR to the Local Distributors to ensure a smooth transition of the business and the Assignment;

       (i) The People's Republic of China; and

       (ii) Africa.

6.2 Subject to the price adjustment set forth in Clause 6.3 below, TNR's obligation to pay the Second Payment to UMD shall become due following twelve (12) months from the date of the First Payment which shall be subject to the following condition (**"Conditions to Second Payment"**), unless it is waived in whole or in part by TNR in writing at its sole discretion:

   (a) the termination letter of any sub-license agreement(s) which is listed on the Sub-license Due Diligence List in **Annex 2** but is not listed on the Sub-license Agreement as listed in **Annex** 1, or any documentation evidencing such termination satisfactory to TNR has been delivered to TNR;

   (b) UMD undertakes to TNR that on the date as notified in writing to UMD by TNR, an appropriate representative of UMD will accompany TNR to the United States of America in order to introduce TNR to

the Buyer Department of Walmart U.S. to negotiate on the sale and distribution of Playboy Products to Walmart stores; and

(c)     it is recorded in the TNR Monthly Management Accounts and satisfactory to TNR that the total amount of the Distribution Fee during the period of 12 months from the First Payment Date plus the Gross Profit is not less than USD three million.

6.3     In the case that the Conditions to Second Payment under Clauses 6.2(a) and 6.2(b) are completed but the sum of Distribution Fee during period of 12 months from the date of the First Payment plus the Gross Profit pursuant to Clause 6.2(c) is less than USD three million, the Parties agree that the Second Payment shall be adjusted based on the below formula:

$$A = B + USD \text{ two million}$$

**Where:**

"**A**"     means     adjusted Second Payment to be paid to UMD

"**B**"     means     the total amount of the actual Distribution Fee during the period of 12 months from the First Payment Date recorded in the TNR Monthly Management Account plus the Gross Profit.

## 7.     PRICE ADJUSTMENT

7.1     The Parties agree that the payment of the Second Payment shall be adjusted pursuant to Clause 6.3 prior to the payment being made to UMD.

7.2     If the Distribution Fee during the period of 12 months from the date of the First Payment and the Gross Profit is zero, TNR shall be obliged to pay the Second Payment to UMD in the total amount of USD two million and the payment obligation of TNR under this Agreement shall be discharged.

7.3     Subject to Clause 7.2, TNR's obligation to pay the adjusted Second Payment shall be discharged in full on the date on which the Second Payment is made by TNR to UMD in accordance with this Clause 7 and Clause 5.6.

## 8.     TAXES AND STAMP DUTIES

8.1     The Consideration owed under this Agreement, is inclusive of applicable Thai withholding tax which TNR is required to deduct and other taxes owed by UMD under applicable laws and the U.S. - Thailand tax treaty.

8.2     The Parties acknowledge and agree that TNR may be required under applicable laws and the U.S. - Thailand tax treaty to deduct the full amount of any withholding tax to which the payment of Consideration is subject under applicable laws and the U.S. - Thailand tax treaty (and, for the avoidance of doubt, TNR shall not be required to increase or gross up the amount of such payment to account for such deduction). TNR shall remit the amount of any such withholding tax to the relevant Revenue Department in accordance with applicable taxes law and remit the remaining consideration to UMD. In such case, TNR shall provide UMD evidence of any such payment of withholding tax and shall procure to obtain a withholding tax certificate from the relevant Revenue Department.

8.3     Each party shall be responsible to pay its own, taxes, stamp duties (including stamp duties affixed to this Agreement) or any other amounts prescribed by applicable law in relation to this Agreement.

## 9.     REPRESENTATIONS AND WARRANTIES

9.1     Each of the Parties warrants to the other Party that the statements set out below are true and accurate as of the Effective Date and during the Term:

*Execution Version*

(a) it is validly existing and is a company duly incorporated under the law of its jurisdiction of incorporation;

(b) it has full power and authority to sign and deliver this Agreement and to exercise all its rights and perform all its obligations under this Agreement and has taken all necessary corporate action to authorize the execution of this Agreement and the exercise of its rights and the performance of its obligations hereunder, and this Agreement constitutes its valid and legally binding obligation, enforceable in accordance with its terms;

(c) all actions, conditions and things required to be taken, fulfilled and done (including the obtaining of any necessary consents from third parties) in order (i) to enable it lawfully to enter into, exercise its rights and perform and comply with its obligations under this Agreement, and (ii) to ensure that those obligations are valid, legally binding and enforceable, have been taken, fulfilled and done;

(d) neither the signing and delivery of this Agreement nor compliance with the terms and provisions hereof will conflict with, or result in a breach of (i) its memorandum of association or articles of association, (ii) any applicable law or regulation of such party's home state and country, (iii) any order, writ, injunction or decree of any court or governmental authority or agency, or (iv) any agreement or instrument to which it is a party or by which it is bound; and

(e) each Party is entering into this Agreement in its own capacity and not on behalf of any other person.

9.2 UMD warrants to TNR that the statements set out below are true and accurate as of the Effective Date and during the Term:

(a) the Product License Agreement and the Sub-license Agreements constitute valid and binding obligations of the parties thereto and are enforceable against the parties in accordance with their terms;

(b) to the best of UMD's knowledge and belief, the novation of the Product License Agreement with Playboy and assignment of the Sub-License Agreements are valid and binding obligations on the parties thereto and are enforceable against the parties in accordance with their terms;

(c) the Distribution Fee during the period of 12 months from the date of the First Payment plus the Gross Profit shall not be less than USD three million;

(d) there are no outstanding actions, disputes, claims or demands between UMD, Playboy, Local Distributors, or any third party affecting the Assignment or the operation of TNR in substitution of UMD under the Product License Agreement or Sub-license Agreements. To the best of its knowledge, UMD is not aware of any actions, claims, proceedings, or any other incidents (including amendments of local laws or regulations) that may cause any adverse effect to the Assignment or the operation of TNR in substitution of UMD under the Product License Agreement or Sub-license Agreement ; and

(e) it fully understands that TNR relies on representation of UMD under Clause 9.2(c) in entering into this Agreement.

9.3 The Parties agree that, in the event of a breach of the warranty by UMD under Clause 9.2(c), TNR's sole remedy shall be the price adjustment set forth in Clause 6.3 above.

## 10. TERMINATION

10.1 This Agreement may be terminated upon the occurrence of the following events:

(a) the Parties mutually agree in writing to terminate this Agreement;

*Execution Version*

(b) in the event either Party defaults on its obligations hereunder and fails to remedy such default to the reasonable satisfaction of the non-defaulting Party within thirty (30) days after such default has been brought to the defaulting Party's attention by written notice, the other Party, at its sole discretion, may immediately terminate this Agreement; or

(c) TNR shall be entitled to, at its sole discretion, immediately terminate this Agreement by giving UMD a notice in writing with immediate effect if the Conditions to the First Payment have not been fulfilled within the period as specified under Clause 6.1.

10.2 If the Agreement is properly terminated by TNR due to the reason under Clause 10.1(b) or Clause 10.1(c), UMD shall not be entitled to receive any further Consideration.

10.3 The termination of this Agreement shall not affect any legal rights which the non-defaulting Party may have due to the breach of the Agreement.

## 11. CONFIDENTIALITY

11.1 The Parties shall treat all correspondences and negotiation between the Parties, the financial terms of this Agreement, as well as any and all information, material, documents and data made available in writing, visual or machine readable form or orally or other documents derived from, containing or reflecting such information that was and will be exchanged between the Parties to comply with its responsibilities under this Agreement ("**Confidential Information**") as strictly confidential (whether or not such Confidential Information is marked or identified as being confidential).

11.2 The Parties shall not use such Confidential Information otherwise than for the purposes set forth in this Agreement and shall not disclose the Confidential Information to any third party except in any of the following manners:

(a) with the prior written consent of the Party who may be affected by such disclosure;

(b) for the disclosure to any person (including any key personnel of the relevant financial institution, advisor or consultant of each Party) who needs to know the Confidential Information in order for a Party to perform under this Agreement, or so that the conditions under this Agreement can be fulfilled, provided always that the disclosing Party shall be obligated to ensure that such person be duly informed of the confidentiality of the Confidential Information and the breach by such person of this obligation shall be deemed as the breach of obligation under this Clause by such disclosing Party;

(c) for the disclosure as required by any applicable law, court order, central bank, or any regulatory body which including but not limited to the Securities and Exchange Commission and the Stock Exchange;

(d) such disclosure or use is required for the purpose of any judicial proceedings arising out of this Agreement; or

(e) if the information has come into the public domain through no fault of that Party.

11.3 The Parties understand and agree that the provisions under this Clause 11 shall survive the termination of this Agreement.

## 12. NOTICES AND OTHER COMMUNICATIONS

12.1 Any notice, communications or documents required to be given by a Party to the other Party under this Agreement shall be given in the English language and shall be deemed validly served by hand delivery, or sent by registered pre-paid post (or by registered airmail in the case of international service), or by e-mail to such address set out in this Clause or to such other address, or e-mail address as may be notified by one Party to the other Parties by a like notice hereunder.

*Execution Version*

**12.2**    The initial address and e-mail address of the Parties are:

    (a)    to TNR:

| | |
|---|---|
| Attention: | Chanin Thiencharoen |
| Address: | 1 Charoenrat Road, Thung Wat Don, Sathon Bangkok, Thailand 10120 |
| E-mail address: | chanin_t@tnrcondom.com |

    (b)    to UMD:

| | |
|---|---|
| Attention: | Jimmy Esebag |
| Address: | 1901 Avenue of the Stars, Suite 470, Los Angeles, CA 90067 |
| E-mail address: | jimmy@umdworld.com |

**12.3**    Any such notice or communication shall be deemed to have been served:

    (a)    if delivered by hand, at the time of delivery;

    (b)    if posted by pre-paid post or by registered airmail or by courier service, at the expiration of five days after the envelope containing the same shall have been put into the post or have been received by the relevant courier company (as the case may be); or

    (c)    if sent by e-mail shall be deemed to have been given when received into the addressee's e-mail system.

## 13.    INDEMNITY

**13.1**    UMD shall indemnify and hold TNR harmless against all actions, proceedings, demands, costs, expenses, duties, liabilities and claims whatsoever caused by or arising from the act, neglect or default of UMD or its agents, representative, directors, or employees under this Agreement.

**13.2**    TNR shall indemnify and hold UMD harmless against all actions, proceedings, demands, costs, expenses, duties, liabilities and claims whatsoever caused by or arising from the act, neglect or default of TNR or its agents, representative, directors, or employees under this Agreement.

## 14.    GOVERNING LAW / VENUE

This Agreement shall be subject to, construed in accordance with and governed by the Laws of California. The exclusive venue for resolution of any disputes arising out of this Agreement or performance thereof shall be the federal courts located in the central district of California.

## 15.    MISCELLANEOUS

**15.1**    Each Party shall, in good faith, cooperate with each other and execute such instruments or documents and take such other actions as may reasonably be requested from time to time in order to carry out, evidence or confirm their rights or obligations or as may be reasonably necessary or helpful to give effect to this Agreement.

**15.2**    Any modification or alteration of any Clause of this Agreement will not be valid unless made in writing and duly signed by an authorized representative of both Parties.

**15.3**    UMD hereby provides irrevocable consent to TNR that TNR may assign any or all part of this Agreement to TNR's designated entity without having to obtain any further consent from UMD. The Parties agree that such assignment by TNR shall take full legal effect upon UMD's receipt of notice from TNR informing UMD of the assignment, whereupon UMD shall thereafter perform its responsibilities under this Agreement to the entity that takes the assignment.

1013942.1 3639723-v1\BKKDMS

*Execution Version*

15.4    The failure of either Party at any time to exercise any of its rights under this Agreement shall not be deemed a waiver of any such rights or in any way prevent either Party from subsequently asserting or exercising any such rights.

15.5    This Agreement constitutes the entire agreement between the Parties relating to the subject matter hereof, superseding all prior agreements, memorandum of understandings, letters of intent or undertakings, oral or written.

15.6    This Agreement may be executed in counterparts, each of which shall be deemed to be an original, but together shall constitute one instrument.

15.7    Each party agrees and understands that no agency relationship or partnership between TNR and UMD shall exist. Neither party shall do any acts or things which may mislead any third party to believe that TNR or UMD is the agent, partner or representative of the other.

*[The remainder of this page is intentionally left blank]*

*Execution Version*

**IN WITNESS WHEREOF,** this Agreement is made and signed in two identical copies in English. Both parties have read and understand this Agreement and affixed their signatures and company seals (if any) to this Agreement on the date first above written.

Signed for and on behalf of

**THAI NIPPON RUBBER INDUSTRY PUBLIC COMPANY LIMITED**

by _____

( AMORN DARARATTANAROJ )

**UNITED MEDICAL DEVICES, LLC**

by _____
( )

in the presence of:

_____ Witness
( NICHANE ALLEN )

_____ Witness
( Chavin Thuencharoen .

1013942.1 3639723-v1\BKKDMS

*Execution Version*

**IN WITNESS WHEREOF,** this Agreement is made and signed in two identical copies in English. Both parties have read and understand this Agreement and affixed their signatures and company seals (if any) to this Agreement on the date first above written.

Signed for and on behalf of

**THAI NIPPON RUBBER INDUSTRY PUBLIC COMPANY LIMITED**

by _____

( AMORN  DARARATTANAROJ )

**UNITED MEDICAL DEVICES, LLC**

by _____

( _____ )

in the presence of:

_____ Witness

( )

_____ Witness

( Chavis  Theanchaoy .

1013942.1 3639723-v1\BKKDMS

## ANNEX I

### LIST OF SUB-LICENSE AGREEMENTS

|  | Country | Company Name |
|---|---|---|
| 1 | Brazil | Alco Do Brazil Impotcao E Commercio Ltda.EPP |
| 2 | Armenia | ARGE Business LLC |
| 3 | India | Dachaa Lifestyle Holding Ltd |
| 4 | Nepal | Dachaa Lifestyle Holding Ltd |
| 5 | Chile | Distribuildora Las Palmas Ltda. |
| 6 | U.A.E. | Cubita Trading LLC |
| 7 | Georgia | Geo Latex Ltd. |
| 8 | Ghana | Ghagiria International Trading |
| 9 | Bolivia | HiperMarcas s.r.l. |
| 10 | Vietnam | I.D.I Distributing JVC / CONG TY CO PHAN HE THONG |
| 11 | Lebanon | MonPro SARL |
| 12 | Malaysia | Teik Senn(Malaysia) SDN BHD |
| 13 | Serbia | Umbrella Corporation Ltd. |
| 14 | Bosnia and Herzegovina | Umbrella Corporation Ltd. |
| 15 | Macedonia | Umbrella Corporation Ltd. |
| 16 | UK and Ireland | Three Pears Ltd. |
| 17 | Venezuela | Dimassi. C.A. |
| 18 | Mongolia | Tsakhiur Tumur LLC |
| 19 | Zambia | Sterlin Medical |
| 20 | Jordan | H2O Marketing Ltd. |
| 21 | Russia | MedCom |

| | Country | Company Name |
|---|---|---|
| 22 | Dominigan Replublic | Mel Caribbean Corp |
| 23 | Surinam | Distributor and Trade Service |
| 24 | China | Flower Rabbit Brand Management |
| 25 | Hongkong | Flower Rabbit Brand Management |
| 26 | Macau | Flower Rabbit Brand Management |
| 27 | South Korea | Medevice Korea Distribution Corp. |
| 28 | Bangladesh | MD investment Group, Dubai |
| 29 | Bhutan | MD investment Group, Dubai |
| 30 | Pakistan | MD investment Group, Dubai |
| 31 | Sri Lanka | MD investment Group, Dubai |
| 32 | Malta | Hayet Global Trade |
| 33 | Bahrain | J.H. Ruyan Company W.L.L. |
| 34 | Kenya | Hudson Fulton LLC. |

## ANNEX II

### SUB-LICENSE AGREEMENT DUE DILIGENCE LIST

|  | Country | Company Name |
|---|---|---|
| 1 | Brazil | Alco Do Brazil Impotcao E Commercio Ltda.EPP |
| 2 | Armenia | ARGE Business LLC |
| 3 | India | Dachaa Lifestyle Holding Ltd |
| 4 | Nepal | Dachaa Lifestyle Holding Ltd |
| 5 | Chile | Distribuildora Las Palmas Ltda. |
| 6 | U.A.E. | Cubita Trading LLC |
| 7 | Georgia | Geo Latex Ltd. |
| 8 | Ghana | Ghagiria International Trading |
| 9 | Bolivia | HiperMarcas s.r.l. |
| 10 | Vietnam | I.D.I Distributing JVC / CONG TY CO PHAN HE THONG |
| 11 | Lebanon | MonPro SARL |
| 12 | Malaysia | Teik Senn(Malaysia) SDN BHD |
| 13 | Serbia | Umbrella Corporation Ltd. |
| 14 | Bosnia and Herzegovina | Umbrella Corporation Ltd. |
| 15 | Macedonia | Umbrella Corporation Ltd. |
| 16 | UK and Ireland | Three Pears Ltd. |
| 17 | Venezuela | Dimassi. C.A. |
| 18 | Mongolia | Tsakhiur Tumur LLC |
| 19 | Zambia | Sterlin Medical |
| 20 | Jordan | H2O Marketing Ltd. |
| 21 | Russia | MedCom |

| | Country | Company Name |
|---|---|---|
| 22 | Dominigan Replublic | Mel Caribbean Corp |
| 23 | Surinam | Distributor and Trade Service |
| 24 | China | Flower Rabbit Brand Management |
| 25 | Hongkong | Flower Rabbit Brand Management |
| 26 | Macau | Flower Rabbit Brand Management |
| 27 | South Korea | Medevice Korea Distribution Corp. |
| 28 | Bangladesh | MD investment Group, Dubai |
| 29 | Bhutan | MD investment Group, Dubai |
| 30 | Pakistan | MD investment Group, Dubai |
| 31 | Sri Lanka | MD investment Group, Dubai |
| 32 | Malta | Hayet Global Trade |
| 33 | Bahrain | J.H. Ruyan Company W.L.L. |
| 34 | Kenya | Hudson Fulton LLC. |
| 35 | United States of America | Gyde Group LLC |
| 36 | Canada | Gyde Group LLC |

**THAI NIPPON RUBBER INDUSTRY PUBLIC COMPANY LIMITED**

**CHECKLIST FOR THE FIRST PAYMENT UNDER THE SALE AND PURCHASE AGREEMENT DATED 9 APRIL 2018**

<u>CONDITIONS TO FIRST PAYMENT</u>

| Clause | Action | Status | Remark |
|---|---|---|---|
| 6.1(a) | <u>**Novation Agreement:**</u><br><br>The signing of the novation agreement of the Product License Agreement | ✓ | |
| 6.1(b) | <u>**Assignment of Sub-license Agreement**</u><br><br>The delivery of the written consents signed by the authorized representatives of the Local Distributors consenting to the assignment of the Sub-license Agreements, provided that the Local Distributors must provide TNR legal evidence under the applicable laws to which they are subject, showing that the signatories are the authorized person of the relevant Local Distributor. | ✓ | • We received all of the assignment letters countersigned by the local distributors as listed in **Appendix 1**.<br>• As agreed previously, TNR only required us to review and confirm the authorized signatories of the following local distributors:<br>    • Hudson Fulton LLC<br>    • Dachaa Lifestyle Holding Ltd.<br>    • MD Investment Group<br>    • Flower Rabbit Brand Management (Beijing) Co., Ltd.<br>Please see details of our response in **Appendix 2**. |
| 6.1(c) | <u>**Notification of Assignment**</u><br><br>UMD has provided the notification of the assignment of the Sub-license Agreements to all Local Distributors. | ✓ | • We received the notifications on the assignment sent to the local distributors as listed in **Appendix 1**. |

1

THAI NIPPON RUBBER INDUSTRY PUBLIC COMPANY LIMITED

CHECKLIST FOR THE FIRST PAYMENT UNDER THE SALE AND PURCHASE AGREEMENT DATED 9 APRIL 2018

| Clause | Action | Status | Remark |
|---|---|---|---|
| 6.1(d) | **Introduction to Local Distributors**<br><br>UMD undertakes to TNR that, within 60 days after the First Payment has been made or other date as notified in writing to UMD by TNR, an appropriate representative of UMD will accompany TNR to the following countries in order to introduce TNR to the Local Distributors to ensure a smooth transition of the business and the Assignment;<br><br>(i)     The People's Republic of China; and<br><br>(ii)    Africa. | ✓ | This has been agreed between TNR and UMD. |

**THAI NIPPON RUBBER INDUSTRY PUBLIC COMPANY LIMITED**

**CHECKLIST FOR THE FIRST PAYMENT UNDER THE SALE AND PURCHASE AGREEMENT DATED 9 APRIL 2018**

<u>APPENDIX 1</u>

**ASSIGNMENT LETTER FROM LOCAL DISTRIBUTORS AND NOTIFICATIONS**

| | Country | Company Name | Assignment Letter | Notification |
|---|---|---|---|---|
| 1 | Brazil | Alco Do Brazil Impotcao E Commercio Ltda.EPP | ✓ | ✓ |
| 2 | Armenia | ARGE Business LLC | ✓ | ✓ |
| 3 | India | Dachaa Lifestyle Holding Ltd | ✓ | ✓ |
| 4 | Nepal | Dachaa Lifestyle Holding Ltd | ✓ | ✓ |
| 5 | Chile | Distribuildora Las Palmas Ltda. | ✓ | ✓ |
| 6 | U.A.E. | Cubita Trading LLC | ✓ | ✓ |
| 7 | Georgia | Geo Latex Ltd. | ✓ | ✓ |
| 8 | Ghana | Ghagiria International Trading | ✓ | ✓ |
| 9 | Bolivia | HiperMarcas s.r.l. | ✓ | ✓ |
| 10 | Vietnam | I.D.I Distributing JVC / CONG TY CO PHAN HE THONG | ✓ | ✓ |
| 11 | Lebanon | MonPro SARL | ✓ | ✓ |
| 12 | Malaysia | Teik Senn(Malaysia) SDN BHD | ✓ | ✓ |
| 13 | Serbia | Umbrella Corporation Ltd. | ✓ | ✓ |

3

THAI NIPPON RUBBER INDUSTRY PUBLIC COMPANY LIMITED

CHECKLIST FOR THE FIRST PAYMENT UNDER THE SALE AND PURCHASE AGREEMENT DATED 9 APRIL 2018

|  | Country | Company Name | Assignment Letter | Notification |
|---|---|---|---|---|
| 14 | Bosnia and Herzegovina | Umbrella Corporation Ltd. | ✓ | ✓ |
| 15 | Macedonia | Umbrella Corporation Ltd. | ✓ | ✓ |
| 16 | UK and Ireland | Three Pears Ltd. | ✓ | ✓ |
| 17 | Venezuela | Dimassi. C.A. | ✓ | ✓ |
| 18 | Mongolia | Tsakhiur Tumur LLC | ✓ | ✓ |
| 19 | Zambia | Sterlin Medical | ✓ | ✓ |
| 20 | Jordan | H2O Marketing Ltd. | ✓ | ✓ |
| 21 | Russia | MedCom | ✓ | ✓ |
| 22 | Dominigan Replublic | Mel Caribbean Corp | ✓ | ✓ |
| 23 | Surinam | Distributor and Trade Service | ✓ | ✓ |
| 24 | China | Flower Rabbit Brand Management | ✓ | ✓ |
| 25 | Hongkong | Flower Rabbit Brand Management | ✓ | ✓ |
| 26 | Macau | Flower Rabbit Brand Management | ✓ | ✓ |
| 27 | South Korea | Medevice Korea Distribution Corp. | ✓ | ✓ |
| 28 | Bangladesh | MD investment Group, Dubai | ✓ | ✓ |

**THAI NIPPON RUBBER INDUSTRY PUBLIC COMPANY LIMITED**

**CHECKLIST FOR THE FIRST PAYMENT UNDER THE SALE AND PURCHASE AGREEMENT DATED 9 APRIL 2018**

|  | Country | Company Name | Assignment Letter | Notification |
|---|---|---|---|---|
| 29 | Bhutan | MD investment Group, Dubai | ✓ | ✓ |
| 30 | Pakistan | MD investment Group, Dubai | ✓ | ✓ |
| 31 | Sri Lanka | MD investment Group, Dubai | ✓ | ✓ |
| 32 | Malta | Hayet Global Trade | ✓ | ✓ |
| 33 | Bahrain | J.H. Ruyan Company W.L.L. | ✓ | ✓ |
| 34 | Kenya | Hudson Fulton LLC. | ✓ | ✓ |

5

THAI NIPPON RUBBER INDUSTRY PUBLIC COMPANY LIMITED

CHECKLIST FOR THE FIRST PAYMENT UNDER THE SALE AND PURCHASE AGREEMENT DATED 9 APRIL 2018

**APPENDIX 2**

CONFIRMATION OF SIGNING AUTHORITY

| Local Offices | Local Distributor | Response |
|---|---|---|
| U.S. Office | **Hudson Fulton LLC** | Under the Certificate of Formation, Hudson Fulton is manager-managed. Therefore, the authority to govern, manage and act on behalf of the company is vested in the manager, Edward Bollen.<br><br>Edward Bollen has signed this consent to assignment of the Distribution Agreement.  Therefore, Hudson Fulton LLC has validly consented to the assignment. |
| Dubai Office | **Dachaa Lifestyle Holding Ltd.**<br>(India and Nepal) | The Certificate of Incumbency of Dachaa Lifestyle Holding Limited shows that the director is Vikram Arora, this means that he is empowered to act on behalf of this company and to sign the assignment letter provided that he is still holding the position of the director on the date of signing the assignment letter. |
| | **MD Investment Group**<br>(Bangladesh, Bhutan, Pakistan, Sri Lanka) | The Certificate of Incumbency of MD, assuming it is up to date, proves that Mohit Mirchandani is the sole shareholder, director and secretary of the company.<br><br>Thus, if the signature of the assignment letter is for Mohit, it means that the letter has a valid signature. |
| China Office | **Flower Rabbit Brand Management (Beijing) Co., Ltd.**<br>(China, Hong Kong and Macau) | Based the scanned copy of the business license provided by the distributor and our search results in the public business registration database, Mr. ZHAO Liyu is registered as the legal representative of the distributor and therefore has the authority to sign on behalf of the company by virtue of his position.<br><br>Furthermore, we note that the assignment letter is also affixed with the distributor's company chop, which is recognized as having the same legal effect as handwritten signature of authorized representative under Chinese law. |

6