1  QUINN EMANUEL URQUHART &
   SULLIVAN, LLP
2    Marshall M. Searcy III (SBN 169269)
     marshallsearcy@quinnemanuel.com
3  865 South Figueroa Street, 10th Floor
   Los Angeles, California 90017-2543
4  Telephone:  (213) 443 3000
   Facsimile:   (213) 443 3100
5
   Attorneys for Defendants
6  Playboy Enterprises International, Inc.
   Products Licensing, LLC
7

8              UNITED STATES DISTRICT COURT

9       CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

10  | Thai Nippon Rubber Industry Public | Case No. 2:21cv9749-JFW |
    | Limited Company, | |
11  | | **DECLARATION OF MARSHALL** |
    | Plaintiff, | **M. SEARCY CONCERNING** |
12  | | **LOCAL RULE 7-3 CONFERENCE** |
    | vs. | |
13  | | Trial Date:  September 26, 2023 |
    | Playboy Enterprises International, Inc., | |
14  | Products Licensing, LLC, and Nicholai | |
    | Allen, | |
15  | | |
    | Defendants. | |
16

17

18

19

20

21

22

23

24

25

26

27

28

I, Marshall Searcy, declare as follows:

1. I am a partner at Quinn Emanuel Urquhart & Sullivan, and lead counsel of record for Defendants Playboy Enterprises International, Inc., and Products Licensing, LLC (collectively, "Playboy").   I submit this declaration pursuant to the Court's April 14, 2022 order (Dkt. No. 37) that the parties conduct an additional Local Rule 7-3 conference concerning Playboy's contemplated motion to dismiss TNR's First Amended Complaint ("FAC") (Dkt. No. 26).

2. On April 14, 2022, after receiving the Court's order, I agreed with Cyndie Chang, partner at Duane Morris and lead counsel of record for Plaintiff Thai Nippon Rubber Industry Public Company ("TNR"), and with Kristin Rose, counsel for TNR at Kirkland & Ellis ("K&E"), that we would meet in person at K&E's offices at 555 South Flower Street, Suite 3700, Los Angeles, CA 90071 on April 18, 2022, to discuss Playboy's motion.

**MATERIALS SENT TO AID DISCUSSION PRIOR TO THE LR 7-3 CONFERENCE**

3. The next day, on April 15, 2022, to facilitate counsel's Rule 7-3 conference, I emailed Ms. Chang and Ms. Rose a draft of Playboy's motion to dismiss.   I sent this draft so that TNR's counsel could further consider Playboy's arguments and the legal authority relied upon for those arguments.   A true and correct copy of my email and attachment to TNR's counsel dated April 15 is attached as Exhibit A hereto.

4. In connection with my two prior Rule 7-3 conferences with TNR's counsel, on January 10, 2022, and March 24, 2022, I had previously sent meet and confer letters detailing the bases for Playboy's position that the tort and franchise claims in TNR's complaint were legally

1   untenable.  A true and correct copy of my letters dated January 10,

2   2022 and March 24, 2022 are attached respectively as Exhibits B and C

3   hereto.  Accordingly, for our Rule 7-3 conference on April 18, TNR

4   was provided with a fully detailed discussion of Playboy's positions

5   and the legal support for those positions.

6

7   **DISCUSSION OF TNR'S FRANCHISE CLAIMS**

8   5.   On April 18, 2022, I met with Ms. Chang and Ms. Rose at K&E's

9   offices to discuss Playboy's motion to dismiss.  Counsel for the parties

10  discussed Playboy's motion at length over the course of half an hour,

11  but as set forth below, they were not able to reach an agreement on the

12  issues to be raised in the motion.

13  6.   The first issue that we discussed concerned TNR's claims that Playboy

14  and TNR had entered into a franchise relationship and that Playboy had

15  failed to comply with California franchise laws.  I explained, as set

16  forth in Playboy's draft motion to dismiss, that the agreement between

17  the parties —the Product License Agreement ("PLA"), which is

18  attached to and the subject of TNR's FAC—dictated that the

19  contractual relationship between the parties was a licensing

20  relationship, not a franchise relationship.  As I explained, the approval

21  rights given to Playboy under the PLA were consistent with a licensing

22  agreement.  However, Playboy did not have the right or ability under

23  the PLA to dictate a marketing plan or system to TNR, which is a

24  required element:   To prove the existence of a franchise under

25  California law, among other things, the alleged franchisor must have

26  substantial control over the alleged franchisee's marketing plan.

27  7.   TNR's counsel disagreed and stated that they believed TNR had

28  adequately pleaded the control necessary to show a franchise

-2-                                         Case No. 2:21cv9749-JFW

relationship. According to TNR's counsel, the approval rights set forth under the PLA were sufficient at the pleading/motion to dismiss stage. Ms. Chang and Ms. Rose stated that they would provide me with additional authorities supporting TNR's position.

8. On April 20, 2022, TNR's counsel provided me with citations to case law that they believed supported TNR's claims. However, the case cited by TNR's counsel, *Boats & Motor Mart v. Sea Ray Boats, Inc.*, 825 F.2d 1285, 1288-89 (9th Cir. 1987), is distinguishable because it did not concern a trademark license agreement, but instead a dealer agreement where the franchisor was provided with "a model marketing program, [] provided a computer printout of prospective customers[,] … [] press kits, promotional tools and marketing advice." In addition, the franchisee's salesman were sent to a training school and provided detailed instructions for how to promote and sell the boats. And the franchisor monitored the franchisee by conducting surveys of customers and then conducting meetings with the franchisee to discuss any problems. *Id.* at 1287.

9. Because the parties disagree over the legal implications of the terms of the PLA, they are at an impasse and require the Court's guidance with regard to TNR's franchise claims.

10. In addition, TNR's counsel and I also discussed Playboy's position that the franchise relationship alleged by TNR would not be subject to California law. TNR's counsel disagreed with me, and Ms. Rose and Ms. Chang stated that they take an additional look at the authorities cited in my draft motion. On April 20, 2022, TNR's counsel told me that they believed the authorities cited in the motion were distinguishable and that TNR's agreement with Playboy to sell

1   condoms and lubricants from outside of California would be subject to

2   California franchise law.

3   11.   Accordingly, the parties were not able to reach an agreement on TNR's

4   franchise claims.  TNR did not agree to drop the claims or ask to amend

5   them, while Playboy believes that these claims fail to state a claim as a

6   matter of law in light of the provisions of the PLA.

7

8   **DISCUSSION OF TNR'S INTERFERENCE CLAIMS**

9   12.   Next, during our April 18, 2022, conference, TNR's counsel and I

10   discussed TNR's claims for intentional interference with contract,

11   negligent interference with contract, and intentional interference with

12   prospective economic advantage.  I explained that—as set forth in the

13   draft motion to dismiss I provided counsel and in my prior letters—the

14   economic loss doctrine barred TNR's claims.  The "interfering" activity

15   that TNR alleges is the same activity that TNR alleges to be a breach of

16   contract between the parties.  This activity includes selling products to

17   Walmart, purportedly at the expense of TNR, by allegedly taking

18   allocated TNR shelf space and using TNR's account.

19   13.   Moreover, Playboy had an economic interest in TNR's relationships

20   with Walmart and other TNR customers by virtue of the parties'

21   licensing relationship.  Accordingly, because a party cannot interfere

22   with its own contract or a contract in which it has an interest, TNR's

23   interference claims fail as a matter of law.

24   14.   TNR's counsel disagreed.  Ms. Chang stated that she believed the

25   activity TNR had alleged with respect to Walmart was sufficiently

26   outside of the parties' contractual relationship so that it was not subject

27   to the economic loss rule.  She also stated that she believed that if

28   Playboy's activity was outside the scope of the agreement, then

1  Playboy could not be said to be interfering with its own agreements.

2  Similarly, Ms. Chang and Ms. Rose thought this activity was

3  sufficiently wrongful to support claims for intentional and negligent

4  interference.

5  15.  Accordingly, the parties were not able to reach an agreement on TNR's

6  interference claims.  TNR did not agree to drop the claims or ask to

7  amend them.  Playboy believes that these claims fail to state a claim as

8  a matter of law under the economic loss rule and under the rule that

9  parties cannot interfere with their own contracts.

10

11  **DISCUSSION OF TNR'S FRAUDULENT INDUCEMENT**

12  **CLAIMS**

13  16.  The next topic for discussion during the April 18, 2022, Rule 7-3

14  conference was TNR's fraudulent inducement claim.  TNR's counsel

15  and I discussed Playboy's position that TNR's fraudulent inducement

16  claim failed as a matter of law for at least two reasons.  First, Playboy

17  did not make a false representation because, as alleged in the FAC,

18  Playboy was agreeing with the position of TNR's agent that CBD

19  products did not come within the scope of the PLA.  Second, because

20  TNR is a sophisticated company, it could not reasonably rely upon

21  Playboy's representations about the scope of the PLA when negotiating

22  at arms-length over an amendment to the PLA.

23  17.  TNR's counsel disagreed.  Ms. Chang stated that she believed TNR's

24  allegations were sufficient.  Her view was that Playboy's statements

25  were not true when they were made and that there was an issue of fact

26  with regard to whether or not Playboy was agreeing with TNR's agent

27  or, instead, making a false representation to him.

28

07281-00001/13331210.1

18. The parties thus could not reach an agreement on TNR's fraudulent inducement claim. TNR did not agree to dismiss the claim and did not ask to amend the claim. On the other hand, Playboy believes that TNR cannot show an actionable false representation or that it could reasonably rely on any such representation.

**DISCUSSION OF TNR'S CONVERSION CLAIM**

19. For the next topic of discussion during the April 18, 2022, conference, Ms. Chang, Ms. Rose, and I discussed TNR's conversion claim. I explained that TNR's conversion claim would be subject to the economic loss rule. In the FAC, TNR alleges that Playboy had been reimbursed for funds that it was not otherwise authorized to receive under the PLA. Further, as I explained, money cannot typically be the subject of a conversion claim, and none of the exceptions applied to TNR's claim.

20. Ms. Chang responded that she believed TNR had sufficiently pleaded a definite sum so that TNR satisfied the requirements of a conversion claim. She also believed that TNR's allegations about expenses it paid to Playboy were sufficiently outside the PLA so that they were not subject to the economic loss rule.

21. Accordingly, the parties could not reach an agreement on TNR's conversion claim. TNR would not agree to drop the claim and did not ask to amend it, and Playboy believes that the conversion claim fails as a matter of law.

**DISCUSSION OF TNR'S SECTION 17200 CLAIM**

22. Finally, during the April 18, 2022, Rule 7-3 conference, TNR's counsel and I discussed TNR's claim under Bus. & Prof Code § 17200. I told

TNR's counsel that such a claim was barred if TNR had pleaded an adequate remedy at law, which it had done with its breach of contract claim.

23. Ms. Chang inquired whether TNR would be able to allege its § 17200 claim as an alternative basis for relief. I responded that the case law provided in the draft motion to dismiss indicated that TNR could not plead a § 17200 claim in the alternative in this way. Not having an adequate remedy at law is an essential element of a § 17200 claim.

24. On April 20, 2022, I followed up with TNR's counsel to further note that TNR's § 17200 claim could not function as an alternative cause of action because it seeks disgorgement of Playboy's earnings from sales of a wipes product. Non-restitutionary disgorgement is not an available remedy under Section 17200.

25. TNR's counsel responded that they believed TNR was properly seeking restitutionary disgorgement. However, the items identified for "restoration," such as shelf space given by Walmart to Playboy to sell its wipes, are also items for damages that TNR seeks in its breach of contract claims. This is not permissible under the applicable case law. TNR's § 17200 claim thus cannot function as a pleading in the alternative of its breach claims.

26. Accordingly, the parties cannot reach an agreement on TNR's § 17200 claim. TNR does not intend to dismiss its § 17200 claim and has not

1    asked to amend it, while Playboy believes the claim fails as a matter of

2    law.

3         I declare under penalty of perjury under the laws of the United States of

4    America that the foregoing is true and correct to the best of my knowledge.

5         Executed on this 21st day of April, 2022, at Los Angeles, California.

6

7    _____

8    Marshall M. Searcy III

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

**Andrea Llamas**

| | |
|---|---|
| **From:** | Marshall Searcy |
| **Sent:** | Friday, April 15, 2022 2:18 PM |
| **To:** | 'Rose, Kristin'; Chang, Cyndie M. |
| **Cc:** | Playboy - TNR |
| **Subject:** | For Meet and Confer--TNR v Playboy Motion to Dismiss |
| **Attachments:** | 04.14.22 Notice of Motion & Partial Motion to Dismiss.pdf |

Kristin and Cyndie—

For our discussion on Monday on Playboy's motion to dismiss, I am sending you a draft copy of the motion. The motion hasn't been filed yet, so it is subject to change as a result of any agreements we might reach. However, I thought that getting you an early copy of the motion would facilitate a full and thorough discussion.

Thanks,
Marshall

1

QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Marshall M. Searcy III (Bar No. 169269)
  marshallsearcy@quinnemanuel.com
  Kristen Bird (Bar No. 192863)
  kristenbird@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017–2543
Telephone:  (213) 443–3000
Facsimile:  (213) 443–3100

Attorneys for Defendants,
Playboy Enterprises International, Inc.,
and Products Licensing LLC

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| THAI NIPPON RUBBER INDUSTRY PUBLIC LIMITED COMPANY,<br><br>Plaintiff,<br><br>vs.<br><br>PLAYBOY ENTERPRISES INTERNATIONAL, INC., PRODUCTS LICENSING, LLC, and NICHOLAI ALLEN,<br><br>Defendants. | Case No. 2:21–cv–09749–JFW<br><br>**DEFENDANTS PLAYBOY ENTERPRISES INTERNATIONAL, INC., and PRODUCTS LICENSING LLC's NOTICE OF MOTION AND PARTIAL MOTION TO DISMISS; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>The Hon. John F. Walter<br><br>Trial Date:        None Set |

07281-00006/13254808.3

DEFENDANTS PLAYBOY ENTERPRISES INTERNATIONAL, INC., and PRODUCTS LICENSING LLC's
NOTICE OF MOTION AND PARTIAL MOTION TO DISMISS

## NOTICE OF MOTION AND PARTIAL MOTION TO DISMISS

PLEASE TAKE NOTICE that on _____, 2022, at __ a.m. or on such other date as may be agreed upon or ordered, in Courtroom 7A of the United States District Court for the Central District of California, located at 350 W. 1st Street, Los Angeles, California, Defendants Playboy Enterprises International, Inc., and Products Licensing LLC will and hereby do move this Court to dismiss Plaintiff's First Amended Complaint in part. This Motion is made pursuant to Federal Rule of Civil Procedure 12(b)(6), and is based on this Notice of Motion, the accompanying memorandum of Points and Authorities, and accompanying exhibits filed concurrently with this Motion, all pleadings and papers filed herein, oral argument of counsel, and any other matter that the Court may consider on this Motion.

07281-00006/13254808.1

–2–

DEFENDANTS PLAYBOY ENTERPRISES INTERNATIONAL, INC., and PRODUCTS LICENSING LLC's
NOTICE OF MOTION AND PARTIAL MOTION TO DISMISS

# TABLE OF CONTENTS

**Page**

I. PRELIMINARY STATEMENT ................................................................. 1

II. RELEVANT BACKGROUND AND ALLEGATIONS ......................................... 2

    A.    Playboy, Its Licensing Business, and the Product License Agreement ......................................................................... 2

    B.    TNR's Allegations ................................................................. 4

III. LEGAL STANDARDS ...................................................................... 6

IV. ARGUMENT ................................................................................ 7

    A.    As a Matter of Law, the PLA Does Not Create a Franchise Relationship Between Playboy and TNR, Nor was the Relationship Within the Jurisdictional Reach of the California Franchise Laws ..................................................................... 7

        1.    *Under the PLA, Playboy Had a Right of Approval, And Did Not Substantially Control TNR's Marketing Plan* ............... 7

        2.    *There Was No Substantial Association Between TNR's Condom Business and Playboy's Content Business* .................. 11

        3.    *To the Extent TNR Could Show That it Was a Franchisee of Playboy, the Relationship was Outside the Jurisdiction of California's Franchise Laws* ....................................... 12

    B.    TNR's Tortious Interference Claims Are Barred as a Matter of Law .................................................................................. 14

        1.    *The Economic Loss Rule Bars TNR's Tortious Interference Claims* ....................................................................... 14

        2.    *Playboy Cannot Be Held Liable for Intentionally Interfering With The Contracts At Issue Here* ....................... 17

        3.    *TNR's Claims for Intentional and Negligent Interference with Prospective Economic Relations Fail as a Matter of Law* ............................................................................ 18

    C.    TNR Fails to State a Cognizable Claim for Fraudulent Inducement ......................................................................... 19

    D.    TNR's Conversion Claim Fails as a Matter of Law ........................ 22

    E.    TNR is Barred from Pursuing its Unfair Competition Claim ............. 23

V. CONCLUSION ............................................................................. 24

-i-

07281-00006/13254808.3

## **TABLE OF AUTHORITIES**

**Page**

**Cases**

*Aas v. Superior Court,*
  24 Cal. 4th 627 (2000) ....................................................................... 14

*Alfaro v. Community Hous. Improvement Sys. & Planning Ass'n, Inc.,*
  171 Cal. App. 4th 1356 (2007) ........................................................... 20

*Applied Equip. Corp. v. Litton Saudi Arabia Ltd.,*
  7 Cal. 4th 503 (1994) .................................................................... 16, 17

*Arntz Contracting Co. v. St. Paul Fire & Marine Ins. Co.,*
  47 Cal. App. 4th 464, 54 (1996) ........................................................ 14

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) .............................................................. 6, 11, 21

*Baggett v. Hewlett–Packard Co.,*
  No. SACV 07–0667 AG (RNBx), 2009 WL 3178066
  (C.D. Cal. Sep. 29, 2009) .................................................................. 21

*Barcamerica Int'l USA Trust v. Tyfield Imps., Inc.,*
  289 F.3d 589 (9th Cir. 2002) ............................................................... 9

*Bell Atlantic Corp. v. Twombly,*
  550 U.S. 544 (2007) ............................................................................ 6

*Cel–Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.,*
  20 Cal. 4th 163 (1999) ...................................................................... 23

*Cusano v. Klein,*
  280 F. Supp. 2d 1035 (C.D. Cal. 2003) ............................................. 22

*Dawn Donut Co. v. Hart's Food Stores, Inc.,*
  267 F.2d 358 (2d Cir. 1959) .............................................................. 10

*Dep't of Parks and Recreation for the State of California v.
  Bazaar Del Mundo, Inc.,*
  448 F.3d 1118 (9th Cir. 2006) ............................................................. 9

*Desert Outdoor Advert. v. Superior Court,*
  196 Cal. App. 4th 866 (2011) ............................................................ 20

*Drink Tank Ventures LLC v. Real Soda in Real Bottles, Ltd.,*
  71 Cal. App. 5th 528 (2021) .............................................................. 18

*Erlich v. Menezes,*
  21 Cal. 4th 543 (1999) ...................................................................... 16

*Fox v. Ehrmantraut,*
  615 P.2d 1383 (Cal. 1980) ................................................................. 13

*Gabana Gulf Distribution, Ltd. v. GAP Intern. Sales, Inc.,*
  No. C 06–02584–CRB, 2008 WL 111223 (N.D. Cal. Jan. 9, 2008) ............... 8, 11

*Godecke v. Kinetic Concepts, Inc.,*
  937 F.3d 1201 (9th Cir. 2019) ............................................................. 6

*Gorenstein Enterprises, Inc. v. Quality Care–USA, Inc.,*
  874 F.2d 431 (7th Cir. 1989) ............................................................... 9

*Haigler v. Donnelly*,
18 Cal. 2d 674 (1941) ............................................................................. 22

*Hamilton San Diego Apartments v. RBC Capital Markets Corp.*,
No. 3:12–CV–2259–JM(BLM), 2013 WL 12090313
(S.D. Cal. Mar. 5, 2013) ......................................................................... 17

*Hahn v. Mirda*,
147 Cal. App. 4th 740 (2007) ................................................................ 20

*Herron v. Best Buy Co. Inc.*,
924 F. Supp. 2d 1161 (E.D. Cal. 2013) ................................................. 20

*Hinesley v. Oakshade Town Ctr.*,
135 Cal. App. 4th 289 (2005) ................................................................ 19

*Hollywood Athletic Club Licensing Corp. v. GHAC–CityWalk*,
938 F. Supp. 612 (C.D. Cal. 1996) ....................................................... 10

*In re German Auto. Mfrs. Antitrust Litig.*,
497 F. Supp. 3d 745 (N.D. Cal. 2020) .................................................... 6

*Jack in the Box Inc. v. San–Tex Restaurants, Inc.*,
No. SA–20–cv–00328–XR, 2021 WL 148058 (W.D. Tex. Jan. 14, 2021) ......... 13

*JRS Products, Inc. v. Matsushita Electric Corp. of America*,
115 Cal. App. 4th 168 (2004) ................................................. 14, 15, 16

*Leadsinger, Inc. v. BMG Music Publ'g*,
512 F.3d 522 (9th Cir. 2008) .................................................................. 7

*Lennar Mare Island, LLC v. Steadfast Insurance Company*,
No. 2:12–cv–02182–KJM–KJN, 2016 WL 829210 (E.D. Cal. Mar. 3, 2016) ........... 16

*Linear Technology Corp. v. Applied Materials, Inc.*,
152 Cal. App. 4th 115 (2007) ................................................................ 19

*Lingsch v. Savage*,
213 Cal. App. 2d 729 (1963) ................................................................. 20

*McColgan v. Mutual of Omaha Ins. Co.*,
4 F. Supp. 3d 1228 (E.D. Cal. 2014) ................................................ 19, 21

*McKell v. Washington Mut., Inc.*,
142 Cal. App. 4th 1457 (2006) .............................................................. 22

*Mendoza v. Continental Sales Co.*,
58 Cal. App. 4th 1395 (2006) ................................................................ 22

*Munning v. Gap, Inc.*,
238 F. Supp. 3d 1195 (N.D. Cal. 2017) ................................................ 23

*National Medical Transportation Network v. Deloitte & Touche*,
62 Cal. App. 4th 412 (1998) .................................................................. 18

*Neubronner v. Milken*,
6 F.3d 666 (9th Cir. 1993) ....................................................................... 6

*Pelayo v. Nestle USA, Inc.*,
989 F. Supp. 2d 973 (C.D. Cal. 2013) ..................................................... 7

*People v. Kline*,
110 Cal. App. 3d 587 (1980) ............................................................... 8, 9

-iii-

*PM Group, Inc. v. Stewart,*
   154 Cal. App. 4th 55 (2007) ....................................................................................17

*Premier Wine and Spirits of South Dakota Inc. v. E. & J. Gallo Winery,*
   644 F. Supp. 1431 (E.D. Cal.) ................................................................................13

*Reyes v. Atlantic Richfield Co.,*
   12 F.3d 1464 (9th Cir. 1993) ..................................................................................13

*Robinson Helicopter Co. v. Dana Corp.,*
   34 Cal. 4th 979 (2004) ......................................................................................14, 16

*Rosenthal v. Great Western Fin. Securities Corp.,*
   14 Cal. 4th 394 (1996) ............................................................................................20

*Rowland v. PaineWebber Inc.,*
   4 Cal. App. 4th 279 (1992) .....................................................................................20

*Sandigo v. Ocwen Loan Servicing, LLC,*
   No. 17–cv–02727–BLF, 2019 WL 2233051 (N.D. Cal. May 23, 2019) .............22

*Schreiber Distributing Co. v. Serv–Well Furniture Co., Inc.,*
   806 F.2d 1393 (9th Cir. 1986) ..................................................................................7

*Sonner v. Premier Nutrition Corp.,*
   971 F.3d 834 (9th Cir. 2020) ..................................................................................23

*State Ready Mix, Inc. v. Moffatt & Nichol,*
   232 Cal. App. 4th 1227 (2015) ...............................................................................14

*Stocco v. Gemological Institute of America, Inc.,*
   975 F. Supp. 2d 1170 (S.D. Cal. 2013) ..................................................................12

*Stop Youth Addiction, Inc. v. Lucky Stores, Inc.,*
   17 Cal. 4th 553 (1998) ............................................................................................23

*Thueson v. U–Haul Intern., Inc.,*
   144 Cal. App. 4th 664 (2006) ...................................................................................8

*Voris v. Lampert,*
   7 Cal. 5th 1141 (2019) ......................................................................................22, 23

*Workplace Techs. Research, Inc. v. Project Mgmt. Inst.,*
   No. 18–cv–1927 JM(MSB), 2019 WL 3804019
   (S.D. Cal. Aug. 13, 2019) .................................................................................18, 19

## Statutory Authorities

Cal. Bus. & Prof. Code § 20001 ...................................................................................7

Cal. Corp. Code § 31005 .........................................................................................7, 12

CFIL § 31005 ................................................................................................................8

CFIL § 31105 .........................................................................................................7, 12

CFIL § 31102 ..............................................................................................................13

CFRA § 20001 ..............................................................................................................8

CFRA § 20009 ..............................................................................................................8

CFRA § 20015 ........................................................................................................7, 12

## Rules and Regulations

Fed. R. Civ. P. 9(b) .......................................................................................................6

Fed. R. Civ. P. 12(b)(6) ............................................................6, 7

**<u>Additional Authorities</u>**

Hon. Kimberly A. Gaab & Sara Church Reese, *Cal. Prac. Guide: Civ. Pro.
    Trial Claims and Def.*, Ch. 12(II)–B, ¶ 12:116 (The Rutter Group) ....................22

<u>California Department of Financial Protection & Innovation, *Release 3–F: When
    Does an Agreement Constitute a "Franchise"*</u> (June 22, 1994) ...........*passim*

Margaret Rhodes, *Playboy's Logo is What Matters—It Earns More Than
    Nudes Do*, Wired (Oct. 13, 2015, 6:35 PM),
    *https://www.wired.com/2015/10/playboys–logo–is–what–mattersit–earns–
    more–than–nudes–do/*................................................................................3

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DEFENDANTS PLAYBOY ENTERPRISES INTERNATIONAL, INC., and PRODUCTS LICENSING LLC's
NOTICE OF MOTION AND PARTIAL MOTION TO DISMISS

1  <u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2  **I.   <u>PRELIMINARY STATEMENT</u>**

3      Defendants   Playboy   Enterprises   International, Inc.,   and   Products

4  Licensing LLC ("Playboy") own valuable trademarks, including the iconic Playboy

5  Rabbit Head Design and the Playboy name. Plaintiff Thai Nippon Rubber Industry

6  Public Limited Company ("TNR") was, for a time, Playboy's exclusive licensee with

7  the right to manufacture, advertise, distribute, and sell condoms and lubricants bearing

8  these trademarks. TNR did not live up to its obligations as licensee, and after an

9  independent audit revealed numerous breaches by TNR, Playboy terminated the

10  license.

11      In retaliation for that termination, TNR brought the present suit, asserting a

12  series of claims that seek to transform a contract dispute into a nine–figure, "bet the

13  company" lawsuit. Even giving TNR's amended complaint every reasonable

14  inference, however, TNR's attempts at over–pleading its case should be rejected.

15      ***First***, TNR has failed to adequately plead the statutory elements of a franchise

16  and, based on the governing agreement between the parties, it cannot do so. Moreover,

17  the jurisdictional reach of California's franchise laws is limited and TNR cannot

18  overcome those jurisdictional limits. TNR's franchise–related claims (causes of

19  action one and two) should thus be dismissed with prejudice.

20      ***Second***, TNR's tortious interference claims are barred as a matter of law on

21  several grounds. TNR alleges that Playboy's failure to honor its contractual

22  obligations injured TNR's relationships with third parties who were purchasing

23  Playboy–branded products. But in so doing, TNR seeks to hold Playboy liable in tort

24  for the same conduct giving rise to its breach of contract and breach of the implied

25  covenant of good faith and fair dealing claims. The economic–loss rule and the rule

26  that a party cannot interfere with its own contracts bar these derivative tort claims.

27  Further, Playboy's alleged breach of the licensing agreement does not constitute an

28  "independent wrong," which is necessary for TNR to maintain its intentional and

-1-

07281-00006/13254808.3

DEFENDANTS PLAYBOY ENTERPRISES INTERNATIONAL, INC., and PRODUCTS LICENSING LLC's
NOTICE OF MOTION AND PARTIAL MOTION TO DISMISS

negligent interference with prospective economic relations claims. Thus, TNR's tortious interference claims (causes of action six, seven, and eight) should be dismissed with prejudice.

**Third**, TNR has not, and cannot, sufficiently plead a cause of action for fraudulent inducement to contract. There is no duty for sophisticated parties dealing at arm's length to explain the terms of a contract to each other. Yet, TNR's theory would require just that. Moreover, TNR's allegations more readily support the conclusion that Playboy acted in good faith rather than with fraudulent intent. Thus, TNR's fraudulent inducement claim (cause of action nine) should be dismissed with prejudice.

**Fourth**, TNR's conversion claim against Playboy fails as a matter of law. TNR's conversion claim—which is based on allegations that Playboy received funds that it was not supposed to receive under the parties' contract—is barred by the economic–loss rule. Moreover, except in rare circumstances not alleged here, money is not usually the subject of a cognizable conversion claim under California law. Thus, TNR's conversion claim (cause of action ten) should be dismissed with prejudice.

**Finally**, TNR seeks an equitable remedy through its Section 17200 Unfair Competition Law ("UCL") claim, which is barred as a matter of law. A plaintiff with adequate remedies at law cannot seek equitable disgorgement under the UCL. Furthermore, TNR cannot use the UCL to circumvent other substantive rules of law that bar its other claims. Thus, TNR's UCL claim (cause of action five) should be dismissed with prejudice.

## II. RELEVANT BACKGROUND AND ALLEGATIONS

### A. Playboy, Its Licensing Business, and the Product License Agreement

Founded in 1953, Playboy has been a globally recognized brand for several decades. Some of its most valuable assets are its intellectual property, including the Rabbit Head Design logo and the Playboy name, at issue in this lawsuit. These trademarks are two of the most recognizable in the world. As Wired Magazine put it,

-2-

"[i]t's safe to say the bunny has achieved design icon status."[1] For years, Playboy has licensed its valuable trademarks for use on various consumer products.

Playboy has successfully licensed its marks in the sexual wellness space in recent years. Executed in 2010, the Product License Agreement ("PLA") granted TNR's predecessor–in–interest, United Medical Devices ("UMD"), a license to use the Playboy Rabbit Head Design and name on sexual wellness products such as condoms and lubricants. This relationship was "overseen by UMD's senior vice–president," Nicholai Allen ("Allen"). *See* Pl.'s First Am. Compl. (docket no. 26) ("FAC") ¶ 17.[2] With Playboy's consent, TNR and UMD executed a Sale and Purchase Agreement ("SPA") in 2018, whereby UMD assigned its rights and obligations under the PLA to TNR. FAC ¶ 19.[3] Subsequently, all three parties executed a Novation Agreement whereby the parties agreed to novate the PLA, replacing UMD with TNR as the licensee. *See id.* ¶ 23.

Like any standard exclusive licensing agreement, the PLA imposed a series of obligations on the licensee. For instance, the PLA required TNR, as licensee, to make certain royalty payments, to receive written approvals from Playboy at various stages of development, marketing, and sales for all products, make certain advertising and marketing expenditures, submit a marketing plan on a yearly basis for Playboy's approval, affix official holograms to products sold outside the United States, seek pre–

---

[1]   Margaret Rhodes, *Playboy's Logo is What Matters—It Earns More Than Nudes Do*, Wired (Oct. 13, 2015, 6:35 PM), https://www.wired.com/2015/10/playboys–logo–is–what–mattersit–earns–more–than–nudes–do/.

[2]   Allen is also named as a defendant in the FAC.

[3]   The SPA also provided that UMD would "pay Allen for one (1) year from the execution of the agreement to assist TNR's efforts to assume the responsibilities assigned to it and ensure a smooth transition of the PLA[.]" FAC ¶ 21. TNR further alleges that it hired Allen to be its "global sales consultant for the Products[.]" FAC ¶ 33.

approval of any sub–contractor or sub–licensee, allow Playboy to conduct up to two audits a year, and make minimum net sales each year, among other obligations. *See id.* ¶¶ 27–28, Ex. 1.

Eventually, Playboy began to suspect that TNR might not be in compliance with the PLA (and its subsequent amendments). Thus, Playboy engaged Credence Global Consulting Limited ("CGCL") to conduct an audit of TNR. *See id.* ¶ 99. The audit found that TNR had committed numerous breaches of the PLA, including failures to obtain product approvals and late payments on royalties, totaling $8,622,713.00 in damages to Playboy. *See id.* ¶ 100. Many of the audit findings, including TNR's failure to obtain product approvals, constituted "incurable default[s]" under the PLA and entitled Playboy to terminate the license immediately. *See id.*, Ex. 1, at ¶ 2.i.(vi). Consequently, Playboy terminated TNR's license in November 2021. *See* FAC ¶ 107.

**B.    TNR's Allegations**

Rather than accepting responsibility for its errors and moving on, TNR filed this lawsuit, alleging a secretive plot to undermine and remove TNR as licensee and seeking extraordinary award of $100,000,000 in damages. As amended, TNR's complaint asserts that Playboy violated California franchise laws, breached the PLA, violated California's Unfair Competition Law, tortiously interfered with TNR's business, fraudulently induced TNR to agree to the eighth amendment to the PLA, and tortiously converted TNR's property.[4]

TNR alleges (in spite of the fact that the governing contract was called the Product *License* Agreement) that the PLA actually "created a franchisee/franchisor relationship." *Id.* ¶ 29. As factual support for this contention, TNR relies on the licensing control procedures alleged at ¶¶ 27–28 of its amended complaint, discussed above. It does not supply any other facts to support this assertion.

---

[4]   The FAC also alleges that Defendant Allen breached his fiduciary duties to TNR.

From there, TNR alleges that Playboy began a months–long campaign to "systematically undermine[] TNR's rights under the PLA." *Id.* at 13. The first step in this alleged scheme was to "induce TNR to enter the Eighth Amendment." *Id.* ¶ 44. This amendment clarified the definition of "Products" under the PLA to exclude CBD–based products. TNR alleges that on July 8, 2019, Dr. Reena Patel ("Patel"), Playboy's Chief Operating Officer, emailed Allen stating, "*To your own point* in a previous email . . . you have stated that THC/CBD and products derived from [c]annabis plants are not within the current scope of TNR's rights . . ." and the "[r]eality is that THC/CBD are not part of their grant (*per your own note*) and would be subject to our approval and grant." *Id.* ¶¶ 46–47 (emphasis added). TNR alleges that this amounted to knowing misrepresentations *to TNR* about the original scope of the PLA because "Playboy . . . knew that any false information it conveyed or failed to disclose to Allen . . . would be communicated to TNR through Allen." *Id.* ¶¶ 44–45. TNR alleges that Playboy "manipulat[ed] Allen to obtain TNR's CEO['s] signature on the Eighth Amendment . . . under false pretenses." *Id.*

TNR then alleges that Playboy "poached" Allen by offering and ultimately agreeing with him to be a consultant on Playboy's behalf for the manufacture and sale of a wipes product. *See id.* ¶¶ 55–69. TNR alleges Playboy used this arrangement in part to interfere with TNR's relationship with retailers. TNR alleges that Playboy had Allen pitch the wipes product along with TNR's products to retailers like Walmart, Walgreens, and CVS. *See id.* ¶¶ 70–81. TNR further alleges that Playboy and Allen did so under TNR's supplier accounts and "using TNR's shelf space." *Id.* ¶ 70.

Playboy's next alleged step in the scheme was to "block[] TNR's attempts to seek new opportunities." *Id.* at 22. Playboy allegedly "instruct[ed] Allen not to pursue" a prospective relationship for TNR with a vendor called Core–Mark. *Id.* ¶ 83. Playboy also allegedly interfered with other prospective relationships by withholding product and marketing plan approvals. *See id.* ¶¶ 84–86.

1    Lastly, TNR alleges that the CGCL audit, which uncovered millions of dollars

2 in breaches by TNR, was pretextual and the last step necessary for Playboy to

3 complete its alleged scheme. *See id.* ¶¶ 92–106. As it must, TNR acknowledges that

4 Playboy terminated the PLA on the basis of this audit. *See id.* ¶ 108.

5                              ### III.    LEGAL STANDARDS

6    "A rule 12(b)(6) dismissal 'can be based on the lack of a cognizable legal

7 theory or the absence of sufficient facts alleged under a cognizable legal theory.'"

8 *Godecke v. Kinetic Concepts, Inc.*, 937 F.3d 1201, 1208 (9th Cir. 2019). "Whether a

9 complaint contains sufficient factual allegations depends on whether it pleads enough

10 facts to 'state a claim to relief that is plausible on its face.'" *In re German Auto. Mfrs.*

11 *Antitrust Litig.*, 497 F. Supp. 3d 745, 753 (N.D. Cal. 2020) (citing *Ashcroft v. Iqbal*,

12 556 U.S. 662, 678 (2009)). "While a complaint attacked by a Rule 12(b)(6) motion to

13 dismiss does not need detailed factual allegations, a plaintiff's obligations to provide

14 the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions,

15 and a formulaic recitation of the elements of a cause of action will not do." *Bell*

16 *Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "[F]actual allegations must be

17 enough to raise a right to relief above the speculative level." *Id.*[5] Dismissal is

18 warranted where there is an "obvious alternative explanation" whereby a defendant

19 would not be found liable. *Iqbal*, 556 U.S. at 682.

20    "Determining whether a complaint states a plausible claim for relief" is "a

21 context–specific task that requires the reviewing court to draw on its judicial

22 experience and common sense." *Id.* at 679. In doing so, "a court may consider material

23 which is properly submitted as part of the complaint and matters which may be

24

25

_____

26 [5]  In addition, Rule 9(b) requires a plaintiff to plead fraud claims "with particularity."
Fed. R. Civ. Pro. 9(b). "[T]he complaint must specify such facts as the times, dates,
27 places, and benefits received, and other details of the alleged fraudulent activity."
*Neubronner v. Milken*, 6 F.3d 666, 672 (9th Cir. 1993).
28

judicially noticed[.]" *Pelayo v. Nestle USA, Inc.*, 989 F. Supp. 2d 273 (C.D. Cal. 2013) (Walter, J.).

"The decision whether to grant leave to amend" is "within the discretion of the district court[.]" *Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 532 (9th Cir. 2008). Leave to amend is properly denied if the court determines that "allegation[s] of other facts consistent with the challenged pleading could not possibly cure the deficiency." *Schreiber Distributing Co. v. Serv–Well Furniture Co., Inc.*, 806 F.2d 1393, 1401 (9th Cir. 1986).

## IV.   ARGUMENT

**A.   As a Matter of Law, the PLA Does Not Create a Franchise Relationship Between Playboy and TNR, Nor was the Relationship Within the Jurisdictional Reach of the California Franchise Laws**

TNR has asserted causes of action for (i) wrongful termination of a franchise and (ii) failure to register as a franchise against Playboy. *See* FAC ¶¶ 126–45. TNR's allegations, along with the PLA that governed the parties' relationship, however, confirm that TNR cannot establish a franchise relationship. *See* Cal. Corp. Code § 31005 (California Franchise Investment Law) ("CFIL"); Cal. Bus. & Prof. Code § 20001 (California Franchise Relations Act) ("CFRA"); *see also* California Department of Financial Protection & Innovation, *Release 3–F: When does an Agreement Constitute a "Franchise"* (June 22, 1994) ("Release"). Moreover, the relationship between Playboy and TNR never came within the jurisdictional reach of the CFIL or the CFRA. *See* CFIL § 31105; CFRA § 20015. Thus, TNR's franchise claims fail as a matter of law and should be dismissed with prejudice.

*1.   Under the PLA, Playboy Had a Right of Approval, And Did Not Substantially Control TNR's Marketing Plan*

The CFIL and the CFRA contain the same operative definition of a franchise relationship. A "'franchise' means a contract between two or more persons by which: (a) a franchisee is granted the right to engage in the business of offering, selling or

-7-

distributing goods or services under a marketing plan or system prescribed in substantial part by a franchisor; and (b) the operation of the franchisee's business pursuant to that plan or system is substantially associated with the franchisor's trademark, service mark, trade name, logotype, advertising, or other commercial symbol designating the franchisor or its affiliate; and (c) the franchisee is required to pay, directly or indirectly, an franchise fee." CFIL § 31005; CFRA § 20001. Guidance and interpretive opinions issued by the Commissioner of Business Oversight regarding what constitutes a "franchise" "shall be prima facie evidence of the scope and extent of coverage of the definition of 'franchise[.]'" CFRA § 20009.[6]

California courts have emphasized that there is a franchise relationship when, for example a franchisor represents to a prospective franchisee that "'it [is] a turn key operation' . . . that [] 'everything is complete, ready to go, absolutely supplied and sustained and everything else . . .'" and where the franchisee was given documents "outlining projected sales, operating expenses, payroll expenses, and profits for [the franchise]." *People v. Kline*, 110 Cal. App. 3d 587, 591 (1980). The Commissioner of Business Oversight guidelines provide further examples, such as where a franchisee is provided with manuals or handbooks, training sessions, and trade secrets. *See* Release ¶ 1.2.2.7.

In contrast, Playboy did not provide TNR with anything other than the license of intellectual property. There are no allegations in the FAC, for example, that TNR was supplied with manuals or handbooks on how to develop a marketing and advertising plan, training sessions for how to produce condoms and lubricants, or

---

[6]  *See also Gabana Gulf Distribution, Ltd. v. GAP Intern. Sales, Inc.*, No. C 06–02584–CRB, 2008 WL 111223, at *5 n.1 (N.D. Cal. Jan. 9, 2008). "While the responsibility for statutory interpretation ultimately rests with the court, the Guidelines, as interpretation of a statute by the officials charged with its administration, *are entitled to great weight.*" *Thueson v. U–Haul Intern., Inc.*, 144 Cal. App. 4th 664, 671 (2006) (emphasis added).

1  trade secrets of any kind. Far from a "turn key operation," TNR was responsible for

2  the "design, manufacture, advertise[ment], promot[ion], [sales], and distribut[ion]" of

3  condoms and lubricants bearing Playboy's trademarks. FAC ¶ 25. On the other hand,

4  Playboy's role was limited in comparison. It had a right to approve or disapprove

5  products, packaging, advertising, sub–contractors and sub–licensees, and the right to

6  audit TNR's books. *See* FAC ¶ 28. In fact, Playboy's role in the marketing plan was

7  largely limited to "prior approval, *on a yearly basis* [of TNR's]

8  advertising/promotional and marketing plans[.]" Because TNR was responsible for

9  proposing the marketing plan in the first instance, it is not reasonable to infer that

10  TNR's marketing plan was "prescribed" in substantial part by Playboy.

11  Similarly, there are no allegations in the FAC that Playboy had control, for

12  example, over "the appearance of [TNR's] business premises and the fixtures and

13  equipment utilized therein, uniforms of employees, hours of operation, housekeeping,

14  and similar declarations." Release ¶ 1.2.2.3.[7]

15  Rather than suggesting a franchise relationship, the sections of the PLA TNR

16  relies on in its FAC prove exactly what the relationship was: *a license*. Uncontrolled

17  licensing is "inherently deceptive." *Barcamerica Int'l USA Trust v. Tyfield*

18  *Imps., Inc.*, 289 F.3d 589, 598 (9th Cir. 2002). Thus, courts have imposed "a

19  correlative duty [on licensors] to make sure that the good or service really is of

20  consistent quality[.]" *Dep't of Parks and Recreation for the State of California v.*

21  *Bazaar Del Mundo, Inc.*, 448 F.3d 1118, 1131 (9th Cir. 2006) (quoting *Gorenstein*

22  *Enterprises, Inc. v. Quality Care–USA, Inc.*, 874 F.2d 431, 435 (7th Cir. 1989)).

23  "[T]he only effective way to protect the public . . . is to place on the licensor the

24

---

25  [7]  The factors identified by the Commissioner and by California courts seem more
26  akin to well–known franchising operations like fast food establishments.  If TNR's
     allegations were sufficient to create a triable issue concerning the existence of a
27  franchise, then all exclusive licenses might suddenly be franchises under California
28  law.

affirmative duty of policing in a reasonable manner the activities of his licensees." *Bazaar Del Mundo*, 448 F.3d at 1131 (quoting *Dawn Donut Co. v. Hart's Food Stores, Inc.*, 267 F.2d 358, 367 (2d Cir. 1959). Perhaps in recognition of these duties, the Commissioner's guidelines singles out various licensing control mechanisms as *not indicative of a marketing plan. See* Release ¶ 1.2.2.6. Some control devices listed by the Commissioner include requiring the licensee to maintain books and records for royalty calculations or control mechanisms "designed to protect the quality of the product[.]" *Id.*

Every section of the PLA relied upon by TNR are normal control mechanisms utilized by licensors to maintain adequate control over product quality, brand reputation, and accounting while upholding its duty prescribed by law to maintain control over its licensee. Sections 2.h–i, for example, were expressly concerned with product quality, *as TNR concedes*. "Section 2.h–i conditioned TNR's ability to sell Products on receiving prior approval from Playboy, and it imposed a series of strict requirements on *product quality*[.]" FAC ¶ 28(c) (emphasis added). Every other section relied upon by TNR were clearly designed to give Playboy adequate control over its licensee. Licensors are permitted, and indeed are required by law, to maintain control over their licensees to ensure product quality and brand reputation. *See Hollywood Athletic Club Licensing Corp. v. GHAC–CityWalk*, 938 F. Supp. 612, 615 (C.D. Cal. 1996) ("The licensor has a strong need to control the use of its mark both to preserve the quality of the mark and to maintain the rights to the mark, for a licensor who fails to monitor its mark risks a later determination that the mark has been abandoned."). The Commissioner's guidelines confirm that California's franchise laws are not meant to encroach into that space. Playboy is a licensor and TNR was its licensee—nothing more. The Court should decline TNR's invitation to vastly expand the reach of California's franchise laws.

07281-00006/13254808.3

DEFENDANTS PLAYBOY ENTERPRISES INTERNATIONAL, INC., and PRODUCTS LICENSING LLC's
NOTICE OF MOTION AND PARTIAL MOTION TO DISMISS

**2.    *There Was No Substantial Association Between TNR's Condom Business and Playboy's Content Business***

Even if TNR could somehow plead past the threshold "control" issues discussed above, it cannot overcome the fact that there is no substantial association between its condom (and lubricant) business and Playboy trademarks licensed under the PLA. "In resolving the question of whether there is a substantial association between the Licensee's business and the licensor's commercial symbol, it is necessary to consider whether that commercial symbol is brought to the attention of the Licensee's customers to such an extent that the *customers regard the Licensee's establishment as one in a chain identified with the licensor*." Release ¶ 1.3. (emphasis added).[8] This requirement is not satisfied even when the products sold bear the trademark of the alleged franchisor. *Gabana*, 2008 WL 111223, at *5–6. In *Gabana*, the alleged franchisee was selling products bearing the GAP trademark, on behalf of GAP. However, because it was obvious that its customers did not think they were transacting with GAP, the plaintiff could not establish a franchise relationship. *See id*.

The same is true here. TNR cannot seriously argue that when, for example, it approached Walmart to sell the products with Playboy's trademark, that Walmart thought it was dealing with Playboy. Such a claim "is [not] plausible on its face." *Iqbal*, 556 U.S. at 678. As the PLA recites, Playboy was in the "multimedia entertainment" business "publish[ing] editions of *Playboy magazine* . . . operat[ing] television networks and distribut[ing] programming globally . . . [and] owns Playboy.com, a leading men's lifestyle and entertainment website[.]" FAC, Ex. 1 at 8. On the other hand, TNR is "an OEM manufacturer of high–quality condoms and lubricants[.]" *Id*. ¶ 3. As the complaint concedes throughout, TNR—not Playboy— sold Playboy–branded condoms to retail outlets. Those customers (the retailers and

---

[8]  Typical examples would be fast food chains, such as McDonald's, or gas stations, such as Chevron.

07281-00006/13254808.3

distributors) understood they were dealing with an independent manufacturer of the product with a license to use Playboy's trademarks.

### 3. To the Extent TNR Could Show That it Was a Franchisee of Playboy, the Relationship was Outside the Jurisdiction of California's Franchise Laws

Assuming, *arguendo*, that Playboy and TNR's relationship was a "franchise," it would not have come within the jurisdictional reach of the CFIL or CFRA. Section 31105 of the CFIL provides "[any franchise] shall be exempted from the provisions of Chapter 2 . . . if all locations from which sales, leases or other transactions between the franchised business and its customers are made, or goods or services are distributed, are physically located outside the state." CFIL § 31105. The "from" qualifier is applicable to both the "sales between" clause and the "goods or services distributed" clause. *See Stocco v. Gemological Institute of America, Inc.*, 975 F. Supp. 2d 1170, 1183 (S.D. Cal. 2013) ("The Court finds that Plaintiffs have failed to allege that any 'sales leases or other transactions between' GIA Italy and its customers are made **from** a location physically within California, or that GIA Italy distributes any 'goods or services' **from** a location physically within California.") (emphasis in original). There are no allegations in the complaint that TNR sold or distributed any products *from* within California. In fact, the complaint confirms that any U.S. based transactions were funneled through Allen and his companies Monarch Digital Media LLC ("Monarch"), Freedom Brands Corp. ("Freedom"), and their sales agent Coastal Solutions Group LLC ("CSG"). *See* FAC ¶¶ 33–43, 120. TNR did not make any sales or distribute any goods inside California. Thus, the CFIL does not apply.

The CFRA contains a similar geographical limit. "The provisions of this chapter apply to any franchise where either the franchisee is domiciled in this state or the franchised business is or has been operated in this state." CFRA § 20015. As the complaint concedes (in order to invoke this Court's diversity jurisdiction), TNR is

-12-

1    domiciled and operates in Thailand. Any business conducted in California was done

2    by Allen, Monarch, Freedom, or CSG, not TNR. *See Premier Wine and Spirits of*

3    *South Dakota Inc. v. E. & J. Gallo Winery*, 644 F. Supp. 1431, 1439 (E.D. Cal.) ("It

4    is not disputed that [Plaintiff] is not domiciled in California. There is also no genuine

5    dispute that [Plaintiff] has never operated in California."). Even if the agreement was

6    first executed by a California resident and then assigned to a non–resident not

7    operating in California, Section 20015 blocks the applicability of the CFRA. *See Jack*

8    *in the Box Inc. v. San–Tex Restaurants, Inc.*, No. SA–20–cv–00328–XR, 2021 WL

9    148058, at *6 (W.D. Tex. Jan. 14, 2021). Thus, even if TNR's predecessor, UMD,

10   hypothetically had a claim against Playboy under the CFRA, TNR does not.

11       Additionally, the PLA is exempt under Section 31102 of the CFIL. "The offer

12   or sale of a franchise by a franchisee for his own account or the offer or sale of the

13   entire area franchise owned by a subfranchisor for his own account, is exempted from

14   the provisions of Section 31110 if the sale is not effected by or through a franchisor.

15   A sale is not effected by or through a franchisor merely because a franchisor has a

16   right to approve or disapprove a different franchisee." CFIL § 31102. "Mere

17   franchisor participation in the sale by furnishing information, referring prospective

18   purchasers of the franchise, or approving purchasers does not deprive a franchisee

19   [seller] of his exemption." *Fox v. Ehrmantraut*, 615 P.2d 1383, 1390 (Cal. 1980).

20   Moreover, "[t]he provision in the section excluding from the exemption sales effected

21   'by or through a franchisor' excludes only those sales where the franchisor obtains all

22   or a substantial part of the purchase price." *Id*. According to the complaint, UMD was

23   paid $15 million for the sale to TNR. *See* FAC ¶ 19. Playboy eventually received

24

25

26

27

28

-13-

DEFENDANTS PLAYBOY ENTERPRISES INTERNATIONAL, INC., and PRODUCTS LICENSING LLC's
NOTICE OF MOTION AND PARTIAL MOTION TO DISMISS

07281-00006/13254808.8

$750,000. *See id.* That is nowhere near all or substantially all of $15 million,[9] thus exempting the PLA.

For the reasons outlined above, the allegations in the complaint (inclusive of the attached documents) do not support application of either the CFIL or the CFRA. Furthermore, TNR cannot allege facts that would satisfy either statute. Thus, TNR's franchise related causes of action should be dismissed with prejudice.

**B.** **TNR's Tortious Interference Claims Are Barred as a Matter of Law**

    *1.* ***The Economic Loss Rule Bars TNR's Tortious Interference Claims***

TNR's three tortious interference claims: intentional interference with contractual relations, intentional interference with prospective economic relations, and negligent interference with prospective economic relations, are all barred under the economic loss doctrine. The economic loss doctrine prevents a plaintiff from recovering in tort against its contracting counterparty for actions that constitute breaches of the underlying contract(s). *See JRS Products, Inc. v. Matsushita Electric Corp. of America*, 115 Cal. App. 4th 168, 183 (2004) ("This complaint sounds in contract, not tort . . . a breach of contract claim cannot be transmuted into tort liability by claiming that the breach interfered with the promisee's business."). "Quite simply, the economic loss rule prevents the law of contract and the law of tort from dissolving one into the other." *Robinson Helicopter Co., Inc. v. Dana Corp.*, 34 Cal. 4th 1227, 1231–32 (2015). The economic loss rule thus prevents TNR from recovering tort damages against Playboy for allegedly breaching the PLA (and subsequent amendments). *See State Ready Mix, Inc. v. Moffatt & Nichol*, 232 Cal. App. 4th 1227, 1232 (2015) ("[Plaintiff] cannot recast [its] complaint for breach of contract/breach of warranty as a tort action. 'A person may not ordinarily recover in tort for the breach

---

[9] Small transfer fees collected on the part of the alleged franchisor do not disrupt application of Section 31102 either. *See Reyes v. Atlantic Richfield Co.*, 12 F.3d 1464, 1472 (9th Cir. 1993).

DEFENDANTS PLAYBOY ENTERPRISES INTERNATIONAL, INC., and PRODUCTS LICENSING LLC's
NOTICE OF MOTION AND PARTIAL MOTION TO DISMISS

1    of duties that merely restate contractual obligations.'") (quoting *Aas v. Superior*

2    *Court*, 24 Cal. 4th 627, 643 (2000), *superseded by statute on other grounds*)).

3         Fundamentally, TNR's tortious interference claims "merely restate contractual

4    obligations" allegedly breached by Playboy. *See* FAC ¶¶ 146–55 (contract claims),

5    167–197 (tortious interference claims). For example, TNR alleges that Playboy

6    breached the PLA by "[c]ompeting directly with TNR by selling Playboy products

7    not manufactured by TNR on TNR's retail shelf space and using packaging copied

8    from TNR's products in violation of Section 11.1 of the Novation Agreement[.]" *Id.*

9    at ¶ 155(d). TNR then substantiates its intentional interference with contract claim by

10   alleging, in part, "Playboy engaged in conduct . . . to disrupt TNR's Walmart

11   agreement and improperly secur[e] shelf space and sales rights at Walmart for

12   Playboy's products. To effectuate those sales, Playboy also deceptively used

13   packaging on its products almost identical to those on TNR's Products." *Id.* at ¶ 171.

14   TNR also alleges that Playboy violated the PLA by "[d]irecting, aiding, and abetting

15   Allen to bill or charge TNR for improper and unauthorized expenses to support sales

16   of Playboy products, including . . . shipping, logistics, insurance, advertising, and

17   other costs and fees[.]" *Id.* at ¶ 155(f). In turn, TNR alleges "Playboy wrongfully

18   obtained benefits at the expense of TNR . . . including but not limited to, shipping,

19   logistics costs, social media advertising, marketing data, and payment of rent . . ." to

20   support its intentional interference with contract claim. *Id.* at 173. In the same vein,

21   TNR alleges that Playboy intentionally interfered with prospective economic relations

22   by "wrongfully and unreasonably withholding approval of TNR's deal with [a]

23   Russian distributor[.]" *Id.* at ¶ 183.[10] TNR outright admits the overlap in

24   paragraph 191 of the FAC by alleging "Playboy owed a duty of care *to perform its*

25

26   [10]  These are merely representative examples of the overlap between TNR's contract
     claims and its tortious interference claims. Other examples include paragraphs
27   155(e) and 182–83, 155(d) and 172, 181, and 194, and paragraphs 148 (a)–(b),
28   155(a)–(b) and 191–197.

-15-

07281-00006/13254808.3

*obligations under the Seventh Amendment of the PLA and the Novation Agreement* in a way that did not cause foreseeable harm to TNR's business." FAC ¶ 191 (emphasis added); *contra JRS*, 115 Cal. App. 4th at 183 ("a breach of contract claim cannot be transmuted into tort liability by claiming that the breach interfered with the promisee's business.").

A plaintiff cannot overcome the economic loss rule even if "[t]here is abundant evidence to support each of the elements of the tort." *JRS*, 115 Cal. App. 4th at 179; *see also Robinson Helicopter*, 34 Cal. 4th at 999 (Werdegar, J., dissenting) ("But the commission of an independent tort, although a necessary condition for the imposition of tort liability, is not sufficient"). If the conduct is wrongful because it breaches a contractual duty, it cannot also support liability sounding in tort.[11] Otherwise, contracting parties would lose the benefit of "enabling [them] to estimate in advance the financial risks of their enterprise." *Erlich*, 21 Cal. 4th at 551.[12] TNR seeks to do

---

[11]  Under rare circumstances, the California Supreme Court has allowed contract and tort claims based on the same underlying conduct to proceed in parallel. "Tort damages have been permitted in contract cases where a breach of duty directly causes physical injury . . . for breach of the covenant of good faith and fair dealing in insurance contracts . . . for wrongful discharge in violation of fundamental public policy . . . or when the contract was fraudulently induced." *Erlich v. Menezes*, 21 Cal. 4th 543, 551–52 (1999) (internal citations omitted). No such circumstances are present here. Furthermore, federal courts have recognized the need to limit any extension of these exceptions. *See e.g., Lennar Mare Island, LLC v. Steadfast Insurance Company*, No. 2:12–cv–02182–KJM–KJN, 2016 WL 829210, at *7 (E.D. Cal. Mar. 3, 2016) ("But lest every contract breach dissolve into a tort, the California Supreme court has emphasized the importance of a 'cautious approach' that preserves the contracting parties' rights to limit their liability to the value of the promise and any exceptions they agree to impose.") (citing *Erlich*, 21 Cal. 4th at 553).

[12]  *See also Robinson Helicopter*, 34 Cal. 4th at 996 (Werdegar, J., dissenting) ("if every breach creates a potentially triable tort claim, 'the potential consequences of any breach of contract—efficient or inefficient, socially desirable or undesirable—become uncertain and unpredictable. Tort liability may or may not follow, depending on a myriad of imponderable factors. As a result, a business fearful of unfathomable tort exposure might lose the ability to respond flexibly to changing economic

---

-16-

exactly what the economic loss rule bars it from doing: hold Playboy liable in tort for allegedly breaching the parties' contract. TNR's tortious interference claims should thus be dismissed with prejudice.

### 2.     *Playboy Cannot Be Held Liable for Intentionally Interfering With The Contracts At Issue Here*

It is axiomatic that, as a matter of law, a party cannot tortiously interfere with its own contract. *See Applied Equipment Corp.*, 7 Cal. 4th at 514. This doctrine also applies to parties with significant economic interests in a contract that necessarily contemplates their own performance under a separate contract. *See PM Group, Inc. v. Stewart*, 154 Cal. App. 4th 55, 65 (2007). This is a natural extension of the rule that only third parties can tortiously interfere with a contract and the economic loss rule. As one court put it, "[p]ermitting [plaintiff] to assert both a breach of contract claim and an intentional interference with contractual relations claim might be duplicative because . . . breach of the [secondary contract] was likely a foreseeable consequence of [the defendant's] breach of its contract with [plaintiff]. Permitting [plaintiff] to file such similar claims may therefore permit [plaintiff] to [recover] damages above and beyond the damages it actually suffered." *Hamilton San Diego Apartments v. RBC Capital Markets Corp.*, No. 3:12–CV–2259–JM (BLM), 2013 WL 12090313, at *5 (S.D. Cal. Mar. 5, 2013).

Every contract TNR claims Playboy intentionally interfered with falls within the scope of this rule. TNR alleges that its contracts with Walmart, Walgreens, Monarch, Freedom, and Allen were all interfered with by Playboy. *See* FAC ¶ 168. However, Playboy had significant economic interests in each of these contracts. As TNR acknowledges, Playboy was paid "guaranteed and earned royalties in the seven–

---

conditions or hesitate to enter into contracts at all in fast–moving aspects of commercial enterprise.'") (quoting *Applied Equipment Corp. v. Litton Saudi Arabia Limited, et al.*, 7 Cal. 4th 503, 520 (1994)).

figure range . . ." under the PLA. FAC ¶ 27. The only way Playboy could earn those royalties, as a licensor, was if TNR subsequently entered into contracts with distributors, suppliers, and customers. Playboy thus had a significant—indeed "in the seven–figure range"—interest in TNR's contracts with Walmart, Walgreens, Monarch, Freedom, and Allen. Moreover, those contracts necessarily contemplated Playboy's performance under the PLA. If Playboy did not deliver the license to TNR (or otherwise breached the PLA), TNR would have no products for Monarch, Freedom, and Allen to distribute or for Walmart and Walgreens to purchase. TNR impliedly conceded as much when it alleged, "Playboy's wrongful . . . termination of the PLA . . . result[ed] in the inability to sell millions of dollars in inventory[.]" *Id.* at ¶ 112; *see also id.* at ¶ 72 (Playboy's breach "jeopardized TNR's performance under the General Merchandise Agreement with Walmart[.]").

For this reason, separate and apart from the economic loss rule argument, TNR's claim for intentional interference with contractual relations should be dismissed with prejudice.

### 3. *TNR's Claims for Intentional and Negligent Interference with Prospective Economic Relations Fail as a Matter of Law*

TNR's intentional and negligent interference claims are barred under a similar rule to the economic loss doctrine. Both intentional and negligent interference with prospective relations claims require wrongful acts that are independently wrongful beyond the interference itself. *National Medical Transportation Network v. Deloitte & Touche*, 62 Cal. App. 4th 412, 439–40 (1998) (applying the rule to negligent interference claim). Breach of contract is not an independent wrongful act capable of supporting such claims. *See Drink Tank Ventures LLC v. Real Soda in Real Bottles, Ltd.*, 71 Cal. App. 5th 528, 532–33 (2021) ("as our Supreme Court has said time and again, an actor's breach of contract, without more, is not 'wrongful conduct' capable of supporting a tort . . . including the tort of intentional interference with a prospective economic advantage."); *Workplace Techs. Research, Inc. v. Project*

-18-

*Mgmt. Inst.*, No. 18–cv–1927 JM (MSB), 2019 WL 3804019, at *8–9 (S.D. Cal. Aug. 13, 2019) (dismissing claim for negligent interference because "[t]he alleged wrongdoing [was] simply [the plaintiff's] breach of contract claim" and a plaintiff "may not transmute its contract claim into a tort claim by alleging [the defendant] wrongfully breached the parties' contract.").

TNR relies on nothing more than Playboy's alleged breach of the PLA to support its interference with prospective relations claims. For example, "Playboy . . . disrupted TNR's prospective economic relationship with the Russian distributor . . . *by wrongfully and unreasonably withholding approval* of TNR's deal[.]" FAC ¶ 183.[13] TNR explicitly relies on Playboy's alleged breach of its contractual obligations as the source of Playboy's duty under its negligent interference claim. *See id.* at ¶¶ 191–97. TNR's claims for intentional and negligent interference with prospective economic relations thus fail as a matter of law and should be dismissed with prejudice.

## C.   TNR Fails to State a Cognizable Claim for Fraudulent Inducement

"A claim for fraud in the inducement requires the following elements: '(a) a misrepresentation (false representation, concealment, or nondisclosure); (b) scienter or knowledge of its falsity; (c) intent to induce reliance; (d) justifiable reliance; and (e) resulting damage.'" *McColgan v. Mutual of Omaha Ins. Co.*, 4 F. Supp. 3d 1228, 1233 (E.D. Cal. 2014) (*quoting Hinesley v. Oakshade Town Ctr.,* 135 Cal. App. 4th 289, 294 (2005)). TNR alleges that Playboy fraudulently induced TNR's assent to the Eighth Amendment to the PLA. TNR, however, has failed to adequately plead its claim.

---

[13]   Again, there is no daylight between the allegations in paragraph 155 (breach of good faith and fair dealing) and paragraphs 181–86 (intentional interference with prospective economic relations).

1    As enumerated above, there are three categories of actionable
2  misrepresentation: false representation, active concealment, or nondisclosure by one
3  with a duty to disclose. *See Linear Technology Corp. v. Applied Materials, Inc.*,
4  152 Cal. App. 4th 115, 131–32 (2007). TNR alleges all three. *See* FAC ¶¶ 200–01.

5    The FAC contains no facts to support TNR's active concealment theory. There
6  are no allegations that Dr. Patel, or anyone at Playboy, somehow affirmatively hid
7  anything from TNR. In fact, TNR's theory of active concealment is legally invalid.
8  TNR alleges "Patel actively concealed discovery of the material facts from TNR by
9  not disclosing such facts during Playboy's discussions with Allen[.]" FAC ¶ 200. The
10  law, however, says "[m]ere nondisclosure does not constitute active concealment."
11  *Herron v. Best Buy Co. Inc.*, 924 F. Supp. 2d 1161, 1176 (E.D. Cal. 2013) (citing
12  *Alfaro v. Community Hous. Improvement Sys. & Planning Ass'n, Inc.*, 171 Cal.
13  App. 4th 1356, 1382 (2007); *Lingsch v. Savage*, 213 Cal. App. 2d 729, 734 (1963)).
14  Thus, TNR's active concealment theory fails as a matter of law.

15    For nondisclosure to be actionable, Playboy must have owed a duty of
16  disclosure to TNR. *See Hahn v. Mirda*, 147 Cal. App. 4th 740, 745 (2007). However,
17  it is hornbook law that "[n]o law requires that parties dealing at arm's length have a
18  duty to explain to each other the terms of a written contract." *Rowland v.*
19  *PaineWebber Inc.*, 4 Cal. App. 4th 279, 286 (1992), *disagreed with on other grounds*
20  *in Rosenthal v. Great Western Fin. Securities Corp.*, 14 Cal. 4th 394, 415 (1996); *see,*
21  *e.g., Desert Outdoor Advert. v. Superior Court*, 196 Cal. App. 4th 866, 872–73
22  (2011). This rule even extends to parties who owe one another fiduciary duties. In
23  *Desert Outdoor Adventure*, the plaintiffs sought to avoid the effect of an arbitration
24  agreement with their attorney, arguing the attorney had a duty to disclose and explain
25  the arbitration provision. *See id*. at 872–875. The court rejected this argument
26  precisely because the plaintiffs were "knowledgeable business persons[.]" *Id*. at 874.
27  Similarly, TNR and Playboy are sophisticated businesses run by competent and
28

-20-

1  knowledgeable businesspersons. Accordingly, Playboy had no duty of disclosure and
2  TNR's nondisclosure theory fails.

3      That leaves just TNR's false representation theory. The lone allegedly false
4  representation contained in the FAC is Playboy's alleged statement "that CBD
5  condoms and lubricants were excluded from the scope of the PLA." FAC ¶ 201.
6  Specifically, TNR references two alleged statements of Patel to Allen, in which she
7  states "[t]o your own point in a previous email . . . you have stated that THC/CBD
8  and products derived from [c]annabis plants are not within the current scope of TNR's
9  rights[,]" and "[r]eality is that THC/CBD are not part of their [TNR's] grant (per your
10 own note) and would be subject to our approval grant." *Id.* at 46–47. This allegation,
11 however, is readily susceptible to an "obvious alternative explanation." *Iqbal*, 556
12 U.S. at 682.

13     Both alleged Patel statements reference *Allen's* opinion regarding the scope of
14 the PLA. Given Allen's "previous position at UMD and experience with the Playboy
15 condoms and lubricant business[,]" (FAC ¶ 33), Allen was arguably in the best
16 position to understand the scope of the PLA. TNR's specific factual allegations thus
17 support the opposite conclusion from TNR's claim. Rather than evidencing Playboy's
18 knowing falsity, the Patel statements more plausibly suggest that the PLA's scope was
19 at best vague and that Patel was relying on Allen's opinions, not the other way around.

20     Paradoxically, to support its claim that Playboy's alleged representations were
21 knowingly false, TNR argues that the scope of the PLA prior to the Eighth
22 Amendment obviously included CBD and cannabis based products. "Put simply, the
23 final and agreed–upon language of the PLA, prior to the Eighth Amendment, clearly
24 grants TNR a license to all condoms and non–medical personal lubricants bearing and
25 sold in connection with Playboy's marks and images, including CBD condoms and
26 lubricants." FAC ¶ 49. But if the PLA so "clearly" included CBD products within its
27 scope, then it would be unreasonable for TNR, a sophisticated business, to rely on
28 Playboy's alleged statements to the contrary.

-21-

07281-00006/13254808.3

DEFENDANTS PLAYBOY ENTERPRISES INTERNATIONAL, INC., and PRODUCTS LICENSING LLC's
NOTICE OF MOTION AND PARTIAL MOTION TO DISMISS

1    For these reasons, TNR's fraudulent inducement claim should be dismissed
2 with prejudice.

3 **D.    TNR's Conversion Claim Fails as a Matter of Law**

4    TNR's conversion claim is also barred by the economic loss rule. *See Baggett v.*
5 *Hewlett–Packard Co.*, No. SACV 07–0667 AG (RNBx), 2009 WL 3178066, at *2
6 (C.D. Cal. Sep. 29, 2009) (citing cases applying the economic loss rule to bar
7 conversion claims). Like its tortious interference claims, TNR's conversion claim is
8 barred because it is "predicated on a mere breach of contract." *Cusano v. Klein*,
9 280 F. Supp. 2d 1035, 1043 (C.D. Cal. 2003). The gravamen of TNR's conversion
10 claim is that Playboy allegedly "usurped TNR's resources" to support its own
11 products. *See* FAC ¶ 207. But, again, this allegation is indistinguishable from TNR's
12 contract based allegations, "[d]irecting . . . Allen to bill or charge TNR for improper
13 and unauthorized expenses to support sales of Playboy products[.]" FAC ¶ 155(f). Put
14 simply, "[TNR's] relationship with [Playboy] 'arises solely out of their contract and
15 commercial transaction.'" *Baggett*, 2009 WL 3178066, at *3. TNR's conversion
16 claim is thus barred by the economic loss rule.

17    In addition, TNR's conversion claim is legally defective. "Normally, money
18 cannot be converted." Hon. Kimberly A. Gaab & Sara Church Reese, *Cal. Prac.*
19 *Guide: Civ. Pro. Trial Claims and Def.*, Ch. 12(II)–B, ¶ 12:116 (The Rutter Group)
20 (citing *McKell v. Washington Mut., Inc.*, 142 Cal. App. 4th 1457, 1491 (2006)).
21 California courts have recognized conversion actions for money under limited
22 circumstances. "[C]ases recognizing claims for the conversion of money 'typically
23 involve those who have misappropriated, commingled, or *misapplied specific funds*
24 *held for the benefit of others*.'" *Voris v. Lampert*, 7 Cal. 5th 1141, 1152 (2019)
25 (emphasis added) (internal citations omitted). Indisputably, TNR is alleging that
26 Playboy converted money. *See* FAC ¶¶ 204–213. However, its claim does not fit
27 within the narrow exception to the rule that money cannot be converted.

28

07281-00006/13254808.3

California courts have recognized claims for the conversion of money where, for example, an agent failed to turn over a definite sum received for their principal's account. *Haigler v. Donnelly*, 18 Cal. 2d 674, 681 (1941); *Mendoza v. Continental Sales Co.*, 58 Cal. App. 4th 1395, 1404 (2006). These cases have held that the converted money was "in essence [held] in trust for the third party vendors." *Sandigo v. Ocwen Loan Servicing, LLC*, No. 17–cv–02727–BLF, 2019 WL 2233051, at *21 (N.D. Cal. May 23, 2019) (quoting *McKell*, 142 Cal. App. 4th at 1491).

Nothing in TNR's FAC suggests that Playboy was holding money in trust for TNR. TNR simply alleges that Playboy "usurped TNR's resources[.]" FAC ¶ 207. In other words, TNR alleges (and as is confirmed by its contract allegations) that Playboy misused funding provided by TNR in contravention of the PLA. If that is true, then TNR can pursue that theory via its breach of contract claim(s). Conversion, however, is not the proper claim. *See Voris*, 7 Cal. 5th at 1151 ("[T]he law has been careful to distinguish proper claims for the conversion of money from other types of monetary claims more appropriately dealt with under other theories of recover.").

### E.   TNR is Barred from Pursuing its Unfair Competition Claim

When a plaintiff has pleaded an adequate remedy at law it cannot pursue equitable claims under California's UCL. *See Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 839–44 (9th Cir. 2020). "It matters not that a plaintiff may have no remedy if her other claims fail." *Munning v. Gap, Inc.*, 238 F. Supp. 3d 1195, 1203 (N.D. Cal. 2017). TNR has pleaded breach of contract, breach of good faith, tortious interference, fraud, and conversion claims. All those claims provide remedies at law. It does not matter that some of those claims may fail based upon this motion to dismiss or at trial. *See id*. Thus, because TNR has pleaded adequate remedies at law, its UCL claim should be dismissed with prejudice.

Furthermore, a UCL claim "cannot be used to state a cause of action the gist of which is absolutely barred under some other principle of law." *Stop Youth Addiction, Inc. v. Lucky Stores, Inc.*, 17 Cal. 4th 553, 566 (1998) *superseded on other*

-23-

*grounds by statute.* As discussed above, TNR's tortious interference and conversion claims are barred as a matter of law. "[T]he resulting immunity [conferred by some other law] should not evaporate merely because the plaintiff discovers a conveniently different label for pleading what is in substance an identical grievance arising from identical conduct . . . We thus conclude that a plaintiff may not bring an action under the unfair competition law if some other provision bars it." *Cel–Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*, 20 Cal. 4th 163, 184 (1999). TNR thus cannot use the UCL to cleverly plead around the doctrines discussed above.

## V.   CONCLUSION

For the forgoing reasons, TNR's first and second causes of action (franchise claims), fifth cause of action (UCL claim), sixth, seventh, and eighth causes of action (tortious interference claims), ninth cause of action (fraudulent inducement claim), and tenth cause of action (conversion claim) should be dismissed with prejudice.

DATED:  April ___, 2022                QUINN EMANUEL URQUHART &
                                       SULLIVAN, LLP


                                       By _____
                                          MARSHALL M. SEARCY III
                                          Attorneys for Defendants,
                                          Playboy Enterprises International, Inc., and
                                          Products Licensing LLC

07281-00006/13254808.3

DEFENDANTS PLAYBOY ENTERPRISES INTERNATIONAL, INC., and PRODUCTS LICENSING LLC's
NOTICE OF MOTION AND PARTIAL MOTION TO DISMISS

# EXHIBIT B

**quinn emanuel** trial lawyers | los angeles

865 South Figueroa Street, 10th Floor, Los Angeles, California 90017-2543 | TEL (213) 443-3000 FAX (213) 443-3100

WRITER'S DIRECT DIAL NO.
**(213) 443-3152**

WRITER'S EMAIL ADDRESS
**marshallsearcy@quinnemanuel.com**

January 10, 2022

**VIA E–MAIL**
**CMCHANG@DUANEMORRIS.COM**

Cyndie M. Chang
Duane Morris LLP
856 South Figueroa Street, Suite 3100
Los Angeles, CA 90017–5450

Re:   <u>Request to Meet and Confer re: TNR v. Playboy Enterprises International, Inc., 2:21–cv–09749</u>

Dear Cyndie:

I write pursuant to Local Rule 7–3 and Section 5(b) of Judge Walter's Standing Order to discuss the substantive basis of Playboy's forthcoming motion to dismiss TNR's complaint. Playboy intends to move for dismissal of the complaint for the reasons set forth below. Based on the Ninth Circuit's liberal policy of allowing amendment to the pleadings and the applicable local rules, TNR is to "carefully evaluate the defendant's contentions as to the deficiencies in the Complaint, and in most instances, the moving party should agree to any amendment that would cure a curable defect." Judge Walter's Standing Order, Section 5(b).

TNR's complaint has clear deficiencies. As discussed below, it may be possible for TNR to remedy some of these deficiencies with an amended complaint. However, several of TNR's claims simply fail as a matter of law, and these claims cannot be saved with an amendment. Please let me know when you are available to meet in person next week to discuss these issues.[1]

---

[1]   The issues discussed below are not an exhaustive recitation of Playboy's grounds for dismissal and nothing in this letter shall be construed as an admission of the allegations made in the complaint and shall not operate as a waiver or disclaimer of any of Playboy's rights, powers, and defenses under Rule 12 of the Federal Rules of Procedure or otherwise available to Playboy under the law.

**quinn emanuel urquhart & sullivan, llp**

ATLANTA | AUSTIN | BOSTON | BRUSSELS | CHICAGO | HAMBURG | HONG KONG | HOUSTON | LONDON | LOS ANGELES | MANNHEIM | MIAMI | MUNICH | NEUILLY-LA DEFENSE | NEW YORK | PARIS | PERTH | SALT LAKE CITY | SAN FRANCISCO | SEATTLE | SHANGHAI | SILICON VALLEY | STUTTGART | SYDNEY | TOKYO | WASHINGTON, DC | ZURICH

### *TNR's Franchise Claims Arising Under Cal. Bus. & Prof. Code § 20001*

In its complaint, TNR claims seeks to hold Playboy liable for (i) wrongful termination of a franchise and (ii) failing to register as a franchise. *See* Compl. Paras. 128–139 (Claim I alleging wrongful termination of franchise), Compl. Paras. 141–147 (Claim II alleging failing to register franchise); Compl. Paras. 162–166 (Claim V alleging unfair business practices based on wrongful termination of franchise and failure to register franchise). Playboy intends to seek dismissal of these claims because TNR has failed to plead the statutory elements of a franchise, and based on the governing agreement between the parties, will not be able to do so.

California law defines a franchise as "a contract … between two or more persons by which: (1) a franchisee is granted the right to engage in the business of offering, selling or distributing goods … ***under a marketing plan or system prescribed in substantial part by a franchisor*** …." Cal. Bus. & Prof. Code § 20001 (West) (emphasis added).

TNR's complaint does not contain factual allegations suggesting Playboy "prescribed in substantial part" a market plan or system. To the contrary, the complaint states that "pursuant to Section 2.o(ii) of the PLA submitted advertising/promotional and marketing plans for Playboy's approval on a yearly basis." Compl. Para. 28. Thus, even assuming for purposes of a motion to dismiss that TNR's allegations are true, TNR has not alleged facts showing how Playboy's approval right materially affected or shaped the marketing policy. *See* Compl. Para. 28 (stating the play was subject to Playboy's approval without alleging any specific facts of how Playboy controlled TNR's marketing plan).

The contract that TNR relies on in its complaint—the Products Licensing Agreement ("PLA")— also makes clear that the full extent of Playboy's influence on TNR's marketing plan was to provide yearly approvals. Accordingly, TNR has failed to adequately plead that TNR's marketing plan was prescribed in substantial part by Playboy, and even if it seeks to amend, will not be able to satisfy the requirements for showing the existence of a franchise agreement because the PLA shows that Playboy did not have the required control over TNR. Playboy intends to seek dismissal of any claims arising from an alleged franchisee/franchisor relationship.

### *TNR's Claims For Breach Of Contract & Implied Covenant Of Fair Dealing*

In its complaint, TNR asserts claims for breach of contract and for breach of the implied covenant of fair dealing. *See* Compl. Paras. 148–153 (Claim III alleging breach of contract); Compl. Paras. 154–58 (Claim IV alleging breach of implied covenant). However, TNR has failed to identify the precise obligations that Playboy allegedly violated and thus has not stated cognizable claims for breach of contract or breach of the implied covenant of fair dealing.

To state a claim for breach of contract and breach of the implied covenant of fair dealing, a plaintiff must plead "(1) the existence of a contract, (2) the plaintiff's performance of the contract or excuse for nonperformance, (3) the defendant's breach, and (4) the resulting damage to the plaintiff." *Workplace Techs. Research, Inc. v. Project Mgmt. Inst.*, No. 18cv1927 JM (MSB), 2019 U.S. Dist. LEXIS 44102, at *27 (S.D. Cal. Mar. 18, 2019) (alteration omitted). A plaintiff fails to state a prima facie claim for breach if the plaintiff does not identify the precise obligations they allege were breached. *See, e.g., id.* at * 29 (dismissing plaintiff's claim for breach of contract on a

[2]

### TNR's Claims Alleging Vicarious Liability

12(b)(6) motion because "conclusory and circular allegations, without citation to contract provisions enumerating the allegedly breached obligations, are insufficient …"); *id.* at * 33–34 (dismissing plaintiff's claim for breach of implied covenant because the complaint "fail[ed] to root the alleged obligations" that were violated in the underlying contract).

Here, TNR did not attach the PLA to its complaint, did not specifically allege what contractual duties Playboy owed, or what the intended benefits of the PLA are. Instead, TNR relies on conclusory allegations that Playboy took "actions contrary to the terms" of the parties' Agreements, Compl. Para 150, or that Playboy withheld approval of proposed products and marketing plans, *see, e.g.*, Compl. Para 157(a) ("Withholding product approvals unreasonably …"); 199 ("withholding timely approval …"). However, because TNR does not identify what specific contractual provisions Playboy violated TNR cannot claim—and a reasonable person would not infer—that Playboy was required to approve TNR's proposals or that it otherwise breached the contract.

Accordingly, Playboy intends to move for dismissal of Claim III because the complaint does not identify what specific obligations were breached. Relatedly, Playboy intends to move for dismissal of Claim IV because the complaint does not identify the intended benefits of the contract that were allegedly frustrated.

### TNR's Claim For Damages Based On Unfair Business Practices

TNR seeks to recover damages exceeding $75,000 based on its allegation that Playboy engaged in unfair business practices. *See* Compl. Paras. 159–168 (Claim V alleging unfair business practices in violation of Cal. Bus. & Prof. Code § 17200 *et seq* and seeking damages exceeding $75,000). However, TNR's request for damages is foreclosed as a matter of law. A plaintiff suing under § 17200 cannot recover monetary damages.

In *Bank of the West v. Superior Court,* 2 Cal. 4th 1254, 1266, 10 Cal. Rptr. 2d 538, 545–46, 833 P.2d 545, 552–53 (1992), the California Supreme Court addressed this precise issue, holding that "damages are not available under section 17203." Instead, a private plaintiff that prevails under this statute is limited to injunctive relief or disgorgement of profits. *Id.*

Accordingly, Playboy intends to seek dismissal of this claim to the extent TNR seeks damages and, in the alternative, will seek to have these portions of TNR's pleadings stricken pursuant to Rule 12(f) of the Federal Rules of Civil Procedure. Because TNR does not allege any facts showing that it would be entitled to the relief provided under § 17200—i.e., restitution or injunctive relief—its claim also does not seem to be salvageable by way of amendment.

Throughout the complaint, TNR also seeks to hold Playboy liable for the actions of Nicholai Allen. *See* Compl. Para 157 (Claim Four alleging that "Playboy has breached its duty of good faith and fair dealing by … [d]irecting, aiding and abetting a Playboy agent to obtain TNR's approval of the Eighth Amendment by concealing material facts about the nature of the agreement."); Para 157(f) (Claim Four accusing Playboy of "[d]irecting, aiding, and abetting a Playboy agent to bill or charge TNR for improper and unauthorized expenses …"); Compl. Para. 162 (Claim Five (e) accusing Playboy of "[d]irecting, aiding, and abetting a Playboy agent to bill or charge TNR

[3]

for improper expenses …"); Compl. Para. 162 (Claim Five (f) accusing Playboy of "[d]irecting, aiding, and abetting a Playboy agent to obtain TNR's approval of the Eighth Amendment by concealing material facts about the nature of the agreement;"); Compl. Para. 176 (Claim Six alleging Playboy further interfered in TNR's contractual relationships with Monarch, Freedom, and Allen by directing, aiding and abetting a Playboy agent to bill or charge TNR for improper expenses …"); Compl. Paras. 207 – 218 (Claim X alleging conversion based on Allen's actions). But TNR has failed to allege facts upon which Playboy could be found vicariously liable for the acts of an independent third party that was not subject to Playboy's control or authorized to act as an agent of Playboy.

According to the California Supreme Court, "[a]gency is the relationship which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." *Edwards v. Freeman*, 34 Cal. 2d 589, 592, 212 P.2d 883, 884 (1949). The California Supreme Court further explained that "[t]he principal must in some manner indicate that the agent is to act for him, and the agent must act or agree to act on his behalf and subject to his control" because "[i]n the absence of the essential characteristic of the right of control, there is no true agency and, therefore, no" vicarious liability. *Id.* That control is a decisive factor in alleging an agency relationship is well established. *See St. Paul Ins. Co. v. Indus. Underwriters Ins. Co.*, 214 Cal. App. 3d 117, 122, 262 Cal. Rptr. 490, 494 (1989) (dismissing claims based on agency relationship where there was no evidence that the defendant had the right to control the third–party tortfeasor). A failure to plead facts suggesting an agency relationship prevents a plaintiff from holding a defendant liable for the acts of an independent third party. *See Daniels v. Select Portfolio Servicing, Inc.*, 246 Cal. App. 4th 1150, 1170, 201 Cal. Rptr. 3d 390, 409 (2016) (dismissing claim of fraudulent inducement based on a third parties' representations because the plaintiffs "have not alleged the existence of an agency relationship between" the defendant and third party).

TNR does not allege that Allen was a Playboy employee when the Eighth Amendment was executed or otherwise subject to Playboy's control. *See generally* Compl. Paras. 45 55 (describing execution of Eighth Amendment). To the contrary, TNR admits that Allen was a contractor for TNR, and it was not until November 2019, when Playboy retained Allen as a consultant. *See* Compl. Paras. 60–63 (alleging that Playboy "planted the ever–growing seed of Allen conflict of interest" on or about November 2019). Like the defendant in *St. Paul Insurance*, Playboy cannot be liable as a principal for Allen's actions because Allen was not subject to Playboy's control and thus was not Playboy's agent. Absent any cognizable allegation that Playboy had a right to control Allen's conduct, Playboy cannot be held vicariously liable for his acts as a matter of law. Accordingly, Playboy intends to seek dismissal of any claim to the extent it seeks to hold Playboy liable for the actions of Allen, an independent third party.

### TNR's Claim For Fraudulent Inducement

TNR claims Playboy is liable for fraud and engaging in unfair business practices because it failed to explain the Eighth Amendment to TNR. *See* Compl. Paras. 154–157 (Claim IV alleging breach of implied covenant of fair dealing by fraudulent inducing execution of Eighth Amendment); Compl. Para. 162(f) (Claim V alleging fraudulent inducement is an unfair business practice); Compl. Paras. 202–06 (Claim IX alleging fraudulent inducement). But parties to an arms–length negotiation have no duty to explain the legal effects of contractual terms to the other party, and,

[4]

therefore, TNR has failed to state a claim for fraudulent inducement (even assuming *arguendo* Playboy could be held vicariously liable for Allen's conduct).

It is hornbook law that "[n]o law requires that parties dealing at arm's length have a duty to explain to each other the terms of a written contract." *Rowland v. PaineWebber Inc.*, 4 Cal. App. 4th 279, 286, 6 Cal. Rptr. 2d 20, 23 (1992); *see, e.g., Desert Outdoor Advert. v. Superior Court*, 196 Cal. App. 4th 866, 872–73, 127 Cal. Rptr. 3d 158, 163 (2011) ("A cardinal rule of contract law is that a party's failure to read a contract, or to carefully read a contract, before signing it is no defense to the contract's enforcement."); *see also id.* ("A necessary element of the defense of fraud in the execution is *reasonable* reliance," and "[g]enerally, it is *not reasonable* to fail to read a contract; this is true even if the plaintiff relied even if the plaintiff relied on the defendant's assertion that it was not necessary to read the contract.") (emphasis added).

In *Desert Outdoor Adventure. v. Superior Court*, 196 Cal. App. 4th 866, 872–73, 127 Cal. Rptr. 3d 158, 163 (2011), the plaintiffs sought to avoid the effect of an arbitration agreement entered into with their attorney, arguing that the attorney "had a duty to disclose and explain the arbitration provision in the new fee agreement and that the arbitration agreement was invalid because he failed to do so." Even though there was no dispute that the attorney owed fiduciary duties to the plaintiffs, the Court of Appeals held that a claim of fraud in the execution could not lie against the attorney where the plaintiffs were "knowledgeable businesspersons" whose duty to read "the readily discernable and clear" contract they entered precluded a claim against the attorney. *Id.* at 874.

Here, Playboy and TNR are sophisticated parties that engaged in arms–length negotiations. TNR, through its CEO Khun Amorn, is capable of making informed business decisions, and had every incentive to do so. Playboy did not discourage or prevent Khun Amorn from reading the Eighth Amendment, consulting counsel about the substance of the document, or proposing different terms. Simply stated, TNR alleges that Playboy did not offer TNR impartial, independent legal advice about the document its CEO signed. But nothing in the complaint or in California caselaw suggests Playboy was required to do.

Accordingly, Playboy intends to seek dismissal of these claims in light of TNR's failure to allege facts under which Playboy would be responsible for explaining the substance of the Eighth Amendment to TNR.

### TNR's Claims For Intentional And Negligent Interference With Prospective Economic Relations

TNR alleges Playboy interfered with prospective economic relationships because Playboy allegedly "failed to uphold the contractual duty of care." Compl. Para. 195; *see also* Compl. Paras. 169–201 (Claim VI, Claim VII, and Claim VIII alleging interference with TNR's relationship with Walgreens, Monarch, Freedom, Allen, Core–Mark, CVS, and a prospective Russian buyer). However, TNR has failed to state a cognizable claim for either intentional or negligent interference with prospective economic relations because it has not alleged that Playboy engaged in conduct that is independently wrongful of the acts supporting its claim for breach of contract.

[5]

To state a claim for tortious interference with prospective business relations, a plaintiff must allege: "(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant." *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1153, 131 Cal. Rptr. 2d 29, 63 P.3d 937 (2003). The pleading standard is met only if the plaintiff alleges that the "defendant's conduct" was "wrongful by some legal measure other than the fact of interference itself." *Id.*; *see also Della Penna v. Toyota Motor Sales, U.S.A.*, 11 Cal. 4th 376, 393, 45 Cal. Rptr. 2d 436, 447, 902 P.2d 740, 751 (1995) ("[A] plaintiff seeking to recover for an alleged interference with prospective contractual or economic relations must plead and prove as part of its case–in–chief that the defendant not only knowingly interfered with the plaintiff's expectancy, but engaged in conduct that was wrongful by some legal measure other than the fact of interference itself.")

A defendant's breach of their contractual obligations does not constitute an independent "wrongful act" that gives rise to tort liability. *See Workplace Techs. Research, Inc. v. Project Mgmt. Inst.*, No. 18cv1927 JM (MSB), 2019 U.S. Dist. LEXIS 136723, at *26 (S.D. Cal. Aug. 13, 2019) (dismissing claim for Negligent Interference because "[t]he alleged wrongdoing [was] simply [the plaintiff's] breach of contract claim" and a plaintiff "may not transmute its contract claim into a tort claim by alleging [the defendant] wrongfully breached the parties' contract."). Therefore, TNR cannot rely on its allegation that Playboy terminated the contract without cause to state a claim for Negligent Interference.

Furthermore, it is well–settled a plaintiff cannot rely on alleged violations of the franchise law and violations of California's statute prohibiting unfair business practices to state a cognizable claim for negligent interference. *See JRS Prods., Inc. v. Matsushita Elec. Corp. of Am.*, 115 Cal. App. 4th 168, 183, 8 Cal. Rptr. 3d 840, 852 (2004) (affirming summary judgment dismissing of Negligent Inference claim where the wrongful conduct provided the basis for contract, franchise, and unfair business practice claims). TNR has not pleaded facts suggesting that Playboy was engaged in independently "wrongful" acts. TNR alleges Playboy is liable under this claim because it failed to act with due care by failing to provide "contractual services" and by intruding on TNR's negotiations with Core–Mark, CVS and an undisclosed Russian buyer. Compl. Paras. 192–201. This cannot state a claim for Negligent Interference. *See JRS Prods.*, 115 Cal. App. 4th at 183. Similarly, TNR's reliance rely on the same conduct giving rise to Claim I, II, and V is misplaced. *See id.*

Accordingly, Playboy intends to seek dismissal of Claim VII, and Claim VIII because TNR has failed to allege that Playboy engaged in wrongful conduct that is separate from its conduct that gives rise to TNR's claims for breach of contract and thus these claims fail as a matter of law.

### TNR'S CLAIM FOR INTENTIONAL INTERFERENCE WITH CONTRACT

Under California law, "a contracting party cannot be held liable in tort for conspiracy to interfere with its own contract." *Asahi Kasei Pharma Corp. v. Actelion Ltd.* (2013) 222 Cal.App.4th 945, 961 (original italics.) Here, however, TNR alleges that Playboy interfered with TNR's contract with Walmart by terminating the PLA. (Complaint, Para. 174). TNR also alleges that Playboy

[6]

breached interfered when it breached its contract with TNR by working with Allen to charge expenses not authorized by TNR pursuant to its contractual relationship with Playboy. (Complaint, Para. 175-76). TNR also alleges that Playboy worked with Allen to sell wipes in breach of the PLA (though there was no breach), and that this interfered with TNR's relationship with Walmart. (Complaint, Para. 173).

Because TNR's allegations do not support a claim for interference with contract, Playboy will seek dismissal of Claim VI.

### TNR'S CLAIM FOR CONVERSION

For a plaintiff to prevail on a conversion claim, the plaintiff must have an immediate right to possession of property. *Plummer v. Day/Eisenberg, LLP* (2010) 184 Cal.App.4th 38, 45. The "mere contractual right of payment" without more, such as one who holds a property right under a secured lien, will not support a conversion claim. *Plummer*, 184 Cal.App.4th at 45. Money cannot be the subject of a cause of action for conversion unless there is a specific, identifiable sum involved. *PCO, Inc. v. Christiansen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro, LLP* (2007) 150 Cal. App. 4th 384, 395-96 ("[A]ctions for the conversion of money have not been permitted when the amount of money involved is not a definite sum.")

TNR alleges that Playboy had Allen submit expenses for various amounts that he was not entitled to receive. (Complaint, Para. 209-10). However, TNR's complaint avers to various disputed categories. It does not identify a specific, identifiable sum, even one that is not subject to a contractual dispute. Accordingly, Count X should be dismissed.

******************************************

Please let me know when you are available to meet in person to discuss these issues.

Very truly yours,

Marshall M. Searcy III


MMS:ED

cc:   Scott B. Kidman
      Gregory A. Fuoco
      Emiliano D. Delgado
07281-00001/13149542.1

[7]

# EXHIBIT C

**quinn emanuel** trial lawyers | los angeles

865 South Figueroa Street, 10th Floor, Los Angeles, California 90017-2543 | TEL (213) 443-3000 FAX (213) 443-3100

WRITER'S DIRECT DIAL NO.
**(213) 443-3152**

WRITER'S EMAIL ADDRESS
marshallsearcy@quinnemanuel.com

March 24, 2022

**VIA E-MAIL**
**CMCHANG@DUANEMORRIS.COM**

Cyndie M. Chang
Duane Morris LLP
865 South Figueroa Street, Suite 3100
Los Angeles, CA 90017-5450

Re:  Request to Meet and Confer re: *TNR v. Playboy Enterprises International, Inc., et al.,*
2:21-cv-09749

Dear Cyndie:

I write pursuant to Local Rule 7-3 and Section 5(b) of Judge Walter's Standing Order to discuss
the substantive basis of Playboy's forthcoming motion to dismiss TNR's first amended complaint
("FAC"). Playboy intends to move for dismissal of the FAC for the reasons set forth below.
Most of TNR's causes of action in the FAC still contain clear deficiencies, and thus fail as a matter
of law or fail to state a claim upon which relief can be granted. Given that this is TNR's second
chance to adequately plead its claims, it is clear that TNR cannot plead claims upon which relief
can be granted. Please let me know when you are available to meet in person next week to discuss
these issues.[1]

*TNR's Franchise Claims*

In its FAC, TNR still seeks to hold Playboy liable for violations of California Franchise Relations
Act and the Franchise Investment Law. *See* FAC ¶¶ 126-45. Specifically, TNR seeks to hold

---

[1]  The issues discussed below are not an exhaustive recitation of Playboy's grounds for dismissal
and nothing in this letter shall be construed as an admission of the allegations made in the FAC
and shall not operate as a waiver or disclaimer of any of Playboy's rights, powers, and defenses
under Rule 12 of the Federal Rules of Civil Procedure or otherwise available to Playboy under the
law.

quinn emanuel urquhart & sullivan, llp

ATLANTA | AUSTIN | BOSTON | BRUSSELS | CHICAGO | HAMBURG | HONG KONG | HOUSTON | LONDON | LOS ANGELES | MANNHEIM | MIAMI |
07281-00006/13349928.1 MUNICH | NEUILLY-LA DEFENSE | NEW YORK | PARIS | PERTH | SALT LAKE CITY | SAN FRANCISCO | SEATTLE | SHANGHAI | SILICON VALLEY |
STUTTGART | SYDNEY | TOKYO | WASHINGTON, DC | ZURICH

Playboy liable for (i) wrongful termination of a franchise and (ii) failing to register as a franchise. *Id*. Playboy intends to seek dismissal of these claims because TNR has failed to plead the statutory elements of a franchise, and based on the governing agreement between the parties, TNR cannot do so.

California law defines a franchise as "a contract … between two or more persons by which: (1) a franchisee is granted the right to engage in the business of offering, selling or distributing goods … ***under a marketing plan or system prescribed in substantial part by a franchisor*** …." Cal. Bus. & Prof. Code § 20001 (West) (emphasis added).

TNR's FAC still does not contain factual allegations that support finding a franchise relationship between Playboy and TNR. To the contrary, the FAC alleges (because it must) that TNR was required to "submit its advertising/promotional and marketing plan for Playboy's approval *on a yearly basis* . . . ." FAC ¶ 28(d). In other words, TNR developed the marketing plan. Playboy's contractually defined role in that process was simply to say yes or no to what TNR had developed, *once a year*. Furthermore, the allegations in the FAC regarding product approvals, product quality, and territory restrictions indicate a licensor/licensee relationship. TNR cannot, after the fact, seek to transform a run-of-the-mill licensing relationship into a franchise relationship for litigation purposes. Accordingly, Playboy still intends to seek dismissal of both the first and second causes of action.

### *TNR's Claims for Breach of Contract and Implied Covenant of Good Faith and Fair Dealing*

The FAC reasserts TNR's claims for breach of contract and breach of the implied covenant of good faith and fair dealing against Playboy. *See* FAC ¶¶ 146-56. TNR has failed to maintain its burden to plead facts upon which a claim for relief can be granted. TNR still relies on conclusory allegations that Playboy acted "unreasonably" and "misused its authority," the exact kind of "labels and conclusions . . . [that] will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).; *see also Gallagher v. Capella Education Company*, No. 21-35188, 2021 WL 6067015, at *1 (9th Cir. Dec. 20, 2021) ("[Plaintiff] makes the *conclusory assertion* that [defendant]'s conduct involved "'bad faith, misconduct, and arbitrary action.'") (emphasis added).

Furthermore, TNR has done nothing more than allege that Playboy took actions it was contractually allowed to take. For example, TNR complains that Playboy did not provide product approvals or marketing plan approvals, exercised its audit rights under the PLA, and terminated the PLA based on the findings of the audit. *See* FAC ¶¶ 146-50. These allegations simply describe Playboy's bargained for rights under the PLA. No matter the "labels and conclusions"[2] TNR uses to describe Playboy's actions, it cannot plead around the fact that Playboy acted in accordance with the PLA. Accordingly, Playboy intends to seek dismissal of TNR's third and fourth causes of action.

### *TNR's Claim Under California's Unfair Competition Law*

---

[2]   *Twombly*, 550 U.S. at 555.

TNR alleges that Playboy violated California's Unfair Competition Law ("UCL"). *See* FAC ¶¶ 157-65. However, because TNR has pled and claims it is owed damages for Playboy's allegedly wrongful conduct, TNR's unfair competition claims are foreclosed as a matter of law. TNR cannot seek both remedies at law and of an equitable nature for the same allegedly wrongful conduct. *See Clark v. American Honda Motor Co., Inc.*, 528 F. Supp. 3d 1108, 1121-23 (C.D. Cal. 2021). Accordingly, Playboy intends to seek dismissal of TNR's fifth cause of action.

### TNR's Claims for Tortious Interference with Actual and Prospective Contractual/Economic Relations

TNR realleges that Playboy interfered with both actual and prospective economic relations in its FAC. *See* FAC ¶¶ 167-97. These claims are barred as a matter of law for several reasons. First, under California law, "a contracting party cannot be held liable in tort for conspiracy to interfere with its own contract." *Asahi Kasei Pharma Corp. v. Actelion Ltd.* 222 Cal. App. 4th 945, 961 (2013). By extension, Playboy cannot be held liable in tort for disruption of contracts it had significant economic interest in and that, by necessity, contemplated Playboy's performance under the PLA. *See PM Group, Inc. v. Stewart*, 154 Cal. App. 4th 55, 65 (2007); *See also United Nat. Maintenance, Inc. v. San Diego Convention Center, Inc.*, 766 F.3d 1002, 1008 (9th Cir. 2014) ("by extension, a contracting party [cannot] be held liable for interfering with the performance of subcontracts if that claim hinge[s] on the defendant's failure to perform on the original contract.").

Second, a defendant's conduct must be "wrongful by some legal measure other than the fact of interference itself." *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1153 (2003); *see also Della Penna v. Toyota Motor Sales, U.S.A.*, 11 Cal. 4th 376, 393 (1995) ("[A] plaintiff seeking to recover for an alleged interference with prospective contractual or economic relations must plead and prove as part of its case–in–chief that the defendant not only knowingly interfered with the plaintiff's expectancy, but engaged in conduct that was wrongful by some legal measure other than the fact of interference itself.").

A defendant's breach of their contractual obligations does not constitute an independent "wrongful act" that gives rise to tort liability. *See Workplace Techs. Research, Inc. v. Project Mgmt. Inst.*, No. 18cv1927 JM (MSB), 2019 U.S. Dist. LEXIS 136723, at *26 (S.D. Cal. Aug. 13, 2019) (dismissing claim for Negligent Interference because "[t]he alleged wrongdoing [was] simply [the plaintiff's] breach of contract claim" and a plaintiff "may not transmute its contract claim into a tort claim by alleging [the defendant] wrongfully breached the parties' contract."). Furthermore, it is well settled that a plaintiff cannot rely on alleged violations of the franchise law and violations of California's statute prohibiting unfair business practices to state a cognizable claim for negligent interference. *See JRS Prods., Inc. v. Matsushita Elec. Corp. of Am.*, 115 Cal. App. 4th 168, 183 (2004) (affirming summary judgment dismissing of Negligent Inference claim where the wrongful conduct provided the basis for contract, franchise, and unfair business practice claims).

Accordingly, Playboy intends to seek dismissal of TNR's sixth, seventh, and eighth causes of action for tortious interference.

### TNR's Claim For Fraudulent Inducement

TNR again claims Playboy is liable for fraud because it failed to explain the Eighth Amendment to the PLA to TNR. *See* FAC ¶¶ 199-203. However, TNR's FAC suffers from the same defect as the original complaint. Parties to an arms–length negotiation have no duty to explain the legal effects of contractual terms to the other party and, therefore, TNR has failed to state a claim for fraudulent inducement.

It is hornbook law that "[n]o law requires that parties dealing at arm's length have a duty to explain to each other the terms of a written contract." *Rowland v. PaineWebber Inc.*, 4 Cal. App. 4th 279, 286 (1992), *disagreed with on other grounds in Rosenthal v. Great Western Fin. Securities Corp.*, 14 Cal. 4th 394, 415 (1996). This rule extends even to parties who owe fiduciary duties to their contracting counterparty. In *Desert Outdoor Adventure*, 196 Cal. App. 4th 866 (2011) for example, the plaintiffs sought to avoid the effect of an arbitration agreement with their attorney, arguing the attorney had a duty to disclose and explain the arbitration provision. *See id.* at 872-875. The court rejected this argument, in part precisely because the plaintiffs were "knowledgeable business persons . . . ." *Id.* at 874.

Here, Playboy and TNR are sophisticated parties that engaged in arms–length negotiations. TNR, through its CEO Khun Amorn, is capable of making informed business decisions, and had every incentive to do so. Playboy did not discourage or prevent Khun Amorn from reading the Eighth Amendment, consulting counsel about the substance of the document, or proposing different terms. Simply stated, TNR alleges that Playboy did not offer TNR impartial, independent legal advice about the document its CEO signed. But nothing in the complaint or in California caselaw suggests Playboy was required to do.

Accordingly, Playboy intends to seek dismissal of these claims in light of TNR's failure to allege facts under which Playboy would be responsible for explaining the substance of the Eighth Amendment to TNR.

**********************************

Please let me know when you are available to meet in person to discuss these issues.

Very truly yours,

Marshall M. Searey III

MMS

07281-00006/13249928.1

**CERTIFICATE OF SERVICE**

I hereby certify that on this 21st day of April, 2022, I electronically filed the

**DECLARATION OF MARSHALL M. SEARCY CONCERNING LOCAL**

**RULE 7-3 CONFERENCE**

using the CM/ECF system which will send notification of such to all parties. I also

certify the document was served via U.S. Mail on anyone unable to accept electronic

filing as indicated on the Notice of Electronic Filing.  Parties may access the

document through the CM/ECF system.


_____/s/ Andrea Llamas_____

Andrea Llamas