1 | QUINN EMANUEL URQUHART & SULLIVAN, LLP
Marshall M. Searcy III (Bar No. 169269)
2 | marshallsearcy@quinnemanuel.com
Kristen Bird (Bar No. 192863)
3 | kristenbird@quinnemanuel.com
865 South Figueroa Street, 10th Floor
4 | Los Angeles, California 90017–2543
Telephone: (213) 443–3000
5 | Facsimile: (213) 443–3100

6 | Attorneys for Defendants,
Playboy Enterprises International, Inc.,
7 | and Products Licensing LLC

8 | UNITED STATES DISTRICT COURT

9 | CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

10 |

11 | THAI NIPPON RUBBER INDUSTRY PUBLIC LIMITED COMPANY,

12 | Plaintiff,

13 | vs.

14 | PLAYBOY ENTERPRISES INTERNATIONAL, INC.,
15 | PRODUCTS LICENSING, LLC, and NICHOLAI ALLEN,
16 |

17 | Defendants.

18 |

19 |

20 |

21 |

22 |

Case No. 2:21–cv–09749–JFW

Hon. John F. Walter

**DEFENDANTS PLAYBOY ENTERPRISES INTERNATIONAL, INC., and PRODUCTS LICENSING LLC's MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PARTIAL MOTION TO DISMISS**

Date: May 23, 2022
Time: 1:30 p.m.
Location: 7A

Complaint Filed: March 16, 2022

Pre-Trial Conference Date: September 1, 2023

Trial Date: September 26, 2023

# **TABLE OF CONTENTS**

**Page**

I. PRELIMINARY STATEMENT ................................................................. 1

II. RELEVANT BACKGROUND AND ALLEGATIONS ......................... 2

    A.   Playboy, Its Licensing Business, and the Product License Agreement ................................................................................. 2

    B.   TNR's Allegations ........................................................................ 4

III. LEGAL STANDARDS ........................................................................ 6

IV. ARGUMENT ...................................................................................... 7

    A.   As a Matter of Law, the PLA Does Not Create a Franchise Relationship Between Playboy and TNR, Nor was the Relationship Within the Jurisdictional Reach of the California Franchise Laws ............................................................................ 7

         1.   *Under the PLA, Playboy Had a Right of Approval, And Did Not Substantially Control TNR's Marketing Plan* ...................... 7

         2.   *There Was No Substantial Association Between TNR's Condom Business and Playboy's Content Business* ................... 11

         3.   *To the Extent TNR Could Show That it Was a Franchisee of Playboy, the Relationship was Outside the Jurisdiction of California's Franchise Laws* ............................................... 12

    B.   TNR's Tortious Interference Claims Are Barred as a Matter of Law .......................................................................................... 15

         1.   *The Economic Loss Rule Bars TNR's Tortious Interference Claims* ................................................................................... 15

         2.   *Playboy Cannot Be Held Liable for Intentionally Interfering With The Contracts At Issue Here* ......................... 18

         3.   *TNR's Claims for Intentional and Negligent Interference with Prospective Economic Relations Fail as a Matter of Law* ........................................................................................ 19

    C.   TNR Fails to State a Cognizable Claim for Fraudulent Inducement ................................................................................ 20

    D.   TNR's Conversion Claim Fails as a Matter of Law .................... 23

    E.   TNR is Barred from Pursuing its Unfair Competition Claim ...... 24

V. CONCLUSION ................................................................................... 25

1

## <u>**TABLE OF AUTHORITIES**</u>

2

<u>**Page**</u>

<u>**Cases**</u>

3

4
*Aas v. Superior Court*,
   24 Cal. 4th 627 (2000) ........................................................................16

5
*Alfaro v. Community Hous. Improvement Sys. & Planning Ass'n, Inc.*,
   171 Cal. App. 4th 1356 (2007) ..........................................................21

6
*Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*,
   7 Cal. 4th 503 (1994) ........................................................................18

7
*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ...............................................................6, 12, 22

8

9
*Baggett v. Hewlett–Packard Co.*,
   No. SACV 07–0667 AG (RNBx), 2009 WL 3178066
   (C.D. Cal. Sep. 29, 2009) ..................................................................23

10
*Barcamerica Int'l USA Trust v. Tyfield Imps., Inc.*,
   289 F.3d 589 (9th Cir. 2002) ............................................................10

11

12
*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007) ............................................................................6

13
*Boat & Motor Mart v. Sea Ray Boats, Inc.*,
   825 F.2d 1285 (9th Cir. 1987) ........................................................8, 9

14
*Cel–Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*,
   20 Cal. 4th 163 (1999) ......................................................................25

15
*Cusano v. Klein*,
   280 F. Supp. 2d 1035 (C.D. Cal. 2003) ............................................23

16

17
*Dawn Donut Co. v. Hart's Food Stores, Inc.*,
   267 F.2d 358 (2d Cir. 1959) ..............................................................10

18
*Dep't of Parks and Recreation for the State of California v.*
   *Bazaar Del Mundo, Inc.*,
   448 F.3d 1118 (9th Cir. 2006) ..........................................................10

19

20
*Desert Outdoor Advert. v. Superior Court*,
   196 Cal. App. 4th 866 (2011) ......................................................21, 22

21
*Drink Tank Ventures LLC v. Real Soda in Real Bottles, Ltd.*,
   71 Cal. App. 5th 528 (2021) ..............................................................20

22
*Erlich v. Menezes*,
   21 Cal. 4th 543 (1999) ................................................................17, 18

23
*Fox v. Ehrmantraut*,
   615 P.2d 1383 (Cal. 1980) ................................................................14

24

25
*Gabana Gulf Distribution, Ltd. v. GAP Intern. Sales, Inc.*,
   No. C 06–02584–CRB, 2008 WL 111223 (N.D. Cal. Jan. 9, 2008) ...............8, 12

26
*Godecke v. Kinetic Concepts, Inc.*,
   937 F.3d 1201 (9th Cir. 2019) ............................................................6

27
*Gorenstein Enterprises, Inc. v. Quality Care–USA, Inc.*,
   874 F.2d 431 (7th Cir. 1989) ............................................................10

28

-ii-

*Haigler v. Donnelly*,
  18 Cal. 2d 674 (1941) ................................................................................24

*Hamilton San Diego Apartments v. RBC Capital Markets Corp.*,
  No. 3:12–CV–2259–JM(BLM), 2013 WL 12090313
  (S.D. Cal. Mar. 5, 2013) ...........................................................................18

*Hahn v. Mirda*,
  147 Cal. App. 4th 740 (2007) ...................................................................21

*Herron v. Best Buy Co. Inc.*,
  924 F. Supp. 2d 1161 (E.D. Cal. 2013) ....................................................21

*Hinesley v. Oakshade Town Ctr.*,
  135 Cal. App. 4th 289 (2005) ...................................................................21

*Hollywood Athletic Club Licensing Corp. v. GHAC–CityWalk*,
  938 F. Supp. 612 (C.D. Cal. 1996) ...........................................................11

*In re German Auto. Mfrs. Antitrust Litig.*,
  497 F. Supp. 3d 745 (N.D. Cal. 2020) ........................................................6

*Jack in the Box Inc. v. San–Tex Restaurants, Inc.*,
  No. SA–20–cv–00328–XR, 2021 WL 148058
  (W.D. Tex. Jan. 14, 2021) .........................................................................14

*JRS Products, Inc. v. Matsushita Electric Corp. of America*,
  115 Cal. App. 4th 168 (2004) ..............................................................15, 17

*Kim v. Servosnax, Inc.*,
  10 Cal. App. 4th 1346 (1992) ...................................................................11

*Korea Supply Co. v. Lockheed Martin Corp.*,
  29 Cal. 4th 1134 (2003) ............................................................................25

*Leadsinger, Inc. v. BMG Music Publ'g*,
  512 F.3d 522 (9th Cir. 2008) ......................................................................7

*Lennar Mare Island, LLC v. Steadfast Insurance Company*,
  No. 2:12–cv–02182–KJM–KJN, 2016 WL 829210
  (E.D. Cal. Mar. 3, 2016) ...........................................................................17

*Linear Technology Corp. v. Applied Materials, Inc.*,
  152 Cal. App. 4th 115 (2007) ...................................................................21

*Lingsch v. Savage*,
  213 Cal. App. 2d 729 (1963) ....................................................................21

*McColgan v. Mutual of Omaha Ins. Co.*,
  4 F. Supp. 3d 1228 (E.D. Cal. 2014) ........................................................20

*McKell v. Washington Mut., Inc.*,
  142 Cal. App. 4th 1457 (2006) ............................................................23, 24

*Mendoza v. Continental Sales Co.*,
  58 Cal. App. 4th 1395 (2006) ...................................................................24

*Munning v. Gap, Inc.*,
  238 F. Supp. 3d 1195 (N.D. Cal. 2017) ....................................................24

*National Medical Transportation Network v. Deloitte & Touche*,
  62 Cal. App. 4th 412 (1998) .....................................................................19

*Neubronner v. Milken*,
  6 F.3d 666 (9th Cir. 1993) ..........................................................................6

-iii-

*Pelayo v. Nestle USA, Inc.*,
  989 F. Supp. 2d 973 (C.D. Cal. 2013) .......................................................... 6

*People v. Kline*,
  110 Cal. App. 3d 587 (1980) ....................................................................... 8

*PM Group, Inc. v. Stewart*,
  154 Cal. App. 4th 55 (2007) ...................................................................... 18

*Premier Wine and Spirits of South Dakota Inc. v. E. & J. Gallo Winery*,
  644 F. Supp. 1431 (E.D. Cal.) .................................................................. 13

*Reyes v. Atlantic Richfield Co.*,
  12 F.3d 1464 (9th Cir. 1993) .................................................................... 14

*Robinson Helicopter Co. v. Dana Corp.*,
  34 Cal. 4th 979 (2004) ................................................................. 15, 17, 18

*Rosenthal v. Great Western Fin. Securities Corp.*,
  14 Cal. 4th 394 (1996) ............................................................................. 21

*Rowland v. PaineWebber Inc.*,
  4 Cal. App. 4th 279 (1992) ...................................................................... 21

*Sandigo v. Ocwen Loan Servicing, LLC*,
  No. 17–cv–02727–BLF, 2019 WL 2233051 (N.D. Cal. May 23, 2019) ............ 24

*Schreiber Distributing Co. v. Serv–Well Furniture Co., Inc.*,
  806 F.2d 1393 (9th Cir. 1986) .................................................................... 7

*Sonner v. Premier Nutrition Corp.*,
  971 F.3d 834 (9th Cir. 2020) ................................................................... 24

*State Ready Mix, Inc. v. Moffatt & Nichol*,
  232 Cal. App. 4th 1227 (2015) ........................................................... 15, 16

*Stocco v. Gemological Institute of America, Inc.*,
  975 F. Supp. 2d 1170 (S.D. Cal. 2013) ....................................................... 13

*Stop Youth Addiction, Inc. v. Lucky Stores, Inc.*,
  17 Cal. 4th 553 (1998) ............................................................................. 25

*Thueson v. U–Haul Intern., Inc.*,
  144 Cal. App. 4th 664 (2006) ..................................................................... 8

*Town of Alma v. AZCO Const., Inc.*,
  10 P.3d 1256 (2000) ................................................................................ 15

*Voris v. Lampert*,
  7 Cal. 5th 1141 (2019) ........................................................................ 23, 24

*Workplace Techs. Research, Inc. v. Project Mgmt. Inst.*,
  No. 18–cv–1927 JM(MSB), 2019 WL 3804019
  (S.D. Cal. Aug. 13, 2019) ........................................................................ 20

## **Statutory Authorities**

Cal. Bus. & Prof. Code § 20001 ................................................................... 7

Cal. Corp. Code § 31005 ............................................................................. 7

CFIL § 31105 ..................................................................................... 7, 8, 13

CFIL § 31102 ........................................................................................... 14

CFRA § 20001 ........................................................................................... 8

CFRA § 20009 ........................................................................................................8

CFRA § 20015 ................................................................................................. 7, 13

**Rules and Regulations**

Fed. R. Civ. P. 9(b) ............................................................................................... 6

**Additional Authorities**

Hon. Kimberly A. Gaab & Sara Church Reese, *Cal. Prac. Guide: Civ. Pro. Trial Claims and Def.*, Ch. 12(II)–B, ¶ 12:116 (The Rutter Group) ....................23

California Department of Financial Protection & Innovation, *Release 3–F: When Does an Agreement Constitute a "Franchise"* (June 22, 1994) .................................................................................. 7, 9, 10, 11

Margaret Rhodes, *Playboy's Logo is What Matters—It Earns More Than Nudes Do*, Wired (Oct. 13, 2015, 6:35 PM), *https://www.wired.com/2015/10/playboys–logo–is–what–mattersit–earns–more–than–nudes–do/*.................................................................................. 3

Restatement (Third) of Torts: Liability for Economic Harms § 3 ...........................15

Vincent R. Johnson, *The Boundary-Line Function of the Economic Loss Rule*, 66 Wash. & Lee L. Rev. 523, 534-35 (2009).................................................15

## **MEMORANDUM OF POINTS AND AUTHORITIES**

## **I.      PRELIMINARY STATEMENT**

Defendants   Playboy   Enterprises   International, Inc.,   and   Products Licensing LLC ("Playboy") own valuable trademarks, including the iconic Playboy Rabbit Head Design and the Playboy name. Plaintiff Thai Nippon Rubber Industry Public Limited Company ("TNR") was, for a time, Playboy's exclusive licensee with the right to manufacture, advertise, distribute, and sell condoms and lubricants bearing these trademarks. TNR did not live up to its obligations as licensee, and after an independent audit revealed numerous breaches by TNR, Playboy terminated the license.

In retaliation for that termination, TNR brought the present suit, asserting a series of claims that seek to transform a contract dispute into a nine–figure, "bet the company" lawsuit. Even giving TNR's amended complaint every reasonable inference, however, TNR's attempts at over–pleading its case should be rejected.

***First***, TNR has failed adequately to plead the statutory elements of a franchise and, based on the governing agreement between the parties, it cannot do so. Moreover, the jurisdictional reach of California's franchise laws is limited and TNR cannot overcome those jurisdictional limits. TNR's franchise–related claims (causes of action one and two) should thus be dismissed with prejudice.

***Second***, TNR's tortious interference claims are barred as a matter of law on several grounds. TNR alleges that Playboy's failure to honor its contractual obligations injured TNR's relationships with third parties who were purchasing Playboy–branded products. But in so doing, TNR seeks to hold Playboy liable in tort for the same conduct giving rise to its breach of contract and breach of the implied covenant of good faith and fair dealing claims. The economic–loss rule and the rule that a party cannot interfere with its own contracts bar these derivative tort claims. Further, Playboy's alleged breach of the licensing agreement does not constitute an "independent wrong," which is necessary for TNR to maintain its intentional and

negligent interference with prospective economic relations claims. Thus, TNR's tortious interference claims (causes of action six, seven, and eight) should be dismissed with prejudice.

*Third*, TNR has not, and cannot, sufficiently plead a cause of action for fraudulent inducement to contract. There is no duty for sophisticated parties dealing at arm's length to explain the terms of a contract to each other. Yet, TNR's theory would require just that. Moreover, TNR's allegations more readily support the conclusion that Playboy acted in good faith rather than with fraudulent intent. Thus, TNR's fraudulent inducement claim (cause of action nine) should be dismissed with prejudice.

*Fourth*, TNR's conversion claim against Playboy fails as a matter of law. TNR's conversion claim—which is based on allegations that Playboy received funds that it was not supposed to receive under the parties' contract—is barred by the economic–loss rule. Moreover, except in rare circumstances not alleged here, money is not usually the subject of a cognizable conversion claim under California law. Thus, TNR's conversion claim (cause of action ten) should be dismissed with prejudice.

*Finally*, TNR seeks an equitable remedy through its Section 17200 Unfair Competition Law ("UCL") claim, which is barred as a matter of law. A plaintiff with adequate remedies at law cannot seek equitable disgorgement under the UCL. Furthermore, TNR cannot use the UCL to circumvent other substantive rules of law that bar its other claims. Thus, TNR's UCL claim (cause of action five) should be dismissed with prejudice.

## II.   RELEVANT BACKGROUND AND ALLEGATIONS

### A.   Playboy, Its Licensing Business, and the Product License Agreement

Founded in 1953, Playboy has been a globally recognized brand for several decades. Some of its most valuable assets are its intellectual property, including the Rabbit Head Design logo and the Playboy name, at issue in this lawsuit. These trademarks are two of the most recognizable in the world. As Wired Magazine put it,

"[i]t's safe to say the bunny has achieved design icon status."[1] For years, Playboy has licensed its valuable trademarks for use on various consumer products.

Playboy has successfully licensed its marks in the sexual wellness space in recent years. Executed in 2010, the Product License Agreement ("PLA") granted TNR's predecessor–in–interest, United Medical Devices ("UMD"), a license to use the Playboy Rabbit Head Design and name on sexual wellness products such as condoms and lubricants. This relationship was "overseen by UMD's senior vice–president," Nicholai Allen ("Allen"). *See* Pl.'s First Am. Compl. (docket no. 26) ("FAC") ¶ 17.[2] With Playboy's consent, TNR and UMD executed a Sale and Purchase Agreement ("SPA") in 2018, whereby UMD assigned its rights and obligations under the PLA to TNR. FAC ¶ 19.[3] Subsequently, all three parties executed a Novation Agreement whereby the parties agreed to novate the PLA, replacing UMD with TNR as the licensee. *See id.* ¶ 23.

Like any standard exclusive licensing agreement, the PLA imposed a series of obligations on the licensee. For instance, the PLA required TNR, as licensee, to make certain royalty payments, to receive written approvals from Playboy at various stages of development, marketing, and sales for all products, make certain advertising and marketing expenditures, submit a marketing plan on a yearly basis for Playboy's approval, affix official holograms to products sold outside the United States, seek pre–

---

[1]  Margaret Rhodes, *Playboy's Logo is What Matters—It Earns More Than Nudes Do*, Wired (Oct. 13, 2015, 6:35 PM), https://www.wired.com/2015/10/playboys–logo–is–what–mattersit–earns–more–than–nudes–do/.

[2]  Allen is also named as a defendant in the FAC.

[3]  The SPA also provided that UMD would "pay Allen for one (1) year from the execution of the agreement to assist TNR's efforts to assume the responsibilities assigned to it and ensure a smooth transition of the PLA[.]" FAC ¶ 21. TNR further alleges that it hired Allen to be its "global sales consultant for the Products[.]" FAC ¶ 33.

approval of any sub–contractor or sub–licensee, allow Playboy to conduct up to two audits a year, and make minimum net sales each year, among other obligations. *See id.* ¶¶ 27–28, Ex. 1.

Eventually, Playboy began to suspect that TNR might not be in compliance with the PLA (and its subsequent amendments). Thus, Playboy engaged Credence Global Consulting Limited ("CGCL") to conduct an audit of TNR. *See id.* ¶ 99. The audit found that TNR had committed numerous breaches of the PLA, including failures to obtain product approvals and late payments on royalties, totaling $8,622,713.00 in damages to Playboy. *See id.* ¶ 100. Many of the audit findings, including TNR's failure to obtain product approvals, constituted "incurable default[s]" under the PLA and entitled Playboy to terminate the license immediately. *See id.*, Ex. 1, at ¶ 2.i.(vi). Consequently, Playboy terminated TNR's license in November 2021. *See* FAC ¶ 107.

**B.    TNR's Allegations**

Rather than accepting responsibility for its errors and moving on, TNR filed this lawsuit, alleging a secretive plot to undermine and remove TNR as licensee and seeking extraordinary award of $100,000,000 in damages. As amended, TNR's complaint asserts that Playboy violated California franchise laws, breached the PLA, violated California's Unfair Competition Law, tortiously interfered with TNR's business, fraudulently induced TNR to agree to the eighth amendment to the PLA, and tortiously converted TNR's property.[4]

TNR alleges (in spite of the fact that the governing contract was called the Product *License* Agreement) that the PLA actually "created a franchisee/franchisor relationship." *Id.* ¶ 29. As factual support for this contention, TNR relies on the licensing control procedures alleged at ¶¶ 27–28 of its amended complaint, discussed above. It does not supply any other facts to support this assertion.

---

[4]   The FAC also alleges that Defendant Allen breached his fiduciary duties to TNR.

From there, TNR alleges that Playboy began a months–long campaign to "systematically undermine[] TNR's rights under the PLA." *Id.* at 13. The first step in this alleged scheme was to "induce TNR to enter the Eighth Amendment." *Id.* ¶ 44. This amendment clarified the definition of "Products" under the PLA to exclude CBD–based products. TNR alleges that on July 8, 2019, Dr. Reena Patel ("Patel"), Playboy's Chief Operating Officer, emailed Allen stating, "*To your own point* in a previous email . . . you have stated that THC/CBD and products derived from [c]annabis plants are not within the current scope of TNR's rights . . ." and the "[r]eality is that THC/CBD are not part of their grant (*per your own note*) and would be subject to our approval and grant." *Id.* ¶¶ 46–47 (emphasis added). TNR alleges that this amounted to knowing misrepresentations *to TNR* about the original scope of the PLA because "Playboy . . . knew that any false information it conveyed or failed to disclose to Allen . . . would be communicated to TNR through Allen." *Id.* ¶¶ 44–45. TNR alleges that Playboy "manipulat[ed] Allen to obtain TNR's CEO['s] signature on the Eighth Amendment . . . under false pretenses." *Id.*

TNR then alleges that Playboy "poached" Allen by offering and ultimately agreeing with him to be a consultant on Playboy's behalf for the manufacture and sale of a wipes product. *See id.* ¶¶ 55–69. TNR alleges Playboy used this arrangement in part to interfere with TNR's relationship with retailers. TNR alleges that Playboy had Allen pitch the wipes product along with TNR's products to retailers like Walmart, Walgreens, and CVS. *See id.* ¶¶ 70–81. TNR further alleges that Playboy and Allen did so under TNR's supplier accounts and "using TNR's shelf space." *Id.* ¶ 70.

Playboy's next alleged step in the scheme was to "block[] TNR's attempts to seek new opportunities." *Id.* at 22. Playboy allegedly "instruct[ed] Allen not to pursue" a prospective relationship for TNR with a vendor called Core–Mark. *Id.* ¶ 83. Playboy also allegedly interfered with other prospective relationships by withholding product and marketing plan approvals. *See id.* ¶¶ 84–86.

Lastly, TNR alleges that the CGCL audit, which uncovered millions of dollars

in breaches by TNR, was pretextual and the last step necessary for Playboy to complete its alleged scheme. *See id*. ¶¶ 92–106. As it must, TNR acknowledges that Playboy terminated the PLA on the basis of this audit. *See id*. ¶ 108.

### III.   LEGAL STANDARDS

"A rule 12(b)(6) dismissal 'can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory.'" *Godecke v. Kinetic Concepts, Inc.*, 937 F.3d 1201, 1208 (9th Cir. 2019). "Whether a complaint contains sufficient factual allegations depends on whether it pleads enough facts to 'state a claim to relief that is plausible on its face.'" *In re German Auto. Mfrs. Antitrust Litig.*, 497 F. Supp. 3d 745, 753 (N.D. Cal. 2020) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligations to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "[F]actual allegations must be enough to raise a right to relief above the speculative level." *Id*.[5] Dismissal is warranted where there is an "obvious alternative explanation" whereby a defendant would not be found liable. *Iqbal*, 556 U.S. at 682.

"Determining whether a complaint states a plausible claim for relief" is "a context–specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id*. at 679. In doing so, "a court may consider material which is properly submitted as part of the complaint and matters which may be judicially noticed[.]" *Pelayo v. Nestle USA, Inc.*, 989 F. Supp. 2d 273 (C.D. Cal. 2013) (Walter, J.).

---

[5]  In addition, Rule 9(b) requires a plaintiff to plead fraud claims "with particularity." Fed. R. Civ. Pro. 9(b). "[T]he complaint must specify such facts as the times, dates, places, and benefits received, and other details of the alleged fraudulent activity." *Neubronner v. Milken*, 6 F.3d 666, 672 (9th Cir. 1993).

"The decision whether to grant leave to amend" is "within the discretion of the district court[.]" *Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 532 (9th Cir. 2008). Leave to amend is properly denied if the court determines that "allegation[s] of other facts consistent with the challenged pleading could not possibly cure the deficiency." *Schreiber Distributing Co. v. Serv–Well Furniture Co., Inc.*, 806 F.2d 1393, 1401 (9th Cir. 1986).

## IV.   <u>ARGUMENT</u>

**A.**   <u>**As a Matter of Law, the PLA Does Not Create a Franchise Relationship Between Playboy and TNR, Nor was the Relationship Within the Jurisdictional Reach of the California Franchise Laws**</u>

TNR has asserted causes of action for (i) wrongful termination of a franchise and (ii) failure to register as a franchise against Playboy. *See* FAC ¶¶ 126–45. TNR's allegations, along with the PLA that governed the parties' relationship, however, confirm that TNR cannot establish a franchise relationship. *See* Cal. Corp. Code § 31005 (California Franchise Investment Law) ("CFIL"); Cal. Bus. & Prof. Code § 20001 (California Franchise Relations Act) ("CFRA"); *see also* California Department of Financial Protection & Innovation, *Release 3–F: When does an Agreement Constitute a "Franchise"* (June 22, 1994) ("Release"). Moreover, the relationship between Playboy and TNR never came within the jurisdictional reach of the CFIL or the CFRA. *See* CFIL § 31105; CFRA § 20015. Thus, TNR's franchise claims fail as a matter of law and should be dismissed with prejudice.

### 1.   *Under the PLA, Playboy Had a Right of Approval, And Did Not Substantially Control TNR's Marketing Plan*

The CFIL and the CFRA contain the same operative definition of a franchise relationship. A "'franchise' means a contract between two or more persons by which: (a) a franchisee is granted the right to engage in the business of offering, selling or distributing goods or services under a marketing plan or system prescribed in substantial part by a franchisor; and (b) the operation of the franchisee's business

pursuant to that plan or system is substantially associated with the franchisor's trademark, service mark, trade name, logotype, advertising, or other commercial symbol designating the franchisor or its affiliate; and (c) the franchisee is required to pay, directly or indirectly, an franchise fee." CFIL § 31005; CFRA § 20001. Guidance and interpretive opinions issued by the Commissioner of Business Oversight regarding what constitutes a "franchise" "shall be prima facie evidence of the scope and extent of coverage of the definition of 'franchise[.]'" CFRA § 20009.[6]

California courts have emphasized that there is a franchise relationship when, for example a franchisor represents to a prospective franchisee that "'it [is] a turn key operation' . . . that [] 'everything is complete, ready to go, absolutely supplied and sustained and everything else . . .'" and where the franchisee was given documents "outlining projected sales, operating expenses, payroll expenses, and profits for [the franchise]." *People v. Kline*, 110 Cal. App. 3d 587, 591 (1980). The Commissioner of Business Oversight guidelines provide further examples, such as where a franchisee is provided with manuals or handbooks, training sessions, and trade secrets. *See* Release ¶ 1.2.2.7. Similarly, the Ninth Circuit concluded there was a franchise relationship where the franchisor "provided [franchisee] with a model marketing program and provided a computer printout of prospective customers. [Franchisor's] advertising agency supplied [franchisee] with press kits, promotional tools and marketing advice." *Boat & Motor Mart v. Sea Ray Boats, Inc.*, 825 F.2d 1285, 1287 (9th Cir. 1987). Furthermore, "[franchisor] required [franchisee] to send its salesmen for training by [franchisor] at its training schools." *Id.*

---

[6]   *See also Gabana Gulf Distribution, Ltd. v. GAP Intern. Sales, Inc.*, No. C 06–02584–CRB, 2008 WL 111223, at *5 n.1 (N.D. Cal. Jan. 9, 2008). "While the responsibility for statutory interpretation ultimately rests with the court, the Guidelines, as interpretation of a statute by the officials charged with its administration, *are entitled to great weight.*" *Thueson v. U–Haul Intern., Inc.*, 144 Cal. App. 4th 664, 671 (2006) (emphasis added).

-8-

In contrast, Playboy did not provide TNR with anything other than the license of intellectual property. There are no allegations in the FAC, for example, that TNR was supplied with manuals or handbooks on how to develop a marketing and advertising plan, training sessions for how to produce condoms and lubricants, or trade secrets of any kind. Far from a "turn key operation," TNR was responsible for the "design, manufacture, advertise[ment], promot[ion], [sales], and distribut[ion]" of condoms and lubricants bearing Playboy's trademarks. FAC ¶ 25. On the other hand, Playboy's role was limited in comparison. It had a right to approve or disapprove products, packaging, advertising, sub–contractors and sub–licensees, and the right to audit TNR's books. *See* FAC ¶ 28. There are no allegations in the FAC that Playboy had the right or ability under the PLA to dictate a marketing plan or system to TNR. In fact, Playboy's role in the marketing plan was largely limited to prior "approval *on a yearly basis*" [of TNR's] advertising/promotional and marketing plans. *Id.* ¶ 28(d); *Cf. Boat and Motor Mart*, 825 F.2d at 1287 (highlighting that the franchisor proactively monitored its franchisee via questionnaires to customers and actively participated in developing marketing plans by using the questionnaire responses to "suggest the most effective media for advertising and promotion."). Because TNR was responsible for proposing the marketing plan in the first instance, it is not reasonable to infer that TNR's marketing plan was "prescribed" in substantial part by Playboy.

Furthermore, there are no allegations in the FAC that Playboy had control, for example, over "the appearance of [TNR's] business premises and the fixtures and equipment utilized therein, uniforms of employees, hours of operation, housekeeping, and similar declarations." Release ¶ 1.2.2.3.[7]

---

[7] The factors identified by the Commissioner and by California courts seem more akin to well–known franchising operations like fast food establishments. If TNR's allegations were sufficient to create a triable issue concerning the existence of a franchise, then all exclusive licenses might suddenly be franchises under California

Rather than suggesting a franchise relationship, the sections of the PLA TNR relies on in its FAC prove exactly what the relationship was: *a license*. Uncontrolled licensing is "inherently deceptive." *Barcamerica Int'l USA Trust v. Tyfield Imps., Inc.*, 289 F.3d 589, 598 (9th Cir. 2002). Thus, courts have imposed "a correlative duty [on licensors] to make sure that the good or service really is of consistent quality[.]" *Dep't of Parks and Recreation for the State of California v. Bazaar Del Mundo, Inc.*, 448 F.3d 1118, 1131 (9th Cir. 2006) (quoting *Gorenstein Enterprises, Inc. v. Quality Care–USA, Inc.*, 874 F.2d 431, 435 (7th Cir. 1989)). "[T]he only effective way to protect the public . . . is to place on the licensor the affirmative duty of policing in a reasonable manner the activities of his licensees." *Bazaar Del Mundo*, 448 F.3d at 1131 (quoting *Dawn Donut Co. v. Hart's Food Stores, Inc.*, 267 F.2d 358, 367 (2d Cir. 1959). Perhaps in recognition of these duties, the Commissioner's guidelines singles out various licensing control mechanisms as *not indicative of a marketing plan*. *See* Release ¶ 1.2.2.6. Some control devices listed by the Commissioner include requiring the licensee to maintain books and records for royalty calculations or control mechanisms "designed to protect the quality of the product[.]" *Id.*

Every section of the PLA relied upon by TNR are normal control mechanisms utilized by licensors to maintain adequate control over product quality, brand reputation, and accounting while upholding its duty prescribed by law to maintain control over its licensee. Sections 2.h–i, for example, were expressly concerned with product quality, *as TNR concedes*. "Section 2.h–i conditioned TNR's ability to sell Products on receiving prior approval from Playboy, and it imposed a series of strict requirements on *product quality*[.]" FAC ¶ 28(c) (emphasis added). Every other section relied upon by TNR were clearly designed to give Playboy adequate control over its licensee. Licensors are permitted, and indeed are required by law, to maintain

law.

control over their licensees to ensure product quality and brand reputation. *See Hollywood Athletic Club Licensing Corp. v. GHAC–CityWalk*, 938 F. Supp. 612, 615 (C.D. Cal. 1996) ("The licensor has a strong need to control the use of its mark both to preserve the quality of the mark and to maintain the rights to the mark, for a licensor who fails to monitor its mark risks a later determination that the mark has been abandoned."). The Commissioner's guidelines confirm that California's franchise laws are not meant to encroach into that space. Playboy is a licensor and TNR was its licensee—nothing more. The Court should decline TNR's invitation to vastly expand the reach of California's franchise laws.

## 2. There Was No Substantial Association Between TNR's Condom Business and Playboy's Content Business

Even if TNR could somehow plead past the threshold "control" issues discussed above, it cannot overcome the fact that there is no substantial association between its condom (and lubricant) business and Playboy trademarks licensed under the PLA. "In resolving the question of whether there is a substantial association between the Licensee's business and the licensor's commercial symbol, it is necessary to consider whether that commercial symbol is brought to the attention of the Licensee's customers to such an extent that the *customers regard the Licensee's establishment as one in a chain identified with the licensor*." Release ¶ 1.3. (emphasis added).[8] "[T]he franchisee, thus is *intimately associated* with [the franchisor] in the mind of the [customer]." *Kim v. Servosnax, Inc.*, 10 Cal. App. 4th 1346, 1357 (1992) (emphasis added).

The FAC is devoid of any facts suggesting that TNR's customers regarded TNR as a chain identified with Playboy, an outlet of Playboy, or "intimately associated" with Playboy. Quite the opposite, TNR repeatedly draws a distinction between "TNR's Products" or "TNR's condoms and lubricants" and Playboy's wipes and

---

[8]   Typical examples would be fast food chains, such as McDonald's.

Playboy's "sexual wellness products." *See* FAC ¶¶ 70-81. In fact, TNR alleges that Playboy exploited "TNR's relationships" with retailers like Walmart and CVS, not the other way around. *See id.* ¶ 81.

TNR's lone allegation regarding "substantial association" is that "[t]he PLA granted TNR the right to engage in the business of selling branded condoms and lubricants bearing Playboy's mark, which was communicated to TNR's customers via the packaging of the Products." FAC ¶ 118. Merely selling a product bearing a trademark, without more, is insufficient to satisfy the "substantial association" prong. *See Gabana*, 2008 WL 111223, at *5–6. In *Gabana*, the alleged franchisee was selling products bearing the GAP trademark, on behalf of GAP. However, because it was obvious that its customers did not think they were transacting with GAP, the plaintiff could not establish a franchise relationship. *See id.*

The same is true here. TNR cannot seriously argue that when, for example, it approached Walmart to sell the products with Playboy's trademark, that Walmart thought it was dealing with Playboy. As TNR alleges, TNR had the independent supplier account with Walmart, not Playboy. *See* FAC ¶ 70. Such a claim thus "is [not] plausible on its face." *Iqbal*, 556 U.S. at 678. Furthermore, Playboy was in the "multimedia entertainment" business "publish[ing] editions of *Playboy magazine . . .* operat[ing] television networks and distribut[ing] programming globally . . . [and] owns Playboy.com, a leading men's lifestyle and entertainment website[.]" FAC, Ex. 1 at 8. On the other hand, TNR is "an OEM manufacturer of high–quality condoms and lubricants[.]" *Id.* ¶ 3. As the complaint concedes throughout, TNR—not Playboy—sold Playboy–branded condoms to retail outlets. Those customers (the retailers and distributors) understood they were dealing with an independent manufacturer of the product licensed to use Playboy's trademarks.

### 3. To the Extent TNR Could Show That it Was a Franchisee of Playboy, the Relationship was Outside the Jurisdiction of California's

*Franchise Laws*

Assuming, *arguendo*, that Playboy and TNR's relationship was a "franchise," it would not have come within the jurisdictional reach of the CFIL or CFRA. Section 31105 of the CFIL provides "[any franchise] shall be exempted from the provisions of Chapter 2 . . . if all locations from which sales, leases or other transactions between the franchised business and its customers are made, or goods or services are distributed, are physically located outside the state." CFIL § 31105. The "from" qualifier is applicable to both the "sales between" clause and the "goods or services distributed" clause. *See Stocco v. Gemological Institute of America, Inc.*, 975 F. Supp. 2d 1170, 1183 (S.D. Cal. 2013) ("The Court finds that Plaintiffs have failed to allege that any 'sales leases or other transactions between' GIA Italy and its customers are made **from** a location physically within California, or that GIA Italy distributes any 'goods or services' **from** a location physically within California.") (emphasis in original). There are no allegations in the complaint that TNR sold or distributed any products *from* within California. In fact, the complaint confirms that any U.S. based transactions were funneled through Allen and his companies Monarch Digital Media LLC ("Monarch"), Freedom Brands Corp. ("Freedom"), and their sales agent Coastal Solutions Group LLC ("CSG"). *See* FAC ¶¶ 33–43, 120. TNR did not make any sales or distribute any goods from inside California. Thus, the CFIL does not apply.

The CFRA contains a similar geographical limit. "The provisions of this chapter apply to any franchise where either the franchisee is domiciled in this state or the franchised business is or has been operated in this state." CFRA § 20015. As the complaint concedes (in order to invoke this Court's diversity jurisdiction), TNR is domiciled and operates in Thailand. FAC ¶ 3. Any business conducted in California was done by Allen, Monarch, Freedom, or CSG, not TNR. *See Premier Wine and Spirits of South Dakota Inc. v. E. & J. Gallo Winery*, 644 F. Supp. 1431, 1439 (E.D. Cal.) ("It is not disputed that [Plaintiff] is not domiciled in California. There is also

-13-

no genuine dispute that [Plaintiff] has never operated in California."). Even if the agreement was first executed by a California resident and then assigned to a non–resident not operating in California, Section 20015 blocks the applicability of the CFRA. *See Jack in the Box Inc. v. San–Tex Restaurants, Inc.*, No. SA–20–cv–00328–XR, 2021 WL 148058, at *6 (W.D. Tex. Jan. 14, 2021) (analyzing and applying the CFRA). Thus, even if TNR's predecessor, UMD, hypothetically had a claim against Playboy under the CFRA, TNR does not.

Additionally, the PLA is exempt under Section 31102 of the CFIL. "The offer or sale of a franchise by a franchisee for his own account or the offer or sale of the entire area franchise owned by a subfranchisor for his own account, is exempted from the provisions of Section 31110 if the sale is not effected by or through a franchisor. A sale is not effected by or through a franchisor merely because a franchisor has a right to approve or disapprove a different franchisee." CFIL § 31102. "Mere franchisor participation in the sale by furnishing information, referring prospective purchasers of the franchise, or approving purchasers does not deprive a franchisee [seller] of his exemption." *Fox v. Ehrmantraut*, 615 P.2d 1383, 1390 (Cal. 1980). Moreover, "[t]he provision in the section excluding from the exemption sales effected 'by or through a franchisor' excludes only those sales where the franchisor obtains all or a substantial part of the purchase price." *Id*. According to the complaint, UMD was paid $15 million for the sale to TNR. *See* FAC ¶ 19. Playboy eventually received $750,000. *See id*. That is nowhere near all or substantially all of $15 million,[9] thus exempting the PLA.

For the reasons outlined above, the allegations in the complaint (inclusive of the attached documents) do not support application of either the CFIL or the CFRA.

---

[9]   Small transfer fees collected on the part of the alleged franchisor do not disrupt application of Section 31102 either. *See, e.g., Reyes v. Atlantic Richfield Co.*, 12 F.3d 1464, 1472 (9th Cir. 1993).

Furthermore, TNR cannot allege facts that would satisfy either statute. Thus, TNR's franchise related causes of action should be dismissed with prejudice.

**B.      TNR's Tortious Interference Claims Are Barred as a Matter of Law**

      **1.      *The Economic Loss Rule Bars TNR's Tortious Interference Claims*[10]**

TNR's three tortious interference claims: intentional interference with contractual relations, intentional interference with prospective economic relations, and negligent interference with prospective economic relations, are all barred under the economic loss doctrine. The economic loss doctrine prevents a plaintiff from recovering in tort against its contracting counterparty for actions that constitute breaches of the underlying contract(s). *See JRS Products, Inc. v. Matsushita Electric Corp. of America*, 115 Cal. App. 4th 168, 183 (2004) ("This complaint sounds in contract, not tort . . . a breach of contract claim cannot be transmuted into tort liability by claiming that the breach interfered with the promisee's business."). "Quite simply, the economic loss rule prevents the law of contract and the law of tort from dissolving one into the other." *Robinson Helicopter Co., Inc. v. Dana Corp.*, 34 Cal. 4th 1227, 1231–32 (2015). The economic loss rule thus prevents TNR from recovering tort damages against Playboy for allegedly breaching the PLA (and subsequent

---

[10]    The term "economic loss rule" can be confusing. As commentators have noted, the term has been used to describe what are actually distinct rules in and of themselves. *See* Restatement (Third) of Torts: Liability for Economic Harms § 3, reporter's note; Vincent R. Johnson, *The Boundary-Line Function of the Economic Loss Rule*, 66 Wash. & Lee L. Rev. 523, 534-35 (2009) ("The truth may be that there is not one economic loss rule broadly applicable throughout the field of torts, but rather several more limited rules that govern recovery of economic losses in selected areas of the law."). Here, Playboy refers to the version that polices the distinction between tort and contract. *See id.*; *State Ready Mix, Inc. v. Moffatt & Nichol*, 232 Cal. App. 4th 1227, 1232 (2015). As the Colorado Supreme Court put it, "[w]hile the economic loss rule serves today to maintain the distinction between contract and tort law, its continued designation as the 'economic loss' rule is merely an unfortunate carry-over from its origins in products liability jurisprudence." *Town of Alma v. AZCO Const., Inc.*, 10 P.3d 1256, 1262 n.9 (2000).

-15-

amendments). *See State Ready Mix, Inc. v. Moffatt & Nichol*, 232 Cal. App. 4th 1227, 1232 (2015) ("[Plaintiff] cannot recast [its] complaint for breach of contract/breach of warranty as a tort action. 'A person may not ordinarily recover in tort for the breach of duties that merely restate contractual obligations.'") (quoting *Aas v. Superior Court*, 24 Cal. 4th 627, 643 (2000), *superseded by statute on other grounds*)).

Fundamentally, TNR's tortious interference claims "merely restate contractual obligations" allegedly breached by Playboy. *See* FAC ¶¶ 146–55 (contract claims), 167–197 (tortious interference claims). For example, TNR alleges that Playboy breached the PLA by "[c]ompeting directly with TNR by selling Playboy products not manufactured by TNR on TNR's retail shelf space and using packaging copied from TNR's products in violation of Section 11.1 of the Novation Agreement[.]" *Id.* at ¶ 155(d). TNR then substantiates its intentional interference with contract claim by alleging, in part, "Playboy engaged in conduct . . . to disrupt TNR's Walmart agreement and improperly secur[e] shelf space and sales rights at Walmart for Playboy's products. To effectuate those sales, Playboy also deceptively used packaging on its products almost identical to those on TNR's Products." *Id.* at ¶ 171. TNR also alleges that Playboy violated the PLA by "[d]irecting, aiding, and abetting Allen to bill or charge TNR for improper and unauthorized expenses to support sales of Playboy products, including . . . shipping, logistics, insurance, advertising, and other costs and fees[.]" *Id.* at ¶ 155(f). In turn, TNR alleges "Playboy wrongfully obtained benefits at the expense of TNR . . . including but not limited to, shipping, logistics costs, social media advertising, marketing data, and payment of rent . . ." to support its intentional interference with contract claim. *Id.* at 173. In the same vein, TNR alleges that Playboy intentionally interfered with prospective economic relations by "wrongfully and unreasonably withholding approval of TNR's deal with [a] Russian distributor[.]" *Id.* at ¶ 183.[11] TNR outright admits the overlap in

---

[11]   These are merely representative examples of the overlap between TNR's contract

paragraph 191 of the FAC by alleging "Playboy owed a duty of care *to perform its obligations under the Seventh Amendment of the PLA and the Novation Agreement* in a way that did not cause foreseeable harm to TNR's business." FAC ¶ 191 (emphasis added); *contra JRS*, 115 Cal. App. 4th at 183 ("a breach of contract claim cannot be transmuted into tort liability by claiming that the breach interfered with the promisee's business.").

A plaintiff cannot overcome the economic loss rule even if "[t]here is abundant evidence to support each of the elements of the tort." *JRS*, 115 Cal. App. 4th at 179; *see also Robinson Helicopter*, 34 Cal. 4th at 999 (Werdegar, J., dissenting) ("But the commission of an independent tort, although a necessary condition for the imposition of tort liability, is not sufficient"). If the conduct is wrongful because it breaches a contractual duty, it cannot also support liability sounding in tort.[12] Otherwise, contracting parties would lose the benefit of "enabling [them] to estimate in advance

---

claims and its tortious interference claims. Other examples include paragraphs 155(e) and 182–83, 155(d) and 172, 181, and 194, and paragraphs 148 (a)–(b), 155(a)–(b) and 191–197.

[12] Under rare circumstances, the California Supreme Court has allowed contract and tort claims based on the same underlying conduct to proceed in parallel. "Tort damages have been permitted in contract cases where a breach of duty directly causes physical injury . . . for breach of the covenant of good faith and fair dealing in insurance contracts . . . for wrongful discharge in violation of fundamental public policy . . . or when the contract was fraudulently induced." *Erlich v. Menezes*, 21 Cal. 4th 543, 551–52 (1999) (internal citations omitted). No such circumstances are present here. Furthermore, federal courts have recognized the need to limit any extension of these exceptions. *See e.g., Lennar Mare Island, LLC v. Steadfast Insurance Company*, No. 2:12–cv–02182–KJM–KJN, 2016 WL 829210, at *7 (E.D. Cal. Mar. 3, 2016) ("But lest every contract breach dissolve into a tort, the California Supreme court has emphasized the importance of a 'cautious approach' that preserves the contracting parties' rights to limit their liability to the value of the promise and any exceptions they agree to impose.") (citing *Erlich*, 21 Cal. 4th at 553).

the financial risks of their enterprise." *Erlich*, 21 Cal. 4th at 551.[13] TNR seeks to do exactly what the economic loss rule bars it from doing: hold Playboy liable in tort for allegedly breaching the parties' contract. TNR's tortious interference claims should thus be dismissed with prejudice.

### 2. *Playboy Cannot Be Held Liable for Intentionally Interfering With The Contracts At Issue Here*

It is axiomatic that, as a matter of law, a party cannot tortiously interfere with its own contract. *See Applied Equipment Corp.*, 7 Cal. 4th at 514. This doctrine also applies to parties with significant economic interests in a contract that necessarily contemplates their own performance under a separate contract. *See PM Group, Inc. v. Stewart*, 154 Cal. App. 4th 55, 65 (2007). This is a natural extension of the rule that only third parties can tortiously interfere with a contract and the economic loss rule. As one court put it, "[p]ermitting [plaintiff] to assert both a breach of contract claim and an intentional interference with contractual relations claim might be duplicative because . . . breach of the [secondary contract] was likely a foreseeable consequence of [the defendant's] breach of its contract with [plaintiff]. Permitting [plaintiff] to file such similar claims may therefore permit [plaintiff] to [recover] damages above and beyond the damages it actually suffered." *Hamilton San Diego Apartments v. RBC Capital Markets Corp.*, No. 3:12–CV–2259–JM (BLM), 2013 WL 12090313, at *5 (S.D. Cal. Mar. 5, 2013).

---

[13]  *See also Robinson Helicopter*, 34 Cal. 4th at 996 (Werdegar, J., dissenting) ("if every breach creates a potentially triable tort claim, 'the potential consequences of any breach of contract—efficient or inefficient, socially desirable or undesirable— become uncertain and unpredictable. Tort liability may or may not follow, depending on a myriad of imponderable factors. As a result, a business fearful of unfathomable tort exposure might lose the ability to respond flexibly to changing economic conditions or hesitate to enter into contracts at all in fast–moving aspects of commercial enterprise.'") (quoting *Applied Equipment Corp. v. Litton Saudi Arabia Limited, et al.*, 7 Cal. 4th 503, 520 (1994)).

Every contract TNR claims Playboy intentionally interfered with falls within the scope of this rule. TNR alleges that its contracts with Walmart, Walgreens, Monarch, Freedom, and Allen were all interfered with by Playboy. *See* FAC ¶ 168. However, Playboy had significant economic interests in each of these contracts. As TNR acknowledges, Playboy was paid "guaranteed and earned royalties in the seven–figure range . . ." under the PLA. FAC ¶ 27. The only way Playboy could earn those royalties, as a licensor, was if TNR subsequently entered into contracts with distributors, suppliers, and customers. Playboy thus had a significant—indeed "in the seven–figure range"—interest in TNR's contracts with Walmart, Walgreens, Monarch, Freedom, and Allen. Moreover, those contracts necessarily contemplated Playboy's performance under the PLA. If Playboy did not deliver the license to TNR (or otherwise breached the PLA), TNR would have no products for Monarch, Freedom, and Allen to distribute or for Walmart and Walgreens to purchase. TNR impliedly conceded as much when it alleged, "Playboy's wrongful . . . termination of the PLA . . . result[ed] in the inability to sell millions of dollars in inventory[.]" *Id.* at ¶ 112; *see also id.* at ¶ 72 (Playboy's breach "jeopardized TNR's performance under the General Merchandise Agreement with Walmart[.]").

For this reason, separate and apart from the economic loss rule argument, TNR's claim for intentional interference with contractual relations should be dismissed with prejudice.

### 3. TNR's Claims for Intentional and Negligent Interference with Prospective Economic Relations Fail as a Matter of Law

TNR's intentional and negligent interference claims are barred under a similar rule to the economic loss doctrine. Both intentional and negligent interference with prospective relations claims require wrongful acts that are independently wrongful beyond the interference itself. *National Medical Transportation Network v. Deloitte & Touche*, 62 Cal. App. 4th 412, 439–40 (1998) (applying the rule to negligent interference claim). Breach of contract is not an independent wrongful act

-19-

capable of supporting such claims. *See Drink Tank Ventures LLC v. Real Soda in Real Bottles, Ltd.*, 71 Cal. App. 5th 528, 532–33 (2021) ("as our Supreme Court has said time and again, an actor's breach of contract, without more, is not 'wrongful conduct' capable of supporting a tort . . . including the tort of intentional interference with a prospective economic advantage."); *Workplace Techs. Research, Inc. v. Project Mgmt. Inst.*, No. 18–cv–1927 JM (MSB), 2019 WL 3804019, at *8–9 (S.D. Cal. Aug. 13, 2019) (dismissing claim for negligent interference because "[t]he alleged wrongdoing [was] simply [the plaintiff's] breach of contract claim" and a plaintiff "may not transmute its contract claim into a tort claim by alleging [the defendant] wrongfully breached the parties' contract.").

TNR relies on nothing more than Playboy's alleged breach of the PLA to support its interference with prospective relations claims. For example, "Playboy . . . disrupted TNR's prospective economic relationship with the Russian distributor . . . *by wrongfully and unreasonably withholding approval* of TNR's deal[.]" FAC ¶ 183.[14] TNR explicitly relies on Playboy's alleged breach of its contractual obligations as the source of Playboy's duty under its negligent interference claim. *See id.* at ¶¶ 191–97. TNR's claims for intentional and negligent interference with prospective economic relations thus fail as a matter of law and should be dismissed with prejudice.

## C.   **TNR Fails to State a Cognizable Claim for Fraudulent Inducement**

"A claim for fraud in the inducement requires the following elements: '(a) a misrepresentation (false representation, concealment, or nondisclosure); (b) scienter or knowledge of its falsity; (c) intent to induce reliance; (d) justifiable reliance; and (e) resulting damage.'" *McColgan v. Mutual of Omaha Ins. Co.*, 4 F. Supp. 3d 1228,

---

[14]   Again, there is no daylight between the allegations in paragraph 155 (breach of good faith and fair dealing) and paragraphs 181–86 (intentional interference with prospective economic relations).

1233 (E.D. Cal. 2014) (*quoting Hinesley v. Oakshade Town Ctr.,* 135 Cal. App. 4th 289, 294 (2005)). TNR alleges that Playboy fraudulently induced TNR's assent to the Eighth Amendment to the PLA. TNR, however, has failed adequately to plead its claim.

As enumerated above, there are three categories of actionable misrepresentation: false representation, active concealment, or nondisclosure by one with a duty to disclose. *See Linear Technology Corp. v. Applied Materials, Inc.*, 152 Cal. App. 4th 115, 131–32 (2007). TNR alleges all three. *See* FAC ¶¶ 200–01.

The FAC contains no facts to support TNR's active concealment theory. There are no allegations that Dr. Patel, or anyone at Playboy, somehow affirmatively hid anything from TNR. In fact, TNR's theory of active concealment is legally invalid. TNR alleges "Patel actively concealed discovery of the material facts from TNR by not disclosing such facts during Playboy's discussions with Allen[.]" FAC ¶ 200. The law, however, says "[m]ere nondisclosure does not constitute active concealment." *Herron v. Best Buy Co. Inc.*, 924 F. Supp. 2d 1161, 1176 (E.D. Cal. 2013) (citing *Alfaro v. Community Hous. Improvement Sys. & Planning Ass'n, Inc.*, 171 Cal. App. 4th 1356, 1382 (2007); *Lingsch v. Savage*, 213 Cal. App. 2d 729, 734 (1963)). Thus, TNR's active concealment theory fails as a matter of law.

For nondisclosure to be actionable, Playboy must have owed a duty of disclosure to TNR. *See Hahn v. Mirda*, 147 Cal. App. 4th 740, 745 (2007). However, it is hornbook law that "[n]o law requires that parties dealing at arm's length have a duty to explain to each other the terms of a written contract." *Rowland v. PaineWebber Inc.*, 4 Cal. App. 4th 279, 286 (1992), *disagreed with on other grounds in Rosenthal v. Great Western Fin. Securities Corp.*, 14 Cal. 4th 394, 415 (1996); *see, e.g.*, *Desert Outdoor Advert. v. Superior Court*, 196 Cal. App. 4th 866, 872–73 (2011). This rule even extends to parties who owe one another fiduciary duties. In *Desert Outdoor Adventure*, the plaintiffs sought to avoid the effect of an arbitration agreement with their attorney, arguing the attorney had a duty to disclose and explain

the arbitration provision. *See id*. at 872–875. The court rejected this argument precisely because the plaintiffs were "knowledgeable business persons[.]" *Id*. at 874. Similarly, TNR and Playboy are sophisticated businesses run by competent and knowledgeable businesspersons. *See generally* FAC ¶ 10. Accordingly, Playboy had no duty of disclosure and TNR's nondisclosure theory fails.

That leaves TNR's false representation theory. The lone allegedly false representation contained in the FAC is Playboy's alleged statement "that CBD condoms and lubricants were excluded from the scope of the PLA." FAC ¶ 201. Specifically, TNR references two alleged statements of Patel to Allen, in which she states "[t]o your own point in a previous email . . . you have stated that THC/CBD and products derived from [c]annabis plants are not within the current scope of TNR's rights[,]" and "[r]eality is that THC/CBD are not part of their [TNR's] grant (per your own note) and would be subject to our approval grant." *Id*. at 46–47. This allegation, however, is readily susceptible to an "obvious alternative explanation." *Iqbal*, 556 U.S. at 682.

Both alleged Patel statements reference *Allen's* opinion regarding the scope of the PLA. Given Allen's "previous position at UMD and experience with the Playboy condoms and lubricant business[,]" (FAC ¶ 33), Allen was arguably in the best position to understand the scope of the PLA. TNR's specific factual allegations thus support the opposite conclusion from TNR's claim. Rather than evidencing Playboy's knowing falsity, the Patel statements more plausibly suggest that the PLA's scope was at best vague and that Patel was relying on Allen's opinions, not the other way around.

Paradoxically, to support its claim that Playboy's alleged representations were knowingly false, TNR argues that the scope of the PLA prior to the Eighth Amendment obviously included CBD and cannabis based products. "Put simply, the final and agreed–upon language of the PLA, prior to the Eighth Amendment, clearly grants TNR a license to all condoms and non–medical personal lubricants bearing and sold in connection with Playboy's marks and images, including CBD condoms and

-22-

lubricants." FAC ¶ 49. But if the PLA so "clearly" included CBD products within its scope, then it would be unreasonable for TNR, a sophisticated business, to rely on Playboy's alleged statements to the contrary.

For these reasons, TNR's fraudulent inducement claim should be dismissed with prejudice.

## D.   TNR's Conversion Claim Fails as a Matter of Law

TNR's conversion claim is also barred by the economic loss rule. *See Baggett v. Hewlett–Packard Co.*, No. SACV 07–0667 AG (RNBx), 2009 WL 3178066, at *2 (C.D. Cal. Sep. 29, 2009) (citing cases applying the economic loss rule to bar conversion claims). Like its tortious interference claims, TNR's conversion claim is barred because it is "predicated on a mere breach of contract." *Cusano v. Klein*, 280 F. Supp. 2d 1035, 1043 (C.D. Cal. 2003). The gravamen of TNR's conversion claim is that Playboy allegedly "usurped TNR's resources" to support its own products. *See* FAC ¶ 207. But, again, this allegation is indistinguishable from TNR's contract based allegations, "[d]irecting . . . Allen to bill or charge TNR for improper and unauthorized expenses to support sales of Playboy products[.]" FAC ¶ 155(f). Put simply, "[TNR's] relationship with [Playboy] 'arises solely out of their contract and commercial transaction.'" *Baggett*, 2009 WL 3178066, at *3. TNR's conversion claim is thus barred by the economic loss rule.

In addition, TNR's conversion claim is legally defective. "Normally, money cannot be converted." Hon. Kimberly A. Gaab & Sara Church Reese, *Cal. Prac. Guide: Civ. Pro. Trial Claims and Def.*, Ch. 12(II)–B, ¶ 12:116 (The Rutter Group) (citing *McKell v. Washington Mut., Inc.*, 142 Cal. App. 4th 1457, 1491 (2006)). California courts have recognized conversion actions for money under only limited circumstances. "[C]ases recognizing claims for the conversion of money 'typically involve those who have misappropriated, commingled, or *misapplied specific funds held for the benefit of others*.'" *Voris v. Lampert*, 7 Cal. 5th 1141, 1152 (2019) (emphasis added) (internal citations omitted). Indisputably, TNR is alleging that

1  Playboy converted money. *See* FAC ¶¶ 204–213. However, its claim does not fit
2  within the narrow exceptions to the rule that money cannot be converted.

3      California courts have recognized claims for the conversion of money where,
4  for example, an agent failed to turn over a definite sum received for their principal's
5  account. *Haigler v. Donnelly*, 18 Cal. 2d 674, 681 (1941); *Mendoza v. Continental*
6  *Sales Co.*, 58 Cal. App. 4th 1395, 1404 (2006). These cases have held that the
7  converted money was "in essence [held] in trust for the third party vendors."
8  *Sandigo v. Ocwen Loan Servicing, LLC*, No. 17–cv–02727–BLF, 2019 WL 2233051,
9  at *21 (N.D. Cal. May 23, 2019) (quoting *McKell*, 142 Cal. App. 4th at 1491).

10     Nothing in TNR's FAC suggests that Playboy was holding money in trust for
11  TNR. TNR simply alleges that Playboy "usurped TNR's resources[.]" FAC ¶ 207. In
12  other words, TNR alleges (and as is confirmed by its contract allegations) that
13  Playboy misused funding provided by TNR in contravention of the PLA. If that is
14  true, then TNR can pursue that theory via its breach of contract claim(s). Conversion,
15  however, is not the proper claim. *See Voris*, 7 Cal. 5th at 1151 ("[T]he law has been
16  careful to distinguish proper claims for the conversion of money from other types of
17  monetary claims more appropriately dealt with under other theories of recovery[?].").

18  **E.      TNR is Barred from Pursuing its Unfair Competition Claim**

19     When a plaintiff has pleaded an adequate remedy at law it cannot pursue
20  equitable claims under California's UCL. *See Sonner v. Premier Nutrition Corp.*, 971
21  F.3d 834, 839–44 (9th Cir. 2020). "It matters not that a plaintiff may have no remedy
22  if her other claims fail." *Munning v. Gap, Inc.*, 238 F. Supp. 3d 1195, 1203 (N.D. Cal.
23  2017). TNR has pleaded breach of contract, breach of good faith, tortious interference,
24  fraud, and conversion claims. All those claims provide remedies at law. It does not
25  matter that some of those claims may fail based upon this motion to dismiss or at trial.
26  *See id.* Thus, because TNR has pleaded adequate remedies at law, its UCL claim
27  should be dismissed with prejudice.

28     Furthermore, a UCL claim "cannot be used to state a cause of action the gist of

-24-

which is absolutely barred under some other principle of law." *Stop Youth Addiction, Inc. v. Lucky Stores, Inc.*, 17 Cal. 4th 553, 566 (1998) *superseded on other grounds by statute*. As discussed above, TNR's tortious interference and conversion claims are barred as a matter of law. "[T]he resulting immunity [conferred by some other law] should not evaporate merely because the plaintiff discovers a conveniently different label for pleading what is in substance an identical grievance arising from identical conduct . . . We thus conclude that a plaintiff may not bring an action under the unfair competition law if some other provision bars it." *Cel–Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*, 20 Cal. 4th 163, 184 (1999). TNR thus cannot use the UCL to cleverly plead around the doctrines discussed above.

Lastly, TNR is also using its UCL claim as an alternative to its tort and contract claims in an impermissible manner. "[A]n action under the UCL 'is not an all-purpose substitute for a tort or contract action.'" *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1150 (2003). Yet, TNR's allegations substantiating its UCL claim are indistinguishable from its contract and tort claims. It simply asserts, instead, that it "has suffered damages entitling it to restitutionary disgorgement of all monies Playboy obtained due to its unlawful business practices[.]" FAC ¶ 166. This is just a damages claim disguised as restitution. TNR identifies nothing that would be "restored." This "nonrestitutionary disgorgement remedy sought by [TNR] closely resembles a claim for damages, something that is not permitted under the UCL." *Korea Supply Co.*, at 1150-51. TNR cannot disgorge Playboy's profits for its allegedly unlawful acts. *Id.*

## V.   **CONCLUSION**

For the forgoing reasons, TNR's first and second causes of action (franchise claims), fifth cause of action (UCL claim), sixth, seventh, and eighth causes of action (tortious interference claims), ninth cause of action (fraudulent inducement claim), and tenth cause of action (conversion claim) should be dismissed with prejudice.

1

2   DATED:  April 26, 2022                QUINN EMANUEL URQUHART &
                                          SULLIVAN, LLP
3

4

5                                         By _____

6                                            MARSHALL M. SEARCY III

7                                            Attorneys for Defendants,
                                             Playboy Enterprises International, Inc., and
8                                            Products Licensing LLC

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS PLAYBOY ENTERPRISES INTERNATIONAL, INC., and PRODUCTS LICENSING LLC's
MEM. ISO PARTIAL MOTION TO DISMISS

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 26th day of April, 2022, I electronically filed the

**DEFENDANTS PLAYBOY ENTERPRISES INTERNATIONAL, INC., and PRODUCTS LICENSING LLC's MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PARTIAL MOTION TO DISMISS**

using the CM/ECF system which will send notification of such to all parties. I also

certify the document was served via U.S. Mail on anyone unable to accept electronic

filing as indicated on the Notice of Electronic Filing.  Parties may access the

document through the CM/ECF system.


_____/s/ Andrea Llamas_____

Andrea Llamas

07281-00001/13311756.1

Case No. 2:21cv9749-JFW

**DEFENDANTS PLAYBOY ENTERPRISES INTERNATIONAL, INC., and PRODUCTS LICENSING LLC's MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PARTIAL MOTION TO DISMISS**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28