1  Cyndie M. Chang (SBN 227542)
   CMChang@duanemorris.com
2  DUANE MORRIS LLP
   865 South Figueroa Street, Suite 3100
3  Los Angeles, CA  90017-5450
   Telephone:  (213) 689-7400
4  Fax:  (213) 689-7401

5  Mark Holscher (SBN 139582)
   mark.holscher@kirkland.com
6  Kristin Rose (SBN 278284)
   kristin.rose@kirkland.com
7  KIRKLAND & ELLIS LLP
   555 South Flower Street
8  Los Angeles, CA  90071
   Telephone: (213) 680-8400
9  Facsimile: (213) 680-8500

10 *Attorneys for Plaintiff*
   *Thai Nippon Rubber Industry Public*
11 *Limited Company*

12            **UNITED STATES DISTRICT COURT**

13          **CENTRAL DISTRICT OF CALIFORNIA**

14 THAI NIPPON RUBBER                ) Case No. 2:21-cv-09749-JFW(PDx)
   INDUSTRY PUBLIC LIMITED           )
15 COMPANY,                          ) The Honorable John F. Walter
                                     )
16                                   ) **PLAINTIFF'S OPPOSITION TO**
              Plaintiff,             ) **PLAYBOY'S MOTION TO DISMISS**
17                                   )
                                     ) Judge:        Hon. John F. Walter
18       v.                          )
                                     ) FAC Filed:  March 16, 2022
19                                   ) Motion to Dismiss Filed: April 26, 2022
   PLAYBOY ENTERPRISES               ) Hearing Date: May 23, 2022
20 INTERNATIONAL, INC.,              ) Hearing Time: 1:30 p.m.
   PRODUCTS LICENSING, LLC, and      ) Hearing Location: 7A
21 NICHOLAI ALLEN                    )
                                     )
22                                   ) Pre-Trial Conference: September 1, 2023
                                     ) Trial Date:  September 26, 2023
23                                   )
                                     )
24 _____  )

25

26

27

28

---

PLAINTIFF'S OPPOSITION TO PLAYBOY'S MOTION TO DISMISS

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ............................................................................... 1

II. FACTUAL BACKGROUND ............................................................. 2

    A.    TNR, Playboy, and the Product License Agreement. ............................ 2

    B.    TNR's First Amended Complaint and Playboy's Motion to Dismiss. . 5

III. LEGAL STANDARD ......................................................................... 5

IV. ARGUMENT ...................................................................................... 6

    A.    The FAC Properly Alleges That the PLA Created A Franchise Under California Law and the PLA Falls Within the Jurisdiction of Those Laws.. ............................................................................................... 6

          1.    The FAC Properly Alleges the PLA Satisfied Each Element Required Under California Law to Create a Franchise. ................... 6

                 a.    The FAC Properly Alleges the PLA Satisfied the Marketing Plan Element Because It Gave Playboy Significant Control Over TNR's Business Associated With Playboy's Mark. ............................................... 8

                 b.    The FAC Properly Alleges That TNR's Condom Business Was Substantially Associated with Playboy's Mark. ....................................................................... 11

          2.    The FAC Alleges Sufficient Facts to Satisfy the Jurisdictional Requirements of the Franchise Laws and No Exemptions Apply. ................................................................ 13

    B.    TNR's Tortious Interference Claims Are Adequately Pled. ................ 15

          1.    The Economic Loss Rule Does Not Bar TNR's Tortious Interference Claims. ....................................................................... 15

          2.    Playboy Can Be Held Liable for Interfering in TNR's Contracts and Relationships with Third Parties. ............................ 18

          3.    TNR Has Adequately Alleged Claims for Intentional And Negligent Interference with Prospective Economic Relations. ...... 20

    C.    TNR Has Stated A Cognizable Claim for Fraudulent Inducement. .. 21

    D.    TNR's Conversion Claim is Adequately Pled. ................................... 23

    E.    TNR Is Entitled To Allege An Unfair Competition Claim. ................ 24

V. CONCLUSION. ................................................................................. 25

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Applied Equipment Corp. v. Litton Saudi Arabia Ltd.*,
  7 Cal. 4th 503 (1994) .................................................................... 18, 19

*Ashcroft v. Iqbal*,
  556 U.S. 662, 129 S. Ct. 1937 (2009)......................................... 1, 5

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544, 127 S. Ct. 1955 (2007)........................................ 1, 5, 6

*Boats & Motor Mart v. Sea Ray Boats, Inc.*,
  825 F.2d 1285 (9th Cir. 1987) ...................................................... 8, 10

*Charpentier v. Los Angeles Rams Football Co., Inc.*,
  75 Cal. App. 4th 301 (1999) .......................................................... 22

*Cusano v. Klein*,
  280 F. Supp. 2d 1035 (C.D. Cal. 2003) ........................................ 23

*Desert Outdoor Advertising v. Superior Court*,
  196 Cal. App. 4th 866 (2011) ....................................................... 22

*Ehrlich v. BMW of N. Am., LLC*,
  801 F. Supp. 2d 908 (C.D. Cal. 2010) ........................................... 5

*Eminence Capital, LLC v. Aspeon, Inc.*,
  316 F.3d 1048 (9th Cir. 2003) ........................................................ 2

*Frango Grille USA, Inc. v. Pepe's Franchising Ltd.*,
  2014 WL 7892164 (C.D. Cal. July 21, 2014)............................... 13

*Gabana Gulf Distribution, Ltd. v. GAP Int'l Sales, Inc.*,
  2008 WL 111223 (N.D. Cal. Jan. 9, 2008)................................... 11

*Gentis v. Safeguard Business Sys., Inc.*,
  60 Cal. App. 4th 1294 (1998) ......................................................... 7

*Hamilton San Diego Apartments v. RBC Capital Markets Corporation*,
  2013 WL 12090313 (S.D. Cal. Mar. 5, 2013) .............................. 18

*JRS Prods. Inc. v. Matsushita Electric Corp. of Am.*,
    115 Cal. App. 4th 168 (2004) ............................................................. 14, 17

*Julius Castle Restaurant Inc. v. Payne*,
    216 Cal. App. 4th 1423 (2013) ................................................................. 23

*Kim v. Servosnax, Inc.*,
    10 Cal. App. 4th 1346 (1992) ..................................................................... 7

*Korea Supply Co. v. Lockheed Martin Corp.*,
    29 Cal. App. 4th 1134 (2003) ............................................................ 24, 25

*Lazy Y Ranch LTD. V. Behrens*,
    546 F.3d 580 (9th Cir. 2008) ...................................................................... 1

*Morongo Band of Mission Indians v. Rose*,
    893 F.2d 1074 (9th Cir. 1990) ................................................................... 2

*Nat'l Med. Transportation Network v. Deloitte & Touche*,
    62 Cal. App. 4th 412 (1998) ..................................................................... 20

*OSU Student Alliance v. Ray*,
    699 F.3d 1053 (9th Cir. 2012) ................................................................... 5

*People v. Kline*,
    110 Cal. App. 3d 587 (1980) ............................................................... 7, 10

*Powerhouse Motorsports Grp. v. Yamaha Motor Corp.*,
    221 Cal. App. 4th 867 (2013) ................................................................... 19

*Robinson Helicopter Co., Inc. v. Dana Corp.*,
    34 Cal. 4th 979 (2004) ............................................................................. 17

*Rosenthal v. Great Western Fin. Sec. Corp.*,
    14 Cal. 4th 394 (1996) ............................................................................. 21

*Scripps Health v. nThrive Rev. Sys. LLC*,
    2021 WL 1978477 (S.D. Cal. May 18, 2021) ......................... 18, 19, 20, 21

*Starr v. Baca*,
    652 F.3d 1202 (9th Cir. 2011) ............................................................ 5, 17

*Stocco v. Gemological Inst. of America, Inc.*,
    975 F. Supp. 2d 1170 (S.D. Cal. 2013) ................................................... 13

iii

*Synergy Proj. Mgmt., Inc. v. City & Cty. of San Francisco*,
  2018 WL 2234596 (N.D. Cal. May 16, 2018)............................................................18

*United Nat'l Maint. Inc. v. San Diego Convention Ctr., Inc.*,
  766 F.3d 1002 (9th Cir. 2014) ...................................................................................19

*Voris v. Lampert*,
  7 Cal. 5th 1141 (2019) ...............................................................................................24

*Welco Electronics, Inc. v. Mora*,
  223 Cal. 4th 202 (2014) .............................................................................................23

*Woods v. Fox Broad. Sub., Inc.*,
  129 Cal. App. 4th 344 (2005) ....................................................................................19

**Statutes**

Cal. Bus. & Prof. Code § 20001 ...................................................................................7, 8

Cal. Bus. & Prof. Code § 20015 .................................................................................12, 13

Cal. Corp. Code § 31005 .........................................................................................7, 8, 12

Cal. Corp. Code § 31102 ..........................................................................................13, 14

**Rules**

Fed. R. Civ. Proc. 8 ..........................................................................................................5, 6

Fed. R. Civ. Proc. 12 ...........................................................................................................5

**Other Authorities**

Eighth Amendment ...........................................................................................3, 4, 21, 22

PLAINTIFF'S OPPOSITION TO PLAYBOY'S MOTION TO DISMISS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## I.    INTRODUCTION

On a motion to dismiss, courts accept the allegations as true; construe the pleadings in the light most favorable to the non-moving party; and resolve all doubts in the pleader's favor. *Lazy Y Ranch LTD. V. Behrens*, 546 F.3d 580, 588 (9th Cir. 2008); *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557-58, 127 S. Ct. 1955, 1966-67 (2007).  Under these standards, the Court should swiftly and completely deny Playboy's Motion.

*First*, Playboy's arguments regarding TNR's franchise claims fail across the board. TNR has pleaded the statutory elements of a franchise including the existence of a marketing plan and substantial association between Playboy's mark and the operation of TNR's business in selling Playboy-branded condoms and lubricants.  TNR has also alleged that TNR's business met the jurisdictional requirements of California's franchise laws, as the business operated within California and engaged in business activities directed at customers from within California.

*Second*, TNR's tortious interference claims are sufficiently pled, as they are premised on Playboy's wrongful interference in TNR's contractual relationships with *third parties*—namely, retailers and distributors with whom TNR had cultivated independent relationships—not Playboy's breaches of the PLA.  They are also based on Playboy's efforts to covertly sell an entirely different category of products outside the scope of the PLA (wipes), without TNR's knowledge while using TNR's relationships and resources. Playboy's arguments to the contrary are premised on a fundamental misunderstanding of TNR's tortious interference claims and applicable precedent.

*Third*, TNR's conversion claim should survive because it seeks damages separate and apart from those sought by TNR's contract cause of action, and because TNR has identified a specific, quantifiable sum that was misappropriated by Playboy.

*Fourth*, Playboy contends that TNR's UCL claim is barred because TNR has adequate remedies at law.  However, this misapprehends the relief sought by TNR under section 17200.  TNR's UCL claim seeks restitutionary disgorgement, for, among other

1

things, Playboy's infiltrating of TNR's shelf space at retailers, which is separate and independent from the contract and tort damages sought elsewhere.

*Finally*, TNR has alleged a cognizable claim for fraudulent inducement. While Playboy contends that TNR has not alleged an actionable misrepresentation, the FAC alleges not only an affirmative misrepresentation by Playboy, but also active concealment of material facts and non-disclosure in violation of a duty to disclose.

Because TNR has adequately alleged each of the claims that Playboy seeks to dismiss, the Court should deny the Motion in its entirety.

## II. FACTUAL BACKGROUND

### A. TNR, Playboy, and the Product License Agreement.

The FAC alleges detailed facts to support each of the claims for relief. For nearly three decades, Thai Nippon Rubber Industry Public Limited Company ("TNR") has operated a successful business as a manufacturer of high-quality condoms, and, more recently, lubricant products. FAC ¶ 10. Since November 2016, TNR has been publicly traded on the Stock Exchange of Thailand, trading under the ticker "TNR." *Id*. The FAC alleges that, for many years, Playboy Enterprises International, Inc. and Products Licensing LLC (together, "Playboy") has used licensing agreements to leverage and increase its worldwide brand recognition and market resources to sell products in the sexual wellness space. FAC ¶ 12. To that end, in April 2018, TNR entered into a Product License Agreement ("PLA") with Playboy,[1] which granted TNR the exclusive right to design, manufacture, advertise, promote, sell, and distribute condoms bearing Playboy's mark (the "Products") in an area covering more than 180 countries, including the United States and California (the "Territory"). FAC ¶ 25. In exchange for this grant of exclusive rights, TNR paid to Playboy guaranteed and earned royalties in the seven-figure range, and an upfront fee under the Novation Agreement. FAC ¶¶ 25–26, 119.

---

[1] TNR entered into the PLA with Playboy by way of Sale and Purchase Agreement ("SPA") with its predecessor in interest United Medical Devices, LLC ("UMD"), and a Novation Agreement between Playboy, UMD, and TNR. FAC ¶¶ 18–25.

PLAINTIFF'S OPPOSITION TO PLAYBOY'S MOTION TO DISMISS

The FAC further alleges that the PLA set forth exacting specifications for TNR's design, manufacture, advertisement, promotion, sale, and distribution of the Products, and gave Playboy significant control over TNR's use of its mark.  FAC ¶¶ 28–29.  The FAC contains detailed allegations regarding Playboy's control over TNR's business related to the Playboy mark.  *Id.*  Among other things, the FAC alleges that the PLA: (a) limited TNR's exercise of its exclusive rights to the Territory and gave Playboy the right to deem any sales of the Products outside the Territory to be an incurable default; (b) conditioned TNR's ability to sell the Products on receiving prior approval from Playboy and imposed a series of strict requirements on product quality and the related packaging materials used in connection with the Products; (c) required TNR to make advertising, promotion, and marketing expenditures in a given License Year related to the Products of not less than 3% of its net sales or minimum net sales; (d) required TNR to submit its advertising, promotional and marketing plan for Playboy's approval on a yearly basis, in Playboy's specified format; (e) required TNR to follow the approved marketing plan in connection with sales of the product; (f) required TNR to seek preapproval of any public relations efforts related to the Products; (g) required TNR to keep books in the manner prescribed by Playboy; (h) required TNR to seek pre-approval for the use of any subcontractor or supplier to manufacture or distribute the products; and (i) required TNR to meet minimum net sales amounts each year.  FAC ¶ 28.  The PLA also imposed severe consequences for failure to comply with these conditions.  *Id.*

The FAC also contains detailed allegations regarding the parties' conduct following their entry into the PLA.  For TNR's part, TNR worked diligently to exercise its rights under the PLA to expand sales and distribution of the Products within the Territory, and its efforts paid off as it significantly expanded sales of the products from what its predecessor had been able to accomplish.  FAC ¶ 55.  As alleged in the FAC, however, Playboy soon began a covert campaign to systematically undermine TNR's rights under the PLA, and take back lucrative rights for itself.  FAC ¶¶ 1, 13, 55.  The FAC alleges that as part of this campaign, Playboy induced TNR to enter the Eighth Amendment to the PLA, which re-

3

defined "Products" to exclude CBD-based products, a potentially lucrative product line that Playboy wished to own and operate itself. FAC ¶¶ 44–45. The FAC further alleges that Playboy also undertook to poach TNR's agent, Nicholai Allen ("Allen") by covertly offering Allen a consulting role and working with Allen to sell his wipes products under the Playboy brand, in exchange for Allen's assistance in exploiting TNR's retail and distributor relationships. FAC ¶¶ 55–69. Playboy deliberately concealed its efforts to poach Allen and exploit TNR's relationships and resources from TNR. *Id.* Playboy also deliberately interfered in TNR's relationships with retailers including Walmart by, among other things, selling its own products using TNR's account and shelf space with those retailers, to the detriment of TNR's ability to sell Playboy-branded products under the PLA. FAC ¶¶ 70–81. Playboy also withheld its approval of marketing plans and potential opportunities under the PLA, significantly hindering TNR's ability to exploit the rights that it had bargained for. FAC ¶¶ 82–91. The FAC contains detailed and specific factual allegations regarding Playboy's wrongful conduct in each of these respects.

In February 2021, Playboy resumed its status as a publicly-traded company, and Playboy's CEO Ben Kohn made clear that Playboy's strategy for the future included taking back rights to product categories it had previously licensed to others. FAC ¶¶ 94–95. In particular, Mr. Kohn confirmed Playboy's desire to seize direct control of the sexual wellness business it was licensing to companies like TNR, stating flatly that "[s]exual wellness is a category [Playboy wants] to own . . . on a global basis" and that Playboy had begun making that desire a reality "by terminating contracts and taking back rights to certain product categories." FAC ¶ 95. In furtherance of this strategy, Playboy informed TNR that it would conduct an unprecedented audit under the PLA, despite never having conducted an audit up to that point of either TNR or its predecessor UMD. FAC ¶ 97. On November 5, 2021, Playboy informed TNR that it was terminating the PLA, effective immediately, citing as its justification audit findings from July 2021. FAC ¶¶ 108–09.

PLAINTIFF'S OPPOSITION TO PLAYBOY'S MOTION TO DISMISS

**B.    TNR's First Amended Complaint and Playboy's Motion to Dismiss.**

TNR filed its original Complaint on December 17, 2022 (ECF No. 1), and its First Amended Complaint on March 16, 2022 (ECF No. 28 (the "FAC")).  TNR's FAC asserts claims against Playboy for: (a) violation of California's Franchise Relations Act and Franchise Investment Law (Counts I and II); (b) breach of contract (Count III); (c) breach of the implied covenant of good faith and fair dealing (Count IV); (d) violation of California's Unfair Competition Law ("UCL") (Count V); (e) tortious interference (Counts VI through VIII); (f) fraudulent inducement to contract (Count IX); and (g) conversion (Count X).

Playboy filed its Amended Motion to Dismiss on April 26, 2022.[2]  Playboy's Motion seeks to dismiss TNR's franchise claims (Counts I and II), UCL claim (Count V), tortious interference claims (Counts VI through VIII), fraudulent inducement claim (Count IX), and conversion claim (Count X).  Playboy's Motion does not seek to dismiss TNR's claims for breach of contract or breach of the covenant of good faith and fair dealing (Counts III and IV).

## III.    LEGAL STANDARD

FRCP 8(a)(2) requires a "short and plain statement of the claim showing that the pleader is entitled to relief."  Plaintiffs need not offer "detailed factual allegations" but must provide "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557–58, 127 S. Ct. 1955, 1966–67 (2007).  To survive a Rule 12(b)(6) motion, a plaintiff's claim must merely be "plausible on its face," which means that the Court can "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft*, 556 U.S. at 678.

In evaluating Playboy's motion, all allegations of fact in the FAC are taken as true and must be construed in the light most favorable to the Plaintiff. *E.g.*, *OSU Student All.*

---

[2]    Playboy originally filed its Motion on April 25, 2022 (ECF No. 43), but re-filed on April 26 to address certain formatting issues identified by the Court (ECF No. 45-1).

PLAINTIFF'S OPPOSITION TO PLAYBOY'S MOTION TO DISMISS

*v. Ray*, 699 F.3d 1053, 1058 (9th Cir. 2012); *Ehrlich v. BMW of N. Am., LLC*, 801 F. Supp. 2d 908, 915 (C.D. Cal. 2010).  And the factual allegations of the complaint "need only plausibly suggest an entitlement to relief."  *Starr v. Baca*, 652 F.3d 1202, 1217 (9th Cir. 2011).  Rule 8(a) "*does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence to support the allegations.*"  *Id.* (citing *Twombly*, 550 U.S. at 556) (emphasis in original).

## IV.   ARGUMENT

### A.   The FAC Properly Alleges That the PLA Created A Franchise Under California Law and the PLA Falls Within the Jurisdiction of Those Laws.

Playboy argues that TNR has not adequately alleged claims under California's franchise laws (Counts I and II), contending that the parties' relationship under the PLA was nothing more than "the license of intellectual property."  Playboy Memo. ISO Partial Motion to Dismiss (ECF No. 45-1) ("MTD") at 9.  Playboy's arguments are based on a flawed interpretation of both the relevant facts and applicable law, and ask the Court to ignore precedent upholding franchise claims based lesser indicia of control than are present here.  In reality, the FAC alleges that (i) the PLA's terms gave Playboy sufficient control to dictate how TNR could sell Playboy's branded products; (ii) TNR's business of making those products was substantially associated with Playboy's mark because TNR had the right to use the mark and sold those products to customers bearing the mark; and (iii) TNR obtained the right to engage in that business only after paying a fee to Playboy.  FAC ¶¶ 28, 113–25.  The FAC also alleges that the PLA fell within the jurisdiction of California's franchise law because TNR conducted business in California and engaged in transactions aimed at its customers from California.  FAC ¶¶ 113–25.

These allegations suffice to state a claim against Playboy for violation of California's franchise laws, and Playboy's arguments to the contrary do not disturb that conclusion.

### 1.   The FAC Properly Alleges the PLA Satisfied Each Element Required Under California Law to Create a Franchise.

PLAINTIFF'S OPPOSITION TO PLAYBOY'S MOTION TO DISMISS

Counts I and II of the FAC assert claims against Playboy for wrongful termination of a franchise in violation of the California Franchise Investment Law ("CFIL") and failure to register a franchise in violation of the California Franchise Relations Act ("CFRA"). FAC ¶¶ 126-45.  Both laws define a franchise essentially the same way:

> "[A] contract or agreement, either expressed or implied, whether oral or written, between two or more persons by which: (1) A franchisee is granted the right to engage in the business of offering, selling or distributing goods or services under a marketing plan or system prescribed in substantial part by a franchisor; and (2) The operation of the franchisee's business pursuant to such plan or system is substantially associated with the franchisor's trademark, service mark, trade name, logotype, advertising or other commercial symbol designating the franchisor or its affiliate; and (3) The franchisee is required to pay, directly or indirectly, a franchise fee."

Cal. Corp. Code § 31005; *see also* Cal. Prof & Bus. Code § 20001.

The core public policy of the franchise laws is to "[protect] prospective franchisees" and to "prevent franchise sales where it is likely that the franchisor's promises would not be fulfilled." *Kim v. Servosnax, Inc.*, 10 Cal. App. 4th 1346, 1355–56 (1992).  Like all protective statutes, the franchise laws must be "liberally construed to effect their object and quell the mischief at which they are directed." *Id*. at 1356.  In determining whether an agreement creates a franchise, "each element should be construed liberally to broaden the group of investors protected by the law and to carry out the legislative intent." *Id*. at 1356. Thus, the parties' characterization of the agreement does not control the inquiry; the focus is whether the agreement satisfies the statutory elements necessary to constitute a franchise. *See, e.g.*, *People v. Kline*, 110 Cal. App. 3d 587, 594 (1980) (finding that a franchisor could not avoid the requirements of the franchise laws by describing the franchise agreement "in terms of sale of a 'business opportunity'"); *Gentis v. Safeguard Bus. Sys., Inc.*, 60 Cal.

PLAINTIFF'S OPPOSITION TO PLAYBOY'S MOTION TO DISMISS

App. 4th 1294, 1301 (1998) (finding that a contract styled as a distributorship agreement constituted a franchise).  The FAC properly alleges that the PLA satisfies each statutory element.

> a. *The FAC Properly Alleges the PLA Satisfied the Marketing Plan Element Because It Gave Playboy Significant Control Over TNR's Business Associated With Playboy's Mark.*

Although California courts have "the final say" on a statute's meaning, the interpretation of the franchise laws by the Department of Financial Protection and Innovation ("DFPI") is "entitled to great weight."  *Kline*, 110 Cal. App. 3d. at 593.  California courts give particular weight to the DFPI Commissioner's Release 3-F (June 22, 1994) ("Release 3-F") and its analysis of what constitutes a franchise.  As Release 3-F explains, whether the marketing plan or system element is satisfied depends on how the provisions of the putative franchise agreement affect the "ability of the person engaged in the business to make decisions substantially without being *subject to restrictions or having to obtain the consent or approval of other persons*."  Release 3-F ¶ 1.2.2.4 (citing Cal. Corp. Code § 31005).

The leading case on the marketing plan or system element is the Ninth Circuit's decision in *Boats & Motor Mart v. Sea Ray Boats, Inc.*, 825 F.2d 1285, 1288–89 (9th Cir. 1987).  In *Sea Ray Boats*, the Ninth Circuit analyzed whether an agreement providing the plaintiff boat dealership with the "right to engage in the business of offering, selling or distributing [the defendant's] goods or services" satisfied the marketing plan or system element under the FRA.  825 F.2d at 1288 (quoting Cal. Bus. & Prof. Code § 20001).  The Ninth Circuit held that requiring the plaintiff to engage in "aggressive advertising," "conduct a variety of promotions and to carry [the defendant's] array of accessory sales devices"—coupled with the fact that the plaintiff received its "instructions and its basic sales information" from the defendant—were more than enough to support a finding that the plaintiff followed a "marketing plan or system prescribed in substantial part by a franchisor."  *Id*. at 1289.

PLAINTIFF'S OPPOSITION TO PLAYBOY'S MOTION TO DISMISS

Taken together, the FAC alleges a series of controls at Playboy's disposal more significant than those the Ninth Circuit found sufficient in *Sea Ray Boats*. The FAC sufficiently alleges several examples of Playboy's control over TNR's decisions about—and operation of—the Playboy-branded business:

- The PLA "conditioned TNR's ability to sell [Playboy's branded products] on receiving prior approval from Playboy, and it imposed a series of strict requirements" on virtually all aspects of what TNR manufactured and sold bearing Playboy's mark—including, but not limited to, product quality, packaging, product materials, labels, containers, artwork, printing, and images. FAC ¶ 28(c);

- The PLA required TNR to seek pre-approval of its marketing, advertising, and promotions activities in connection with the products, it also required TNR to spend "not less than 3% of either its net sales or minimum net sales, whichever was greater" on such efforts. FAC ¶ 28(d);

- The PLA prevented TNR from using "any subcontractor or supplier to manufacture or distribute the Products" without Playboy's prior approval, and it required TNR to engage those parties using Playboy's specified contracts; FAC ¶ 28(h);

- The PLA "required TNR to affix Playboy's official holograms to the Products for certain sales of Products outside the United States and to provide reports with certain metrics about hologram usage." FAC ¶ 28(f);

- The PLA limited TNR's exclusive rights under the PLA to the territory (FAC ¶ 28(b)), and it likewise "restricted TNR's use of advertising, promotion, sales materials to use in the Territory and restricted its distribution of the Products to those distribution channels specified in the PLA." FAC ¶ 28(e); and

- The PLA subjected TNR to a twice-yearly audit, dictated the manner in which TNR kept its books and retained financial records, and obligated TNR to bear the cost for an audit revealing certain deficiencies. FAC ¶ 28(g).

PLAINTIFF'S OPPOSITION TO PLAYBOY'S MOTION TO DISMISS

The control mechanisms of the PLA were substantial, and they enabled Playboy to control virtually all aspects of the manner in which TNR operated the business associated with Playboy's marks—from product quality to marketing and advertising efforts to the use of subcontractors and distributors.  Though it tries to minimize the effect of the control mechanisms, Playboy concedes in its brief that these mechanisms allowed Playboy "to approve or disapprove products, packaging, advertising, sub-contractors and sub-licensees, and [gave Playboy] the right to audit TNR's books."  MTD at 9.  The FAC thus alleges that the PLA satisfies the marketing plan element.

To sidestep the franchise laws, Playboy makes the unsupported contention that the marketing plan element evaluates the licensor's power to approve the licensee's actual marketing plan.  MTD at 7–11.  In actuality, the element serves as a barometer of the licensor's control over *the franchisee's business associated with the franchisor's mark*— here, the Playboy-branded sexual wellness products. And as explained above, Playboy's control over that business was significant.  But even if Playboy's analysis were correct, the argument still fails because the FAC pleads that (i) the PLA required TNR to secure approval[3] of its marketing plan, which TNR then had to use in selling Playboy's products; and (ii) TNR also needed prior approval of all other public relations, advertising, and promotional efforts.  FAC ¶¶ 28(d).

Next, Playboy advances the similarly misplaced argument that a franchise is created only when the franchisor provides everything necessary for the franchisee to operate the

---

[3]  Playboy tries to minimize its approval powers under the PLA, but, to be sure, the FAC alleges not only that Playboy *possessed* significant powers under the PLA to control TNR's marketing, advertising, promotional, and public relations efforts, but it also *used* those powers—to TNR's detriment. For example, the FAC alleges that Playboy's failure in 2021 to timely approve TNR's marketing and promotion/advertising requests kept TNR from pursuing "various holiday promotions such as Valentine's Day and St. Patrick's Day themed promotions" and to forego "opportunities for increased sales." FAC ¶ 116.  Likewise, the FAC alleges that Playboy withheld approval of a 200-page marketing plan that served as a blueprint for TNR's attempt to sell Playboy's products through social media, digital marketing, and other internet-based efforts.  FAC ¶ 85. Thus, even if the franchisor's control over the franchisee's marketing plan and related efforts were the proper yardstick to measure TNR's franchise claims, the FAC's allegations are more than sufficient to establish that control.

PLAINTIFF'S OPPOSITION TO PLAYBOY'S MOTION TO DISMISS

relevant business.  MTD at 8. Yet none of the authorities Playboy cites support that proposition, and Playboy only reaches it by selectively citing examples from those cases and treating them as if those are the only examples found sufficient to indicate the existence of a franchise.  *See* MTD at 8–9 (citing *Kline*, 110 Cal. App. 3d at 591 and *Sea Ray Boats*, 825 F.2d at 1287).

Finally, Playboy argues that the PLA was just a license, and the control mechanisms of the PLA simply provided a means to police that license.  MTD at 17–18.  As explained above, the provisions of the PLA went beyond ensuring uniformity of products and quality control; in material and significant ways, they controlled the way TNR operated, marketed, and promoted the business of selling Playboy's branded products.  *See, e.g.*, FAC ¶¶ 28(a)-(i), 29, 115(a)-(h).  Playboy is also wrong to make the blanket assertion that the control mechanisms of the PLA are ones that Release 3-F has specifically "single[d] out . . . as not indicative of a marketing plan."  MTD at 10 (citing Commissioner's Release 3-F ¶ 1.2.2.6).  Rather, Release 3-F explains that while any single mechanism will not establish the required marketing plan or system (Release 3-F ¶ 1.2.2.6), several such mechanisms taken together may well "amount to such a plan or system" (*id*. ¶ 1.2.2.7).  That is precisely the situation here: The various mechanisms embedded in the PLA, taken together, provided Playboy with more than sufficient to control to satisfy the marketing plan or system element.  *See, e.g.*, FAC ¶¶ 28(a)(i), 29, 115(a)-(h).

        b.   *The FAC Properly Alleges That TNR's Condom Business Was Substantially Associated with Playboy's Mark.*

The substantial association element "is satisfied where the franchisee is granted the right to use the franchisor's symbol *or* where the trademark is communicated to" the franchisee's customers.  *Gabana Gulf Distrib., Ltd. v. GAP Int'l Sales, Inc.*, No. C 06-02584 CRB, 2008 WL 111223, at *5 (N.D. Cal. Jan. 9, 2008) (emphasis in original).  The FAC alleges that both those conditions are met here: The PLA granted TNR the right to "engage in the business of selling branded condoms and lubricants bearing Playboy's mark, [*and* that mark] was communicated to TNR's customers via the packaging of the Products."

PLAINTIFF'S OPPOSITION TO PLAYBOY'S MOTION TO DISMISS

FAC ¶ 118 (emphasis added).  Indeed, the FAC further alleges that sales of Playboy's branded sexual wellness products were the crux of TNR's sales relationships with major retailers like Walmart.  *See* FAC ¶¶ 41–43, 73.  Playboy's motion to dismiss should therefore be denied because the FAC alleges that the PLA granted TNR the right to use Playboy's mark, and that mark was communicated to TNR's customers.

Playboy's arguments to the contrary do not change that analysis.  Playboy relies on *Gabana* to argue that no substantial association existed between TNR's sales of Playboy-branded products and the Playboy mark because customers did not think they were transacting with Playboy.  MTD at 12 (citing *Gabana*, 2018 WL 111223, at *5).  But *Gabana* held that the plaintiff failed to show customers associated it *with the defendant's trademark*, not that the plaintiff's failed to show customers thought they were doing business with the defendant.  *Id*. at *6.

Further, key differences between the agreement in *Gabana* and the one here illustrate why that case does not help Playboy's position.  The relevant agreement between the parties in *Gabana* specifically barred the plaintiff "from 'adopt[ing] any trademark, service mark, trade name, trade dress or any element thereof which might be considered [to] carry the risk of association with [the defendant].'"  *Id*. at *5.  By contrast, the FAC alleges that the PLA provided TNR with the express "right to design, manufacture, advertise, promote, sell, and distribute condoms *bearing Playboy's mark*" in an exclusive territory covering more than 180 countries.  FAC ¶ 25.

Playboy fares no better when it argues that the parties' core businesses were too disparate from one another to satisfy the substantial association element, because Playboy is an adult content company (with its most recent publicized announcement from its CEO that it was going into TNR's business of sexual wellness products), and TNR is a manufacturer of condoms and lubricants.  MTD at 12.  That argument misunderstands the substantial association analysis, and just as before, Playboy seems to have invented it from whole cloth.  The franchise laws require a substantial association between the franchisor's mark and "[t]he operation of the franchisee's business pursuant to [the franchisor's

marketing] plan or system[.]"  Cal. Corp. Code § 31005.  Those laws do not require an association between the franchisor and franchisee's overall businesses.

The FAC properly alleges that the terms of the PLA satisfy both the marketing plan and substantial association elements of the franchise laws.  The court should deny Playboy's motion to dismiss TNR's franchise claims.

**2.    The FAC Alleges Sufficient Facts to Satisfy the Jurisdictional Requirements of the Franchise Laws and No Exemptions Apply.**

Both the CFIL and CFRA limit their protections to franchisees that operate within California or engage in business activities directed at customers from within California.  *See* Cal. Corp. Code § 31005; Cal. Bus. & Prof. Code § 20015.  Those limitations aim to prevent franchisees operating wholly out of state from seeking the protection of California's franchise laws.

The FAC alleges that TNR "engaged in sales, leases, and business transactions directed toward customers from within California" through the activities of Nicholai Allen and his California-based marketing and sales company, Monarch Digital Media LLC.  FAC ¶ 120.  Mr. Allen was TNR's Global Sales Manager, and his principal place of business was in California.  FAC ¶¶ 33, 120.   The FAC further alleges that "TNR officials routinely engaged in transactions from California directed at customers" and that "TNR also paid rent to Playboy [for an office space in California]" on Allen's behalf. *Id*.  Those allegations suffice to establish the jurisdiction of the CFIL and CFRA over TNR's claims against Playboy.

Relying on *Stocco v. Gemological Inst. of America, Inc.*, 975 F. Supp. 2d 1170, 1183 (S.D. Cal. 2013), Playboy tries to sidestep the application of those laws by arguing that the PLA is exempt from the CFIL because the FAC does not allege "that TNR sold or distributed any products *from* within California."  MTD at 13.  That argument fails for two reasons. First, as explained above, the FAC *does* allege that TNR engaged in the activities specified in the CFIL from *within* California.  FAC ¶ 120.  Playboy offers no authority to support the notion that TNR is not entitled to the protection of the CFIL by structuring its

1  business to have Allen conduct its sales and marketing activities through his companies.

2  Second, *Stocco* is not on point, because the plaintiff's complaint was dismissed for failing

3  to plead *any* facts to satisfy the requirements of the CFIL; instead, the allegations

4  established the plaintiff conducted *all* business transactions and provided its goods and

5  services from locations wholly within Italy.  *See Stocco*, 972 F. Supp. 2d at 1183.

6      Playboy's related arguments under the CFRA fail for similar reasons. The CFRA

7  exempts franchises that are neither domiciled in California nor operate there.  Cal. Bus. &

8  Prof. Code § 20015.  The FAC alleges that TNR operated in California both through Allen

9  and through the efforts of TNR executives during their visits to the state.  FAC ¶ 120.  But

10  even if the FAC did not include those allegations, Playboy's argument also fails because

11  the PLA gave TNR *the exclusive right* to operate in California, regardless of whether it did

12  so.  *See Frango Grille USA, Inc. v. Pepe's Franchising Ltd.*, No. CV 12-2086 DSF PLAX,

13  2014 WL 7892164, at *2 (C.D. Cal. July 21, 2014) (holding that the exemption does not

14  bar claims in which the franchisee had *the right* to operate in California despite neither

15  being domiciled nor operating in the state).

16      Finally, Playboy is incorrect that "the PLA is exempt under Section 31102 of the

17  CFIL." MTD at 14. That provision exempts the "offer or sale of a franchise *by a franchisee*

18  *for his own account*" unless the sale is "effected by or through a franchisor." Cal. Corp.

19  Code § 31102 (emphasis added).  The FAC alleges that Playboy effected a transfer of the

20  franchise from the predecessor franchisee to TNR through a novation in which TNR paid

21  $750,000 to Playboy through the predecessor for the right to become the new franchisee.

22  FAC ¶ 23.  Playboy admits that it received[4] the entire $750,000 fee for the novation of the

23

24  ─────────────────────
    [4]  In trying to seek shelter under the exemption in Section 31102, Playboy conflates the
25  predecessor's sale assigning its rights and obligations under the PLA to TNR with the
    transfer of the franchise from the predecessor to TNR.  MTD at 14.  To be sure, TNR
26  paid $15 million for the assignment of the predecessor's rights and obligations, but that
    assignment was worthless without Playboy's agreement to novate the PLA, and the
27  franchise could only change hands once the novation occurred.  *See* FAC ¶¶ 19, 23;
    FAC Exs. 2 and 3.  The terms of the novation required TNR to pay the $750,000 fee to
28  Playboy through the predecessor franchisee as part of the $15 million assignment that
    preceded it.  *See* FAC Ex. 3.  Still, the $750,000 novation fee represented TNR's *entire*

PLAINTIFF'S OPPOSITION TO PLAYBOY'S MOTION TO DISMISS

PLA. MTD at 14. Accordingly, Playboy cannot avail itself of the exemption under Section 31102 of the CFIL.

Because the FAC alleges that the PLA created a franchise and that no exemptions bar the application of the franchise laws, the court should deny Playboy's motion to dismiss Counts I and II of the FAC.

**B.    TNR's Tortious Interference Claims Are Adequately Pled.**

**1.    The Economic Loss Rule Does Not Bar TNR's Tortious Interference Claims.**

Playboy argues that TNR's tortious interference claims—intentional interference with contractual relations (Count VI), intentional interference with prospective economic relations (Count VII) and negligent interference with prospective economic relations (Count VIII)—are all barred under the economic loss doctrine. MTD at 15. The economic loss doctrine prevents a plaintiff from recovering in tort against its contracting counterparty for actions that constitute breaches of the underlying contract(s). *See JRS Prods. Inc. v. Matsushita Elec. Corp. of Am.*, 115 Cal. App. 4th 168, 183 (2004) ("This complaint sounds in contract, not tort . . . a breach of contract claim cannot be transmuted into tort liability by claiming that the breach interfered with the promisee's business."). Playboy argues that TNR's tortious interference claims are barred because they "merely restate contractual obligations" that TNR claims Playboy breached under the PLA. MTD at 16. Playboy's argument, however, is premised on a fundamental misapprehension of the allegations in this case, and a flawed application of the economic loss doctrine to the conduct alleged by TNR. In fact, TNR's tortious interference claims are adequately pled because they are premised on Playboy's wrongful interference in TNR's contractual relationships with *third parties*, not Playboy's breaches of the PLA.

---

*payment* for the right to operate Playboy's sexual wellness franchise. Playboy's admission that it received the fee prevents it from hiding this transaction behind the exemption of Section 31102.

PLAINTIFF'S OPPOSITION TO PLAYBOY'S MOTION TO DISMISS

A review of the FAC confirms that TNR's tortious interference claims—and the damages arising therefrom—are separate and distinct from TNR's breach of contract claim. TNR's tortious interference claims are centered on Playboy's wrongful interference in TNR's contracts and relationships with third party retailers and distributors—such as Walmart, Walgreens, CVS, and Core-Mark—relationships *to which Playboy was never a party.* FAC ¶¶ 168–74, 180–84, 190–92. TNR pursued relationships with these third party retailers and distributors in order to advance its condom and lubricant business in the United States and other parts of the Territory, and devoted significant resources to this effort. *See, e.g.*, FAC ¶¶ 22, 38, 42, 55. For example, with respect to Walmart, TNR worked diligently to pass Walmart's rigorous compliance evaluation process to become an authorized supplier to Walmart stores (FAC ¶ 42), entered into a General Merchandise Agreement which established the terms and conditions under which TNR would sell products in Walmart stores (FAC ¶ 41), and increased its sales of products in Walmart stores from 1,110 stores to all Walmart stores nationwide (FAC ¶ 55). Playboy was neither a participant in these efforts nor a party to the General Merchandise Agreement between TNR and Walmart.

The FAC lays out in detail the separate existence of these contractual relationships (*see, e.g.*, FAC ¶¶ 171–73), the fact that Playboy itself was neither a party nor an agent of a party to these contracts (*see, e.g.*, FAC ¶¶ 174), and Playboy's wrongful interference in these relationships through conduct that is separate and apart from any breach of the PLA and independent of the act of interference itself (FAC ¶¶ 171–73, 181–83, 195–96). *See, e.g.* FAC ¶ 171 ("Playboy engaged in conduct independent of the actual interference by intentionally misrepresenting its products as belonging to TNR in a presentation to Walmart to disrupt TNR's Walmart agreement and improperly securing shelf space and sales rights at Walmart for Playboy's products.").[5] The damages resulting from Playboy's

---

[5] Further evidencing the distinction between TNR's contract claims and its tortious interference claims, there are distinct products at issue with respect to each category of claims. Indeed, TNR's contract claims center on Playboy's violations of the PLA,

interference in these third party contracts is likewise separate and apart from contractual damages under the PLA. *See, e.g.*, FAC ¶ 171 ("These acts disrupted the contractual relationship between TNR and Walmart by depressing TNR's sales at Walmart, harming TNR's certified supplier status, brand, trust, and reputation with Walmart . . . and decreasing TNR's enjoyment of the benefits it derived from the Walmart agreement.").

By contrast, TNR's breach of contract claim (Count III) pertains to Playboy's breaches of the PLA *between TNR and Playboy*, which governed TNR's sale of Playboy-branded condoms and lubricants. FAC ¶¶ 146–51.[6] These breaches include: (a) Playboy's unreasonable and unjustified withholding of product approvals; (b) Playboy's failure to provide timely product and marketing plan approvals; (c) failure to cooperate with TNR as licensee in good faith; and (d) engaging in the wrongful termination of the PLA on the basis of pretextual audit findings. FAC ¶ 148. In turn, the damages sought by TNR for Playboy's breaches of the PLA include general, special and consequential damages resulting from Playboy's violations of the PLA. FAC ¶ 151.

TNR's allegations regarding its tortious interference claims are more than sufficient to survive the pleading stage, as TNR plausibly alleges each of the required elements and wrongful conduct that is separate and apart from any breach of contract. *See, e.g., Starr v. Baca*, 652 F.3d 1202, 1217 (9th Cir. 2011) (finding that factual allegations "need only 'plausibly suggest an entitlement to relief'"). In fact, the cases cited by Playboy underscore the plausibility of TNR's tortious interference claims here. For example, in *Robinson Helicopter Co., Inc. v. Dana Corp.*, 34 Cal. 4th 979 (2004), the plaintiff alleged tort claims

which permitted TNR to sell Playboy-branded condoms and lubricants. FAC ¶¶ 1, 16, 22, 148, 155. By contrast, TNR's tortious interference claims allege that Playboy engaged in wrongful conduct by, among other things, selling entirely separate products that were not within the scope of the PLA—climax delaying wipes—through TNR's account with retailers. FAC ¶¶ 66–67, 70–73.

[6] Playboy's effort to draw comparisons between TNR's breach of contract claim (Count III) and its tortious interference claims (Counts VI through VIII), consists of cherry-picking two allegations in support of TNR's breach of the implied covenant of good faith and fair dealing claim (Count IV). MTD at 16. Playboy ignores numerous breaches of the FAC that are alleged by TNR (FAC ¶ 148) that are clearly separate from TNR's tortious interference allegations (FAC ¶¶ 171–73, 181–83, 195–96).

based on the defendant's issuance of false certificates of conformance for helicopter clutches, and a breach of contract claim based on the defendant's provision of the same nonconforming clutches. *Id.* at 990–91. Rejecting the defendant's arguments premised on the economic loss doctrine, the California Supreme Court found that the economic loss rule *did not* bar tort recovery for the plaintiff, as the tort claims alleged by plaintiff were independent of the breach of contract claim.[7] 34 Cal. 4th at 991–92.

Similarly, Playboy cites *JRS Products Inc. v. Matsushita Electric Corp. of America*, for the proposition that the economic loss rule bars TNR's tortious interference claims even if "[t]here is abundant evidence to support each of the elements of the tort." 115 Cal. App. 4th at 179. But the plaintiff's tortious interference claim in *JRS* was based fundamentally on the fact "that [its contractual counterparty] terminated the contract [between the parties] without good cause." *Id.* at 183. Because the very same action—wrongful termination of the parties' contract—was the basis for both the breach of contract and the tortious interference claims, the Court of Appeal found that the plaintiff was not entitled to pursue a tort cause of action. *Id.* By contrast here, TNR's tortious interference claims are based on numerous wrongful acts, specified at length in the FAC, that were undertaken by Playboy to interfere in TNR's relationships with third parties, which are independent of Playboy's contractual breaches. *Compare* FAC ¶¶ 171–73, 181–83, 195–96 *with* FAC ¶¶ 146–51.

### 2. Playboy Can Be Held Liable for Interfering in TNR's Contracts and Relationships with Third Parties.

Playboy contends that a party cannot be held liable for interfering in its own contracts. MTD at 18. Again, this is not what TNR alleges here. TNR alleges that Playboy interfered in TNR's contracts with third parties that TNR, and TNR alone, secured as the manufacturer, distributor, and exclusive seller of Playboy-branded condoms and lubricants

---

[7] Playboy's MTD largely relies on a dissenting opinion from Justice Werdgar from *Robinson Helicopter*, rather than the majority opinion that found the plaintiff's claims sounding in tort were not barred by the economic loss doctrine. MTD at 17, 18.

PLAINTIFF'S OPPOSITION TO PLAYBOY'S MOTION TO DISMISS

in the US.  FAC ¶¶ 171–74, 181–83, 195–96.  The cases on which Playboy relies support the viability of these allegations.  For example, in *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.*, the California Supreme Court held that a party to a contract could not tortiously conspire with another to breach *that same contract*.  7 Cal. 4th 503, 514 (1994).  The *Applied Equipment* court further explained that "the tort duty not to interfere with the contract falls only on strangers – interlopers who have no legitimate interest in the scope or course of the contract's performance."  This is consistent with Playboy's conduct here: an interloper interfering in TNR's relationships with third party retailers and distributors.  *See, e.g.*, FAC ¶¶ 171–74, 181–83, 195–96.

Playboy also argues that, even though it was not a party to these contracts, it cannot be held liable for interfering with them because it had "significant economic interests" in their performance.  MTD at 18.  But Playboy's arguments misconstrue precedent on this point.[8]   Indeed, "California courts have repeatedly held that parties with an economic interest in a contractual relationship may be liable for intentional interference with that relationship."  *United Nat'l Maint. Inc. v. San Diego Convention Ctr., Inc.*, 766 F.3d 1002, 1008 (9th Cir. 2014) (citations omitted); *see also Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503 (1994); *Woods v. Fox Broad. Sub., Inc.*, 129 Cal. App. 4th 344 (2005) (company potentially liable for interference in a contract between a partially-owned subsidiary and several of its employees); *Powerhouse Motorsports Grp. v. Yamaha Motor Corp.*, 221 Cal. App. 4th 867 (2013) (manufacturer may be liable for interference with a sales contract between a franchise operator and a potential new owner).

---

[8]  Playboy relies on *Hamilton San Diego Apartments v. RBC Capital Markets Corporation*, No. 312CV2259JMBLM, 2013 WL 12090313 (S.D. Cal. Mar. 5, 2013) in support of its argument that it cannot be held liable for interfering in TNR's contracts with third party retailers and distributors.  MTD at 18.  But *Hamilton* has been called into question by subsequent cases, which have upheld claims for tortious interference where the underlying contract (like TNR's agreements with third parties here) does not expressly require the defendant's performance.  *Scripps Health v. Nthrive Rev. Sys. LLC*, No. 19-CV 00760-H-DEB, 2021 WL 1978477, at *7 (S.D. Cal. May 18, 2021); *Synergy Proj. Mgmt., Inc. v. City & Cty. of San Francisco*, 2018 WL 2234596, at *4 (N.D. Cal. May 16, 2018).

PLAINTIFF'S OPPOSITION TO PLAYBOY'S MOTION TO DISMISS

TNR's tortious interference claims are consistent with the holdings of these cases. In *United National Maintenance*, for example, the Ninth Circuit upheld a tortious interference claim where the defendant had an economic interest in the subject contract, where the defendant was not a party to (or agent of) the subject contract. 766 F.3d at 1008 ("There is no suggestion here that SDC was the agent of either Champion or GES."). Likewise here, Playboy was neither a party to (or agent of a party to) TNR's agreements with third parties. FAC ¶ 174. Moreover, consistent with *United National Maintenance*, TNR's tortious interference claims are not based on Playboy's failure to perform on a contract with Walmart, CVS, Core-Mark, etc. *United Nat'l Maint. Inc.*, 766 F.3d at 1008 (upholding tortious interference claim where plaintiff's "theory of liability . . . is not based on [defendant's] failure to perform a contract with [plaintiff's third party contractual counterparties]").

Further, Playboy does not identify any language in TNR's agreements with these third parties that expressly requires Playboy's performance. *Scripps Health*, 2021 WL 1978477, at *7 (upholding tortious interference claim were defendant "does not identify any language in the contract at issue between [plaintiff and another party] that expressly requires [defendant's] performance"). TNR's allegations that Playboy interfered in TNR's independent contracts with third parties thus fall squarely within the realm of tortious interference claims that have been permitted to proceed in this circuit. *Id.*

### 3.   TNR Has Adequately Alleged Claims for Intentional And Negligent Interference with Prospective Economic Relations.

Playboy argues that TNR's intentional and negligent interference with prospective economic relations claims (Counts VII and VIII) are barred because they fail to allege acts that are "independently wrongful." MTD at 19. In particular, Playboy contends that TNR "relies on nothing more than Playboy's alleged breach of the PLA to support its interference with prospective relations claims." *Id.* at 20. In support, Playboy provides a single "example" of wrongful conduct alleged by TNR, that "Playboy disrupted TNR's prospective economic relationship with the Russian distributor . . . by *wrongfully and*

*unreasonably withholding approval* of TNR's deal[.]"  *Id.* (emphasis in original) (citing FAC ¶ 183).

This is simply incorrect.  The FAC plainly alleges additional wrongful conduct by Playboy, which is separate and independent of Playboy's breaches of the PLA.  For example, the FAC alleges that Playboy: "disrupted TNR's prospective economic relationship with CVS . . . by (i) stealing TNR's professional and financial resources to have Allen present Playboy's products to CVS, using materials created by a presentation vendor paid for by TNR, in a TNR-exclusive presentation, (ii) violating the UCL by wrongfully inducing Allen to present Playboy's products in the aforementioned presentation; and (iii) misrepresenting itself to CVS . . . as being an authorized beneficiary of TNR's retailer relationship."  FAC ¶ 181.  The FAC further alleges that Playboy disrupted TNR's prospective economic relationship with Core-Mark by, among other things, "wrongfully inducing Allen to put a hold on TNR's negotiations with Core-Mark to force the negotiations to fail and undermine TNR's operations."  FAC ¶ 182.  Playboy makes no mention of these allegations, which clearly constitute conduct independent of Playboy's breach of the PLA and are accordingly the basis for an appropriately pled claim for interference with prospective economic relations.  *See, e.g.*, *Nat'l Med. Transportation Network v. Deloitte & Touche*, 62 Cal. App. 4th 412, 439–40 (1998).

## C.  TNR Has Stated A Cognizable Claim for Fraudulent Inducement.

Playboy argues that TNR's claim for fraudulent inducement (Count IX) fails because TNR has not sufficiently alleged an actionable misrepresentation.  MTD at 20–21.  Playboy acknowledges that there are three categories of actionable misrepresentations—false representation, active concealment, and nondisclosure by one with a duty to disclose—and that TNR has alleged all three, but claims that TNR's allegations are nonetheless insufficient to support a fraudulent inducement claim.  *Id.* at 21.  Playboy is wrong.

*First*, Playboy suggests that TNR alleges "mere non-disclosure" rather than active concealment, and that it had no duty because the parties were "dealing at arm's length" with respect to the Eighth Amendment.  This ignores salient facts that are specifically

alleged in the FAC, namely: (1) Playboy's obligations under the parties' agreements to act as a supportive licensor to TNR; and (2) Playboy withheld facts regarding the scope of the FAC from Allen, whom Playboy knew TNR relied upon for its US operations.  FAC ¶ 200.  The FAC also alleges that Playboy actively concealed material facts from TNR to induce its entry into the Eighth Amendment to the PLA, including that Playboy needed the Eighth Amendment to lawfully implement its CBD growth plan.  FAC ¶¶ 45, 200.

The FAC further explains that Playboy falsely represented that the Eighth Amendment needed to be signed urgently, which prevented TNR from seeking or consulting legal counsel prior to signing the document (FAC ¶¶ 50–53), and that TNR was required to rely on Allen due to its status as a new licensee (FAC ¶ 54).  Under these circumstances, Playboy's non-disclosure violated duties owed to TNR, and is grounds for an actionable claim for fraudulent inducement.  *See Rosenthal v. Great Western Fin. Sec. Corp.*, 14 Cal. 4th 394, 428 (1996) (upholding fraud claim where "the alleged fraud of [defendant's] representatives, if true, would have deprived [plaintiffs] of a reasonable opportunity to learn the character and essential terms of the documents they signed.").[9]

*Second*, TNR has adequately alleged a false representation: Playboy's false representation to Allen that CBD condoms and lubricants were excluded from the scope of the PLA, which Playboy falsely represented Allen had previously agreed with and knew Allen would relay to TNR.  FAC ¶ 201.  Playboy claims that this is insufficient to state a fraud claim based on a false representation, because it is "susceptible to an obvious

---

[9]  Playboy cites *Desert Outdoor Advertising v. Superior Court* to suggest that "knowledgeable business persons" are somehow precluded from asserting claims for fraudulent inducement based on non-disclosure.  MTD at 21–22 (citing *Desert Outdoor Advertising v. Superior Court*, 196 Cal. App. 4th 866, 874 (2011)).  But *Desert Outdoor Advertising* involved facts much different than the circumstances alleged here.  There, the arbitration agreement plaintiffs signed (and later asked to avoid) was sent to them with a cover letter that explained that it was new, needed to be reviewed and approved, and offered to make arrangements for new counsel in the event plaintiffs were unwilling to sign.  196 Cal. App. 4th at 874.  The arbitration agreement was also sent simultaneously to the plaintiff's corporate and litigation counsel.  *Id.*  Here, in contrast, Playboy withheld facts about the essential impact of the Eighth Amendment and conveyed a false sense of urgency that pressured TNR to sign the document without the benefit of counsel.  FAC ¶¶ 51–54.

PLAINTIFF'S OPPOSITION TO PLAYBOY'S MOTION TO DISMISS

alternative explanation"—that the scope of the PLA was "at best vague and that [Playboy COO] Patel was relying on Allen's opinions."  MTD at 22.  But this is simply not a viable alternative explanation, given the facts alleged elsewhere in the FAC that Playboy then moved immediately after execution of the Eighth Amendment to implement its plans for CBD products.  FAC ¶ 47 n.7.  Instead, Playboy's false representation was made in order to permit Playboy to retake valuable CBD rights that had previously belonged to TNR. These allegations are, at a minimum, sufficient to proceed past the pleading stage.  *See Charpentier v. Los Angeles Rams Football Co., Inc.*, 75 Cal. App. 4th 301, 311–12 (1999) (permitting fraud claim to proceed where former season ticket holder alleged that professional football team falsely represented its intentions to remain in Los Angeles).

At bottom, Playboy made actionable misrepresentations to induce TNR to sign the Eighth Amendment to the PLA because it wished to retake rights to CBD products for itself, which deprived TNR of valuable rights under the PLA for no consideration.  TNR has clearly alleged each of the elements required under California law.  *See, e.g.*, *Julius Castle Rest. Inc. v. Payne*, 216 Cal. App. 4th 1423, 1440 (2013)  (holding that fraudulent inducement occurs "when the promisor knows what he is signing but his consent is *induced* by fraud, mutual assent is present and a contract is formed, which, by reason of the fraud, is *voidable*[.]") (citations omitted) (emphasis in original).

### D.    TNR's Conversion Claim is Adequately Pled.

Playboy argues that TNR's conversion claim (Count X) is barred (1) by the economic loss rule and (2) because it improperly alleges the conversion of money.  MTD at 23–24.  Playboy's arguments are off base on both counts.  *First*, Playboy again attempts to conflate a non-contractual claim with TNR's claim for breach of contract by cherry-picking allegations in the FAC.  MTD at 23.  But here again, TNR's claim for conversion alleges wrongful conduct separate and apart from Playboy's breach of the PLA.  TNR alleges that Playboy wrongfully usurped TNR's resources to support its own products, for example, TNR's payment of $210,000 to Allen by poaching Allen to be a double agent to undermine TNR's operations.  FAC ¶ 207(b).  TNR's payment to Allen, which Playboy

PLAINTIFF'S OPPOSITION TO PLAYBOY'S MOTION TO DISMISS

improperly usurped, is not an amount that is contemplated or within the scope of the PLA, and TNR's contract claim against Playboy provides no avenue for TNR to recover this amount. TNR's conversion claim, therefore, is not "predicated on a mere breach of contract." *Cusano v. Klein*, 280 F. Supp. 2d 1035, 1043 (C.D. Cal. 2003).

*Second*, Playboy argues that TNR's conversion claim fails because money generally cannot be converted. MTD at 23–24. To the contrary, TNR's conversion claim is consistent with California precedent. TNR alleges conversion of a specific and identifiable sum. *Welco Elec., Inc. v. Mora*, 223 Cal. 4th 202, 216 (2014) ("A conversion claim does not require that a specific lump sum of money be entrusted to defendant; the plaintiff merely must prove a specific, identifiable sum of money that was taken from it."); *see also* FAC ¶ 207. Further, TNR alleges that the specific sums set forth in the FAC were misappropriated by Playboy and used for costs that are outside the scope of the PLA. FAC ¶ 207. This constitutes conversion as it is "interfer[ence] with [TNR's] possessory interest in a specific, identifiable sum," rather than "the simple failure to pay money owed." *Voris v. Lampert*, 7 Cal. 5th 1141, 1151 (2019).

### E.   TNR Is Entitled To Allege An Unfair Competition Claim.

Playboy argues that TNR cannot pursue a claim under California's Unfair Competition Law ("UCL") because it has pleaded adequate remedies at law. MTD at 24. But TNR's UCL claim is premised on conduct for which it has no adequate remedy at law, and which is independent of any of the damages claims it asserts elsewhere. For example, TNR alleges that Playboy "misrepresent[ed] Playboy's products as TNR products to usurp TNR's goodwill and take advantage of TNR's relationships with one or more major retailers" and "deceptively infiltrating TNR's earned and designated shelf space at one or more major retailers." FAC ¶ 160. Playboy does not contend that TNR seeks damages based on this conduct elsewhere.

Playboy further contends that TNR's UCL claim is barred because it is simply "a damages claim disguised as restitution." MTD at 25. But the relief sought by TNR under its section 17200 claim is restitutionary relief—specifically restitutionary disgorgement

(FAC ¶ 166)—that is separate and independent from the contract and tort damages TNR seeks elsewhere. For example, the FAC alleges that Playboy violated the UCL by, among other things, deceptively obtaining payment from TNR for expenses that were used for non-TNR products outside the of PLA, and infiltrating TNR's shelf space at retailers for the benefit of those same products. FAC ¶ 160. This is conduct that is separate and apart from the contractual breaches alleged by TNR elsewhere in the FAC (see, e.g., FAC ¶ 148), and TNR seeks restitutionary disgorgment from Playboy for amounts TNR expended or lost based on these unfair business practices. *See, e.g., Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. App. 4th 1134, 1150 (2003) ("[The UCL] provides an equitable means through which both public prosecutors and private individuals can bring suit to prevent unfair business practices and restore money or property to victims of these practices."). This is consistent with California precedent on remedies permitted under the UCL as TNR seeks to restore money it lost as a result of Playboy's unfair practices, and does not simply seek "duplicative liability" for its tortious interference claims as California courts have cautioned against. *See, e.g., Korea Supply Co.*, 29 Cal. App. 4th at 1143.

## V.    CONCLUSION.

For the foregoing reasons, TNR respectfully requests that the Court deny Playboy's Motion to Dismiss in its entirety.[10]

---

[10]    To the extent the Court is inclined to grant Playboy's Motion as to any of TNR's claims, TNR respectfully requests that any dismissal be granted with leave to amend. *See, e.g., Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) (where a motion to dismiss is granted, a district court should provide leave to amend unless it is clear that the Complaint could not be saved by any amendment); *see also Morongo Band of Mission Indians v. Rose*, 893 F.2d 1074, 1079 (9th Cir. 1990).

PLAINTIFF'S OPPOSITION TO PLAYBOY'S MOTION TO DISMISS

1

2    DATED:  May 2, 2022                KIRKLAND & ELLIS LLP

3                                       /s/  Mark Holscher
                                        Mark Holscher (SBN 139582)
4                                       mark.holscher@kirkland.com
                                        Kristin Rose (SBN 278284)
5                                       kristin.rose@kirkland.com
                                        KIRKLAND & ELLIS LLP
6                                       555 South Flower Street
                                        Los Angeles, CA  90071
7                                       Telephone: (213) 680-8400
                                        Facsimile: (213) 680-8500
8

9                                       DUANE MORRIS LLP

10                                      Cyndie M. Chang (SBN 227542)
                                        CMChang@duanemorris.com
11                                      DUANE MORRIS LLP
                                        865 South Figueroa Street, Suite 3100
12                                      Los Angeles, CA  90017-5450
                                        Telephone:  (213) 689-7400
13                                      Fax:  (213) 689-7401

14                                      Attorneys for Plaintiff
15                                      Thai Nippon Rubber Industry Public Limited
                                        Company
16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S OPPOSITION TO PLAYBOY'S MOTION TO DISMISS