**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES -- GENERAL**

Case No.     **CV 21-9749-JFW(PDx)**                                    Date:  June 6, 2022

Title:    Thai Nippon Rubber Industry Public Limited Company -v- Playboy Enterprises International, Inc., et al.

**PRESENT:**

**HONORABLE JOHN F. WALTER, UNITED STATES DISTRICT JUDGE**

Shannon Reilly                                None Present
**Courtroom Deputy**                          **Court Reporter**

**ATTORNEYS PRESENT FOR PLAINTIFFS:**         **ATTORNEYS PRESENT FOR DEFENDANTS:**
               None                                           None

**PROCEEDINGS (IN CHAMBERS):**     ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' PARTIAL MOTION TO DISMISS [filed 4/25/22; Docket No. 43]

On April 25, 2022, Defendants Playboy Enterprises International, Inc. ("Playboy") and Products Licensing LLC ("Products Licensing") (collectively, "Defendants") filed a Partial Motion to Dismiss ("Motion").  On May 2, 2022, Plaintiff Thai Nippon Rubber Industry Public Limited Company ("Plaintiff") filed its Opposition.  On May 9, 2022, Defendants filed a Reply.  Pursuant to Rule 78 of the Federal Rules of Civil Procedure and Local Rule 7-15, the Court found the matter appropriate for submission on the papers without oral argument.  The matter was, therefore, removed from the Court's May 23, 2022 hearing calendar and the parties were given advance notice.  After considering the moving, opposing, and reply papers, and the arguments therein, the Court rules as follows:

**I.     Factual and Procedural Background**

   **A.     The Parties**

   For nearly three decades, Plaintiff has operated a successful business as a manufacturer of high-quality condoms, and, more recently, lubricant products.  Since November 2016, Plaintiff has been publicly traded on the Stock Exchange of Thailand, trading under the ticker "TNR."

   Playboy was founded in 1953 and has been a globally recognized brand for several decades.  Some of its most valuable assets are its intellectual property, including the Playboy Rabbit Head Design logo and the Playboy name (collectively, the "Playboy marks"), which are at issue in this action.   For years, Playboy has licensed the Playboy marks for use on various

consumer products. Products Licensing is a limited liability company that has as its sole member Playboy International, Inc.

B.   **The Product Licensing Agreement**

On April 1, 2010, Defendants and Plaintiff's predecessor-in-interest, United Medical Devices ("UMD") entered into a Product License Agreement ("PLA"), which granted UMD a license to use the Playboy marks on its products. Specifically, the PLA granted UMD the exclusive right to design, manufacture, advertise, promote, sell, and distribute condoms (and, subsequently, lubricants) bearing the Playboy marks in a territory covering more than 180 countries, including the United States. In exchange for this grant of exclusive rights, the PLA imposed a series of obligations on UMD, including, amongst others: (1) requiring UMD to make certain royalty payments; (2) requiring UMD to obtain written approvals from Defendants at various stages of the development, marketing, and sales of all products; (3) requiring UMD to make certain advertising and marketing expenditures; (4) requiring UMD to submit a marketing plan on a yearly basis for Defendants' approval; (5) requiring UMD to affix official holograms on products sold outside the United States; (6) requiring UMD to seek pre-approval of any sub-contractor or sub-licensee; (7) allowing Defendants to conduct up to two audits each year; and (8) requiring UMD to make certain minimum net sales each year. According to Plaintiff's First Amended Complaint ("FAC"), the relationship between Defendants and UMD was "overseen by UMD's senior vice-president," Nicholai Allen ("Allen").[1]  FAC, ¶ 17.

On April 9, 2018, Plaintiff and UMD, with Defendants' consent, executed a Sale and Purchase Agreement ("SPA"), which assigned UMD's rights and obligations under the PLA to Plaintiff. On April 12, 2018, Plaintiff, Defendants, and UMD executed a Novation Agreement whereby the parties agreed to novate the PLA, replacing UMD with Plaintiff as the licensee.

C.   **Termination of the Agreement**

In July 2021, Defendants engaged Credence Global Consulting Limited ("CGCL") to conduct an audit of Plaintiff. The audit found that Plaintiff had breached the PLA in numerous ways, including the failure to obtain product approvals and the late payment of royalties, totaling $8,622,713.00 due and owing to Defendants. Several of the audit findings, including Plaintiff's failure to obtain product approvals, constituted "incurable default[s]" under the PLA and entitled Playboy to terminate the license immediately. As a result, Defendants terminated the PLA on November 5, 2021.

In the FAC, Plaintiff alleges that the audit and subsequent termination of the PLA was part of "a deceitful and improper campaign to move Playboy away from its historic magazine business and to take the license [in the Playboy marks] back for itself out of envy of [Plaintiff's] profits and success." *Id.*, at ¶ 1. In addition to the audit, Plaintiff alleges that Defendants also improperly induced Plaintiff to enter into the Eighth Amendment to the PLA, which excluded CBD-based

---

[1] According to Plaintiff, Allen subsequently served as Plaintiff's global sales consultant through an agreement with Allen's marketing and sales company, Monarch Digital Medial LLC ("Monarch"). FAC, ¶ 120.

products from the definition of "Products" because Defendants realized that the CBD product line would be very lucrative and Defendants wanted to own and operate the CBD product line themselves. *Id.*, at ¶¶ 44-45. Plaintiff also alleges that Defendants "poached" Plaintiff's agent, Allen, by covertly offering Allen a consulting position and agreeing to work with Allen to sell his intimate wipes products under the Playboy brand in exchange for Allen's assistance in improperly exploiting Plaintiff's retail and distributor relationships. *Id.*, at ¶¶ 55-69. Plaintiff alleges that Defendants deliberately interfered with Plaintiff's relationships with its retailers, including Walmart, by, among other things, selling its own products using Plaintiff's account and shelf space with those retailers, to the detriment of Plaintiff's ability to sell Playboy-branded products under the PLA. *Id.*, at ¶¶ 70-81. Furthermore, Plaintiff alleges that Defendants withheld approval of Plaintiff's marketing plans and potential opportunities, which significantly hindered Plaintiff's ability to exploit the rights that Plaintiff had bargained for under the PLA. *Id.*, at ¶¶ 82-91.

According to Plaintiff, Defendants' actions were the result of Playboy's resumption of its status as a publicly traded company in February 2021 and Playboy's CEO Ben Kohn's ("Kohn") statement that Playboy's strategy for the future included taking back rights to product categories it had previously licensed to others. *Id.*, at ¶ 95. Plaintiff alleges that Kohn confirmed Playboy's desire to seize direct control of the sexual wellness business it was licensing to companies such as Plaintiff, stating that "[s]exual wellness is a category [Playboy wants] to own . . . on a global basis" and that Playboy had begun making that desire a reality "by terminating contracts and taking back rights to certain product categories." *Id.* Kohn explained that Playboy's incentive to move from licensor to owner/operator of its sexual wellness portfolio was to maximize that sector's value to Playboy, stating "licensing is a less efficient model for that, and we can own a lot more of the spend. That $3 billion of consumer spend, the challenge with licensing is you're getting pennies on the dollar for that, $0.02, $0.03 on the dollar for that. If we pivot and we own that, not only can I drive the lifetime value of the customer up and the average order size because I can [s]ell you more products, but I can drive my revenue up. When you look at that, there could be a [twenty time] increasing [of] revenue just if you model it out and actually an increase in EBITDA by five or six times as well." *Id.*, at ¶ 96.

### D.   Procedural History

On December 17, 2021, Plaintiff filed a Complaint against Defendants. On March 16, 2022, Plaintiff filed a First Amended Complaint ("FAC"), alleging claims for relief for: (1) wrongful termination of franchise in violation of the California Franchise Relations Act, California Corporations Code §§ 20000, *et seq.* ("CFRA"); (2) violation of the California Franchise Investment Law, California Corporations Code §§ 31000, *et seq.* ("CFIL"); (3) breach of contract; (4) breach of the implied covenant of good faith and fair dealing; (5) violation of California's Unfair Competition Law, California Business & Professions Code §§ 17200, *et seq.*("UCL"); (6) intentional interference with contractual relations; (7) intentional interference with prospective economic relations; (8) negligent interference with prospective economic relations; (9) fraudulent inducement to contract; (10) conversion; and (11) breach of fiduciary duty.[2]

---

[2] The FAC added Allen as a Defendant. The eleventh claim for relief for breach of fiduciary duty is alleged against Allen. The first through tenth claims for relief are alleged against Defendants. On May 12, 2022, Allen filed an Answer to the FAC and is not a party to this Motion.

In their Motion, Defendants move to dismiss Plaintiff's first claim for relief for violation of the CFRA, second claim for relief for violation of the CFIL, fifth claim for relief for violation of the UCL, sixth claim for relief for intentional interference with contractual relations, seventh claim for relief for intentional interference with prospective economic relations, eighth claim for relief for negligent interference with prospective economic relations, ninth claim for relief for fraudulent inducement to contract, and tenth claim for relief for conversion.

## II.     Legal Standard

A motion to dismiss brought pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the claims asserted in the complaint.  "A Rule 12(b)(6) dismissal is proper only where there is either a 'lack of a cognizable legal theory' or 'the absence of sufficient facts alleged under a cognizable legal theory.'" *Summit Technology, Inc. v. High-Line Medical Instruments Co., Inc.*, 922 F. Supp. 299, 304 (C.D. Cal. 1996) (quoting *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1988)).  However, "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations and alterations omitted).  "[F]actual allegations must be enough to raise a right to relief above the speculative level."  *Id.*

In deciding a motion to dismiss, a court must accept as true the allegations of the complaint and must construe those allegations in the light most favorable to the nonmoving party.  *See, e.g., Wyler Summit Partnership v. Turner Broadcasting System, Inc.*, 135 F.3d 658, 661 (9th Cir. 1998). "However, a court need not accept as true unreasonable inferences, unwarranted deductions of fact, or conclusory legal allegations cast in the form of factual allegations." *Summit Technology*, 922 F. Supp. at 304 (citing *Western Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981) *cert. denied*, 454 U.S. 1031 (1981)).

"Generally, a district court may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion." *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1555 n. 19 (9th Cir. 1990) (citations omitted).  However, a court may consider material which is properly submitted as part of the complaint and matters which may be judicially noticed pursuant to Federal Rule of Evidence 201 without converting the motion to dismiss into a motion for summary judgment.  *See, e.g., id.*; *Branch v. Tunnel*, 14 F.3d 449, 454 (9th Cir. 1994).

Where a motion to dismiss is granted, a district court must decide whether to grant leave to amend.  Generally, the Ninth Circuit has a liberal policy favoring amendments and, thus, leave to amend should be freely granted.  *See, e.g., DeSoto v. Yellow Freight System, Inc.*, 957 F.2d 655, 658 (9th Cir. 1992).  However, a Court does not need to grant leave to amend in cases where the Court determines that permitting a plaintiff to amend would be an exercise in futility.  *See, e.g., Rutman Wine Co. v. E. & J. Gallo Winery*, 829 F.2d 729, 738 (9th Cir. 1987) ("Denial of leave to amend is not an abuse of discretion where the pleadings before the court demonstrate that further amendment would be futile.").

**III.    Discussion**

    **A.    Plaintiff's Franchise Claims**

In their Motion, Defendants move to dismiss Plaintiff's first claim for relief for violation of the CFRA and second claim for relief for violation of the CFIL on the grounds that Plaintiff failed to adequately plead the statutory elements of a franchise and, based on the PLA, cannot do so. Defendants also argue that the jurisdictional reach of California's franchise laws is limited and Plaintiff cannot overcome those jurisdictional limits.  In its Opposition, Plaintiff argues that it has pled all the statutory elements of a franchise and that it has met the jurisdictional requirements of California's franchise laws.

        **1.    Legal Definition for a "Franchise"**

The CFIL defines a "franchise" as:

[A] contract of agreement, either expressed or implied, whether oral or written, between two or more persons by which:

(1) A franchisee is granted the right to engage in the business of offering, selling or distributing goods or services under a marketing plan or system prescribed in substantial part by a franchisor; and

(2) The operation of the franchisee's business pursuant to such plan or system is substantially associated with the franchisor's trademark, service mark, trade name, logotype, advertising or other commercial symbol designating the franchisor or its affiliate; and

(3) The franchisee is required to pay, directly or indirectly, a franchise fee.

*See* CFIL, § 31005.  The CFRA uses the same definition of "franchise."  *See* CFRA, § 20001. Pursuant to statute, "the regulations, releases, guidelines, and interpretive opinions of the Commissioner of Business Oversight . . . regarding whether or not an agreement constitutes a 'franchise' . . . shall be prima facie evidence of the scope and extent of coverage of the definition of 'franchise.'"  CFRA, § 20009.  The Commissioner's interpretation of these factors is afforded "great weight," although the "final determination of what constitutes a franchise rests with the courts." *Macedonia Distrib., Inc. v. S-L Distribution Co., LLC*, 2018 WL 6190592, at *3 (C.D. Cal. Aug. 7, 2018).  The Commissioner has exercised its statutory authority and promulgated guidelines addressing when a contract constitutes a franchise agreement under California law. *See* Department of Financial Protection & Innovation, *Release 3–F: When does an Agreement Constitute a "Franchise"* (June 22, 1994) ("Release").

        **2.    Plaintiff Has Failed to Adequately Plead the Existence of a Franchise**

In this case, the Court concludes that Plaintiff has failed to plead the existence of a franchise because Plaintiff has failed to allege, and cannot allege, that Plaintiff operated under a marketing plan or system prescribed in substantial part by Defendants.  "[T]he requirement of a

marketing plan or system prescribed in substantial part by the franchisor is not satisfied merely because an agreement imposes upon the operator of a business procedures or techniques which are customarily observed in business relationships in the particular trade or industry, even though, to some extent, they may restrict the freedom of action or the discretion of the operator." Release, ¶ 2.2.6.  Indeed, the Release provides that the question of a substantial association "must be determined . . . based upon an evaluation of the provisions contained" within the relevant agreement (in this case, the PLA) and "the effect which these provisions have as a whole on the ability of the person engaged in the business to make decisions substantially without being subject to restrictions or having to obtain the consent or approval of other persons.  This determination may be made in the light of applicable principles of general law and of customs prevailing in the particular trade or industry."  Release, ¶ 1.2.4.  For example, California courts have found that there is a franchise relationship when a franchisor represents to a prospective franchisee that "it [is] a turn key operation," that "everything is complete, ready to go, absolutely supplied and sustained and everything else," and where the franchisee was given documents "outlining projected sales, operating expenses, payroll expenses, and profits for [the franchise]."  *See, e.g., People v. Kline*, 110 Cal. App. 3d 587, 591 (1980).  In addition, the Ninth Circuit concluded there was a franchise relationship where the franchisor "provided [franchisee] with a model marketing program and provided a computer printout of prospective customers," the franchisor's "advertising agency supplied [franchisee] with press kits, promotional tools and marketing advice," and the franchisor "required [franchisee] to send its salesmen for training by [franchisor] at its training schools."  *See, e.g., Boat & Motor Mart v. Sea Ray Boats, Inc*., 825 F.2d 1285, 1287 (9th Cir. 1987).  Similarly, the Release provides as an example of a franchise relationship situations where a franchisee is provided with manuals or handbooks, training sessions, and trade secrets.  *See* Release ¶ 1.2.2.7.

Although Plaintiff was required pursuant to the PLA to obtain "prior approval from" Defendants for marketing materials and to "follow the approved marketing plan," the PLA did not require (and Plaintiff does not allege) that Defendants required Plaintiff to follow a marketing plan that was created by Defendants or that Defendants used the "availab[ility] of a successful market plan" to induce Plaintiff's novation of the PLA.  *See, e.g.,* Release ¶ 2.2.3.  Indeed, under the PLA, Defendants' role in Plaintiff's marketing plan was simply limited to prior "approval on a yearly basis" of advertising/promotional and marketing plans independently developed by Plaintiff.  In addition, the PLA did not require (and Plaintiff does not allege) Defendants to supply Plaintiff with manuals or handbooks on how to develop a marketing and advertising plan or how to structure employee training sessions regarding the production and sales of condoms and lubricants, or to provide Plaintiff with trade secrets of any kind.  Instead, the PLA required Plaintiff to "design, manufacture, advertise, promote, sell, and distribute" condoms and lubricants bearing Playboy's trademarks and merely gave Defendants the right to approve products, packaging, advertising, sub–contractors and sub–licensees, and the right to audit TNR's books.  Moreover, the PLA did not give Defendants control over "the appearance of [Plaintiff's] business premises and the fixtures and equipment utilized therein, uniforms of employees, hours of operation, housekeeping, and similar declarations."  *See* Release ¶ 1.2.2.3.  As a result, the Court concludes that no provision in the PLA expressly stated, or even implied, that Defendants were providing Plaintiff with a "turn key operation" or anything remotely resembling a franchise.  *Kline*, 110 Cal. App. 3d at 591.

Because Plaintiff was responsible for initially developing its own marketing plan, the Court concludes that Plaintiff's marketing plan was not "prescribed" in substantial part by Defendants.

*See, e.g., Boat and Motor Mart*, 825 F.2d at 1287 ((concluding that the plaintiff had demonstrated a dispute of material fact sufficient for the franchise claims to proceed to trial where the defendant provided the plaintiff with "a model marketing program, . . . press, kits, promotional tools, and marketing advice" that included giving the plaintiff "detailed instructions" on what its salesman would do at boat shows, specific instructions on how to set up the booth, how to clean the boats, when to clean the boats, and how the salesmen should dress and required the plaintiff to purchase at its own expense films, video cassettes, banners, posters, floats, hats, visors and T-shirts that the defendant had designed).  To the contrary, rather than suggesting a franchise relationship, the sections of the PLA Plaintiff relies on in its FAC demonstrate nothing more than a typical licensor-licensee relationship and contain the normal provisions allowing a licensor in general to protect its brand.  Licensors of trademarks are required to "make sure the good or service [of their licensees] really is of consistent quality." *Dep't of Parks and Recreation for the State of California v. Bazaar Del Mundo, Inc.*, 448 F.3d 1118, 1131 (9th Cir. 2006) (*quoting Gorenstein Enterprises, Inc. v. Quality Care–USA, Inc.*, 874 F.2d 431, 435 (7th Cir. 1989)).  Indeed, "it is well established that where a trademark owner engages in naked licensing, without any control over the quality of goods produced by the licensee, such a practice is inherently deceptive and constitutes abandonment of any rights to the trademark by the licensor." *Barcamerica Int'l USA Trust v. Tyfield Imps., Inc.*, 289 F.3d 589, 598 (9th Cir. 2002) (*quoting First Interstate Bancorp v. Stenquist*, 16 U.S.P.Q.2d 1704, 1706 (N.D. Cal.1990)).  In addition, the Ninth Circuit has concluded that "the only effective way to protect the public . . . is to place on the licensor the affirmative duty of policing in a reasonable manner the activities of his licensees." *Bazaar Del Mundo*, 448 F.3d at 1131 (*quoting Dawn Donut Co. v. Hart's Food Stores, Inc.*, 267 F.2d 358, 367 (2d Cir. 1959).  The Release singles out various licensing control mechanisms as specifically not indicative of a marketing plan, including requiring the licensee to maintain books and records for royalty calculations or control mechanisms "designed to protect the quality of the product."  *See* Release ¶ 1.2.2.6.  In this case, the sections of the PLA relied on by Plaintiff in its FAC are nothing more than basic, normal control mechanisms used by licensors to maintain adequate control over product qualify, brand reputation, and accounting.  *See Hollywood Athletic Club Licensing Corp. v. GHAC–CityWalk*, 938 F. Supp. 612, 615 (C.D. Cal. 1996) ("The licensor has a strong need to control the use of its mark both to preserve the quality of the mark and to maintain the rights to the mark, for a licensor who fails to monitor its mark risks a later determination that the mark has been abandoned").  For example, as Plaintiff concedes in the FAC, Sections 2(h) and (i) of the PLA are expressly concerned with product quality.  FAC, ¶ 28(c) ("Section 2.h–i conditioned TNR's ability to sell Products on receiving prior approval from Playboy, and it imposed a series of strict requirements on product quality").  Therefore, the Court concludes that Plaintiff has failed to plead the existence of a franchise because the PLA did not require Plaintiff to operate under a marketing plan or system prescribed in substantial part by Defendants, but, instead, merely subjected Plaintiff to normal control mechanisms typically used by licensors with their licensees.

Accordingly, because Plaintiff has failed to plead the existence of a franchise, Defendants' Motion is granted with respect to Plaintiff's first claim for relief for violation of the CFRA and second claim for relief for violation of the CFIL.

### 3.     Amendment of Plaintiff's Franchise Claims is Futile

The Ninth Circuit has instructed that "a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not

possibly be cured by the allegation of other facts." *See, e.g., Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (*en banc*) (quoting *Doe v. United States*, 58 F.3d 494, 497 (9th Cir. 1995)). However, "[a] district court may dismiss a complaint without leave to amend if amendment would be futile." *Airs Aromatics, LLC v. Opinion Victoria's Secret Stores Brand Mgmt., Inc.*, 744 F.3d 595, 600 (9th Cir. 2014) (citation and quotation marks omitted); *Gardner v. Martino*, 563 F.3d 981 (9th Cir. 2009) (finding no abuse of discretion in denying leave to amend when amendment would be futile); *Rutman Wine Co. v. E. & J. Gallo Winery*, 829 F.2d 729, 738 (9th Cir. 1987) ("Denial of leave to amend is not an abuse of discretion where the pleadings before the court demonstrate that further amendment would be futile").

In this case, the Court concludes that it would be futile and, thus, unnecessary to provide Plaintiff another opportunity to amend its first and second claims for relief. *See, e.g., Chaset v. Fleer/Skybox Int'l*, 300 F.3d 1083, 1087-88 (9th Cir. 2002) ("The basic underlying facts have been alleged by plaintiffs and have been analyzed by the district court and us. We conclude that the plaintiffs cannot cure the basic flaw in their pleading. Because any amendment would be futile, there is no need to prolong the litigation by permitting further amendment"); *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1039 (9th Cir. 2002) ("Because any amendment would be futile, there was no need to prolong the litigation by permitting further amendment"); *Klamath–Lake Pharmaceutical Ass'n v. Klamath Med. Serv. Bureau*, 701 F.2d 1276, 1293 (9th Cir. 1983) (holding that "futile amendments should not be permitted"). Plaintiff has had two opportunities to allege its franchise claims and Plaintiff has failed to indicate in its Opposition what, if any, additional facts it could allege in order to state viable franchise claims against Defendants. Indeed, because the Court has concluded based on the language of the PLA that Plaintiff has not, and cannot, allege the existence of a franchise relationship between Plaintiff and Defendants, any attempt to allege additional facts would be futile. Therefore, the Court concludes that Plaintiff does not have viable franchise claims.

Accordingly, Plaintiff's Plaintiff's first claim for relief for violation of the CFRA and second claim for relief for violation of the CFIL are dismissed without leave to amend.

### B.    Plaintiff's Tortious Interference Claims, Fraudulent Inducement Claim, Conversion Claim, and Violation of the UCL Claim

In their Motion, Defendants also move to dismiss Plaintiff's fifth claim for relief for violation of the UCL, sixth claim for relief for intentional interference with contractual relations, seventh claim for relief for intentional interference with prospective economic relations, eighth claim for relief for negligent interference with prospective economic relations, ninth claim for relief for fraudulent inducement to contract, and tenth claim for relief for conversion. The Court has considered the arguments raised by the parties regarding these claims and finds Plaintiff's arguments persuasive, and the Court concludes that the issues raised in Defendants' Motion with respect to these claims are more appropriately resolved on a motion for summary judgment.

Accordingly, Defendants' Motion is denied with respect to Plaintiff's fifth, sixth, seventh, eighth, ninth, and tenth claims for relief.

**IV.     Conclusion**

       For all the foregoing reasons, Defendants' Motion is **GRANTED in part** and **DENIED in part**.  Defendants' Motion is **GRANTED** with respect to Plaintiff's first claim for relief for violation of the CFRA and second claim for relief for violation of the CFIL, and Plaintiff's first and second claims for relief are **DISMISSED without leave to amend**.  Defendants' Motion is **DENIED** with respect to Plaintiff's fifth claim for relief for violation of the UCL, sixth claim for relief for intentional interference with contractual relations, seventh claim for relief for intentional interference with prospective economic relations, eighth claim for relief for negligent interference with prospective economic relations, ninth claim for relief for fraudulent inducement to contract, and tenth claim for relief for conversion.

       IT IS SO ORDERED.